Gene H. Shioda – SBN 186780
ghs@slclawoffice.com
Christopher J. Langley – SBN 258851
chris@slclawoffce.com
Steven P. Chang – SBN 221783
schang@slclawoffice.com
**SHIODA, LANGLEY & CHANG LLP**
1063 E. Las Tunas Dr.
San Gabriel, CA 91776
Tel: (626)281-1232
Fax: (626)281-2919

Counsel for Jinzheng Group (USA) LLC
Debtor and Debtor-in-Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:21-bk-16674-ER |
| | Chapter 11 |
| JINZHENG GROUP (USA) LLC | |
| Debtor and Debtor in Possession. | **OBJECTION TO PROOF OF CLAIM NO. 18 OF BETULA LENTA INC.; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF CHRISTOPHER J. LANGLEY IN SUPPORT THEREOF** |
| | **HEARING DATE:** |
| | Date:  March 22, 2022<br>Time:  10:00am<br>Location: Ctrm 1568<br>255 E. Temple St.<br>Los Angeles, CA 90012 |

**TO THE HONORABLE ERNEST M. ROBLES, U.S. BANKRUPTCY JUDGE,**

**OFFICE OF THE UNITED STATES TRUSTEE, AND ALL INTERESTED PARTIES:**

1

JINZHENG GROUP (USA) LLC ("Debtor"), the chapter 11 debtor and debtor-in-possession respectfully submits the motion ("Motion") objection to the Claim of Betula Lenta, Inc. filed as official Claim 18.

The Motion is based on this Notice, the Motion and its accompanying Memorandum of Points and Authorities, the Declaration of Christopher J. Langley, the pleadings and files in the Debtor's bankruptcy cases, and upon such further oral and documentary evidence as may be presented to the Court. The Motion will be heard on March 22, 2022, at 10:00 a.m., in the United States Bankruptcy Court for the Central District of California, Los Angeles Division, located at 255 E. Temple St. Los Angeles, CA 90012 in Courtroom 1568.

**NOTICE TO CLAIMANT IS HEREBY GIVEN**: the Debtor has filed an objection to the Betula Lenta Inc.'s ("Betula") Proof of Claim ("Claim") identified as follows:

| Claim No. | Date Filed | Claimant | Alleged Claim Amount | Disputed Amount | Claim To Be Allowed |
|-----------|-----------|----------|---------------------|-----------------|---------------------|
| 18 | 2/03/2022 | Betula Lenta, Inc. | $1,643,977. | $1,643,977. | $0.00 |

The Motion seeks to alter Betula's rights by reducing Betula's Proof of Claim based on the grounds set forth in the Motion detailed below.

PLEASE TAKE FURTHER NOTICE that any response to the objections must be in the form as required by Rule 9013-1(f) of the Local Bankruptcy Rules ("LBR") and filed with the Clerk of the above-entitled Court no later than fourteen (14) days prior to the hearing date set forth above, and a copy served on Christopher J. Langley at the address indicated above. A copy of any response must also be served on the Office of the United States Trustee, 915 Wilshire Blvd. Ste 1850, Los Angeles, CA 90017. Failure to timely respond may be deemed as acceptance of the proposed objections and the Court may grant the relief requested in the Objection Motion without further notice or hearing. *See* LBR 3007-1(b) and 9013-1(h).

Dated: 2/20/2022                    SHIODA, LANGLEY & CHANG LLP

                                   /s/Christopher J. Langley

                                   By: Christopher J. Langley
                                   Attorneys for Debtor and Debtor in Possession

## 1.    Summary of Argument

The basis for the objection to the Claim is that Claimant has provide insufficient documentation and information to support Betula's claim for $1,643,977.00. There is no support for the said Claim because either no or limited information has been provided to ascertain how Claimant determined its claim amount.

Therefore, and for the reasons stated below, this Court must sustain this Objection and disallow the claims in their entirety, or in the alternative continue the said hearing.

## 2.    Statement of Facts

### A.    Factual Background

Debtor is a single member LLC that is wholly owned by Mr. Jiaqing Yang. Between August 2016 and July 2017, the Debtor acquired approximately 32 contiguous acres in Los Angeles that it intended to develop (the "Los Angeles Properties"). The Debtor contracted with Betula Lenta, Inc. ("Betula"), a real estate consultancy company, in December 2017 to assist Debtor with the development and entitlement of the Los Angeles Properties.  To fund the development of the Los Angeles Properties, Debtor borrowed $7,000,000 on September of 2018 which was cross collateralized by a first priority deed of trust held by Royal Equity Lending. When Debtor was unable to refinance the loan because Betula was unable to obtain the necessary entitlements (which Betula claims it did 65% of the work), Royal Equity Lending initiated foreclosure on its note, which necessitated this bankruptcy filing.[1]

---

[1] Presumptively, if Betula did 65% of the work as it claims, then Debtor should have been able to refinance the loan with Royal Equity Lending.  However, Royal Equity, Inc. did not refinance the loan and started foreclosure proceedings.

## B.    Debtor's Chapter 11 Bankruptcy

On August 24, 2021 ("Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Central District of California.

On December 9, 2021, Debtor filed a Notice of Bar Date for Filing Proofs of Claim. The deadline for filing claims in this case was February 4, 2022. To date, the 21 proofs of claims have been filed against the Debtor's bankruptcy estate:

| Claim | Creditor | Secured | Priority | Unsecured | Total |
|---|---|---|---|---|---|
| 1 | LA County Tax Collector | $163,520.10 | -- | -- | $163,520.10 |
| 2 | Royalty Equity Lending LLC | $9,353,009.29 | -- | -- | $9,353,009.29 |
| 3 | IRS | | $28,700.70 | -- | $28,700.70 |
| 4 | Michael and Shari Dorff | $50,000.00 | -- | -- | $50,000.00 |
| 5 | Investment Management Company | $350,000.00 | -- | -- | $350,000.00 |
| 6 | Testa Capital Group | -- | $13,650.00 | $672,900.00 | $686,550.00 |
| 7 | Home Loans Unlimited Inc. | -- | $13,650.00 | $672,900.00 | $686,550.00 |
| 8 | Corona Capital Group, LLC | $540,000.00 | -- | -- | $540,000.00 |
| 9 | Michael Carlin | -- | $15,650.00 | -- | $15,650.00 |
| 10 | Michael Carlin | -- | $15,650.00 | -- | $15,650.00 |
| 11 | UltraSystems Environmental | -- | -- | $37,106.50 | $37,106.50 |
| 12 | Land Design Consultants, Inc. | -- | -- | $48,145.00 | $48,145.00 |
| 13 | Craig Fry & Associates, LLC | -- | -- | $240,700.47 | $240,700.47 |
| 14 | Breezeblock Capital LLC | $124,653.99 | -- | -- | $124,653.99 |
| 15 | Betty Zheng | -- | -- | $95,000.00 | $95,000.00 |
| 16 | Shawn Charles Sourgose | -- | 13,650.00 | $672,900.00 | $686,550.00 |
| 17 | The Phalanx Group | -- | -- | $158,845.00 | $158,845.00 |
| 18 | Betula Lenta Inc. | -- | -- | $1,643,977.00 | $1,643,977.00 |
| 19 | Donna Bullock | $45,000 | -- | $97,803.00 | $142,803.00 |
| 20 | Pennington Construction Advisors | -- | -- | $75,000.00 | $75,000.00 |
| 21 | DNQ LLC | $420,000.00 | -- | -- | $420,000.00 |
| | | $11,046,183.38 | $110,950.70 | $4,415,276.97 | $15,562,411.05 |

On January 18, 2022, the Court approved the employment of Debtor's Counsel with the effective date of November 21, 2021.

On January 18, 2022, the Court extended the exclusivity period for Debtor to file a plan to April 21, 2020, as well as extending the exclusivity deadline to solicit acceptances of its Plan to May 20, 2022.

1        On January 25, 2022, The United States Trustee filed a notice of appointment of Creditors'

2  Committee naming Betula Lenta Inc, Pennington Construction Advisors, Inc and The Phalanx

3  Group Inc. as committee members.

4        Debtor is currently in the process of drafting the disclosure statement and proposed plan of

5  reorganization.  Debtor's current counsel substituted in the said matter on December 6, 2021.

6

7

### C.    Proof of Claim

8        On February 3, 2022, Betula Lenta Inc. ("Claimant or Betula") filed Official Proof of

9  Claim 18 for $1,643,977.00 based on "Services performed. Expenses paid to 3rd parties per

10  Contract. Consulting." A true and correct copy of the Claim is attached to the Declaration of

11  Christopher J. Langley ("Langley Declaration") as **Exhibit A.**

12        As evidence of his Claim, Claimant attached three separate contracts: 1) Predevelopment

13  Consulting Agreement dated December 7, 2017 (Claim Attachment "CA" p. 1), 2) Construction

14  Management Agreement dated June 22, 2018 (CA p. 14), and 3) CFD Bonds Procurement – CM -

15  Development Agreement (CA p. 18). The respective amount due under the contracts are

16  $2,594,500; $4,517,913; $4,517,913. The contracts anticipate that the payments are due upon

17  certain levels of completion of the project.

18        Despite multiple requests for a full accounting and progress report, the only breakdown or

19  accounting that Debtor has received is an email from Claimant's counsel, Mr. Peter Kim. A true

20  and correct copy of the email is attached to the Langley Declaration as Exhibit B.

21

22                          **2929 Amethyst**

| | |
|---|---|
| Original Contract Amount | 11,754,928 |
| Change Order Amount | 1,500,000 |
| Total Amount | 13,254,928 |
| | |
| Amount Received from Jinzheng | 6,971,726 |

group
(As of 2/3/2022)

| | |
|---|---|
| % work done | 65% |
| The Calculated amount by work done | 8,615,703.20 |
| Outstanding amount | 1,643,977 |

Claimant acknowledges receipt of $6,971,726 and is calculating the Claim amount based on what percentage of the project Betula believes to be completed. Betula fails to provide the Court any facts or evidence that Betula completed 65% of the work it was contracted to do. Claimant has been unable or unwilling to provide a report of the alleged progress of the project. Claimant has failed to appear to the Court Ordered 2004 exam.

There are no entitlements on the Los Angeles Properties, and the project is still at its very early stages of development. See attached declaration of Max Yang.

The documentation attached to the Claim is completely insufficient as it lacks any information to verify whether Claimant is owed anything by the Debtor. There is no report or information on how Claimant completed 65% of the work which is the basis of the Claimant's claim.

Debtor has been diligent in investigating its liabilities including receiving Court orders for the 2004 examinations of David Park and Jonathan Pae, two of the principals of Claimant. Despite the examinations being set for January 18, 2022, for David Park and January 21, 2022 for Jonathan Pea, neither has yet to appear for examination. The exams were continued multiple times at Park and Pae's request. The exams are currently scheduled for February 24 and March 2, respectively. Debtor is hopeful that both will appear without need for further Court intervention.

On January 25, 2022, The United States Trustee appointed Betula Lenta Inc to Creditors' Committee. Betula Lenta Inc then retained Pachulski Stang Ziehl & Jones LLP as committee

DEBTOR-IN-POSSESSION'S OBJECTION TO CLAIM 18

1  counsel. Interestingly, these acts occurred after David Park and Jonathan Pea failed to appear for

2  their respective 2004 exam.

3       On February 7, 2022, Debtor filed a lawsuit against Betula Lenta Inc, Jonathan Pae, David

4  Park for Breach of Contract, Intentional and Negligent Misrepresentation and other related causes

5  of action.

6       Based on the above, Claimant has failed to demonstrate that it is a viable creditor of the

7  Debtor with a right to payment or that it has a right to an "equitable remedy" against Debtor, or

8  that Debtor is liable to Claimant. As such, the objection to the Claim should be sustained as this

9  Court has no information, facts or evidence to substantiate the claim that 65% of the purported

10  work by Betula was actually done.

11

12  **3.      Memorandum of Points and Authorities**

13       **a.      Claim No. 18 must be disallowed because Claimant is not a creditor**

14            **of the Debtor.**

15       Under the Bankruptcy Code, to assert a "claim" and be treated as a creditor, a claimant

16  must have a "right to payment" or a right to an "equitable remedy." 11 U.S.C. §101(5)(A)(B).

17  Further, under Section 502(b)(1) of the Bankruptcy Code, a claim may not be allowed if "such

18  claim is unenforceable against the debtor and property of the debtor, under any agreement or

applicable law." 11 U.S.C. 502(b)(1).

19       Here, Claimant asserts a $1,643,977 claim based on Services performed and amount paid

20  to 3rd parties per contract but fails to provide even the most minimal of evidentiary support. The

21  evidence it does produce does not actually support its claim since the Claimant has failed to

22  perform under the same and Claimant does not produce any supporting evidence it has performed

23  any work under any of the three agreements.  In fact, the assertion that this claim is based on 65%

24  of the completed work came from Betula Lenta's attorney but that is not even provided in the

25  Claim.  Indeed, all the claimant provided are the contracts with the Debtor and not a single

1    reference to the total amount of work completed.  Ultimately, there are NO facts to show what

2    work was done, what entitlements were procured, how the said entitlements were procured, and

3    when they were procured.

4         When pressed for supporting documentation to demonstrate that 65% of the work was

5    completed, Betula fails to provide it.  The referenced court orders for the 2004 exam of Park and

6    Pae also orders Betula, Park and Pae to provide documentation one week before the 2004 exam.

7    Rather than provide documents supporting Betula's claim, Park and Pae simply provide the

8    contracts and limited documents about the contracts nothing again to substantiate 65% of the work

9    being completed or for that matter any work were ever started or completed.  What is missing, as

10   evidenced by Betula's claim filing, are the facts, evidence or support on when, how, what Betula

11   actually did to conclude it completed 65% of the work.

12        Based on the Claims as filed and exhibits attached thereto, because Claimant neither

13   asserts nor provides any evidence that shows that Claimant is owed anything by the Debtor, or that

14   the Debtor is otherwise liable to it, thus Claimant is not a creditor of the Debtor.  *See e.g., In re*

15   *Jeter,* 2014 Bankr. LEXIS 969, at *38 (Bankr. E.D. Tenn. Mar. 13, 2014 ) (stating party was

16   creditor of debtor where it held contingent right to payment under the agreement at issue); *In re*

17   *B-Bar Tavern Inc.,* 506 B.R. 879, 914 (Bankr. D. Mont. 2013) (finding, notwithstanding the broad

18   definitions under 11 U.S.C. 101, that party was not creditor of debtor with a right to payment of

19   debt alleged in its proof of claim where no written evidence existed in the record of a note or other

20   promise by debtor to repay for the alleged loans); *In re Player Wire Wheels, Ltd.*, 428 B.R. 767,

21   769-770 (Bankr. N.D. Ohio 2010) (finding ex-wife of deceased debtor's principal was not a

22   creditor of debtor where debtor did not owe her any money). Claimant fails to provide any

23   documents on its purported claim against the Debtor, or any other evidence that would support his

24   assertion that it is a creditor of the Debtor, or that it has a right to an equitable remedy against

     Debtor.

25

Based on the above, Claimant has failed to provide evidence that he is a creditor of Debtor. As such, the Court should sustain this Objection and disallow the Claim in its entirely.

### b.    Claimant has not met his burden of proof.

A proof of claim executed and filed in accordance with Federal Rule of Bankruptcy Procedure 3001 constitutes *prima facie* evidence of the validity and amount of the claim. FRBP 3001(f). The proof of claim is deemed allowed "unless a party in interest" objects. 11 U.S.C. §502(a). "[I]f such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount[.]" 11 U.S.C. §502(b).

It is an objecting party's burden to submit sufficient evidence to overcome the presumption of the validity of the proof of claim executed and filed in accordance with FRBP 3001. *See* LBR 3007-1(c)(1); *In re Lundell*, 223 F.3d 1035, 1039 (9th Cir. 2000). The objecting party is not required to disprove the claim. *In re Kahn*, 114 B.R. 40 (Bankr. S.D.N.Y. 1990). The objecting party only has the initial burden of producing facts sufficient to demonstrate that an actual dispute regarding the validity or amount of the claim exists. *In re Hydorn*, 94 B.R. 608 (Bankr. W.D. Mo. 1988). If the objecting party provides sufficient evidence to negate one or more of the sworn facts in the proof of claim, then the burden reverts back to the claimant to prove the validity by a preponderance of the evidence. *In re Lundell*, 233 F.3d at 1039. The ultimate burden of persuasion remains at all times with the claimant. *Id.*; *In re Holms*, 931 F.2d 620 (9th Cir. 1991).

In the present case, the entire Claim as filed fails to provide any statement itemizing its interest, fees, or charges as to allow any understanding of the basis for the $1,643,977.00 it is asserting.  Plus there are no documents for the Court to evaluate that 65% of the work was actually performed by Betula, and again this assertion the claim is based on 65% completion of all work from the 3 contracts is not evident in the claim but rather only supplied to Debtor in an email through Claimant's counsel.

Furthermore, this Claim is not "executed" as required under 3001(f), Claimant instead of providing a holographic signature merely used /s/ David Park, which, in light of its lack of

willingness to provide any evidentiary support despite demands since December and Court order should be construed against Claimant and the validity of its claim.

Moreover, Debtor has raised issues sufficient to demonstrate an actual dispute regarding the validity of the claim. As stated above, Claimant has failed to meet its burden of proof that it is a creditor of the Debtor, that Debtor owes Claimant any money, or that Debtor is otherwise liable to Claimant.   Just because a claim is asserted does not mean the Claim is valid.  Certainly supporting documentation showing or illustrating that 65% of the work is completed is a pre-requisite for the Court to determine the validity of the claim.

Because Claimant does not have a "right to payment" or an "equitable remedy," it cannot assert a claim under the Bankruptcy Code. Claimant therefore must establish by a preponderance of the evidence that the Claim should be allowed, and based upon the substance of this Objection, the burden of persuasion squarely rests with it.

Based on the foregoing, the Objection to the Claim should be sustained and the claim disallowed in its entirety as set forth herein.

### c.    The Objection should be sustained absent a response.

Rule 3007-1(b)(6) of this Court's Local Bankruptcy Rules provides that in the event of an objection to claim, "If the claimant does not timely file and serve a response, the court may sustain the objection without a hearing. (A) The objector must file a declaration attesting that no response was timely filed and served upon the objector. The declaration must identify the docket number and filing date of the objection to claim, notice, and proof of service of the notice and objection to claim and be served on the claimant. (B) The objector must also lodge a proposed order prepared and served in accordance with LBR 9021-1 and the Court Manual. (C) The objecting party must serve the entered order on the claimant and counsel, if any."

Absent a response by Claimant, this Objection should be sustained without hearing and the Claim should be disallowed in its entirety.

### 4.    Conclusion

1    Based on the foregoing, the Objection to the Claim must be sustained, disallowing the

2   claim in its entirety without the right to amend and for such other and further relief as the Court

3   may deem just and proper.

4

5                                                  Respectfully Submitted,

6   Dated: 2/20/2022

7                                        /s/Christopher J. Langley

8                                        By: Christopher J. Langley
                                          Shioda, Langley & Chang LLP
9                                        Attorneys for Debtor and Debtor in Possession

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DEBTOR-IN-POSSESSION'S OBJECTION TO CLAIM 18

## DECLARATION OF CHRISTOPHER J. LANGLEY

I, Christopher J. Langley, am the attorney duly authorized and admitted to practice law in this jurisdiction. I represent the Debtor and Debtor-in-possession Jinzhang Group (USA) LLC. I have personal knowledge of the matters set forth in this declaration and, if called upon to testify, I could and would competently testify thereto. I make this declaration in support of OBJECTION TO PROOF OF CLAIM NO. 18 OF BETULA LENTA INC.; which this declaration is attached to.

1.      A true and correct copy of Official Claim #18 filed by Betula Lenta, Inc. is attached as **Exhibit A.** They were served on me through the Court's electronic noticing system and are true and correct copies of the claims on file with the Court

2.      On at least 5 separate occasions I have requested a full accounting and progress report, the only breakdown or accounting that Debtor has received is an email that was forwarded to me on February 3, 2022 from Claimant's counsel, Mr. Peter Kim. A true and correct copy of the email is attached hereto as Exhibit B.

3.      The Court granted my request for 2004 examinations of David Park and Jonathan Pae, two of the principals of Claimant. Despite the examinations being set for January 18, 2022, for David Park and January 21, 2022 for Jonathan Pea, neither has yet to appear for examination. The exams were continued multiple times at Park and Pea's request and once at mine since they had failed to produce the documents requested. The exams are currently scheduled for February 24 and March 2, respectively.

4.      On January 25, 2022, the United States Trustee appointed Betula Lenta Inc. to Creditors' Committee. After discussing the matter with both the United States Trustee and Pachulski Stang Ziehl & Jones LLP, I ascertained that Betula Lenta Inc was the party that hired Pachulski on behalf of the committee. It is my understanding that Betula is the taking the lead for the three committee members.

5.      On February 7, 2022, Debtor filed a lawsuit against Betula Lenta Inc, Jonathan Pae, David Park for Breach of Contract, Intentional and Negligent Misrepresentation and other related causes of action.

1    I declare under penalty of perjury under the laws of the United States of America that the

2    foregoing is true and correct to the best of my knowledge.

3

4    Dated: February 17, 2022                    By: /s/Christopher J. Langley
                                                     Christopher Langley

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DEBTOR-IN-POSSESSION'S OBJECTION TO CLAIM 18

## <u>DECLARATION OF MAX YANG</u>

I, Max Yang, am the attorney-in-fact for Jiaqing Yang ("J. Yang"), the managing member of Jinzheng Group (USA), LLC ("Debtor"), the debtor in possession in the above captioned bankruptcy case. I have personal knowledge of the matters set forth in this declaration and, if called upon to testify, I could and would competently testify thereto. I make this declaration in support of OBJECTION TO PROOF OF CLAIM NO. 18 OF BETULA LENTA INC.; which this declaration is attached to.

1.     The Debtor commenced this bankruptcy case by filing a voluntary chapter 11 bankruptcy petition on August 24, 2021 (the "Petition Date"). The Debtor continues to manage its financial affairs as a debtor in possession pursuant to 11 U.S.C. §§ 1107, 1108.

2.     Debtor is a single member LLC that is wholly owned by Mr. Jiaqing Yang. Between August 2016 and July 2017, the Debtor acquired approximately 32 contiguous acres in Los Angeles that it intended to develop (the "Los Angeles Properties"). The Debtor contracted with Betula Lenta, Inc. ("Betula"), a real estate consultancy company, in December 2017 to assist it with the development and entitlement of the Los Angeles Properties. To fund the development of the Los Angeles Properties, Debtor borrowed $7,000,000 in September of 2018 which was cross collateralized by a first priority deed of trust held by Royal Equity Lending. The Debtor was unable to refinance the short-term loan in large part because Betula was unable to obtain the necessary entitlements and the project was not progressing as planned. Debtor filed for bankruptcy protection on the eve of Royal Equity Lending foreclosing on the Los Angeles Properties.

3.     I have reviewed the Official Claim #18 of Betula Lenta Inc as well as the rudimentary accounting produced by Betula through its attorney in which it claims that the Los Angeles Properties are 65% complete.

4.     Based on my personal knowledge and review of the County records, the Los Angeles Properties do not have any entitlements. The entitlement project is still at a very early stages. The project is not anywhere near 65% complete based on the defined scope of the 3 contracts with Betula that are attached to its proof of claim.

1           I declare under penalty of perjury that the foregoing is true and correct to the best of my

2    knowledge.

3    Dated: _____

4                                                                    _____
                                                                     Shao Xing Max Yang

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

**Fill in this information to identify the case:**

Debtor 1   JINZHENG GROUP (USA) LLC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court   **Central District of California**

Case number:  **21-16674**

**FILED**

**U.S. Bankruptcy Court
Central District of California**

2/3/2022

**Kathleen J. Campbell, Clerk**

Official Form 410
# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) **that you received.**

| **Part 1:**  **Identify the Claim** |
| --- |

| | |
| --- | --- |
| 1.**Who is the current creditor?** | Betula Lenta Inc. |
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor      David Park. The Code Solution. TCS. TCS Building Solutions |
| 2.**Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes. From whom? |
| 3.**Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Where should notices to the creditor be sent?        Where should payments to the creditor be sent? (if different)<br><br>Betula Lenta Inc.<br><br>Name                                           Name<br>800 West 6th Street<br>Suite 1250<br>Los Angeles, CA 90017<br><br>Contact phone     2135370158             Contact phone<br>Contact email<br>    david@thecodesolution.com            Contact email<br><br>Uniform claim identifier for electronic payments in chapter 13 (if you use one): |
| 4.**Does this claim amend one already filed?** | ☑ No<br>☐ Yes. Claim number on court claims registry (if known)           Filed on<br>                                                   MM / DD / YYYY |
| 5.**Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes. Who made the earlier filing? |

Official Form 410                                  Proof of Claim                                   page 1

**Part 2:** Give Information About the Claim as of the Date the Case Was Filed

| | |
|---|---|
| **6. Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ |

**7. How much is the claim?** $ 1643977.00   **Does this amount include interest or other charges?**
☐ No
☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as healthcare information.

Services performed. Expenses paid to 3rd parties per contract. Consulting

**9. Is all or part of the claim secured?**

☑ No
☐ Yes. The claim is secured by a lien on property.

**Nature of property:**
☐ Real estate.  If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*
☐ Motor vehicle
☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $ _____

**Amount of the claim that is secured:** $ _____

**Amount of the claim that is unsecured:** $ _____  (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $ _____

**Annual Interest Rate** (when case was filed) _____ %

☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☑ No
☐ Yes. Amount necessary to cure any default as of the date of the petition. $ _____

**11. Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: _____

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☒ No<br>☐ Yes. *Check all that apply:* | | Amount entitled to priority |
|---|---|---|---|---|
| | A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | | $_____ |
| | | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | | $_____ |
| | | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | | $_____ |
| | | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | | $_____ |
| | | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | | $_____ |
| | | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(_) that applies | | $_____ |
| | | * Amounts are subject to adjustment on 4/1/22 and every 3 years after that for cases begun on or after the date of adjustment. | | |

## Part 3:  Sign Below

| The person completing this proof of claim must sign and date it. FRBP 9011(b).<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.<br>18 U.S.C. §§ 152, 157 and 3571. | Check the appropriate box:<br><br>☒ I am the creditor.<br>☐ I am the creditor's attorney or authorized agent.<br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct. |
|---|---|

Executed on date   2/3/2022

MM / DD / YYYY

/s/  David Park

Signature

Print the name of the person who is completing and signing this claim:

| Name | David Park |
|---|---|
| | First name    Middle name    Last name |
| Title | President |
| Company | Betula Lenta Inc. |
| | Identify the corporate servicer as the company if the authorized agent is a servicer |
| Address | 800 West 6th Street Suite 1250 |
| | Number  Street |
| | Los Angeles, CA 90017 |
| | City  State  ZIP Code |
| Contact phone | 2135370158        Email    david@thecodesolution.com |

*PREDEVELOPMENT CONSULTING AGREEMENT*

This Predevelopment Consulting Agreement ("Agreement") is made effective as of November December _7_, 2017, and entered into by and between **JINZHENG GROUP (USA), LLC**, **a California limited liability company** ("Principal") and **BETULA LENTA, INC.**, **a California Corporation** ("Consultant"), with regard to the following:

WHEREAS, Principal and Consultant desire to enter into this Agreement for the purpose of Consultant providing and performing certain predevelopment consulting services (the "Predevelopment Services") with respect to the construction and development of certain for-sale residential improvements (the "Project") on that certain real property commonly referred to as 2929 Amethyst Street, Los Angeles, California 90032 (the "Site") as more specifically detailed, outlined and provided for below in this Agreement and as set forth in the "Scope of Services" which is attached hereto as Exhibit "A" and fully incorporated into this Agreement by this reference as though fully set forth herein; and

WHEREAS, Consultant hereby represents and warrants that it possesses the necessary expertise and experience required to provide and perform the Predevelopment Services with respect to the development of the Site and is fully prepared and able to provide and perform the Predevelopment Services in a timely manner; and

WHEREAS, Principal hereby acknowledges and agrees that it or a legal entity owned and controlled by it or one of its principals owns fee title to the Site and is duly authorized to enter into this Agreement for the performance of the Predevelopment Services by Consultant,

NOW, THEREFORE, the Principal and Consultant (collectively referred to herein as the "Parties") do hereby agree to the following and terms and conditions established herein below in this Agreement.

1. DESCRIPTION OF PREDEVELOPMENT SERVICES. Commencing on the date on which this Agreement is fully executed by the Parties, Consultant shall timely provide and perform the Predevelopment Services as provided for in this Agreement and the Scope of Services.

2. PERFORMANCE OF PREDEVELOPMENT SERVICES. The manner in which the Predevelopment Services are to be performed and provided shall be determined exclusively by Consultant and will include, but not limited to, the specific amount of hours to be worked; provided however, Consultant shall commit as many hours as may be reasonably necessary to fulfill Consultant's obligations under this Agreement and the Scope of Services.

3. COMPENSATION SCHEDULE. Compensation payable to Consultant by Principal for the Predevelopment Services shall as set forth in that certain "Compensation Schedule" which is attached to this Agreement as Exhibit "B" and fully incorporated into this Agreement as though fully set forth herein. As provided in the Compensation Schedule, payments shall be

I

made on an installment basis with each installment fully due and payable to Consultant within five (5) business days following the delivery of written notice by Consultant to Principal requesting payment. Failure to provide full payment of the requested amount shall be subject to a ten percent (10 %) late fee.

**4. EXPENSE REIMBURSEMENT.** All expenses not otherwise provided for in this Agreement shall be the sole responsibility of Consultant. Except as otherwise agreed upon by the Parties, the Principal shall not be responsible for the reimbursement of any expenses incurred by Consultant.

**5. OUTSIDE PROJECT APPROVAL.** Principal acknowledges and agrees that Consultant is and/or may become engaged in providing its services on various development projects other the Project. In this regard, Consultant shall provide Principal with a list of all such development projects in which it currently is involved and shall provide written notice to Principal of any and future projects in which it will be involved for approval consideration, pursuant to which, Principal shall not unreasonably withhold, delay, or condition its approval if such work does not materially and adversely affect Consultant's providing and performing the Predevelopment Work on the Project as provided for in this Agreement and the Scope of Development. In the event that Principal reasonably determines that such other project work will have an adverse and material effect on Consultant's performance of the Predevelopment Services, the Parties shall meet and confer to address and resolve the concerns of Principal.

**6. TERM/TERMINATION.** This Agreement shall terminate automatically upon completion of the Predevelopment Services by Consultant as required by this Agreement and the Scope of Services. However, in the event of a default with respect to of any of the obligations set forth in this Agreement by either Principal or Consultant, and such default is not cured within thirty (30) days following written notice to cure from the non-defaulting part, the non-defaulting party may terminate this Agreement and pursue any and all legal rights pertinent to such default including, but not limited to, damages or specific performance of the outstanding obligation(s).

**7. RELATIONSHIP OF PARTIES.** It is understood by the Parties that Consultant is an independent contractor with respect to providing and performing the Predevelopment Services and is not an employee of the Principal, who shall not be required to provide any fringe benefits, including health insurance benefits, paid vacation, or any other employee benefits, for the benefit of Consultant.

**8. DISCLOSURE.** Consultant is required to disclose to Principal any outside activities or interests, including ownership or participation in any developments that conflict or will conflict with the Consultant's providing and performing of the Predevelopment Services and the ultimate development of the Project on the Site.

**9. EMPLOYEES.** Consultant's contractors, consultants and employees, if any, who perform any aspect of the Predevelopment Services for Consultant under this Agreement shall also be bound by the provisions of this Agreement. At the written request of the Principal, Consultant shall provide adequate evidence that such persons are Consultant's agents, contractors, consultants, or employees.

2

**10. INJURIES AND INSURANCE.** Consultant acknowledges that Consultant's obligation to obtain appropriate insurance coverage for the benefit of Consultant (and Consultant's agents, contractors, consultants and employees, if any) to the extent required by applicable California law. Consultant waives any and all rights to recovery against Principal for any injuries that Consultant (and/or Consultant's agents, contractors, consultants and employees, if any) may sustain while providing and/or performing the Predevelopment Services under this Agreement, and that are a result of the negligence of Consultant or Consultant's agents, contractors, consultants, or employees.

**11. INDEMNIFICATION.** Consultant agrees to indemnify and hold Principal harmless from all claims, losses, expenses, fees including attorney fees, costs, and judgments that may be asserted against Principal that result from the acts or omissions of Consultant, Consultant's agents, contractors, consultants, and employees, if any.

Principal agrees to indemnify and hold Consultant, Consultant's agents, contractors, consultants, and employees, harmless from all claims, losses, expenses, fees including attorney fees, costs, and judgments that may be asserted against Consultant for any of the following: (a) any third-party work previously provided and performed on the behalf of Principal with respect to the Project; or (b) any acts or omissions of Principal, Principals agents, contractors, consultants, and/or employees.

**12. INTELLECTUAL PROPERTY.** The following provisions shall apply with respect to copyrightable works, ideas, discoveries, inventions, applications for patents, and patents (collectively, "Intellectual Property"):

*Consultant's Intellectual Property.* Consultant does not presently hold any interest in any Intellectual Property with respect to the development of the Project on the Site.

*Development of Intellectual Property.* To the extent that any Intellectual Property rights are established with respect to providing or performing the Predevelopment Services, or development of the Project on the Site, unless otherwise provided, all such Intellectual Property shall be the property of Principal and Consultant shall take all such reasonable efforts to cause all such rights to be assigned to Principal.

**13. OWNERSHIP OF SOCIAL MEDIA CONTACTS.** Any social media contacts, including "followers" or "friends," that are acquired through accounts (including, but not limited to email addresses, blogs, Twitter, Facebook, You-tube, or other social media networks) used or created in conjunction with providing and performing the Predevelopment Services shall be the property of Consultant.

**14. CONFIDENTIALITY.** Principal recognizes that Consultant has and will have the following information:

- prices
- costs

3

- discounts
- future plans
- process information
- technical information
- copyrights
- proprietary information

as well as any other proprietary information (collectively, "Information") which are valuable, special and unique assets of Principal that require protection from improper disclosure. In consideration for access and disclosure of the Information to Consultant, Consultant agrees that it will not at any time or in any manner, either directly or indirectly, use any Information for Consultant's own benefit, or divulge, disclose, or communicate in any manner any Information to any third party without the prior written consent of Principal. Consultant will protect the Information and treat it as strictly confidential. A violation of this paragraph shall be a material violation of this Agreement.

**15. UNAUTHORIZED DISCLOSURE OF INFORMATION.** If it appears that Consultant has disclosed (or has threatened to disclose) Information in violation of this Agreement, Principal shall be entitled to an injunction to restrain Consultant from disclosing, in whole or in part, such Information, or from providing any services to any party to whom such Information has been disclosed or may be disclosed. Principal shall not be prohibited by this provision from pursuing any other remedies, including a claim for losses and damages.

**16. CONFIDENTIALITY AFTER TERMINATION.** The confidentiality provisions of this Agreement shall remain in full force and effect after the termination of this Agreement.

**17. SERVICES TO THIRD PARTIES.** Except as otherwise approved by Principal as set forth hereinabove in this Agreement, Consultant shall not provide any consulting services to any third party during the term of this Agreement.

**18. RETURN OF RECORDS.** Upon termination of this Agreement, Consultant, at the written request of Principal, shall deliver all records, notes, data, memoranda, models, and equipment of any nature that are in Consultant's possession or under Consultant's control that are Principal's property or directly relate to Principal's business.

**19. NOTICES.** All notices required or permitted under this Agreement shall be in writing and shall be deemed delivered when delivered in person or deposited in the United States mail, postage prepaid, addressed as follows:

4

If to Principal:

**JINZHENG GROUP (USA), LLC,**
**a California limited liability company**
100 E. Huntington Drive,
Alhambra, CA 91801
Phone: (626) 703-4116
Attn: Jianging Yang, President


If to Consultant:

**BETULA LENTA, INC.**
**a California limited liability company**
1125 West 6th Street.
Suite 205
Los Angeles, CA 90017
Phone: (310) 295-8764
Attn: David Park, CEO

Such address may be changed from time to time by either party by providing written notice to the other in the manner set forth above.

**20. ENTIRE AGREEMENT.** This Agreement along with the two attached exhibits constitutes the entire agreement of the parties and there are no other promises or conditions in any other agreement whether oral or written. This Agreement supersedes any prior written or oral agreements between the parties.

**21. AMENDMENT.** This Agreement may be modified or amended if the amendment is made in writing and is signed by the Parties.

**22. SEVERABILITY.** If any provision of this Agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

**23. WAIVER OF CONTRACTUAL RIGHT.** The failure of either party to enforce any provision of this Agreement shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Agreement.

**24. APPLICABLE LAW.** This Agreement shall be governed by the laws of the State of California.

**25. INTERRUPTION OF SERVICE.** Either party shall be excused from any delay or failure in performance required hereunder if caused by reason of any occurrence or contingency

5

beyond its reasonable control, including, but not limited to, acts of God, acts of war, fire, insurrection, laws proclamations, edits, ordinances or regulations, strikes, lock-outs or other serious labor disputes, riots, earthquakes, floods, explosions or other acts of nature. The obligations and rights of the party so excused shall be extended on a day-to-day basis for the time period equal to the period of such excusable interruption. When such events have abated, the parties' respective obligations hereunder shall resume. In the event the interruption of the excused party's obligations continues for a period in excess of thirty (30) days, either party shall have the right to terminate this Agreement upon ten (10) days' prior written notice to the other party.

**26. ASSIGNMENT.** Consultant agrees that it will not assign, sell, transfer, delegate or otherwise dispose of any rights or obligations under this Agreement without the prior written consent of Principal. Any purported assignment, transfer, or delegation shall be null and void. Nothing in this Agreement shall prevent the consolidation of Principal with, or its merger into, any other legally recognized entity by the State of California, or the sale by Principal of all or substantially all of its properties or assets, or the assignment by Principal of this Agreement and the performance of its obligations hereunder to any successor in interest or any affiliated company, owned or controlled by Principal. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, legal representatives, successors, and permitted assigns, and shall not benefit any person or entity other than those enumerated above.

**27. SIGNATORIES.** This Agreement shall be signed on behalf of Principal by Jianqing Yang, and on behalf of Consultant by David Park and effective as of the date first above written.

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement as of the date first written above.

PRINCIPAL:

JINZHENG GROUP (USA), LLC,
a California limited liability company

By: _____
Its: President

CONSULTANT:

BETULA LENTA, INC.,
a California corporation

By: _____
Its: Chief Executive Officer

6

EXHIBIT "A"

## SCOPE OF SERVICES
### (Pre-Development Services)

1. Perform pre-development feasibility and pre-concept design strategy with emphasis on developing up to three hundred (300) for-sale detached single-family residential units as a master planned community.

2. Consultation with City representatives regarding development concept for master planned community.

3. Neighborhood outreach services as identified by City representatives including targeted neighborhood groups and organizations for project input and comments.

4. Coordination of project-related applications and submittals.

5. City Entitlement Coordination and Process:

   (A) California Environmental Quality Act Requirements (CEQA): Determine or cause to be determined environmental clearances necessary for the project. Prepare or cause to be prepared initial study for project impacts in order to determine if significant impact(s) are likely. Determine if impacts can be mitigated below a threshold of significance and cause to be prepared a Mitigated Negative Declaration (MND). If the project is determined to cause significant impacts that cannot be mitigated then the consultant shall cause an Environmental Impact Report (EIR) to be prepared for peer review by the Los Angeles Department of City Planning (LADCP) as lead agency. Submit all such documents as part of project review and facilitate/monitor LADCP processing.

   (B) General Plan Amendment, Zone Change and Tentative Tract Map Processing: Determine optimal processing for multiple entitlement and discretionary approvals in order to facilitate highest and best use for the property with a goal of establishing a Master Planned Community with up to 300 detached residential units. Prepare or cause to be prepared Master Land Use application, obtain Authorization to File from LADCP Management Team. Prepare or cause to be prepared justification and findings/specialized requirements in order to expedite the processing of such General Plan Amendment, Zone Change and Tentative Tract Map entitlements through both the LADCP and LA Bureau of Engineering (LABE). Coordinate with Los Angeles Parks and Recreation Department (LAPRD) as needed. Facilitate review in compliance with Subdivision Map Act as part of discretionary project review.

   (C) Traffic Study:  Determine or cause to be determined traffic clearances necessary for the project. Prepare or cause to be prepared reports for project impacts in order to determine if significant impact(s) are likely. Determine if impacts can be mitigated below a threshold of significance and cause to be prepared a Memorandum of Understanding (MOU) or Technical Letter. If the project is determined to cause significant impacts that cannot be mitigated then the consultant shall cause a full

7

Traffic Study to be prepared for peer review by the Los Angeles Department of Transportation (LADOT) as lead agency. Submit all such documents as part of project review and facilitate/monitor LADCP processing

(D) <u>City Planning Commission/ Planning and Land Use Meeting/ City Council Meetings</u>: Represent project and or coordinate representation at all required public hearing meetings and coordinate all responses to queries or conditions of approval.

6. Pre-Construction Activity:

7. Prepare or cause to be prepared schematic architectural design.

8. Prepare or cause to be prepared mass grading plan for site preparation work.

9. Prepare or cause to be prepared 3rd-party engineering reports and analysis.

10. Coordination, response, and access analysis through LADCP with various agencies including, but not limited to Bureau of Engineering (BOE), Los Angeles Fire Department (LAFD), Los Angeles Department of Water and Power (LADWP), sanitation, and other utilities

8



ADDENDUM TO DECEMBER 7, 2017 CONTRACT BETWEEN JINZHENG GROUP (USA) LLC AND BETULA LENTA, INC. for Consultant Services for 2929 Amethyst

Consultant Betula Lenta, Inc. agrees and is engaged to complete the scope of services listed in the Agreement with TL Pacific, Inc. , a copy of which is attached as Exhibit "A" hereto.

EXHIBIT B
COMPENSATION SCHEDULE

## 2929 Amethyst Milestones and Budget

| | | |
|---|---|---|
| Original contract Amount | $ | 2,594,500.00 |
| Amount previously disbursed | $ | 1,581,975.00 |
| Budget Remaining (to be disbursed below) | $ | 1,012,525.00 |

| Months | Task | | Milestone Amounts |
|---|---|---|---|
| 1 | Contract Execution | $ | 390,000.00 |
| | Continue City Meetings | | |
| | Traffic Study Proposal | | |
| | Neighborhood Targeted Support Groups Initiatives | | |
| | Phase I Report | | |
| | Slope Band Analysis | | |
| | Geotech/Soils Report | | |
| | Seismic Study | | |
| | Complete Conceptual Plans | | |
| | Hillside Analysis/Findings | | |
| | LADOT MOU Submission | | |
| | Massings/sections/elevations/floorplates | | |
| | Initial Study Proposal/IER (MND is less) | | |
| | Additional Traffic Data Reports as needed | | |
| | Traffic Study Submission | | |
| | Traffic Mitigation/DOT Tasks/DOT-PDM Meetings | | |
| | Shade and Shadow Study (if needed) | | |
| | Biological Study (if needed) | | |
| | Begin Schematic Plans | | |
| | LADCP Final Case Management | | |
| | LADCP Pre-Development Meeting | | |
| | Community/Agency Referral Approvals | | |
| | Specific IS Report Data Requirements | | |
| | Continue Specific Plans Progress | | |
| | Continue Master Planning Concept | | |
| | Begin Expedite Referral Process (if possible) | | |
| 3 to 4 | Completion of Initial Study | $ | 218,000.00 |
| | Land-Use Attorney/Neighborhood Consultant | | |
| | Remainder of Proposals, after retainers | | |
| | General Plan Amendment Initiation Plan (as needed) | | |
| | Initial Zoning Administrator meetings | | |
| | ZA Findings | | |
| | 2nd. LADCP Pre-Development Meeting | | |
| | Completion of IS/MND/EIR | | |
| | Mailing Labels | | |
| | Radius Map | | |
| 5 to 8 | EAF/MND/EIR Submission | $ | 123,000.00 |
| | City Filing Fee | | |
| | Master Land Use Application/Filing/Equivalent | | |
| | ZA Coordination | | |
| | Planning Commission Coordination | | |
| | Continue Council Meetings | | |
| | Continue Neighborhood Targeted Support | | |
| | Traffic Mitigation | | |
| | Completion of IS/MND/EIR | | |
| | LADOT Tech Letter Sign off (equivalent) | | |
| | Traffic Report Approval | | |
| | Begin Civil and Architectural Infrastructure Coordination | | |
| | Final Findings | | |
| | Ready Public Hearing Package | | |
| 8 to 10 | Initial Public Hearing | $ | 138,000.00 |
| | Follow up from any comments | | |
| | Neighborhood Outreach regarding specific comments | | |
| | Continue Council Meetings | | |
| | Continue Neighborhood Targeted Support | | |
| 9 to 12 | Planning Commission Public Hearing/NOC/Equivalent | $ | 58,000.00 |
| | City Council Resolution Coordination | | |
| | City Council Calendaring | | |
| | Continue Council Meetings | | |
| | Continue Neighborhood Targeted Support | | |
| 11 to 14 | City Council Hearing/Discretionary Approval | $ | 85,525.00 |
| | Follow up from City Council Resolution and Approval | | |
| | CLA Coordination | | |
| | Any recordations | | |
| | | $ | 1,012,525.00 |

<u>TL Pacific, Inc.</u>August 31, 2016

<u>Subject:</u>Pre-Development Scope for 2929 Amethyst Street Los Angeles CA 90032

Proposed Development Strategy:

### Up to 300 Unit Master Planned Community

Dear Mr. Yang:

TL Pacific, Inc. specializes in the ability to take the known aspects of a property and increase the use and development potential. We are pleased to submit this proposal for Professional Entitlement & Land-Use Consulting Services, and Project Management Services. Based upon our meetings and subsequent conversations, it is my understanding that we are charged to consult for the future development of the 30 +- acre site located at the address above, and this proposal and initial work scope shall consist of the following:

**1. Scope of Work, as applicable: (Other work scope and consulting shall be addressed in a subsequent Development Services Agreement)**

- Development feasibility/strategy
- Concept Design consultation
- Initial Land-use consultation
- City Agency Liaison
- Neighborhood Outreach
- Case Management Coordination
- Case Management meetings
- Affordable Housing Referral/DB submission coordination (if applicable)
- Affordable Housing Referral/DB Submission compliance (LAMC section 12.22, if applicable)
- Ancillary AB 2222 Research and planning input outside of mandatory legal representation, if applicable
- Zoning Administration Coordination
- Planning Commission (CPC) Coordination/Hearings
- Planning and Land Use Management (PLUM) Coordination/Hearings
- Work with District Councilman's office to assist in approval of desired Master Plan
- City Council Calendar and Resolution Coordination as required
- Peer Review Coordination, including representation at review hearings as needed
- Urban Planning Design Department Coordination, if applicable
- CEQA/Traffic integration from 3rd-party input as needed
- Public Hearing Coordination
- Non-profit outreach if required
- Pre-Construction Analysis/Coordination with 3rd party
- Initial Findings, Initial Research, and Summary Input Coordination

Exhibit "A" to Addendum to 12/7/17 Agreement between Dinghang Group COSA LLC & Betula Lenta, Inc.

12

- CEQA (State/local municipality level) Initial Study/Findings Coordination
- General Plan Amendment Coordination as needed, in-house and 3rd party
- Zone Change Coordination as needed, in-house and 3rd party
- Entitlement/Planning pre-package
- Master Land Use application consultation
- EAF/MND application consultation (outside of 3rd-party reports) if applicable
- MLU/EAF/MND Exhibits consultation (outside of 3rd-party reports, maps, findings, etc.) if applicable
- Preparation of relevant Findings
- Preparation of relevant Summaries
- Preparation of relevant Codes
- Environmental documentation coordination
- Environmental Impact Report
- Project coordination with relevant vendors
- Conceptual Design: to include initiation of consultants and engineers
- Master Plan Concept Design
- City Agency Liaison, as needed
- Neighborhood Outreach
- Peer Review Coordination (including representation at peer review hearings as needed)
- Urban Planning Design Department Coordination
- CEQA/Traffic integration from 3rd-party input, as needed
- Civil Engineering integration from 3rd-party input, as needed
- Bureau of Engineering integration from 3rd-party input, as needed
- Parks & Recreation Dept. integration from 3rd-party input, as needed
- Public Hearing Coordination & Documentation, as needed
- Pre-Construction Cost Coordination
- Master Plan Community Safety and Finish design Coordination with 3rd party
- Master Plan Community/Other Specification Coordination with 3rd party
- Project coordination with relevant vendors
- Prepare architectural conceptual design set to submit to City of Los Angeles
- Documentation preparation for CPC/City Council/PLUM, as needed
- Documentation preparation for Case Management/Pre-Development Meetings
- Documentation preparation for Land Use Submissions
- Implementing, delegating, and/or coordinating necessary General Plan and Zone Change processing duties (not including 3rd-party duties and deliverables)
- Services related to clearances associated with project
- Design of entrances with access either from North Broadway or Lincoln Avenue, or both
- Design integration either including or not including six existing houses at southern property line

*(Please note that the scope of work and work product are based upon assumptions and investigation into the development, but in no way guarantees the timing and outcome of the development, due to forces outside the scope of the consultants)*





13

**2. Additional Compensation:**

- Any unforeseen or extra work not included in above "Scope of Work" will be discussed and mutually agreed upon between Mr. Yang and TL Pacific, Inc.,prior to additional work being performed.

**3. Exclusions:**

- Subsequent variations of items detailed in "Scope of Work."
- Other exclusions shall be addressed in full Development Services Agreement.

**4. Authorization & Retainer:**

Total itemized estimated cost for above Scope of Work: $2,594,500. To signify your authorization to proceed, please sign proposal and remit a retainer in the amount of $673,625.00.

Subsequent Payments as follows:

1) $134,725.00 at Master Plan Concept.
2) $134,725.00 at Kick off meeting with Engineers to integrate Master Plan.
3) $269,450.00 at 50% Architectural Conceptual Plan.
4) $269,450.00 at Case management Submission.
5) $269,450.00 at 100% Master Plan Conceptual Design.
6) $269,450.00 at Peer review Coordination/Land Use Submission.
7) $269,450.00 at 100% Architectural Concept Design.
8) $269,400.00 at Planning Case Public Hearing.
9) $ 34,725.00 at Final Planning Approval of Master Plan.

Respectfully submitted,

Rich Lamphere, TL Pacific Inc.

Acceptance of Proposal by: Jinzheng Group (USA) LLC

Signature: _____    Date: 2016. 9. 3.

TL Pacific Inc.

Signature: _____ Pres TL Pacific Inc.    Date: Sept 3, 2016

14

## CONSTRUCTION MANAGEMENT AGREEMENT

This Construction Management Agreement ("Agreement") is made effective as of June __22__, 2018, and entered into by and between **JINZHENG GROUP (USA), LLC, a California limited liability company** ("Principal") and **BETULA LENTA, INC., a California Corporation** ("Construction Manager"), with regard to the following:

      **WHEREAS,** Principal and Construction Manager desire to enter into this Agreement for the purpose of Construction Manager providing and performing certain construction management services (the "Construction Management Services") with respect to the construction and development of the infrastructure preparation for 2929 North Amethyst Street, Los Angeles, CA 90032 (the "Project") as more specifically detailed, outlined and provided for below in this Agreement and as set forth in the "GMAX Estimate" (herein attached Exhibit "B") and fully incorporated into this Agreement by this reference as though fully set forth herein; and

      **WHEREAS,** Construction Manager hereby represents and warrants that it possesses the necessary expertise, licenses, and experience required to provide and perform the Construction Management Services with respect to the development of the Property and is fully prepared and able to provide and perform the Construction Management Services in a timely manner; and will pull all applicable permits.

      **WHEREAS,** Principal hereby acknowledges and agrees that it or a legal entity owned and controlled by it or one of its principals owns fee title to the Property and is duly authorized to enter into this Agreement for the performance of the Construction Management Services by Construction Manager,

      **NOW, THEREFORE,** the Principal and Construction Manager (collectively referred to herein as the "Parties") do hereby agree to the following and terms and conditions established herein below in this Agreement.

1. **DESCRIPTION OF CONSTRUCTION MANAGEMENT SERVICES.** Both Parties wish to perform the duties and engage the professionals necessary to cause either one of the following duties to occur:  a). Grading or equivalent permit for Property AND b). Infrastructure Construction Start, OR c). Cut and Fill Earthwork to Start. Once the duties have commenced, the Construction Manager has fulfilled his obligations to the Agreement.

2. **PERFORMANCE OF CONSTRUCTION MANAGEMENT SERVICES.**
   The manner in which the Construction Management Services are to be performed and provided shall be determined exclusively by Construction Manager.

3. **COMPENSATION SCHEDULE.** Compensation payable to Construction Manager by Principal for the Construction Management Services shall as set forth in that certain "Compensation Schedule" (Herein attached Exhibit A) and fully incorporated into this Agreement as though fully set forth herein. As provided in the Compensation Schedule, payments shall be made on an installment basis with each installment fully due and payable to Construction Manager within five (5) business days following the delivery of written notice

JY _JY_  DP _ℝ_



by Construction Manager to Principal requesting payment. ~~Failure to provide full payment of the requested amount shall be subject to a ten percent (10 %) late fee.~~

4. **EXPENSE REIMBURSEMENT. All Permit, Plan Check, and other City Fees.** All other expenses not otherwise provided for in this Agreement shall be the sole responsibility of Construction Manager. Except as otherwise agreed upon by the Parties, the Principal shall not be responsible for the reimbursement of any expenses incurred by Construction Manager.

5. **GUARANTEED MAXIMUM PRICE.** Both Parties agree that Construction Documents may be incomplete and unavailable at the time of the execution of this contract. However, both Parties agree that a Guaranteed Maximum Price (hereinafter "GMAX") amount of $4,517,913 detailed in Exhibit B will be the basis of the GMAX for the services detailed herein, to complete the Construction Management Services described herein under Paragraph 1 a), and b), or c). Further to the aforementioned;

   • The estimated costs detailed in Exhibit B include the estimated expenses for the actual cost of the services, the staffing, overhead, contingency, general conditions, and insurance.

   • Any initial savings from a given line item shall be kept in reserve for any overages in any other line items.

   • At the end of the services detailed herein, there is a savings from the GMAX amount of $4,517,913, then the balance of savings shall be disbursed 75% to Principal and 25% to Construction Manager.

   • An Estimated Timeline (herein attached "Exhibit C"), shall constitute the estimated timeline for the start of Infrastructure Construction, depending on the date of the signing of this Agreement.

   • Last, although the GMAX estimate is $4,517,913, Principal is also required to hold in reserve an additional $2 million in the Principal's bank account, during the entire time the work scope of this Agreement is being done, and the entire $2 million shall be held in reserve until after Construction Funding has occurred AND Lender has approved of release of reserve.

6. **OPEN BOOK POLICY.** Both Parties agree that all data, agreements, and accounting related to the GMAX and all information related to the source of funds for the GMAX shall be viewed openly by Principal and Construction Manager in an effort to ensure costs are minimized where possible.

7. **TERM/TERMINATION.** This Agreement shall terminate automatically upon completion of the Construction Management Services by Construction Manager as required by this Agreement and the Construction Estimate. However, in the event of a default with respect to of any of the obligations set forth in this Agreement by either Principal or Construction Manager, and such default is not cured within thirty (30) days following written notice to

Page | 2                                                                     JY JY  DP

cure from the non-defaulting part, the non-defaulting party may terminate this Agreement and pursue any and all legal rights pertinent to such default including, but not limited to, damages or specific performance of the outstanding obligation(s).

8. **RELATIONSHIP OF PARTIES.** It is understood by the Parties that Construction Manager is an independent Construction Manager with respect to providing and performing the Construction Management Services and is not an employee of the Principal, who shall not be required to provide any fringe benefits, including health insurance benefits, paid vacation, or any other employee benefits, for the benefit of Construction Manager.

9. **DISCLOSURE.** Construction Manager is required to disclose to Principal any outside activities or interests, including ownership or participation in any developments that conflict or will conflict with the Construction Manager's providing and performing of the Construction Management Services and the ultimate development of the Project on the Property.

10. **EMPLOYEES.** Construction Manager's Construction Managers, Construction Managers and employees, if any, who perform any aspect of the Construction Management Services for Construction Manager under this Agreement shall also be bound by the provisions of this Agreement. At the written request of the Principal, Construction Manager shall provide adequate evidence that such persons are Construction Manager's agents, Construction Managers, Construction Managers, or employees.

11. **INJURIES AND INSURANCE.** Construction Manager acknowledges that Construction Manager's obligation to obtain appropriate insurance coverage for the benefit of Construction Manager (and Construction Manager's agents, Construction Managers, Construction Managers and employees, if any) to the extent required by applicable California law. Construction Manager waives any and all rights to recovery against Principal for any injuries that Construction Manager (and/or Construction Manager's agents, Construction Managers, Construction Managers and employees, if any) may sustain while providing and/or performing the Construction Management Services under this Agreement, and that are a result of the negligence of Construction Manager or Construction Manager's agents, Construction Managers, Construction Managers, or employees.

12. **INDEMNIFICATION.** Construction Manager agrees to indemnify and hold Principal harmless from all claims, losses, expenses, fees including attorney fees, costs, and judgments that may be asserted against Principal that result from the acts or omissions of Construction Manager, Construction Manager's agents, Construction Managers, Construction Managers, and employees, if any.

Principal agrees to indemnify and hold Construction Manager, Construction Manager's agents, Construction Managers, Construction Managers, and employees, harmless from all claims, losses, expenses, fees including attorney fees, costs, and judgments that may be asserted against Construction Manager for any of the following: (a) any third-party work previously provided and performed on the behalf of Principal with respect to the Project; or (b) any acts or omissions of Principal, Principals agents, Construction Managers, Construction Managers, and/or employees.

JY_JY_ DP _

13. **INTELLECTUAL PROPERTY.** The following provisions shall apply with respect to copyrightable works, ideas, discoveries, inventions, applications for patents, and patents (collectively, "Intellectual Property"):

*Construction Manager's Intellectual Property.* Construction Manager does not presently hold any interest in any Intellectual Property with respect to the development of the Project on the Property.

*Development of Intellectual Property.* To the extent that any Intellectual Property rights are established with respect to providing or performing the Construction Management Services, or development of the Project on the Property, unless otherwise provided, all such Intellectual Property shall be the property of Principal and Construction Manager shall take all such reasonable efforts to cause all such rights to be assigned to Principal.

14. **OWNERSHIP OF SOCIAL MEDIA CONTACTS.** Any social media contacts, including "followers" or "friends," that are acquired through accounts (including, but not limited to email addresses, blogs, Twitter, Facebook, You-tube, or other social media networks) used or created in conjunction with providing and performing the Construction Management Services shall be the property of Construction Manager.

15. **CONFIDENTIALITY.** Principal recognizes that Construction Manager has and will have the following information:

- costs
- discounts
- future plans
- process information
- technical information
- copyrights
- proprietary information

as well as any other proprietary information (collectively, "Information") which are valuable, special and unique assets of Principal that require protection from improper disclosure. In consideration for access and disclosure of the Information to Construction Manager, Construction Manager agrees that it will not at any time or in any manner, either directly or indirectly, use any Information for Construction Manager's own benefit, or divulge, disclose, or communicate in any manner any Information to any third party without the prior written consent of Principal. Construction Manager will protect the Information and treat it as strictly confidential. A violation of this paragraph shall be a material violation of this Agreement.

16. **UNAUTHORIZED DISCLOSURE OF INFORMATION.** If it appears that Construction Manager has disclosed (or has threatened to disclose) Information in violation of this Agreement, Principal shall be entitled to an injunction to restrain Construction Manager from disclosing, in whole or in part, such Information, or from providing any services to any party to whom such Information has been disclosed or may be disclosed. Principal shall not be prohibited by this provision from pursuing any other remedies, including a claim for losses and damages.

JY JY DP

17. **CONFIDENTIALITY AFTER TERMINATION.** The confidentiality provisions of this Agreement shall remain in full force and effect after the termination of this Agreement.

18. **SERVICES TO THIRD PARTIES.** Except as otherwise approved by Principal as set forth hereinabove in this Agreement, Construction Manager shall not provide any consulting services to any third party during the term of this Agreement.

19. **RETURN OF RECORDS.** Upon termination of this Agreement, Construction Manager, at the written request of Principal, shall deliver all records, notes, data, memoranda, models, and equipment of any nature that are in Construction Manager's possession or under Construction Manager's control that are Principal's property or directly relate to Principal's business.

20. **NOTICES.** All notices required or permitted under this Agreement shall be in writing and shall be deemed delivered when delivered in person or deposited in US Mail in the U.S Mail, postage prepaid, addressed as follows:

<u>If to Principal:</u>

**JINZHENG GROUP (USA), LLC,**
**a California limited liability company**
100 E. Huntington Drive,
Alhambra, CA 91801
Phone: (626) 703-4116
Attn: Jianging Yang, President

<u>If to Construction Manager</u>:

**BETULA LENTA, INC.**
**a California corporation**
1125 West 6th Street.
Suite 205
Los Angeles, CA 90017
Phone: (310) 295-8764
Attn: David Park, CEO

Such address may be changed from time to time by either party by providing written notice to the other in the manner set forth above.

21. **ENTIRE AGREEMENT.** This Agreement along with the two attached exhibits constitutes the entire agreement of the parties and there are no other promises or conditions in any other agreement whether oral or written. This Agreement supersedes any prior written or oral agreements between the parties.

22. **AMENDMENT.** This Agreement may be modified or amended if the amendment is made in writing and is signed by the Parties.

Page | 5

JY JY    DP

23. **SEVERABILITY.** If any provision of this Agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

24. **WAIVER OF CONTRACTUAL RIGHT.** The failure of either party to enforce any provision of this Agreement shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Agreement.

25. **APPLICABLE LAW.** This Agreement shall be governed by the laws of the State of California.

26. **INTERRUPTION OF SERVICE.** Either party shall be excused from any delay or failure in performance required hereunder if caused by reason of any occurrence or contingency beyond its reasonable control, including, but not limited to, acts of God, acts of war, fire, insurrection, laws proclamations, edits, ordinances or regulations, strikes, lock-outs or other serious labor disputes, riots, earthquakes, floods, explosions or other acts of nature. The obligations and rights of the party so excused shall be extended on a day-to-day basis for the time period equal to the period of such excusable interruption. When such events have abated, the parties' respective obligations hereunder shall resume. In the event the interruption of the excused party's obligations continues for a period in excess of thirty (30) days, either party shall have the right to terminate this Agreement upon ten (10) days' prior written notice to the other party.

27. **ASSIGNMENT.** Construction Manager agrees that it will not assign, sell, transfer, delegate or otherwise dispose of any rights or obligations under this Agreement without the prior written consent of Principal. Any purported assignment, transfer, or delegation shall be null and void. Nothing in this Agreement shall prevent the consolidation of Principal with, or its merger into, any other legally recognized entity by the State of California, or the sale by Principal of all or substantially all of its properties or assets, or the assignment by Principal of this Agreement and the performance of its obligations hereunder to any successor in interest or any affiliated company, owned or controlled by Principal. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, legal representatives, successors, and permitted assigns, and shall not benefit any person or entity other than those enumerated above.

28. **SIGNATORIES.** This Agreement shall be signed on behalf of Principal by Jianging Yang, and on behalf of Construction Manager by David Park and effective as of the date first above written.

*(SIGNATURES FOLLOW):*

JY JY  DP

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement as of the date first written above.

**PRINCIPAL:**

**JINZHENG GROUP (USA), LLC,**
**a California limited liability company**

By: _____  6-22-18_____
Its: President


**CONSTRUCTION MANAGER:**

**BETULA LENTA, INC.,**
**a California corporation**

By: _____  6-22-18_____
Its: President

JY _JY_  DP _DP_

## COMPENSATION SCHEDULE
## EXHIBIT A

1. Payment One - Retainer (30% of total contracted amount) - $1,355,373.90

2. Payment Two – At 30% Completion of Construction Management Services - $1,807,165.20

3. Payment Three – At 70% Completion of Construction Management Services - $ 908,582.60

4. Payment Four – At 80% Completion of Construction Management Services - $ 451,791.30

JY JY  DP

**EXHIBIT B**

**2929 Amethyst Estimatd Costs**

| Infrastructure/Property Capacity for Planning Approvals | | | | Phase 2 Funding Needed:| $ | 4,517,913.00 | |
|---|---|---|---|---|---|---|---|
| | | | Payment One | Payment Two | Payment Three | Payment Four | |
| | | | $ 1,355,373.90 | $ 1,807,165.20 | $ 903,584.60 | $ 451,791.30 | |
| Task or Professional Engaged (Mar, 2018-Jun, 2019) | | | Estimated Fee | Description | | | |
| | Project Manager | | $ 450,000 | David Park/Craig Fry - Pre-Construction Management/Developer Fee | | | |
| 1 | Architect (Schematic Design) | | $ 295,000 | SchematSc Layout of Homes and Site Plan for 310 Lots | | | |
| 2 | Architect (Master Planning) | | $ 270,000 | Master Community Plan & Infrastructure Design, Schematic through Design Development | | | |
| | | | $ 1,015,000 | | | | |
| 3 | Civil Engineer | | $ 595,000 | Entire Infrastructure from Concept through Construction Plans ("CDs")/Plan check | | | |
| 4 | Geotech/Soils Engineer | | $ 42,500 | Geotechnical Approvals & Engineering Input through CDs/Plan check | | | |
| 5 | Hydrologist | | $ 35,000 | Water Flow Analysis of entire site, irrigation, storm water flow, etc. to CDs/Plan check | | | |
| 6 | Structural Engineer | | $ 165,452 | Structural Plans of 5 model homes to CDs/plan check | | | |
| 7 | Site Structural Engineer | | $ 395,000 | Structural Plans of 310 lots, roads, infrastructure to CD/plan check | | | |
| 8 | Seismic Engineer (Trench Consultant) | | $ 85,000 | Seismic Study, Report, Approvals, and Plan submissions, as needed | | | |
| 9 | Shoring Engineer | | $ 225,000 | All Supplemental Shoring (to structure) Plans of 310 lots, roads, infrastructure to CD/plan check | | | |
| 10 | Traffic Improvements & Mitigation Consultant | | $ 72,500 | After Traffic Approval engineer to work with LADOT on all future mitigation & improvements | | | |
| 11 | Landscape Architect | | $ 125,000 | Master Site Plan - Concept and Schematic through Design Development (landscape only) | | | |
| 12 | Landscape/Hardscape Engineer | | $ 125,000 | Master Site Plan - Concept and Schematic through Design Development (landscape only) | | | |
| 13 | Fire Access & Hydrants Engineer | | $ 75,000 | Engineering, FD mitigation, and City Lobby | | | |
| 14 | Grading Engineer | | $ 225,000 | All Grading Plans of 310 lots, roads, infrastructure to CDs/plan check | | | |
| | | | $ 2,165,452 | | | | |
| 15 | Pre-Construction Consultant | | $ 243,461 | Potential General Contractor to vet, research, bid, RFP all Infrastructure Costs | | | |
| 16 | Sub-contractor bid coordinator | | $ 115,000 | CM watching over GC candidate for item #15 | | | |
| | | | $ 358,461 | | | | |
| 17 | Storm Water Consultant | | $ 25,000 | Engineering and Design of rain water capture to CDs/Plan check | | | |
| 18 | Water Control Board Consultant | | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of Utility Agency | | | |
| 19 | LADWP (Water and Power) Capacity Consultant | | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of LADWP Utility | | | |
| 20 | Gas Consultant | | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of Gas Utility | | | |
| 21 | Sewer Consultant | | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of Sewer | | | |
| 22 | Street Lighting Consultant | | $ 50,000 | Specifications written, Design, and City Approval of all exterior lighting on and off-site | | | |
| 23 | Earthwork Consultant | | $ 50,000 | Potential future Earthwork Subcontractor who will run all cut and fill analysis, scheduling, and costs | | | |
| 24 | Parks and Recreation Consultant | | $ 97,500 | Mitigation, Agreements, Analysis, & City Approval of Subway, P & R, Tree replacement | | | |
| 25 | Public Works Consultant | | $ 100,000 | Lobby, Mitigation, Agreements, Analysis, & City Approval of Dept. of Public Works & BOE | | | |
| 26 | Bureau of Engineering Consultant | | $ 100,000 | Lobby, Mitigation, Agreements, Analysis, & City Approval of Dept. of BOE | | | |
| 27 | Sanitation Consultant | | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of Dept. Of Sanitation | | | |
| | | | $ 435,000 | | | | |
| 28 | LADBS Expeditor | | $ 20,000 | Lobby & Plan Check Coordination between architect, engineers, consultants | | | |
| 29 | LA Fire Life & Safety Consultant and Expeditor | | $ 20,000 | Lobby, Mitigation, Agreements, Analysis, & City Approval of LAFD and LAPD | | | |
| 30 | HVAC & Mechanical Engineer | | $ 20,000 | All HVAC & Mech system Site Plans to CDs/plan check | | | |
| 31 | Plumbing Engineer | | $ 20,000 | All HVAC & Mech system Site Plans to CDs/plan check | | | |
| 32 | Electric Engineer | | $ 20,000 | All HVAC & Mech system Site Plans to CDs/plan check | | | |
| 33 | Cable and Scifi Utilities Consultant | | $ 2,500 | Agreements, Design, and Engineering for Internet and Cable | | | |
| 34 | Solar Sub/Consultant | | $ 2,500 | Engineering, Analysis, and City Approvals for Solar System | | | |
| 35 | Filtration and Grey Water Consultant | | $ 2,500 | Engineering and Analysis of reusable water system | | | |
| 36 | LID Consultant | | $ 2,500 | Design, CDs/Plan check of "Low Impact Design" Rules | | | |
| 37 | LEED Consultant | | $ 5,000 | Lobby, Mitigation, Design, & City Approval | | | |
| | | | $ 115,000 | | | | |
| | | | $ 3,988,913 | | | | |
| | | | | | | | |
| | | TOTAL: | $ 3,988,913 | | | | |
| | | | | Loan Proceeds for start of Infrastructure Construction to fund below and construction | | | |

| Homes Construction Phase of Contracts | | | | | |
|---|---|---|---|---|---|
| Initial Phase of Homes Permits | | | Budget | | |
| | Task or Professional Engaged (March, 2018-Jun, 2019) | | Estimated Fee | Description | |
| 1 | Architect | | $ 150,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes | |
| 2 | Civil Engineer | | $ 95,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes | |
| 3 | Structural Engineer | | | Already above for first 5 homes | |
| 4 | HVAC & Mechanical Engineer | | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes | |
| 5 | Plumbing Engineer | | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes | |
| 6 | Electric Engineer | | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes | |
| 7 | Landscape Architecture | | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes | |
| 8 | Grading Engineer | | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes | |
| 9 | Utilities Consultant | | $ 7,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & Coordination of Infrastructure into individual homes | |
| 10 | LADBS Expeditor | | $ 7,500 | Lobby & Plan Check Coordination between architect, engineers, consultants, & City for homes | |
| 11 | LA Fire Life & Safety Consultant and Expeditor | | $ 12,500 | Lobby, Mitigation, Agreements, Analysis, & City Approval of LAFD and LAPD for homes | |
| 12 | Alarm, Sprinkler, and Emergency Consultant | | $ 2,500 | Integration of systems into individual homes | |
| 13 | Cable and Scifi Utilities Consultant | | $ 1,000 | Engineering, Analysis, and City Approvals for Solar System for homes | |
| 14 | Solar Sub/Consultant | | $ 1,000 | Engineering and Analysis of reusable water system for homes | |
| 15 | LID Consultant | | $ 1,000 | Design, CDs/Plan check of "Low Impact Design" Rules for homes | |
| 16 | LEED Consultant | | $ 1,000 | Lobby, Mitigation, Design, & City Approval for homes | |
| | | TOTAL: | $ 529,000 | | |

JY

Amethyst Development Schedule

Jinzheng/Betula Lenta/DPark

| ID | Task Name | Duration | Start | Finish | Predec | Resource Names |
|----|-----------|----------|-------|--------|--------|----------------|
| 39 | Begin Construction Plans | 100 days | Mon 12/3/18 | Fri 4/19/19 | 38 | TCS |
| 40 | Submit All Construction Plans for Plan Check (for Homes Building Permit) | 120 days | Mon 4/22/19 | Fri 10/4/19 | 39 | TCS |
| 41 | Submit All Construction Plans for Plan Check (if DELAY) | 120 days | Mon 11/11/19 | Fri 4/24/20 | 32 | TCS |
| 42 | Ready Team for Grading Permit | 30 days | Mon 4/23/18 | Fri 6/1/18 | 20 | Park |
| 43 | Soils Report Approval | 60 days | Mon 6/4/18 | Fri 8/24/18 | 22 | PGI/TCS |
| 44 | Finish All Earthwork Calculations | 25 days | Mon 4/23/18 | Fri 5/25/18 | 7 | LDC/Build |
| 45 | Finish all Storm Calculations | 20 days | Mon 5/21/18 | Fri 6/15/18 | 13 | LDC/Build |
| 46 | Finish all Sewer Calculations | 20 days | Mon 5/21/18 | Fri 6/15/18 | 13 | LDC/Build |
| 47 | Initial Earthwork RFPs | 60 days | Mon 4/23/18 | Fri 7/13/18 | 20 | Build GC |
| 48 | Complete all Cut and Fill Calculations | 30 days | Mon 5/21/18 | Fri 6/29/18 | 5 | LDC |
| 49 | Complete all Infrastructure Calculations | 30 days | Mon 5/21/18 | Fri 6/29/18 | 5 | LDC/Build |
| 50 | Shoring Engineering Plans | 90 days | Mon 4/23/18 | Fri 8/24/18 | 20 | TBD |
| 51 | Grading Engineer Plans | 90 days | Mon 4/23/18 | Fri 8/24/18 | 20 | TBD |
| 52 | Complete All Pre-Construction Bids for Infrastructure Construction Loan | 120 days | Mon 7/16/18 | Fri 12/28/18 | 24 | Park/Build |
| 53 | Coordination between Model Homes and Infrastructure Build | 45 days | Mon 9/10/18 | Fri 11/9/18 | 47,33 | Park/TCS/Build |
| 54 | Final Grading Submission preparation | 30 days | Mon 7/16/18 | Fri 8/24/18 | 47 | Park/TCS/Build |
| 55 | Final Grading Permit Submission | 60 days | Mon 8/27/18 | Fri 11/16/18 | 54 | Park/TCS/Build |
| 56 | Construction Loan Due Diligence and Underwriting | 90 days | Mon 9/10/18 | Fri 1/11/19 | 33,48 | Park |
| 57 | Construction Loan for Infrastructure | 30 days | Mon 12/31/18 | Fri 2/8/19 | 47,52 | Park |
| 58 | Begin Grading/Infrastructure Construction | 300 days | Mon 2/11/19 | Fri 4/3/20 | 57,52 | GC/TCS/Park |
| 59 | Begin Construction of Model Homes | 240 days | Mon 4/6/20 | Fri 3/5/21 | 58 | Park/TCS/Build |
| 60 | Begin Construction of Homes (Phase 1) | 300 days | Mon 10/7/19 | Fri 11/27/20 | 40 | Park/TCS/Build |
| 61 | Begin Construction of Homes (Phase 1) (ONLY if DELAY) | 300 days | Mon 4/27/20 | Fri 6/18/21 | 41 | Park/TCS/Build |
| 62 | Complete all Infrastructure | 180 days | Mon 11/30/20 | Fri 8/6/21 | 60 | Park/TCS/Build |
| 63 | | 30 days | Mon 8/9/21 | Fri 9/17/21 | 62 | Park/TCS/Build |
| 64 | | 30 days | Mon 9/20/21 | Fri 10/29/21 | 63 | Park/TCS/Build |
| 65 | | 30 days | Mon 11/1/21 | Fri 12/10/21 | 64 | Park/TCS/Build |
| 66 | | 30 days | Mon 12/13/21 | Fri 1/21/22 | 65 | Park/TCS/Build |
| 67 | | 30 days | Mon 1/24/22 | Fri 3/4/22 | 66 | Park/TCS/Build |
| 68 | | 30 days | Mon 3/7/22 | Fri 4/15/22 | 67 | Park/TCS/Build |
| 69 | | 30 days | Mon 4/18/22 | Fri 5/27/22 | 68 | Park/TCS/Build |

2929 North Amethyst ST.
Los ANgeles, CA  90032

| | | | |
|--|--|--|--|
| Phase One Task | Summary | Split | Inactive Task | Duration-only | Progress |
| Phase Two task | Rolled Up Milestone | Project Summary | Inactive Milestone | Start-only | Deadline |
| Milestone | Rolled Up Progress | Group By Summary | Inactive Summary | Finish-only | |



**EXHIBIT B**

## 2929 Amethyst Estimatd Costs

| | | | Phase 2 Funding Needed: $ | | 4,817,913.00 | |
|---|---|---|---|---|---|---|
| **Infrastructure/Property Capacity for Planning Approvals** | | | Payment One | Payment Two | Payment Three | Payment Four |
| | | | $ 1,355,373.90 | $ 1,607,165.20 | $ 903,584.60 | $ 451,791.30 |
| | **Task or Professional Engaged (May, 2018-Jan. 2019)** | **Estimated Fee** | **Description** | | | |
| | Project Manager | $ 450,000 | David Park/Craig Fry - Pre-Construction Management/Developer Fee | | | |
| 1 | Architect (Schematic Design) | $ 295,000 | Schematic Layout of Homes and Site Plan for 310 Lots | | | |
| 2 | Architect (Master Planning) | $ 270,000 | Master Community Plan & Infrastructure Design, Schematic through Design Development | | | |
| | | $ 1,015,000 | | | | |
| 3 | Civil Engineer | $ 595,000 | Entire infrastructure from Concept through Construction Plans "CDs")/Plan check | | | |
| 4 | Geotech/Soils Engineer | $ 42,500 | Geotechnical Approvals & Engineering input through CDs/Plan check | | | |
| 5 | Hydrologist | $ 35,000 | Water Flow Analysis of entire site, irrigation, storm water flow, etc. to CDs/plan check | | | |
| 6 | Structural Engineer | $ 165,452 | Structural Plans of 5 model homes to CDs/plan check | | | |
| 7 | Site Structural Engineer | $ 395,000 | Structural Plans of 310 lots, roads, infrastructure to CDs/plan check | | | |
| 8 | Seismic Engineer (Trench Consultant) | $ 85,000 | Seismic Study, Report, Approvals, and Plan submissions, as needed | | | |
| 9 | Shoring Engineer | $ 225,000 | All Supplemental Shoring (to structure) Plans of 310 lots, roads, infrastructure to CDs/plan check | | | |
| 10 | Traffic Improvements & Mitigation Consultant | $ 72,500 | After Traffic Approval engineer to work with LADOT on all future mitigation & improvements | | | |
| 11 | Landscape Architect | $ 125,000 | Master Site Plan - Consept and Schematic through Design Development (landscape only) | | | |
| 12 | Landscape/Hardscape Engineer | $ 125,000 | Master Site Plan - Consept and Schematic through Design Development (hardscape only) | | | |
| 13 | Fire Access & Hydrants Engineer | $ 75,000 | Engineering, FD mitigation, and City Lobby | | | |
| 14 | Grading Engineer | $ 225,000 | All Grading Plans of 310 lots, roads, infrastructure to CDs/plan check | | | |
| | | $ 2,165,452 | | | | |
| 15 | Pre-Construction Consultant | $ 243,461 | Potential General Contractor to vet, research, bid, RFP all Infrastructure Costs | | | |
| 16 | Sub-contractor bid coordinator | $ 15,000 | CM watching over GC candidate for item #16 | | | |
| | | $ 258,461 | | | | |
| 17 | Storm Water Consultant | $ 25,000 | Engineering and Design of rain water capture to CDs/Plan check | | | |
| 18 | Water Control Board Consultant | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of Utility Agency | | | |
| 19 | LADWP (Water and Power) Capacity Consultant | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of LADWP Utility | | | |
| 20 | Gas Consultant | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of Gas Utility | | | |
| 21 | Sewer Consultant | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of Sewer | | | |
| 22 | Street Lighting Consultant | $ 50,000 | Specifications written, Design, and City Approval of all exterior lighting on and off-site | | | |
| 23 | Earthwork Consultant | $ 50,000 | Potential future Earthwork Subcontractor who will run all cut and fill analysis, scheduling, and costs | | | |
| 24 | Parks and Recreation Consultant | $ 97,500 | Mitigation, Agreements, Analysis, & City Approval of Quimby, P & R, Tree replacement | | | |
| 25 | Public Works Consultant | $ 100,000 | Lobby, Mitigation, Agreements, Analysis, & City Approval of Dept. of Public Works & BOE | | | |
| 26 | Bureau of Engineering Consultant | $ 100,000 | Lobby, Mitigation, Agreements, Analysis, & City Approval of Dept. of BOE | | | |
| 27 | Sanitation Consultant | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of Dept. Of Sanitation | | | |
| | | $ 435,000 | | | | |
| 28 | LADBS Consultant | $ 20,000 | Lobby & Plan Check Coordination between architect, engineers, consultants, & City | | | |
| 29 | LA Fire Life & Safety Consultant and Expeditor | $ 20,000 | Lobby, Mitigation, Agreements, Analysis, & City Approval of LAFD and LAPD | | | |
| 30 | HVAC & Mechanical Engineer | $ 20,000 | All HVAC & Mech system Site Plans to CDs/plan check | | | |
| 31 | Plumbing Engineer | $ 20,000 | All HVAC & Mech system Site Plans to CDs/plan check | | | |
| 32 | Electric Engineer | $ 20,000 | All HVAC & Mech system Site Plans to CDs/plan check | | | |
| 33 | Cable and Soft Utilities Consultant | $ 2,500 | Agreements, Design, and Engineering for Internet and Cable | | | |
| 34 | Solar Sub/Consultant | $ 2,500 | Engineering, Analysis, and City Approvals for Solar System | | | |
| 35 | Filtration and Grey Water Consultant | $ 2,500 | Engineering and Analysis of reusable water system | | | |
| 36 | LID Consultant | $ 2,500 | Design, CDs/Plan check of "Low Impact Design" Rules | | | |
| 37 | LEED Consultant | $ 5,000 | Lobby, Mitigation, Design, & City Approval | | | |
| | | $ 115,000 | | | | |
| | | $ 3,988,913 | | | | |
| | **TOTAL:** | $ 3,988,913 | | | | |
| | | | Loan Proceeds for start of Infrastructure Construction to fund below and construction | | | |

### Homes Construction Phase of Contracts

| | Initial Phase of Homes Permits | Budget | | | | |
|---|---|---|---|---|---|---|
| | **Task or Professional Engaged (March, 2018-Jan. 2019)** | **Estimated Fee** | **Description** | | | |
| 1 | Architect | $ 150,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes | | | |
| 2 | Civil Engineer | $ 95,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes | | | |
| 3 | Structural Engineer | | Already above for first 5 homes | | | |
| 4 | HVAC & Mechanical Engineer | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes | | | |
| 5 | Plumbing Engineer | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes | | | |
| 6 | Electric Engineer | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes | | | |
| 7 | Landscape Architecture | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes | | | |
| 8 | Grading Engineer | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes | | | |
| 9 | Utilities Consultant | $ 7,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & Coordination of Infrastructure into individual home | | | |
| 10 | LADBS Expeditor | $ 7,500 | Lobby & Plan Check Coordination between architect, engineers, consultants, & City for homes | | | |
| 11 | LA Fire Life & Safety Consultant and Expeditor | $ 12,500 | Lobby, Mitigation, Agreements, Analysis, & City Approval of LAFD and LAPD for homes | | | |
| 12 | Alarm, Sprinkler, and Emergency Consultant | $ 2,500 | Integration of systems into individual homes | | | |
| 13 | Cable and Soft Utilities Consultant | $ 1,000 | Engineering, Analysis, and City Approvals for Solar System for homes | | | |
| 14 | Solar Sub/Consultant | $ 1,000 | Engineering and Analysis of reusable water system for homes | | | |
| 15 | LID Consultant | $ 1,000 | Design, CDs/Plan check of "Low Impact Design" Rules for homes | | | |
| 16 | LEED Consultant | $ 1,000 | Lobby, Mitigation, Design, & City Approval for homes | | | |
| | **TOTAL:** | $ 529,000 | | | | |

JY

## CFD BONDS PROCUREMENT - CM - DEVELOPMENT AGREEMENT

This CFD Bonds Procurement - CM - Development Agreement ("Agreement") is made effective as of March ___13___, 2019, and entered into by and between **JINZHENG GROUP (USA), LLC, a California limited liability company** ("Principal") and **BETULA LENTA, INC., a California Corporation** ("Developer/Underwriter"), with regard to the following:

        **WHEREAS,** Principal and Developer/Underwriter desire to enter into this Agreement for the purpose of Developer/Underwriter providing and performing certain CFD Bonds Procurement - CM - Development services (the "CFD Bonds Procurement - CM - Development Services") with respect to the construction and development of the infrastructure preparation for 2929 North Amethyst Street, Los Angeles, CA 90032 (the "Project") as more specifically detailed, outlined and provided for below in this Agreement and as set forth in the "GMAX Estimate" herein and fully incorporated into this Agreement by this reference as though fully set forth herein; and

        **WHEREAS,** Developer/Underwriter hereby represents and warrants that it possesses the necessary expertise, licenses, and experience required to provide and perform the CFD Bonds Procurement - CM - Development Services with respect to the development of the Property and is fully prepared and able to provide and perform the CFD Bonds Procurement - CM - Development Services in a timely manner; and will pull all applicable permits.

        **WHEREAS,** Principal hereby acknowledges and agrees that it or a legal entity owned and controlled by it or one of its principals owns fee title to the Property and is duly authorized to enter into this Agreement for the performance of the CFD Bonds Procurement - CM - Development Services by Developer/Underwriter,

        **NOW, THEREFORE,** the Principal and Developer/Underwriter (collectively referred to herein as the "Parties") do hereby agree to the following and terms and conditions established herein below in this Agreement.

1. **DESCRIPTION OF CFD BONDS PROCUREMENT - CM - DEVELOPMENT SERVICES.** Both Parties wish to perform the duties and engage the professionals necessary to cause either one of the following duties to occur: CFD Bond Procurement or any like Financing Vehicle. Once the Financing has commenced, the Developer/Underwriter has fulfilled his obligations to the Agreement.

2. **PERFORMANCE OF CFD BONDS PROCUREMENT - CM - DEVELOPMENT SERVICES.**
The manner in which the CFD Bonds Procurement - CM - Development Services are to be performed and provided shall be determined exclusively by Developer/Underwriter.

3. **COMPENSATION SCHEDULE.** Compensation payable to Developer/Underwriter by Principal for the CFD Bonds Procurement - CM - Development Services shall be requisitioned on a monthly basis as deemed necessary for the Project by the Developer/Underwriter and shall be paid by Principal or directly by the funding sources secured by the Project within 5 days of the requisition of funds requested.




4. **EXPENSE REIMBURSEMENT. All Permit, Plan Check, and other City Fees.** All other expenses not otherwise provided for in this Agreement shall be the sole responsibility of Developer/Underwriter. Except as otherwise agreed upon by the Parties, the Principal shall not be responsible for the reimbursement of any expenses incurred by Developer/Underwriter.

5. **GUARANTEED MAXIMUM PRICE.** Both Parties agree that Construction Documents may be incomplete and unavailable at the time of the execution of this contract. However, both Parties agree that a Guaranteed Maximum Price (hereinafter "GMAX") amount of $6,224,490 detailed (herein attached "Exhibit A") will be the basis of the GMAX for the services detailed herein, to complete the CFD Bonds Procurement - CM - Development Services described herein as follows;

   - The estimated costs detailed in Exhibit A include the estimated expenses for the actual cost of the services, the staffing, overhead, 3rd-party fees, expenses, and insurance.

   - Any initial savings from a given line item shall be kept in reserve for any overages in any other line items.

   - If at the end of the services detailed herein for Phase I, there is a savings from the GMAX amount of $6,224,490, then the balance of savings shall be disbursed 75% to Principal and 25% to Developer/Underwriter.

   - Although the GMAX amount of $6,224,490 shall be deemed as the estimated expenses for Phase I & 2 of the services detailed herein, Developer/Underwriter shall earn such fees as detailed in the Total Budget (herein attached "Exhibit B"),

   - Last, although the GMAX estimate is $6,224,490, Principal is also required to hold in reserve an additional $10 million in the Principal's bank account which was set up directly for the Project, and shall be held in reserve until after Construction Funding has occurred AND Lender has approved of release of reserve.

6. **OPEN BOOK POLICY.** Both Parties agree that all data, agreements, and accounting related to the GMAX and all information related to the source of funds for the GMAX shall be viewed openly by Principal and Developer/Underwriter in an effort to ensure costs are minimized where possible.

7. **TERM/TERMINATION.** This Agreement shall terminate automatically upon completion of the CFD Bonds Procurement - CM - Development Services by Developer/Underwriter as required by this Agreement and the Construction Estimate. However, in the event of a default with respect to any of the obligations set forth in this Agreement by either Principal or Developer/Underwriter, and such default is not cured within thirty (30) days following written notice to cure from the non-defaulting part, the non-defaulting party may terminate this Agreement and pursue any and all legal rights pertinent to such default including, but not limited to, damages or specific performance of the outstanding obligation(s).

8. **RELATIONSHIP OF PARTIES.** It is understood by the Parties that Developer/Underwriter is an independent Developer/Underwriter with respect to providing



and performing the CFD Bonds Procurement - CM - Development Services and is not an employee of the Principal, who shall not be required to provide any fringe benefits, including health insurance benefits, paid vacation, or any other employee benefits, for the benefit of Developer/Underwriter.

9. **DISCLOSURE.** Developer/Underwriter is required to disclose to Principal any outside activities or interests, including ownership or participation in any developments that conflict or will conflict with the Developer/Underwriter's providing and performing of the CFD Bonds Procurement - CM - Development Services and the ultimate development of the Project on the Property.

10. **EMPLOYEES.** Developer/Underwriter's Developer/Underwriters, Developer/Underwriters and employees, if any, who perform any aspect of the CFD Bonds Procurement - CM - Development Services for Developer/Underwriter under this Agreement shall also be bound by the provisions of this Agreement. At the written request of the Principal, Developer/Underwriter shall provide adequate evidence that such persons are Developer/Underwriter's agents, Developer/Underwriters, Developer/Underwriters, or employees.

11. **INJURIES AND INSURANCE.** Developer/Underwriter acknowledges that Developer/Underwriter's obligation to obtain appropriate insurance coverage for the benefit of Developer/Underwriter (and Developer/Underwriter's agents, Developer/Underwriters, Developer/Underwriters and employees, if any) to the extent required by applicable California law. Developer/Underwriter waives any and all rights to recovery against Principal for any injuries that Developer/Underwriter (and/or Developer/Underwriter's agents, Developer/Underwriters, Developer/Underwriters and employees, if any) may sustain while providing and/or performing the CFD Bonds Procurement - CM - Development Services under this Agreement, and that are a result of the negligence of Developer/Underwriter or Developer/Underwriter's agents, Developer/Underwriters, Developer/Underwriters, or employees.

12. **INDEMNIFICATION.** Developer/Underwriter agrees to indemnify and hold Principal harmless from all claims, losses, expenses, fees including attorney fees, costs, and judgments that may be asserted against Principal that result from the acts or omissions of Developer/Underwriter, Developer/Underwriter's agents, Developer/Underwriters, Developer/Underwriters, and employees, if any.

Principal agrees to indemnify and hold Developer/Underwriter, Developer/Underwriter's agents, Developer/Underwriters, Developer/Underwriters, and employees, harmless from all claims, losses, expenses, fees including attorney fees, costs, and judgments that may be asserted against Developer/Underwriter for any of the following: (a) any third-party work previously provided and performed on the behalf of Principal with respect to the Project; or (b) any acts or omissions of Principal, Principals agents, Developer/Underwriters, Developer/Underwriters, and/or employees.

13. **INTELLECTUAL PROPERTY.** The following provisions shall apply with respect to copyrightable works, ideas, discoveries, inventions, applications for patents, and patents

(collectively, "Intellectual Property"):

*Developer/Underwriter's Intellectual Property.* Developer/Underwriter does not presently hold any interest in any Intellectual Property with respect to the development of the Project on the Property.

*Development of Intellectual Property.* To the extent that any Intellectual Property rights are established with respect to providing or performing the CFD Bonds Procurement - CM - Development Services, or development of the Project on the Property, unless otherwise provided, all such Intellectual Property shall be the property of Principal and Developer/Underwriter shall take all such reasonable efforts to cause all such rights to be assigned to Principal.

**14. CONFIDENTIALITY.** Principal recognizes that Developer/Underwriter has and will have the following information:

- costs
- discounts
- future plans
- process information
- technical information
- copyrights
- proprietary information

as well as any other proprietary information (collectively, "Information") which are valuable, special and unique assets of Principal that require protection from improper disclosure. In consideration for access and disclosure of the Information to Developer/Underwriter, Developer/Underwriter agrees that it will not at any time or in any manner, either directly or indirectly, use any Information for Developer/Underwriter's own benefit, or divulge, disclose, or communicate in any manner any Information to any third party without the prior written consent of Principal. Developer/Underwriter will protect the Information and treat it as strictly confidential. A violation of this paragraph shall be a material violation of this Agreement.

**15. UNAUTHORIZED DISCLOSURE OF INFORMATION.** If it appears that Developer/Underwriter has disclosed (or has threatened to disclose) Information in violation of this Agreement, Principal shall be entitled to an injunction to restrain Developer/Underwriter from disclosing, in whole or in part, such Information, or from providing any services to any party to whom such Information has been disclosed or may be disclosed.  Principal shall not be prohibited
by this provision from pursuing any other remedies, including a claim for losses and damages.

**16. CONFIDENTIALITY AFTER TERMINATION.** The confidentiality provisions of this Agreement shall remain in full force and effect after the termination of this Agreement.

**17. SERVICES TO THIRD PARTIES.** Except as otherwise approved by Principal as set forth hereinabove in this Agreement, Developer/Underwriter shall not provide any consulting services to any third party during the term of this Agreement.




18. **RETURN OF RECORDS.** Upon termination of this Agreement, Developer/Underwriter, at the written request of Principal, shall deliver all records, notes, data, memoranda, models, and equipment of any nature that are in Developer/Underwriter's possession or under Developer/Underwriter's control that are Principal's property or directly relate to Principal's business.

19. **NOTICES.** All notices required or permitted under this Agreement shall be in writing and shall be deemed delivered when delivered in person or deposited in US Mail in the U.S Mail, postage prepaid, addressed as follows:

**If to Principal:**

**JINZHENG GROUP (USA), LLC,**
**a California limited liability company**
100 E. Huntington Drive,
Alhambra, CA 91801
Phone: (626) 703-4116
Attn: Jianping Yang, President

**If to Developer/Underwriter:**

**BETULA LENTA, INC.**
**a California corporation**
800 West 6th Street.
Suite 1250
Los Angeles, CA 90017
Phone: (310) 295-8764
Attn: David Park, President

Such address may be changed from time to time by either party by providing written notice to the other in the manner set forth above.

20. **ENTIRE AGREEMENT.** This Agreement along with the two attached exhibits constitutes the entire agreement of the parties and there are no other promises or conditions in any other agreement whether oral or written. This Agreement supersedes any prior written or oral agreements between the parties.

21. **AMENDMENT.** This Agreement may be modified or amended if the amendment is made in writing and is signed by the Parties.

22. **SEVERABILITY.** If any provision of this Agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.



23. **WAIVER OF CONTRACTUAL RIGHT.** The failure of either party to enforce any provision of this Agreement shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Agreement.

24. **APPLICABLE LAW.** This Agreement shall be governed by the laws of the State of California.

25. **INTERRUPTION OF SERVICE.** Either party shall be excused from any delay or failure in performance required hereunder if caused by reason of any occurrence or contingency beyond its reasonable control, including, but not limited to, acts of God, acts of war, fire, insurrection, laws proclamations, edits, ordinances or regulations, strikes, lock-outs or other serious labor disputes, riots, earthquakes, floods, explosions or other acts of nature. The obligations and rights of the party so excused shall be extended on a day-to-day basis for the time period equal to the period of such excusable interruption. When such events have abated, the parties' respective obligations hereunder shall resume. In the event the interruption of the excused party's obligations continues for a period in excess of thirty (30) days, either party shall have the right to terminate this Agreement upon ten (10) days' prior written notice to the other party.

26. **ASSIGNMENT.** Developer/Underwriter agrees that it will not assign, sell, transfer, delegate or otherwise dispose of any rights or obligations under this Agreement without the prior written consent of Principal. Any purported assignment, transfer, or delegation shall be null and void. Nothing in this Agreement shall prevent the consolidation of Principal with, or its merger into, any other legally recognized entity by the State of California, or the sale by Principal of all or substantially all of its properties or assets, or the assignment by Principal of this Agreement and the performance of its obligations hereunder to any successor in interest or any affiliated company, owned or controlled by Principal. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, legal representatives, successors, and permitted assigns, and shall not benefit any person or entity other than those enumerated above.

27. **SIGNATORIES.** This Agreement shall be signed on behalf of Principal by Jianging Yang, and on behalf of Developer/Underwriter by David Park and effective as of the date first above written.

*(SIGNATURES FOLLOW):*

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement as of the date first written above.

**PRINCIPAL:**

**JINZHENG GROUP (USA), LLC,**
a California limited liability company

By: _____
Its: President

**DEVELOPER/UNDERWRITER:**

**BETULA LENTA, INC.,**
a California corporation

By: _____
Its: President

## EXHIBIT A

### 2929 Amethyst Estimated Costs

**Phase 3 Funding Needed (for CFD Bonds):**

| Consultants and Engaged Contracts | Estimated Total Fees (Through Construction) | CFD Bond Expenses (Phase I) | CFD Bond Expenses (Phase 2) | Balance to be paid by CFD Bonds |
|---|---|---|---|---|
| 1 Developer Fee (ALL City Fees & Below) | $ 3,500,000 | $ 225,000 | $ 225,000 | $ 3,050,000 |
| 2 Brokerage - (Included in Development Fee) | | | | $ - |
| 3 Architect (All Homes) - TCS | $ 4,310,389 | $ 432,000 | $ 432,000 | $ 3,446,389 |
| 4 Architect (Master Planning & Landscape Architecture) - TCS | $ 2,600,000 | $ 216,000 | $ 216,000 | $ 2,168,000 |
| 5 Conceptual Design - Nvision | PAID IN FULL | | | |
| 6 Civil Engineer - Land Design Consultants/Other | $ 3,455,194 | $ 266,245 | $ 266,245 | $ 2,922,704 |
| 7 Geotech/Soils Engineer - Pacific Geotech (Included in Civil) | | | | |
| 8 Entitlements & Code Compliance - Craig Fry/Other | $ 2,344,525 | $ 273,500 | $ 273,500 | $ 1,797,525 |
| 9 Structural Engineer - TBD | $ 4,146,233 | $ 184,000 | $ 184,000 | $ 3,778,233 |
| 10 Site Structural Engineer (Included in Strutural) | | | | $ - |
| 11 Seismic Engineer (Trench Consultant) (Included in Strutural) | | | | $ - |
| 12 Shoring Engineer (Included in Strutural) | | | | $ - |
| 13 Traffic Improvements & Mitigation Consultant - Overland Traffic | $ 250,000 | $ 17,500 | $ 17,500 | $ 215,000 |
| 14 Landscape Architect - Harmony Gardens/Bardez/Other | $ 1,382,078 | $ 97,500 | $ 97,500 | $ 1,187,078 |
| 15 Landscape/Hardscape Engineer (Included in Landscape) | | | | $ - |
| 16 Grading Engineer (Included in Strutural) | | | | $ - |
| 17 Project Management | $ 3,000,000 | $ 180,000 | $ 180,000 | $ 2,640,000 |
| 18 CEQA Reports (Included in Entitlements) | | | | $ - |
| 19 Pre-Construction Consultant | $ 2,923,190 | $ 149,000 | $ 149,000 | $ 2,625,190 |
| 20 Sub-contractor bid coordinator (Included in Construction Management) | | | | $ - |
| 21 MEP Engineers | $ 2,764,156 | $ 97,500 | $ 97,500 | $ 2,569,156 |
| 22 Construction Management/GC Fees | $ 5,169,235 | $ 231,500 | $ 231,500 | $ 4,706,235 |
| 23 Bond Counsel | $ 2,700,000 | $ 450,000 | $ 450,000 | $ 1,800,000 |
| 24 Bonds Reservation/State Sponsor/App Fees | $ 900,000 | $ 97,500 | $ 97,500 | $ 705,000 |
| 25 Bonds Consultant/Commission | $ 1,800,000 | $ 97,500 | $ 97,500 | $ 1,605,000 |
| 26 Bonds Placement Investment Banker | $ 1,800,000 | $ 97,500 | $ 97,500 | $ 1,605,000 |
| **Proceeds Needed:** | $ 43,045,000 | $ 3,112,245 | $ 3,112,245 | $ 36,820,510 |

**Included in Developer Fee:**

| | | |
|---|---|---|
| 1 Developer Overhead and Expenses | $ | 500,000 |
| 2 Staff | $ | 318,090 |
| 3 Liability Insurance | $ | 165,000 |
| 4 Construction Bond Fees | $ | 325,000 |
| 5 City Fees - LADCP/LADBS | $ | 765,325 |
| 6 City Fees - LADOT & Other Agencies | $ | 226,585 |
| 7 Community Outreach | $ | 350,000 |
| 8 Inspection Fees | $ | 250,000 |
| 9 Non-Profit Donations | $ | 150,000 |
| 10 Legal | $ | 450,000 |
| | $ | 3,500,000 |



## EXHIBIT B

|  |  | 24 (months) | General Conditions: | Per SF/Yd. | | Total |
|---|---|---|---|---|---|---|
| Cut & Fill Site: | 1,532,930 |  | General Conditions: | $ 164,130.00 | $ | 3,939,120.00 |
|  |  |  | Site Work: | $ 28.99 | $ | 44,439,641 |
|  |  |  | Concrete: | $ 0.23 | $ | 352,574 |
|  |  |  | Masonry: | $ 0.20 | $ | 306,586 |
|  |  |  | Metals: | $ 0.06 | $ | 91,976 |
|  |  |  | Wood Structures: | $ 0.41 | $ | 628,501 |
|  |  |  | Water Proofing: | $ 0.38 | $ | 582,513 |
|  |  |  | Specialties: | $ 0.05 | $ | 76,647 |
|  |  |  | Special Construction: | $ 0.23 | $ | 352,574 |
|  |  |  | Electrical: | $ 1.02 | $ | 1,563,589 |
|  |  |  | Misc. Expenses: | $ 0.67 | $ | 1,027,063 |
|  |  |  | Job equipment: | $ 0.42 | $ | 643,831 |
|  |  |  | Design and Construction Contingency: | 10.000% | $ | 5,400,461 |
|  |  |  | Off-Site GL & SDI: | 2.722% | $ | 1,617,006 |
|  |  |  | Fee: | 4.500% | $ | 2,745,994 |

| Streets: | 372,714 |
|---|---|

| Lots & Streets: | 372,714 |  | Infrastructure SUB Total: | $ | 63,768,075 |
|---|---|---|---|---|---|
| 1 Acre: | 43,560 | sf | CFD Bond Fees: | $ | 6,421,445 |

**Homes:**

| Model | SF (incl. garage) |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|
| Yellow | 1,604.1 | 24 | 38,498 | $ | 200.00 | $ | 7,699,680 |  |
| Magenta | 2,111.4 | 50 | 105,570 | $ | 225.00 | $ | 23,753,250 |  |
| Red | 1,905.5 | 36 | 68,598 | $ | 250.00 | $ | 17,149,500 |  |
| Beige | 2,572.3 | 38 | 97,747 | $ | 265.00 | $ | 25,903,061 |  |
| Orange | 3,885.6 | 23 | 89,369 | $ | 265.00 | $ | 23,682,732 |  |
|  |  |  |  |  |  |  |  |  |
| Green (Canteliver) | 2,785.4 | 106 | 295,252 | $ | 295.00 | $ | 87,099,458 |  |
| Custom (Purple) | 4,960.0 | 7 | 34,720 | $ | 350.00 | $ | 12,152,000 |  |
|  |  | 284 | 729,755 |  | Subtotal Homes: | $ |  | 197,439,681 |

| Slope Analysis: | R1 |
|---|---|

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| 3.84 | 167,270.40 | 83,635.20 | Architecture: | 24,332 | $ 6,910,389 |
| 8.08 | 351,964.80 | 158,384.16 | Landscape Architecture: | 4,866.47 | $ 1,382,078 |
| 6.21 | 270,507.60 | 108,203.04 | MEP Engineering: | 9,733 | $ 2,764,156 |
| 7.21 | 314,067.60 | 109,923.66 | Structural Engineering: | 14,599 | $ 4,146,233 |
| 5.58 | 243,064.80 | 72,919.44 | Civil Engineering: | 12,166 | $ 3,455,194 |
|  | 1,346,875.20 | 533,065.50 | Entitlements: |  | $ 2,594,525 |
|  |  |  | City Fees (During Entitlements): |  | $ 350,000 |
|  |  |  | Permits: |  | $ 5,923,190 |
|  |  |  | City Fees (Construction): |  | $ 7,403,988 |
|  |  | Project Management (Phase II & III) & 3rd-party Construction Services: |  |  | $ 5,923,190 |
|  |  |  | Developer Fee: |  | $ 5,000,000 |
|  |  |  | Construction Management: |  | $ 5,169,235 |

| Total (Including CFD Bonds): | $ | 318,651,380 |
|---|---|---|
| Mello Roos (CFD Bond Portion): | $ | 90,104,281 |
| NET Total: | $ | 228,547,099 |

EXHIBIT B

| | |
|---|---|
| **From:** | David Park |
| **To:** | Peter A. Kim |
| **Cc:** | Jonathan Pae; Jamie Cho |
| **Subject:** | Fwd: 2929 Amethyst Total Accounting |
| **Date:** | Thursday, February 3, 2022 6:40:25 PM |

HI Peter,

Here is the basic accounting breakdown.

Best,
David

**David Park | Partner**
800 W. 6th Street, Suite 1250, Los Angeles, CA 90017
Phone:   213-537-0158, extension 103
www.thecodesolution.com
E-Mail: david@thecodesolution.com

**Check out our new real estate platform: Introducing Terrakan**

---------- Forwarded message ---------
From: **Jamie Cho** <jamie@thecodesolution.com>
Date: Thu, Feb 3, 2022 at 4:37 PM
Subject: Re: 2929 Amethyst Total Accounting
To: David Park <david@thecodesolution.com>
Cc: Jonathan Pae <jonathan@thecodesolution.com>

### 2929 Amethyst

| | |
|---|---:|
| Original Contract Amount | 11,754,928 |
| Change Order Amount | 1,500,000 |
| Total Amount | 13,254,928 |
| | |
| Amount Received from Jinzheng group | |
| (As of 2/3/2022) | 6,971,726 |
| | |
| % work done | 65% |
| The Calculated amount by work done | 8,615,703.20 |
| | |
| Outstanding amount | 1,643,977 |

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: **4158 14th Street, Riverside, CA 92501**

A true and correct copy of the foregoing document entitled (*specify*): **OBJECTION TO PROOFS OF CLAIM NO. 9 & 10 OF MICHAEL CARLIN; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF CHRISTOPHER J. LANGLEY IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):** Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 2/20/2022, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Donna C Bullock    donnabullockcarrera@yahoo.com, donna.bullock@ymail.com
Michael F Chekian    mike@cheklaw.com, chekianmr84018@notify.bestcase.com
Susan Titus Collins    scollins@counsel.lacounty.gov
Jeffrey W Dulberg    jdulberg@pszjlaw.com
Richard Girgado    rgirgado@counsel.lacounty.gov
M. Jonathan Hayes    jhayes@rhmfirm.com,
roksana@rhmfirm.com;matt@rhmfirm.com;rosario@rhmfirm.com;pardis@rhmfirm.com;russ@rhmfirm.com;david@rhmfirm.com;sloan@rhmfirm.com;boshra@rhmfirm.com;rosario@rhmfirm.com
Christopher J Langley    chris@slclawoffice.com,
omar@slclawoffice.com;langleycr75251@notify.bestcase.com
Benjamin R Levinson    ben@benlevinsonlaw.com, courtney@benlevinsonlaw.com
Eric A Mitnick    MitnickLaw@aol.com, mitnicklaw@gmail.com
Giovanni Orantes    go@gobklaw.com, gorantes@orantes-law.com,cmh@gobklaw.com,gobklaw@gmail.com,go@ecf.inforuptcy.com;orantesgr89122@notify.bestcase.com
Matthew D. Resnik    matt@rhmfirm.com,
roksana@rhmfirm.com;rosario@rhmfirm.com;susie@rhmfirm.com;max@rhmfirm.com;priscilla@rhmfirm.com;pardis@rhmfirm.com;russ@rhmfirm.com;rebeca@rhmfirm.com;david@rhmfirm.com;sloan@rhmfirm.com
Allan D Sarver    ADS@asarverlaw.com
David Samuel Shevitz    david@shevitzlawfirm.com,
shevitzlawfirm@ecf.courtdrive.com;r48785@notify.bestcase.com;Jose@shevitzlawfirm.com
United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
Hatty K Yip    hatty.yip@usdoj.gov, hatty.k.yip@usdoj.gov
☐                    Service information continued on attached page

**2.   SERVED BY UNITED STATES MAIL:**
On (*date*) 2/20/2022, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows: Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Honorable Ernest M. Robles
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1560 / Courtroom 1568
Los Angeles, CA 90012

Michael Carlin
PO Box 67132
Century City, CA 90067
(Address per proof of claim)

16

1            ☐     Service information continued on attached page

2   **3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**:
(state the method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on
3   (*date*) 2/20/2022, I served the following persons and/or entities by personal delivery, overnight mail service,
or (for those who consented in writing to such service method), by facsimile transmission and/or email as
follows:  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the
4   judge will be completed no later than 24 hours after the document is filed.

5            ☐     Service information continued on attached page

6   I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

7

| 2/20/2022 | John Martinez | /s/John Martinez |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

17

---

DEBTOR-IN-POSSESSION'S OBJECTION TO CLAIM 18