1   ZEV SHECHTMAN (State Bar No. 266280)
    *zs@DanningGill.com*
2   ALPHAMORLAI L. KEBEH (State Bar No. 336798)
    *akebeh@DanningGill.com*
3   DANNING, GILL, ISRAEL & KRASNOFF, LLP
    1901 Avenue of the Stars, Suite 450
4   Los Angeles, California 90067-6006
    Telephone: (310) 277-0077
5   Facsimile: (310) 277-5735

6   General Bankruptcy Counsel for Jinzheng Group
    (USA) LLC, Debtor and Debtor in Possession
7

8                  **UNITED STATES BANKRUPTCY COURT**

9                  **CENTRAL DISTRICT OF CALIFORNIA**

10                     **LOS ANGELES DIVISION**

11

12  | In re | Case No. 2:21-bk-16674-ER |

13  | JINZHENG GROUP (USA) LLC, | Chapter 11 |

14  |              Debtor. | **DEBTOR'S NOTICE OF MOTION AND** |

15  | | **MOTION TO AUTHORIZE SALE OF REAL PROPERTY LOCATED AT 6840 DE CELIS PLACE, APT 9, VAN NUYS,** |

16  | | **CALIFORNIA 91406, FREE AND CLEAR OF LIENS; MEMORANDUM OF POINTS** |

17  | | **AND AUTHORITIES, DECLARATIONS OF ZHAO PU YANG, EMMANUEL D.** |

18  | | **MARGEN, JR., ANALIE E. MARGEN, DARREN HUBERT, AND** |

19  | | **ALPHAMORLAI L. KEBEH, AND REQUEST FOR JUDICIAL NOTICE IN** |

20  | | **SUPPORT THEREOF** |

21  | | Date:      October 24, 2022 |
        | | Time:      11:00 a.m. |
22  | | Crtrm.:    1568 |
        | |             255 East Temple Street |
23  | |             Los Angeles, California 90012 |

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

I.    FACTUAL STATEMENT ..................................................................................................8

    A.    Bankruptcy Background ......................................................................................8

    B.    The Subject Property ...........................................................................................8

    C.    Proposed Treatment of Liens Against the Property.............................................8

        1.    The Property Liens ...................................................................................9

    D.    The Debtor's Marketing Efforts and Proposed Sale..........................................10

II.    PROPOSED OVERBID PROCEDURES ......................................................................10

III.    LEGAL DISCUSSION..................................................................................................12

    A.    The Proposed Sale of the Assets is Supported by the Debtor's Sound
        Business Judgment and is in the Best Interests of the Debtor's Estate and Its
        Creditors ...........................................................................................................12

    B.    The Sale Should Be Free and Clear of Any and All Liens, Claims and Other
        Interests .............................................................................................................13

    C.    The Sale Should be Free and Clear of Default Interest Because Default
        Interest Is In Bona Fide Dispute .......................................................................13

    D.    The Sale Should be Free and Clear of The Dorffs' Claim for Attorneys' Fees
        Because They are In Bona Fide Dispute.............................................................16

    E.    The Proposed Sale May be Authorized Under Section 363 of the Bankruptcy
        Code ..................................................................................................................17

    F.    The Debtor Requests that the Court Find that the Buyers and Any Backup
        Buyer Are Good Faith Purchasers Pursuant to Section 363(m) of the
        Bankruptcy Code ..............................................................................................18

    G.    Waiver of FRBP 6004(h) is Warranted .............................................................18

IV.    CONCLUSION...............................................................................................................19

DECLARATION OF ZHAO PU YANG ...............................................................................20

DECLARATION OF EMMANUEL D. MARGEN, JR. .......................................................21

DECLARATION OF ANALIE E. MARGEN ........................................................................22

DECLARATION OF DARREN HUBERT ............................................................................23

DECLARATION OF ALPHAMORLAI L. KEBEH ............................................................25

REQUEST FOR JUDICIAL NOTICE...................................................................................26

1

# TABLE OF AUTHORITIES

2

**Page**

3

## CASES

4
Coward v. AC & S, Inc.,
   91 Fed. Appx. 919, 924 (5th Cir. 2004)...................................................... 16

5

6
Ewell v. Diebert (In re Ewell),
   958 F.2d 276, 281 (9th Cir. 1992) ............................................................. 18

7
Foss v. Boardwalk Partners (In re Boardwalk Partners),
   171 B.R. 87 (Bankr. D. Ariz. 1994)............................................................ 14

8

9
Gen. Elec. Capital Corp. v. Future Media Prods., Inc.,
   536 F.3d 969, 974 (9th Cir. 2008) ............................................................. 14

10
In re 3MB, LLC,
   609 B.R. 841 (Bankr. E.D. Cal. 2019)........................................................ 14

11

12
In re 785 Partners LLC,
   470 B.R. 126, 134 (Bankr. S.D.N.Y. 2012)................................................. 14

13
In re Beltway One Dev. Grp., LLC,
   547 B.R. 819, 830 (B.A.P. 9th Cir. 2016) .................................................. 14

14

15
In re Continental Air Lines, Inc.,
   780 F.2d 1223 (5th Cir. 1986) ................................................................... 12

16
In re Derivium Capital, LLC,
   380 B.R. 392 (Bankr. D.S.C. 2007).................................................. 12, 13

17

18
In re DWS Invs., Inc.,
   121 B.R. 845, 849 (Bankr. C.D. Cal. 1990) ............................................... 14

19
In re Jack Kline Co. Inc.,
   440 B.R. 712, 747 (Bankr. S.D. Tex. 2010) ............................................... 14

20

21
In re Lahijani,
   325 B.R. 282 (B.A.P. 9th Cir. 2005) .......................................................... 12

22
In re Laymon,
   958 F.2d 72, 75 (5th Cir. 1992) ................................................................. 14

23

24
In re Lionel Corp.,
   722 F.2d 1063 (2d Cir. 1983) .................................................................... 12

25
In re Pine Coast Enters., Ltd.,
   147 B.R. 30, 33 (Bankr. N.D. Ill. 1992) ..................................................... 18

26

27
In re Process Property Corp.,
   327 B.R. 603, 609 (Bankr. N.D. Tex. 2005)............................................... 15

28

1

### TABLE OF AUTHORITIES
**(Continued)**

2

**Page**

3 In re Terry Ltd. P'ship,
    27 F.3d 241, 243 (7th Cir. 1994) ......................................................................... 14

4

In re Texas Star Indus. Group, Ltd. Co.,

5     2007 WL 4522323 at 3 (Bankr. N.D. Tex. Dec. 19, 2007) .................................. 14

6 In re Valdez,
    324 B.R. 296, 300 (Bankr. S.D. Tex. 2005) ........................................................ 16

7

Sec. & Exch. Comm'n v. Capital Cove Bancorp LLC,

8     2015 WL 9701154 at 11 (C.D. Cal. Oct. 13, 2015)............................................. 14

9 Southland Corp. v. Toronto–Dominion (In re Southland Corp.),
    160 F.3d 1054 (5th Cir. 1998) ....................................................................... 14, 15

10

_Stephens Indus., Inc. v. McClung_,

11     789 F.2d 386 (6th Cir. 1986) ............................................................................... 12

12

### STATUTES

13

11 U.S.C. § 363(b)(1) ..................................................................................................... 12

14

11 U.S.C. § 363(f).......................................................................................................... 13

15

11 U.S.C. § 363(f)(3) ..................................................................................................... 17

16

11 U.S.C. § 363(f)(4) ..................................................................................................... 17

17

11 U.S.C. § 363(m)........................................................................................................ 18

18

11 U.S.C. § 506(b)......................................................................................................... 13

19

11 U.S.C. § 704(a)(1) .................................................................................................... 12

20

21 ### RULES

22
FRBP 6004(h)................................................................................................................ 18

23

24

25

26

27

28

TO THE HONORABLE ERNEST M. ROBLES AND INTERESTED PARTIES:

PLEASE TAKE NOTICE THAT on October 24, 2022 at 11:00 a.m., or as soon thereafter the matter may be heard, in Courtroom 1568 of the United States Bankruptcy Court, 255 E. Temple Street, Los Angeles, California, Jinzheng Group (USA), LLC, Debtor and Debtor in Possession (the "Debtor"), will and hereby does move (the "Motion") the Court under 11 U.S.C. §§ 363(b) and (f), and Local Bankruptcy Rules 6004-1(c) and 9013-1, for an order authorizing the sale of real property located at 6840 De Celis Place, Apt. 9, Van Nuys, California 91406, free and clear of liens and encumbrances.  The proposed sale is pursuant to a Purchase and Sale Agreement (the "PSA"), a copy of which is attached to the Motion as Exhibit "1."

The Motion is made on the following grounds: the Debtor is requesting authority to sell the Property free and clear of liens pursuant to 11 U.S.C. § 363.

Pursuant to Local Bankruptcy Rule 6004-1(c), the Debtor provides the following information:

A.    The date, time and place of the hearing on the Motion are set forth above.

B.    The Debtor has proposed the sale of the Property to Emmanuel D. Margen, Jr. and Analie E. Margen (the "Buyers"), subject to opportunities for overbidding.

C.    The property to be sold consists of all of the Debtor's right, title, and interest in the Property, which is located at 6840 De Celis Place, Apt. 9, Van Nuys, California 91406, bearing Assessor Parcel Number 225-001-043.

D.    Any and all contingencies agreed to relating to the sale have been waived, and thus the sale will not be contingent upon any events or conditions other than this Court's approval and potential overbidding.

The Property will be sold for **$650,000 (the "Proposed Sale Price"), subject to overbid, in its "as is," "where is" condition, with no warranty or recourse whatsoever.**  The Buyers have conducted all due diligence on the Property that the Buyers believe is necessary for the completion of this sale.

E.    Based on a review of the Debtor's schedules, proofs of claim filed in the Debtor's case, and a preliminary title report[1], the only known liens and encumbrances against the Property are:

1.    A deed of trust in favor of Investment Management Company, LLC ("IMC"), securing a note in the amount of approximately $361,768.75 (the "IMC Deed of Trust"). This amount is comprised of a principal debt of $350,000, default interest charges in the sum of $10,578.75, and attorneys' fees in the sum of $1,190.

2.    A deed of trust in favor of Michael E. Dorff and Shari L. Dorff (collectively, the "Dorffs"), securing a note in the amount of approximately $70,621.89 (the "Dorff Deed of Trust"). This amount is comprised of a principal debt of $50,000, default interest charges in the sum of $11,287.89, attorneys' fees in the sum of $8,984, and miscellaneous "Admin" fees in the amount of $350.

3.    A notice of Homeowners Association Assessment Lien in favor of the De Celis Court Homeowners Association in the amount of $1,347.20 (the "HOA Lien").

The liens and claims in favor of IMC and the Dorffs are referred to hereinafter collectively as the "Property Liens." The Debtor does not dispute the principal amount and non-default interest owed under the Property Liens. However, the Debtor disputes the default interest asserted by IMC and the Dorffs, as well as the attorneys' fees asserted by the Dorffs, and is preparing to object to such disputed portions of the Property Liens. Thus, such disputed portions of the Property Liens are subject to a bona fide dispute under section 363(f)(4). Accordingly, the Debtor seeks to sell the Property free and clear of the Property Liens, including free and clear of the disputed portions. The Debtor intends to sell the Property free and clear of these liens, satisfy the undisputed amounts owed under the Property Liens in full from the net sale proceeds, and attach the disputed portions to the net proceeds of the sale with the same force, effect, validity and priority that they have with respect to the Property.

---

[1] A copy of the title report is attached to the Declaration of Alphamorlai L. Kebeh as Exhibit "10."

1       The Debtor is preparing to object to the default interest accrued in connection with the

2   Property Liens (the "Default Interest") because, based on Ninth Circuit and other authority, default

3   interest charges may be challenged on equitable grounds.  The Debtor believes that the default

4   interest rates asserted by IMC and the Dorffs would cause significant harm to the Debtor's

5   creditors and the estate.  The Debtor therefore plans to object to IMC and the Dorffs' claims to

6   determine that the Default Interest and other disputed portions are inequitable.  The Debtor is also

7   preparing to object to the claim for attorneys' fees asserted by the Dorffs because the Debtor

8   believes that such fees are not allowable under the Bankruptcy Code.  Thus, the sale of the Property

9   will be made free and clear of the disputed portions of the Property Liens, including the Default

10  Interest, which will attach to the sale proceeds with the same force, effect, validity, and priority that

11  they have with respect to the Property.  Specifically, the Debtor will hold the applicable net sale

12  proceeds in escrow, subject to further Court order.

13      F.      The proposed sale is subject to higher and better bids and, by way of this Motion,

14  the Debtor is requesting that the Court approve the overbid procedures described in the

15  accompanying memorandum of points and authorities, summarized as follows:

16          1.      **Minimum initial overbid**:  $660,000 (i.e. $10,000 above the Buyers'

17  current offer).

18          2.      **Minimum overbidding increments**:  $2,000.

19          3.      **Initial overbid deposit**:  $19,800.

20          4.      **Qualification for overbidding**:  At least three business days prior to the

21  commencement of the hearing on this Motion, any party wishing to overbid on the Property

22  must deliver to the Debtor c/o Danning, Gill, Israel & Krasnoff, LLP, Attn: Zev Shechtman,

23  1901 Avenue of the Stars, Suite 450, Los Angeles, California 90067:

24              i.      a cashier's check payable to "Jinzheng Group (USA) LLC" in the

25  amount of $19,800, and

26              ii.     a written, executed overbid in the form attached as Exhibit "2" to the

27  Zhao Pu Yang's declaration.

28

1694334.5  27086                                        4

Absent the Debtor's discretion, no party will be allowed to bid on the Property absent timely delivery of the initial overbid deposit and the written, executed overbid form.  The Debtor in its sole discretion may determine that a party desiring to bid is not qualified due to insufficient documentation or financial qualifications.  Accordingly, any party wishing to bid is encouraged to contact the Debtor's counsel at least one week before the hearing to ensure qualification.

G.    **Back-up bidders**:  Any qualified overbidder who is not the successful overbidder may opt to be a back-up bidder, subject to the Debtor's approval, in which case such back-up bidder's initial deposit will be retained by the Debtor's counsel until the sale closes.

H.    **Reimbursement of Expenses:** The Debtor also requests authority to reimburse the costs incurred by the Debtor's broker relating to the maintenance of the Property, including service costs for cleaning and handling of furniture.  To date, the Debtor's broker has incurred $740 in costs relating to the maintenance of the Property.  The Debtor requests authority to pay additional reasonable and ordinary costs to the broker, prior to the closing of the sale, relating to the removal of garbage on the premises or other maintenance matters.

I.    **Estimated Net Sale Proceeds**: The opening sale price for the Property is $650,000. The Debtor estimates that the breakdown of the net sale proceeds, with 4.25% broker's commission, liens, fees, and anticipated costs of sale, as follows:

| | |
|---|---|
| Sale Price | $650,000.00 |
| Commission to Avenue 8 (2.25%) (Debtor's Broker) | ($14,625.00) |
| Commission to Vidal Capital Investments, Inc. (2%) (Buyers' Broker) | ($13,000.00) |
| Debtor's Broker's expense reimbursements | ($740.00) |
| Sale costs (estimated 2% of Sale Price) | ($13,000.00) |
| IMC Deed of Trust (Principal and Postpetition Attorneys' Fees only) | ($351,190.00) |
| Dorff Deed of Trust (Principal and "Admin" Fees Only) | ($50,350.00) |
| HOA Lien | ($1,347.20) |
| **Estimated Net Sale Proceeds** | **$205,747.80** |

J.      The Debtor proposes to pay a real estate broker's commission of 4.25% of the sale price of the Property to the brokers as follows: 2.25% to the Debtor's broker Avenue 8, and 2% to Vidal Capital Investments, Inc., the Buyers' broker ("Vivid").  If there is a successful overbidder (i.e., not the Buyers), such successful overbidder shall receive the 2% allocated to the Buyers' broker.  If such successful overbidder does not have a broker, Avenue 8 will receive a total commission of 3% of the sale price of the Property, as the Debtor's broker.  Avenue 8 will be reimbursed $740 for out of pocket expenses advanced to date, plus any future out of pocket expenses it may incur prior to the closing of the Property sale.

K.      **Anticipated Taxes**: The Debtor is inquiring with his tax consultant regarding the potential tax consequences of the sale.  The Debtor expects to provide an update with respect to any tax consequences prior to the hearing on the Motion.

This Motion is based upon this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the Declarations of Zhao Pu Yang, Emmanuel D. Margen, Jr., Analie E. Margen, Darren Hubert, and Alphamorlai L. Kebeh, and Request for Judicial Notice; the papers and pleadings in the Debtor's bankruptcy case; and such other evidence that may be presented at the hearing.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Local Bankruptcy Rule 9013-1(f), each interested party opposing, joining in, or responding to the Motion must, not later than **14 days** before the date of the hearing, file with the Clerk of the Bankruptcy Court and serve upon the Debtor's undersigned general counsel either: (i) a complete written statement of all reasons in opposition thereto or in support or joinder thereof, declarations and copies of all evidence on which the responding party intends to rely, and any responding memorandum of points and authorities; or (ii) a written statement that the Motion will not be opposed.

///

///

///

///

///

1         Pursuant to Local Bankruptcy Rule 9013-1(h), failure to timely file and serve papers may

2    be deemed by the Court to be consent to the granting of the Motion.

3

4    DATED:  October 3, 2022               DANNING, GILL, ISRAEL & KRASNOFF, LLP

5

6                                    By:    _____*/s/ Alphamorlai L. Kebeh*_____

7                                           ALPHAMORLAI L. KEBEH
                                            General Bankruptcy Counsel for Jinzheng Group
8                                           (USA) LLC, Debtor and Debtor in Possession

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### FACTUAL STATEMENT

**A.    Bankruptcy Background**

On August 24, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor continues in possession of its property and is operating and managing its business as a debtor in possession pursuant to the provisions of 11 U.S.C. §§ 1107(a) and 1108.  No Trustee or examiner has been appointed in the Debtor's Chapter 11 Case.

**B.    The Subject Property**

The assets of the bankruptcy estate include a number of real properties, including a parcel of real property located at 6840 De Celis Place, Apt. 9, Van Nuys, California 91406 (the "Property").  In addition to the Property, the Debtor is in possession of three other parcels (or areas) of real property which it intends to sell as part of its liquidation plan.  Like the Property, these other properties are encumbered by liens.

**C.    Proposed Treatment of Liens Against the Property**

Based on a review of the Debtor's schedules, proofs of claim filed in the Debtor's case, and a preliminary title report[2], the only known liens and encumbrances against the Property are:

(1)    A deed of trust in favor of Investment Management Company, LLC ("IMC"), securing a note in the amount of approximately $361,768.75 (the "IMC Deed of Trust").  This amount is comprised of a principal debt of $350,000, default interest charges in the sum of $10,578.75, and attorneys' fees in the sum of $1,190.

(2)    A deed of trust in favor of Michael E. Dorff and Shari L. Dorff (collectively, the "Dorffs") securing a note in the amount of approximately $70,621.89 (the "Dorff Deed of Trust"). This amount is comprised of a principal debt of $50,000, default interest charges in the sum of

---

[2] A copy of the title report is attached to the Declaration of Alphamorlai L. Kebeh as Exhibit "10."

1  $11,287.89, attorneys' fees in the sum of $8,984, and miscellaneous "Admin" fees in the amount of

2  $350.

3        (3)    A notice of Homeowners Association Assessment Lien in favor of the De Celis

4  Court Homeowners Association in the amount of $1,347.20 (the "HOA Lien").

5        The liens and claims in favor of IMC and the Dorffs are referred to hereinafter collectively

6  as the "Property Liens."

7      **1.**    <u>The Property Liens</u>

8        On or about August 11, 2020, a note in the name of the Debtor in favor of IMC was

9  executed and secured by the IMC Deed of Trust (the "IMC Note").  A copy of the IMC Note is

10  attached to the Motion as Exhibit "3."  The original principal amount of the IMC Note was

11  $350,000.  On August 12, 2020, the Debtor and IMC executed a default interest rate rider

12  amending the IMC Promissory note (the "Default Rider").  A copy of the Default Rider is attached

13  to the Motion as Exhibit "4."   The standard interest rate under the IMC Note is 12%.  The default

14  interest rate under the IMC Note, as amended by the default rider, is 24%.  The Debtor is informed

15  by IMC that IMC has agreed to reduce the default interest rate under the IMC Note to 18%.

16        On or about November 20, 2020, a note in the name of the Debtor in favor of Dorff was

17  executed and secured by the Dorff Deed of Trust (the "Dorff Note").  A copy of the Dorff Note is

18  attached to the Motion as Exhibit "5."  The original principal amount of the Dorff Note was

19  $50,000.  On the same date, the Debtor executed a rider to the Dorff Note amending the Dorff Note

20  (the "Dorff Rider").  A copy of the Dorff Rider is attached to the Motion as Exhibit "6."  The

21  standard interest rate under the Dorff Note is 12%.  The default interest rate under the Dorff Note,

22  as amended by the Dorff Rider, is 17%.

23        The Debtor believes that the default interest accrued by virtue of the Property Liens (the

24  "Default Interest") is unreasonable, deviates from market standards, and would cause significant

25  harm to the unsecured creditors in this case.  Therefore, the Debtor anticipates challenging the

26  Default Interest as inequitable.

27

28

**D.      The Debtor's Marketing Efforts and Proposed Sale**

On August 8, 2022, the Court entered an order authorizing the employment of Avenue 8 as the Debtor's broker.  The Debtor has marketed the Property since July 28, 2022.  In that time, the Debtor, through its broker, has held multiple open houses and private showings, and has received a total of 6,089 online views.  With the aid of the broker, the Debtor has robustly marketed the Property for sale, and the Buyers' offer is the best offer the Debtor has received to date.  The only remaining requirement to close the sale is Court approval, subject to qualified overbids made at the sale hearing.

## II.

### PROPOSED OVERBID PROCEDURES

The Debtor requests that the Court approve the following procedures for overbids:

1.      Any party wishing to present an overbid must deliver the following to the Debtor at least three (3) business days prior to the commencement of the hearing on this Motion:

(a)      a deposit in the form of a cashier's check in the amount of $19,800 payable to "Jinzheng Group (USA) LLC" (the "Deposit");

(b)      a written offer on the form attached as Exhibit "2" to the Declaration of Zhao Pu Yang, without any changes or conditions; and

(c)      provide proof of ability to close acceptable in the sole discretion of the Debtor.

2.      The initial overbid must be no less than $660,000, representing $10,000 over the Proposed Sale Price.

3.      The acceptance of any overbid from a qualified bidder shall be in the Debtor's sole discretion and may be made prior to or at the time of hearing to confirm the sale.

4.      If qualified overbids are received and accepted by the Debtor, an auction will be held at and during the hearing on the Debtor's motion for approval of the proposed sale.  The Debtor proposes that each overbid to be made during the hearing be at least $2,000 more than the then-highest overbid.  At the conclusion of the auction, the Debtor will have the right, based solely

1  on his business judgment and sole discretion, to recommend to the Court for confirmation the offer

2  that the Debtor determines is the highest and best overall offer.

3          5.      If the Court approves a sale to the bidding party (hereinafter the "Successful

4  Bidder"), the Successful Bidder will be bound by all of the terms of the Purchase and Sale

5  Agreement except as to price, without any contingencies (including no financing contingency).

6  The Successful Bidder's deposit will be retained by the Debtor and will be applied to the sale price.

7  The deposit will be non-refundable in the event that, for any reason whatsoever, the Successful

8  Bidder fails to close the sale timely.

9          6.      The closing will take place as soon as practicable after the date of entry of the

10 Court's order approving the sale (the "Sale Order"), but no later than the first business day which is

11 more than fourteen calendar days following the date of entry of the Sale Order.  The Debtor and the

12 Successful Bidder may mutually agree in writing to extend the time for closing the sale, without the

13 need to obtain Court approval(s) of such extension(s).

14         7.      In its sole discretion, the Debtor may request that the Court confirm a "Back-Up

15 Bidder" so that if the Successful Bidder does not close timely, the Debtor may sell the Property to

16 the Back-Up Bidder for the amount of such Back-Up Bidder's last bid.  In that event, the Back-Up

17 Bidder's deposit will be retained by the Debtor's counsel.  If the sale to the Successful Bidder does

18 not close timely, the Debtor will advise the Back-Up Bidder accordingly.  The closing will take

19 place on or before fourteen calendar days following the date on which the Debtor gives notice of

20 the Successful Bidder's failure to close.  The Back-Up Bidder will be bound by all of the terms of

21 the Sale Agreement except as to price, without contingencies (including any financing

22 contingency).  The Back-Up Bidder's deposit will be retained by the Debtor's counsel and will be

23 applied to the sale price.  If so notified that the Back-Up Bidder is up to proceed with the sale, then

24 the deposit will become non-refundable in the event that the Back-Up Bidder fails to close the sale

25 timely.

26         8.      If a qualified overbidder is not the Successful Bidder or the Back-Up Bidder, the

27 overbidder's deposit will be returned to the overbidder within ten (10) days after the date of the

28

1694334.5  27086                                    11

1    hearing.  If the sale to the Successful Bidder closes, the Back-Up Bidder's deposit will be returned

2    to the Back-Up Bidder within ten (10) days from the date of closing.

3        9.    Pursuant to the Court-approved listing agreement, the aggregate commission to be

4    paid by the Debtor is an amount equal to 4.25% of the gross sales price.  In addition, the Debtor

5    requests that the Court authorize the Debtor to pay through escrow costs advanced for the Property

6    by the Debtor's broker plus any future out of pocket expenses they may advance.  To date, these

7    out of pocket expenses have aggregated $740.

8

9                                    **III.**

10                            **LEGAL DISCUSSION**

11   **A.    The Proposed Sale of the Assets is Supported by the Debtor's Sound Business**

12         **Judgment and is in the Best Interests of the Debtor's Estate and Its Creditors**

13        To enable a Trustee (or debtor-in-possession) to fulfill his duty to "collect and reduce to

14   money the property of the estate" (11 U.S.C. § 704(a)(1)), the trustee "after notice and a hearing,

15   may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11

16   U.S.C. § 363(b)(1).  In this Circuit and others, courts will authorize sales where the decision to sell

17   assets outside the ordinary course of business is based upon sound business judgment.  In re

18   Continental Air Lines, Inc., 780 F.2d 1223, 1226 (5th Cir. 1986); In re Derivium Capital, LLC, 380

19   B.R. 392, 404 (Bankr. D.S.C. 2007) ("In determining whether to approve a sale proposed by a

20   trustee, courts generally apply a business judgment test").

21        Based on the Second Circuit's decision in In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983),

22   courts generally hold that the following four elements must exist to satisfy the "sound business

23   judgment test":  (1) sound business reasons; (2) accurate and reasonable notice to interested

24   persons; (3) an adequate, fair and reasonable price; and (4) good faith.  See Stephens Indus., Inc. v.

25   McClung, 789 F.2d 386, 390 (6th Cir. 1986) (affirming sale of debtor's assets proposed by trustee

26   as being supported by a sound business purpose); Lionel, 722 F.2d at 1071.  "Ordinarily, the

27   position of the trustee is afforded deference, particularly where business judgment is entailed in the

28   analysis or where there is no objection."  In re Lahijani, 325 B.R. 282, 289 (B.A.P. 9th Cir. 2005);

1   Derivium, 380 B.R. at 404 ("the Trustee's business judgment is to be given 'great judicial

2   deference,' [however] the Court must scrutinize whether the Trustee has fulfilled his duty to

3   'maximize the value obtained from a sale'").

4          The Debtor believes that the proposed sale of the Property, subject to overbid, is the best

5   method by which to maximize the value of the estate's interest in the Property.  As detailed above,

6   the Debtor retained a licensed real estate broker to list, market, and aid it in selling the Property.

7   The Debtor has obtained an offer subject to overbidding and Bankruptcy Court approval, and the

8   Buyers' is the highest and best offer received to date (taking into account financial qualifications as

9   well as price).  The price was arrived at with the Buyers following arms-length negotiations and the

10  Debtor believes that it represents a fair and adequate price for the Property.

11         The proposed sale is subject to overbids, so any and all qualified parties wishing to

12  purchase the Property for a higher price may do so.

13  **B.    The Sale Should Be Free and Clear of Any and All Liens, Claims and Other Interests**

14         A debtor may sell estate property free and clear of any non-debtor's interest in such

15  property if:

16         (1) applicable nonbankruptcy law permits the sale of such property free and clear of
           such interest; (2) such entity consents; (3) such interest is a lien and the price at
17         which such property is to be sold is greater than the aggregate value of all liens on
           such property; (4) such interest is in bona fide dispute; or (5) such entity could be
18         compelled, in a legal or equitable proceeding, to accept a money satisfaction of such
           interest.
19
20  11 U.S.C. § 363(f).  The Debtor seeks to sell the Property free and clear of all liens, claims or other

21  interests, in particular the undisputed portions of the liens of IMC and Dorff.  Thus, sections 363(f)

22  is satisfied.

23  **C.    The Sale Should be Free and Clear of Default Interest Because Default Interest Is In
24         Bona Fide Dispute**

25         Section 506(b) of the Bankruptcy Court states, in relevant part, that the holder of an

26  oversecured claim "shall be allowed…interest…and any reasonable fees, costs, or charges provided

27  for under the agreement or State statute under which such claim arose."  11 U.S.C. § 506(b).  With

28  respect to default interest rates, bankruptcy courts have applied a presumption of allowability for

1   contracted-for default rates.  Gen. Elec. Capital Corp. v. Future Media Prods., Inc., 536 F.3d 969,

2   974 (9th Cir. 2008).  However, the Ninth Circuit, among others, has stated that this presumption is

3   subject to challenge based on applicable nonbankruptcy law and the "equities involved in [the]

4   bankruptcy proceeding."  Id. (quoting In re Laymon, 958 F.2d 72, 75 (5th Cir. 1992)); In re Terry

5   Ltd. P'ship, 27 F.3d 241, 243 (7th Cir. 1994);  In re Beltway One Dev. Grp., LLC, 547 B.R. 819,

6   830 (B.A.P. 9th Cir. 2016) (noting that "the presumptive rule for default interest is also subject to

7   rebuttal based on equitable considerations"); See In re 3MB, LLC, 609 B.R. 841 (Bankr. E.D. Cal.

8   2019); See Southland Corp. v. Toronto–Dominion (In re Southland Corp.), 160 F.3d 1054 (5th Cir.

9   1998).  When weighing the equities involved, courts have considered various factors.  3MB, 608

10  B.R. at 850 (noting that the court's equitable powers should be exercised where "the application of

11  the contractual interest rate would harm the unsecured creditors or impair the debtor's fresh start")

12  (quoting In re 785 Partners LLC, 470 B.R. 126, 134 (Bankr. S.D.N.Y. 2012); In re DWS Invs., Inc.,

13  121 B.R. 845, 849 (Bankr. C.D. Cal. 1990) (considering the default interest's relation to the market

14  rate of interest, the default interest's relationship to the actual or projected loss as a result of

15  nonpayment, the debtor's solvency, and the likelihood of distribution to unsecured creditors).  Most

16  important of all the factors is whether junior or unsecured creditors will be harmed by an award of

17  default interest.  Sec. & Exch. Comm'n v. Capital Cove Bancorp LLC, 2015 WL 9701154 at 11

18  (C.D. Cal. Oct. 13, 2015) ("courts have recognized that this consideration of whether junior or

19  unsecured creditors will be harmed 'has special significance'") (quoting In re Jack Kline Co. Inc.,

20  440 B.R. 712, 747 (Bankr. S.D. Tex. 2010); 785 Partners LLC, 470 B.R. at 134 (stating that post-

21  petition default interest may not be allowed where "the application of the contractual interest rate

22  would harm the unsecured creditors"); DWS Invs., Inc., 121 B.R. at 849 (declining to apply a post-

23  petition default interest rate in part because "[t]he estate is insolvent and the unsecured creditors are

24  unlikely to receive a distribution" if the rate is applied); Foss v. Boardwalk Partners (In re

25  Boardwalk Partners), 171 B.R. 87 (Bankr. D. Ariz. 1994); In re Texas Star Indus. Group, Ltd. Co.,

26  2007 WL 4522323 at 3 (Bankr. N.D. Tex. Dec. 19, 2007) (Declining to apply an 18% default

27  interest rate, noting that "[t]he most important factor is whether junior creditors will be harmed or

28  impaired if postpetition interest is paid at the default rate"); In re Process Property Corp., 327 B.R.

603, 609 (Bankr. N.D. Tex. 2005) (finding that an increase in an oversecured creditor's interest rate from 6% to a statutory default rate of 12% was inequitable and stating that the increased rate's impact on other creditors is "the most important aspect of the inquiry when examining the equities"); Southland Corp., 160 F.3d at 1060 (5th Cir. 1998) (stating that the impact of awarding default interest on junior creditors was "especially significant").

Here, the equities of the Debtor's case support a finding that default interest should not be awarded on the Property Liens. At this stage in the Debtor's case, the unsecured creditors of the estate will not receive distributions in full satisfaction of their claims, if at all. Indeed, the estate does not yet have sufficient funds to pay its administrative expenses. With respect to at least one other property of the Debtor (San Marino), the third lienholder has agreed to subordinate a substantial part of its lien to make the sale of that property possible.[3] Thus, to the extent any lienholder receives default interest, that payment will be at the expense of payment of undersecured lienholders, administrative creditors, priority creditors, and general unsecured creditors.

Furthermore, the default interest rates attached to the Property Liens are substantially higher than market rates at the time that the IMC Note and the Dorff Note were executed. The Property is a condominium. Prior to the Petition Date, standard interest rates for mortgages were well below 4%. Indeed, the 30-year fixed rate for a home loan fell below 3% during 2021.[4] The non-default rates of 12% were exorbitant at the outset. 17% or 18% as the default rate is not acceptable under most traditional circumstances involving an ordinary marketable condominium such as the Property. These facts weigh against the allowance of Default Interest under the Property Liens.

---

[3] See doc. no. 343 (motion to approve carveout agreement with DNQ LLC)

[4] Google: "Mortgage Interest Rate in 2020" or "Mortgage Interest Rate in 2021." https://www.google.com/search?q=mortgage+intereste+rates+in+2020&rlz=1C1NHXL_enUS817US817&oq=mortgage+intereste+rates+in+2020&aqs=chrome..69i57j0i13j0i22i30l7j0i8i13i30.6801j0j4&sourceid=chrome&ie=UTF-8

1    The Debtor is in possession of four properties,[5] including the Property subject to this

2  Motion.  The Debtor is attempting to sell its properties to generate funds for the benefit of the

3  estate and its creditors.  All of the Debtor's properties are encumbered by claims secured by liens,

4  and most of the secured creditors allege amounts owed based, in part, on default interest.  Should

5  the Court award interest at the default rate to these claims, the estate will lose a substantial sums

6  which would otherwise be available for the benefit of the estate.  This is a case where unsecured

7  creditors will not receive any distribution absent a successful sale of real properties.  Here,

8  awarding default interest would prejudice all parties other than the oversecured creditors by

9  reducing the chance that any other party will receive full or partial (depending on their priority)

10  satisfaction of their claims.  At the same time that unsecured creditors may receive nothing, the

11  Debtor's oversecured creditors would enjoy not only full payment of their principal, but also

12  payment of default interested at rates of 5 to 6 times the prevailing market interest rates that existed

13  when the Debtor obtained the loans.[6]  Accordingly, the Debtor objects to such treatment and

14  requests that the portion of IMC and the Dorffs' claim relating to the Default Interest attach to the

15  net proceeds of the sale with the same force, effect, validity and priority that they have with respect

16  to the Property.

17  **D.**    **The Sale Should be Free and Clear of The Dorffs' Claim for Attorneys' Fees Because**

18         **They are In Bona Fide Dispute**

19    Section 506(b) requires that the party requesting post-petition attorneys' fees must show:

20  "(1) the creditor's claim is an allowed secured claim; (2) the creditor is oversecured; (3) the fees are

21  reasonable; and (4) the fees are provided for under the agreement."  In re Valdez, 324 B.R. 296,

22  300 (Bankr. S.D. Tex. 2005).  The oversecured creditor bears the burden of proof that it is entitled

23  to postpetition attorneys' fees.  Coward v. AC & S, Inc., 91 Fed. Appx. 919, 924 (5th Cir. 2004).

24

25

26  [5] The property described as the Lincoln Heights Property is actually comprised of several parcels
that are being marketed for sale together.

27  [6] These facts may also support allegations under 11 U.S.C. § 548(a)(1)(B) for constructively
28  fraudulent transfers.

1    The Dorffs' claim against the Debtor's estate includes a claim for postpetition attorneys'

2    fees in the amount of $8,984, nearly matching the total of default interest accrued and comprising

3    of nearly 20% of the underlying note's original value.  Further, the note securing the Dorff Deed of

4    Trust does not provide that the Debtor has any obligation relating to the Dorffs' attorneys' fees.

5    For these reasons, the Debtor contends that the Dorffs' are not entitled to postpetition attorneys'

6    fees and disputes this portion of their claim.

7    **E.**    **The Proposed Sale May be Authorized Under Section 363 of the Bankruptcy Code**

8    Section 363(f) of the Bankruptcy Code provides that, upon certain conditions, the trustee

9    (or debtor) may sell property free and clear of a lien or interest in such property:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—
>
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

19    11 U.S.C. § 363(f).

20    The Debtor will pay off all the undisputed portions of the liens on the Property, thus

21    satisfying sections 363(f)(3) and (4).  The purchase price for the Property will be at least $650,000,

22    which will be sufficient to pay the undisputed portions of the Property Liens.  The Debtor further

23    seeks authority to pay the allowable and undisputed amounts of the Property Liens, the HOA Lien,

24    and Avenue 8's out of pocket expenses in full from escrow.  There are no other known liens or

25    interests in the Property.  The Debtor further requests that the Court approve payments of all sales

26    costs from the Property sale proceeds, including broker commissions, escrow fees, taxes and

27    insurance, if any.  The Debtor estimates these sale costs to be approximately $40,625.00.

28

**F.      The Debtor Requests that the Court Find that the Buyers and Any Backup Buyer Are**

**Good Faith Purchasers Pursuant to Section 363(m) of the Bankruptcy Code**

A purchaser of property is protected from the effects of reversal on appeal of the

authorization to sell or lease as long as the Court finds that the purchaser acted in good faith.  See

11 U.S.C. § 363(m).  A good faith purchaser is one who buys in good faith and for value.  Ewell v.

Diebert (In re Ewell), 958 F.2d 276, 281 (9th Cir. 1992).  The Code does not define "good faith,"

but courts have provided guidance as to the appropriate factors to consider.  See Id. (lack of good

faith generally shown by fraud, collusion between the purchaser and other bidders or the trustee, or

an attempt to take grossly unfair advantage of other bidders); In re Pine Coast Enters., Ltd., 147

B.R. 30, 33 (Bankr. N.D. Ill. 1992) (requirement that a purchaser act in good faith speaks to the

integrity of its conduct in the course of sale proceeding).

Here, the Debtor employed broker to list, market and aid in selling the Property.  The

broker listed the Property and negotiations with the Buyers and other potential purchasers were

made in an arms-length fashion.  The Debtor will continue to negotiate at arms-length with

potential overbidders, and intends to present evidence to the Court at or before the hearing

supporting a finding of good faith as to any Successful Bidder or Back-Up Bidder.  Moreover, the

Debtor, the Debtor's broker and the Buyers have submitted declarations, attached to this Motion,

supporting a finding of good faith.  As a result, the Debtor requests that the Court make a finding

that the party to whom the Court confirms the sale, as well as any Back-Up Bidder, is a good faith

purchaser of the Property within the meaning of § 363(m) of the Code.

**G.      Waiver of FRBP 6004(h) is Warranted**

The Debtor respectfully requests a waiver of the 14-day stay of the effect of the sale order.

It would be beneficial to the estate and all creditors to complete the sale at the earliest possible

time.  The Debtor prays that the Court enter such relief pursuant to FRBP 6004(h) to ensure an

expeditious closing.

**IV.**

**CONCLUSION**

For the foregoing reasons, the Debtor requests that the Court enter an order:

1.      authorizing the Debtor to sell all right, title and interest in and to the Property free and clear of any and all liens, claims or interests pursuant to 11 U.S.C. § 363(b) and (f);

2.      approving the proposed overbid procedures;

3.      directing that the sale be free and clear of all liens, claims and interests and to provide that the disputed portions of the liens secured by the IMC Deed of Trust and the Dorff Deed of Trust shall attach to like amounts of the net sale proceeds, with the same force, effect, validity and priority that they have with respect to the Property;

4.      authorizing the Debtor to pay brokerage commissions, ordinary and customary costs of sale (including title and escrow fees) through escrow, and to reimburse the Debtor's broker's out of pocket expenses;

5.      determining that the Buyers and back-up bidder(s) (if any) are good faith purchasers within the meaning of 11 U.S.C. § 363(m);

6.      waiving the effect of FRBP 6004(h);

7.      approving the form and manner of notice provided by the Debtor of the sale; and

8.      for such further relief as the Court deems just and proper.

DATED:  October 3, 2022                    DANNING, GILL, ISRAEL & KRASNOFF, LLP


                                           By:    _/s/ Alphamorlai L. Kebeh_
                                                  ALPHAMORLAI L. KEBEH
                                                  General Bankruptcy Counsel for Jinzheng Group
                                                  (USA) LLC, Debtor and Debtor in Possession

1694334.5  27086                                    19

<div align="center">

**DECLARATION OF ZHAO PU YANG**

</div>

I, Zhao Pu Yang, declare as follows:

1.    I am the Attorney in Fact for Jianqing Yang, Managing Member of Jinzheng Group (USA) LLC.  I am also the son of Jianqing Yang.

2.    All facts in this declaration are based upon my personal knowledge, discussions with the Debtor's or my own advisors, broker or counsel, and/or my personal opinion based upon my experience and general knowledge about the Debtor.

3.    I am over the age of 18 and am authorized to submit this declaration on behalf of the Debtor.  If called to testify, I would testify to the matters set forth in this declaration.

4.    I submit my declaration in support of the Debtor's Motion to Authorize Sale of Real Property Located At 6840 De Celis Place, Apt. 9, Van Nuys, CA 91406 Free and Clear of Liens (the "Motion").

5.    I believe that the sale terms are reasonable and in the best interests of the estate and respectfully request that the Court approve the Motion.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Los Angeles, California on October 3, 2022.


By:    SIGNATURE TO FOLLOW
_____
ZHAO PU YANG

DocuSign Envelope ID: 76A324AE-EE4C-4D27-B9DD-C4BB78CF38FE

**DECLARATION OF EMMANUEL D. MARGEN, JR.**

I, Emmanuel D. Margen, Jr., declare as follows:

1.      I am a buyer of all right, title, and interest in real property commonly known as 6840 De Celis Place, Apt. 9, Van Nuys, CA 91406 (the "Property") from Jinzheng Group (USA) LLC (the "Debtor"), as seller.

2.      I make this declaration in support of the Debtor's Motion to Authorize the Sale of Real Property Commonly Known as 6840 De Celis Place, Apt. 9, Van Nuys, CA 91406 (the "Motion").

3.      I have personal knowledge of the facts in this declaration, except those matters that are based upon information and belief and as to such matters, I believe such matters are true.  If called as witnesses, I could testify competently to these facts.

4.      I do not have any prior, current, or expected association or other connection with the Debtor, major creditors or equity security holders in the Debtor's bankruptcy case, or with any of the professionals employed by the Debtor.

5.      There has been no collusion between myself and other bidders for the sale of the Property, or any attempt by me to take unfair advantage of other bidders.  My offer was in response to the marketing efforts of the Debtor's real estate broker.  All negotiations were conducted at arm's length.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Los Angeles, California on October _, 2022.

By:     _____
        Emmanuel D. Margen, Jr.

1694334.3  27086

21

DocuSign Envelope ID: 76A324AE-EE4C-4D27-B9DD-C4BB78CF38FE

**<u>DECLARATION OF ANALIE E. MARGEN</u>**

I, Analie E. Margen, declare as follows:

1.     I am a buyer of all right, title, and interest in real property commonly known as 6840 De Celis Place, Apt. 9, Van Nuys, CA 91406 (the "Property") from Jinzheng Group (USA) LLC (the "Debtor"), as seller.

2.     I make this declaration in support of the Debtor's Motion to Authorize the Sale of Real Property Commonly Known as 6840 De Celis Place, Apt. 9, Van Nuys, CA 91406 (the "Motion").

3.     I have personal knowledge of the facts in this declaration, except those matters that are based upon information and belief and as to such matters, I believe such matters are true.  If called as witnesses, I could testify competently to these facts.

4.     I do not have any prior, current, or expected association or other connection with the Debtor, major creditors or equity security holders in the Debtor's bankruptcy case, or with any of the professionals employed by the Debtor.

5.     There has been no collusion between myself and other bidders for the sale of the Property, or any attempt by me to take unfair advantage of other bidders.  My offer was in response to the marketing efforts of the Debtor's real estate broker.  All negotiations were conducted at arm's length.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Los Angeles, California on October __, 2022.

By:        _Analie E. Margen_

          Analie E. Margen

1694334.3  27086

22

## <u>DECLARATION OF DARREN HUBERT</u>

I, Darren Hubert, declare as follows:

1.      I am a realtor at Avenue 8, the broker for Jinzheng Group (USA) LLC (the "Debtor").

2.      I make this declaration in support of the Debtor's Motion to Authorize the Sale of Real Property Commonly Known as 6840 De Celis Place, Apt. 9, Van Nuys, CA 91406 (the "Motion").

3.      I have personal knowledge of the facts in this declaration, except those matters that are based upon information and belief and as to such matters, I believe such matters are true.  If called as witnesses, I could testify competently to these facts.

4.      I am authorized to make and execute this declaration on behalf of Avenue 8. Avenue 8 does not have any prior, current, or expected association or other connection with the Debtor, major creditors or equity security holders in the Debtor's bankruptcy case, or with any of the professionals employed by the Debtor, except in that Avenue 8 has sometimes worked with the Danning Gill firm as bankruptcy counsel.

5.      There has been no collusion between Avenue 8 and other brokers or bidders for the sale of real property commonly known as 6840 De Celis Place, Apt. 9, Van Nuys, CA 91406 (the "Property"), or any attempt by Avenue 8 to take unfair advantage of other brokers or bidders.

6.      The Property has been listed on the market since July 28, 2022.  I believe that the Property has been sufficiently exposed to the market during that time.  Avenue has held multiple open houses and private showings, and has received a total of 6,089 online views altogether.

7.      It is my business judgment based on years of experience as a broker and of many real property bankruptcy sales I've conducted, that the proposed sale of the Property on the terms set forth in the Purchase and Sale Agreement between the Debtor and the buyers is fair and reasonable.

8.      The offer presented by the buyers is the best offer the Debtor has received to date.

9.      In order to most effectively market the Property, Avenue 8 has advanced costs relating to the maintenance of the Property, including service costs for cleaning and handling of

1694334.5  27086

23

1  furniture.  As of the date of this Motion, Avenue 8 has incurred $740 in costs relating to the

2  maintenance of the Property.

3       10.    Avenue 8 may also incur an additional $400 in costs prior to the closing of the sale,

4  relating to the removal of garbage on the premises.

5       I declare under penalty of perjury under the laws of the United States of America that the

6  foregoing is true and correct.

7  Executed at Los Angeles, California on October 3, 2022.

8

9

10                    By:  _____

11                         Darren Hubert

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1694334.3  27086

24

## DECLARATION OF ALPHAMORLAI L. KEBEH

I, Alphamorlai L. Kebeh, declare as follows:

1.    I am an attorney employed by the law firm of Danning, Gill, Israel & Krasnoff, LLP ("Danning-Gill" or the "Firm"), attorneys for Debtor and Debtor in Possession, Jinzheng Group (USA), LLC (the "Debtor"). I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently testify thereto.

2.    I make this declaration in support of Debtor's Motion to Authorize the Sale of Real Property Commonly Known as 6840 De Celis Place, Apt. 9, Van Nuys, California 91406 (the "Motion").

3.    In the course of conducting the proposed sale of the Debtor's property located at 6840 De Celis Place, Apt. 9, Van Nuys, California 91406, I received a preliminary title report from the escrow agent for the proposed sale. A copy of the title report is attached hereto as Exhibit "10."

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Los Angeles, California on October 3, 2022.

By: _____
Alphamorlai L. Kebeh

1694334.5  27086

**<u>REQUEST FOR JUDICIAL NOTICE</u>**

Jinzheng Group (USA) LLC, debtor and debtor-in-possession (the "Debtor"), hereby respectfully requests that the Court take judicial notice of the following facts:

1.      On August 24, 2021, the Debtor filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code.  The case was assigned case number 2:21-bk-16674-ER.

2.      Pursuant to an order entered on August 8, 2022 (docket no. 328), the Debtor was authorized to employ Avenue 8 through its agent, Darren Hubert, as its real estate broker.

3.      Attached hereto as Exhibit "7" is a copy of a document entitled "Deed of Trust" recorded in the County Recorder's Office as instrument no. 20200957956 on or about August 18, 2020.

4.      Attached hereto as Exhibit "8" is a copy of a document entitled "Deed of Trust" recorded in the County Recorder's Office as instrument no. 20201525930 on or about November 25, 2020.

5.      Attached hereto as Exhibit "9" is a copy of a document entitled "Notice of Delinquent Assessment" recorded in the County Recorder's Office as instrument no. 20180240534 on or about March 13, 2018.

DATED:  October 3, 2022                    DANNING, GILL, ISRAEL & KRASNOFF, LLP


                                           By:    _/s/ Alphamorlai L. Kebeh_
                                                  ALPHAMORLAI L. KEBEH
                                                  General Bankruptcy Counsel for Jinzheng Group
                                                  (USA) LLC, Debtor and Debtor in Possession

EXHIBIT 1

# PURCHASE AND SALE AGREEMENT

This agreement is intended to set forth a contract for the purchase by <u>Emmanuel D Margen, Jr & Analie E Margen</u> (the "Buyer"), from Jinzheng Group (USA), LLC, as the Chapter 11 Debtor and Debtor in possession (the "Debtor" or "Seller"), Seller of the real property commonly known as 6840 De Celis Pl., Apt. 9, Van Nuys, CA 91406 (the "Property"). When executed below, the agreement (the "Counter-Offer") will constitute conclusive evidence of the contract for the sale and purchase of the Property and replace in its entirety the offer dated 9/07/2022, and any oral or written negotiations prior to or since then.

1.     The purchase price for the Property shall be <u>$650,000</u>. The initial deposit shall be $19,500. An executed copy of this Counter-Offer shall be delivered to the Debtor upon acceptance of this Counter-Offer by the Buyer. Escrow instructions corresponding to the terms of this agreement shall be signed by the parties within five (5) business days after the date of execution of this agreement. The deposit shall be non-refundable **after the Due Diligence Date**. Buyer's deposit shall be deemed liquidated damages if the transaction fails to close as a result of Buyer's default, but otherwise will be applied to the purchase price upon closing. Escrow holder shall be A & A Escrow Services, Inc. (415 N. Crescent Dr., Beverly Hills, California 90210). Title insurance shall be issued by the title company of the Seller's choice.

2.     Buyer shall have until <u>12 days </u>after the contract is fully executed to perform and complete all contingencies, inspections, investigations, tests and reviews of reports and complete all due diligence which the Buyer believes to be required for the purchase of the Property, including but not limited to any financing contingencies or inspections (the "Due Diligence Date"). The Buyer at the end of the Due Diligence Period may advise the Seller in writing of Buyer's election to withdraw from this agreement and receive a full refund on the deposit; otherwise, silence shall be deemed acceptance. After expiration of that time period, the Seller shall file a motion to confirm this sale with the Bankruptcy Court for the Central District of California (the "Bankruptcy Court").

3.     The sale shall be "as is" and "where is" with no warranty or recourse whatsoever. Transfer of the Property shall be by Quitclaim Deed. The Debtor has neither seen nor inspected the Property or determined its fitness for any particular use.

4.     The Seller shall convey and the Buyer shall accept the marketable title to the Property that will be insured by the Seller's choice of title insurance, without material exception including free and clear of all liens, subject only to the terms of the within contract of sale. The Seller shall pay the costs of a CLTA Standard Owner's policy of title insurance, and the Buyer shall pay the premium for any ALTA Policy. The Buyer shall be free to assign this contract to another, but in that event the Buyer shall remain liable hereunder in the event that the assignee fails to perform.

5.     The Buyer acknowledges that sale of the Property is subject to notice to creditors, entry of an order approving the sale by the Bankruptcy Court, and higher and better bids through and including the hearing to approve the sale. Payment of any and all real estate broker's commissions is also subject to notice to creditors and approval by the Bankruptcy Court. Payment of any commission to the Debtor's real estate broker is also subject to approval of the

DocuSign Envelope ID: 7C3BB5E6-554F-44BC-9432-72B5E8259CEA

Debtor's broker's employment by the Bankruptcy Court.  Unless both Parties waive in writing this provision, the closing shall take place not more fifteen (15) calendar days after the date of entry of the order approving the sale.

6.      If any law or local ordinance requires as a condition of sale or transfer that the Property be brought into compliance with minimum energy conservation standards, that smoke detectors be installed or that water heaters be strapped, the Buyer shall comply with and pay for these requirements at Buyer's sole expense.  The Seller will not deliver to the Buyer a written statement of compliance with any applicable state and local law or sign any disclosures. Buyer is responsible for any required government retrofitting.  It is the Buyer's responsibility to complete any and all retrofitting or city reports if they are required.  The Debtor will not pay for any termite report or repairs.

7.      The seller will pay for a standard Natural Hazard Zone Disclosure report with the company of sellers choice.  The seller agrees to pay for HOA transfer fees.

8.      All allowable assessments and real property taxes shall be prorated through the closing date to the applicable accounts of the Seller and the Buyer.  The sale shall be free and clear of all real property taxes enforceable against the Property through the date of closing of the sale.  Escrow fees shall be split between the Buyer and the Seller, and the Seller shall pay any real property transfer tax.  Except as otherwise set forth herein, the Buyer shall bear the expense of all other reports or inspections.

9.      The Seller is represented by Avenue 8 Inc (the "Seller's Broker").  The Buyer is represented by Vidal Capital Investments, Inc (the "Buyer's Broker").  The Seller's Broker and the Buyer's Broker are collectively referred to as the "Brokers."  No commission shall be due or payable except from the cash proceeds of an actual sale of the Property to the Buyer.

10.      In the event of any material change in the condition of the Property from the date of acceptance of this Counter-Offer, if the Buyer demands repair of any actual damage to the property, the Seller may, at his sole option, elect to terminate this agreement, make repairs at the estate's expense, assign any insurance proceeds for the Property or credit the cost of repair into escrow.

11.      The Buyer's sole remedy in the event that escrow fails to close as a result of the Seller's inability to close escrow shall be a refund of the deposit in full.  In the event the Buyer fail to perform by reason of the Buyer's default, the deposit of $19,500 may be retained by the Seller as liquidated damages without further legal action.

[Buyer's initials]

12.      The Bankruptcy Court for the Central District of California shall have jurisdiction to interpret and enforce the terms of this agreement.  This agreement shall be construed pursuant to the laws of the State of California and the United States Bankruptcy Code.

13.      This Counter-Offer shall expire if not accepted on or before 9/13/2022, at 12:00 p.m.

14.    This Counter-Offer is binding upon and shall inure to the benefit of the parties hereto, and their respective attorneys, agents, heirs, administrators, predecessors, successors and assigns.

15.    This Counter-Offer constitutes the entire agreement between the Parties hereto pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements and other writings between the parties.  No supplement, modification, waiver or termination of this Agreement shall be binding unless executed in writing by the Parties to be bound thereby.

DATED:  September ___, 2022              "SELLER"

JINZHENG GROUP (USA), LLC

By: _Zhao Pu Yang_____              9/9/2022

Zhao Pu Yang, Attorney in Fact for Jianqing Yang, Managing Member

AGREED AND ACCEPTED:

DATED:  September 10, 2022              "BUYER"

By: _____ / _____

Emmanuel D. Margen, Jr   /   Analie E. Margen

EXHIBIT 2

## <u>OFFER TO PURCHASE REAL PROPERTY</u>

The undersigned (collectively "Offerors") hereby offer (the "Offer") to purchase from Jinzheng Group (USA), LLC (the "Debtor"), debtor and debtor-in-possession, the Debtor's right, title and interest to the real property commonly known as 6840 De Celis Place, Apt. 9, Van Nuys, CA 91406, bearing Assessor Parcel Number 225-001-043 (the "Property"), which is the subject of a certain Purchase and Sale Agreement and amendments thereto (collectively, the "PSA"), dated on or about September 10, 2022.  **Offerors hereby acknowledges receipt of a copy of the PSA. [Initials_____; initials _____].**  Offerors agree to substitute into the Debtor's currently pending sale upon identical terms and conditions, except as to price and as otherwise set forth herein.

The Offer price, all cash, shall be $_____ [at least $660,000].

There are no contingencies to the Offer whatsoever—save and excepting Bankruptcy Court approval after notice and hearing—including, without limitation, inspection, due diligence or financing contingencies.  The Offer is subject to acceptance by the Debtor, approval by the Bankruptcy Court, and higher and better bids at a sale motion hearing on October 24, 2022, at 11 a.m. in: Courtroom "1568" of the United States Bankruptcy Court located at 255 East Temple Street, Los Angeles, California 90012.  The Offerors understand, acknowledge, and agree that if the Offerors are deemed "qualified bidders," they or a duly authorized representative, shall personally attend the hearing.

Offerors understand that the Debtor has neither inspected the Property nor analyzed its fitness for any particular use.  Offerors further understand that the sale is of the Debtor's right, title and interest, if any, in the Property only, and is sold on an "As Is" and "Where Is" basis, with no warranty or recourse whatsoever.  Offerors have completed all due diligence which Offerors believe to be required to purchase the Property and have not relied upon any statement or representation from the Debtor, its attorneys, its real estate brokers or other agents.  Any necessary testing, remediation, repairs, or other actions, including without limitation, those relating to any environmental laws, shall be the sole responsibility of the Offerors, at Offerors' sole expense.

The initial deposit is $19,800 (the "Deposit").  To be "qualified bidders" for the Property, Offerors must deliver by October 18, 2022, to Jinzheng Group (USA), LLC, c/o Zev Shechtman, 1901 Avenue of the Stars, Suite 450, Los Angeles, California 90067-6006: (a) a cashier's check payable to "Jinzheng Group (USA), LLC, Debtor and Debtor-In-Possession" in an amount not less than the Deposit, (b) an executed copy of this Offer, and (c) proof of adequate funding.  Parties who do not timely submit the foregoing will be barred from bidding at the sale motion hearing at the Debtor's discretion.  The Deposit shall be non-refundable in the event that the Court confirms the sale to the Offerors but Offerors breach their obligations under the Offer, in which event the Debtor shall be free to sell the Property to another party and to retain the entire Deposit without liability to anyone.  Offerors' sole remedy in the event that the Debtor is unable to close the sale shall be a return of the Deposit in full.  If the Offerors perform in full under the terms of the Offer, but the Court confirms the sale of the Property to another party, Offerors' Deposit shall be refundable in full.  If another party is the successful bidder at the sale motion

EXHIBIT 2

hearing, Offerors may opt to be a back-up bidder in which event the Deposit will be retained by the Debtor until the sale closes.

A commission of 2% of the sale price shall be payable to Offerors' real estate broker, if any, subject to approval of the Bankruptcy Court, but only upon closing of the sale to Offerors.

The Offerors further understand, acknowledge, and agree that at the sale motion hearing, only qualified bidders shall be entitled to bid, and that the Debtor has sole discretion to determine, in the exercise of its sound business judgment, whether the Offerors are "qualified bidders." If the Offerors are not deemed qualified bidders (but have not otherwise defaulted), the Debtor will refund the Deposit.

The Offerors understand, acknowledge, and agree that upon conclusion of the bidding process, the Debtor shall have sole discretion, in the exercise of its sound business judgment, to decide which of the bids is the best bid, subject to approval of the Bankruptcy Court. The overbidder who is accepted by the Debtor and approved by the Bankruptcy Court as the successful bidder must pay all amounts reflected in its bid in cash at the closing of the sale. At the sale hearing, and upon conclusion of the bidding process, the Debtor may also acknowledge a back-up bidder, which shall be the bidder with the next best bid determined in the sole discretion of the Debtor subject to Bankruptcy Court approval. Should the successful bidder fail to timely close on the sale of the Property, the Debtor may sell the Property to the back-up bidder without further court order and retain the Deposit as liquidated damages. The undersigned Offerors hereby agree that the Bankruptcy Court wherein the Bankruptcy Case No. 2:21-bk-16674 is pending, for Jinzheng Group (USA), LLC, debtor and debtor-in-possession, shall have and retain exclusive jurisdiction to interpret and enforce this Offer as well as to resolve any dispute related in any way to this Offer, without a jury, and to enter final judgments thereon.

Dated: _____      _____
                                            (Name of Offeror)


                                            _____
                                            (address of Offeror)


                                            _____
                                            (tel. no. and email address of Offeror)


                                            _____
                                            (name, tel. no. email address of authorized agent
                                            of Offeror, if applicable)


                                            _____

1694698.3  27086                    2

31

(name, tel. no. email address of real estate agent and
brokerage of Offeror, if applicable)

_____
(signature of Offeror and/or authorized agent
of Offeror, if applicable)

Dated: _____      _____
(Name of Offeror)


_____
(address of Offeror)


_____
(tel. no. and email address of Offeror)


_____
(name, tel. no. email address of authorized agent
of Offeror, if applicable)


_____
(name, tel. no. email address of real estate agent and
brokerage of Offeror, if applicable)


_____
(signature of Offeror and/or authorized agent
of Offeror, if applicable)

EXHIBIT 3

Loan Number: 1464

# INTEREST-ONLY PERIOD FIXED RATE NOTE

AUGUST 11, 2020                   SANTA MONICA                   CALIFORNIA
[Date]                                      [City]                                   [State]

6840 DE CELIS PLACE #9, LOS ANGELES, CALIFORNIA 91406
[Property Address]

## 1.   BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 350,000.00          (this amount is called "Principal"), plus interest, to the order of the Lender.  The Lender is  INVESTMENT MANAGEMENT COMPANY, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY                                    .
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note.  The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.   INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid.  I will pay interest at a yearly rate of          12.000 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3.   PAYMENTS

(A) Time and Place of Payments

I will make a payment every month.  This payment will be for interest only for the first   11   months, and then will consist of principal and interest.

I will make my monthly payment on the   1st   day of each month beginning on   OCTOBER 1   ,
2020              .  I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note.  Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest it will be applied to interest before Principal. If, on    SEPTEMBER 1, 2021    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at   1507 7TH STREET #344, SANTA MONICA, CALIFORNIA 90401
                                                            or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $  3,500.00          for the first   11   months of this Note, and thereafter will be in the amount of U.S. $  353,500.00          .  The Note Holder will notify me prior to the date of change in monthly payment.

## 4.   BORROWER'S RIGHT TO PREPAY   ** See attached Prepayment Note Addendum.

I have the right to make payments of Principal at any time before they are due.  A payment of Principal only is known as a "Prepayment."  When I make a Prepayment, I will tell the Note Holder in writing that I am doing so.  I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge.  The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note.  However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note.  If I make a partial Prepayment, there will be no changes in

MULTISTATE INTEREST-ONLY PERIOD FIXED RATE NOTE
US3271.NOT  09/03/15                                     Page 1 of 4                          DocMagic eForms
                                                                                            www.docmagic.com

EXHIBIT 3                                    33

the due date of my monthly payment unless the Note Holder agrees in writing to those changes. However, if the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest as well as during the time that my payments consist of principal and interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, the amount of my monthly payment will not decrease; however, the principal and the interest required under this Note will be paid prior to the Maturity Date.

## 5.  LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6.  BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of          5 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be          10.000 % of my overdue payment of interest and/or principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7.  GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8.  OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.



## 9.   WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor.  "Presentment" means the right to require the Note Holder to demand payment of amounts due.  "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10.   UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions.  In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note.  That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note.  Some of those conditions are described as follows:

> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

> If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## [REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

MULTISTATE INTEREST-ONLY PERIOD FIXED RATE NOTE
US3271.NOT  09/03/15                                   Page 3 of 4                          DocMagic *eForms*
www.docmagic.com

9

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

JINZHENG GROUP (USA) LLC, A CALIFORNIA LIMITED LIABILITY COMPANY

_____ (Seal)         _____ (Seal)
BETTY ZHENG            -Borrower                              -Borrower


_____ (Seal)         _____ (Seal)
                      -Borrower                              -Borrower


_____ (Seal)         _____ (Seal)
                      -Borrower                              -Borrower



*[Sign Original Only]*

DocMagic *eForms*
www.docmagic.com

36

EXHIBIT 4

# DEFAULT INTEREST RATE RIDER

**The last sentence of Paragraph 2 of the Note is hereby deleted and the following provisions are substituted in its place in the Note, and added to the Mortgage or Security Agreement:**

## EXTENDED DEFAULT

If, for any reason, (1) I fail to make a full monthly payment on or before the last day of the month in which said monthly payment is due; or (2) I fail to pay the entire amount due on my loan on the maturity date or other date on which I am required to make immediate payment in full of the entire amount due on my loan, whether by reason of acceleration of my loan or otherwise, or (3) I fail to perform any of my obligations under the loan note or the Mortgage (Security Instrument); or (4) If this is a loan on a cooperative apartment unit, the (Collateral Note and Security Agreement) for more than thirty (30) days, then my loan, and any other connected or related loan held by you, will be in Extended Default, and I will be obligated to pay interest at the Default Interest Rate, as set forth below.

## DEFAULT INTEREST RATE

If I am in Extended Default, as described above, the interest rate on my loan, and on any other connected or related loan held by you (Note Holder), will be increased to      24.000 % per annum (the "Default Interest Rate") without prior notice to me, until either of the following two events occurs: (1) all amounts which are due and unpaid on the loan, including monthly payments and charges due (including interest at the Default Interest Rate imposed hereunder), are paid in full, and all other defaults under the loan documents have been cured, provided that the loan has not matured, by acceleration or otherwise, and I have complied with all requirements contained in the loan documents to correct defaults; or (2) the entire amount due on the loan, including all principal, interest (including interest at the Default Interest Rate imposed hereunder) and all other amounts and charges due, are paid in full.  Interest at the Default Interest Rate will be charged from the first day of the month immediately following the month in which any monthly payment in Extended Default was due, or from the date of the occurrence of any other event which causes my loan to be in Extended Default.  Accrual of interest at the Default Interest Rate shall be in addition to, and not in place of, any late fees or charges, or any other charges which may become due under the loan documents.  In no event shall I be required to pay interest at an interest rate greater than the maximum interest rate permitted by law, or interest at the Default Interest Rate for a period greater than permitted by law.  In the event that you determine that interest at the Default Interest Rate is in excess of the above requirements, such excess will be credited to reduce the principal balance due on the loan.  You may, at your option, notify me of the increase of the interest rate on my loan due to the Default Interest Rate, and the increased monthly payment due by reason of the application of the Default Interest Rate, on subsequent monthly billing statements.

---

DEFAULT INTEREST RATE RIDER
DIRR.MSC  08/21/12                          Page 1 of 2                    *DocMagic eForms*
                                                                          *www.docmagic.com*

I agree to the terms of this Default Interest Rate Rider.

JINZHENG GROUP (USA) LLC, A CALIFORNIA LIMITED LIABILITY COMPANY

_____  8-12-2020      _____
Borrower BETTY ZHENG              Date       Borrower                          Date


_____            _____
Borrower                          Date       Borrower                          Date


_____            _____
Borrower                          Date       Borrower                          Date

DEFAULT INTEREST RATE RIDER
DIRR.MSC  08/21/12                     Page 2 of 2                    DocMagic eForms
                                                                      www.docmagic.com

20                                                                              38

EXHIBIT 5

DO NOT DESTORY THIS NOTE: When paid, this note with Deed of Trust securing same, must be surrendered to Trustee for cancellation before reconveyance will be made.

THE PROPERTY IS COMMONLY KNOWN AS:
Property Address: 6840 DE CELIS PL APT 9, VAN NUYS, CA 91406

CONDOMINIUM | BUSINESS PURPOSE | NON-CONSUMER | NOTE SECURED BY 2ND DEED OF TRUST

# INSTALLMENT – INTEREST ONLY FIXED RATE NOTE

$50,000.00                                    NOVEMBER 18, 2020
Newport Beach, California

1. **BORROWER'S PROMISE TO PAY** In installments as herein stated, for value received, Jinzheng Group (USA), LLC, a California Limited Liability Company and Jianqing Yang personal guarantor,
promises to pay to
MICHAEL E. DORFF and SHARI L. DORFF, as Joint Tenants, as BENEFICIARY or order at place designated by Beneficiary.

The principal sum of FIFTY THOUSAND Dollars and no Cents ($50,000.00), herein called the "Principal" plus interest to the order of the Lender. The Lender is MICHAEL E. DORFF and SHARI L. DORFF, as Joint Tenants, as BENEFICIARY. I will make these payments under this Note in the form of cash, check, money order or wire transfer Based on (3-C) pre-paid interest below.

2. **INTEREST**
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **12.00%**

3. **LOAN TERM | PAYMENTS**

(A) Loan Term | Time and Place of Payments
Loan term will be NOVEMBER 24, 2020 through AUGUST 24, 2021.
9 months from day of funding as based on (3-C) below.
All nine (9) monthly payments will be held in advance by lender as based on (3-C) below.

On AUGUST 24, 2021 the unpaid principal balance together with any accrued interest shall become due and payable. I will make these payments without notice or demand as based
on (3-C) below.
PAYABLE TO:
MICHAEL E. DORFF and SHARI L. DORFF, as Joint Tenants.
3239 Bordero Lane, Thousand Oaks, CA 92362

(B) Amount of Monthly Payments
My monthly interest only payment will be in the amount of U.S. $ 500.00 FIVE HUNDRED DOLLARS AND NO CENTS)

(C). Pre-paid interest: 9 months – held in advance by lender

$4,500.00 – NOVEMBER 24, 2020 through AUGUST 24, 2021.
Any unused interest after initial 3 months minimum interest, will be credited to borrower at early payoff.

In addition, borrower will authorize escrow to prepay existing 1st trust deed lender and HOA NINE months as well.

Page 1 of 2    Initial _____    Initial _JY by BZ AIF_

| **TESTA CAPITAL GROUP**                         BRE Broker # 01790365  NMLS # 328319

EXHIBIT 5                    39

**4. MINIMUM INTEREST REQUIRED**
NO PREPAYMENT PENALTY IF PAID OFF AFTER SIX (3) MONTHS.
3 MONTHS MINIMUM INTEREST REQUIRED.

**5. LATE CHARGES** In the event of nonpayment of any installment within 5 days of the due date, I will agree to pay the holder of the Note hereof a late payment charge of 10% of my overdue payment.

**6. ADDITIONAL TERMS**

**MULTIPLE BENEFICIARIES:** The consent of 51% in interest of the Beneficiaries of the Deed of Trust is necessary and sufficient to bind and to direct the action to be taken by all Beneficiaries of this Deed of Trust.

**7. THIS NOTE IS SECURED BY DEED OF TRUST (2nd TRUST DEED)** <u>ON</u> 6840 DE CELIS PL APT 9, VAN NUYS, CA 91406
In addition to the protections given to the Note Holder under this Note, a Deed of Trust dated the same day as this Note protects the Note holder from possible losses which might result if I do not keep the promises which I make in this Note.

If the Trustor shall sell, convey or alienate said property, or any part thereof, or any interest therein, or be divested of his title or any interest therein any manner or way whether voluntarily or involuntarily without the written consent of the beneficiary being first obtained, beneficiary shall have the right, at its option, except as prohibited by law, to declare any indebtedness or obligation secured hereby, irrespective of the maturity date specified in any documents not evidencing the same immediately due and payable.

**8. EXHIBIT "A" and "B"**
Rider to Note and Arbitration agreement are attached hereto and made a part here of.

In the event of any default in the payment of any installment of principal or interest as herein provided all sums so due including interest, shall bear interest rate set forth above but such unpaid interest so compounded shall not exceed an amount equal to simple interest on the unpaid principal at the maximum rate permitted by law. Should default be made in payment of any of installment of principal or interest when due the whole sum of principal and interest shall at the option of the holder of this note become immediately due. Principal and interest payable in lawful money of the United States. If action be instituted on this note I/we promise to pay such sum as the Court may fix as attorney's fees. This note is secured by a DEED OF TRUST to the TITLE COMPANY, as TRUSTEE.

BORROWER

Date: 11 - 18 - 2020

Jinzheng Group (USA), LLC, a California
Limited Liability Company,
By Betty Zheng, Manager

PERSONAL GUARANTOR

Date: 11 - 20 - 2020

JIANQING YANG by ___ as his
Jianqing Yang    attorney in fact
An Individual
By Betty Zheng, His attorney in fact

Page 2 of 2

TESTA CAPITAL GROUP

<u>BRE Broker # 01790365</u>  <u>NMLS # 328319</u>

EXHIBIT 6

DO NOT DESTORY THIS NOTE: When paid, this note with Deed of Trust securing same, must be surrendered to Trustee for cancellation before reconveyance will be made.

THE PROPERTY IS COMMONLY KNOWN AS:
Property Address: 6840 DE CELIS PL APT 9, VAN NUYS, CA 91406

<div style="border:1px solid">

### RIDER TO NOTE
### EXHIBIT "A"

The terms and conditions set forth in Exhibit "A" take precedence over and control any conflicting terms and conditions found elsewhere in Note:

1. Lender does not allow borrowers to be due for two monthly payments at any one time on this current 2ND Trust Deed loan. Hence, if any obligation, monetary or non-monetary, owed under this Note or the Deed of Trust securing it becomes 30 days delinquent: (a) Lender may record a Notice of Default and (b) interest rate reflected in the Note shall, without notice to Borrower, increase by 5 percentage points, and continue at that rate until the default is cured or the loan is paid in full. Said increase shall begin and be retroactive to the 1st day of the initial delinquent month.

2. A default upon any provision or condition in the Note and Deed of Trust including Riders shall constitute a default upon all provisions or conditions.

3. The Holder may choose to advance money to protect the security of the Deed of Trust securing this Note or, by way of example only, payments due Senior Leins, Fire Insurance on Property Taxes. All sums advances by the Holder shall be added to the principal balance of the Note and shall bear interest at the then applicable Note rate until paid. An Administrative charge of 10% of the advancement shall be paid to the Holder per advancement.

</div>

**BORROWER**

Date: 11-20-2020

Jinzheng Group (USA), LLC, a
California
Limited Liability Company,
By Betty Zheng, Manager

**PERSONAL GUARANTOR**

Date: 11-20-2020

JIANQING YANG by BZ as his attorney in fact

Jianqing Yang
An Individual
By Betty Zheng,
His attorney in fact

**TESTA CAPITAL GROUP**        BRE Broker # 01790365 NMLS # 328319

EXHIBIT 6

41

EXHIBIT 7



**This page is part of your document - DO NOT DISCARD**





## 20200957956



**Pages:
0029**

**Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California**

**08/18/20 AT 08:00AM**

| | |
|---|---|
| FEES: | 108.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 75.00 |
| PAID: | 183.00 |



**L E A D S H E E T**



**202008181000023**

**00018732785**



**011070617**

**SEQ:
01**

**SECURE - 8:00AM**



**THIS FORM IS NOT TO BE DUPLICATED**

*E521946*

E08_200817_7956299

EXHIBIT 7

42

RECORDING REQUESTED BY:
NORTH AMERICAN TITLE CO.

Recording Requested By:
INVESTMENT MANAGEMENT COMPANY, LLC

And After Recording Return To:
INVESTMENT MANAGEMENT
COMPANY, LLC
1507 7TH STREET #344
SANTA MONICA, CALIFORNIA 90401
Loan Number: 1464

——————————— [Space Above This Line For Recording Data] ———————————

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated        AUGUST 11, 2020        , together with all Riders to this document.
(B) "Borrower" is JINZHENG GROUP (USA) LLC, A CALIFORNIA LIMITED LIABILITY COMPANY BORROWER'S ADDRESS IS 100 EAST HUNTINGTON DRIVE 207, ALHAMBRA, CALIFORNIA 91801.

Borrower is the trustor under this Security Instrument.
(C) "Lender" is  INVESTMENT MANAGEMENT COMPANY, LLC

Lender is a             CALIFORNIA LIMITED LIABILITY COMPANY             organized and existing under the laws of                    CALIFORNIA
Lender's address is    1507 7TH STREET #344, SANTA MONICA, CALIFORNIA 90401

Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is  SBS TRUST DEED NETWORK, A CALIFORNIA CORPORATION
31194 LA BAYA DRIVE, SUITE 106, WESTLAKE VILLAGE, CALIFORNIA 91362

(E) "Note" means the promissory note signed by Borrower and dated        AUGUST 11, 2020
The Note states that Borrower owes Lender   THREE HUNDRED FIFTY THOUSAND AND 00/100
                                        Dollars (U.S. $ 350,000.00           )

---

CALIFORNIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3005  1/01

*DocMagic eForms*
*www.docmagic.com*

Page 1 of 15

43

plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than    **SEPTEMBER 1, 2021**    .

(F)    **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

(G)    **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H)    **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | |
|---|---|
| ☐ Adjustable Rate Rider | ☐ Planned Unit Development Rider |
| ☒ Balloon Rider | ☐ Biweekly Payment Rider |
| ☒ 1-4 Family Rider | ☐ Second Home Rider |
| ☒ Condominium Rider | ☒ Other(s) [specify]  Default Interest Rate Rider, Prepayment Rider |

(I)    **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J)    **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K)    **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L)    **"Escrow Items"** means those items that are described in Section 3.

(M)    **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N)    **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O)    **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P)    **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q)    **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

| | | |
|---|---|---|
| **COUNTY** | of | **LOS ANGELES** |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] |

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".
A.P.N.: 2225-001-043

which currently has the address of **6840 DE CELIS PLACE #9**

|   | [Street] | |
|---|---|---|
| **LOS ANGELES** | , California **91406** | ("Property Address"): |
| [City] | [Zip Code] | |

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:
**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights

hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4.  Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5.  Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater

or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released

proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for

Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums

secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such

*DocMagic eForms*
*www.docmagic.com*

other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized

to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

## [REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

The undersigned Borrower requests that a copy of any Notice of Default and any Notice of Sale under this Security Instrument be mailed to Borrower at the address set forth above.

Jinzheng Group (USA), a California
Limited Liability Company

8-12-2020

Borrower BETTY ZHENG, manager    Date

_____    _____
Witness                              Witness

———————————————— [Space Below This Line For Acknowledgment] ————————————————

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of   CALIFORNIA                    )

County of LOS ANGELES                    )

On ___8/12/20 20___ before me, _Brooke O. Rodrigue z, Notary Public_
              Date                           Here Insert Name and Title of the Notarizing Officer

personally appeared __BETTY ZHENG_____

_____

_____ ,
                                    Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.



Notary Seal

_____
Signature of Notary Public

# EXHIBIT A
# LEGAL DESCRIPTION

PARCEL 1:

AN UNDIVIDED ONE-THIRTY SIXTH (1/36TH) FEE SIMPLE INTEREST AS A TENANT IN COMMON IN AND TO THE COMMON AREA OF MODULE "A" OF LOT 1 OF TRACT NO. 62442, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES AS PER MAP RECORDED IN BOOK 1331, PAGES 20 THROUGH 21, INCLUSIVE, OF MAPS, AS SHOWN ON THAT CERTAIN CONDOMINIUM PLAN FOR MODULES "A" AND "B" OF SAID LOT 1 OF TRACT NO. 62442, WHICH CONDOMINIUM PLAN WAS RECORDED ON MAY 31, 2007, AS INSTRUMENT NO. 07-1312424 AND AMENDED BY DOCUMENT RECORDED MARCH 21, 2008 AS INSTRUMENT NO. 08-489155, ("CONDOMINIUM PLAN") ALL IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THEREFROM THE UNITS AS SHOWN ON SAID CONDOMINIUM PLAN.

PARCEL 2:

UNIT NO. 9, OF SAID MODULE "A" OF LOT NO. 1 OF TRACT NO. 62442, AS SHOWN AND DESCRIBED IN SAID CONDOMINIUM PLAN. RESERVING FROM SAID PARCELS 1 AND 2 ABOVE, FOR THE BENEFIT OF GRANTOR, ITS SUCCESSORS IN INTEREST, AND OTHERS, EASEMENTS FOR ACCESS, USE, ENJOYMENT, DRAINAGE, REPAIRS, AND FOR OTHER PURPOSES, ALL AS DESCRIBED IN THE DECLARATION OF ESTABLISHMENT OF CONDITIONS, COVENANTS AND RESTRICTIONS FOR DE CELIS COURT ("DECLARATION"), RECORDED ON 5/31, 2007 AS INSTRUMENT NO. 07-1312425, OF THE OFFICIAL RECORDS OF LOS ANGELES COUNTY, CALIFORNIA, INCLUDING ANY AMENDMENTS THERETO, ALL OF WHICH ARE INCORPORATED HEREIN BY THIS REFERENCE.

PARCEL 3:

NONEXCLUSIVE EASEMENTS FOR ACCESS, INGRESS, EGRESS, USE, ENJOYMENT, DRAINAGE, ENCROACHMENT, SUPPORT, MAINTENANCE, REPAIRS, AND FOR OTHER PURPOSES ALL AS DESCRIBED IN THE DECLARATION RECORDED 5/31/07 AS 07-1312425; AND THE CONDOMINIUM PLAN.

EXHIBIT 8

 

**This page is part of your document - DO NOT DISCARD**

## 20201525930





Pages:
0011

**Recorded/Filed in Official Records**
**Recorder's Office, Los Angeles County,**
**California**

**11/25/20 AT 08:00AM**

| | |
|---|---|
| FEES: | 74.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 150.00 |
| PAID: | 224.00 |



**L E A D S H E E T**



202011250190050

00019395490



011488077

**SEQ:**
**01**

**SECURE - 8:00AM**



**THIS FORM IS NOT TO BE DUPLICATED**

E08_201125_8008448

EXHIBIT 8

59

AND WHEN RECORDED MAIL THIS DEED AND TAX
STATEMENTS TO:

MICHAEL E. DORFF and SHARI L. DORFF
3239 Bordero Lane,
Thousand Oaks, CA 92362

SPACE ABOVE THIS LINE IS FOR RECORDER'S USE

## DEED OF TRUST

THIS DEED OF TRUST, made on NOVEMBER 19, 2020 between

**Jinzheng Group (USA), LLC, a California Limited Liability Company** herein called TRUSTOR,
whose address is 100 E. HUNTINGTON DR., STE 207 ALHAMBRA CA 91801.
and NORTH AMERICAN TITLE COMPANY herein called TRUSTEE,

AND MICHAEL E. DORFF and SHARI L. DORFF, as Joint Tenants, as BENEFICIARY

WITNESETH: That Trustor irrevocably GRANTS, TRANSFERS AND ASSIGNS to TRUSTEE IN TRUST,
WITH POWER OF SALE that property in the City of Los Angeles, County of Los Angeles, State of
CALIFORNIA described as:

THE LEGAL DESCRIPTION OF THE PROPERTY IS:
LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF -- EXHIBIT "A"

THE PROPERTY IS COMMONLY KNOWN AS:
Property Address: 6840 DE CELIS PL APT 9, VAN NUYS, CA 91406

If the Trustor shall sell, convey, or alienate said property, or any part thereof, or any interest therein, or shall be divested of
his title or any interest therein in any manner or way, whether voluntarily or involuntarily, without the written consent of the
beneficiary being first had and obtained, beneficiary shall have the right, at its option, except as prohibited by law, to
declare any indebtedness or obligations secured hereby, irrespective of the maturity date specified in any note evidencing
the same, immediately due and payable.

Together with the rents, issues and profits thereof, subject, however, to the right, power and authority hereinafter given to
and conferred upon Beneficiary to collect and apply such rents, issues and profits.

For the Purpose of Securing: (1) Performance of the indebtedness evidenced by one promissory note in the principal
**sum of $50,000.00 2ND TRUST DEED** with interest thereon according to the terms of a promissory note or notes
of even date herewith made by Trustor, payable to order of Beneficiary, and extensions or renewals thereof; (2) the
performance of each agreement of Trustor incorporated by reference or contained or reciting it is so secured; (3)
Payment of additional sums and interest thereon which may hereafter be loaned to Trustor, or his successors or assigns,
when evidenced by a promissory note or notes reciting that they are secured by this Deed of Trust.

RIDERS TO THIS SECURITY INSTRUMENT THAT ARE EXECUTED BY BORROWER. THE FOLLOWING
RIDERS ARE TO BE EXECUTED BY BORROWER:
1. LEGAL DESCRIPTION -- EXHIBIT A
2. BALLOON RIDER
3. PREPAYMENT RIDER
4. 1-4 RIDER

TESTA CAPITAL GROUP

To Protect the Security of This Deed of Trust, and with respect to the property above described, Trustor expressly makes each and all of the agreements, and adopts and agrees to perform and be bound by each and all of the terms and provisions set forth in subdivision A, and it is mutually agreed that each and all of the terms and provisions set forth in subdivision B of the fictitious deed of trust recorded in Official Records in the office of the county recorder of the county where said property is located, noted below opposite the name of such county, viz:

| County | Book | Page | County | Book | Page | County | Book | Page | County | Book | Page |
|--------|------|------|--------|------|------|--------|------|------|--------|------|------|
| Alameda | 435 | 684 | Kings | 792 | 833 | Placer | 895 | 301 | Sierra | 29 | 335 |
| Alpine | 1 | 250 | Lake | 362 | 39 | Plumas | 151 | 5 | Siskiyou | 468 | 181 |
| Amador | 104 | 348 | Lassen | 171 | 471 | Riverside | 3005 | 523 | Solano | 1105 | 182 |
| Butte | 1145 | 1 | Los Angeles | T2055 | 899 | Sacramento | 4331 | 62 | Sonoma | 1851 | 689 |
| Calaveras | 145 | 152 | Madera | 810 | 170 | San Benito | 271 | 383 | Stanislaus | 1715 | 456 |
| Colusa | 296 | 617 | Marin | 1508 | 339 | San Bernardino | 5567 | 61 | Sutter | 572 | 297 |
| Contra Costa | 3978 | 47 | Mariposa | 77 | 292 | San Francisco | A332 | 905 | Tehama | 401 | 289 |
| Del Norte | 78 | 414 | Mendocino | 579 | 530 | San Joaquin | 2470 | 311 | Trinity | 93 | 366 |
| Eldorado | 568 | 456 | Merced | 1547 | 538 | San Luis Obispo | 1151 | 12 | Tulare | 2294 | 275 |
| Fresno | 4626 | 572 | Modoc | 184 | 851 | San Mateo | 4078 | 420 | Tuolumne | 135 | 47 |
| Glenn | 422 | 184 | Mono | 52 | 429 | Santa Barbara | 1878 | 860 | Ventura | 2062 | 388 |
| Humboldt | 657 | 527 | Monterey | 2194 | 538 | Santa Clara | 5336 | 341 | Yolo | 653 | 245 |
| Imperial | 1091 | 501 | Napa | 639 | 86 | Santa Cruz | 1431 | 494 | Yuba | 334 | 486 |
| Inyo | 147 | 598 | Nevada | 305 | 320 | Shasta | 684 | 528 | | | |
| Kern | 3427 | 60 | Orange | 5889 | 611 | San Diego | Series 2 Book 1961 Page 183887 | | | | |

Shall inure to bind the parties hereto, with respect to the property above described. Said agreements, terms and provisions contained in said subdivisions A and B (identical in all counties, and printed on the reverse side of page one hereof) are by within reference thereto, incorporated herein and made a part of this Deed of Trust for all purposes as fully as if set forth at length herein, and Beneficiary may charge for a statement regarding the obligation secured herby, provided the charge therefore does not exceed the maximum allowed by law.

The undersigned Trustor requests that a copy of any Notice of Default and of any Notice of Sale hereunder be mailed to him at his address hereinbefore set forth.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of LOS ANGELES.

THE PROPERTY IS COMMONLY KNOWN AS:
Property Address: 2602 Lincoln Park Avenue as to Parcel One; 5209-005-003 as to Parcel Two, Los Angeles, California 90031

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that TRUSTOR Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

2 of 3

**TESTA CAPITAL GROUP**

BY SIGNING BELOW, TRUSTOR - Borrower accepts and agrees to the terms and covenants contained in this Security Instrument (including those provisions of the Fictitious Deed of Trust that are incorporated by reference) and in any Rider executed by Borrower and recorded with it.

The undersigned TRUSTOR Borrower requests that a copy of any Notice of Default and any Notice of Sale under this Security Instrument be mailed to the Borrower at the address set forth above.

BORROWER

Date: _11-20-2020_

Jinzheng Group (USA), LLC, a California
Limited Liability Company,
By Betty Zheng, Manager

3 of 3

TESTA CAPITAL GROUP

62

# ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _Los Angeles_____ )

On ___11/20/2020_____ before me, _William Earl Bolden Jr. Notary Public_
(insert name and title of the officer)

personally appeared _Betty Zheng_____
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

WILLIAM EARL BOLDEN JR.
Notary Public – California
San Bernardino County
Commission # 2182063
My Comm. Expires Feb 2, 2021

Signature _____ (Seal)

Clear Form    Print Form

EXHIBIT 9



**This page is part of your document - DO NOT DISCARD**



# 20180240534



**Pages:**
**0003**

**Recorded/Filed in Official Records**
**Recorder's Office, Los Angeles County,**
**California**

**03/13/18 AT 11:22AM**

| | |
|---|---|
| FEES: | 31.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 75.00 |
| PAID: | 106.00 |



**L E A D S H E E T**



**201803130700006**

**00014990052**



**008956663**

**SEQ:**
**01**

**DAR - Courier (Upfront Scan)**

**THIS FORM IS NOT TO BE DUPLICATED**

*E497906*

RECORDING REQUESTED BY AND MAIL TO:

**PROFESSIONAL LIEN SERVICES, LLC**
15315 Magnolia Blvd., Suite 212
Sherman Oaks, California 91403

Space above for Recorder's use

## NOTICE OF DELINQUENT ASSESSMENT

In accordance with California Civil Code Section §5675 and the Declaration of Covenants, Conditions, and Restrictions (CC&R's), for **De Celis Court Homeowners Association** recorded on **5/31/07 & 11/13/07 & 12/28/07** as Instrument Number **20071312425 & 20072528727 & 20072850667** in the official records of Los Angeles County, California, the following is recorded as a lien on the property described below:

The property upon which these and other subsequent delinquent assessments and other charges shall constitute a lien is commonly referred to as: **6840 De Celis Pl #9, Lake Balboa, CA 91406** and is legally described as: Apn Number **2225-001-043**, Lot **1**, Unit **9**, Tract **62442** as shown on the applicable recorded Tract Map in the records of Los Angeles County, California.

The name(s) of recorded owner(s) thereof: **Chao Yang**

The mailing address is: **PO Box 3702, Alhambra, CA 91803**

| | |
|---|---|
| Total delinquent assessments from **11/1/2017** through today's date amounts to | **$715.00** |
| Other assessments, interest, late charges, attorney fees (if any), collection fees amounts to | $632.20 |
| Total amount of delinquency (See attached exhibit "A") | **$1347.20** |

Additional monies will accrue under this claim at the rate of claimant's regular monthly or special assessments, plus permissible late charges of **10%** per month, cost of assessment lien, reasonable attorney's fees, and interest at the rate of **12%** per annum.

Should the Association named herein act to have the lien enforced by non-judicial foreclosure and sale, as provided in Civil Code Section 5700(a), the Trustee authorized to enforce and release the lien shall be Witkin & Neal, Inc. 5805 Sepulveda Blvd #670 Van Nuys, CA 91411, (818) 845-8808.

Dated: **March 9 2018**

By:   **De Celis Court Homeowners Association**
Professional Lien Services, LLC

By:   _____
Josh Spies, Agent

**Account Number: 169-8796**
**3107 De Celis Court**

**EXHIBIT "A"**

**Account History Report**

# De Celis Court HOA

**Chao Yang**                                          00169-8796

Community Address:   6840 De Celis Place #9          Date Settled:
                     Lake Balboa, CA 91406           Unit Type:    01 - Unit Type 01 143.00

Mailing Address:     P.O. Box 3702                   **Last payment date:**    Wed Oct 11, 2017
                     Alhambra, CA 91803              **Last payment amount:**          947.20
                                                     **Current balance:**            1,347.20

| Trans Date | Transaction | Charges | Payments | Balance | Date Billed | Reference | Comments |
|---|---|---|---|---|---|---|---|
| 07/15/2016 | Opening Balance | | 0.00 | 0.00 | | | |
| 08/01/2016 | Assessments | 143.00 | | 143.00 | | Monthly Charges | Recurring Charges: 08/01/2016 |
| 08/16/2016 | Late Charges | 14.30 | | 157.30 | | Late Fee | Late Fee: 08/16/2016 |
| 09/01/2016 | Assessments | 143.00 | | 300.30 | | Monthly Charges | Recurring Charges: 09/01/2016 |
| 09/16/2016 | Late Charges | 14.30 | | 314.60 | | Late Fee | Late Fee: 09/16/2016 |
| 09/19/2016 | Collection Costs | 175.00 | | 489.60 | | Pre-Lien Notice Se | Pre-Lien Notice Sent 9/20/16 |
| 10/01/2016 | Assessments | 143.00 | | 632.60 | | Monthly Charges | Recurring Charges: 10/01/2016 |
| 10/17/2016 | Late Charges | 14.30 | | 646.90 | | Late Fee | Late Fee: 10/17/2016 |
| 11/01/2016 | Assessments | 143.00 | | 789.90 | | Monthly Charges | Recurring Charges: 11/01/2016 |
| 11/16/2016 | Late Charges | 14.30 | | 804.20 | | Late Fee | Late Fee: 11/16/2016 |
| 12/01/2016 | Assessments | 143.00 | | 947.20 | | Monthly Charges | Recurring Charges: 12/01/2016 |
| 12/16/2016 | Late Charges | 14.30 | | 961.50 | | Late Fee | Late Fee: 12/16/2016 |
| 12/27/2016 | Check Payment | | -947.20 | 14.30 | | 1044 | Lock Box: 12/27/2016 |
| 01/01/2017 | Assessments | 143.00 | | 157.30 | | Monthly Charges | Recurring Charges: 01/01/2017 |
| 01/17/2017 | Late Charges | 14.30 | | 171.60 | | Late Fee | Late Fee: 01/17/2017 |
| 02/01/2017 | Assessments | 143.00 | | 314.60 | | Monthly Charges | Recurring Charges: 02/01/2017 |
| 02/16/2017 | Late Charges | 14.30 | | 328.90 | | Late Fee | Late Fee: 02/16/2017 |
| 02/21/2017 | Collection Costs | 175.00 | | 503.90 | | Pre-Lien Notice Se | Pre-Lien Notice Sent 2/22/17 |
| 03/01/2017 | Assessments | 143.00 | | 646.90 | | Monthly Charges | Recurring Charges: 03/01/2017 |
| 03/16/2017 | Late Charges | 14.30 | | 661.20 | | Late Fee | Late Fee: 03/16/2017 |
| 04/01/2017 | Assessments | 143.00 | | 804.20 | | Monthly Charges | Recurring Charges: 04/01/2017 |
| 04/18/2017 | Late Charges | 14.30 | | 818.50 | | Late Fee | Late Fee: 04/18/2017 |
| 04/28/2017 | On-Line Payment | | -961.50 | -143.00 | | 85281859 | On-Line ACH Payment |
| 05/01/2017 | Assessments | 143.00 | | 0.00 | | Monthly Charges | Recurring Charges: 05/01/2017 |
| 06/01/2017 | Assessments | 143.00 | | 143.00 | | Monthly Charges | Recurring Charges: 06/01/2017 |
| 06/16/2017 | Late Charges | 14.30 | | 157.30 | | Late Fee | Late Fee: 06/16/2017 |
| 07/01/2017 | Assessments | 143.00 | | 300.30 | | Monthly Charges | Recurring Charges: 07/01/2017 |
| 07/17/2017 | Late Charges | 14.30 | | 314.60 | | Late Fee | Late Fee: 07/17/2017 |
| 08/01/2017 | Assessments | 143.00 | | 457.60 | | Monthly Charges | Recurring Charges: 08/01/2017 |
| 08/09/2017 | Collection Costs | 175.00 | | 632.60 | | Pre-Lien Notice Se | Pre-Lien Notice Sent 8/10/17 |
| 08/16/2017 | Late Charges | 14.30 | | 646.90 | | Late Fee | Late Fee: 08/16/2017 |
| 09/01/2017 | Assessments | 143.00 | | 789.90 | | Monthly Charges | Recurring Charges: 09/01/2017 |
| 09/16/2017 | Late Charges | 14.30 | | 804.20 | | Late Fee | Late Fee: 09/16/2017 |
| 10/01/2017 | Assessments | 143.00 | | 947.20 | | Monthly Charges | Recurring Charges: 10/01/2017 |
| 10/11/2017 | Check Payment | | -947.20 | 0.00 | | 1215 | Lock Box: 10/11/2017 |
| 11/01/2017 | Assessments | 143.00 | | 143.00 | | Monthly Charges | Recurring Charges: 11/01/2017 |
| 11/16/2017 | Late Charges | 14.30 | | 157.30 | | Late Fee | Late Fee: 11/16/2017 |
| 12/01/2017 | Assessments | 143.00 | | 300.30 | | Monthly Charges | Recurring Charges: 12/01/2017 |
| 12/16/2017 | Late Charges | 14.30 | | 314.60 | | Late Fee | Late Fee: 12/16/2017 |
| 12/18/2017 | Collection Costs | 175.00 | | 489.60 | | Pre-Lien Notice Se | Pre-Lien Notice Sent 12/19/17 |
| 01/01/2018 | Assessments | 143.00 | | 632.60 | | Monthly Charges | Recurring Charges: 01/01/2018 |
| 01/16/2018 | Late Charges | 14.30 | | 646.90 | | Late Fee | Late Fee: 01/16/2018 |
| 02/01/2018 | Assessments | 143.00 | | 789.90 | | Monthly Charges | Recurring Charges: 02/01/2018 |
| 02/16/2018 | Late Charges | 14.30 | | 804.20 | | Late Fee | Late Fee: 02/16/2018 |
| 03/01/2018 | Assessments | 143.00 | | 947.20 | | Monthly Charges | Recurring Charges: 03/01/2018 |
| 03/09/2018 | Collection Costs | 400.00 | | 1,347.20 | | Lien | Lien filed |

Page 1 of 1                                                              User: joshua -- Fri Mar 09, 2018 11:40 am

EXHIBIT 10

# WFG National Title Company
a Williston Financial Group company

**PRELIMINARY REPORT**

**Title Contact Information:**
**WFG National Title Company of California**
**700 N Brand Blvd., Suite 1100**
**Glendale, CA  91203**
**Phone:  (818) 476-4083**
**E-mail:  teammark@wfgtitleco.com**

**Title Officer:  Mark Mendoza**

A&A Escrow Services, Inc.
Antonia Delgado
415 N Crescent Drive Suite 320
Beverly Hills, CA 90210

**Escrow No: 105609-AA**

**Order No.:**  22-425418

**Ref. No.:**   105609-AA

**Property Address:**
**6840 De Celis Place Apt #9**
**Los Angeles, CA 91406**

**APN:  2225-001-043**

In response to the above referenced application for a policy of title insurance, WFG National Title Insurance Company hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a Policy or Policies of Title Insurance of describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien, or encumbrance not shown or referred to as an Exception below or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations of said Policy forms.

The printed Exceptions and Exclusions from the coverage and Limitations on Covered Risks of said policy or policies are set forth in Exhibit One attached.  The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties.  Limitations on Covered Risks applicable to the CLTA and ALTA Homeowner's Policies of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limit of Liability for certain coverages are also set forth in Exhibit One.  Copies of the policy forms should be read.  They are available from the office which issued this report.

**Please read the exceptions shown or referred to below and the exceptions and exclusions set forth in Exhibit One of this report carefully.  The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered.**

It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects, and encumbrances affecting title to the land.  This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.

The form of policy or policies of title insurance contemplated by this report is/are:

**ALTA® Homeowner's Policy (12-02-13)**

**ALTA® Ext Loan Policy (06-17-06)**

**Issued by WFG National Title Insurance Company**

Dated as of: **August 31, 2022 at 7:30 am**

The estate or interest in the land hereinafter described or referred to covered by this Report is:

**A Fee**

Title to said estate or interest at the date hereof is vested in:

**Jinzheng Group (USA) LLC, a California Limited Liability Company, Subject to Item 21 shown herein**

view image

The land referred to in this report is situated in the State of California, County of Los Angeles, and is described as follows:

**SEE ATTACHED EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF**

# EXHIBIT   "A"
## LEGAL DESCRIPTION

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

A CONDOMINIUM COMPRISED OF:

PARCEL 1:

AN UNDIVIDED ONE-THIRTY SIXTH (1/36TH) FEE SIMPLE INTEREST AS A TENANT IN COMMON IN AND TO THE COMMON AREA OF MODULE "A" OF LOT 1 OF TRACT NO. 62442, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, AS PER MAP RECORDED IN BOOK 1331, PAGES 20 THROUGH 21, INCLUSIVE, OF MAPS, AS SHOWN ON THAT CERTAIN CONDOMINIUM PLAN FOR MODULES "A" AND "B" OF SAID LOT 1 OF TRACT NO. 62442, WHICH CONDOMINIUM PLAN WAS RECORDED ON MAY 31, 2007, AS INSTRUMENT NO. 07-1312424 ("CONDOMINIUM PLAN"), ALL IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THEREFROM THE UNITS AS SHOWN ON SAID CONDOMINIUM PLAN.

PARCEL 2:

UNIT NO. 9, OF SAID MODULE "A" OF LOT NO. 1 OF TRACT NO. 62442, AS SHOWN AND DESCRIBED IN SAID CONDOMINIUM PLAN. RESERVING FROM SAID PARCELS 1 AND 2 ABOVE, FOR THE BENEFIT OF GRANTOR, ITS SUCCESSORS IN INTEREST, AND OTHERS, EASEMENTS FOR ACCESS, USE, ENJOYMENT, DRAINAGE, REPAIRS, AND FOR OTHER PURPOSES, ALL AS DESCRIBED IN THE DECLARATION OF ESTABLISHMENT OF CONDITIONS, COVENANTS AND RESTRICTIONS FOR DE CELIS COURT ("DECLARATION"), RECORDED ON 5/31, 2007 AS INSTRUMENT NO. 07-1312425, OF THE OFFICIAL RECORDS OF LOS ANGELES COUNTY, CALIFORNIA, INCLUDING ANY AMENDMENTS THERETO, ALL OF WHICH ARE INCORPORATED HEREIN BY THIS REFERENCE.

PARCEL 3:

NONEXCLUSIVE EASEMENTS FOR ACCESS, INGRESS, EGRESS, USE, ENJOYMENT, DRAINAGE, ENCROACHMENT, SUPPORT, MAINTENANCE, REPAIRS, AND FOR OTHER PURPOSES, ALL AS DESCRIBED IN THE DECLARATION RECORDED MAY 31, 2007 AS INSTRUMENT NO. 07-1312425, OF OFFICIAL RECORDS AND THE CONDOMINIUM PLAN.

APN:    2225-001-043

**At the date hereof exception to coverage in addition to the printed Exceptions and Exclusions in said policy form would be as follows:**

1a.    General and special taxes and assessments for the fiscal year 2022 - 2023, a lien not yet due or payable.

1b.    General and Special City and/or County taxes, including any personal property taxes and any assessments collected with taxes, for the fiscal year 2021 - 2022:

|  |  |
|---|---|
| 1st Installment: | $3,508.57, Paid |
| 2nd Installment: | $3,508.57, Paid |
| APN.: | 2225-001-043 View Taxes |
| Code Area: | 00016 |

1c.    Supplemental taxes for the fiscal year  issued pursuant to the provisions of Chapter 3.5 (commencing with Section 75) of the Revenue and Taxation Code of the State of California.

|  |  |
|---|---|
| APN No.: | 2225-001-043 View Taxes |
| Supplemental Bill No.: | 2225-001-043 |
| 1st Installment: | $594.28, Paid |
| 2nd Installment: | $594.27, Paid |

1d.    The lien of supplemental taxes, if any, assessed pursuant to Chapter 3.5 commencing with Section 75 of the California Revenue and Taxation Code.

1e.    Assessments, for community facility districts, if any, affecting said land which may exist by virtue of assessment maps or notices filed by said districts.

1f.    The liens of bonds and assessments liens, if applicable, collected with the general and special taxes.

2.    Water rights, claims or title to water, whether or not shown by the public records.

3.    Any easements or servitudes appearing in the public records.

Affects: Common Area

4.    An easement for pole lines, conduit for public utility and rights incidental thereto, as set forth in a document recorded in (book) 5966 (page) 9, of Deeds.

Reference is hereby made to said document for full particulars.

5.    Covenants, conditions, restrictions and easements in the document recorded in  (book) 5966 (page) 9, of Deeds.

6.    An easement for construct, maintain underground communication facilities  and rights incidental thereto, as set forth in a document recorded on July 16, 1981, as Instrument No. 81-707781, of Official Records.

Reference is hereby made to said document for full particulars.

7.    An easement for communication lines and rights incidental thereto, as set forth in a document recorded on July 16, 1981, as Instrument No. 81-707784, of Official Records.

Reference is hereby made to said document for full particulars.

8.    The terms, conditions and provisions contained in the document entitled "Memorandum of Waiver of the 15% Document Requirement", recorded on June 30, 2005, as Instrument No. 2005-1549287, Official Records.

Reference is hereby made to said document for full particulars.

Order No.: 22-425418

9.    The terms, conditions and provisions contained in the document entitled "Master Covenant and Agreement", recorded on March 16, 2006, as Instrument No. 2006-568266, Official Records.

Reference is hereby made to said document for full particulars.

10.    The terms, conditions and provisions contained in the document entitled "Master Covenant and Agreement Regarding Onsite BMP Maintenance" , recorded on March 20, 2006, as Instrument No. 2006-594300 , Official Records.

Reference is hereby made to said document for full particulars.

11.    The terms, conditions and provisions contained in the document entitled  "Master Covenant and Agreement", recorded on March 22, 2006, as Instrument No. 2006-616200 , Official Records.

Reference is hereby made to said document for full particulars.

12.    The terms, conditions and provisions contained in the document entitled "Master Covenant and Agreement", recorded on May 31, 2006, as Instrument No. 2006-1194322, Official Records.

Reference is hereby made to said document for full particulars.

13.    An easement for public utilities and rights incidental thereto, as set forth in a document recorded on December 13, 2006, as Instrument No.  2006-2777274, of Official Records.

Reference is hereby made to said document for full particulars.

14.    On the Map of Tract No. 62442, portion of Lot 1 is shown as a "future street".

15.    An easement for public sidewalk and rights incidental thereto, as shown or as offered for dedication on the recorded Map of said Tract.

16.    The terms, conditions and provisions contained in the document entitled "Notice of Existence of Procedures and Impact on Rights", recorded on May 29, 2007, as Instrument No. 2007-1285845, Official Records.

Reference is hereby made to said document for full particulars.

17.    Covenants, conditions, restrictions, easements, assessments, liens, charges, terms and provisions in the document recorded on May 31, 2007, as Instrument No. 2007-1312425, of Official Records.

Said covenants, conditions and restrictions provide that a violation thereof shall not defeat nor render invalid the lien of any mortgage or deed of trust made in good faith and for value.

Said instrument also provides for the levy of assessments, the liens of which are stated to be subordinate to the lien of any mortgage or deed of trust made in good faith and for value.

Document(s) declaring modifications thereof recorded on November 13, 2007, as Instrument No. 2007-2528727, of Official Records.

Document(s) declaring modifications thereof recorded on December 28, 2007, as Instrument No. 20072850667, of Official Records.

18.    The terms, conditions and provisions contained in the document entitled "Notice of Seller's Election for Handling of Construction Claims Pursuant to California Civil Code Section 895 et. seq.", recorded on May 31, 2007, as Instrument No. 2007-1312426 , Official Records.

Reference is hereby made to said document for full particulars.

19.  The terms, conditions and provisions contained in the document entitled "Resolution", recorded on March 24, 2016, as Instrument No. 20160323494, Official Records.

Reference is hereby made to said document for full particulars.

20.  A Notice of Homeowners Association Assessment Lien:

| | |
|---|---|
| Association: | De Celis Court Homeowners Association |
| Amount: | $1,347.20, and any other amounts due thereunder |
| Recorded: | March 13, 2018 |
| Instrument No.: | 2018-240534, of Official Records. |

21.  The requirement we be furnished an affidavit from
Chao Yang
to substantiate the deed recorded August 7, 2020 as Instrument No. 2020-915247, of Official Records wherein Jinzheng Group (USA) LLC, a California Corporation
acquired title, along with a current statement of information for consideration prior to our committing to issue the insurance requested.
Said declaration should be notarized by a notary public familiar to this company.

22.  A deed of trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby:

| | |
|---|---|
| Amount: | $350,000.00 |
| Dated: | August 11, 2020 |
| Trustor: | Jinzheng Group (USA) LLC, a California Limited Liability Company |
| Trustee: | SBS Trust Deed Network, a California Corporation |
| Beneficiary: | Investment Management Company, LLC, a California Limited Liability Company |
| Lender: | Investment Management Company, LLC, a California Limited Liability Company |
| Recorded: | August 18, 2020 |
| Instrument No.: | 20200957956 of Official Records |

23.  A deed of trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby:

| | |
|---|---|
| Amount: | $60,000.00 |
| Dated: | November 19, 2020 |
| Trustor: | Jinzheng Group (USA) LLC, a California Limited Liability Company |
| Trustee: | North America Title Company |
| Beneficiary: | Michael E. Dorff and Shari L. Dorff, as joint tenants |
| Lender: | Michael E. Dorff and Shari L. Dorff, as joint tenants |
| Recorded: | November 25, 2020 |
| Instrument No.: | 20201525930 of Official Records |

To avoid delays at time of closing, please submit the original note and deed of trust together with a properly executed Substitution of Trustee and Full Reconveyance to this office, at least one week prior to the close of escrow.


## END OF EXCEPTIONS

Order No.: 22-425418

# REQUIREMENTS

Req. No. 1.    Statements of information from all parties to the transaction are required.

Req. No. 2.    With respect to Jinzheng Group (USA), LLC, a California limited liability company:

    a.  A copy of its operating agreement and any amendments thereto;

    b.  If it is a California limited liability company, that a certified copy of its articles of organization (LLC-1) and any certificate of correction (LLC-11), certificate of amendment (LLC-2), or restatement of articles
of organization (LLC-10) be recorded in the public records;

    c.  If it is a foreign limited liability company, that a certified copy of its application for registration (LLC-5) be recorded in the public records;

    d.  With respect to any deed, deed of trust, lease, subordination agreement or other document or instrument executed by such limited liability company and presented for recordation by the Company or upon which the Company is asked to rely, that such document or instrument be executed in accordance with one of the following, as appropriate:
(i) If the limited liability company properly operates through officers appointed or elected pursuant to the terms of a written operating agreement, such document must be executed by at least two duly elected or appointed officers, as follows: the chairman of the board, the president or any vice president, and any secretary, assistant secretary, the chief financial officer or any assistant treasurer;
(ii) If the limited liability company properly operates through a manager or managers identified in the articles of organization and/or duly elected pursuant to the terms of a written operating agreement, such document must be executed by at least two such managers or by one manager if the limited liability company properly operates with the existence of only one manager.

    e.  Other requirements which the Company may impose following its review of the material required herein and other information which the Company may require.

Req. No. 3.    Prior to the issuance of title insurance, it will be necessary that we be furnished a written statement from the Homeowners Association of which said property is a member, which will provide that all liens, charges and/or assessments levied on said land have been paid. Said statement should provide clearance up to and including the time of closing. In order to avoid unnecessary delays at the time of closing we ask that you obtain and forward said statement at your earliest convenience.

Req. No. 4.    Determination of whether reporting is required under any applicable U.S. Department of Treasury FINCEN Geographic Targeting Order (GTO) and, if reporting under the GTO is required, providing to the Company the information and identity documents required to comply with the GTO and complete the report.

Order No.: 22-425418

# NOTES

This report does not reflect requests for notice of default, requests for notice of delinquency, subsequent transfers of easements, and similar matters not germane to the issuance of the policy of title insurance anticipated hereunder.

Note 1:    If this company is requested to disburse funds in connection with this transaction, Chapter 598 of 1989 Mandates of the California Insurance Code requires hold periods for checks deposited to escrow or sub-escrow accounts. Such periods vary depending upon the type of check and anticipated methods of deposit should be discussed with the escrow officer.

Note 2:    No endorsement issued in connection with the policy and relating to covenants, conditions or restrictions provides coverage for environmental protection.

Note 3:    Special recordings: Due to a severe budget shortfall, many county recorders have announced that severe limitations will be placed on the acceptance of "special recordings."

Note 4:    Homeowners association: if the property herein described is subject to membership in a homeowners association, it will become necessary that we be furnished a written statement from the said homeowners association of which said property is a member, which provides that all liens, charges and/or assessments levied on said land have been paid. Said statement should provide clearance up to and including the time of closing. In order to avoid unnecessary delays at the time of closing, we ask that you obtain and forward said statement at your earliest convenience.

Note 5:    Demands: This Company requires that all beneficiary demands be current at the time of closing. If the demand has expired and a current demand cannot be obtained it may be necessary to hold money whether payoff is made based on verbal figures or an expired demand.

Note 6:    Line of credit payoffs: If any deed of trust herein secures a line of credit, we will require that the account be frozen and closed and no additional advances be made to the borrower. If the beneficiary is unwilling to freeze the account, we will require you submit to us all unused checks, debit vouchers, and/or credit cards associated with the loan along with a letter (affidavit) signed by the trustor stating that no additional advances will be made under the credit line. If neither of the above is possible, it will be necessary to hold any difference between the demand balance and the maximum available credit.

Note 7:    Maps: The map attached hereto may or may not be a survey of the land depicted thereon. You should not rely upon it for any purpose other than orientation to the general location of the parcel or parcels depicted. WFG National Title Company of California expressly disclaims any liability for alleged loss or damages which may result from reliance upon this map.

Note 8:    In the event of cancellation or if the transaction has not closed within 90 days from the date hereof, the rate imposed and collectable shall be a minimum of $360.00, pursuant to Section 12404 of the Insurance code, unless other provisions are made.

Note 9:    A Preliminary Change of Ownership Report (PCOR) must be filed with each conveyance in the County Recorder's office for the county where the property is located. If a document evidencing a change in ownership is presented to the Recorder for recordation without the concurrent filing of a PCOR, the Recorder may charge an additional recording fee of twenty dollars ($20). State law also provides for a penalty of be levied if the Change of Ownership Report is not returned to the Assessor within a timely filing period. The penalty for failure to file a Change in Ownership Statement is $100 or 10% of the new tax bill, whichever is greater, but not to exceed $2,500.

Note 10:    As to any and all covenants and restrictions set forth herein, the following is added: "but omitting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, sexual orientation, familial status, disability, handicap, national origin, genetic information, gender, gender identity, gender expression, marital status, source of income (as defined in subdivision (p) of Section 12955), or ancestry, that restriction violates state and federal fair housing laws and is void, and may be removed pursuant to Section 12956.2 of the Government Code, to the extent such covenants, conditions or restrictions violate Title 42, Section 3604(c), of the United States Codes or Section 12955 of the California Government Code. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status."

73

Note 11:    Due to current conflicts or potential conflicts between state and federal law, which conflicts may extend to local law, regarding marijuana, if the transaction to be insured involves property which is currently used or is to be used in connection with a marijuana enterprise, including but not limited to the cultivation, storage, distribution, transport, manufacture, or sale of marijuana and/or products containing marijuana, the Company declines to close or insure the transaction, and this Preliminary Title Report shall automatically be considered null and void and of no force and effect.

Note 12:    This report is preparatory to the issuance of an ALTA Loan Policy. We have no knowledge of any fact which would preclude the issuance of the policy with CLTA Endorsement forms 100, 116 or 116.01 and if applicable, 115 and 116.02 attached.

When issued, the CLTA endorsement form 116, 116.01 or 116.02, if applicable will reference **Condominium**

known as
**6840 De Celis Place Apt #9, City of Los Angeles, County of Los Angeles, California**

Note 13:    The only conveyances affecting said land which recorded within twenty-four (24) months of the date of this report are:

None of Record

## Exhibit One (Rev. 06-15-14)
## CLTA STANDARD COVERAGE POLICY—1990 (4-8-14)
## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1.  (a)    Any law, ordinance or governmental regulation (including but not limited to building or zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

    (b)    Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2.  Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3.  Defects, liens, encumbrances, adverse claims or other matters:

    (a)    whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or  agreed to by the insured claimant;

    (b)    not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;

    (c)    resulting in no loss or damage to the insured claimant;

    (d)    attaching or created subsequent to Date of Policy; or

    (e)    resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.

4.  Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.

5.  Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6.  Any claim, which arises out of the transaction vesting in the insured the estate of interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

## EXCEPTIONS FROM COVERAGE—SCHEDULE B, PART I

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1.  Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.

    Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

2.  Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the land which may be asserted by persons in possession thereof.

3.  Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.

4.  Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

5.  (a)  Unpatented mining claims;  (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof;  (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

6.  Any lien or right to a lien for services, labor or material not shown by the public records.

Order No.: 22-425418

## CLTA/ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE (12-02-13)
## EXCLUSIONS

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1.  Governmental police power, and the existence or violation of those portions of any law or government regulation concerning:

    (a)  building;

    (b)  zoning;

    (c)  land use;

    (d)  improvements on the Land;

    (e)  land division; and

    (f)  environmental protection.

    This Exclusion does not limit the coverage described in Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23 or 27.

2.  The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This Exclusion does not limit the coverage described in Covered Risk 14 or 15.

3.  The right to take the Land by condemning it. This Exclusion does not limit the coverage described in Covered Risk 17.

4.  Risks:

    (a)  that are created, allowed, or agreed to by You, whether or not they are recorded in the Public Records;

    (b)  that are Known to You at the Policy Date, but not to Us, unless they are recorded in the Public Records at the Policy Date;

    (c)  that result in no loss to You; or

    (d)  that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.e., 25, 26, 27 or 28.

5.  Failure to pay value for Your Title.

6.  Lack of a right: (a) to any land outside the area specifically described and referred to in paragraph 3 of Schedule A; and (b) in streets, alleys, or waterways that touch the Land. This Exclusion does not limit the coverage described in Covered Risk 11 or 21.

7.  The transfer of the Title to You is invalid as a preferential transfer or as a fraudulent transfer or conveyance under federal bankruptcy, state insolvency, or similar creditors' rights laws.

8.  Contamination, explosion, fire, flooding, vibration, fracturing, earthquake or subsidence.

9.  Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

## LIMITATIONS ON COVERED RISKS

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:

- For Covered Risk 16, 18, 19, and 21 Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.

The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

|  | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 16: | 1% of Policy Amount Shown in Schedule A or $2,500 (whichever is less) | $10,000.00 |
| Covered Risk 18: | 1% of Policy Amount Shown in Schedule A or $5,000 (whichever is less) | $25,000.00 |
| Covered Risk 19: | 1% of Policy Amount Shown in Schedule A or $5,000 (whichever is less) | $25,000.00 |
| Covered Risk 21: | 1% of Policy Amount Shown in Schedule A or $2,500 (whichever is less) | $ 5,000.00 |

## 2006 ALTA LOAN POLICY (06/17/06))
## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1.  (a)  Any law, ordinance or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting or relating to
    (i)  the occupancy, use, or enjoyment of the Land;
    (ii)  the character, dimensions or location of any improvement erected on the Land;
    (iii)  the subdivision of land; or
    (iv)  environmental protection,
    or the effect of any violation of these laws, ordinances or governmental regulations.  This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.

(b)    Any governmental police power.  This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2.    Rights of eminent domain.  This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3.    Defects, liens, encumbrances, adverse claims or other matters:

(a)    created, suffered, assumed or agreed to by the Insured Claimant;

(b)    not Known to the Company, not recorded in the public records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an insured under this policy;

(c)    resulting in no loss or damage to the Insured Claimant;

(d)    attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11,13, or 14); or

(e)    resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4.    Unenforceability of the lien of the Insured Mortgage because of the inability or failure of the Insured to comply with applicable doing-business laws of the state in which the land is situated.

5.    Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6.    Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is

(a)    a fraudulent conveyance or fraudulent transfer, or

(b)    a preferential transfer for any reason not stated in covered Risk 13(b) of this policy..

7.    Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records.  This Exclusion does not modify or limit the coverage provided under covered Risk 11(b).

The above policy form may be issued to afford either Standard Coverage or Extended Coverage.  In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

## EXCEPTIONS FROM COVERAGE

Except as provided in Schedule B - Part II, this policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

### PART 1

1.    (a)    Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records;

(b)    Proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2.    Any facts, rights, interests or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.

3.    Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.

4.    Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.

5.    (a)    Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the Public Records

6.    Any lien or right to a lien for services, labor or material not shown by the Public Records.

### PART II

In addition to the matters set forth in Part I of this Schedule, the Title is subject to the following matters, and the Company insures against loss or damage sustained in the event that they are not subordinate to the lien of the Insured Mortgage:]

## 2006 ALTA OWNER'S POLICY (06/17/06)
## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1.    (a)    Any law, ordinance or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting or relating to
(i) the occupancy, use, or enjoyment of the Land;
(ii) the character, dimensions or location of any improvement erected on the Land;
(iii) the subdivision of land; or
(iv) environmental protection;
or the effect of any violation of these laws, ordinances or governmental regulations.  This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.

(b)    Any governmental police power.  This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2.    Rights of eminent domain.  This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3.    Defects, liens, encumbrances, adverse claims or other matters:

(a)    created, suffered, assumed or agreed to by the Insured Claimant;

Order No.: 22-425418

    b)      not Known to the Company, not recorded in the public records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an insured under this policy;

c)      resulting in no loss or damage to the Insured Claimant;

    (d)      attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or

    (e)      resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.

4.      Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is

    (a)      a fraudulent conveyance or fraudulent transfer, or

    (b)      a preferential transfer for any reason not stated in covered Risk 9 of this policy..

5.      Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage and the Company will not pay costs, attorneys' fees or expenses which arise by reason of:

1.    (a)      Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records;

    (b)      Proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2.      Any facts, rights, interests or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.

3.      Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.

4.      Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.

5.    (a)      Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the Public Records.

6.      Any lien or right to a lien for services, labor or material not shown by the Public Records.

7.      Variable exceptions such as taxes, easements, CC&R's, etc. shown here.

## ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY (12-02-13)
## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1.   (a)   Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
         (i)   the occupancy, use, or enjoyment of the Land;
         (ii)   the character, dimensions, or location of any improvement erected on the Land;
         (iii)   the subdivision of land; or
         (iv)   environmental protection;
      or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.
   (b)   Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.

2.   Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3.   Defects, liens, encumbrances, adverse claims, or other matters
   (a)   created, suffered, assumed, or agreed to by the Insured Claimant;
   (b)   not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c)   resulting in no loss or damage to the Insured Claimant;
   (d)   attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 16, 17, 18, 19, 20, 21, 22, 23, 24, 27 or 28); or
   (e)   resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4.   Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.

5.   Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury, or any consumer credit protection or truth-in-lending law. This Exclusion does not modify or limit the coverage provided in Covered Risk 26.

6.   Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to Advances or modifications made after the Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11.

7.   Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching subsequent to Date of Policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11(b) or 25.

8.   The failure of the residential structure, or any portion of it, to have been constructed before, on or after Date of Policy in accordance with applicable building codes. This Exclusion does not modify or limit the coverage provided in Covered Risk 5 or 6.

9.   Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
   (a)   a fraudulent conveyance or fraudulent transfer, or
   (b)   a preferential transfer for any reason not stated in Covered Risk 27(b) of this policy.

10.   Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.

11.   Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

# STATEMENT OF INFORMATION

**CONFIDENTIAL - TO BE USED ONLY IN CONNECTION WITH ORDER NO: 22-425418, ESCROW NO.:  22-425418AND
PROPERTY ADDRESS:  6840 DE CELIS PLACE APT #9, VAN NUYS, CA  91406**

1. **IMPROVEMENTS:**  ☐ NONE/VACANT LAND   ☐ SINGLE RESIDENCE   ☐ MULTIPLE RESIDENCE   ☐ COMMERICAL
2. **OCCUPIED BY:**  ☐ OWNER   ☐ TENANTS
3. **CONSTRUCTION WITHIN LAST 6 MONTHS?**  ☐ YES   ☐ NO
   IF YES, INDICATE WORK DONE: _____

| PARTY 1 | PARTY 2 |
|---|---|
| FIRST        MIDDLE ☐ NONE     LAST | FIRST        MIDDLE ☐ NONE     LAST |
| FORMER LAST NAME(S), IF ANY | FORMER LAST NAME(S), IF ANY |
| BIRTHPLACE          BIRTH DATE | BIRTHPLACE          BIRTH DATE |
| SOCIAL SECURITY NUMBER     DRIVER'S LICENSE | SOCIAL SECURITY NUMBER     DRIVER'S LICENSE |
| NAME OF FORMER SPOUSE/REGISTERED DOMESTIC PARTNER | NAME OF FORMER SPOUSE/REGISTERED DOMESTIC PARTNER |

**MARRIAGE**

☐ SINGLE      ☐ MARRIED      ☐ UNMARRIED      DATE OF MARRIAGE/DIVORCE: _____

**PARTY 1**

**RESIDENCES FOR LAST 10 YEARS**

| ADDRESS | CITY | STATE | FROM (DATE) TO (DATE) |
|---|---|---|---|
| ADDRESS | CITY | STATE | FROM (DATE) TO (DATE) |
| ADDRESS | CITY | STATE | FROM (DATE) TO (DATE) |

**OCCUPATIONS FOR LAST 10 YEARS**

| OCCUPATION | FIRM NAME | ADDRESS | NUMBER OF YEARS |
|---|---|---|---|
| OCCUPATION | FIRM NAME | ADDRESS | NUMBER OF YEARS |

**PARTY 2**

**RESIDENCES FOR LAST 10 YEARS**

| ADDRESS | CITY | STATE | FROM (DATE) TO (DATE) |
|---|---|---|---|
| ADDRESS | CITY | STATE | FROM (DATE) TO (DATE) |
| ADDRESS | CITY | STATE | FROM (DATE) TO (DATE) |

**OCCUPATIONS FOR LAST 10 YEARS**

| OCCUPATION | FIRM NAME | ADDRESS | NUMBER OF YEARS |
|---|---|---|---|
| OCCUPATION | FIRM NAME | ADDRESS | NUMBER OF YEARS |

**THE UNDERSIGNED DECLARE, UNDER PENALTY OF PERJURY, THAT THE FOREGOING IS TRUE AND CORRECT.**

**EXECUTED ON** _____ (DATE), **AT** _____ (CITY)**.**

BY _____     BY _____

HOME TELEPHONE: _____     HOME TELEPHONE _____

BUSINESS TELEPHONE _____     BUSINESS TELEPHONE _____

EMAIL_____     EMAIL_____

## Disclosure to Consumer of Available Discounts
## Pursuant to California Code of Regulations Section 2355.3

In compliance with Section 2355.3 of the California Code of Regulations, if the current transaction involves an improved, one-to-four family, residential dwelling, the proposed insured may be entitled to certain cost reductions and/or discounts in their title insurance premiums and/or settlement service charges, pursuant to the programs listed below, and as further described in the Company's current Schedule of Rates and Rules for the State of California, currently on file with the California Department of Insurance.  The reductions and/or discounts available are:

| | |
|---|---|
| Electronic Commerce | Expedited/Electronic Refinance Rates |
| Group Title Discount Program | Lender Special Rates 1, 2, 3 |
| First Time Buyer(s) | Limited Escrow Rates |
| Senior Citizen Rate | Home Equity Escrow Rate |
| U.S. Military Rate | REO Escrow Rate |
| Consumer Direct Rates | Group Rate Escrow Discount |
| Disaster Loans | |

Application of the Reductions and/or Discounts listed above shall be governed by the rules and requirements set forth in the Schedule of Rates and Rules on file in the office of the California Insurance Commissioner.  Multiple programs may or may not be applied.  Pursuant to the above referenced California Code of Regulations Section, neither provision nor acceptance of this form shall constitute a waiver of the consumer's right to be charged the filed rate.

With the receipt of the Preliminary Report to which this Disclosure Form is attached, the proposed insured acknowledges that they have been notified that they may be entitled to certain cost reductions and/or discounts, as listed above and as more particularly described in the Company's Schedule of Rates and Rules, currently on file in the office of the Insurance Commissioner of the State of California.

**Williston Financial Group**

**Plain English Privacy Statement
for Appraisal, Title & Escrow Customers**

WFG believes it is important to protect your privacy and confidences. We recognize and respect the privacy expectations of our customers. We believe that making you aware of how we collect information about you, how we use that information, and with whom we share that information will form the basis for a relationship of trust between us. This Privacy Policy provides that explanation. We reserve the right to change this Privacy Policy from time to time.

Williston Financial Group, LLC, WFG National Title Insurance Co. and each of the affiliates listed below (collectively "WFG" or the "WFG Family") are obligated to comply with Federal and state privacy laws. While there are some common requirements to those laws, the definitions and duties differ significantly from law-to-law and state-to-state. A privacy statement drafted to comply with all of the applicable privacy laws and their differing definitions would likely be confusing. Therefore, in an attempt to better communicate our privacy policies, WFG designed this "Plain English" explanation, followed by the Gramm-Leach-Bliley Act model form and website links to State-Specific Privacy Notices in order to provide you with the complete, legal privacy notices and disclosures required under Federal and applicable State Laws.

WFG's primary business is providing appraisal, title insurance and, escrow services for the sale or refinance of real property. This can be a complicated process, involving multiple parties, many of whom have been selected by our customers, each filling a specialized role. In part, you have hired WFG to coordinate and smooth the passage of the information necessary for an efficient settlement or closing.

In the course of this process, WFG collects a significant amount of personal and identifying information about the parties to a transaction, including sensitive items that include but are not limited to: your contact information including email addresses, Social Security numbers, driver's license and, other identification numbers and information; financial, bank and insurance information; information about past and proposed mortgages and loans; about properties you currently or previously owned; your mortgage application package; and the cookie, IP address, and other information captured automatically by computer systems.

Much of this information is gathered from searches of public land records, tax, court and credit records to make certain that any liens, challenges, or title defects are addressed properly. Some of the information that is collected is provided by you, or the computer systems you use. We also may receive information from real estate brokers and agents, mortgage brokers and, others working to facilitate your transaction. We also may receive information from public, private or governmental databases including credit bureaus, 'no-fly' lists, and terrorist 'watch lists' , as well as from your lenders and credit bureaus.

**What Information is Shared?**

**WFG DOES NOT SELL any of your information to non-affiliated companies for marketing or any other purpose.**

However, some of the same information does get shared with persons inside and outside the WFG Family in order to facilitate and complete your transaction.

For example:

- Information, draft documents, and closing costs will pass back and forth between WFG and your mortgage broker and lender to facilitate your transaction.
- Information, including purchase agreements and amendments, will pass back and forth between WFG and the real estate agents and brokers, the mortgage brokers and lenders, the lawyers and accountants, and others involved in facilitating the transaction.
- WFG may order property searches and examinations from title searchers, abstractors and title plants.
- WFG may use third parties to obtain tax information, lien information, payoff information, condominium and, homeowners' association information and payoff information.
- Third parties may be engaged to prepare documents in connection with your transaction.
- Surveys, appraisals and, inspections may be ordered.

82

- Within the WFG Family of companies, we may divide up the work to handle each closing in the most efficient manner possible and to meet specific legal and licensing requirements.   Certain parts of your closing (for example a search or disbursement) may be handled by another division or company within the WFG Family.
- When it is time for signatures, your complete closing package may be sent to a notary, remote online notary, or notary service company who will arrange to meet with you to sign documents. The notary will, in turn, send signed copies back to us along with copies of your driver's license or other identity documents usually by mail, UPS, Federal Express or another courier service.
- Your deed, mortgage and other documents required to perfect title will be recorded with the local recorder of deeds.
- In some cases, we use an outside service to coordinate the recording or electronic-recording of those instruments, and they will receive copies of your deeds, mortgages and other recordable documents to process, scan and send on to the recording office.
- Various government agencies get involved.   The law requires us to provide certain information to the IRS, the US Treasury, local and state tax authorities and other governmental agencies.

You have a choice in the selection of a mortgage broker, lender, real estate broker or agent and others that make up your 'transaction team.' Information flows to and from the members of the transaction team you have selected to facilitate an efficient transaction for you.

When WFG selects and engages a third-party provider, we limit the scope of the information shared with that third party to the information reasonably necessary for that service provider to provide the requested services.  With most, we have entered into express agreements in which they expressly commit to maintain a WFG customer's information in strict confidence and use the information only for purposes of providing the requested services, clearing title, preventing fraud and addressing claims under our title insurance policies.

### How does WFG use your Information?

We may use your personal information in a variety of ways, including but not limited to:

- Provide the products, services and title insurance you have requested and to close and facilitate your transaction.
- Coordinate and manage the appraisal process.
- Handle a claim or provide other services relating to your title insurance policies.
- Create and manage your account.
- Operate and improve WFG's applications and websites, including WFG MyHome®, WFG's secure communication and transaction portal.  Your information is used for access management, payment processing, site administration, internal operations, troubleshooting, data analysis, testing, research, and for statistical purposes.
- Respond to your requests, feedback, or inquiries.
- Comply with laws, regulations, and other legal requirements.
- Comply with relevant industry standards and our policies, including managing WFG's risk profile through reinsurance.
- Protect and enforce your rights and the rights of other users against unlawful activity, including identity theft and fraud.
- Protect and enforce our collective rights arising under any agreements entered into between WFG and you or any other third party;
- Protect the integrity and maintain security of our applications, websites, and products;
- Operate, evaluate, and improve our business; and
- Provide you with information about products, services, and promotions, from WFG or third parties that may interest you.

### How Do We Store and Protect Your Personal Information?

Although no system can guarantee the complete security of your personal information, we will use our best efforts to maintain commercially reasonable technical, organizational, and physical safeguards, consistent with applicable law, to protect your personal information and our systems and sites from malicious intrusions or hacking.

**How Long Do We Keep Your Personal Information?**

We keep your personal information for as long as necessary to comply with the purpose for which it was collected, our business needs, and our legal and regulatory obligations. We may store some personal information indefinitely. If we dispose of your personal information, we will do so in a way that is secure and appropriate to the nature of the information subject to disposal.

**Computer Information**

When you access a WFG website, or communicate with us by e-mail, we may automatically collect and store more information than you are expressly providing when you fill out a survey or send an email.   This may include:

- Your IP Address.
- Your email address, your alias and, social media handles.
- The type of browser and operating system you use.
- The time of your visit.
- The pages of our site you visit.
- Cookies.

In order to provide you with customized service, we make use of Web browser cookies.  Cookies are files that help us identify your computer and personalize your online experience.  You may disable cookies on your computer, but you may not be able to download online documents or access certain sites unless cookies are enabled.

The technical information we collect is used for administrative and technical purposes and to prevent fraud and provide identity verification.  For instance, we may use it to count the number of visitors to our site and determine the most popular pages.  We may also use it to review types of technology you are using, determine which link brought you to our Web site, assess how our advertisements on other sites are working, help with maintenance, and improve our customers' experience.

We may compare information gathered on previous visits to verify that we are interacting with the same parties and not a potential imposter.

If we ask you to fill out any forms or surveys, we will use the information we receive only for the specific purposes indicated in those forms or surveys.

The information you and your transaction team send us in emails or attached to an email, or provide through any of our online tools, is used for purposes of providing title, escrow and appraisal management services and used for the purposes described above.

**Links to Third Party Sites**

Our Applications and Websites may contain links to third-party websites and services. Please note that these links are provided for your convenience and information, and the websites and services may operate independently from us and have their own privacy policies or notices, which we strongly suggest you review. This Privacy Notice applies to WFG's applications and websites only.

**Do Not Track**

Because there is not an industry-standard process or defined criteria to permit a user to opt-out of tracking their online activities (Do Not Track or DNT), our websites do not currently change the way they operate based upon detection of a "Do Not Track" or similar signal.  Likewise, we cannot assure that third parties are not able to collect information about your online activities on WFG websites or applications.

**Social Media Integration**

Our applications, websites, and products contain links to and from social media platforms. You may choose to connect to us through a social media platform, such as Facebook, Twitter, Google, etc. When you do, we may collect additional information from or about you, such as your screen names, profile picture, contact information, contact list, and the profile pictures of your contacts, through the social media platform. The social media platforms may also collect information from you.

When you click on a social plug-in, such as Facebook's "Like" button, Twitter's "tweet" button or the Google+, that particular social network's plugin will be activated and your browser will directly connect to that provider's servers.  Your action in clicking on the social plug-in causes information to be passed to the social media platform.

We do not have control over the collection, use and sharing practices of social media platforms. We, therefore, encourage you to review their usage and disclosure policies and practices, including their data security practices, before using social media platforms.

**How Can You "Opt-Out?"**

We do not sell your information; therefore there is no need to opt-out of such reselling.  Under various laws, you can opt-out of the sharing of your information for more narrow purposes.  For additional detail, consult the Links under the "Legal" Notices attached below.

**The "Legal" Notices**

To comply with various federal and state laws, we are required to provide more complete legal notices and disclosures.  In reviewing these, you will find that these notices incorporate the definitions and terminology used in the respective privacy laws which can often be somewhat convoluted and may even seem inconsistent with the descriptions above.  The state-specific statutes may also give residents of those states additional rights and remedies.

**Privacy Notice for California Residents** - https://national.wfgnationaltitle.com/privacy-notice-california

**Privacy Notice for Oregon Residents** - https://national.wfgnationaltitle.com/privacy-notice-oregon

### How to Contact Us

If you have any questions about WFG's privacy policy or how we protect your information, please contact WFG:

- By email: Consumerprivacy@willistonfinancial.com

- By telephone: 833-451-5718

- By fax: 503-974-9596

- By mail: 12909 SW 68th Pkwy, Suite 350, Portland, OR 97223

- In-person: 12909 SW 68th Pkwy, Suite 350, Portland, OR 97223

**WFG FAMILY**
WILLISTON FINANCIAL GROUP LLC
WFG NATIONAL TITLE INSURANCE COMPANY
WFG LENDER SERVICES, LLC
WFGLS TITLE AGENCY OF UTAH, LLC
WFG NATIONAL TITLE COMPANY OF WASHINGTON, LLC
WFG NATIONAL TITLE COMPANY OF CALIFORNIA
WFG NATIONAL TITLE COMPANY OF TEXAS, LLC D/B/A WFG NATIONAL TITLE COMPANY
UNIVERSAL TITLE PARTNERS, LLC
VALUTRUST SOLUTIONS, LLC
WILLISTON ENTERPRISE SOLUTIONS & TECHNOLOGY, LLC
WFG NATIONAL TITLE COMPANY OF CLARK COUNTY, WA, LLC D/B/A WFG NATIONAL TITLE

Revised 6.12.20

Rev. 12/2019

| FACTS | **WHAT DOES WILLISTON FINANCIAL GROUP DO WITH YOUR PERSONAL INFORMATION?** |
|---|---|
| Why? | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| What? | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br>• Social Security number and other government identification information<br>• Your name, address, phone, and email<br>• Information about the property, any liens and restrictions<br>• Financial Information including credit history and other debt<br>• Financial account information, including wire transfer instructions. |
| How? | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons Williston Financial Group chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does Williston Financial Group share? | Can you limit this sharing? |
|---|---|---|
| For our everyday business purposes— such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| For our marketing purposes— to offer our products and services to you | Yes | No |
| For joint marketing with other financial companies | No | We don't share |
| For our affiliates' everyday business purposes— information about your transactions and experiences | Yes | No |
| For our affiliates' everyday business purposes— information about your creditworthiness | No | We don't share |
| For our affiliates to market to you | No | We don't share |
| For nonaffiliates to market to you | No | We don't share |

| To limit our sharing | • Call 833-451-5718—our menu will prompt you through your choice(s)<br>• Visit us online: http://bit.ly/WFGsConsumerPrivacyInformationRequestPage or e-mailing us at consumerprivacy@willistonfinancial.com<br>• Mail the form below<br><br>Please note:<br><br>If you are a new customer, we can begin sharing your information from the date we sent this notice. When you are no longer our customer, we continue to share your information as described in this notice.<br>However, you can contact us at any time to limit our sharing. |
|---|---|
| Questions? | Call 833-451-5718 or Email consumerprivacy@willistonfinancial.com |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| Mail-In Form | |
|---|---|
| If you have a joint policy, your choices will apply to everyone on your account. | Mark any/all you want to limit:<br>[ ]   Do not share information about my creditworthiness with your affiliates for their everyday business purposes.<br>[ ]   Do not allow your affiliates to use my personal information to market to me.<br>[ ]   Do not share my personal information with nonaffiliates to market their products and services to me. |

| Name | | Mail to: |
|---|---|---|
| **Address** | | Williston Financial Group |
| | | PRIVACY DEPT |
| **City, State, Zip** | | 12909 SW 68th Pkwy, #350 |
| **File Number** | | Portland, OR 97223 |

86

Page 2

| **Who we are** | |
|---|---|
| Who is providing this notice | Williston Financial Group, LLC and its affiliates and subsidiaries as listed below: |
| **What we do** | |
| How does Williston Financial Group protect my personal information? | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings.  We limit access to your information to employees that need to use the information to process or protect transaction. We take industry standard (IPSEC) measures to protect against malicious intrusions or hacking |
| How does Williston Financial Group collect my personal information? | We collect your personal information, for example, when you<br>• Apply for insurance<br>• Engage us to provide appraisal, title and escrow services<br>• Give us your contact information<br>• Provide your mortgage information<br>• Show your driver's license<br><br>We also collect your personal information from others, such as real estate agents and brokers, mortgage brokers, lenders, credit bureaus, affiliates, and others |
| Why can't I limit all sharing? | Federal law gives you the right to limit only<br>• sharing for affiliates' everyday business purposes—information about your creditworthiness<br>• affiliates from using your information to market to you<br>• sharing for nonaffiliates to market to you<br>State laws and individual companies may give you additional rights to limit sharing. See below for more on your rights under state law. |
| What happens when I limit sharing for an account I hold jointly with someone else? | Your choices will apply to everyone on your policy. |
| **Definitions** | |
| Affiliates | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br><br>Our affiliates include companies with a common corporate identity, including those listed below. |
| Nonaffiliates | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br><br>Nonaffilliates we share with can include real estate agents and brokers, mortgage brokers, lenders, appraisers, abstractors and title searchers and others as appropriate to facilitate your transaction. |
| Joint marketing | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br><br>Williston Financial Group does not jointly market. |
| **Other important information** | |

As a resident or citizen of certain states, we may have to provide additional state specific privacy notices and you may have rights other than as set forth above.  The links below will provide state specific information:

**Privacy Notice for California Residents -** https://national.wfgnationaltitle.com/privacy-notice-california

**Privacy Notice for Oregon Residents -** https://national.wfgnationaltitle.com/privacy-notice-oregon

ORDER NO. 22-425418

This affidavit when completed is to be signed and notarized, before returning be sure to complete all the requested information to enable this company to properly process the transaction presently pending.

# AFFIDAVIT

## Re:  DEED LACKING MONETARY CONSIDERATION OR UNINSURED/UNESCROWED

With reference to the deed from _____ as Grantor, to
_____ as Grantee, Dated _____ and recorded _____ as Instrument No. _____ of Official Records of _____ County.

The following questions are answered for the purpose of enabling WFG National Title Insurance Company and/or its Underwriter to pass upon the sufficiency of said Deed:

1.    Were the Grantor and Grantee related?  _____
       If so state relationship  _____

2.    Was the deed a true gift deed?  _____
       If not, state reason  _____
       _____

3.    What is the value of the property?  _____

4.    Despite the lack of monetary consideration, was there other adequate consideration given for the deed?
       _____
       If so, please explain briefly how consideration was paid:_____
       _____

5.    Were Federal or State Gift Taxes paid in connection with the above referred to conveyance either by the Grantor
       or Grantee in the deed? _____

6.    What was the age of the Grantor at the date of signing the deed?  _____

7.    At the date of signing the deed, what was the Grantor's physical condition?  _____
       _____
       What was the Grantor's mental condition?  _____

8.    Was the deed actually delivered to the Grantee?  _____

9.    Where has the deed been since it was signed?  _____

10.   Who is currently occupying the premises located on said land?  _____

11.   Is the Grantor deceased?  _____
       If the answer is yes, you will be asked to fill out a supplemental questionnaire.

12.   What are the Grantor's current physical and mental conditions?  _____

13.   Did the Grantee have an agreement to act or was he/she acting as a foreclosure consultant?  _____

14.   Was the Grantor facing a foreclosure or serious financial problems (outstanding debt) at the time the deed was
       signed?  _____

15.   Has the Grantor been provided an option to repurchase the property?  _____

88

16.     If known, what is the Grantor's current address and telephone number_____

_____

17.     Has the Grantor, to the best of your knowledge, ever filed for bankruptcy, or other debtor relief provisions, under the Bankruptcy Laws? _____if so, when?_____ state other facts if known_____

18.     If the grantee is taking subject to trust deeds or encumbrances placed on the property by the grantor, explain the circumstances for this action_____

**TITLE ORDER NO. 22-425418**                              **APN NO. 2225-001-043**

*Dated*     _____

**Signature** _____

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy or validity of that document. |
|---|

STATE OF CALIFORNIA

COUNTY OF     _____     **}**   SS.

On _____, before me, _____, a Notary Public, personally appeared _____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

**WITNESS** my hand and official seal.

Signature _____
          Signature of Notary                                    (This area for official notarial seal)

89



OFFICE OF THE ASSESSOR
COUNTY OF LOS ANGELES
COPYRIGHT © 2002

Date Printed: 9/14/2016 9:39:08 AM
Date Saved: 9/14/2016 9:38:38 AM



# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 1901 Avenue of the Stars, Suite 450, Los Angeles, CA 90067-6006.

A true and correct copy of the foregoing document entitled (*specify*):  DEBTOR'S NOTICE OF MOTION AND MOTION TO AUTHORIZE SALE OF REAL PROPERTY LOCATED AT 6840 DE CELIS PLACE, APT 9, VAN NUYS, CALIFORNIA 91406, FREE AND CLEAR OF LIENS; MEMORANDUM OF POINTS AND AUTHORITIES, DECLARATIONS OF ZHAO PU YANG, EMMANUEL D. MARGEN, JR., ANALIE E. MARGEN, DARREN HUBERT, AND ALPHAMORLAI L. KEBEH, AND REQUEST FOR JUDICIAL NOTICE IN SUPPORT THEREOF  will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)  October 3, 2022  I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page.

**2.  SERVED BY UNITED STATES MAIL**:  On  October 3, 2022 , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by causing to be placed a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page.

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (**state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| October 3, 2022 | Beverly Lew | */s/ Beverly Lew* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

ADDITIONAL SERVICE INFORMATION (if needed):

## 1. SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")

Donna C Bullock on behalf of Interested Party Donna Bullock Carrera
donnabullockcarrera@yahoo.com, donna.bullock@ymail.com

Steven P Chang on behalf of Interested Party Courtesy NEF
heidi@spclawoffice.com,
schang@spclawoffice.com,assistant1@spclawoffice.com,attorney@spclawoffice.com;g9806@notify.cincompass.com;
changsr75251@notify.bestcase.com

Michael F Chekian on behalf of Creditor The Phalanx Group
mike@cheklaw.com, chekianmr84018@notify.bestcase.com

Michael F Chekian on behalf of Interested Party Chekian Law Office, Inc.
mike@cheklaw.com, chekianmr84018@notify.bestcase.com

Heidi M Cheng on behalf of Plaintiff JINZHENG GROUP (USA) LLC
heidi@slclawoffice.com,
assistant1@spclawoffice.com;schang@spclawoffice.com;chenghr75251@notify.bestcase.com

Susan Titus Collins on behalf of Interested Party INTERESTED PARTY
scollins@counsel.lacounty.gov

Nicholas S Couchot on behalf of Creditor Royal Business Bank
ncouchot@buchalter.com, docket@buchalter.com;marias@buchalter.com

Jeffrey W Dulberg on behalf of Creditor Committee OFFICIAL COMMITTEE OF UNSECURED CREDITORS
jdulberg@pszjlaw.com

Oscar Estrada on behalf of Creditor LOS ANGELES COUNTY TREASURER AND TAX COLLECTOR
oestrada@ttc.lacounty.gov

Danielle R Gabai on behalf of Debtor JINZHENG GROUP (USA) LLC
dgabai@danninggill.com, dgabai@ecf.courtdrive.com

Runmin Gao on behalf of Plaintiff JINZHENG GROUP (USA) LLC
ivy.gao@aalrr.com, alicia.mcmaster@aalrr.com

Runmin Gao on behalf of Plaintiff JINZHENG GROUP (USA) LLC
ivy.gao@aalrr.com, alicia.mcmaster@aalrr.com

Richard Girgado on behalf of Interested Party Courtesy NEF
rgirgado@counsel.lacounty.gov

Brian T Harvey on behalf of Interested Party Courtesy NEF
bharvey@buchalter.com, IFS_filing@buchalter.com;dbodkin@buchalter.com

M. Jonathan Hayes on behalf of Interested Party Courtesy NEF
jhayes@rhmfirm.com,
roksana@rhmfirm.com;matt@rhmfirm.com;rosario@rhmfirm.com;pardis@rhmfirm.com;russ@rhmfirm.com;david@rhm
firm.com;sloan@rhmfirm.com;boshra@rhmfirm.com;rosario@rhmfirm.com

Teddy M Kapur on behalf of Creditor Committee OFFICIAL COMMITTEE OF UNSECURED CREDITORS
tkapur@pszjlaw.com, mdj@pszjlaw.com

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                     **F 9013-3.1.PROOF.SERVICE**

Alphamorlai Lamine Kebeh on behalf of Debtor JINZHENG GROUP (USA) LLC
akebeh@danninggill.com

Alphamorlai Lamine Kebeh on behalf of Plaintiff JINZHENG GROUP (USA) LLC
akebeh@danninggill.com

Peter A Kim on behalf of Attorney LAW OFFICES OF PETER KIM
peter@pkimlaw.com, peterandrewkim@yahoo.com

Peter A Kim on behalf of Defendant Betula Lenta Inc
peter@pkimlaw.com, peterandrewkim@yahoo.com

Peter A Kim on behalf of Defendant David Park
peter@pkimlaw.com, peterandrewkim@yahoo.com

Peter A Kim on behalf of Defendant Jonathan Pae
peter@pkimlaw.com, peterandrewkim@yahoo.com

Christopher J Langley on behalf of Plaintiff JINZHENG GROUP (USA) LLC
chris@slclawoffice.com, omar@slclawoffice.com;langleycr75251@notify.bestcase.com;ecf123@casedriver.com

Paul J Leeds on behalf of Creditor Sound Equity, Inc.
Pleeds@fsl.law, ssanchez@fsl.law

Benjamin R Levinson, ESQ on behalf of Creditor Michael E. Dorff and Shari L. Dorff
ben@benlevinsonlaw.com, courtney@benlevinsonlaw.com

Damian J. Martinez on behalf of Plaintiff JINZHENG GROUP (USA) LLC
damian.martinez@aalrr.com, julissa.ruiz@aalrr.com

Damian J. Martinez on behalf of Plaintiff JINZHENG GROUP (USA) LLC
damian.martinez@aalrr.com, julissa.ruiz@aalrr.com

Eric A Mitnick on behalf of Creditor Corona Capital Group LLC
MitnickLaw@aol.com, mitnicklaw@gmail.com

Eric A Mitnick on behalf of Interested Party Courtesy NEF
MitnickLaw@aol.com, mitnicklaw@gmail.com

Giovanni Orantes on behalf of Other Professional Orantes Law Firm, P.C.
go@gobklaw.com, gorantes@orantes-
law.com,cmh@gobklaw.com,gobklaw@gmail.com,go@ecf.inforuptcy.com;orantesgr89122@notify.bestcase.com

Donald W Reid on behalf of Interested Party INTERESTED PARTY
don@donreidlaw.com, ecf@donreidlaw.com

Matthew D. Resnik on behalf of Attorney Matthew Resnik
matt@rhmfirm.com,
roksana@rhmfirm.com;rosario@rhmfirm.com;susie@rhmfirm.com;max@rhmfirm.com;priscilla@rhmfirm.com;pardis@r
hmfirm.com;russ@rhmfirm.com;rebeca@rhmfirm.com;david@rhmfirm.com;sloan@rhmfirm.com

Matthew D. Resnik on behalf of Creditor Royalty Equity Lending, LLC/Bobs LLC
matt@rhmfirm.com,
roksana@rhmfirm.com;rosario@rhmfirm.com;susie@rhmfirm.com;max@rhmfirm.com;priscilla@rhmfirm.com;pardis@r
hmfirm.com;russ@rhmfirm.com;rebeca@rhmfirm.com;david@rhmfirm.com;sloan@rhmfirm.com

Matthew D. Resnik on behalf of Interested Party Courtesy NEF

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                    F 9013-3.1.PROOF.SERVICE

matt@rhmfirm.com,
roksana@rhmfirm.com;rosario@rhmfirm.com;susie@rhmfirm.com;max@rhmfirm.com;priscilla@rhmfirm.com;pardis@r
hmfirm.com;russ@rhmfirm.com;rebeca@rhmfirm.com;david@rhmfirm.com;sloan@rhmfirm.com

Peter J Ryan on behalf of Defendant Testa Capital Group
ryan@floresryan.com, schneider@floresryan.com

Peter J Ryan on behalf of Defendant Thomas L. Testa    ryan@floresryan.com, schneider@floresryan.com

Allan D Sarver on behalf of Creditor Investment Management Company LLC    ADS@asarverlaw.com

Allan D Sarver on behalf of Interested Party Courtesy NEF    ADS@asarverlaw.com

Zev Shechtman on behalf of Attorney DANNING, GILL, ISRAEL & KRASNOFF, LLP
zshechtman@DanningGill.com, danninggill@gmail.com;zshechtman@ecf.inforuptcy.com

Zev Shechtman on behalf of Debtor JINZHENG GROUP (USA) LLC
zshechtman@DanningGill.com, danninggill@gmail.com;zshechtman@ecf.inforuptcy.com

Zev Shechtman on behalf of Interested Party INTERESTED PARTY
zshechtman@DanningGill.com, danninggill@gmail.com;zshechtman@ecf.inforuptcy.com

Zev Shechtman on behalf of Plaintiff JINZHENG GROUP (USA) LLC
zshechtman@DanningGill.com, danninggill@gmail.com;zshechtman@ecf.inforuptcy.com

David Samuel Shevitz on behalf of Interested Party INTERESTED PARTY
david@shevitzlawfirm.com,
shevitzlawfirm@ecf.courtdrive.com;r48785@notify.bestcase.com;Jose@shevitzlawfirm.com

John N Tedford, IV on behalf of Interested Party INTERESTED PARTY
jtedford@DanningGill.com, danninggill@gmail.com;jtedford@ecf.courtdrive.com

United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov

Hatty K Yip on behalf of U.S. Trustee United States Trustee (LA)    hatty.yip@usdoj.gov, hatty.k.yip@usdoj.gov

## 2.  **SERVED BY U.S. MAIL**

JINZHENG GROUP (USA) LLC
1414 S Azusa Ave, Suite B-22
West Covina, CA 91791

The Honorable Ernest M. Robles
U.S. Bankruptcy Court
255 E. Temple Street, Suite 1560
Los Angeles, CA 90012

De Celis Court Homeowners
Association
c/o Professional Lien Services,
LLC
15315 Magnolia Blvd., Suite 212
Sherman Oaks, CA  91403

DNQ LLC
Jason D. Wang
6145 W. Spring Mountain Road,
#205
Las Vegas, NV  89146

Breezeblock Capital
Nichole Glowin, Esq.
ZBS Law, LLP
30 Corporate Park, Suite 450
Irvine, CA  92606

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                        **F 9013-3.1.PROOF.SERVICE**