ZEV SHECHTMAN (State Bar No. 266280)
*zs@DanningGill.com*
ALPHAMORLAI L. KEBEH (State Bar No. 336798)
*akebeh@DanningGill.com*
DANNING, GILL, ISRAEL & KRASNOFF, LLP
1901 Avenue of the Stars, Suite 450
Los Angeles, California 90067-6006
Telephone: (310) 277-0077
Facsimile: (310) 277-5735

General Bankruptcy Counsel for Jinzheng Group
(USA) LLC, Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>JINZHENG GROUP (USA) LLC,<br><br>        Debtor. | Case No. 2:21-bk-16674-ER<br><br>Chapter 11<br><br>**DEBTOR'S NOTICE OF OPPOSITION AND OPPOSITION TO MOTION FOR RELIEF FROM THE AUTOMATIC STAY FILED BY ROYAL EQUITY LENDING LLC; MEMORANDUM OF POINTS AND AUTHORITIES DECLARATION OF MARK CIANCIULLI AND REQUEST FOR JUDICIAL NOTICE IN SUPPORT THEREOF**<br><br>Date:    November 14, 2022<br>Time:    10:00 a.m.<br>Crtrm.:  1568<br>          255 East Temple Street<br>          Los Angeles, California 90012 |

1696889.1  27086

1    TO THE HONORABLE ERNEST M. ROBLES AND INTERESTED PARTIES:

2

3    PLEASE TAKE NOTICE THAT Debtor and Debtor in Possession, Jinzheng Group (USA),

4    LLC (the "Debtor") hereby opposes the motion for relief from stay (docket no. 395) (the "RFS

5    Motion") filed by Royal Equity Lending LLC ("REL" or "Movant").

6

7    Any reply must be filed and served not later than 7 days before the hearing on the RFS

8    Motion.

9

10   DATED:  October 31, 2022              DANNING, GILL, ISRAEL & KRASNOFF, LLP

11

12                                        By:  _____

13                                             ZEV SHECHTMAN
                                              ALPHAMORLAI L. KEBEH
14                                            General Bankruptcy Counsel for Jinzheng Group
                                              (USA) LLC, Debtor and Debtor in Possession
15

16

17

18

19

20

21

22

23

24

25

26

27

28

1696889.1  27086

1

# **TABLE OF CONTENTS**

2                                                                                    **Page**

3  I.    INTRODUCTION ...................................................................................................1

4       A.    The Debtor's Sale Efforts ................................................................................1

5       B.    The Motion .........................................................................................................3

6  II.   FACTUAL BACKGROUND.................................................................................4

7       A.    Bankruptcy Facts ..............................................................................................4

8       B.    The Subject Property .......................................................................................4

9       C.    The Relief From Stay Motions ......................................................................5

10      D.    The Debtor's Recent Marketing Efforts .....................................................5

11 III.  DISCUSSION.........................................................................................................7

12      A.    REL Does Not Satisfy the Standard for Relief From the Automatic Stay .................7

13            1.    REL Does not have Sufficient "Cause" ...........................................7

14                  (a)    REL's Interest in the Property Could be Adequately Protected
                          by an Equity Cushion.............................................................8

15                  (b)    The Debtor Is Properly Managing the Property ...................9

16
17            2.    REL Does Not Satisfy the Standards for Relief Under 11 U.S.C. §
                    362(d)(2) ..............................................................................................9

18                  (a)    REL Cannot Prove that the Debtor Lacks Equity in the
                          Property.......................................................................10

19
20                  (b)    Any Lack of Equity In The Property is Exacerbated by REL's
                          Excessive Fees ..............................................................10

21                  (c)    The Property is Necessary For an Effective Reorganization.............11

22            3.    This Court Has Already Denied a Relief From Stay Motion Against
                    This Property .....................................................................................12

23
24            4.    The True Value of REL's Claim is Unclear ..................................13

     IV.   CONCLUSION.......................................................................................................14
25

26

27

28

# TABLE OF AUTHORITIES

**Page**

**CASES**

Bank of Am. v. 203 N. LaSalle St. P'ship
    526 U.S. 434 (1999)..................................................................... 10, 12

In re Beltway One Dev. Grp., LLC
    547 B.R. 819 (B.A.P. 9th Cir. 2016) ................................................. 13

In re Breuer
    4 B.R. 499 (Bankr. S.D.N.Y. 1980)................................................. 7, 8

In re Curtis
    9 B.R. 110 (Bankr. E.D. Penn. 1981) ................................................. 7

In re Dahlquist
    34 B.R. 476 (Bankr. D.S.D. 1983)..................................................... 13

In re EM Lodgings, LLC
    580 B.R. 803 (Bankr. C.D. Ill. 2018) ................................................ 11

In re Grant Broad. of Philadelphia, Inc., 75 B.R. 819 (E.D. Pa. 1987) ................. 10

In re McGowan
    6 B.R. 241 (Bankr. E.D. Pa. 1980) ..................................................... 7

In re Rogers Dev. Corp.
    2 B.R. 679 (Bankr. E.D. Va. 1980)..................................................... 7

In re San Clemente Estates
    5 B.R. 605 (Bankr. S.D. Cal. 1980) ................................................... 7

In re Tucker
    5 B.R. 180 (Bankr. S.D.N.Y. 1980)..................................................... 7

La Jolla Mortg. Fund v. Rancho El Cajon Assoc.
    18 B.R. 283 (Bankr. S.D. Cal. 1982)............................................... 7, 11

Pistole v. Mellor (In re Mellor)
    734 F.2d 1396 (9th Cir. 1984) .......................................................... 7

United Companies Fin. Corp. v. Brantley
    6 B.R. 178 (Bankr. N.D. Fla. 1980)................................................... 13

United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.
    484 U.S. 365 (1988).......................................................................... 10

Vanston Bondholders Protective Comm. v. Green
    329 U.S. 156, 67 S.Ct. 237,
    91 L.Ed. 162 (1946).......................................................................... 13

1

**TABLE OF AUTHORITIES**
(Continued)

2

Page

3

**STATUTES**

4

11 U.S.C. § 362(d)(1) ................................................................................................ 7, 8

5

11 U.S.C. § 362(d)(2) ...................................................................................................... 9

6

11 U.S.C. § 362(d)(2)(B) ............................................................................................... 11

7

11 U.S.C. § 362(g) ................................................................................................... 10, 13

8

11 U.S.C. § 363(d)(2) ..................................................................................................... 10

9

11 U.S.C. § 506(b) ..................................................................................................... 10, 14

10

11 U.S.C. § 1107(a) ......................................................................................................... 4

11

11 U.S.C. § 1108 .............................................................................................................. 4

12

**OTHER AUTHORITIES**

13

2 *Collier on Bankruptcy*, § 361.02[3] at 361–9; (15th ed. 1979) ...................................... 7

14

H.R. Rep. No. 95–595, 95th Cong., 1st Sess. 338–40 (1977) ......................................... 9

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**INTRODUCTION**

**A.    The Debtor's Sale Efforts**

The parcels of real property which are the subject of the RFS Motion include the most valuable and important properties owned by the Debtor, in particular, 2929 Amethyst Street, Los Angeles, CA (the "Amethyst Property"). The Amethyst Property itself is in excess of 31 acres of vacant land in the Lincoln Heights neighborhood of Los Angeles. It possesses unique panoramic views of Dodgers Stadium and Downtown Los Angeles. With its steep inclines it also poses unique challenges. The Amethyst Property, over 31 acres of raw, undeveloped hillside land, in densely populated Los Angeles is nothing if not unique. The Debtor owns several adjacent parcels which, together with the seminal Amethyst Property, comprise the Debtor's "Lincoln Heights Properties."[1]

After pivoting to a liquidation strategy in June 2022, the Debtor immediately began searching for brokers to sell all of its properties. To list the Lincoln Heights Properties, the Debtor hired brokers with expertise in selling vacant real estate in complex situations. The property hit the public listing July 26, 2022.[2] Given the uniqueness of the Lincoln Heights Properties, the vast disparities in professional appraisals conducted for the Property in recent years, and the lack of truly comparable sales, the brokers originally listed the Property without stating a list price.[3] As

---

[1] The Lincoln Heights Properties are comprised of 15 separate, mostly adjacent, parcels: 2929 Amethyst (APN 5209-009-001), a triplex at 2526-28 Lincoln Park Ave. (APN 5208-025-001), a duplex at 2520-22 Lincoln Park Ave. (APN 5208-025-002), land at 2602 Lincoln Park Ave, (APN 5208-025-014) and land at 2600 Sierra Street (APN 5209-005-00, and the parcels of vacant land described as the Paradise Drive Lots (APNs (i) 5209-021-002, -005, -006; (ii) 5209-022-007; (iii) 5209-023-022, -029; -030; -031; -032; and (iv) 5209-025-006).

[2] The brokers were employed effective as of June 23, 2022 (docket no. 298), but conducted extensive due diligence and prepared appropriate marketing materials before going live with the listing.

[3] The assumption is that most buyers of such a property would have their own sense of value, and that there could be a chilling effect of selecting a list price that is too high or too low.

1   detailed below, the brokers received multiple inquiries, but did not receive offers.  The brokers

2   continue to communicate with potential offerors.  Consistent with a strategy outlined at the outset

3   of the listing, in mid-October, when the initial strategy of listing without a price did not result in

4   immediate offers, the brokers added a list price of $12 million to the listing.  Interest and activity

5   have increased since then.

6        According to the brokers, it would typically require four to seven months to properly

7   market a property like the Lincoln Heights Properties (or the "Property").  This is not like selling a

8   single family home or condo in Los Angeles, with comparable sales data available, a massive

9   residential market, readily available financing, and limited, standardized due diligence.  In addition

10   to the uniqueness of the Property, we are now facing possibly the most significant real estate

11   slowdown since the Great Recession, while interest rates are reaching heights unseen since 2008.[4]

12   These factors may or may not impact the purchaser of such a unique Property.

13        Taken together, these facts evidence that the Debtor, since June of 2022, has been working

14   expeditiously toward an orderly, value maximizing liquidation of the Lincoln Heights Properties.

15   The marketing process is about half way through the estimated time that the brokers believe it can

16   reasonably take, at least four to seven months.  Seven months from the date of the brokers

17   employment, June 23, 2022, is January 23, 2022.  Seven months from date of the listing, July 26,

18   2022, is February 26, 2022.

19        The brokers are in midstream of the marketing process.  They have been working diligently

20   to market and have been made available to the Movant and to the Committee on a regular basis to

21   communicate about the marketing process.  Stopping the marketing process now, in the middle,

22   could potentially devastate the effort to maximize the Property's value and will hurt all

23   constituencies.

24        The Debtor should be afforded a reasonable amount of time to complete the marketing of

25   the Lincoln Heights Properties for the benefit of the estate, its creditors, and the Movant.

26

27

28   [4] https://www.freddiemac.com/pmms/pmms30.

**B.**     **The Motion**

The RFS Motion should be denied for multiple reasons.  Relief from stay must only be granted if the Debtor does not have equity in the Property and the Property is not necessary for an effective reorganization.  The value of the Property is uncertain.  The best way to determine the fair market value of a property is to test it against the market.  The Debtor has been undergoing this process for the past four months, and is updating its listing strategy as the market shifts.  Despite this, REL has filed the RFS Motion and seeks to upend the Debtor's efforts just before the marketing effort can determine the Property's value.  Without knowing the true market value of the Property, one cannot calculate the Debtor's equity, and therefore cannot claim that the Debtor lacks any equity at all.

Apart from the uncertainty as to the Property's value, there is another issue precluding the relief that REL seeks: the Property is essential to the Debtor's liquidation plan.  The Property constitutes the Debtor's most valuable asset.  The Debtor requires this Property not only to satisfy the liens against it, but in order to make a meaningful distribution to the estate and its unsecured creditors.  The Property presents an opportunity to recover hundreds of thousands, if not millions, of dollars for the benefit of the estate.  Because of this potential, the Debtor must be afforded a full opportunity to complete its marketing process.  Despite the current economic conditions, the Debtor is fully focused on obtaining a buyer for the Property and is doing no less to complete a sale than REL could do.

The Debtor is also in the process of addressing REL's minor complaints.  REL complains that the Debtor has not provided it with progress reports relating to the marketing of the Property.  The Debtor has corrected any lack of communication by communicating regularly with REL since the RFS Motion was filed, including allowing REL to communicate directly with the Debtor's brokers.  This opposition details the efforts of the Debtor and its professionals, and the Debtor intends to continue such communications until the Property is sold.  The Debtor is also working on segregating the rents received from the REL Properties appropriately.  However, the relevant, critical point remains: granting relief from stay is not appropriate at this stage, and will only serve to abruptly interrupt the Debtor's marketing process and a sale.

1    Most importantly, the Debtor needs time to complete the marketing and sale process.  The

2    Debtor asks for at least 120 days to complete marketing and an additional 120 days to close escrow.

3

4                                                    II.

5                                **FACTUAL BACKGROUND**

6    **A.    Bankruptcy Facts**

7    On August 24, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief

8    under chapter 11 of the Bankruptcy Code.  The Debtor continues in possession of its property and

9    is operating and managing its business as a debtor in possession pursuant to the provisions of

10   11 U.S.C. §§ 1107(a) and 1108.  No Trustee or examiner has been appointed in the Debtor's

11   Chapter 11 Case.

12

13   **B.    The Subject Property**

14   The assets of the bankruptcy estate include a number of real properties, including a group of

15   parcels of real property encumbered by liens in favor of REL, with the following Assessor Parcel

16   Numbers: 5209-009-001, 5209-005-003, 5208-025-014, 5208-025-001, and 5208-025-002.  These

17   parcels are collectively referred to hereinafter as the "REL Properties."[5]  The specific property

18   addresses and assessor parcel numbers for the Lincoln Heights Properties are attached to the

19   Declaration of Mark Cianciulli as Exhibit "1."[6]  Three entities appear to hold liens against various

20   parcels.  The apparent holders of those liens are as follows: Royalty Equity Lending LLC/Bobs

21   LLC, Michael E. Dorff and Shari L. Dorff (collectively, the "Dorffs"), and Helen P. Ho, Trustee of

22   the Helen P. Ho Revocable Trust (the "Ho Trust").  The assortment of these liens against the

23   Property are as follows, in order of first priority to last:

24        (i) APN 5209-009-001: REL and the Ho Trust

25

26   _____

     [5] There are other adjacent parcels which are being marketed together with the REL Properties,
27   comprising the Lincoln Heights Properties.

28   [6] The listing includes all of the Lincoln Heights Properties, including the REL Properties.

1    (ii) APN 5209-005-003: the Dorffs and REL

2    (iii) APN 5208-025-014: the Dorffs and REL

3    (iv) APN 5208-025-001: REL

4    (v) APN 5208-025-002: REL

5    **C.    The Relief From Stay Motions**

6    On October 10, 2022, REL filed its *Notice of Motion and Motion for Relief from the*

7    *Automatic Stay Under 11 U.S.C. § 362* (docket no. 395), along with an accompanying

8    memorandum of points and authorities (docket no. 396) (the "RFS Memo"). Per the RFS Motion,

9    REL is allegedly owed $11,351,597.94 on account of its secured claim. However, REL filed a

10   proof of claim in the Debtor's bankruptcy case in the amount of $9,353,009.29, as Proof of Claim

11   No. 2.

12   **D.    The Debtor's Recent Marketing Efforts**

13   On July 12, 2022, the Court entered an order authorizing the Debtor to employ the CREM

14   Group and Marcus & Millichap (collectively, the "Brokers"), as its real estate brokers (docket no.

15   298). A true and correct copy of the Order Granting the Application to Employ Real Estate

16   Brokers and to Enter into Exclusive Listing Agreement is attached to the Declaration of Mark

17   Cianciulli as Exhibit "2." The Brokers are renowned and elite professionals who have particular

18   knowledge regarding the marketing and sale of complex properties. In particular, Lonnie

19   McDermott of Marcus & Millichap, has expertise in the sale of vacant land and land with

20   entitlement, zoning, or other land use issues.[7]

21   The Property was officially listed on the market on July 26, 2022. The Property has been

22   marketed on a variety of commercial real estate sale mediums, including, but not limited to:

23   CoStar, Loopnet, Crexi, Brevitas, and TheMLS.

24   Due to the uniqueness of the Property -- i.e. the Property being primarily made up of over

25   30 acres of agriculturally zoned land in the densely populated region of Lincoln Heights, less than

26

---

27   [7] See brokers' employment application, docket no. 263 at Exhibit 3, documenting Mr. McDermott
     and his team's extensive experience in land sales and other complex commercial and residential
28   developments.

three miles northeast of Downtown Los Angeles, possessing unique topography (e.g. steep inclines along the property), and a wide range of professional opinions of value – the Brokers made a strategic recommendation to market the property without a list price.

As of October 17, 2022, the Brokers had documented 16,235 views of the Property across all marketing resources, their offering memorandum had been downloaded 565 times, they had four executed NDAs with interested parties, they completed one on-site property tour, and had received zero offers.  Due to the fact that they had received no offers as of October 17, 2022, the Brokers recommended that the Debtor add a list price to the listing.  The Debtor agreed to the Brokers' recommendation, and therefore, on October 20, 2022, the Brokers added a $12,000,000 list price to their listing materials across all commercial real estate sale mediums where the Property was being marketed.[8]  A true and correct copy of the listing per The MLS is attached to the Declaration of Mark Cianciulli as Exhibit "3."

To date, the most serious prospective buyer is a conservancy group interested in acquiring the Property and preserving the land as-is.  Additionally, since October 20, 2022, when the Brokers amended the listing to include a $12,000,000 list price, they have had an increase in inquiries, offering memorandum downloads, and requests for additional information about the Property.  To summarize, the Property has been actively listed and marketed for 95 days in total, 85 days without a list price and ten days with a list price.

The Brokers have advised that real property of this kind is extremely unique and requires a qualified buyer with one of three ultimate objectives:

1. To develop the land to arguably it's highest and best use (i.e. a 70 single family home development),

2. Long-term land holding and speculation, or

3. To preserve the raw and open land in its current state, in perpetuity.

---

[8] The listing and the list price applies collectively to the Property and the adjacent parcels which are collectively referred to as the Lincoln Heights Properties.

1    Regardless of the objective, the real estate market is declining and interest rates are

2  increasing.  Real property sales, across the board, are taking longer to consummate.  When looking

3  at the combination of factors present, such as price, lending environment, the uncommon attributes

4  of the Property, and legal issues surrounding the Property, the Brokers advise that it will take at

5  least four to seven  months to find the appropriate/best buyer for the Property at issue.

6

7    **III.**

8    **DISCUSSION**

9  **A.    REL Does Not Satisfy the Standard for Relief From the Automatic Stay**

10    **1.    REL Does not have Sufficient "Cause"**

11    Section 362(d)(1) of the Bankruptcy Code provides that the bankruptcy court shall lift the

12  automatic stay "for cause", which includes the lack of adequate protection.  11 U.S.C. § 362(d)(1).

13  While the term "adequate protection" is not defined in the Bankruptcy Code, courts have

14  recognized that a creditor may be adequately protected by the existence of an "equity cushion."

15  Pistole v. Mellor (In re Mellor), 734 F.2d 1396, 1400 (9th Cir. 1984) (citing In re Curtis, 9 B.R.

16  110, 111–112 (Bankr. E.D. Penn. 1981).  Indeed, courts have found that "the existence of an equity

17  cushion, standing alone, can provide adequate protection."  Mellor, 734 F.2d at 1400; In re San

18  Clemente Estates, 5 B.R. 605, 610 (Bankr. S.D. Cal. 1980); In re Tucker, 5 B.R. 180, 182 (Bankr.

19  S.D.N.Y. 1980); 2 Collier on Bankruptcy, § 361.02[3] at 361–9; (15th ed. 1979).  The existence of

20  junior liens cannot be considered in determining whether a senior lienholder is adequately

21  protected.  La Jolla Mortgage Fund v. Rancho El Cajon Associates, 18 B.R. 283, 289 (Bankr. S.D.

22  Cal. 1982);  See  In re Breuer, 4 B.R. 499 (Bankr. S.D.N.Y. 1980) (holding there was a sufficient

23  equity cushion for creditor holding first mortgage despite existence of four junior mortgages

24  totaling more than market value of property).  Courts have found that equity cushions as low as

25  10% of the value of a property were sufficient for adequate protection determinations, even when

26  the Debtor lacked any equity in the property.  In re McGowan, 6 B.R. 241, 243 (Bankr. E.D. Pa.

27  1980) (holding a 10% cushion is sufficient to be adequate protection);  In re Rogers Development

28  Corp., 2 B.R. 679, 685 (Bankr. E.D. Va. 1980) (holding that an equity cushion of approximately

1   15% to 20% was sufficient adequate protection to the creditor, even though the debtors had no

2   equity in the property); <u>Breuer</u>, 4 B.R. at 501 (creditor protected by equity cushion of $21,000

3   despite fact that debtor lacked equity in the property).

4         The RFS Motion points to several factors that REL believes constitute sufficient cause for

5   relief from the automatic stay.  The Debtor disputes the statements made with respect to many of

6   these factors and contends that those factors which are undisputed are insufficient to establish

7   "cause" under section 362(d)(1).

8                (a)    **REL's Interest in the Property Could be Adequately Protected by an**

9                       **Equity Cushion**

10        In the RFS Motion, REL argues that the Property is not adequately protected.  RFS Motion,

11  p. 10-12.  REL also claims that the combined value of the Property is $8,600,000.  RFS Motion, p.

12  11-13.  The Debtor disputes this valuation.  In actuality, the value of the Property is unknown.

13  Movant has submitted an appraisal that differs vastly from prior valuations of the Property.[9]  This

14  Court has previously opined that it is the market that will ultimately decide the value.[10]  Without

15  knowing the true value of the Property, one cannot determine whether its value provides adequate

16  protection.

17        Moreover, there is uncertainty regarding the amount of REL's claim.  REL filed a proof of

18  claim in the amount of $9.35 million yet argues now that it is the holder of an $11.35 million

19  secured claim.  Components of the claim include a significant amount of default interest, late fees

20  and other charges, adding up to over 2 million dollars.  The Debtor disputes REL's entitlement to

21  interest above the original contract rate of 9.75% and over $1 million in extension fees, and

22  anticipates challenging REL's claim.  A reduction in the secured claim necessarily means an

23  increase in potential equity.

24

25
_____

26  [9] See opposition to Relief from Stay filed with respect to REL's prior relief from stay motion and
    exhibits reflecting a valuation of $23,450,000 (docket no. 148).

27  [10] See Court order regarding the prior motion and ruling attached collectively as Exhibit "4" to

28  Request for Judicial Notice.

1    The two most important elements in an equity cushion analysis are the value of the property

2    and the value of a lienholder's claim against that property.  See H.R. Rep. No. 95–595, 95th Cong.,

3    1st Sess. 338–40 (1977) ("Determining the value of a creditor's secured claim for purposes of relief

4    from the automatic stay and adequate protection is, of course, critical to a proceeding for relief

5    from the stay.")  In this case, the first element is unknown and the second element has not been

6    clearly articulated, and has been hyper-inflated with disallowable interest and fees.  With such

7    vague and inaccurate figures, it is difficult to know the extent to which REL's interest is protected

8    by an equity cushion.  Indeed, REL's inflated claim for various charges renders the adequate

9    protection analysis infeasible.

10              **(b)      The Debtor Is Properly Managing the Property**

11   The RFS Motion makes several complaints relating to the Property's insurance coverage,

12   rents, and conservation.  RFS Motion, p. 12-13.  Since the RFS Motion was filed, the Debtor has

13   started to segregate rents received from the Property appropriately.  The Debtor has property

14   insurance and will share proof thereof with the Movant.  With respect to the conditions of the

15   property located at 2602 Lincoln Park, the Motion is not clear as to when alleged damage took

16   place and the Debtor is investigating the issue.  The Debtor is confident that such alleged damage

17   did not occur in the four months since the Debtor adopted its new liquidation strategy.  As

18   previously stated, the Debtor is doing everything it can to market and preserve the maximum value

19   of its properties for the benefit of the estate.  While REL may take issue with parts of the Debtor's

20   approach, such disputes do not warrant a relief from the automatic stay under these circumstances.

21       **2.      REL Does Not Satisfy the Standards for Relief Under 11 U.S.C. § 362(d)(2)**

22   Section 362(d)(2) of the Bankruptcy Code provides that the bankruptcy court shall lift the

23   automatic stay as to a debtor's property if the debtor does not have equity in such property and such

24   property is not necessary to an effective reorganization.  11 U.S.C. § 362(d)(2).

25   Neither of these requirements are met.  It is currently unknown whether the Debtor has any

26   equity in the Property, and the Property is necessary for the Debtor's liquidation plan.

27

28

1

### (a)    REL Cannot Prove that the Debtor Lacks Equity in the Property

2         It is the moving party's burden to establish the lack of equity in the Property.  11 U.S.C.

3 § 362(g). Equity is defined as the "surplus of value remaining after the amount of indebtedness is

4 subtracted from the fair market value of the collateral."  In re Grant Broadcasting of Philadelphia,

5 Inc., 75 B.R. 819, 822 (E.D. Pa. 1987).

6         As previously explained, the value of the Property is in the process of being determined by

7 the best method possible—true marketing.  Bank of America v. 203 North LaSalle Street

8 Partnership, 526 U.S. 434, 456–57 (1999).  From the perspective of the Debtor and this Court,[11] the

9 best way to determine the Property's value is by testing the Property on the market.  The testing

10 process has not yet been thoroughly completed.  Only once the Debtor completes the sale process,

11 can the Court truly gauge whether the Property has equity.  Pulling the Property off the market now

12 and interrupting the Brokers' process is not the answer to maximizing the value and, in fact, would

13 only harm all parties.

14         Without a sale price, the Court and interested parties are missing a critical piece of the

15 formula necessary to determine if equity exists.  The requirements of section 363(d)(2) cannot be

16 met without knowing the Property's value.  Accordingly, REL is not entitled to relief from the

17 automatic stay.

18

### (b)    Any Lack of Equity In The Property is Exacerbated by REL's Excessive

19

### Fees

20         Pursuant to section 506(b) of the Bankruptcy Code, only oversecured creditors are entitled

21 to interest on their claims.  11 U.S.C. § 506(b); See United Sav. Ass'n of Texas v. Timbers of

22 Inwood Forest Assocs., Ltd., 484 U.S. 365, 372–73 (1988) ("Since this provision permits

23 postpetition interest to be paid only out of the 'security cushion,' the undersecured creditor, who

24 has no such cushion, falls within the general rule disallowing postpetition interest.").

25         If the Court does find that the Debtor lacks equity in the Property, such lack of equity can

26 be credited to REL's assessment of exorbitant interest and fees against the Debtor.  As mentioned

27

28 ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
[11] Exhibit "4."

1   previously, the Debtor believes that many aspects of REL's secured claim are unreasonable and

2   objectionable pursuant to the Bankruptcy Code.  For example, REL asserts that the most recent

3   value of its claim is $11,351,597.94, which includes $1.2 million of postpetition interest.  If REL's

4   claim is undersecured, as it alleges, then an assessment postpetition interest should not exist on the

5   claim.  REL's prepetition claim also includes $1,008,752.55 in purported extension fees.  If REL's

6   claim was only comprised of its principal and interest at the original contract rate of 9.75%, the

7   current value of the claim would be $8,520,442.10, nearly three million dollars less.  If the true

8   value is on the lower end of the spectrum between REL's valuation of $8,600,000 and the 2021

9   Cushman & Wakefield valuation of $23,450,000, there would likely be equity in the Property.

10  Thus, REL has not met its burden to establish that the Debtor does not have equity in the Property.

11              **(c)      The Property is Necessary For an Effective Reorganization**

12          Liquidation in chapter 11 may be an "effective reorganization" for purposes of section

13  362(d)(2)(B), since liquidation is a legitimate chapter 11 purpose.  See In re EM Lodgings, LLC,

14  580 B.R. 803, 813–14 (Bankr. C.D. Ill. 2018) (collecting cases).  To satisfy its burden in the event

15  of liquidation, the Debtor should show that it is making progress toward an effective liquidation.

16  Id. at 814.

17          In this analysis, courts have also conferred "considerable merit" to the argument that the

18  sale of an over-encumbered property would help the debtor satisfy the claims of its creditors.  La

19  Jolla, 18 B.R. at 291 ("If the debtor can satisfy certain claims in whole, or in part, from property

20  that has no equity and which has no particular place in the reorganization effort beyond its value in

21  being able to satisfy the claims it secures, then, the debtor may have more flexibility in dealing

22  with the remaining claims with the other assets available").

23          The Property comprises the Debtor's most valuable asset without question.  Throughout the

24  course of this bankruptcy case, and particularly in the last four months, the Debtor has taken

25  appropriate measures to maximize the value of the Property.  Since June 23, the Debtor has

26  employed expert professionals with experience in marketing properties as difficult to sell as the

27  Property.  As previously explained, the Debtor's brokers are in the process of thoroughly testing

28  the Property against the market.  The Debtor's marked determination in marketing the Property is

1   indicative of its importance to the estate and its creditors.  If the Debtor is successful in marketing

2   the Property, its efforts could result in a substantial return for the estate's general unsecured

3   creditors, in addition to a full satisfaction of the REL lien.  Upon a closer analysis of the

4   encumbrances against the Property and any potential objections thereto, such return could mean

5   hundreds of thousands of dollars for the benefit of the estate, if not millions.  Naturally, such facts

6   make the Property vital to the Debtor's bankruptcy case and liquidation plan.

7        **3.**    <u>This Court Has Already Denied a Relief From Stay Motion Against This Property</u>

8        On May 17, 2022, this Court heard and denied a previous iteration of REL's motion for

9   relief from the automatic stay (docket no. 127).  In its tentative ruling (the "Tentative") (docket no.

10   223), the Court made several statements regarding the merit of REL's motion.  Importantly, the

11   Court was not persuaded by REL's assertion that the Property is only worth $9,035,000.  Indeed,

12   the Court found that a transaction in the actual market is a more accurate indicator of value, noting

13   that "[T]he best way to determine value is exposure to a market."  Tentative, p. 22 (quoting <u>Bank of

14   America v. 203 North LaSalle Street Partnership</u>, 526 U.S. 434, 456–57 (1999).  Finally, the

15   Tentative also recognized that the Property is "necessary to an effective reorganization."  Tentative,

16   p. 23.  See Exhibit "4" to Request for Judicial Notice.

17        Within weeks after the last ruling, the Debtor began executing its liquidation strategy.  The

18   Property remains a vital asset in the Debtor's case.  The Debtor's purchase price of $18.5 million,

19   as an actual market transaction, is still the best evidence available relating to the Property's value.

20   REL has not provided sufficient evidence to suggest that the value of the Property could have

21   dropped nearly $10 million in the last six months.  Since REL's prior relief from stay motion was

22   denied, the Debtor's circumstances have improved.  The Debtor has become fully focused on

23   liquidating its real estate assets, and its plan is working.[12]  The Debtor's freedom to execute its

24   liquidation strategy has rewarded the bankruptcy estate with opportunities to generate value for all

25   of its creditors.  The same result is possible with respect to the Property.  Based on this trajectory,

26

27    _____

[12] See Debtor's motions requesting the authority to sell its properties located in Arcadia and Van

28   Nuys (docket nos. 420 and 387, respectively).

1    denial of REL's motion for relief from the automatic stay is even more appropriate now than it was

2    in May.

3        **4.**    The True Value of REL's Claim is Unclear

4        Section 362(g) of the Bankruptcy Code states:

5        In any hearing under subsection (d) or (e) of this section concerning relief from the stay of
     any act under subsection (a) of this section—
6
     (1) the party requesting such relief has the burden of proof on the issue of the debtor's
7    equity in property; and

8        (2) the party opposing such relief has the burden of proof on all other issues.

9    11 U.S.C. § 362(g).

10       Within the context of a relief from stay analysis, "a creditor must establish the validity and

11   perfection of its security interest and the amount of the debt and other allowable costs secured by

12   its secured claim and must carry the ultimate burden of proof with respect to equity." In re

13   Dahlquist, 34 B.R. 476, 481 (Bankr. D.S.D. 1983) (citing United Companies Fin. Corp. v. Brantley,

14   6 B.R. 178, 184 (Bankr. N.D. Fla. 1980)).

15       The asserted value of REL's claim against the Property is dubious.  There is a significant

16   discrepancy between the value REL asserted in its proof of claim and the value it asserts in the RFS

17   Motion.  Furthermore, the amount of additional interest and fees REL assessed against the Debtor

18   total over 50% of the loan's principal and appear to be objectionable on multiple grounds. To

19   ensure fair treatment of all creditors and parties in interest, the Debtor is preparing to pursue such

20   objections, on equitable and legal grounds, when the issue is ripe.  In re Beltway One Dev. Grp.,

21   LLC, 547 B.R. 819, 826–27 (B.A.P. 9th Cir. 2016) ("We continue, of course, to recognize

22   bankruptcy courts' 'broad equitable discretion' in awarding post-petition interest.") (internal

23   citations omitted). Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 67 S.Ct.

24   237, 91 L.Ed. 162 (1946) ("A purpose of bankruptcy is so to administer an estate as to bring about

25   a ratable distribution of assets among the bankrupt's creditors").

26

27

28

The difference between the asserted value of REL's claim and its true value could be worth millions of dollars.[13]  This sum is certainly not negligible, and would have a dramatic impact on the estate's unsecured creditors.  The true value of REL's claim against the Property is unclear and the evidence regarding the claim is adequate as a basis from which to establish equity or a lack thereof.

## IV.

## CONCLUSION

Four months ago, the Debtor established a marketing strategy for the Property.  This strategy has only been partially executed, and it requires more time.  Furthermore, REL has not met the requirements necessary for granting relief from the automatic stay.

For these reasons and those set forth above, the Debtor respectfully requests that the Court deny the RFS Motion.  In the alternative, if the Court is inclined to grant the RFS Motion, the Debtor requests that the Debtor be afforded 120 additional days to market the property and an additional 120 days thereafter to close escrow on a sale of the Property.

DATED:  October 31, 2022                    DANNING, GILL, ISRAEL & KRASNOFF, LLP


By:    _____
       ZEV SHECHTMAN
       ALPHAMORLAI L. KEBEH
       General Bankruptcy Counsel for Jinzheng Group
       (USA) LLC, Debtor and Debtor in Possession

---

[13] Objection to this claim, depending on the outcome of the sale, could be determinative of whether REL is over- or undersecured for purposes of section 506(b).

## <u>DECLARATION OF MARK CIANCIULLI</u>

I, Mark Cianciulli, declare as follows:

1.       I have personal knowledge of the facts stated below.

2.       I have been a licensed real estate broker, in good standing, since 2015.

3.       I am a co-founder and principal of CREM Brokerage and Professional Services, Inc., doing business as "The CREM Group," a real estate brokerage specializing in court supervised real estate sales.

4.       I am representing the debtor and debtor in possession, Jinzheng Group (USA) LLC (the "Debtor"), as one of the co-brokers, tasked with listing and selling multiple pieces of real property (the "Real Property") for sale in Lincoln Heights.  The specific property addresses and assessor parcel numbers for the Real Property are listed within Addendum 1 of the Listing Agreement, attached as Exhibit A.

5.       The other co-broker tasked with listing, marketing, and selling the Real Property, is Lonnie McDermott, a licensed real estate broker with Marcus & Millichap, Inc.

6.       A true and correct copy of the Order Granting the Application to Employ Real Estate Brokers and to Enter into Exclusive Listing Agreement, which was filed and entered on July 12, 2022 is attached hereto as Exhibit B.

7.       The Real Property was listed on the market on July 26, 2022.

8.       The Real Property has been marketed on a variety of commercial real estate sale mediums, including, but not limited to: CoStar, Loopnet, Crexi, Brevitas, and TheMLS.

9.       Due to the uniqueness of the Real Property -- i.e. the property being primarily made up of 33 acres of agriculturally zoned land in a highly dense region of Lincoln Heights, possessing unique topography (e.g. steep inclines along the property), and a wide range of professional opinions of value – Lonnie and I made a strategic recommendation to market the property without a list price.

10.       As of October 17, 2022, we had 16,235 views of the Real Property across all marketing resources, our offering memorandum had been downloaded 565 times, we had 4

1  executed NDA with interested parties, we completed 1 on-site property tour, and had received zero

2  ("0") offers.

3         11.    Due to the fact we had received zero ("0") offers as of October 17, 2022, Lonnie

4  McDermott and I advised the Debtor to add a list price to the listing.

5         12.    The Debtor agreed to our recommendation, and therefore, on October 20, 2022, we

6  added a $12,000,000 list price to our listing materials across all commercial real estate sale

7  mediums where the Real Property was being marketed, including, but not limited to: CoStar,

8  Loopnet, Crexi, Brevitas, TheMLS.  A true and correct copy of the listing per The MLS is attached

9  hereto as Exhibit C.

10        13.    To date, our most serious prospective buyer is a conservancy group spearheaded by

11  John Urquiza, who is interested in acquiring the Real Property and preserving the land as-is.

12        14.    Additionally, since October 20, 2022, when we amended the listing to include a

13  $12,000,000 list price, we have had an increase in inquiries, offering memorandum downloads, and

14  requests for additional information about the Real Property.

15        15.    To summarize, the Real Property has been actively listed and marketed for 92 days

16  in total, 85 days without a list price and 7 days with a list price.

17        16.    In my professional opinion, real property of this kind is extremely unique and

18  requires a qualified buyer with one of three ultimate objectives: 1. to develop the land to arguably

19  it's highest and best use (i.e. a 70 single family home development), 2. long-term land holding and

20  speculation, or 3. to preserve the raw and open land in its current state, in perpetuity.

21        17.    Regardless of the objective, we are in a declining real estate market and an

22  increasing interest rate environment.  Real property sales, across the board, are taking longer to

23  consummate.  Therefore, when looking at the combination of factors present, such as price, lending

24  environment, the uncommon attributes of the subject property, and legalities surrounding the

25  subject property, I believe it will take at least 4 - 7 months to find the appropriate/best buyer for the

26  Real Property at issue.

27        I declare under penalty of perjury under the laws of the United States of America that the

28  foregoing is true and correct.

1    Executed on this 31st day of October, 2022, at Los Angeles, California.

2

3    _____

4    Mark Cianciulli

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **REQUEST FOR JUDICIAL NOTICE**

2          Debtor and Debtor in Possession, Jinzheng Group (USA), LLC (the "Debtor") hereby

3   respectfully requests that the Court take judicial notice of the following facts pursuant to Rule 201

4   of the Federal Rules of Evidence:

5          1.      On May 18, 2022, the Court entered its Order Denying Motion for Relief form the

6   Automatic Stay Without Prejudice (docket no. 226) adopting its tentative ruling as the "Ruling" of

7   the Court.  A copy of the order and the Ruling are attached collectively as Exhibit "4" hereto.

8

9   DATED:  October 31, 2022                    DANNING, GILL, ISRAEL & KRASNOFF, LLP

10

11                                       By:  _____

12                                            ZEV SHECHTMAN
                                             ALPHAMORLAI L. KEBEH
13                                            General Bankruptcy Counsel for Jinzheng Group
                                             (USA) LLC, Debtor and Debtor in Possession
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT "1"**

DocuSign Envelope ID: 3D511D59-84BB-4C8C-BA18-13378EFA6650

# DISCLOSURE REGARDING
# REAL ESTATE AGENCY RELATIONSHIP
(As required by the Civil Code)
(C.A.R. Form AD, Revised 12/21)

☐ (If checked) This form is being provided in connection with a transaction for a leasehold interest exceeding one year as per Civil Code section 2079.13(j), (k), and (l).

When you enter into a discussion with a real estate agent regarding a real estate transaction, you should from the outset understand what type of agency relationship or representation you wish to have with the agent in the transaction.

**SELLER'S AGENT**

A Seller's agent under a listing agreement with the Seller acts as the agent for the Seller only. A Seller's agent or a subagent of that agent has the following affirmative obligations:
To the Seller: A Fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Seller.
To the Buyer and the Seller:
    (a)  Diligent exercise of reasonable skill and care in performance of the agent's duties.
    (b)  A duty of honest and fair dealing and good faith.
    (c)  A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties. An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

**BUYER'S AGENT**

A Buyer's agent can, with a Buyer's consent, agree to act as agent for the Buyer only. In these situations, the agent is not the Seller's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Seller. An agent acting only for a Buyer has the following affirmative obligations:
To the Buyer: A fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Buyer.
To the Buyer and the Seller:
    (a)  Diligent exercise of reasonable skill and care in performance of the agent's duties.
    (b)  A duty of honest and fair dealing and good faith.
    (c)  A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties. An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

**AGENT REPRESENTING BOTH SELLER AND BUYER**

A real estate agent, either acting directly or through one or more salespersons and broker associates, can legally be the agent of both the Seller and the Buyer in a transaction, but only with the knowledge and consent of both the Seller and the Buyer.
In a dual agency situation, the agent has the following affirmative obligations to both the Seller and the Buyer:
    (a)  A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either the Seller or the Buyer.
    (b)  Other duties to the Seller and the Buyer as stated above in their respective sections.
In representing both Seller and Buyer, a dual agent may not, without the express permission of the respective party, disclose to the other party confidential information, including, but not limited to, facts relating to either the Buyer's or Seller's financial position, motivations, bargaining position, or other personal information that may impact price, including the Seller's willingness to accept a price less than the listing price or the Buyer's willingness to pay a price greater than the price offered.

**SELLER AND BUYER RESPONSIBILITIES**

Either the purchase agreement or a separate document will contain a confirmation of which agent is representing you and whether that agent is representing you exclusively in the transaction or acting as a dual agent. Please pay attention to that confirmation to make sure it accurately reflects your understanding of your agent's role.

The above duties of the agent in a real estate transaction do not relieve a Seller or Buyer from the responsibility to protect his or her own interests. You should carefully read all agreements to assure that they adequately express your understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

If you are a Buyer, you have the duty to exercise reasonable care to protect yourself, including as to those facts about the property which are known to you or within your diligent attention and observation.

Both Sellers and Buyers should strongly consider obtaining tax advice from a competent professional because the federal and state tax consequences of a transaction can be complex and subject to change.

Throughout your real property transaction you may receive more than one disclosure form, depending upon the number of agents assisting in the transaction. The law requires each agent with whom you have more than a casual relationship to present you with this disclosure form. You should read its contents each time it is presented to you, considering the relationship between you and the real estate agent in your specific transaction. **This disclosure form includes the provisions of Sections 2079.13 to 2079.24, inclusive, of the Civil Code set forth on page 2. Read it carefully. I/WE ACKNOWLEDGE RECEIPT OF A COPY OF THIS DISCLOSURE AND THE PORTIONS OF THE CIVIL CODE PRINTED ON THE SECOND PAGE.**

| | | | |
|---|---|---|---|
| ☐ Buyer ☒ Seller ☐ Landlord ☐ Tenant | _Zhao Pu Yang_ | _Jinzheng Group USA LLC_ Date | 6/24/2022 |
| | 34929D9DEA804CA... | | |
| ☐ Buyer ☐ Seller ☐ Landlord ☐ Tenant | | Date | |

Agent _____ **The CREM Group** _____ DRE Lic. # _02029217_
       Real Estate Broker (Firm)

By _____ **Mark Cianciulli** DRE Lic. # _01990266_ ___ Date _6/24/2022_
    5BDE5C4DF6B94...(Salesperson or Broker-Associate, if any)

© 2021, California Association of REALTORS®, Inc.

**AD REVISED 12/21 (PAGE 1 OF 2)**



## DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIP (AD PAGE 1 OF 2)

The CREM Group, 3900 W. Alameda Ave, Suite 1200 Burbank CA 91505          Phone: 3236835100          Fax:          Jinzheng Group
Mark Cianciulli          Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201  www.lwolf.com

20

2079.13. As used in Sections 2079.7 and 2079.14 to 2079.24, inclusive, the following terms have the following meanings:

**(a)** "Agent" means a person acting under provisions of this title in a real property transaction, and includes a person who is licensed as a real estate broker under Chapter 3 (commencing with Section 10130) of Part 1 of Division 4 of the Business and Professions Code, and under whose license a listing is executed or an offer to purchase is obtained. The agent in the real property transaction bears responsibility for that agent's salespersons or broker associates who perform as agents of the agent. When a salesperson or broker associate owes a duty to any principal, or to any buyer or seller who is not a principal, in a real property transaction, that duty is equivalent to the duty owed to that party by the broker for whom the salesperson or broker associate functions. **(b)** "Buyer" means a transferee in a real property transaction, and includes a person who executes an offer to purchase real property from a seller through an agent, or who seeks the services of an agent in more than a casual, transitory, or preliminary manner, with the object of entering into a real property transaction. "Buyer" includes vendee or lessee of real property. **(c)** "Commercial real property" means all real property in the state, except (1) single-family residential real property, (2) dwelling units made subject to Chapter 2 (commencing with Section 1940) of Title 5, (3) a mobilehome, as defined in Section 798.3, (4) vacant land, or (5) a recreational vehicle, as defined in Section 799.29. **(d)** "Dual agent" means an agent acting, either directly or through a salesperson or broker associate, as agent for both the seller and the buyer in a real property transaction. **(e)** "Listing agreement" means a written contract between a seller of real property and an agent, by which the agent has been authorized to sell the real property or to find or obtain a buyer, including rendering other services for which a real estate license is required to the seller pursuant to the terms of the agreement. **(f)** "Seller's agent" means a person who has obtained a listing of real property to act as an agent for compensation. **(g)** "Listing price" is the amount expressed in dollars specified in the listing for which the seller is willing to sell the real property through the seller's agent. **(h)** "Offering price" is the amount expressed in dollars specified in an offer to purchase for which the buyer is willing to buy the real property. **(i)** "Offer to purchase" means a written contract executed by a buyer acting through a buyer's agent that becomes the contract for the sale of the real property upon acceptance by the seller. **(j)** "Real property" means any estate specified by subdivision (1) or (2) of Section 761 in property, and includes (1) single-family residential property, (2) multiunit residential property with more than four dwelling units, (3) commercial real property, (4) vacant land, (5) a ground lease coupled with improvements, or (6) a manufactured home as defined in Section 18007 of the Health and Safety Code, or a mobilehome as defined in Section 18008 of the Health and Safety Code, when offered for sale or sold through an agent pursuant to the authority contained in Section 10131.6 of the Business and Professions Code. **(k)** "Real property transaction" means a transaction for the sale of real property in which an agent is retained by a buyer, seller, or both a buyer and seller to act in that transaction, and includes a listing or an offer to purchase. **(l)** "Sell," "sale," or "sold" refers to a transaction for the transfer of real property from the seller to the buyer and includes exchanges of real property between the seller and buyer, transactions for the creation of a real property sales contract within the meaning of Section 2985, and transactions for the creation of a leasehold exceeding one year's duration. **(m)** "Seller" means the transferor in a real property transaction and includes an owner who lists real property with an agent, whether or not a transfer results, or who receives an offer to purchase real property of which he or she is the owner from an agent on behalf of another. "Seller" includes both a vendor and a lessor of real property. **(n)** "Buyer's agent" means an agent who represents a buyer in a real property transaction.

**2079.14.** A seller's agent and buyer's agent shall provide the seller and buyer in a real property transaction with a copy of the disclosure form specified in Section 2079.16, and shall obtain a signed acknowledgment of receipt from that seller and buyer, except as provided in Section 2079.15, as follows: **(a)** The seller's agent, if any, shall provide the disclosure form to the seller prior to entering into the listing agreement. **(b)** The buyer's agent shall provide the disclosure form to the buyer as soon as practicable prior to execution of the buyer's offer to purchase. If the offer to purchase is not prepared by the buyer's agent, the buyer's agent shall present the disclosure form to the buyer not later than the next business day after receiving the offer to purchase from the buyer.

**2079.15.** In any circumstance in which the seller or buyer refuses to sign an acknowledgment of receipt pursuant to Section 2079.14, the agent shall set forth, sign, and date a written declaration of the facts of the refusal.

**2079.16** Reproduced on Page 1 of this AD form.

**2079.17(a)** As soon as practicable, the buyer's agent shall disclose to the buyer and seller whether the agent is acting in the real property transaction as the buyer's agent, or as a dual agent representing both the buyer and the seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller, the buyer, and the buyer's agent prior to or coincident with execution of that contract by the buyer and the seller, respectively. **(b)** As soon as practicable, the seller's agent shall disclose to the seller whether the seller's agent is acting in the real property transaction as the seller's agent, or as a dual agent representing both the buyer and seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller and the seller's agent prior to or coincident with the execution of that contract by the seller.

CONFIRMATION: **(c)** The confirmation required by subdivisions (a) and (b) shall be in the following form:

Seller's Brokerage Firm _____ DO NOT COMPLETE. SAMPLE ONLY _____ License Number _____
Is the broker of (check one): ☐ the seller; or ☐ both the buyer and seller. (dual agent)
Seller's Agent _____ DO NOT COMPLETE. SAMPLE ONLY _____ License Number _____
Is (check one): ☐ the Seller's Agent. (salesperson or broker associate) ☐ both the Buyer's and Seller's Agent. (dual agent)
Buyer's Brokerage Firm _____ DO NOT COMPLETE. SAMPLE ONLY _____ License Number _____
Is the broker of (check one): ☐ the buyer; or ☐ both the buyer and seller. (dual agent)
Buyer's Agent _____ DO NOT COMPLETE. SAMPLE ONLY _____ License Number _____
Is (check one): ☐ the Buyer's Agent. (salesperson or broker associate) ☐ both the Buyer's and Seller's Agent. (dual agent)

**(d)** The disclosures and confirmation required by this section shall be in addition to the disclosure required by Section 2079.14. An agent's duty to provide disclosure and confirmation of representation in this section may be performed by a real estate salesperson or broker associate affiliated with that broker.

**2079.18** (Repealed pursuant to AB-1289)

**2079.19** The payment of compensation or the obligation to pay compensation to an agent by the seller or buyer is not necessarily determinative of a particular agency relationship between an agent and the seller or buyer. A listing agent and a selling agent may agree to share any compensation or commission paid, or any right to any compensation or commission for which an obligation arises as the result of a real estate transaction, and the terms of any such agreement shall not necessarily be determinative of a particular relationship.

**2079.20** Nothing in this article prevents an agent from selecting, as a condition of the agent's employment, a specific form of agency relationship not specifically prohibited by this article if the requirements of Section 2079.14 and Section 2079.17 are complied with.

**2079.21 (a)** A dual agent may not, without the express permission of the seller, disclose to the buyer any confidential information obtained from the seller. **(b)** A dual agent may not, without the express permission of the buyer, disclose to the seller any confidential information obtained from the buyer. **(c)** "Confidential information" means facts relating to the client's financial position, motivations, bargaining position, or other personal information that may impact price, such as the seller is willing to accept a price less than the listing price or the buyer is willing to pay a price greater than the price offered. **(d)** This section does not alter in any way the duty or responsibility of a dual agent to any principal with respect to confidential information other than price.

**2079.22** Nothing in this article precludes a seller's agent from also being a buyer's agent. If a seller or buyer in a transaction chooses to not be represented by an agent, that does not, of itself, make that agent a dual agent.

**2079.23** A contract between the principal and agent may be modified or altered to change the agency relationship at any time before the performance of the act which is the object of the agency with the written consent of the parties to the agency relationship.

**2079.24** Nothing in this article shall be construed to either diminish the duty of disclosure owed buyers and sellers by agents and their associate licensees, subagents, and employees or to relieve agents and their associate licensees, subagents, and employees from liability for their conduct in connection with acts governed by this article or for any breach of a fiduciary duty or a duty of disclosure.

© 2021, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

AD REVISED 12/21 (PAGE 2 OF 2)

**DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIP (AD PAGE 2 OF 2)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201 www.lwolf.com          Jinzheng Group



ASSOCIATION
OF REALTORS®

**FAIR HOUSING & DISCRIMINATION ADVISORY**
(C.A.R. Form FHDA, 10/20)

1. **EQUAL ACCESS TO HOUSING FOR ALL:** All housing in California is available to all persons. Discrimination as noted below is prohibited by law. Resources are available for those who have experienced unequal treatment under the law.

2. **FEDERAL AND STATE LAWS PROHIBIT DISCRIMINATION AGAINST IDENTIFIED PROTECTED CLASSES:**
   A. FEDERAL FAIR HOUSING ACT ("FHA") Title VIII of the Civil Rights Act; 42 U.S.C. §§ 3601-3619; Prohibits discrimination in sales, rental or financing of residential housing against persons in protected classes;
   B. CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT ("FEHA") California Government Code ("GC") §§12900-12996,12955; 2 California Code of Regulations ("CCR") §§12005-12271; Prohibits discrimination in sales, rental or financing of housing opportunity against persons in protected classes by providers of housing accommodation and financial assistance services as related to housing;
   C. CALIFORNIA UNRUH CIVIL RIGHTS ACT ("Unruh") California Civil Code ("CC") §51; Prohibits business establishments from discriminating against, and requires full and equal accommodation, advantages, facilities, privileges, and services to persons in protected classes;
   D. AMERICANS WITH DISABILITIES ACT ("ADA") 42 U.S.C. §§12181-12189; Title III of the ADA prohibits discrimination based on disability in public accommodations; and
   E. OTHER FAIR HOUSING LAWS: Section 504 of Rehabilitation Act of 1973 29 U.S.C. §794; Ralph Civil Rights Act CC §51.7.; California Disabled Persons Act; CC §§54-55.32; any local city or county fair housing ordinances, as applicable.

3. **POTENTIAL LEGAL REMEDIES FOR UNLAWFUL DISCRIMINATION: Violations of fair housing laws may result in monetary civil fines, injunctive relief, compensatory and/or punitive damages, and attorney fees and costs.**

4. **PROTECTED CLASSES/CHARACTERISTICS:** Whether specified in Federal or State law or both, discrimination against persons if based on that person's belonging to, association with, or perceived membership to, any of the following classes or categories is prohibited.

| Race | Color | Ancestry | National Origin | Religion |
|---|---|---|---|---|
| Sex | Sexual Orientation | Gender | Gender Identity | Gender Expression |
| Marital Status | Familial Status (family with a child or children under 18) | Source of Income (e.g., Section 8 Voucher) | Disability (Mental & Physical) | Medical Condition |
| Citizenship | Primary Language | Immigration Status | Military/Veteran Status | Age |
| Criminal History (non-relevant convictions) | | | Any arbitrary characteristic | |

5. **THE CALIFORNIA DEPARTMENT OF REAL ESTATE REQUIRES TRAINING AND SUPERVISION TO PREVENT HOUSING DISCRIMINATION BY REAL ESTATE LICENSEES:**
   A. California Business & Professions Code ("B&PC") §10170.5(a)(4) requires 3 hours of training on fair housing for DRE license renewal; Real Estate Regulation §2725(f) requires brokers who oversee salespersons to be familiar with the requirements of federal and state laws relating to the prohibition of discrimination.
   B. Violation of DRE regulations or real estate laws against housing discrimination by a real estate licensee may result in the loss or suspension of the licensee's real estate license. B&PC §10177(l)(1); 10 CCR §2780

6. **REALTOR® ORGANIZATIONS PROHIBIT DISCRIMINATION:** NAR Code of Ethics Article 10 prohibits discrimination in employment practices or in rendering real estate license services against any person because of race, color, religion, sex, handicap, familial status, national origin, sexual orientation, or gender identity by REALTORS®.

7. **WHO IS REQUIRED TO COMPLY WITH FAIR HOUSING LAWS?**
   Below is a non-exclusive list of providers of housing accommodations or financial assistance services as related to housing who are most likely to be encountered in a housing transaction and who must comply with fair housing laws.

   - Sellers
   - Real estate licensees
   - Mobilehome parks
   - Insurance companies
   - Landlords
   - Real estate brokerage firms
   - Homeowners Associations ("HOAs");
   - Government housing services
   - Sublessors
   - Property managers
   - Banks and Mortgage lenders

8. **EXAMPLES OF CONDUCT THAT MAY NOT BE MOTIVATED BY DISCRIMINATORY INTENT BUT COULD HAVE A DISCRIMINATORY EFFECT:**
   A. Prior to acceptance of an offer, asking for or offering buyer personal information or letters from the buyer, especially with photos. Those types of documents may inadvertently reveal, or be perceived as revealing, protected status information thereby increasing the risk of **(i)** actual or unconscious bias, and **(ii)** potential legal claims against sellers and others by prospective buyers whose offers were rejected.
   B. Refusing to rent **(i)** an upper level unit to an elderly tenant out of concern for the tenant's ability to navigate stairs or **(ii)** a house with a pool to a person with young children out of concern for the children's safety.

9. **EXAMPLES OF UNLAWFUL OR IMPROPER CONDUCT BASED ON A PROTECTED CLASS OR CHARACTERISTIC:**
   A. Refusing to negotiate for a sale, rental or financing or otherwise make a housing opportunity unavailable; failing to present offers due to a person's protected status;
   B. Refusing or failing to show, rent, sell or finance housing; "channeling" or "steering" a prospective buyer or tenant to or away from a particular area due to that person's protected status or because of the racial, religious or ethnic composition of the neighborhood;
   C. "Blockbusting" or causing "panic selling" by inducing a listing, sale or rental based on the grounds of loss of value of property, increase in crime, or decline in school quality due to the entry or prospective entry of people in protected categories into the neighborhood;
   D. Making any statement or advertisement that indicates any preference, limitation, or discrimination;

© 2020, California Association of REALTORS®, Inc.
**FHDA 10/20 (PAGE 1 OF 2)**

**FAIR HOUSING & DISCRIMINATION ADVISORY (FHDA PAGE 1 OF 2)**

The CREM Group, 3900 W. Alameda Ave, Suite 1200 Burbank CA 91505          Phone: 3236835100          Fax:          Jinzheng Group
Mark Cianciulli                    Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201  www.lwolf.com

22

**E.** Inquiring about protected characteristics (such as asking tenant applicants if they are married, or prospective purchasers if they have children or are planning to have children);

**F.** Using criminal history information before otherwise affirming eligibility, and without a legally sufficient justification;

**G.** Failing to assess financial standards based on the portion of the income responsible by a tenant who receives government subsidies (such as basing an otherwise neutral rent to income ratio on the whole rent rather than just the part of rent that is the tenant's responsibility);

**H.** Denying a home loan or homeowner's insurance;

**I.** Offering inferior terms, conditions, privileges, facilities or services;

**J.** Using different qualification criteria or procedures for sale or rental of housing such as income standards, application requirements, application fees, credit analyses, sale or rental approval procedures or other requirements;

**K.** Harassing a person;

**L.** Taking an adverse action based on protected characteristics;

**M.** Refusing to permit a reasonable modification to the premises, as requested by a person with a disability (such as refusing to allow a wheel chair bound tenant to install, at their expense, a ramp over front or rear steps, or refusing to allow a physically disabled tenant from installing, at their own expense, grab bars in a shower or bathtub);

**N.** Refusing to make reasonable accommodation in policies, rules, practices, or services for a person with a disability (such as the following, if an actual or prospective tenant with a disability has a service animal or support animal):

   **(i)** Failing to allow that person to keep the service animal or emotional support animal in rental property,

   **(ii)** Charging that person higher rent or increased security deposit, or

   **(iii)** Failing to show rental or sale property to that person who is accompanied by the service animal or support animal, and;

**O.** Retaliating for asserting rights under fair housing laws.

**10. EXAMPLES OF POSITIVE PRACTICES:**

**A.** Real estate licensees working with buyers or tenants should apply the same objective property selection criteria, such as location/neighborhood, property features, and price range and other considerations, to all prospects.

**B.** Real estate licensees should provide complete and objective information to all clients based on the client's selection criteria.

**C.** Real estate licensees should provide the same professional courtesy in responding to inquiries, sharing of information and offers of assistance to all clients and prospects.

**D.** Housing providers should not make any statement or advertisement that directly or indirectly implies preference, limitation, or discrimination regarding any protected characteristic (such as "no children" or "English-speakers only").

**E.** Housing providers should use a selection process relying on objective information about a prospective buyer's offer or tenant's application and not seek any information that may disclose any protected characteristics (such as using a summary document, e.g. C.A.R. Form SUM-MO, to compare multiple offers on objective terms).

**11. FAIR HOUSING RESOURCES**: If you have questions about your obligations or rights under the Fair Housing laws, or you think you have been discriminated against, you may want to contact one or more of the sources listed below to discuss what you can do about it, and whether the resource is able to assist you.

**A.** Federal: **https://www.hud.gov/program_offices/fair_housing_equal_opp**

**B.** State: **https://www.dfeh.ca.gov/housing/**

**C.** Local: local Fair Housing Council office (non-profit, free service)

**D.** DRE: **https://www.dre.ca.gov/Consumers/FileComplaint.html**

**E.** Local Association of REALTORS®. List available at: **https://www.car.org/en/contactus/rosters/localassociationroster**.

**F.** Any qualified California fair housing attorney, or if applicable, landlord-tenant attorney.

**12. LIMITED EXCEPTIONS TO FAIR HOUSING REQUIREMENTS: No person should rely on any exception below without first seeking legal advice about whether the exception applies to their situation. Real estate licensees are not qualified to provide advice on the application of these exceptions.**

**A.** Legally compliant senior housing is exempt from FHA, FEHA and Unruh as related to age or familial status only;

**B.** An owner of a single-family residence who resides at the property with one lodger may be exempt from FEHA for rental purposes, PROVIDED **no real estate licensee is involved** in the rental;

**C.** An owner of a single-family residence may be exempt from FHA for sale or rental purposes, PROVIDED **(i) no real estate licensee is involved** in the sale or rental and **(ii)** no discriminatory advertising is used, and **(iii)** the owner owns no more than three single-family residences. Other restrictions apply;

**D.** An owner of residential property with one to four units who resides at the property, may be exempt from FHA for rental purposes, PROVIDED **no real estate licensee is involved** in the rental; and

**E.** Both FHA and FEHA do not apply to roommate situations. See, *Fair Housing Council v Roommate.com LLC*, 666 F.3d 1216 (2019).

**F.** Since both the 14th Amendment of the U.S. Constitution and the Civil Rights Act of 1866 prohibit discrimination based on race; the FHA and FEHA exemptions do not extend to discrimination based on race.

Buyer/Tenant and Seller/Landlord have read, understand and acknowledge receipt of a copy of this Fair Housing & Discrimination Advisory.

| | |
|---|---|
| Buyer/Tenant _____ | Date _____ |
| Buyer/Tenant _____ | Date _____ |
| Seller/Landlord _____ *Zhao Pu Yang* _____ DocuSigned by: *Jinzheng Group USA LLC* | Date 6/24/2022 |
| 34929D9DEA804CA... | |
| Seller/Landlord _____ | Date _____ |

© 2020, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020



**FHDA 10/20 (PAGE 2 OF 2)**

**FAIR HOUSING & DISCRIMINATION ADVISORY (FHDA PAGE 2 OF 2)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201 www.lwolf.com     **Jinzheng Group**

DocuSign Envelope ID: 3D511D50-84BB-4C8C-BA18-13378EFA6850



**POSSIBLE REPRESENTATION OF MORE THAN ONE BUYER
OR SELLER - DISCLOSURE AND CONSENT**
(C.A.R. Form PRBS, Revised 12/21)

A real estate broker (Broker), whether a corporation, partnership or sole proprietorship, may represent more than one buyer or seller. This multiple representation can occur through an individual licensed as a broker or salesperson or through different individual broker's or salespersons (associate licensees) acting under the Broker's license. The associate licensees may be working out of the same or different office locations.

**Multiple Buyers:** Broker (individually or through its associate licensees) may be working with many prospective buyers at the same time. These prospective buyers may have an interest in, and make offers on, the same properties. Some of these properties may be listed with Broker and some may not. Broker will not limit or restrict any particular buyer from making an offer on any particular property whether or not Broker represents other buyers interested in the same property.

**Multiple Sellers:** Broker (individually or through its associate licensees) may have listings on many properties at the same time. As a result, Broker will attempt to find buyers for each of those listed properties. Some listed properties may appeal to the same prospective buyers. Some properties may attract more prospective buyers than others. Some of these prospective buyers may be represented by Broker and some may not. Broker will market all listed properties to all prospective buyers whether or not Broker has another or other listed properties that may appeal to the same prospective buyers.

**Dual Agency:** If Seller is represented by Broker, Seller acknowledges that broker may represent prospective buyers of Seller's property and consents to Broker acting as a dual agent for both seller and buyer in that transaction. If Buyer is represented by Broker, buyer acknowledges that Broker may represent sellers of property that Buyer is interested in acquiring and consents to Broker acting as a dual agent for both buyer and seller with regard to that property.

In the event of dual agency, seller and buyer agree that: a dual agent may not, without the express permission of the respective party, disclose to the other party confidential information, including, but not limited to, facts relating to either the buyer's or seller's financial position, motivations, bargaining position, or other personal information that may impact price, including the seller's willingness to accept a price less than the listing price or the buyer's willingness to pay a price greater than the price offered; and except as set forth above, a dual agent is obligated to disclose known facts materially affecting the value or desirability of the Property to both parties.

**Offers not necessarily confidential:** Buyer is advised that seller or listing agent may disclose the existence, terms, or conditions of buyer's offer unless all parties and their agent have signed a written confidentiality agreement. Whether any such information is actually disclosed depends on many factors, such as current market conditions, the prevailing practice in the real estate community, the listing agent's marketing strategy and the instructions of the seller.

Buyer and seller understand that Broker may represent more than one buyer or more than one seller and even both buyer and seller on the same transaction and consents to such relationships.

**Seller and/or Buyer acknowledges reading and understanding this Possible Representation of More Than One Buyer or Seller - Disclosure and Consent and agrees to the agency possibilities disclosed.**

| | | |
|---|---|---|
| Seller _Zhao Pu Yang_ (DocuSigned by: 34929D9DEA804CA...) | *Jinzheng Group USA LLC* Date | 6/24/2022 |
| Seller _____ | Date _____ |
| Buyer _____ | Date _____ |
| Buyer _____ | Date _____ |
| Buyer's Brokerage Firm *The CREM Group* _____ | DRE Lic # _____ Date _____ |
| By _Mark Cianciulli_ | DRE Lic # _____ Date _____ |
| Seller's Brokerage Firm *The CREM Group* _____ | DRE Lic # *02029217* Date _____ |
| By _Mark Cianciulli_ (DocuSigned by: 5C4DF6B04F2...) | DRE Lic # *01990266* Date 6/24/2022 |

© 2021, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020



**PRBS REVISED 12/21 (PAGE 1 OF 1)**

**POSSIBLE REPRESENTATION OF MORE THAN ONE BUYER OR SELLER (PRBS PAGE 1 OF 1)**

The CREM Group, 3900 W. Alameda Ave, Suite 1200 Burbank CA 91505        Phone: 3236835100        Fax:        Jinzheng Group
Mark Cianciulli        Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201  www.lwolf.com

24

DocuSign Envelope ID: 3D511D59-84BB-4C8C-BA18-13378EFA6850

ASSOCIATION
OF REALTORS®

**VACANT LAND LISTING AGREEMENT**
(C.A.R. Form VLL, Revised 6/20)

Date Prepared: *June 17, 2022*

1. **EXCLUSIVE AUTHORIZATION:** _____ *Jinzheng Group USA LLC* _____ ("Owner")
   hereby employs and grants _____ *The CREM Group* _____ ("Broker")
   beginning (date) _____ and ending at 11:59 P.M. on (date) _____ ("Listing Period")
   the exclusive and irrevocable right to: [X] SELL, [ ] LEASE, [ ] EXCHANGE, [ ] OPTION, or [ ] OTHER _____
   the real property described as: _____ *Multiple Addresses; See Addendum #1* _____ ,
   situated in _____ (City), _____ (County), California, _____ (Zip Code),
   Assessor's Parcel No.: _ *See Addendum #1* _ ("Property").

2. **LISTING PRICE AND TERMS:**
   **A.** The listing price shall be _____
   _____ Dollars ($ _____ ).
   **B.** Additional Terms: *Listing Price Subject to Offer.*
   _____ .

3. **COMPENSATION TO BROKER:**
   **Notice: The amount or rate of real estate commissions is not fixed by law. They are set by each Broker individually and may be negotiable between Owner and Broker (real estate commissions include all compensation and fees to Broker).**
   **A.** Owner agrees to pay to Broker as compensation for services irrespective of agency relationship(s): [X] _ *5.000* _ percent
   of the listing price (or if a purchase agreement is entered into, of the contract price), or [ ] $ _____ ,
   AND _____ , as follows:
   - **(1)** If during the Listing Period, or any extension, Broker, cooperating broker, Owner or any other person procures a ready, willing and able buyer(s) or transferee(s) whose offer to purchase, lease, exchange, option, or otherwise transfer the Property on any price and terms is accepted by Owner, provided the Buyer or Transferee completes the transaction or is prevented from doing so by Owner. (It is agreed by Owner that any reference to Buyer or Prospective Buyer in this Agreement shall and does also include Transferee or Prospective Transferee. Broker is entitled to compensation whether any escrow or other transfer resulting from such offer closes during or after the expiration of the Listing Period or any extension.)
   - **OR (2)** If within _ *180* _ calendar days (a) after the end of the Listing Period or any extension; or (b) after any cancellation of this Agreement, unless otherwise agreed, Owner enters into a contract to sell, convey, lease or otherwise transfer the Property to anyone ("Prospective Buyer") or that person's related entity: **(i)** who physically entered and was shown the Property during the Listing Period or any extension by Broker or a cooperating broker; or **(ii)** for whom Broker or any cooperating broker submitted to Owner a signed, written offer to acquire, lease exchange or obtain an option on the Property. Owner, however, shall have no obligation to Broker under paragraph 3A(2) unless, not later than the end of the Listing Period or any extension or cancellation, Broker has given Owner a written notice of the names of such Prospective Buyers.
   - **OR (3)** If, without Broker's prior written consent, the Property is withdrawn from sale, conveyed, leased, rented, otherwise transferred, or made unmarketable by a voluntary act of Owner during the Listing Period, or any extension.
   **B.** If completion of the sale is prevented by a party to the transaction other than Owner, then compensation which otherwise would have been earned under paragraph 3A shall be payable only if and when Owner collects damages by suit, arbitration, settlement or otherwise, and then in an amount equal to the lesser of one-half of the damages recovered or the above compensation, after first deducting title and escrow expenses and the expenses of collection, if any.
   **C.** In addition, Owner agrees to pay Broker: _____
   **D.** Owner has been advised of Broker's policy regarding cooperation with, and the amount of compensation offered to, other brokers.
   - **(1)** Broker is authorized to cooperate with and compensate brokers participating through the multiple listing service(s) ("MLS") by offering to MLS brokers out of Broker's compensation specified in 3A, either [X] _ *2.000* _ percent of the purchase price, or [ ] $ _____ .
   - **(2)** Broker is authorized to cooperate with and compensate brokers operating outside the MLS as per Broker's policy.
   - ~~**E.** Owner hereby irrevocably assigns to Broker the above compensation from Owner's funds and proceeds in escrow. Broker may submit this Agreement, as instructions to compensate Broker pursuant to paragraph 3A, to any escrow regarding the Property involving Owner and a buyer, Prospective Buyer or other transferee.~~
   **F. (1)** Owner represents that Owner has not previously entered into a listing agreement with another broker regarding the Property, unless specified as follows: _____ .
   - **(2)** Owner warrants that Owner has no obligation to pay compensation to any other broker regarding the Property unless the Property is transferred to any of the following individuals or entities: _____
   _____ .
   - **(3)** If the Property is sold to anyone listed above during the time Owner is obligated to compensate another broker: **(i)** Broker is not entitled to compensation under this Agreement; and **(ii)** Broker is not obligated to represent Owner in such transaction.

© 2020, California Association of REALTORS®, Inc

Owner's Initials ( ZPY ) ( _____ )



**VLL REVISED 6/20 (PAGE 1 OF 5)**

**VACANT LAND LISTING AGREEMENT (VLL PAGE 1 OF 5)**

The CREM Group, 3900 W. Alameda Ave, Suite 1200 Burbank CA 91505          Phone: 3236835100          Fax:          Jinzheng Group
Mark Cianciulli          Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com

25

Property Address: **_Multiple Addresses; See Addendum #1._** Date: **_June 17, 2022_**

4. **A ITEMS EXCLUDED AND INCLUDED:** Unless otherwise specified in a real estate purchase agreement, all fixtures and fittings that are attached to the Property are included, and personal property items are excluded, from the purchase price.
   **ADDITIONAL ITEMS EXCLUDED:** _____ .
   **ADDITIONAL ITEMS INCLUDED:** _____
   Owner intends that the above items be excluded or included in offering the Property for sale, but understands that; **(i)** the purchase agreement supersedes any intention expressed above and will ultimately determine which items are excluded and included in the sale; and **(ii)** Broker is not responsible for and does not guarantee that the above exclusions and/or inclusions will be in the purchase agreement.

   **B. (1) LEASED OR NOT OWNED ITEMS:** The following items are leased or not owned by Owner:
   ☐ Solar power system ☐ Water Softener _____
   **(2) LIENED ITEMS:** The following items have been financed and a lien has been placed on the Property to secure payment:
   ☐ Solar power system ☐ _____
   Owner will provide to Buyer, as part of the sales agreement, copies of lease documents, or other documents obligating Owner to pay for any such leased or liened item.

5. **MULTIPLE LISTING SERVICE:**
   **A. WHAT IS AN MLS?** The MLS is a database of properties for sale that is available and disseminated to and accessible by all other real estate agents who are participants or subscribers to the MLS. As set forth in **paragraph 7**, participants and subscribers conducting public marketing of a property listing must submit the property information to the MLS. Property information submitted to the MLS describes the price, terms and conditions under which the Owner's property is offered for sale (including but not limited to the listing broker's offer of compensation to other brokers). It is likely that a significant number of real estate practitioners in any given area are participants or subscribers to the MLS. The MLS may also be part of a reciprocal agreement to which other multiple listing services belong. Real estate agents belonging to other multiple listing services that have reciprocal agreements with the MLS also have access to the information submitted to the MLS. The MLS may further transmit listing information to Internet sites that post property listings online.
   **B. WHAT INFORMATION IS PROVIDED TO THE MLS:** All terms of the transaction, including sales price and financing, if applicable, **(i)** will be provided to the MLS in which the Property is listed for publication, dissemination and use by persons and entities on terms approved by the MLS, and **(ii)** may be provided to the MLS even if the Property was not listed with the MLS. Owner consents to Broker providing a copy of this listing agreement to the MLS if required by the MLS.
   **C. WHAT IS BROKER'S MLS?** Broker is a participant/subscriber to _**The MLS**_ Multiple Listing Service (MLS) and possibly others. That MLS is (or if checked ☐ is not) the primary MLS for the geographic area of the Property. When required by paragraph 7 or by the MLS, Property will be listed with the MLS(s) specified above.

6. **BENEFITS OF USING THE MLS; IMPACT OF OPTING OUT OF THE MLS**
   **A. EXPOSURE TO BUYERS THROUGH MLS:** Listing property with an MLS exposes an seller's property to all real estate agents and brokers (and their potential buyer clients) who are participants or subscribers to the MLS or a reciprocating MLS. The MLS may further transmit the MLS database to Internet sites that post property listings online.
   **B. IMPACT OF OPTING OUT OF MLS:** If Owner elects to exclude the Property from the MLS, Owner understands and acknowledges that: **(i)** Owner is authorizing limited exposure of the Property and NO marketing or advertising of the Property to the public will occur; **(ii)** real estate agents and brokers from other real estate offices, and their buyer clients, who have access to that MLS may not be aware that Owner's Property is offered for sale; **(iii)** Information about Owner's Property will not be transmitted from the MLS to various real estate Internet sites that are used by the public to search for property listings and; **(iv)** real estate agents, brokers and members of the public may be unaware of the terms and conditions under which Owner is marketing the Property.
   **C. REDUCTION IN EXPOSURE:** Any reduction in exposure of the Property may lower the number of offers and negatively impact the sales price.
   **D. NOT LISTING PROPERTY IN A LOCAL MLS:** If the Property is listed in an MLS which does not cover the geographic area where the Property is located then real estate agents and brokers working that territory, and Buyers they represent looking for property in the neighborhood, may not be aware the Property is for sale.

   | Owner's Initials ( _ZP4_ )( _____ ) | Broker's/Agent's Initials ( _MC_ )( _____ ) |
   |---|---|

7. **PUBLIC MARKETING OF PROPERTY:**
   **A. CLEAR COOPERATION POLICY:** MLS rules require (☐ Do NOT require - see 7F) that residential real property with one to four units and vacant lot listings be submitted to the MLS within 1 business day of any public marketing.
   **B. PUBLIC MARKETING WITHIN CLEAR COOPERATION: (i) Public marketing** includes, but is not limited to, flyers displayed in windows, yard signs, digital marketing on public facing websites, brokerage website displays, digital communications marketing and email blasts, multi-brokerage listing sharing networks, marketing to closed or private listing clubs or groups, and applications available to the general public. **(ii)** Public marketing does not include an office exclusive listing where there is direct promotion of the listing between the brokers and licensees affiliated with the listing brokerage, and one-to-one promotion between these licensees and their clients.
   **C. "COMING SOON" STATUS IMPACT ON MARKETING:** Owner is advised to discuss with Broker the meaning of "Coming Soon" as that term applies to the MLS in which the Property will be listed, and how any Coming Soon status will impact when and how a listing will be viewable to the public via the MLS. Owner does (☐ does not) authorize Broker to utilize Coming Soon status, if any.
   **D. Owner Instructs Broker:**
   **(1)** Owner instructs Broker to market the Property to the public, and to start marketing on the beginning date of this Agreement or ☐ _____ (date).

**VLL REVISED 6/20 (PAGE 2 OF 5)** Owner's Initials ( _ZP4_ ) ( _____ )

**VACANT LAND LISTING AGREEMENT (VLL PAGE 2 OF 5)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201 www.lwolf.com Jinzheng Group

26

Property Address: *Multiple Addresses; See Addendum #1* _____ Date: *June 17, 2022*

**OR (2)** ☐ Owner instructs Broker NOT to market the Property to the public. (MLS may require C.A.R. Form SELM or local equivalent form) Owner understands that no public marketing will occur and the scope of marketing that will occur will consist only of direct one-on-one promotion between the brokers and licensees affiliated with the listing brokerage and their respective clients.

**E.  Whether 7D(1) or 7D(2) is selected,** Owner understands and agrees that should any public marketing of the property occur, the Property listing will be submitted to the MLS within 1 business day.

**F.** ☐ **CLEAR COOPERATION POLICY DOES NOT APPLY:** Paragraphs 7A (other than the language in the parenthetical), 7B, 7D and 7E do not apply to this listing. Broker shall disclose to Owner and obtain Owner's consent for any instruction to not market the Property on the MLS or to the public.

**8.  MLS DATA ON THE INTERNET:** MLS rules allow MLS data to be made available by the MLS to additional Internet sites unless Broker gives the MLS instructions to the contrary. Specific information that can be excluded from the Internet as permitted by (or in accordance with) the MLS is as follows:

**A.  PROPERTY OR PROPERTY ADDRESS:** Owner can instruct Broker to have the MLS not display the Property or the Property address on the Internet (C.A.R. Form SELI). Owner understands that either of these opt-outs would mean consumers searching for listings on the Internet may not see the Property or Property's address in response to their search.

**B.  FEATURE OPT-OUTS:** Owner can instruct Broker to advise the MLS that Owner does not want visitors to MLS Participant or Subscriber Websites or Electronic Displays that display the Property listing to have the features below (C.A.R. Form SELI). Owner understands **(i)** that these opt-outs apply only to Websites or Electronic Displays of MLS Participants and Subscribers who are real estate broker and agent members of the MLS; **(ii)** that other Internet sites may or may not have the features set forth herein; and **(iii)** that neither Broker nor the MLS may have the ability to control or block such features on other Internet sites.

   **(1)  COMMENTS AND REVIEWS:** The ability to write comments or reviews about the Property on those sites; or the ability to link to another site containing such comments or reviews if the link is in immediate conjunction with the Property display.

   **(2)  AUTOMATED ESTIMATE OF VALUE:** The ability to create an automated estimate of value or to link to another site containing such an estimate of value if the link is in immediate conjunction with the Property display.
   ☐ Owner elects to opt out of certain Internet features as provided by C.A.R. Form SELI or the local equivalent form.

~~**9.  OWNER REPRESENTATIONS:** Owner represents that, unless otherwise specified in writing, Owner is unaware of:~~
~~**(i)** any Notice of Default recorded against the Property; **(ii)** any delinquent amounts due under any loan secured by, or other obligation affecting, the Property; **(iii)** any bankruptcy, insolvency or similar proceeding affecting the Property; **(iv)** any litigation, arbitration, administrative action, government investigation or other pending or threatened action that affects or may affect the Property or Owner's ability to transfer it; and **(v)** any current, pending or proposed special assessments affecting the Property. Owner shall promptly notify Broker in writing if Owner becomes aware of any of these items during the Listing Period or any extension thereof.~~

**10. BROKER'S AND OWNER'S DUTIES:**

**A.** Broker agrees to exercise reasonable effort and due diligence to achieve the purposes of this Agreement. Unless Owner gives Broker written instructions to the contrary, Broker is authorized, but not required, to **(i)** order reports and disclosures including those specified in 7C as necessary, **(ii)** advertise and market the Property by any method and in any medium selected by Broker, including MLS and the Internet, and, to the extent permitted by these media, control the dissemination of the information submitted to any medium; and **(iii)** disclose to any real estate licensee making an inquiry the receipt of any offers on the Property and the offering price of such offers.

**B.** Broker agrees to present all offers received for Owner's Property, and present them to Owner as soon as possible, unless Owner gives Broker written instructions to the contrary.

**C.** Owner agrees to consider offers presented by Broker, and to act in good faith to accomplish the sale of the Property by, among other things, making the Property available for showing at reasonable times and, subject to paragraph 3F, referring to Broker all inquiries of any party interested in the Property. Owner is responsible for determining at what price to list and sell the Property.

**D.  Investigations and Reports:** Owner agrees, within **5 (or _10_ ) Days** of the beginning date of this Agreement, to pay for the following pre-sale reports: ☐ Structural Pest Control  ☐ General Property Inspection  ☐ Homeowners Association Documents ☐ Other _____ . If Property is located in a Common Interest Development or Homeowners Association, Owner is advised that there may be benefits to obtaining any required documents prior to entering into escrow with any buyer. Such benefits may include, but not be limited to, potentially being able to lower costs in obtaining the documents and avoiding any potential delays or complications due to late or slow delivery of such documents.

**E.** Owner agrees to provide Broker and transferee(s) all written disclosures, as required by law. Owner further agrees to immediately disclose in writing any condition known to Owner that affects the Property, including, but not limited to, any past or current generation, storage, release, threatened release, disposal, and presence and location of asbestos, PCB transformers, petroleum products, flammable explosives, underground storage tanks, and other hazardous, toxic or contaminated substances or conditions in, or, or about the Property. Owner shall maintain public liability and property damage insurance on the Property during the Listing Period or any extension. Owner waives all subrogation rights under any insurance against Broker, cooperating brokers or employees.

~~**F.** Owner further agrees to indemnify, defend and hold Broker harmless from all claims, disputes, litigation, judgments, attorney fees and costs arising from any incorrect or incomplete information supplied by Owner, or from any material facts that Owner knows but fails to disclose including dangerous or hidden conditions on the Property.~~

**G.** ☐ (If checked) The attached property disclosures is part of this Listing Agreement and may be provided to Prospective Transferees.

**11. DEPOSIT:** Broker is authorized to accept and hold on Owner's behalf any deposits to be applied toward the purchase price.

**12. AGENCY RELATIONSHIPS:**

**A.** DISCLOSURE: The Seller acknowledges receipt of a ☒ "Disclosure Regarding Real Estate Agency Relationships" (C.A.R. Form AD).

**VLL REVISED 6/20 (PAGE 3 OF 5)**          Owner's Initials  ( _ZPY_ )  ( _____ )

**VACANT LAND LISTING AGREEMENT (VLL PAGE 3 OF 5)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX  75201  www.lwolf.com          Jinzheng Group

**27**

Property Address: *Multiple Addresses; See Addendum #1*     Date: *June 17, 2022*

**B.** **OWNER REPRESENTATION:** Broker shall represent Owner in any resulting transaction, except as specified in paragraph 3F.

**C.** **POSSIBLE DUAL AGENCY WITH BUYER:** Depending upon the circumstances, it may be necessary or appropriate for Broker to act as an agent for both Owner and buyer, exchange party, or one or more additional parties ("Buyer"). Broker shall, as soon as practicable, disclose to Owner any election to act as a dual agent representing both Owner and Buyer. If a Buyer is procured directly by Broker or an associate-licensee in Broker's firm, Owner hereby consents to Broker acting as a dual agent for Owner and Buyer. In the event of an exchange, Owner hereby consents to Broker collecting compensation from additional parties for services rendered, provided there is disclosure to all parties of such agency and compensation. Owner understands and agrees that: a dual agent may not, without the express permission of the respective party, disclose to the other party confidential information, including, but not limited to, facts relating to either the Buyer's or Owner's financial position, motivations, bargaining position, or other personal information that may impact price, including the Owner's willingness to accept a price less than the listing price or the Buyer's willingness to pay a price greater than the price offered; and except as set forth above, a dual agent is obligated to disclose known facts materially affecting the value or desirability of the Property to both parties.

**D.** **CONFIRMATION:** Broker shall confirm the agency relationship described above, or as modified, in writing, prior to or concurrent with Owner's execution of a purchase agreement.

**E.** **Potentially Competing Sellers and Buyers:** Owner understands that Broker may have or obtain listings on other properties, and that potential buyers may consider, make offers on, or purchase through Broker, property the same as or similar to Owner's Property. Owner consents to Broker's representation of sellers and buyers of other properties before, during and after the end of this Agreement. Owner acknowledges receipt of a ☒ "Possible Representation of More than One Buyer or Seller - Disclosure and Consent" (C.A.R. Form PRBS).

**13.** **SECURITY, INSURANCE, SHOWINGS, AUDIO AND VIDEO:** Broker is not responsible for loss of or damage to personal or real property, or person, whether attributable to use of a keysafe/lockbox, a showing of the Property, or otherwise. Third parties, including, but not limited to, appraisers, inspectors, brokers and prospective buyers, may have access to, and take videos and photographs of, the interior of the Property. Owner agrees: **(i)** to take reasonable precautions to safeguard and protect valuables that might be accessible during showings of the Property; **(ii)** to obtain insurance to protect against these risks. Broker does not maintain insurance to protect Owner. Persons visiting the Property may not be aware that they could be recorded by audio or visual devices installed by Owner (such as "nanny cams" and hidden security cameras). Owner is advised to post notice disclosing the existence of security devices.

**14.** **PHOTOGRAPHS AND INTERNET ADVERTISING:**

**A.** In order to effectively market the Property for sale it is often necessary to provide photographs, including aerial photographs, virtual tours and other media to buyers. Owner agrees (or ☐ if checked, does not agree) that Broker or others may photograph or otherwise electronically capture images of the exterior and interior of the Property ("Images") for static and/or virtual tours of the Property by buyers and others for use on Broker's website, the MLS, and other marketing materials and sites. Owner acknowledges that if Broker engages third parties to capture and/or reproduce and display Images, the agreement between Broker and those third parties may provide such third parties with certain rights to those Images. The rights to the Images may impact Broker's control or lack of control of future use of the Images. If Owner is concerned, Owner should request that Broker provide any third parties' agreement impacting the Images. Owner also acknowledges that once Images are placed on the Internet neither Broker nor Owner has control over who can view such Images and what use viewers may make of the Images, or how long such Images may remain available on the Internet. Owner further assigns any rights in all Images to the Broker/ Agent and agrees that such Images are the property of Broker/Agent and that Broker/Agent may use such Images for advertising, including post sale and for Broker/Agent's business in the future.

**B.** Owner acknowledges that prospective buyers and/or other persons coming onto the property may take photographs, videos or other images of the property. Owner understands that Broker does not have the ability to control or block the taking and use of Images by any such persons. (If checked) ☐ Owner instructs Broker to publish in the MLS that taking of Images is limited to those persons preparing Appraisal or Inspection reports. Owner acknowledges that unauthorized persons may take images who do not have access to or have not read any limiting instruction in the MLS or who take images regardless of any limiting instruction in the MLS. Once Images are taken and/or put into electronic display on the Internet or otherwise, neither Broker nor Owner has control over who views such Images nor what use viewers may make of the Images.

**15.** **KEYSAFE/LOCKBOX:** A key safe/lockbox is designed to hold a key to the Property to permit access to the Property by Broker, cooperating brokers, MLS participants, their authorized licensees and representatives, authorized inspectors, and accompanied prospective buyers. Owner further agrees that Broker, at Broker's discretion, and without further approval from Owner, shall have the right to grant access to and convey Owner's consent to access the Property to inspectors, appraisers, workers, repair persons, and other persons requiring entry to the Property in order to facilitate the sale of the Property. Broker, cooperating brokers, MLS and Associations/Boards of REALTORS® are not insurers against injury, theft, loss, vandalism or damage attributed to the use of a key safe/lockbox. Owner does (or if checked ☐ does not) authorize Broker to install a key safe/lockbox. If Owner does not occupy the Property, Owner shall be responsible for obtaining occupant(s)' written permission for use of a key safe/lockbox (C.A.R. Form KLA).

**16.** **SIGN:** Owner does (or if checked ☐ does not) authorize Broker to install a FOR SALE/SOLD sign on the Property.

**17.** **EQUAL HOUSING OPPORTUNITY:** The Property is offered in compliance with federal, state and local anti-discrimination laws.

**18.** **ATTORNEY FEES:** In any action, proceeding or arbitration between Owner and Broker to enforce the compensation provisions of this Agreement, the prevailing Owner or Broker shall be entitled to reasonable attorney fees and costs from the non-prevailing Owner or Broker, except as provided in paragraph 22A.

**19.** **ADDITIONAL TERMS:** ☐ REO Advisory Listing (C.A.R. Form REOL) ☐ Short Sale Information and Advisory (C.A.R. Form SSIA) ☐ Trust Advisory (C.A.R. Form TA)
☐ Owner intends to include a contingency to purchase a replacement property as part of any resulting transaction
*Listing Agreement to be included with the sale of properties listed in Addendum #1*
*Seller discloses there is a bankruptcy that is affecting the property.*
*See additional terms on Addendum #2.*

| | |
|---|---|
| **VLL REVISED 6/20 (PAGE 4 OF 5)** | Owner's Initials ( ZPY ) ( ) |

**VACANT LAND LISTING AGREEMENT (VLL PAGE 4 OF 5)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com    Jinzheng Group



**28**

20. **MANAGEMENT APPROVAL:** ~~If an associate-licensee in Broker's office (salesperson or broker-associate) enters into this Agreement on Broker's behalf, and Broker or Manager does not approve of its terms, Broker or Manager has the right to cancel this Agreement, in writing, within 5 Days after its execution.~~

21. **SUCCESSORS AND ASSIGNS:** This Agreement shall be binding upon Owner and Owner's successors and assigns.

22. ~~**DISPUTE RESOLUTION:**~~

    **A.** ~~**MEDIATION:** Owner and Broker agree to mediate any dispute or claim arising between them regarding the obligation to pay compensation under this Agreement, before resorting to arbitration or court action. Mediation fees, if any, shall be divided equally among the parties involved. If, for any dispute or claim to which this paragraph applies, any party **(i)** commences an action without first attempting to resolve the matter through mediation, or **(ii)** before commencement of an action, refuses to mediate after a request has been made, then that party shall not be entitled to recover attorney fees, even if they would otherwise be available to that party in any such action. Exclusions from this mediation agreement are specified in paragraph 22B.~~

    **B.** ~~**ADDITIONAL MEDIATION TERMS: The following matters shall be excluded from mediation: (i) a judicial or non-judicial foreclosure or other action or proceeding to enforce a deed of trust, mortgage or installment land sale contract as defined in Civil Code §2985; (ii) an unlawful detainer action; (iii) the filing or enforcement of a mechanic's lien; and (iv) any matter that is within the jurisdiction of a probate, small claims or bankruptcy court. The filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, shall not constitute a waiver or violation of the mediation provisions.**~~

    **C.** ~~**ARBITRATION ADVISORY:** If Seller and Broker desire to resolve disputes arising between them through arbitration rather than court, they can document their agreement by attaching and signing an Arbitration Agreement (C.A.R. Form ARB).~~

23. **ENTIRE AGREEMENT:** All prior discussions, negotiations and agreements between the parties concerning the subject matter of this Agreement are superseded by this Agreement, which constitutes the entire contract and a complete and exclusive expression of their agreement and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. If any provision of this Agreement is held to be ineffective or invalid, the remaining provisions will nevertheless be given full force and effect. This Agreement and any supplement, addendum or modification, including any photocopy or facsimile, may be executed in counterparts.

24. **OWNERSHIP, TITLE AND AUTHORITY: Owner** warrants that: **(i)** Owner is the owner of the Property; **(ii)** no other persons or entities have title to the Property; and **(iii)** Owner has the authority to both execute this Agreement and sell the Property. Exceptions to ownership, title and authority are as follows: *Jinzheng Group USA LLC* _____

---

[X] **REPRESENTATIVE CAPACITY:** This Listing Agreement is being signed for Owner by an individual acting in a Representative Capacity as specified in the attached Representative Capacity Signature Disclosure (C.A.R. Form RCSD-S). Wherever the signature or initials of the representative identified in the RCSD appear on this Agreement or any related documents, it shall be deemed to be in a representative capacity for the entity described and not in an individual capacity, unless otherwise indicated. Owner **(i)** represents that the entity for which the individual is signing already exists and **(ii)** shall Deliver to Broker, within 3 Days after execution of this Agreement, evidence of authority to act (such as but not limited to: applicable trust document, or portion thereof, letters testamentary, court order, power of attorney, resolution, or formation documents of the business entity).

---

**By signing below, Owner acknowledges that Owner has read, understands, received a copy of and agrees to the terms of this Listing Agreement and any attached schedule of compensation.**

Owner _*Zhao Pu Yang*_____ *Jinzheng Group USA LLC* Date 6/24/2022
Address *Multiple Addresses; See Addendum #1*_____ City _____ State _____ Zip _____
Telephone _____ Fax _____ E-mail _____

Owner _____ Date _____
Address *Multiple Addresses; See Addendum #1*_____ City _____ State _____ Zip _____
Telephone _____ Fax _____ E-mail _____

[ ] Additional Signature Addendum attached (C.A.R. Form ASA)

Real Estate Broker (Firm) *The CREM Group*_____ DRE Lic. # *02029217*
Address *3900 W. Alameda Ave, Suite 1200*____ City *Burbank* State *CA* Zip *91505*
By _____ Tel. *(323)683-5100* E-mail *mark@cremgroupre.com* DRE Lic.# *01990266* Date 6/24/2022
  *Mark Cianciulli*
By _____ Tel. _____ E-mail _____ DRE Lic.# _____ Date _____

[X] Two Brokers with different companies are co-listing the Property. Co-listing Broker information is on the attached Additional Broker Acknowledgement (C.A.R. Form ABA).

© 2020, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

**VLL REVISED 6/20 (PAGE 5 OF 5)**
Reviewed by _____

**VACANT LAND LISTING AGREEMENT (VLL PAGE 5 OF 5)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com        Jinzheng Group

29

ASSOCIATION
OF REALTORS®

**SELLER'S VACANT LAND ADVISORY**
(C.A.R. Form SVLA, 12/19)

1. **INTRODUCTION:** Selling property in California is a process that involves many steps. From start to finish, it could take anywhere from a few weeks to many months, depending upon the condition of your Property, local market conditions and other factors. You have already taken an important step by listing your Property for sale with a licensed real estate broker. Your broker will help guide you through the process and may refer you to other professionals, as needed. This advisory addresses many things you may need to think about and do as you market your Property. Some of these things are requirements imposed upon you, either by law or by the listing or sale contract. Others are simply practical matters that may arise during the process. Please read this document carefully and, if you have any questions, ask your broker or appropriate legal or tax advisor for help.

2. **DISCLOSURES:**

   A. **General Disclosure Duties:** You must affirmatively disclose to the buyer, in writing, any and all known facts that materially affect the value or desirability of your Property. You must disclose these facts whether or not asked about such matters by the buyer, any broker, or anyone else. This duty to disclose applies even if the buyer agrees to purchase your Property in its present condition without requiring you to make any repairs. If you do not know what or how to disclose, you should consult a real estate attorney in California of your choosing. Broker cannot advise you on the legal sufficiency of any disclosures you make.

   B. **Specific Contractual Disclosure Duties:**

      (1) The Vacant Land Purchase Agreement provides that the seller shall, if required by Law, deliver to buyer information regarding earthquakes, environmental hazards, flood hazards, and fire hazards

      (2) If seller has actual knowledge, the Purchase Contract requires seller to disclose **(i)** Legal Proceedings affecting the Property, **(ii)** Agricultural Use restrictions, **(iii)** Deed restrictions; **(iv)** Farm Use and right to farm issues, **(v)** Endangered Species issues, **(vi)** Environmental Hazards, **(vii)** Common Walls, **(viii)** Landlocked property, **(ix)** Easements and Encroachments, **(x)** Soil fill and Soil problems, **(xi)** Earthquake damage, **(xii)** Zoning Issues, **(xiii)** Neighborhood problems.

      (3) Existing Rental and Service agreements must be disclosed.

      (4) Seller is also required to make a good faith effort to obtain and deliver to the buyer a disclosure notice from the appropriate local agency(ies) about any special tax levied on your Property pursuant to the Mello-Roos Community Facilities Act, the Improvement Bond Act of 1915, and a notice concerning the contractual assessment provided by section 5898.24 of the Streets and Highways Code.

      (5) Common Interest Developments: If the Property is in a common interest development, you must provide to the buyer copies of the governing documents, the most recent financial statements distributed, and other documents required by law or contract. If you do not have a current version of these documents, you can request them from the management of your homeowners' association. To avoid delays, you are encouraged to obtain these documents as soon as possible, even if you have not yet entered into a purchase agreement to sell your Property.

      (6) Contract Terms and Conditions: A buyer may request, as part of the contract for the sale of your Property, that you pay for repairs to the Property and other items. Your decision on whether or not to comply with a buyer's requests may affect your ability to sell your Property at a specified price.

   C. **Other Legal Duties Withholding Taxes:** Under federal and California tax laws, a buyer is required to withhold a portion of the purchase price from your sale proceeds for tax purposes unless you sign an affidavit of non-foreign status and California residency, or some other exemption applies and is documented.

   D. **Prohibition Against Discrimination:** Discriminatory conduct in the sale of real property against individuals belonging to legally protected classes is a violation of the law.

3. **LEGAL AND TAX IMPLICATIONS:** Your Property may have legal, tax, insurance, title or other implications. You should consult an appropriate professional for advice on these matters.

4. **MARKETING CONSIDERATIONS:**

   A. **Pre-Sale Inspections and Considerations:** You should consider doing what you can to prepare your Property for sale. Many people are not aware of defects in or problems with their own Property. One way to make yourself aware is to obtain professional inspections prior to sale. Pre-sale inspections may include a general property inspection and an inspection of the septic or well systems, if any, among others. By doing this, you then have an opportunity to make repairs before your Property is sold, which may enhance its marketability. Keep in mind, however, that any problems revealed by such inspection reports or repairs that have been made, whether or not disclosed in a report, should be disclosed to the buyer (see "Disclosures" in paragraph 2 above). This is true even if the buyer gets his/her own inspections covering the same area. Obtaining inspection reports may also assist you during contract negotiations with the buyer.

   B. **Safety Precautions:** Advertising and marketing your Property for sale, including, but not limited to, placing a

© 2019, California Association of REALTORS®, Inc.

**SVLA 12/19 (PAGE 1 OF 2)**

| The CREM Group, 3900 W. Alameda Ave, Suite 1200 Burbank CA 91505 | Phone: 3236835100 | Fax: | Jinzheng Group |
|---|---|---|---|
| Mark Cianciulli | Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com | | |

**30**

DocuSign Envelope ID: 3D511D59-94BB-4C8C-BA18-13378EFA6050

Keysafe/lockbox, erecting FOR SALE signs, and disseminating photographs, videotapes, and virtual tours of the Property, may jeopardize the safety of your Property. You are strongly encouraged to maintain insurance, and to take any and all possible precautions and safeguards to protect Property, and your belongings, including valuables located on the Property.

**C. Expenses:** You are advised that you, not the Broker, are responsible for the fees and costs, if any, to comply with your duties and obligations to the buyer of your Property.

**5. OTHER ITEMS:**

_____

_____

Seller has read and understands this Advisory. By signing below, Seller acknowledges receipt of a copy of this document.

Seller _____*Zhao Pu Yang*_____ Date ___6/24/2022___
          34929D9DEA804CA...

***Jinzheng Group USA LLC***_____
Print Name

Seller _____ Date _____

_____
Print Name

Real Estate Broker (Listing Firm) ***The CREM Group***_____ DRE Lic# ***02029217***_____

By _____***Mark Cianciulli*** DRE Lic # ***01990266***___ Date __6/24/2022__
     58DE5C4DF6B94F2...

By _____ DRE Lic # _____ Date _____

Address ***3900 W. Alameda Ave, Suite 1200***_____ City ***Burbank***_____ State ***CA***__ Zip ***91505***___

Telephone ***(323)683-5100***_____ Fax _____ E-mail ***mark@cremgroupre.com***_____

© 2019, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

**SVLA 12/19 (PAGE 2 OF 2)**



**SELLER'S VACANT LAND ADVISORY (SVLA PAGE 2 OF 2)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201 www.lwolf.com          Jinzheng Group

31

## CALIFORNIA CONSUMER PRIVACY ACT ADVISORY, DISCLOSURE AND NOTICE
### (C.A.R. Form CCPA, Revised 12/21)

The California Consumer Privacy Act (commencing with Civil Code § 1798.100) ("CCPA") grants to California residents certain rights in their private, personal information ("PI") that is collected by companies with whom they do business. Under the CCPA, PI is defined broadly to encompass non-public records information that could reasonably be linked directly or indirectly to you. PI could potentially include photographs of, or sales information about, your property.

During the process of buying and selling real estate your PI will be collected and likely shared with others, including real estate licensees, a Multiple Listing Service, real estate internet websites, service providers, lenders, and title and escrow companies, to name several possibilities. Businesses that are covered by the CCPA are required to grant you various rights in your PI, including the right to know what PI is collected, "opt out" or stop the transfer of your PI to others, and the right to request that the business delete your PI entirely. You may get one or more notices regarding your CCPA rights from businesses you interact with in a real estate transaction. However, not all businesses that receive or share your PI are obligated to comply with the CCPA. Also, even businesses that are otherwise covered under the CCPA may have a legal obligation to maintain PI, notwithstanding your instruction to the contrary. For instance, regardless of whether they are covered by CCPA, under California law, brokers and Multiple Listing Services are required to maintain their records for 3 years. If you wish to exercise your rights under CCPA, where applicable, you should contact the respective business directly.

You can obtain more information about the CCPA and your rights under the law from the State of California Department of Justice (oag.ca.gov/privacy/ccpa).

**I/we acknowledge receipt of a copy of this California Consumer Privacy Act Advisory, Disclosure and Notice.**

Buyer/Seller/Landlord/Tenant ___*Zhao Pu Yang*_____ Date __6/24/2022__
                          *Jinzheng Group USA LLC*

Buyer/Seller/Landlord/Tenant _____ Date _____

© 2021, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

**CCPA REVISED 12/21 (PAGE 1 OF 1)**

### CALIFORNIA CONSUMER PRIVACY ACT ADVISORY (CCPA PAGE 1 OF 1)

| The CREM Group, 3900 W. Alameda Ave, Suite 1200 Burbank CA 91505 | | Phone: 3236835100 | Fax: | Jinzheng Group |
|---|---|---|---|---|
| Mark Cianciulli | Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201 www.lwolf.com | | | |

DocuSign Envelope ID: 3D511D59-84BB-4C8C-BA18-13278EEA6650



# CALIFORNIA
## ASSOCIATION
### OF REALTORS®

## ADDENDUM No. ____
**(C.A.R. Form ADM, Revised 12/21)**

The following terms and conditions are hereby incorporated in and made a part of the Purchase Agreement, OR ☐ Residential Lease or Month-to-Month Rental Agreement, ☐ Transfer Disclosure Statement (Note: An amendment to the TDS may give the Buyer a right to rescind), ☒ Other _Vacant Land Listing Agreement._ _____,
dated _____ *June 17, 2022* _____ , on property known as _____ *Multiple Addresses; See Addendum #1*
_____ ("Property/Premises"),
in which _____ is referred to as ("Buyer/Tenant")
and _____ *Jinzheng Group USA LLC* _____ is referred to as ("Seller/Landlord").
Buyer/Tenant and Seller/Landlord are referred to as the "Parties."

*A)  The property addresses and APN numbers listed below are to be listed and sold together.*

*1. 2929 Amethyst St, Los Angeles CA 90032: 5209-009-001, Land,*

*2. 2526-2528 Lincoln Park Ave, Los Angeles CA 90031: 5208-025-001, Triplex,*

*3. 2520-2522 Lincoln Park Ave, Los Angeles CA 90031: 5208-025-002, Duplex,*

*4. 2602 Lincoln Park Ave, Los Angeles CA 90031: 5208-025-014, Land,*

*5. 2600 N Sierra St, Los Angeles CA 90031: APN 5209-005-003, Land,*

*6. \*The Paradise Drive Lots include APNs (i) 5209-021-002, -005, -006; (ii) 5209-022-007; (iii) 5209-023-022, -029; -030; -031; -032; and (iv) 5209-025-006.*

The foregoing terms and conditions are hereby agreed to, and the undersigned acknowledge receipt of a copy of this Addendum.

Buyer/Tenant _____ Date _____

Buyer/Tenant _____ Date _____

Seller/Landlord _____ *Zhao Pu Yang* _____ Date 6/24/2022
*Jinzheng Group USA LLC*

Seller/Landlord _____ Date _____

© 2021, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

ADM REVISED 12/21 (PAGE 1 OF 1)

## ADDENDUM (ADM PAGE 1 OF 1)

DocuSign Envelope ID: 3D511D59-84BB-4C8C-BA18-13378EFA6850

CALIFORNIA
ASSOCIATION
OF REALTORS®

**ADDENDUM No. _2_**

**(C.A.R. Form ADM, Revised 12/21)**

The following terms and conditions are hereby incorporated in and made a part of the Purchase Agreement, OR ☐ Residential Lease or Month-to-Month Rental Agreement, ☐ Transfer Disclosure Statement (Note: An amendment to the TDS may cause the Buyer a right to rescind),  ☒ Other *Vacant Land Listing Agreement* ,
dated _____*June 17, 2022*_____ , on property known as _____*Multiple Addresses; See Addendum #1*_____
("Property/Premises"),
in which _____ is referred to as ("Buyer/Tenant")
and _____*Jinzheng Group USA LLC*_____ is referred to as ("Seller/Landlord").
Buyer/Tenant and Seller/Landlord are referred to as the "Parties."

*B). Seller is the Debtor-In-Possession in the United States Bankruptcy Court for the Central District of California, under*
*Proceeding No. _____, Chapter 11, Jinzheng Group USA, LLC, Debtor.*

*C). This Agreement is expressly conditioned upon approval to its terms and conditions by the Bankruptcy Court ("Court").*

*D). All sales are subject to the approval of the Bankruptcy Court.*

*E). All sales commission due hereunder shall be deducted (to the extent possible) from the gross proceeds of the sale of the*
*Property.*

*F). Additional terms attached. Bankruptcy addendum shall control.*

**The foregoing terms and conditions are hereby agreed to, and the undersigned acknowledge receipt of a copy of this Addendum.**

Buyer/Tenant _____   Date _____

Buyer/Tenant _____   Date _____

Seller/Landlord ___*Zhao Pu Yang*_____   Date  6/24/2022
*Jinzheng Group USA LLC*

Seller/Landlord _____   Date _____

© 2021, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

R E B S   Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020



**ADM REVISED 12/21 (PAGE 1 OF 1)**

**ADDENDUM (ADM PAGE 1 OF 1)**

The CREM Group, 3900 W. Alameda Ave, Suite 1200 Burbank CA 91505          Phone: 3236835100          Fax:          Jinzheng Group
Mark Cianciulli          Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201  www.lwolf.com

34

DocuSign Envelope ID: 3D511D59-84BB-4C8C-BA18-13378EFA6650

## **BANKRUPTCY ADDENDUM TO VACANT LAND LISTING AGREEMENT**

Jinzheng Group (USA) LLC ("Seller"), it its capacity as debtor and debtor in possession of its bankruptcy estate in *In re Jinzheng Group (USA) LLC*, Case No. 2:21-bk-16674-ER, agrees to grant The CREM Group and Marcus & Millichap (collectively, "Broker"), the exclusive right to negotiate the sale of multiple parcels of real property described in Addendum #1 (the "Property"), upon the terms and conditions of the foregoing Residential Listing Agreement, together with the Seller Instruction to Exclude Listing from the Multiple Listing Service and Days on Market and other accompanying standard disclosures and advisories (collectively the "Listing Agreement"), as amended by the following terms and conditions:

1.    <u>Addendum</u>.    This document is an addendum to Listing Agreement. Notwithstanding any contrary terms and conditions in the Listing Agreement, this Addendum shall apply.

2.    <u>Deletions from the Listing Agreement</u>.    The following paragraphs of the Listing Agreement shall not apply:

      a.    paragraph 3(E) (irrevocable assignment);

      b.    paragraph 9 (Seller representations);

      c.    paragraph 10(F) (indemnification); and

      c.    paragraph 22 (dispute resolution).

3.    <u>No Dual Agency</u>.    Notwithstanding California law or anything in the Listing Agreement to the contrary, Broker will act as the agent for Seller only and will not act as the agent of both Seller and the purchaser in the transaction.

4.    <u>Commission</u>.    If buyer is not represented in the transaction by a real estate broker, the total commission to Broker shall be 3.5%, instead of 5%. If buyer is represented by a broker, the split of commission shall be 3% to the listing Broker (which shall be split between The CREM Group and Marcus & Millichap per a separate addendum to the Listing Agreement), and 2% to the buyer's broker.

5.    <u>Abandonment</u>.    Seller reserves the right, in its sole discretion, to determine not to sell the Property and to abandon the Property by serving a notice of its intention to abandon the Property in accordance with the Bankruptcy Code and applicable court rules. In the event of any such abandonment, the Listing Agreement and this Addendum shall

1686052.1  27086

terminate and no liability or obligations shall accrue to Seller as a result of any such abandonment and termination.

6.    <u>Conditions of Sale</u>.  Broker agrees and understands that any sale of the Property shall be subject to the following terms and conditions:

a.    Seller is selling the Property in its capacity as the representative of a bankruptcy estate.

b.    If for any reason, or no reason whatsoever, Seller is unable to deliver possession or title to the Property to any potential purchaser, the purchaser's sole remedy shall be the return of any money that the purchaser has deposited towards the purchase of the Property.

c.    Seller is selling the Property on an "AS IS" and "WHERE IS" basis without any representations or warranties whatsoever, including without limitation representations or warranties as to title, oil and mineral rights, city or government agency notifications regarding work to be done, marketability of title, ownership, physical condition, compliance with state, city or federal statutes, codes, ordinances, or regulations, geological stability, zoning, suitability for improvement, and fire insurance policies to cover any improvements on the Property, nor any assurances regarding the subdividability of the Property.

d.    The sale of the Property is subject to Bankruptcy Court approval after notice given in accordance with the Bankruptcy Code and applicable court rules.

e.    The sale of the Property may be subject to overbid at public sale.  Seller reserves the right to reject any and all offers which in its judgment are insufficient.  If overbids are received and the Property is sold to an overbidder, or to the original bidder, at a higher price, the commission to be paid to Broker shall be based upon the higher sale price (not the original bid price).

f.    The purchaser shall, at the purchaser's sole expense, acquire any and all insurance policies that the purchaser desires to cover the Property.  Seller does not agree to acquire or transfer any insurance policies to the purchaser.

g.    The purchaser is to arrange for all financing of the acquisition of the Property before the close of escrow.

h.    All escrow fees shall be shared and paid on a 50/50 basis by Seller and the purchaser.

1686052.1  27086

      i.      The Property is being sold subject to:

      (1)      All general and special taxes that are presently due, or may become due, regarding the Property, other than property taxes, which shall be prorated as of the close of escrow; and

      (2)      Any and all easements, restrictions, rights and conditions of record and rights of way, against, on or regarding the Property.  Title, however, is to be transferred free and clear of secured claims of record.

7.      <u>Payment of Commission</u>. The commission to be paid to Broker shall only be paid from the proceeds of the sale of the Property.  The payment of commission is subject to prior approval of the Bankruptcy Court.

8.      <u>Limitation of Liability of Broker</u>.  Broker's liability is limited to the amount of Broker's commission hereunder in the event of any damages caused by negligence or unwilful misconduct by Broker.

9.      <u>Entire Agreement</u>. This Addendum and the Listing Agreement (and attachments thereto), to the extent that the Listing Agreement is not contrary to the terms and conditions herein, constitute the entire contract between the parties.  Their terms are intended by the parties as a final expression of their agreement with respect to such terms as are included herein, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement.  The parties further intend that this this Addendum and the Listing Agreement constitute the complete, final and exclusive statement of their terms and that no extrinsic evidence whatsoever may be introduced in any judicial or arbitration proceeding, if any, involving this agreement.

10.      <u>Bankruptcy Court Jurisdiction</u>. The United States Bankruptcy Court for the Central District of California shall have exclusive jurisdiction to resolve any and all disputes relating to this Addendum and the Listing Agreement sitting without a jury, which is specifically waived.  This agreement and any disputes related thereto shall be governed by California law, to the extent not pre-empted by federal law.

Date:  June __, 2022              Date:  June __, 2022

"SELLER"                     "BROKER"

Jinzheng Group (USA) LLC           The CREM Group

1686052.1  27086

3

DocuSigned by:

_Zhao Pu Yang_    6/24/2022

B3929D971186AC4...

By:  Zhao Pu Yang

DocuSigned by:

6/24/2022

58DE5C4DF5B9452...

By:  Mark Cianciulli

"BROKER"
Marcus & Millichap

DocuSigned by:

6/24/2022

4AFB43130F3A4D9...

By:  Lonnie McDermott

1686052.1  27086

4

**38**

DocuSign Envelope ID: 3D511DB9-84BB-4C8C-BA18-13378EFA6650

CALIFORNIA
ASSOCIATION
OF REALTORS®

# REPRESENTATIVE CAPACITY SIGNATURE DISCLOSURE
## (FOR SELLER REPRESENTATIVES)
### (C.A.R. Form RCSD-S, Revised 12/21)

This form is not an assignment. It should not be used to add new parties after a contract has been formed. The purpose of this form is to identify who the principal is in the transaction and who has authority to sign documents on behalf of the principal.

☐ The disclosure in this form supersedes any Legally Authorized Signer representation or Representative Capacity Signature Disclosure made in the Agreement specified below or on separate form.

This is a disclosure to the Purchase Agreement, OR ☐ Listing Agreement, ☒ Other *Vacant Land Listing Agreement* ("Agreement"), dated *06/17/2022* , for the property known as *Multiple Addresses; See Addendum #1, ,* ("Property"), between *The CREM Group* ("Buyer", ☒ Listing Broker). And *Jinzheng Group USA LLC* ("Seller").

Buyer and Seller are referred to as the "Parties." If a trust, in the blank line above identify Seller as the trustee(s) of the trust or by simplified trust name (ex. John Doe, co-trustee, Jane Doe, co-trustee or Doe Revocable Family Trust 3). Full name of trust should be identified in 1A below. If power of attorney, insert principal's name as Seller.

**1. A.** ☐ **TRUST:** (1) The Property is held in trust pursuant to a trust document, titled (Full name of trust): _____

_____ dated _____

(2) The person(s) signing below is/are Sole/Co/Successor Trustee(s) of the Trust.

**B.** ☒ **ENTITY:** Seller is a ☐ Corporation, ☒ Limited Liability Company, ☐ Partnership ☐ Other: _____

which has authorized the officer(s), managing member(s), partner(s) or person(s) signing below to act on its behalf. An authorizing resolution of the applicable body of the entity described above ☐ is ☒ is not attached.

**C.** ☐ **POWER OF ATTORNEY:** Seller ("Principal") has authorized the person(s) signing below ("Attorney-In-Fact", "Power of Attorney" or "POA") to act on his/her behalf pursuant to a General Power of Attorney (☐ Specific Power of Attorney for the Property), dated _____. **This form is not a Power of Attorney. A Power of Attorney must have already been executed before this form is used.**

**D.** ☐ **ESTATE:** (1) Seller is an ☐ estate, ☐ conservatorship, or ☐ guardianship, identified by Superior Court Case name as _____ , Case #_____ .

(2) The person(s) signing below is/are court approved representatives (whether designated as Sole or Co-Executor, Administrator, Conservator, Guardian) of the estate, conservatorship or guardianship identified above.

**2.** Seller's Representative represents that the trust, entity or power of attorney for which that Party is acting already exists.

**Seller:**

By _____ Date: 6/24/2022

*Zhao Pu Yang*

(Sign Name of Trustee, Officer, Managing Member, Partner, Attorney-in-Fact or Administrator/Executor)

(Print Representative Name) *Zhao Pu Yang* Title: Attorney in Fact for Managing Member, Jianqing Yang

By _____ Date: _____

(Sign Name of Trustee, Officer, Managing Member, Partner, Attorney-in-Fact or Administrator/Executor)

(Print Representative Name) _____ Title: _____

**Acknowledgement of Receipt by Other Party:**

| AT TIME OF SALE |
|---|
| Seller and _____ ("Buyer") are parties to a Purchase Agreement dated _____ for property known as *Multiple Addresses; See Addendum #1, ,* _____ . |
| Buyer _____ Date _____ |
| Buyer _____ Date _____ |

© 2021, California Association of REALTORS®, Inc.

**RCSD-S REVISED 12/21 (PAGE 1 OF 2)**

EQUAL HOUSING OPPORTUNITY

**REPRESENTATIVE CAPACITY SIGNATURE DISCLOSURE (RCSD-S PAGE 1 OF 2)**

The CREM Group, 3900 W. Alameda Ave, Suite 1200 Burbank CA 91505     Phone: 3236835100     Fax:     Jinzheng Group
Mark Cianciulli     Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com

**AT TIME OF LISTING AGREEMENT**

Seller and _____ **The CREM Group** _____ ("Seller's Broker")

are parties to a Listing Agreement dated __6/17/2022__ .

Real Estate Broker _____ **The CREM Group** _____

By _**Mark Cianciulli**_____    Date __6/24/2022__

DocuSigned by:

58DE5C4DF6B94F2...

© 2021, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

**RCSD-S REVISED 12/21 (PAGE 2 OF 2)**



**REPRESENTATIVE CAPACITY SIGNATURE DISCLOSURE (RCSD-S PAGE 2 OF 2)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX  75201    www.lwolf.com        Jinzheng Group

**40**

**CALIFORNIA
ASSOCIATION
OF REALTORS®**

# ADDITIONAL BROKER ACKNOWLEDGEMENT
**(C.A.R. Form ABA, Revised 12/21)**

This is an addendum to the Purchase Agreement, OR ☐ Listing Agreement, ☒ Other *Vacant Land Listing Agreement* _____
(collectively, "Agreement"),
dated *06/17/2022*, on property known as *Multiple Addresses; See Addendum #1, ,* _____
between _____ *The CREM Group* _____ ("Buyer/Tenant/Broker")
and _____ *Jinzheng Group USA LLC* _____ ("Seller/Landlord").

**1. LISTING AGREEMENT:**
Co-Listing Brokers:

_____ *The CREM Group* _____ (Broker 1) and
_____ *Marcus & Millichap* _____ (Broker 2) are
Co-listing Brokers under the Listing Agreement identified above and agree to share responsibility and compensation for the representation of Seller/Landlord as follows: *Agreed upon compensation 2% to Marcus & Millichap, 1% to The CREM Group.If Buyer is not represented in the transaction, 2.25% to Marcus & Millichap, 1.25% to CREM Group.*
(☒ on the terms of the attached agreement).

**2. PURCHASE AGREEMENT/OTHER:**
Check **ONE** box **ONLY**. If more than one applies, use separate forms for each.
**A.** ☒ Multiple Brokers Representing Seller/Landlord**:**

_____ *The CREM Group* _____ (Broker 1) and
_____ *Marcus & Millichap* _____ (Broker 2) are
parties to a Residential Listing Agreement, ☒ Other *Vacant Land Listing Agreement* dated *06/17/2022*
in which they have agreed to share responsibility and compensation for the representation of Seller/Landlord.

**OR B.** ☐ Multiple Brokers Representing Buyer/Tenant:

_____ _____ (Broker 1) and
_____ _____ (Broker 2) are
real estate brokers who have entered into an agreement to share responsibility and compensation for the representation of Buyer/Tenant.

**3.** ☐ Activity under the license of Broker 1 and/or Broker 2 will be conducted by multiple associate licensees, partners or teams as indicated on the attached Additional Agent Acknowledgement form(s) (C.A.R. Form AAA).

**4.** By signing below, all parties understand, acknowledge and agree that, wherever the name of either Broker 1 or Broker 2, as applicable, is indicated in the Agreement or related documents, as a representative for the Buyer or Seller specified in 1, 2A or B above, the other Broker shall also be deemed to be named. Buyer/Tenant signatures are not necessary if this form is only used as part of a Listing Agreement.

Real Estate Broker (Broker 1) *The CREM Group* _____ DRE Lic.# *02029217*
By _____ *Mark Cianciulli* DRE Lic.# *01990266* _____ Date 6/24/2022
Real Estate Broker (Broker 2) *Marcus & Millichap* _____ DRE Lic.# *00530854*
By _____ *Lonnie McDermott* DRE Lic.# *01874375* _____ Date 6/24/2022
Seller/Landlord _____ *Jinzheng Group USA LLC* Date 6/24/2022
Seller/Landlord _____ Date _____
Buyer/Tenant _____ Date _____
Buyer/Tenant _____ Date _____

© 2021, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020



**ABA REVISED 12/21 (PAGE 1 OF 1)**

## ADDITIONAL BROKER ACKNOWLEDGEMENT (ABA PAGE 1 OF 1)

The CREM Group, 3900 W. Alameda Ave, Suite 1200 Burbank CA 91505          Phone: 3236835100          Fax:          Jinzheng Group
Mark Cianciulli          Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201    www.lwolf.com

# EXHIBIT "2"

1  ZEV SHECHTMAN (State Bar No. 266280)
   *zs@DanningGill.com*
2  JOHN N. TEDFORD, IV (State Bar No. 205537)
   *jtedford@DanningGill.com*
3  DANIELLE R. GABAI (State Bar No. 339242)
   *dgabai@DanningGill.com*
4  DANNING, GILL, ISRAEL & KRASNOFF, LLP
   1901 Avenue of the Stars, Suite 450
5  Los Angeles, California 90067-6006
   Telephone: (310) 277-0077
6  Facsimile: (310) 277-5735

7  Attorneys for JinZheng Group (USA) LLC

**FILED & ENTERED**

**JUL 12 2022**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gonzalez  DEPUTY CLERK

**CHANGES MADE BY COURT**

8              **UNITED STATES BANKRUPTCY COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10             **LOS ANGELES DIVISION**

11  In re

12  JINZHENG GROUP (USA) LLC,

13              Debtor and Debtor in
                Possession

14

15

16

17

18              .

19

Case No. 2:21-bk-16674-ER

Chapter 11

**ORDER ~~APPROVING~~ GRANTING
APPLICATION TO EMPLOY REAL
ESTATE BROKERS AND TO ENTER
INTO EXCLUSIVE LISTING
AGREEMENT [Docket No. 263]**

[No Hearing Required]

20        On June 23, 2022, Jinzheng Group (USA) LLC, the debtor and debtor-in-possession herein

21  (the "Debtor"), filed it *Notice of Application and Application to Employ Real Estate Brokers and to*

22  *Enter into Exclusive Listing Agreement* (the "Application") (docket no. 263).[1]

23        The Court having read and considered the Application, all papers filed in support thereof,

24  including the Declaration of Zhao Pu Yang, Statements of Disinterestedness, and all of the other

25  pleadings on file in the Debtor's case; having found that notice of the Application was adequate

26

27  _____
   [1] Defined terms have the same meaning as in the Application.

28

1687856.1  27086                          1

and proper; having received no objection or request for hearing; and for good cause appearing, it is hereby

**ORDERED THAT:**

1.      The Application is approved in its entirety <span style="color:red">and compensation shall be awarded pursuant to 11 U.S.C. §328.</span>

2.      The Debtor is authorized to employ The Crem Group through its agents, Daniel Taylor and Mark Cianciulli, and Marcus & Millichap through its agent, Lonnie McDermott, as its real estate brokers, <span style="color:red">effective as of June 23, 2022</span> (collectively, the "Brokers").

3.      The Debtor is authorized to enter into the Listing Agreement with the Brokers in the form attached as Exhibit "1" to the Application.

4.      The Debtor is further authorized to take such other actions, and execute such documents, as necessary or appropriate to list and market the property for sale.

<span style="color:red">IT IS SO ORDERED.</span>

###

Date: July 12, 2022

Ernest M. Robles
United States Bankruptcy Judge

# EXHIBIT "3"

**2929 Amethyst St**
Los Angeles, CA 90032

LP $12,000,000


Active




| Area | 1375 Lincoln Heights |
|---|---|
| Subdivision | |
| Zoning | LAA1 |
| Horse Property | |
| Present Use | |
| Potential Usage | |
| MLS# | 22-210161 |
| APN | 5209-009-001 |

**Directions:** Multiple Properties.  See Remarks.

**Remarks:** We are pleased to present Skyline View Estates Portfolio, a 1,439,454 SF development opportunity located in Los Angeles, CA. The bulk of the property is hillside located off of Lincoln Park Ave to the West, N Broadway to the South, and Paradise Dr along the top of the hill on the Eastern edge. The portfolio includes 15 APNs, with additional lots along Sierra St, Lincoln Park Ave, and Paradise Dr. The portfolio is part of a Bankruptcy Sale and is subject to court confirmation. Property is sold as is. The property includes multiple zoning, the main lot is zoned [Q]A1-1D, with additional lots zoned [Q]R1-1D and [Q]RE20-1D. The property has proposed plans for 70 residential units. Access to the property is currently through narrow two lane partially improved streets, which are proposed to be improved. The proposed units will have panoramic views of the Los Angeles downtown and surrounding environments. Proposed improvements also include sidewalk and interior streets, small park and perimeter gate and entry secured community. The subject site is not entitled and has no approved plans for residential subdivision development. Plans have been submitted and the approval process is on-going with the city of Los Angeles. The subject property is located minutes away from Downtown Los Angeles, Chinatown, Dodger Stadium, and Pasadena. The property is also nearby Cal State Los Angeles, and East Los Angeles College. The property boasts beautiful views of Downtown Los Angeles, the Hollywood Sign, and on clear days even the Pacific Ocean. The property has easy access to the 5-Freeway, to the West, the 10 Freeway to the East, the 710 Freeway to the South, and the 110 Freeway to the North.

**Agent Remarks:** This is a bankruptcy sale. The sale of the Property is subject to Bankruptcy Court approval after notice given in accordance with the Bankruptcy Code and applicable court rules. Portfolio includes APN#s 5209-009-001, 5208-025-001, 5208-025-002, 5209-005-003, 5208-025-014, 5209-021-002, 5209-021-005, 5209-021-006, 5209-021-007, 5209-023-022, 5209-023-029, 5209-023-030, 5209-023-031, 5209-023-032, 5209-025-006

| ⬡ Land/Lot Info | | | 🖼 Potential/Present Land Use | | | 🔧 contract info | | DOM 8 |
|---|---|---|---|---|---|---|---|---|
| Land Type | | | Cleared | | | List Date | 10-20-2022 | |
| Addl Parcel | | | Staked | | | List Price | $12,000,000 | |
| Lot Dimen | | | Usable Land % | | | Orig List Price | $12,000,000 | |
| Lot Descr. | | | Current Geological | | | Status Date | 10-20-2022 | |
| Lot Location | | | Bonds & Asmt | | | Change Date/Type | 10-28-2022/Active | |
| View | Other | | Fenced | | | Sale Type | Notice Of Default | |
| Waterfront | | | Soil Type | | | Probate Y/N | | |
| Telephone | No | | Trees | | | Court Approval | | |
| TV/Cable | No | | Special Zone | Other | | CSO | 2% | |
| Electric Service | | | PUD | | | Listing Type | Exclusive Agency | |
| Gas | | | Elevation ASL | | | Disclosure | Bankruptcy | |
| Sewer | | | Fence Condition | | | Concessions Amount | | |
| Telephone Service | | | Possible New Zone | | | Avail for Lease | | |
| Price Per Acre | | | Streets | | | Lease Option | | |
| Land Value | | | Assessments | | | Financing | | |
| Land Value % | | | Cert of Compliance | | | Listing Terms | | |
| Road Frontage | | | On File | | | Possession | | |
| Lease per Mo/Yr | | | Site | Varied, Hillside | | Scope Of Service | Full Service | |
| Tract Map | | | Survey | | | LBA | | |
| Units per Acre | | | Topography | Varied | | Variable Rate Comm | | |
| Public Street | | | | | | | | |

| 🏘 Community/Development | | 💧 Water Details | | 🔒 Sale/Sold Info | |
|---|---|---|---|---|---|
| HOA Dues | | Water Type | | Contract Date | |
| Subdivision | | Water Table Depth | | Sold Date | |
| Tract Name | | Water Well | | Sold Price | |
| Builders Name | | Water District | | Sold Price/SqFt | |
| Builders Tract Code | | Well Depth | | Sale Terms | |
| Builders Model Code | | Well Gallons Per Minute | | SP/LP | |
| Builders Model Name | | Well Hole Size | | | |
| Complex/Assoc Name | | Well Pump Horsepower | | | |
| Complex/Assoc Phone | | | | | |

46

### Tax, Liens &c.

| | | | |
|---|---|---|---|
| **Lien Release (Y/N)** | | **Distance To House of Worship** | **Cross Streets** | |
| **Present Loans** | | | **Country** | UNITED STATES OF AMERICA |
| **Tax Rate** | | **Distance To Electric** | | |
| **Tax Rate Total** | | **Distance To Freeway** | **Map** | |
| **Tax Rate Year** | | **Distance To Gas** | **School District** | |
| **Tax Total** | | **Distance To Phone Service** | **Elementary** | |
| **Gross Equity** | | | **Junior HS** | |
| **Have** | | **Distance To Schools** | **Senior HS** | |
| **Improvements** | | **Distance To Sewer** | | |
| **Improvements Amount** | | **Distance To Stores** | | |
| **Improvements Percent** | | **Distance To Street** | | |
| **Ingress/Egress** | | **Distance To Water** | | |
| **Personal Property Amount** | | | | |
| **Personal Property Percent** | | | | |
| **Tax Area** | | | | |

### Showing Info

| | | | |
|---|---|---|---|
| **Contact Name** | | **Lockbox Location** | |
| **Contact Phone** | | **Lockbox Type** | |
| **Occupancy/Show** | | **Occupant Type** | |
| | | **Gate Code** | |

**Mark Cianciulli**
**The CREM Group DRE#: 02029217**
**Seller's Agent1 CALDRE#: 01990266**

| | |
|---|---|
| **Phone / Cell** | p: 323-208-9512 / c: 323-208-9512 |
| **Email** | mark@cremgroupre.com |
| **Fax** | |
| **Office Phone / Fax** | p: 323-347-1009 |

**Lonnie McDermott**
**Marcus & Millichap DRE#: 00530854**
**Seller's Agent2 CALDRE#: 01874375**

| | |
|---|---|
| **Phone / Cell** | p: 818-212-2745 / c: 818-577-8904 |
| **Email** | lonnie.mcdermott@marcusmillichap.com |
| **Fax** | 818-212-2710 |
| **Office Phone / Fax** | p: 818-212-2700 / f: 818-212-2710 |

**NOTICE:** Due to COVID-19, DOM was frozen and not recorded in the history from March 15, 2020 to July 5, 2020.Broker/Agent does not guarantee the accuracy of the square footage, lot size or other information concerning the conditions or features of the property provided by the seller or obtained from Public Records or other sources. Buyer is advised to independently verify the accuracy of all information through personal inspection and with appropriate professionals. The property may have video/surveillance devices. VESTA*PLUS*™ Copyright © 2022 by TheMLS™. Information deemed reliable but not guaranteed. Presented by: Daniel Taylor CALDRE# 01889109

# EXHIBIT "4"



FILED & ENTERED

MAY 18 2022

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gonzalez  DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA—LOS ANGELES DIVISION

|  |  |
|---|---|
| In re:    Jinzheng Group (USA) LLC,<br>Debtor. | Case No.: 2:21-bk-16674-ER<br>Chapter:  11<br><br>**ORDER DENYING MOTION FOR RELIEF FROM THE AUTOMATIC STAY WITHOUT PREJUDICE**<br><br>**[RELATES TO DOC. NO. 127]**<br><br>Date:     May 17, 2022<br>Time:     10:00 a.m.<br>Location:  Courtroom 1568<br>           Roybal Federal Building<br>           255 East Temple Street<br>           Los Angeles, CA 90012 |

At the above-captioned date and time, the Court conducted a hearing on the *Motion for Relief from the Automatic Stay Under § 362* [Doc. No. 127] (the "RFS Motion") filed by Royalty Equity Lending LLC. Good cause appearing therefor, the Court **HEREBY ORDERS AS FOLLOWS:**

1) The tentative ruling [Doc. No. 223] is adopted as the final ruling (the "Ruling") and is incorporated herein by reference. The findings supporting the entry of this Order are set forth in the Ruling.
2) The RFS Motion is **DENIED WITHOUT PREJUDICE**.

IT IS SO ORDERED.

###

Date: May 18, 2022

Ernest M. Robles
United States Bankruptcy Judge

# United States Bankruptcy Court
## Central District of California
### Los Angeles
### Ernest Robles, Presiding
### Courtroom 1568 Calendar

---

**Tuesday, May 17, 2022**                                    **Hearing Room     1568**

---

<u>10:00 AM</u>
**2:21-16674     JINZHENG GROUP (USA) LLC**                          **Chapter 11**

####    #7.00    Hearing
RE: [135]  MOTION TO CHANGE MEMBERSHIP AND DISBAND OFFICIAL
COMMITTEE OF UNSECURED CREDITORS PURSUANT TO 11 U.S.C. §§
1102(a)(4) and 105(a)  LLC  (Langley, Christopher)

fr. 3-22-22; 5-4-22

Docket        135

**Tentative Ruling:**

5/16/2022

**Note: Parties may appear at the hearing either in-person or by telephone. The use
of face masks in the courtroom is optional. Parties electing to appear by telephone
should contact CourtCall at 888-882-6878 no later than one hour before the
hearing.**

For the reasons set forth below, (1) the Debtor's motion to disband the Official
Committee of Unsecured Creditors is **DENIED**; (2) the Debtor's second motion to
extend its plan exclusivity periods is **DENIED**; (3) the application of the Official
Committee of Unsecured Creditors to employ Pachulski, Stang, Ziehl & Jones LLP as its
general bankruptcy counsel is **GRANTED**; and (4) Royal Equity Lending's motion for
relief from the automatic stay is **DENIED**.

**Pleadings Filed and Reviewed:**
1)  Debtor's Motion to Change Membership and Disband Official Committee of
    Unsecured Creditors:
    a)  Motion to Change Membership and Disband Official Committee of Unsecured
        Creditors Pursuant to 11 U.S.C. §§ 1102(a)(4) and 105(a) [Doc. No. 135] (the
        "Disbandment Motion")
    b)  Opposition of the Official Committee of Unsecured Creditors to Debtor's Motion
        to Change Membership and Disband Official Committee of Unsecured Creditors
        Pursuant to 11 U.S.C. §§ 1102(a)(4) and 105(a) [Doc. No. 201]
    c)  Reply in Support of Motion to Change Membership and Disband Official
        Committee of Unsecured Creditors Pursuant to 11 U.S.C. §§ 1102(a)(4) and

# United States Bankruptcy Court
## Central District of California
### Los Angeles
### Ernest Robles, Presiding
### Courtroom 1568 Calendar

---

**Tuesday, May 17, 2022**                                    **Hearing Room    1568**

---

<u>10:00 AM</u>
**CONT...**      **JINZHENG GROUP (USA) LLC**                          **Chapter 11**

    105(a) [Doc. No. 213]

    d)  United States Trustee's Statement in Response to Motion to Change Membership and Disband Official Committee of Unsecured Creditors Pursuant to 11 U.S.C. §§ 102(a)(4) and 105(a) [Doc. No. 215]

  2)  Second Motion of Debtor for Order Extending Debtor's Exclusivity Period to File Chapter 11 Plan and Solicit Acceptances Thereto:

    a)  Second Motion of Debtor for Order Extending Debtor's Exclusivity Period to File Chapter 11 Plan and Solicit Acceptances Thereto [Doc. No. 169]

      i)  Notice of Motion [Doc. No. 170]

      ii)  Amended Notice of Motion [Doc. No. 181]

    b)  Response of the Official Committee of Unsecured Creditors to Debtor's Second Motion for Order Extending Debtor's Exclusivity Period to File Chapter 11 Plan and Solicit Acceptances Thereto [Doc. No. 202]

      i)  Supplement to the Response of the Official Committee of Unsecured Creditors to Debtor's Second Motion for Order Extending Debtor's Exclusivity Period to File Chapter 11 Plan and Solicit Acceptances Thereto [Doc. No. 217]

    c)  Opposition to Second Motion of Debtor for Order Extending Debtor's Exclusivity Period to File Chapter 11 Plan and Solicit Acceptances Thereto [filed by Royal Equity Lending] [Doc. No. 203]

    d)  Reply in Support of Second Motion of Debtor for Order Extending Debtor's Exclusivity Period to File Chapter 11 Plan and Solicit Acceptances Thereto [Doc. No. 214]

  3)  RFS Motion:

    a)  Motion for Relief from the Automatic Stay Under § 362 [Doc. No. 127]

      i)  Memorandum of Points and Authorities Re Motion for Relief from the Automatic Stay [Doc. No. 128]

    b)  Joint Opposition of Debtor and Official Committee of Unsecured Creditors to Motion for Relief from the Automatic Stay Under 11 U.S.C. § 362 [Doc. No. 148]

  4)  Employment Application:

    a)  Application for an Order Authorizing and Approving the Employment of Pachulski Stang Ziehl & Jones LLP as Counsel to the Official Committee of Unsecured Creditors, Effective as of January 25, 2022 [Doc. No. 98]

    b)  Notice of Hearing on [Employment Application] [Doc. No. 130]

    c)  Stipulation [Withdrawing Debtor's Opposition to Employment Application] [Doc. No. 211]

**United States Bankruptcy Court**
**Central District of California**
**Los Angeles**
**Ernest Robles, Presiding**
**Courtroom 1568 Calendar**

Tuesday, May 17, 2022                                                    **Hearing Room    1568**

10:00 AM
**CONT...        JINZHENG GROUP (USA) LLC**                                    **Chapter 11**

## I. Facts and Summary of Pleadings

On August 24, 2021 (the "Petition Date"), Jinzheng Group (USA) LLC (the "Debtor") filed a voluntary Chapter 11 petition. The Debtor's primary asset is 32 acres of undeveloped land located near downtown Los Angeles. The Debtor's objective is to create a residential housing development on the land.

From the Petition Date until November 21, 2021, the Debtor was represented by the Law Offices of Donna Bullock ("Bullock"). On December 6, 2021, the Debtor filed a *Substitution of Attorney* form which stated that Shioda, Langley & Chang LLP ("SLC") had been retained as its new reorganization counsel. On January 18, 2022, the Court approved SLC's employment as the Debtor's general bankruptcy counsel, effective as of November 21, 2021. Doc. No. 81.

On January 18, 2022, the Court extended the Debtor's exclusive deadline to file a Chapter 11 Plan to and including April 21, 2022, and extended the Debtor's exclusive period to solicit acceptances of its Plan to and including May 20, 2022. Doc. No. 80. The extension of exclusivity was without prejudice to the ability of any interested party to file a motion to terminate exclusivity.

As of the Petition Date, Royal Equity Lending ("REL") asserted a claim against the Debtor in the amount of $9,353,009.29. The loan giving rise to REL's claim (the "Loan") is secured by four parcels of real property (the "Properties").

**A. Appointment of the Official Committee of Unsecured Creditors**

On January 25, 2022, the United States Trustee (the "UST") appointed the following three creditors to serve on the Official Committee of Unsecured Creditors (the "Committee"): (1) Betula Lenta, Inc. ("Betula"), (2) Pennington Construction Advisors, Inc. ("Pennington"), and (3) The Phalanx Group, Inc. ("Phalanx"). Doc. No. 93.

On March 30, 2022, the Court conducted hearings on the Debtor's objections to the claims asserted by Betula, Pennington, and Phalanx. As more fully described below, the Court (1) found that an evidentiary hearing was required to adjudicate the validity of Betula's claim; (2) found that Phalanx holds a general unsecured claim in the amount of $158,845, with such finding being without prejudice to the Debtor's ability to file a renewed objection to Phalanx's claim after conducting further discovery; and (3) disallowed Pennington's claim.

1. Betula's Proof of Claim

Betula asserts a general unsecured claim in the amount of $1,643,977.00. *See* Proof of Claim No. 18-1 ("Claim 18"). Claim 18 is based upon several contracts executed

# United States Bankruptcy Court
## Central District of California
### Los Angeles
### Ernest Robles, Presiding
### Courtroom 1568 Calendar

---

**Tuesday, May 17, 2022**                                                                 **Hearing Room    1568**

---

<u>10:00 AM</u>
**CONT...        JINZHENG GROUP (USA) LLC**                                                    **Chapter 11**

between the Debtor and Betula (collectively, the "Betula Contracts"), under which Betula agreed to (1) assist the Debtor in obtaining the entitlements necessary to develop the vacant land, (2) arrange for and supervise the construction of infrastructure improvements on the vacant land, and (3) assist the Debtor in obtaining financing to develop the vacant land.

At the March 30, 2022 hearing, the Court found that an evidentiary hearing was required to adjudicate the validity of Betula's claim. Doc. No. 174. The evidentiary hearing is set for the week of October 24, 2022. Doc. No. 189.

On February 7, 2022, the Debtor filed a complaint against Betula and other parties in the Los Angeles Superior Court (Case No. 22-STCV-04623) (the "Betula Action"). In the Betula Action, the Debtor alleges that Betula and other parties conspired to charge the Debtor over $12 million in false service fees under the Betula Contracts. The Debtor seeks general damages exceeding $5 million, plus special damages, punitive damages, and attorney's fees and costs. On April 14, 2022, Betula removed the Betula Action to this Court.

<u>2. Phalanx's Proof of Claim</u>

Phalanx asserts a general unsecured claim in the amount of $158,845. *See* Proof of Claim No. 17-1 ("Claim 17"). Claim 17 is based upon a *Security Consulting Contract* (the "Phalanx Contract"), under which Phalanx agreed to provide security consulting services to the Debtor, including (1) assisting in the design of a security system to protect the vacant land, (2) acting as a liaison between the Debtor and adjacent residential property owners, (3) assessing and mitigating gang activity surrounding the project, (4) providing daily property visits, and (5) furnishing and managing a third-party security patrol service to protect the vacant land.

At the March 30, 2022 hearing, the Court found that Phalanx holds a general unsecured claim in the amount of $158,845. Doc. No. 173. The Court's ruling was without prejudice to the Debtor's ability to file a renewed objection to Phalanx's claim after conducting further discovery. Doc. No. 192.

<u>3. Pennington's Proof of Claim</u>

Pennington asserts a general unsecured claim in the amount of $75,000. *See* Proof of Claim 20-1 ("Claim 20"). The contract upon which Pennington's claim is based is between Pennington and Betula.

Pennington did not oppose the Debtor's objection to its claim. At the March 30, 2022 hearing, the Court disallowed Pennington's claim in its entirety. Doc. Nos. 172 and 190.

# United States Bankruptcy Court
## Central District of California
### Los Angeles
### Ernest Robles, Presiding
### Courtroom 1568 Calendar

**Tuesday, May 17, 2022**                                              **Hearing Room      1568**

<u>10:00 AM</u>
**CONT...       JINZHENG GROUP (USA) LLC**                                        **Chapter 11**

### B. Amendment of the Committee's Membership

On March 31, 2022, the UST amended the Committee's membership by removing Pennington from the Committee. As a result, the Committee is now composed of two members—Betula and Phalanx.

### C. Initial Hearing on REL's Motion for Relief from the Automatic Stay

On March 30, 2022, the Court conducted an initial hearing on REL's motion for relief from the automatic stay as to the Properties (the "RFS Motion"). Upon the request of REL, the Court continued the RFS Motion to provide the Debtor and REL additional time to negotiate potential adequate protection payments with respect to the Properties. The Court fixed May 9, 2022 as the deadline for the parties to file any additional papers on the RFS Motion. No additional papers have been filed.

### D. Summary of Papers Filed in Connection with the Debtor's Motion to Disband the Committee

The Debtor moves for the disbandment of the Committee (the "Disbandment Motion"). First, the Debtor argues that Betula must be removed from the Committee because it is an insider with an unavoidable conflict of interest. The Debtor's theory is that Betula is a statutory insider pursuant to § 101(31)(a)(iv) because it is a "person in control of the Debtor." In support of this contention, the Debtor cites declaration testimony from the Debtor's former counsel, Bullock, in which Bullock testifies that prior to the filing of the petition, a secretary from Betula contacted her to review the Debtor's resolution to hire a Chief Restructuring Officer. The Debtor notes that if Betula is removed from the Committee, the Committee will be left with only Phalanx as a member. Since a "committee of one has been held insufficient," 7 Collier on Bankruptcy ¶ 1102.02[2][a][iv], the Debtor argues that the Committee must be disbanded.

The Committee opposes the Disbandment Motion. First, it argues that it is not clear whether the Court has authority to disband a committee, since the Bankruptcy Code contains no specific provision authorizing disbandment of a committee. Even if disbandment is within the Court's authority, the Committee contends that disbandment is not warranted and that the Committee is properly constituted. The Committee asserts that even if Betula is an insider, that would not necessarily disqualify Betula from serving on the Committee. The Committee "takes no position on whether Betula had been an insider of the Debtor at any point in time." Doc. No. 201 at 10.

The UST's position is that a ruling on the Disbandment Motion would be premature because the evidentiary hearing on the validity of Betula's claim is not scheduled to take place until the week of October 24, 2022. The UST requests that the Disbandment

**United States Bankruptcy Court**
**Central District of California**
Los Angeles
**Ernest Robles, Presiding**
**Courtroom 1568 Calendar**

---

**Tuesday, May 17, 2022**                                                                 **Hearing Room    1568**

---

10:00 AM
**CONT...      JINZHENG GROUP (USA) LLC**                                                       **Chapter 11**

Motion either be denied without prejudice, or be continued to a date after the Court has
adjudicated the validity of Betula's claim.

### E. Summary of Papers Filed in Connection with the Debtor's Motion for an Extension of Exclusivity

The Debtor moves for a second extension of its exclusive periods for filing a Plan and
soliciting acceptances thereon (the "Second Exclusivity Motion"). Specifically, the
Debtor seeks to extend the exclusive period for filing a Plan for 120 days, from April 21,
2022 to August 19, 2022, and to extend the exclusive period for soliciting acceptances of
a Plan from May 20, 2022 to September 17, 2022.

The Committee opposes the Second Exclusivity Motion. The Committee argues that
the Debtor has filed a Plan that likely would not pass the best-interests-of-creditors test
and would not garner sufficient creditor support to provide one consenting impaired
class. Provided that exclusivity is not extended, the Committee is prepared to offer an
alternative Plan that it believes unsecured creditors will favor.

REL, the Debtor's secured lender, also opposes the Second Exclusivity Motion. It
argues that the Debtor's motive for seeking a further extension of exclusivity is to
prevent creditors from filing a competing Plan.

## II. Findings of Fact and Conclusions of Law
### A. The Disbandment Motion is Denied

Section 1102(a)(4) provides:

> On request of a party in interest and after notice and a hearing, the court may
> order the United States trustee to change the membership of a committee
> appointed under this subsection, if the court determines that the change is
> necessary to ensure adequate representation of creditors or equity security
> holders. The court may order the United States trustee to increase the number of
> members of a committee to include a creditor that is a small business concern (as
> described in section 3(a)(1) of the Small Business Act), if the court determines
> that the creditor holds claims (of the kind represented by the committee) the
> aggregate amount of which, in comparison to the annual gross revenue of that
> creditor, is disproportionately large.

To determine whether a committee provides "adequate representation," courts consider
factors including "the ability of the committee to function, the nature of the case, the
standing and desires of the various constituencies, the ability for creditors to participate

**United States Bankruptcy Court**
**Central District of California**
**Los Angeles**
**Ernest Robles, Presiding**
**Courtroom 1568 Calendar**

---

**Tuesday, May 17, 2022**                                              **Hearing Room    1568**

---

<u>10:00 AM</u>
**CONT...       JINZHENG GROUP (USA) LLC**                                           **Chapter 11**

in the case without an official committee, the possibility that different classes would be treated differently under a plan and need representation, and the motivation of the movant." *In re ShoreBank Corp.*, 467 B.R. 156, 161 (Bankr. N.D. Ill. 2012). Another factor "courts sometimes consider in determining adequate representation is whether members of a committee have conflicts of interest…. Before a conflict of interest necessitates reconstitution of a committee … there must be specific evidence that the committee member or members with the conflict have breached or are likely to breach their fiduciary duties." *Id.*

A committee member breaches its fiduciary duties to the creditor body as a whole when that committee member takes action in furtherance of its own interests to the detriment of the interests of the overall class of all unsecured creditors. Illustrating this principle, in *In re Anderson*, 349 B.R. 448 (E.D. Va. 2006), the court examined the extent to which a creditor's committee was entitled to participate in a claim objection proceeding. The *Anderson* court found that in connection with the claim objection proceeding, it was appropriate to permit the committee to participate in discovery regarding the debtor in possession's alleged fraud, a matter common to every creditor's claim. *Id.* at 464. The court took care to emphasize that through such participation, "the Committee did not seek, or purport, to assert the rights or claims of any particular Committee member." *Id.* The court noted that the rights of the individual committee members had been asserted by the claimants' counsel, not the committee's counsel. *Id. See also In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 717, 722 (Bankr. S.D.N.Y.), *aff'd,* 140 B.R. 347 (S.D.N.Y. 1992) ("Counsel for the ... committee do not represent any individual creditor's interest in [a] case; they were retained to represent the entire ... class. Therefore, counsel for the creditors' committee do not owe a duty to [one creditor] to maximize its interest at the expense of the remaining creditors in the represented class.").

The Debtor argues that "Betula is likely to breach its fiduciary duties to general unsecured creditors by using the Committee to thwart" the Debtor's prosecution of the Betula Action. Doc. No. 135 at 15. However, the Debtor has failed to offer any specific evidence of actions that the Committee has taken that benefitted Betula to the detriment of other general unsecured creditors. To the contrary, the actions taken by the Committee to date in this case have inured to the benefit of the entire constituency of unsecured creditors. As a result of its negotiations with the Committee, the Debtor has filed an amended Plan. Although that amended Plan remains "unacceptable to the Committee," Doc. No. 201 at 2, the negotiations have demonstrated the need for the Committee.

The Debtor next argues that Betula is disqualified from serving on the Committee because it is a "person in control of the Debtor" and therefore an "insider" for purposes

# United States Bankruptcy Court
## Central District of California
### Los Angeles
### Ernest Robles, Presiding
### Courtroom 1568 Calendar

**Tuesday, May 17, 2022**                                    **Hearing Room    1568**

<u>10:00 AM</u>
**CONT...       JINZHENG GROUP (USA) LLC**                              **Chapter 11**

of § 101(31)(B)(iii). The present record is not sufficiently developed for the Court to determine whether Betula was an insider prior to the Petition Date. However, even if Betula were an insider (a determination the Court does not make), it would not necessarily be disqualified from serving on the Committee. As set forth in the leading treatise:

> Most decisions considering this issue have held that insiders should not be excluded on a *per se* basis from serving on a creditors' committee. The relationship between a particular insider and the debtor can be examined by the United States trustee on a case by case basis to determine whether the relationship justifies exclusion of the person from the creditors' committee.

7 Collier on Bankruptcy ¶ 1102.02 (16th rev'd ed. 2022).

To disqualify Betula from serving on the Committee, the Debtor must provide evidence of "some overt, specific act to indicate a conflict of interest has developed to justify removing a creditor from the committee." *In re Cont'l Cast Stone, LLC*, 625 B.R. 203, 208 (Bankr. D. Kan. 2020). The Debtor has provided no such evidence; it offers only speculation that Betula *might* in the future breach its fiduciary obligations. That is not sufficient to warrant removing Betula from the Committee.

The rationale for the Disbandment Motion is that Betula must be removed from the Committee, and that after Betula is removed, the Committee will not be viable because it will consist of only one member. Because the Debtor has failed to show that Betula's removal is warranted, the Disbandment Motion fails.

**B. The Committee's Application to Employ Pachulski Stang Ziehl & Jones LLP As its Counsel is Granted**

The Committee seeks authorization to employ Pachulski, Stang, Ziehl, & Jones LLP ("PSZJ") as its counsel (the "Employment Application"). The Debtor initially opposed the Employment Application but subsequently withdrew its opposition. Doc. No. 211. No other interested parties have opposed the Employment Application.

The Employment Application is **GRANTED**. The Committee is authorized to retain PSZJ as its counsel, effective as of January 25, 2022. The Committee's compensation shall be subject to review by the Court pursuant to § 330(a).

**C. The Exclusivity Motion is Denied**

Section 1121(b) gives the Debtor the exclusive right to file a plan during the first 120 days after the date of the order for relief. Section 1121(d) permits the Court to reduce or

# United States Bankruptcy Court
## Central District of California
### Los Angeles
### Ernest Robles, Presiding
### Courtroom 1568 Calendar

**Tuesday, May 17, 2022**                                    **Hearing Room    1568**

10:00 AM

**CONT...      JINZHENG GROUP (USA) LLC**                          **Chapter 11**

increase the exclusivity period "for cause." Section 1121 provides the bankruptcy court
with "maximum flexibility to suit various types of reorganization proceedings." *In re
Public Service Company of New Hampshire*, 88 B.R. 521, 534 (Bankr. D.N.H. 1988).
In determining whether "cause" exists for purposes of § 1121(d), the Court has discretion
to consider "[a] variety of matters." *Off. Comm. of Unsecured Creditors v. Henry Mayo
Newhall Mem'l Hosp. (In re Henry Mayo Newhall Mem'l Hosp.)*, 282 B.R. 444, 452
(B.A.P. 9th Cir. 2002). In *Henry Mayo Newhall*, exclusivity was extended in a situation
involving "(1) a first extension; (2) in a complicated case; (3) that had not been pending
for a long time, relative to its size and complexity; (4) in which the debtor did not appear
to be proceeding in bad faith; (5) had improved operating revenues so that it was paying
current expenses; (6) had shown a reasonable prospect for filing a viable plan; (7) was
making satisfactory progress negotiating with key creditors; (8) did not appear to be
seeking an extension of exclusivity to pressure creditors; and (9) was not depriving the
Committee of material or relevant information." *Id.*

The Debtor has not shown cause for a second extension of its exclusivity periods.
The Court has already granted the Debtor one extension of its exclusivity periods; as a
result, the Debtor has had more than eight months of exclusivity (factor one). Although
this case is more complicated than many Chapter 11 cases filed by individuals, it is not
particularly complicated when compared to cases filed by corporations (factor two). The
Debtor has not made material progress in its negotiations with the Committee (factor
seven). It appears that the Debtor's primary motivation for seeking a second extension of
exclusivity is to pressure creditors by preventing the Committee from filing a competing
Plan (factor eight).

**D. The RFS Motion is Denied**

REL moves for relief from the automatic stay under § 362(d)(1) and (d)(2). REL
asserts that there is no equity in the Properties and that the Debtor will be unable to
effectively reorganize because it lacks sufficient capital.

As of the Petition Date, REL asserted a claim against the Debtor in the amount of
$9,353,009.29, secured by four parcels of real property. The following table sets forth
the addresses of the Properties, as well as REL's valuation of each parcel; the valuation
is supported by an appraisal report prepared by Thomas E. Oakley of A-Credited Realty
Advisors:

| Parcel | Valuation |
|--------|-----------|

## United States Bankruptcy Court
## Central District of California
### Los Angeles
### Ernest Robles, Presiding
### Courtroom 1568 Calendar

**Tuesday, May 17, 2022**                                          **Hearing Room     1568**

<u>10:00 AM</u>
**CONT...        JINZHENG GROUP (USA) LLC**                                          **Chapter 11**

| | |
|---|---|
| 32 acres of undeveloped land upon which the Debtor intends to build a residential development, located at 2929 Amethyst Street, Los Angeles, CA 90031 | $6,890,000 |
| 3-unit residential triplex building, located at 2526 Lincoln Park Avenue, Los Angeles, CA 90031 | $795,000 |
| 2-unit residential duplex building, located at 2520 Lincoln Park Avenue, Los Angeles, CA 90031 | $1,050,000 |
| Single family residence, located at 2602 Lincoln Park, Los Angeles, CA 90031 | $300,000 (value is per Debtor's schedules; Oakley did not appraise this property) |
| **TOTAL** | $9,035,000 |

The Debtor filed an opposition to the Motion (the "Opposition"), which the Committee joins "on the limited basis that [REL] is adequately protected by a significant equity cushion under 11 U.S.C. § 362(d)(1), and as such there is no basis for relief under either 11 U.S.C. § 362(d)(1), or § 362(d)(2)." The Debtor disputes REL's assertion that the Properties are collectively worth only $9,035,000. The Debtor notes that in August 2016, the Debtor purchased the 32 acres of vacant land for $18,500,000, and that an appraisal prepared by Cushman & Wakefield shortly prior to the Petition Date valued the vacant land at $23,450,000. The Debtor further asserts that it has proposed a viable Plan, which includes a new value contribution in the amount of $4 million to recapitalize the Debtor.

"[T]he best way to determine value is exposure to a market." *Bank of America v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 456–57 (1999). In August 2016, the Debtor purchased the 32 acres of vacant land for $18,500,000. This arms-length transaction is far more persuasive evidence of the vacant land's value than REL's appraisal, which values the vacant land at only $6,890,000. The condition of the vacant land has been improved since the August 2016 purchase, because at least some work has been done towards securing the entitlements necessary to construct a residential development.

REL has identified no events in the past five years which could have caused the vacant land to lose roughly two-thirds of its value. The Cushman & Wakefield appraisal, which valued the vacant land at $23,450,000 shortly prior to the Petition Date, further shows that the land has not declined in value since the August 2016 purchase.

The Court need not determine the exactly value of the vacant land or the three other

# United States Bankruptcy Court
## Central District of California
### Los Angeles
### Ernest Robles, Presiding
### Courtroom 1568 Calendar

**Tuesday, May 17, 2022**                                    **Hearing Room    1568**

<u>10:00 AM</u>
**CONT...    JINZHENG GROUP (USA) LLC**                        **Chapter 11**

parcels for purposes of the instant RFS Motion, because even when applying conservative assumptions, it is clear that the Debtor has substantial equity in the Properties. Even if the vacant land has not appreciated since August 2016, which is highly unlikely, the value of the vacant land plus the three other properties would materially exceed REL's claim of $9,353,009.29. The Properties are also necessary to an effective reorganization.

Based upon the Debtor's substantial equity in the Properties and the necessity of the Properties for an effective reorganization, REL's requests for stay relief under § 362(d)(1) and (d)(2) are both **DENIED**.

## III. Conclusion

Based upon the foregoing, (1) the Debtor's motion to disband the Official Committee of Unsecured Creditors is **DENIED**; (2) the Debtor's second motion to extend its plan exclusivity periods is **DENIED**; (3) the application of the Official Committee of Unsecured Creditors to employ Pachulski, Stang, Ziehl & Jones LLP as its general bankruptcy counsel is **GRANTED**; and (4) Royal Equity Lending's motion for relief from the automatic stay is **DENIED**.

The Court will prepare and enter appropriate orders.

No appearance is required if submitting on the court's tentative ruling. If you intend to submit on the tentative ruling, please contact Landon Foody or Daniel Koontz, the Judge's Law Clerks, at 213-894-1522. **If you intend to contest the tentative ruling and appear, please first contact opposing counsel to inform them of your intention to do so.** Should an opposing party file a  late opposition or appear at the hearing, the court will determine whether further hearing is required. If you wish to make a telephonic appearance, contact Court Call at 888-882-6878, no later than one hour before the hearing.

| Party Information |
|---|

**<u>Debtor(s):</u>**

JINZHENG GROUP (USA) LLC            Represented By
                                    Christopher J Langley

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 1901 Avenue of the Stars, Suite 450, Los Angeles, CA 90067-6006.

A true and correct copy of the foregoing document entitled (*specify*):  DEBTOR'S NOTICE OF OPPOSITION AND OPPOSITION TO MOTION FOR RELIEF FROM THE AUTOMATIC STAY FILED BY ROYAL EQUITY LENDING LLC; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF MARK CIANCIULLI AND REQUEST FOR JUDICIAL NOTICE IN SUPPORT THEREOF  will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) October 31, 2022  I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page.

**2. <u>SERVED BY UNITED STATES MAIL</u>**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page.

**3. <u>SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL</u> (state method for each person or entity served)**: Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| October 31, 2022 | Patricia Morris | */s/ Patricia Morris* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                **F 9013-3.1.PROOF.SERVICE**

<u>**ADDITIONAL SERVICE INFORMATION**</u> **(if needed):**

1. <u>**SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**</u>

- **Donna C Bullock**    donnabullockcarrera@yahoo.com, donna.bullock@ymail.com
- **Steven P Chang**    heidi@spclawoffice.com,
  schang@spclawoffice.com,assistant1@spclawoffice.com,attorney@spclawoffice.com;g9806@notify.cincompass.com;changsr75251@notify.bestcase.com
- **Michael F Chekian**    mike@cheklaw.com, chekianmr84018@notify.bestcase.com
- **Heidi M Cheng**    heidi@slclawoffice.com,
  assistant1@spclawoffice.com;schang@spclawoffice.com;chenghr75251@notify.bestcase.com
- **Susan Titus Collins**    scollins@counsel.lacounty.gov
- **Nicholas S Couchot**    ncouchot@buchalter.com, docket@buchalter.com;marias@buchalter.com
- **Jeffrey W Dulberg**    jdulberg@pszjlaw.com
- **Oscar Estrada**    oestrada@ttc.lacounty.gov
- **Danielle R Gabai**    dgabai@danninggill.com, dgabai@ecf.courtdrive.com
- **Runmin Gao**    ivy.gao@aalrr.com, alicia.mcmaster@aalrr.com
- **Richard Girgado**    rgirgado@counsel.lacounty.gov
- **Brian T Harvey**    bharvey@buchalter.com, IFS_filing@buchalter.com;dbodkin@buchalter.com
- **M. Jonathan Hayes**    jhayes@rhmfirm.com,
  roksana@rhmfirm.com;matt@rhmfirm.com;rosario@rhmfirm.com;pardis@rhmfirm.com;russ@rhmfirm.com;david@rhmfirm.com;sloan@rhmfirm.com;boshra@rhmfirm.com;rosario@rhmfirm.com
- **Teddy M Kapur**    tkapur@pszjlaw.com, mdj@pszjlaw.com
- **Alphamorlai Lamine Kebeh**    akebeh@danninggill.com
- **Peter A Kim**    peter@pkimlaw.com, peterandrewkim@yahoo.com
- **Christopher J Langley**    chris@slclawoffice.com,
  omar@slclawoffice.com;langleycr75251@notify.bestcase.com;ecf123@casedriver.com
- **Paul J Leeds**    Pleeds@fsl.law, ssanchez@fsl.law
- **Benjamin R Levinson**    ben@benlevinsonlaw.com, courtney@benlevinsonlaw.com
- **Damian J. Martinez**    damian.martinez@aalrr.com, julissa.ruiz@aalrr.com
- **Eric A Mitnick**    MitnickLaw@gmail.com, mitnicklaw@gmail.com
- **Giovanni Orantes**    go@gobklaw.com, gorantes@orantes-law.com,cmh@gobklaw.com,gobklaw@gmail.com,go@ecf.inforuptcy.com;orantesgr89122@notify.bestcase.com
- **Donald W Reid**    don@donreidlaw.com, ecf@donreidlaw.com
- **Matthew D. Resnik**    matt@rhmfirm.com,
  roksana@rhmfirm.com;rosario@rhmfirm.com;susie@rhmfirm.com;max@rhmfirm.com;priscilla@rhmfirm.com;pardis@rhmfirm.com;russ@rhmfirm.com;rebeca@rhmfirm.com;david@rhmfirm.com;sloan@rhmfirm.com
- **Peter J Ryan**    ryan@floresryan.com, schneider@floresryan.com
- **Allan D Sarver**    ADS@asarverlaw.com
- **Zev Shechtman**    zshechtman@DanningGill.com,
  danninggill@gmail.com;zshechtman@ecf.inforuptcy.com
- **David Samuel Shevitz**    david@shevitzlawfirm.com,
  shevitzlawfirm@ecf.courtdrive.com;r48785@notify.bestcase.com;Jose@shevitzlawfirm.com
- **John N Tedford**    jtedford@DanningGill.com, danninggill@gmail.com;jtedford@ecf.courtdrive.com
- **United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov
- **Hatty K Yip**    hatty.yip@usdoj.gov, hatty.k.yip@usdoj.gov

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                                        **F 9013-3.1.PROOF.SERVICE**