ZEV SHECHTMAN (State Bar No. 266280)
*zs@DanningGill.com*
ALPHAMORLAI L. KEBEH (State Bar No. 336798)
*akebeh@DanningGill.com*
DANNING, GILL, ISRAEL & KRASNOFF, LLP
1901 Avenue of the Stars, Suite 450
Los Angeles, California 90067-6006
Telephone: (310) 277-0077
Facsimile: (310) 277-5735

General Bankruptcy Counsel for Jinzheng Group
(USA) LLC, Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:21-bk-16674-ER |
| JINZHENG GROUP (USA) LLC, | Chapter 11 |
| Debtor. | **DEBTOR'S NOTICE OF MOTION AND MOTION TO:** |
| | **(1) AUTHORIZE SALE OF REAL PROPERTY LOCATED AT 2240 LORAIN ROAD, SAN MARINO, CA 91108 FREE AND CLEAR OF LIENS; AND** |
| | **(2) APPROVE COMPROMISE WITH CORONA CAPITAL GROUP, LLC;** |
| | **MEMORANDUM OF POINTS AND AUTHORITIES, DECLARATIONS OF ZHAO PU YANG, WEIJUN XU, LIHUA HE, WILLIAM FRIEDMAN, STEPHEN ENG, AND ALPHAMORLAI L. KEBEH, AND REQUEST FOR JUDICIAL NOTICE IN SUPPORT THEREOF** |
| | Date:    April 4, 2023<br>Time:    11:00 a.m.<br>Crtrm.:    1568<br>    255 East Temple Street<br>    Los Angeles, California 90012 |

1710607.2  27086

1

# **TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................8

I.    FACTUAL STATEMENT ..................................................................................................8

    A.    Bankruptcy Background ..........................................................................................8

    B.    The Subject Property ...............................................................................................8

    C.    Proposed Treatment of Liens Against the Property.................................................8

        1.    The Property Tax Lien..................................................................................9

        2.    The RBB Lien...............................................................................................9

        3.    The Corona Deed of Trust ...........................................................................9

        4.    The DNQ Compromise .................................................................................9

    D.    The Debtor's Marketing Efforts and Proposed Sale...............................................10

    E.    Relief From Stay.....................................................................................................10

    F.    Proposed Agreement with Corona Capital Group, LLC .........................................11

II.    PROPOSED OVERBID PROCEDURES ..........................................................................11

III.    SALE OF THE PROPERTY SHOULD BE APPROVED..................................................13

    G.    The Proposed Sale of the Property is Supported by the Debtor's Sound
        Business Judgment and is in the Best Interests of the Debtor's Estate and Its
        Creditors ................................................................................................................13

    H.    The Proposed Sale May be Authorized Under Section 363 of the Bankruptcy
        Code.......................................................................................................................14

    I.    The Debtor Requests that the Court Find that the Buyers and Any Backup
        Buyer Are Good Faith Purchasers Pursuant to Section 363(m) of the
        Bankruptcy Code ...................................................................................................15

    J.    Waiver of FRBP 6004(h) is Warranted .................................................................16

IV.    THE CORONA CARVEOUT AGREEMENT SHOULD BE APPROVED........................16

        1.    Probability of Success in Litigation............................................................17

        2.    Difficulties in Collection ............................................................................17

        3.    Complexity, Expense, Inconvenience, and Delay of Litigation ...................18

        4.    Interest of Creditors ...................................................................................18

# TABLE OF CONTENTS
### (Continued)

Page

V.    CONCLUSION.................................................................................................................18

DECLARATION OF ZHAO PU YANG ...........................................................................20

DECLARATION OF WEIJUN XU ...................................................................................22

DECLARATION OF LIHUA HE.......................................................................................23

DECLARATION OF WILLIAM FRIEDMAN .................................................................24

DECLARATION OF STEPHEN ENG...............................................................................26

DECLARATION OF ALPHAMORLAI L. KEBEH .........................................................28

REQUEST FOR JUDICIAL NOTICE...............................................................................30

1

# TABLE OF AUTHORITIES

2

**Page**

3

## CASES

4

Ewell v. Diebert (In re Ewell),
      958 F.2d 276, 281 (9th Cir. 1992) ............................................................ 15

5

*Flight Transportation Corporation Securities Litigation*,
      730 F.2d 1128, 1135 (8th Cir. 1984) ........................................................ 17

6

7

*In re A & C Properties*,
      784 F.2d 1377, 1381 (9th Cir. 1986) ........................................................ 17

8

*In re Carla Leather, Inc.*,
      50 B.R. 764, 775 (Bankr. S.D.N.Y. 1985) ................................................ 16

9

10

*In re Continental Air Lines, Inc.*,
      780 F.2d 1223 (5th Cir. 1986) .................................................................. 13

11

*In re Derivium Capital, LLC*,
      380 B.R. 392 (Bankr. D.S.C. 2007) ................................................... 13, 14

12

13

*In re Lahijani*,
      325 B.R. 282 (B.A.P. 9th Cir. 2005) ........................................................ 14

14

*In re Lionel Corp.*,
      722 F.2d 1063 (2d Cir. 1983) .................................................................. 14

15

16

In re Pine Coast Enters., Ltd.,
      147 B.R. 30, 33 (Bankr. N.D. Ill. 1992) .................................................. 15

17

*In re Teletronics Services, Inc.*,
      762 F.2d 185, 189 (2d Cir. 1985) ............................................................ 17

18

19

*In re W.T. Grant Co.*,
      699 F.2d 599, 608 (2d Cir. 1983) ............................................................ 17

20

*In re Walsh Construction, Inc.*,
      669 F.2d 1325, 1328 (9th Cir. 1982) ........................................................ 17

21

22

*Stephens Indus., Inc. v. McClung*,
      789 F.2d 386 (6th Cir. 1986) .................................................................. 14

23

24

## STATUTES

25

11 U.S.C. § 362(a) ............................................................................................ 10

26

11 U.S.C. § 363(b)(1) ...................................................................................... 13

27

11 U.S.C. § 363(m) .......................................................................................... 16

28

11 U.S.C. § 704(a)(1) ...................................................................................... 13

# TABLE OF AUTHORITIES
### (Continued)

**Page**

28 U.S.C. § 157(b)(2)(A) .................................................................................................... 16

**RULES**

Fed. R. Bankr. P. 2002 ...................................................................................................... 16

Fed. R. Bankr. P. 9019(a) .................................................................................................. 16

FRBP 6004(h) .................................................................................................................... 16

TO THE HONORABLE ERNEST M. ROBLES AND INTERESTED PARTIES:

**PLEASE TAKE NOTICE THAT** on **April 4, 2023 at 11:00 a.m.**, or as soon thereafter the matter may be heard, in **Courtroom 1568 of the United States Bankruptcy Court, 255 E. Temple Street, Los Angeles**, California, Jinzheng Group (USA), LLC, Debtor and Debtor in Possession (the "Debtor"), will and hereby does move (the "Motion") the Court under 11 U.S.C. § 363, Rule 9019 of the Federal Rules of Bankruptcy Procedure, and Local Bankruptcy Rules 6004-1(c) and 9013-1, for an order (1) authorizing the sale of real property located at 2240 Lorain Road, San Marino, CA 91108 free and clear of liens and encumbrances; and (2) approving the compromise with Corona Capital Group, LLC (the "Corona Carveout Agreement"). The proposed sale is pursuant to a Purchase and Sale Agreement (the "PSA"), a copy of which is attached to the declaration of Zhao Pu Yang as Exhibit "1."

**PLEASE TAKE FURTHER NOTICE** that the Motion seeks the following relief:

## SALE OF REAL PROPERTY

Pursuant to Local Bankruptcy Rule 6004-1(c), the Debtor provides the following information:

A.   **Date, Time and Place:** The date, time and place of the hearing on the Motion are set forth above.

B.   **Name and Address of the Proposed Buyers:** The Debtor has proposed the sale of the Property, subject to possible overbidding, to Lihua He and Weijun Xu (the "Buyers"), whose address is 13103 Country Club Way, Whittier, CA 91731.

C.   **Description of the Property to be Sold:** The property to be sold consists of the Debtor's right, title, and interest in real property located at 2240 Lorain Road, San Marino, CA 91108 (the "Property"), with the following legal description:

Parcel 1: Lot 149 of tract no. 8954, in the city of San Marino, county of Los Angeles, state of California, as per map recorded in book 145 pages 82 and 83 of maps, in the office of the county recorder of said county

Parcel 2: That portion of the northeast quarter of section 2, township 1 south, range 12 west, San Bernardino meridian, in the city of San Marino, county of Los Angeles, state of California, according to the official plat of the survey of said land on file in the bureau of land management, included within that portion of the 40 feet of strip of land marked "Southern Pacific Railway Monrovia Branch" on the map of

San Marino Park, recorded in book 12, page 74 of maps, in the office of the county recorder of said county, lying between the southerly prolongation of the west line of Lot 149 of Tract No. 8954, as per map recorded in book 145 pages 82 and 83 of maps, in the office of said county recorder, and the center line of San Marino Avenue, 80 feet wide shown on the map of said tract no. 8954.

D.      **Terms and Conditions, Including Price and All Contingencies:** The Property will be sold for **$1,800,000** (the "Proposed Sale Price"), subject to overbid, in its "as is," "where is" condition, with no warranty or recourse whatsoever.  Any and all contingencies have been waived, and thus the sale will not be contingent upon any events or conditions other than this Court's approval and potential overbidding.  The Buyers have conducted all due diligence on the Property that the Buyers believe is necessary for the completion of this sale.

E.      **Whether the Proposed Sale is Free and Clear of, and Description of Liens, Claims or Interests:** Based on a review of the Debtor's schedules, proofs of claim filed in the Debtor's case, and a preliminary title report,[1] the only known liens and encumbrances against the Property are:

1.      A tax claim in connection with city/county taxes assessed against the Property for the fiscal year 2022-2023 in the amount of $27,547.41 (the "Property Tax Lien").

2.      A deed of trust in favor of Pacific Bay Lending Group, assigned to Royal Business Bank ("RBB") and securing a promissory note (the "RBB Deed of Trust").  As of January 31, 2023 RBB alleges that it is owed at least $1,177,301.24 on account of the RBB Deed of Trust.[2] This amount is allegedly comprised of a principal debt of $1,058,604.70, interest charges in the amount of $67,420.40, attorneys' fees in the amount of at least $42,806.71, and various other fees and charges in the amount of $51,276.14.

3.      A deed of trust in favor of Corona Capital Group, LLC ("Corona") and securing a promissory note (the "Corona Deed of Trust").  Corona alleges that, as of May 6, 2022, it is owed at least $583,194.21 on account of the Corona Deed of Trust.

---

[1] A copy of the title report is attached to the declaration of Alphamorlai L. Kebeh as Exhibit "6."

[2] The resultant lien in favor of RBB is referred to hereinafter as the "RBB Lien."

4.      A deed of trust in favor of DNQ LLC ("DNQ") in the amount of $420,000 (the "DNQ Deed of Trust").

The Debtor intends to pay the Property Tax Lien and RBB Lien in full from the proceeds of the sale of the Property, and thus intends to sell free and clear of such liens.  The Debtor previously entered into an agreement with DNQ whereby, in relevant part, DNQ has consented to the sale of the Property free and clear of its lien (docket no. 342) (the "DNQ Carveout Agreement").  Because liens senior to DNQ's are not anticipated to be paid in full, there will be no distribution on account of DNQ's secured claim absent overbidding sufficient to raise the price of the Property to pay Corona in full.

If the Court approves the Corona Carveout Agreement, the Debtor intends to sell the Property free and clear of the liens and claims in favor of Corona as well, with Corona to be paid from the proceeds of the sale pursuant to the Corona Carveout Agreement discussed below.

F.      **Overbidding:** The proposed sale is subject to higher and better bids and, by way of this Motion, the Debtor is requesting that the Court approve the overbid procedures described in the accompanying memorandum of points and authorities, summarized as follows:

1.      **Minimum initial overbid**:  $1,825,000 (i.e. $25,000 above the Buyers' current offer).

2.      **Minimum overbidding increments**:  $10,000.

3.      **Initial overbid deposit**:  $55,000.

4.      **Qualification for overbidding**:  By **March 30, 2023**, any party wishing to overbid on the Property must deliver to the Debtor c/o Danning, Gill, Israel & Krasnoff, LLP, Attn: Alphamorlai L. Kebeh, 1901 Avenue of the Stars, Suite 450, Los Angeles, California 90067:

i.      a cashier's check payable to "Jinzheng Group (USA) LLC" in the amount of $55,000, and

ii.     a written, executed overbid in the form attached as Exhibit "2" to the declaration of Alphamorlai L. Kebeh.

No party will be allowed to bid on the Property absent timely delivery of the initial overbid deposit and the written, executed overbid form.  The Debtor in its sole discretion, after consulting

with counsel for the committee of unsecured creditors, may determine that a party desiring to bid is or is not qualified to bid. Accordingly, any party wishing to bid is encouraged to contact the Debtor's counsel at least one week before the hearing to ensure qualification.

5. **Back-up bidders**: Any qualified overbidder who is not the successful overbidder may opt to be a back-up bidder, subject to the Debtor's approval, in which case such back-up bidder's initial deposit will be retained by the Debtor's counsel until the sale closes.

G. **Estimated Consideration**: The opening sale price for the Property is $1,800,000. The Debtor estimates that the breakdown of the proceeds, with 4% broker's commission, liens, fees, and anticipated costs of sale, will be as follows:

| | |
|---|---|
| Sale Price | $1,800,000.00 |
| Commission to Debtor's Brokers (4%) | ($72,000.00) |
| Sale costs (estimated 2% of Sale Price) | ($35,000.00) |
| Property Tax Lien | ($27,547.41) |
| RBB Deed of Trust (Principal and Standard Interest Only) | ($1,177,301.24) |
| Amount owed to Debtor's estate per Carveout Agreement | ($25,000) |
| Amount owed to Corona per Carveout Agreement | ($463,151.35) |
| DNQ Carveout Payment | $0 |

The estate will be entitled to receive additional funds if there is a successful overbid, pursuant to the Corona Carveout Agreement.

H. **Brokers' Commission:** The Debtor proposes to pay a real estate broker's commission of 4% of the sale price of the Property as follows: (1) 2% total to the Debtor's brokers, divided equally (1% each) between Coldwell Banker Realty and Re/Max of Cerritos (the "Brokers"); and (2) 2% total to the Buyers' broker, RubyHome Corporation. If another buyer overbids, then the 2% allocated to Buyers' broker will be paid to the successful overbidder's broker. If a successful overbidder does not have a broker or if the Debtor's Brokers represent both the Debtor and the buyer, the Debtor's Brokers will be entitled to a total commission of 4%,

1  divided equally.  The commission was originally set at 5% per the order authorizing the Debtor's

2  Brokers' employment, but was reduced to 4% by the Carveout Agreement between the Debtor and

3  Corona with the consent of the Debtor's Brokers.

4      I.      **Anticipated Taxes**: The Debtor inquired with its tax consultant and is informed that

5  there will be no tax consequences as a result of the sale.

6      J.      **Objections Deadline**: As further explained below, any objection must be filed at

7  least 14 days before the hearing.

8

9              **THE CORONA CARVEOUT AGREEMENT**

10     The Debtor also seeks Court approval of the Corona Carveout Agreement.  A copy of the

11 Corona Carveout Agreement is attached to the declaration of Zhao Pu Yang as Exhibit "3."

12 Without modifying the terms set forth therein, the Corona Carveout Agreement provides, among

13 other things, that:

14     1.      Corona consents to the sale of the Property free and clear of any lien, right, or claim

15             it may have with respect to the Property.

16     2.      If the Debtor completes the sale of the Property, the Debtor shall receive a carveout

17             as follows: (1) $25,000 from the net sale proceeds, plus (2) 1/3 of the net sale

18             proceeds generated from the sale of the Property in excess of a $1,800,000 gross

19             sale price.  In exchange, Corona will receive, after payment of senior liens, any

20             property tac liabilities and any other reasonable and customary escrow or closing

21             costs and brokers' commissions, all net proceeds up to the value of its secured

22             claim.

23     The Debtor believes that the terms of the Corona Carveout Agreement are in the best

24 interests of the estate and its creditors, and should be approved by the Court.

25     **PLEASE TAKE FURTHER NOTICE** that the Motion is based upon this Notice of

26 Motion and Motion, the attached Memorandum of Points and Authorities, the declarations of Zhao

27 Pu Yang, Weijun Xu, Lihua He, William Friedman, Stephen Eng and Alphamorlai L. Kebeh, and

28

1    Request for Judicial Notice; the papers and pleadings in the Debtor's bankruptcy case; and such

2    other evidence that may be presented at the hearing.

3        **PLEASE TAKE FURTHER NOTICE** that pursuant to Local Bankruptcy Rule 9013-1(f),

4    each interested party opposing, joining in, or responding to the Motion must, not later than **14 days**

5    before the date of the hearing, file with the Clerk of the Bankruptcy Court and serve upon the

6    Debtor's general counsel, Zev Shechtman and Alphamorlai L. Kebeh, Danning, Gill, Israel &

7    Krasnoff, LLP, 1901 Avenue of the Stars, Suite 450, Los Angeles, California 90067-6006, and the

8    United States Trustee, 915 Wilshire Blvd., Suite 1850, Los Angeles, California 90017, either: (i) a

9    complete written statement of all reasons in opposition thereto or in support or joinder thereof,

10   declarations and copies of all photographs and documentary evidence on which the responding

11   party intends to rely, and any responding memorandum of points and authorities; or (ii) a written

12   statement that the Motion will not be opposed.

13       Pursuant to Local Bankruptcy Rule 9013-1(h), failure to timely file and serve papers may

14   be deemed by the Court to be consent to the granting of the Motion.

15   DATED:  March 14, 2023           DANNING, GILL, ISRAEL & KRASNOFF, LLP

16

17                   By:    */s/ Alphamorlai L. Kebeh*

18                       ALPHAMORLAI L. KEBEH
                    General Bankruptcy Counsel for Jinzheng Group

19                       (USA) LLC, Debtor and Debtor in Possession

20

21

22

23

24

25

26

27

28

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.

3

## FACTUAL STATEMENT

4  **A.      Bankruptcy Background**

5          On August 24, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief

6  under chapter 11 of the Bankruptcy Code.  The Debtor continues in possession of its property and

7  is operating and managing its business as a debtor in possession pursuant to the provisions of 11

8  U.S.C. §§ 1107(a) and 1108.

9

10  **B.      The Subject Property**

11          The assets of the bankruptcy estate include a number of real properties, including a parcel

12  of real property located at 2240 Lorain Road, San Marino, California 91108 (the "Property").

13

14  **C.      Proposed Treatment of Liens Against the Property**

15          Based on a review of the Debtors' schedules and proofs of claim filed in the Debtors' case,

16  the only known liens and encumbrances against the Property are:

17          (1)      A tax claim in connection with County Property taxes assessed against the Property

18  for the fiscal year 2022-2023 in the amount of $27,547.41 (the "Property Tax Lien").

19          (2)      A deed of trust in favor of Pacific Bay Lending Group, assigned to Royal Business

20  Bank ("RBB") and securing a promissory note (the "RBB Deed of Trust").  As of January 31, 2023

21  RBB alleges that it is owed at least $1,177,301.24 on account of the RBB Deed of Trust.[3]  This

22  amount is allegedly comprised of a principal debt of $1,058,604.70, interest charges in the amount

23  of $67,420.40, attorneys' fees in the amount of at least $42,806.71, and various other fees and

24  charges in the amount of $51,276.14.

25

26

27

---

28  [3] The resultant lien in favor of RBB is referred to hereinafter as the "RBB Lien."

(3)    A deed of trust in favor of Corona Capital Group, LLC ("Corona") and securing a promissory note (the "Corona Deed of Trust").  Corona alleges that, as of May 6, 2022, it is owed at least $583,194.21 on account of the Corona Deed of Trust.

(4)    A deed of trust in favor of DNQ LLC ("DNQ") in the amount of $420,000 (the "DNQ Deed of Trust").

**1.    The Property Tax Lien**

The Debtor intends to pay the Property Tax Lien in full from the proceeds of the sale of the Property, and thus intends to sell free and clear of such lien.

**2.    The RBB Lien**

On June 27, 2018, a note in favor of RBB was executed and secured by the RBB Deed of Trust (the "RBB Note").  A copy of the RBB Note is attached to the declaration of Alphamorlai L. Kebeh as Exhibit "4."  The original principal amount of the RBB Note is $1,100,000.  Under the RBB Note, the standard interest rate is 5.5% per annum.  The Debtor intends to pay the RBB Lien in full from the proceeds of the sale of the Property, and thus intends to sell free and clear of such lien.

**3.    The Corona Deed of Trust**

On June 14, 2021, a note in favor of Corona (the "Corona Note") was executed and secured by the Corona Deed of Trust, recorded on June 25, 2021.  A copy of the Corona Deed of Trust is attached to the declaration of Alphamorlai L. Kebeh as Exhibit "5."  The original principal amount of the Corona Note is $540,000.  Corona asserts that, as of May 6, 2022, it is owed at least $583,194.21 on account of the Corona Note.

If the Court approves the Corona Carveout Agreement, the Debtor intends to sell the Property free and clear of the lien and claim in favor of Corona as well, with Corona to be paid from the proceeds of the sale pursuant to the Corona Carveout Agreement discussed below.

**4.    The DNQ Compromise**

On or about August 15, 2022, the Debtor filed its *Motion for Order Approving Compromise Between Debtor and DNQ LLC* (the "DNQ Compromise") (docket no. 342).  Per the DNQ Compromise, DNQ has consented to the sale of the Property free and clear of its lien.  On or about

1  September 15, 2022, the Court entered an order approving the DNQ Compromise in full (docket

2  no. 382).  Because liens senior to DNQ's are not anticipated to be paid in full, there will be no

3  distribution on account of DNQ's secured claim absent overbidding sufficient to raise the price of

4  the Property to pay Corona in full.

5

6  **D.    <u>The Debtor's Marketing Efforts and Proposed Sale</u>**

7          On August 19, 2022, the Court entered an order authorizing the employment of Re/Max of

8  Cerritos and Coldwell Banker as the Debtor's Brokers.  With the aid of the Brokers, the Debtor has

9  marketed the Property for sale, and the Buyer's offer is the best offer the Debtor has received to

10  date.  The below declarations of  William Friedman and Stephen Eng detail the Brokers' marketing

11  efforts.  The only remaining requirement to close the sale is Court approval, subject to qualified

12  overbids made at the sale hearing.

13

14  **E.    <u>Relief From Stay</u>**

15          On July 20, 2022, Corona filed its motion for relief from the automatic stay as to the

16  Property, alleging certain defaults under the loan documents as set forth therein (docket no. 320).

17  On August 10, 2022, RBB filed its motion for relief from the automatic stay as to the Property,

18  alleging certain defaults under the loan documents as set forth therein (docket no. 333).  On

19  September 9, 2022, the Debtor, RBB, and Corona filed a stipulation to resolve RBB and Corona's

20  pending relief from stay motions (docket no. 375) (the "Stipulation").  The Stipulation provided,

21  among other things, for the termination of the automatic stay as to RBB and Corona's rights and

22  remedies with regard to the Property.  Further, the Stipulation provides that neither RBB nor

23  Corona may take any action that would be stayed under 11 U.S.C. § 362(a), until ninety days after

24  the Court entered an order on the Stipulation.  The Court entered an amended order approving the

25  Stipulation on September 13, 2022.  On December 20, 2022, RBB filed a notice of default as to the

26  Property with the Los Angeles County Recorder's office.  On December 14, 2022, Corona filed a

27  notice of default.  The Debtor believes that neither RBB nor Corona is likely to move forward with

28  a foreclosure if this Motion is approved.

1710607.2  27086                                    10

**F.      Proposed Agreement with Corona Capital Group, LLC**

The Debtor and Corona have reached a resolution with regard to the distribution of proceeds from the sale of the Property, subject to Court approval (the "Corona Carveout Agreement").  A true and correct copy of the Corona Carveout Agreement is attached to the declaration of Zhao Pu Yang as Exhibit "3."

Without modifying in any respect the terms set forth therein, the Corona Carveout Agreement provides, among other terms, that:

1.      Corona consents to the sale of the Property free and clear of any lien, right, or claim it may have with respect to the Property.

2.      If the Debtor completes the sale of the Property, the Debtor shall receive a carveout as follows: (1) $25,000 from the net sale proceeds, plus (2) 1/3 of the net sale proceeds generated from the sale of the Property in excess of a $1,800,000 gross sale price.  In exchange, Corona will receive, after payment of senior liens, any property tac liabilities and any other reasonable and customary escrow or closing costs and brokers' commissions, all net proceeds up to the value of its secured claim.

See Exhibit "3."

## II.

## PROPOSED OVERBID PROCEDURES

The Debtor requests that the Court approve the following procedures for overbids:

1.      Any party wishing to present an overbid must deliver the following to the Debtor's undersigned counsel by March 30, 2023:

(a)      a deposit in the form of a cashier's check in the amount of $55,000 payable to "Jinzheng Group (USA) LLC" (the "Deposit");

(b)      a written offer on the form attached as Exhibit "2" to the declaration of Alphamorlai L. Kebeh, without any changes or conditions; and

(c)    provide proof of ability to close acceptable in the sole discretion of the Debtor, after consulting with counsel for the committee of unsecured creditors.

2.    The initial overbid must be no less than $1,825,000, representing $25,000 over the Proposed Sale Price.

3.    The acceptance of any overbid from a qualified bidder shall be in the Debtor's sole discretion, after consulting with counsel for the committee of unsecured creditors, and may be made at any time up to and including the time of the hearing to confirm the sale.

4.    If qualified overbids are received and accepted by the Debtor, an auction will be held at and during the hearing on the Debtor's Motion for approval of the proposed sale.  The Debtor proposes that each overbid be at least $10,000 more than the then-highest overbid.  At the conclusion of the auction, the Debtor will have the right, based solely on its business judgment and sole discretion, after consulting with counsel for the committee of unsecured creditors, to recommend to the Court for confirmation the offer that the Debtor determines is the highest and best overall offer.

5.    If the Court approves a sale to the bidding party (hereinafter the "Successful Bidder"), the Successful Bidder will be bound by all of the terms of the Purchase and Sale Agreement except as to price, without any contingencies (including no financing contingency). The Successful Bidder's deposit will be retained by the Debtor and will be applied to the sale price. The deposit will be non-refundable in the event that, for any reason whatsoever, the Successful Bidder fails to close the sale timely.

6.    The closing will take place as soon as practicable after the date of entry of the Court's order approving the sale (the "Sale Order"), but no later than the first business day which is more than fourteen calendar days following the date of entry of the Sale Order.  The Debtor and the Successful Bidder may mutually agree in writing to extend the time for closing the sale, without the need to obtain Court approval(s) of such extension(s).

7.    In its sole discretion, after consulting with counsel for the committee of unsecured creditors, the Debtor may request that the Court confirm a "Back-Up Bidder (or Bidders)" so that if the Successful Bidder does not close timely, the Debtor may sell the Property to the Back-Up

Bidder for the amount of such Back-Up Bidder's last bid.  In that event, the Back-Up Bidder's deposit will be retained by the Debtor's counsel.  If the sale to the Successful Bidder does not close timely, the Debtor will advise the Back-Up Bidder accordingly.  The closing will take place on or before fourteen calendar days following the date on which the Debtor gives notice of the Successful Bidder's failure to close.  The Back-Up Bidder will be bound by all of the terms of the Sale Agreement except as to price, without contingencies (including any financing contingency).  The Back-Up Bidder's deposit will be retained by the Debtor's counsel and will be applied to the sale price.  If so notified that the Back-Up Bidder is to proceed with the sale, then the deposit will become non-refundable in the event that the Back-Up Bidder fails to close the sale timely.

8.      If a qualified overbidder is not the Successful Bidder or a Back-Up Bidder, the overbidder's deposit will be returned to the overbidder within ten (10) court days after the date of the hearing.  If the sale to the Successful Bidder closes, the Back-Up Bidder's deposit will be returned to the Back-Up Bidder within ten (10) court days from the date of closing.

9.      The aggregate commission to be paid be the Debtor's brokers is an amount equal to 4% of the gross sales price.

## III.

## SALE OF THE PROPERTY SHOULD BE APPROVED

**G.**     **The Proposed Sale of the Property is Supported by the Debtor's Sound Business Judgment and is in the Best Interests of the Debtor's Estate and Its Creditors**

To enable a Trustee (or debtor-in-possession) to fulfill his duty to "collect and reduce to money the property of the estate" (11 U.S.C. § 704(a)(1)), the trustee "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  In this Circuit and others, courts will authorize sales where the decision to sell assets outside the ordinary course of business is based upon sound business judgment.  In re Continental Air Lines, Inc., 780 F.2d 1223, 1226 (5th Cir. 1986); In re Derivium Capital, LLC, 380 B.R. 392, 404 (Bankr. D.S.C. 2007) ("In determining whether to approve a sale proposed by a trustee, courts generally apply a business judgment test").

Based on the Second Circuit's decision in In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983), courts generally hold that the following four elements must exist to satisfy the "sound business judgment test":  (1) sound business reasons; (2) accurate and reasonable notice to interested persons; (3) an adequate, fair and reasonable price; and (4) good faith.  See Stephens Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) (affirming sale of debtor's assets proposed by trustee as being supported by a sound business purpose); Lionel, 722 F.2d at 1071.  "Ordinarily, the position of the trustee is afforded deference, particularly where business judgment is entailed in the analysis or where there is no objection." In re Lahijani, 325 B.R. 282, 289 (B.A.P. 9th Cir. 2005); Derivium, 380 B.R. at 404 ("the Trustee's business judgment is to be given 'great judicial deference,' [however] the Court must scrutinize whether the Trustee has fulfilled his duty to 'maximize the value obtained from a sale'").

The Debtor believes that the proposed sale of the Property, subject to overbid, is the best method by which to maximize the value of the estate's interest in the Property.  As detailed above, the Debtor retained licensed real estate brokers to list, market, and aid it in selling the Property. The Debtor has obtained an offer subject to overbidding and Bankruptcy Court approval, and the Buyers' is the highest and best offer received to date (taking into account financial qualifications as well as price).  The price was arrived at with the Buyers following arms-length negotiations and the Debtor believes that it represents a fair and adequate price for the Property.

The proposed sale is subject to overbids, so any and all qualified parties wishing to purchase the Property for a higher price may do so.

**H.      The Proposed Sale May be Authorized Under Section 363 of the Bankruptcy Code**

Section 363(f) of the Bankruptcy Code provides that, upon certain conditions, the trustee (or debtor) may sell property free and clear of a lien or interest in such property:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—
>
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

The purchase price for the Property will be at least $1,800,000.  The Debtor seeks to sell the Property free and clear of all liens and interests and claims.  The Debtor seeks authority to pay the Property Tax Lien and the RBB Lien in full from the net sale proceeds.  The Debtor further requests that the Court approve payments of all sales costs from the Property sale proceeds, including broker commissions, escrow fees, taxes and insurance, if any.

All of the parties who hold liens and encumbrances against the Property have either consented to its sale free and clear of their liens or will receive a share of the net sale proceeds sufficient to fully satisfy their liens against the Property.  Thus, the elements of 363(f) are satisfied.

I.      **The Debtor Requests that the Court Find that the Buyers and Any Backup Buyer Are Good Faith Purchasers Pursuant to Section 363(m) of the Bankruptcy Code**

A purchaser of property is protected from the effects of reversal on appeal of the authorization to sell or lease as long as the Court finds that the purchaser acted in good faith.  See 11 U.S.C. § 363(m).  A good faith purchaser is one who buys in good faith and for value.  Ewell v. Diebert (In re Ewell), 958 F.2d 276, 281 (9th Cir. 1992).  The Code does not define "good faith," but courts have provided guidance as to the appropriate factors to consider.  See id. (lack of good faith generally shown by fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders); In re Pine Coast Enters., Ltd., 147 B.R. 30, 33 (Bankr. N.D. Ill. 1992) (requirement that a purchaser act in good faith speaks to the integrity of its conduct in the course of sale proceeding).

Here, the Debtor employed the Brokers to list, market and aid in selling the Property.  The Brokers listed the Property and negotiations with the Buyers and other potential purchasers were

1   made in an arms-length fashion.  The Debtor will continue to negotiate at arms-length with

2   potential overbidders, and intends to present evidence to the Court at or before the hearing

3   supporting a finding of good faith as to any Successful Bidder or Back-Up Bidder.  Moreover, the

4   Debtor, the Debtor's brokers and the Buyers have submitted declarations supporting a finding of

5   good faith.  As a result, the Debtor requests that the Court make a finding that the party to whom

6   the Court confirms the sale, as well as any Back-Up Bidder, is a good faith purchaser of the

7   Property within the meaning of § 363(m) of the Code.

8

9   **J.**      **Waiver of FRBP 6004(h) is Warranted**

10          The Debtor respectfully requests a waiver of the 14-day stay of the effect of the order on

11  this Motion.  It would be beneficial to the estate and all creditors to complete the sale at the earliest

12  possible time, especially given the notices of default, which will otherwise result in foreclosure.

13  The Debtor prays that the Court enter such relief pursuant to FRBP 6004(h) to ensure an

14  expeditious closing.

15

16                                            **IV.**

17               **THE CORONA CARVEOUT AGREEMENT SHOULD BE APPROVED**

18          The Corona Carveout Agreement is in the best interest of the Debtor's estate and should be

19  approved under Bankruptcy Rule 9019.

20          Inherent in the grant of jurisdiction to the district courts over all civil proceedings arising

21  under, arising in or related to cases under title 11 is the Court's authority, under Section 105(a) of

22  the Bankruptcy Code, to enter orders approving compromises.  This power is expressly recognized

23  in Bankruptcy Rule 9019(a), which provides that the Court may approve a compromise or

24  settlement on motion by the trustee after notice is provided pursuant to Bankruptcy Rule 2002.  The

25  approval of a compromise is a "core proceeding" under 28 U.S.C. § 157(b)(2)(A) and (O).  In re

26  Carla Leather, Inc., 50 B.R. 764, 775 (Bankr. S.D.N.Y. 1985).

27          The approval or rejection of a proposed compromise is addressed to the sound discretion of

28  the Court and is to be determined by the particular circumstances of each case.  In re Walsh

1  Construction, Inc., 669 F.2d 1325, 1328 (9th Cir. 1982).  The burden of establishing the fairness of

2  the compromise rests on the proponent, here, the Debtor.

3        In determining the acceptability of a proposed compromise, the following four factors

4  should be considered: (1) the probability of success in the litigation; (2) the difficulties, if any,

5  encountered in the matter of collection; (3) the complexity of the litigation involved, the expense,

6  inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors and

7  a proper deference to their reasonable views.  In re A & C Properties, 784 F.2d 1377, 1381 (9th Cir.

8  1986); Flight Transportation Corporation Securities Litigation, 730 F.2d 1128, 1135 (8th Cir.

9  1984).  This Court is not required to decide the questions of law and fact in dispute, but to canvas

10  the issues to see whether the "settlement falls below the lowest point in a range of reasonableness."

11  In re Teletronics Services, Inc., 762 F.2d 185, 189 (2d Cir. 1985) (quoting In re W.T. Grant Co.,

12  699 F.2d 599, 608 (2d Cir. 1983)).

13        The Debtor believes that the Corona Carveout Agreement is fair and reasonable, in the best

14  interest of the Debtor's estate and its creditors, and satisfies the standards for approval of a

15  settlement.  With respect to the factors set forth in A & C Properties, the Debtor believes that the

16  Agreements should be approved based on the factors discussed below.

17        **1.**    Probability of Success in Litigation

18        Absent the proposed agreement, the Debtor would be forced to challenge the asserted

19  amount owed in connection with the Corona Deed of Trust in order to obtain any value for the

20  estate.  Because a majority of the asserted debt on the Corona Deed of Trust arises from a valid,

21  secured promissory note, the Debtor is not certain it would be successful in objecting to a portion

22  of Corona's claim sufficient enough to sell the Property and benefit the estate.  The estimated net

23  sale proceeds after payment in full of Corona at a purchase price of $1,800,000 is $0.  Thus, this

24  sale would not be possible and would provide no benefit to the estate absent the Corona Carveout

25  Agreement.  Therefore, this factor militates toward approval of the compromise.

26        **2.**    Difficulties in Collection

27        There is no issue with collection as against Corona – the dispute involves a determination of

28  the amounts owed to Corona on account of its secured claim.

**3.**    Complexity, Expense, Inconvenience, and Delay of Litigation

The Debtor could not readily sell the Property and benefit the estate absent the Corona Carveout Agreement.  The Corona Carveout Agreement resolves Corona's secured claim efficiently and at a lower cost than any possible litigation.  The Debtor cannot risk any further delay due to litigation, as RBB or Corona may foreclose on the Property absent a sale.  Thus, this factor weighs in favor of settlement.

**4.**    Interest of Creditors

The Corona Carveout Agreement serves the paramount interest of creditors.  It allows the Debtor to sell the Property, with payment to Corona in satisfaction of any secured claims in connection with its liens and encumbrances.  It will result in $25,000 of the net sale proceeds coming into the Debtor's estate, plus a percentage of any increase in the gross sale price achieved through overbidding.  Without the Corona Carveout Agreement, the Debtor would like not be able to sell the Property and generate enough revenue to benefit any creditors beyond the holders of liens against the Property.  This factor also supports the approval of the Corona Carveout Agreement.

# V.

## CONCLUSION

For the foregoing reasons, the Debtor requests that the Court enter an order:

1.    Granting the Motion in its entirety;

2.    Approving the PSA in its entirety;

3.    Approving and authorizing the Debtor to enter into the Corona Carveout Agreement;

4.    Authorizing the Debtor to sell to the Buyers or any Back-Up Bidder all right, title and interest in and to the Property free and clear of any and all liens, claims or interests pursuant to 11 U.S.C. § 363(b) and (f);

5.    Approving the proposed overbid procedures;

1710607.2  27086                                        18

1    6.    Authorizing the Debtor to pay brokerage commissions and ordinary and customary

2    costs of sale (including title and escrow fees) through escrow;

3    7.    Determining that the Buyers and back-up bidder(s) (if any) are good faith purchasers

4    within the meaning of 11 U.S.C. § 363(m);

5    8.    Waiving the effect of FRBP 6004(h);

6    9.    Approving the form and manner of notice provided by the Debtor of the sale; and

7    for such further relief as the Court deems just and proper.

8

9    DATED:  March 14, 2023                    DANNING, GILL, ISRAEL & KRASNOFF, LLP

10

11                                        By:  _____/s/ Alphamorlai L. Kebeh_____

12                                             ALPHAMORLAI L. KEBEH
                                              General Bankruptcy Counsel for Jinzheng Group
13                                            (USA) LLC, Debtor and Debtor in Possession

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>DECLARATION OF ZHAO PU YANG</u>

2

I, Zhao Pu Yang, declare as follows:

3

1.    I am the Attorney in Fact for Jianqing Yang, Managing Member of Jinzheng Group

4

(USA) LLC.  I am also the son of Jianqing Yang.

5

2.    All facts in this declaration are based upon my personal knowledge, discussions

6

with the Debtor's or my own advisors, brokers or counsel, and/or my personal opinion based upon

7

my experience and general knowledge about the Debtor.

8

3.    I am over the age of 18 and am authorized to submit this declaration on behalf of the

9

Debtor.  If called to testify, I would testify to the matters set forth in this declaration.

10

4.    I submit my declaration in support of the Debtor's Motion to (1) Authorize Sale of

11

Real Property Located At 2240 Lorain Road, San Marino, CA 91108 Free and Clear of Liens and

12

(2) Approve Compromise with Corona Capital Group, LLC (the "Motion").

13

5.    The Debtor entered into a "Purchase and Sale Agreement" ("PSA") with Lihua He

14

and Weijun Xu (the "Buyers"), pursuant to which the Debtor agreed to sell, and the Buyers agreed

15

to buy, for $1,800,000, subject to overbid and Court approval, the Debtor's right, title, and interest

16

in the real property commonly known as 2240 Lorain Road, San Marino, CA 91108 (the

17

"Property").  A copy of the PSA is attached herein as Exhibit "1."

18

6.    Based on my business judgment, I believe the proposed sale of the Property on the

19

terms set forth in the PSA is in the best interests of the Debtor's estate and its creditors.  Based on

20

the evaluation and advice from my brokers, I believe that $1,800,000, subject to overbid, is a fair

21

and reasonable price for the Property.

22

7.    My brokers assisted with the marketing of the Property to potential overbidders.  I

23

have no independent knowledge or familiarity with the Buyers.

24

8.    I have reached an agreement with Corona Capital Group, LLC ("Corona") regarding

25

the proposed sale (the "Corona Carveout Agreement") and authorized my attorney to execute it.  A

26

copy of the Corona Carveout Agreement is attached hereto as Exhibit "3" and incorporated herein

27

by this reference.

28

1710607.2  27086

20

9.      For the reasons set forth in the Motion, I believe that the Corona Carveout Agreement is reasonable, fair and equitable and in the best interests of the estate and its creditors, and should be approved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at ___Beijing, China___ on March __14__, 2023.

By: ___YANG ZHAOPU_____

ZHAO PU YANG

1710607.1   27086

## **DECLARATION OF WEIJUN XU**

I, Weijun Xu, declare as follows:

1.    I am a buyer of all right, title, and interest in the real property commonly known as 2240 Lorain Road, San Marino, CA 91108 (the "Property") from Jinzheng Group (USA) LLC (the "Debtor"), as seller.

2.    I submit my declaration in support of the Debtor's Motion to (1) Authorize Sale of Real Property Located At 2240 Lorain Road, San Marino, CA 91108 Free and Clear of Liens and (2) Approve Compromise with Corona Capital Group, LLC (the "Motion").

3.    I have personal knowledge of the facts in this declaration, except those matters that are based upon information and belief and as to such matters, I believe such matters are true.  If called as witnesses, I could testify competently to these facts.

4.    I do not have any prior, current, or expected association or other connection with the Debtor, major creditors or equity security holders in the Debtor's bankruptcy case, or with any of the professionals employed by the Debtor.

5.    There has been no collusion between myself and other bidders for the sale of the Property, or any attempt by me to take unfair advantage of other bidders.  My offer was in response to the marketing efforts of the Debtor's real estate brokers.  All negotiations were conducted at arm's length.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Whittier, California

Executed at 3/14/2023 on March 14, 2023.


By: _____

                       *Weijun Xu*

                       EAB26F17FFA5497...

Weijun Xu

## DECLARATION OF LIHUA HE

I, Lihua He, declare as follows:

1.     I am a buyer of all right, title, and interest in the real property commonly known as 2240 Lorain Road, San Marino, CA 91108 (the "Property") from Jinzheng Group (USA) LLC (the "Debtor"), as seller.

2.     I submit my declaration in support of the Debtor's Motion to (1) Authorize Sale of Real Property Located At 2240 Lorain Road, San Marino, CA 91108 Free and Clear of Liens and (2) Approve Compromise with Corona Capital Group, LLC (the "Motion").

3.     I have personal knowledge of the facts in this declaration, except those matters that are based upon information and belief and as to such matters, I believe such matters are true.  If called as witnesses, I could testify competently to these facts.

4.     I do not have any prior, current, or expected association or other connection with the Debtor, major creditors or equity security holders in the Debtor's bankruptcy case, or with any of the professionals employed by the Debtor.

5.     There has been no collusion between myself and other bidders for the sale of the Property, or any attempt by me to take unfair advantage of other bidders.  My offer was in response to the marketing efforts of the Debtor's real estate broker.  All negotiations were conducted at arm's length.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at   Whittier, California / 3/14/2023   on March **14**, 2023.

By: _____
    Lihua He

## <u>DECLARATION OF WILLIAM FRIEDMAN</u>

I, William, declare as follows:

1.      I am a realtor at Coldwell Banker Residential Broker ("Coldwell"), the broker for Jinzheng Group (USA) LLC (the "Debtor").

2.      I submit my declaration in support of the Debtor's Motion to (1) Authorize Sale of Real Property Located At 2240 Lorain Road, San Marino, CA 91108 Free and Clear of Liens and (2) Approve Compromise with Corona Capital Group, LLC (the "Motion").

3.      I have personal knowledge of the facts in this declaration, except those matters that are based upon information and belief and as to such matters, I believe such matters are true.  If called as witnesses, I could testify competently to these facts.

4.      I am authorized to make and execute this declaration on behalf of Coldwell. Coldwell does not have any prior, current, or expected association or other connection with the Debtor, major creditors or equity security holders in the Debtor's bankruptcy case, or with any of the professionals employed by the Debtor, except in that Coldwell has sometimes worked with the Danning Gill firm as bankruptcy counsel.

5.      There has been no collusion between Coldwell and other brokers or bidders for the sale of real property commonly known as 2240 Lorain Road, San Marino, CA 91108 (the "Property"), or any attempt by Coldwell to take unfair advantage of other brokers or bidders.

6.      The Property has been listed on the market since July 13, 2022.  I believe that the Property has been sufficiently exposed to the market during that time.   Additionally, I will post the time and date of the hearing on the Motion, as well as the overbidding requirements, on Coldwell's website and the MLS to further market the Property.

7.      It is my business judgment based on years of experience as a broker and of many real property bankruptcy sales I've conducted, that the proposed sale of the Property on the terms set forth in the Purchase and Sale Agreement between the Debtor and the buyers is fair and reasonable.

8.      I am a co-broker on this sale with Stephen Eng of Re/Max of Cerritos.  We have both agreed to a reduction of the brokers' commissions from 5% to 4% as part of the consideration for the Corona Carveout Agreement reflected in the above Motion.

9.      The offer presented by the buyers is the best offer the Debtor has received to date.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Los Angeles, California on March 14, 2023.

By: _____
        William Friedman

1710607.1  27086

25

## DECLARATION OF STEPHEN ENG

I, Stephen Eng, declare as follows:

1.  I am a realtor at Re/Max of Cerritos, one of the brokers for Jinzheng Group (USA) LLC (the "Debtor").

2.  I submit my declaration in support of the Debtor's Motion to (1) Authorize Sale of Real Property Located At 2240 Lorain Road, San Marino, CA 91108 Free and Clear of Liens and (2) Approve Compromise with Corona Capital Group, LLC (the "Motion").

3.  I have personal knowledge of the facts in this declaration, except those matters that are based upon information and belief and as to such matters, I believe such matters are true.  If called as witnesses, I could testify competently to these facts.

4.  I am authorized to make and execute this declaration on behalf of Re/Max of Cerritos.  Re/Max of Cerritos does not have any prior, current or expected association or other connection with the Debtor, major creditors or equity security holders in the Debtor's bankruptcy case or with any of the professionals employed by the Debtor.

5.  Pursuant to an order entered by the Court on August 8, 2022, Re/Max of Cerritos has been working with Coldwell Banker Residential Broker ("Coldwell") through its agent, William Friedman, to market and effect the sale of real property commonly known as 2240 Lorain Road, San Marino, CA 91108 (the "Property").

6.  Apart from its work with Coldwell Banker Residential Broker, there has been no collusion between Re/Max of Cerritos and other brokers or bidders for the sale of Property, or any attempt by Re/Max of Cerritos to take unfair advantage of other brokers or bidders.

7.  I, along with Coldwell, engaged in a comprehensive marketing campaign to promote the Property. Our approach included the use of professional photography, virtual staging and 3D virtual touring technology, MLS postings, Zillow postings, Re/Max.com postings, and other online advertising.  We believe that our approach helped to attract potential buyers and position the property for a successful sale.

8.  Overall, our marketing efforts were designed to maximize exposure and generate interest in the property.

1710607.2  27086

**26**

1        9.      It is my business judgment based on years of experience as a broker that the

2  proposed sale of the Property on the terms set forth in the Purchase and Sale Agreement between

3  the Debtor and the buyers is fair and reasonable.

4        10.     The offer presented by the buyers is the best offer the Debtor has received to date.

5

6        I declare under penalty of perjury under the laws of the United States of America that the

7  foregoing is true and correct.

**Arcadia, California**

8        Executed at 3/14/2023 , California on March **14** , 2023.

9

10

11

12                             Stephen Eng

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1710607.2  27086

## <u>DECLARATION OF ALPHAMORLAI L. KEBEH</u>

I, Alphamorlai L. Kebeh, declare as follows:

1.     I am an attorney employed by the law firm of Danning, Gill, Israel & Krasnoff, LLP ("Danning-Gill" or the "Firm"), attorneys for Debtor and Debtor in Possession, Jinzheng Group (USA), LLC (the "Debtor").  I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently testify thereto.

3.     I submit my declaration in support of the Debtor's Motion to (1) Authorize Sale of Real Property Located At 2240 Lorain Road, San Marino, CA 91108 Free and Clear of Liens and (2) Approve Compromise with Corona Capital Group, LLC (the "Motion").

4.     Attached hereto as Exhibit "2" is a true and correct copy of the form the Debtor intends to require for the submission of overbids.  The Debtor intends to request that its brokers forward a copy of the form to, among others, each potential buyer from whom the Debtor receives an offer or request.

5.     On June 27, 2018, a note in favor of Royal Business Bank ("RBB") was executed and secured by a deed of trust (the "RBB Note").  A copy of the RBB Note is attached hereto as Exhibit "4."

6.     On June 14, 2021, a note in favor of Corona (the "Corona Note") was executed and secured by the Corona Deed of Trust, recorded on June 25, 2021.  A copy of the Corona Deed of Trust is attached to the declaration of Alphamorlai L. Kebeh as Exhibit "5."  The original principal amount of the Corona Note is $540,000.  Corona asserts that, as of May 6, 2022, it is owed at least $583,194.21 on account of the Corona Note.

7.     In the course of conducting the proposed sale of the Debtor's property located at 2240 Lorain Road, San Marino, CA 91108, I received a preliminary title report from the escrow agent for the proposed sale.  A copy of the title report is attached hereto as Exhibit "6."

8.     On December 20, 2022, RBB filed a notice of default as to the Property with the Los Angeles County Recorder's office.

1    9.    The Debtor is informed and believes that RBB may record a notice of trustee sale as

2   early as March 20, 2023.

3    I declare under penalty of perjury under the laws of the United States of America that the

4   foregoing is true and correct.

5    Executed at Los Angeles, California on March **14**, 2023.

6

7

8    By:    ___**/s/ Alphamorlai L. Kebeh**___

    Alphamorlai L. Kebeh

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **REQUEST FOR JUDICIAL NOTICE**

Jinzheng Group (USA) LLC, debtor and debtor-in-possession (the "Debtor"), hereby respectfully requests that the Court take judicial notice of the following facts:

1.      On August 24, 2021, the Debtor filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code.  The case was assigned case number 2:21-bk-16674-ER.

2.      Danning, Gill, Israel, and Krasnoff, LLP was employed as the Debtor's general bankruptcy counsel, effective as of May 31, 2022, pursuant to an order entered on July 7, 2022 (docket no. 289).

3.      Pursuant to an order entered on August 19, 2022 (docket no. 354), the Debtor was authorized to employ Re/Max of Cerritos and Coldwell Banker through its agents, Stephen Eng and William Friedman, respectively, as its real estate brokers.

4.      On July 20, 2022, Corona Capital Group, LLC ("Corona") filed its Motion For Relief From The Automatic Stay (docket no. 320).

5.      On August 10, 2022, Royal Business Bank ("RBB") filed its Motion For Relief From The Automatic Stay (docket no. 333).

6.      On September 9, 2022, the Debtor, RBB, and Corona filed their Stipulation Resolving Motions For Relief From The Automatic Stay (docket no. 375).

DATED:  March 14, 2023                DANNING, GILL, ISRAEL & KRASNOFF, LLP


By:      _/s/ Alphamorlai L. Kebeh_
ALPHAMORLAI L. KEBEH
General Bankruptcy Counsel for Jinzheng Group
(USA) LLC, Debtor and Debtor in Possession

EXHIBIT 1

Authentisign ID: FD4FAA2F-588C-ED11-AC20-0050F2765AB1

## COUNTER-OFFER

This agreement (the "Agreement" or "Counter-Offer") is intended to set forth the terms and conditions of a contract for the purchase by and sale to Lihua He and Weijun Xu (the "Buyer") from Jinzheng Group (USA), LLC, by and through its manager Jianqing Yang, by his attorney in fact Zhaopu Yang, and solely in its capacity as chapter 11 debtor (the "Seller"), of the real property more commonly known as 2240 Lorain Road, San Marino, California,(the "Property"). When executed below, this Agreement will constitute conclusive evidence and the exclusive terms and conditions of the contract for such purchase and sale (the "Sale") of the Property and will supersede and replace in its entirety Buyer's written Residential Property Purchase Agreement and all attachments in support thereof dated December 22, 2022 (the "Offer") and any oral or written negotiations since the Offer.

**PURCHASE PRICE; DEPOSIT; ESCROW.**  The purchase price for the Property shall be $1,800,000 (the "Purchase Price"). Buyer shall make an initial deposit of $54,000 (the "Initial Deposit") in the form of cashier's check or wire transfer made payable to "A&A Escrow Services, Inc." (the "Escrow Holder") which shall be delivered to A&A Escrow Services, Inc., 15250 Ventura Blvd, suite 715, Sherman Oaks, Calif. 91403, within two (2) business days of (i) acceptance of this Counter-Offer by Buyer, (ii) Seller's execution of the Affirmation Agreement in the form attached hereto as Exhibit "A", and (iii) Buyer's receipt of a copy of the fully executed Counter-Offer and the Affirmation Agreement.

**FINANCIAL WHEREWITHAL.**  Buyer shall deliver to the Seller, within two (2) business days of (i) acceptance of this Counter-Offer by Buyer, (ii) Seller's execution of the Affirmation Agreement in the form attached hereto as Exhibit "A", and (iii) Buyer's receipt of a copy of the fully executed Counter-Offer and the Affirmation Agreement, proof of committed funds available to Buyer sufficient to enable Buyer to consummate the acquisition contemplated herein, which proof shall be in the form of a letter of credit, loan commitment, or other form acceptable to Seller in Seller's sole discretion.  In the event that either (i) Buyer fails timely to provide any such proof, or (ii) Seller determines, in Seller's sole discretion, that any proof of funds provided to Seller by Buyer is unacceptable, Seller shall have the right, at Seller's option, to provide written notice to Buyer that this Counter-Offer is terminated.  In the event that Seller exercises such termination right, this Counter-Offer shall terminate effective as of the date of Seller's written notice to Buyer, whereupon the Initial Deposit (if theretofore deposited with the Escrow Holder) shall be returned to Buyer and Buyer and Seller shall each be relieved of any further obligations hereunder.

**ESCROW INSTRUCTIONS.**  Escrow instructions corresponding to the terms of this Agreement shall be provided by the Escrow Holder and signed by the parties within five (5) business days of the date of Buyer's and Seller's receipt of said escrow instructions.  Buyer and Seller shall deposit such documents and instruments with the Escrow Holder as and when reasonably required to complete the sale.  Prior to the Seller's filing of its motion to approve the sale of the Property, Buyer shall be free to assign this Agreement to another person or entity (the "Assignee") subject to Seller's prior review and written approval (which

1701850.1  27086

EXHIBIT 1

Authentisign ID: FD4FA42F-588C-ED11-AC20-0050F2755AB1

approval Seller may grant or withhold in his sole discretion), but Buyer shall remain liable hereunder, together with such Assignee, in the event that such Assignee fails to perform any of Buyer's obligations hereunder.  Buyer shall not assign this Agreement to another person or entity after the Seller has filed its motion for approval of the sale of the Property with the Bankruptcy Court.

**BUYER'S DUE DILIGENCE AND CANCELLATION RIGHT.**  Buyer shall have 5 calendar days from the date of execution hereof to perform, complete, and satisfy all contingencies, inspections, investigations, tests and reviews of reports, and to complete all due diligence which Buyer desires for the Sale of the Property, including, but not limited to performing and completing any geological, soil, structural, environmental, or other tests, inspections, and investigations desire by Buyer.  Buyer may, not later than the end of the 5 calendar day due diligence period, provide Seller written notice of Buyer's election to withdraw from this Agreement because of Buyer's inability to complete or dissatisfaction with the results of any of those matters (the "Notice of Cancellation"), in which event Buyer's and Seller's obligations under this Agreement shall be terminated and Buyer shall receive a full refund of Buyer's deposit.  If Buyer fails to give such Notice of Cancellation within such due diligence period, all such contingencies shall be automatically removed and Buyer's obligation to proceed shall be non-contingent except as provided herein for (i) Buyer's review of a preliminary title report and underlying documents respecting the title to the Property (as set forth below), and (ii) Bankruptcy Court approval of this Agreement and the Sale (as set forth below).

**FINANCING AND APPRAISAL**.  Buyer waives the appraisal and financing contingencies.

**TITLE; TITLE INSURANCE.**  Within three (3) business days after acceptance of this Agreement, Stewart Title Company or such other title company of Seller's choice (the "Title Company") will be instructed to provide a preliminary report of the condition of title to the Property, including copies of underlying documents referred to in Schedule B thereof, for Buyer's review.  Buyer shall have three (3) business days after receipt of the preliminary title report and underlying documents in which to provide Seller written notice (the "Notice of Title Disapproval") that Buyer disapproves the condition of title with respect to a material matter(s) that interfere with the use or marketability of the Property for the purpose for which it is currently used or intended to be used.  Such notice must refer to the specific exception(s) in Schedule B of the preliminary title report and the specific underlying document(s) which are the basis for Buyer's disapproval.  Within five (5) business days after receipt of the Notice of title Disapproval, Seller may, in Seller's sole discretion, either (i) cancel this Agreement and the Sale, in which event Buyer's and Seller's obligations under this Agreement shall be terminated and Buyer shall receive a full refund of the Initial Deposit, or (ii) elect to correct the item(s) that were disapproved by Buyer, in which event the Sale shall proceed.  Seller may correct such item by any means that will result in the Title Company either removing the disapproved exception(s) from the preliminary report, providing title insurance coverage by endorsement against such exception(s), or providing that the order approving the Sale entered by the Bankruptcy Court shall resolve such exception.  At the close of the Sale, Seller shall convey and Buyer shall accept title to the Property as shown in Schedule B of the preliminary title report, subject to any corrections as in this paragraph above, free and clear of all monetary

1701850.1  27086

Authentisign ID: FD4FA02F-588C-ED11-AC20-0050F2755AB1

liens, subject to the terms of the Agreement and the order approving the Sale.  Seller shall pay the costs of a CLTA Standard Owner's policy of title insurance.

**REMOVAL OF CONTINGENCIES; COURT CONFIRMATION; CLOSING; DELIVERY OF POSSESSION.**  If Buyer does not give Seller written Notice of Cancellation or Notice of Title Disapproval as and when provided in this Agreement, Buyer's silence shall be deemed acceptance and Buyer shall be deemed to have satisfied and removed all of Buyer's contingencies and to proceed with the Sale.  Seller shall then file a motion with the Bankruptcy Court to confirm the Sale, which sale shall be subject to qualified overbids as approved by the Bankruptcy Court.  Upon such removal of contingencies, Buyer shall be unconditionally obligated to proceed with the Sale, subject only to Bankruptcy Court confirmation as set forth below.  If the Bankruptcy Court confirms the Sale to Buyer, the closing shall take place as soon as practicable after entry of the order approving the Sale, but no later than the later to occur of (i) the first business day after fourteen (14) calendar days following the entry of the operative Order of the Bankruptcy Court approving the Sale or (ii) if the effectiveness of the Order of the Bankruptcy Court approving the Sale is stayed, the first business day after the Order is no longer stayed (the "Closing Date"). The closing shall occur on the date the deed transferring the Property to Buyer is recorded with the County Recorder where the Property is located. Occupancy shall be delivered to Buyer upon Escrow Holder's confirmation of recording.

**BANKRUPTCY SALE.**  Buyer acknowledges that Seller is a chapter 11 debtor in possession duly appointed to administer the bankruptcy estate, and is a party to this Agreement solely in that capacity.  Seller and its brokers and agents (collectively, the "Seller's Brokers") have not and will not determine the condition or fitness for use of the Property for any particular purpose.  The Sale shall be "as is," "where is," "with all faults," and with no warranty by or recourse whatsoever to Seller or Seller's Brokers herein.  Transfer of the Property shall be by Quitclaim Deed.  All parties acknowledge that Seller is a party to this Agreement solely in its capacity as chapter 11 debtor in possession and that in the event of any default in the performance of any of Seller's obligations under the Offer (as modified hereby) or in the event that any other claim is asserted against Seller, its manager Jianqing Yang or his attorney in fact or agent, or the estate in connection with this transaction, the Seller and Mr. Yang shall in no event have any personal liability whatsoever. It being expressly understood and agreed that Buyer's sole recourse, if any, in such event shall be to the assets of the Seller's bankruptcy estate.

**TAXES; PRORATIONS; COSTS OF SALE.**  All real property taxes and assessments for the current tax year shown in the current County Tax Bill shall be prorated between Seller and Buyer and charged as of the closing date to the applicable accounts of Seller and Buyer.  The Sale shall be free and clear of any homeowner's association assessments and all real property taxes (other than those prorated as provided above) enforceable against the Property through the closing date of the Sale.  Escrow fees shall be split between Buyer and Seller in the manner customary in the County where the Property is located.  Seller shall pay any real property transfer tax.   Seller shall pay the cost of a Natural Hazard Disclosure Report, from a vendor selected by Seller, to be furnished to Buyer through escrow.   Buyer shall pay and have sole responsibility for compliance with any

1701850.1  27086

Authentisign ID: FD4FA02F-588C-ED11-AC20-0050F2F054B1

requirements imposed on the Property or this Sale by any governmental agency(ies), including compliance with any applicable governmental retrofit requirements.  Buyer shall pay the cost of recording the deed.  Buyer and Seller shall each pay their own expenses of every other type except as specifically provided in this Agreement.

**BANKRUPTCY COURT APPROVAL; OVERBIDDING.**  The Sale is subject to notice to creditors, approval by the Bankruptcy Court, and better qualified bids received by Seller through and including the Bankruptcy Court hearing to confirm the Sale.  Payment of any and all real estate brokers' commissions is also subject to notice to creditors and approval by the Bankruptcy Court.  Buyer acknowledges and agrees that Seller may not seek to obtain the Bankruptcy Court's approval if Seller has determined that it would be in the best interest of the bankruptcy estate not to do so, and Seller holds sole and absolute discretion with regard to the foregoing.  Buyer acknowledges and agrees that if the Bankruptcy Court approves the Sale to a different buyer (the "Successful Overbidder") at the hearing on the Sale, the Seller may hold the Buyer's deposit pending close of the Sale to the Successful Overbidder and, if the Successful Overbidder does not timely close its purchase of the Property, the Seller has the right to close the Sale to the Buyer at the Purchase Price hereunder, or such higher price as the Buyer may have bid at the hearing on the Sale.

**BROKERS.**  Seller is represented by Re/Max of Cerritos and Coldwell Banker.  Buyer is represented by Excellence RE Real Estate. Subject to Bankruptcy Court approval, Seller will pay a real estate broker's commission aggregating 5% of net sales price of the Property as follows: 1.5% to Coldwell Banker, 1.5% to Re/Max of Cerritos and 2% to Excellence RE Real Estate in connection with the closing of the Sale.  Weijun Xu is one of the Buyers and also one of the real estate agents representing the Buyers. Seller's Brokers and Buyer's Brokers are collectively referred to herein as the "Brokers".  No commission or compensation shall be due or payable to Brokers in connection with this Agreement or Sale except from the cash proceeds of an actual Sale of the Property that closes to Buyer.  Buyer hereby represents and warrants that, other than the Brokers, Buyer has not dealt with any broker, finder, or other person entitled to any fee, commission, or other compensation in connection with the Sale and Buyer shall indemnify, defend, protect, and hold Seller and the related bankruptcy estate harmless of, from, and against any claims, demands, actions, causes of action, losses, liabilities, costs, and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as Seller may suffer or incur in the event that any claims for any such fees, commissions, or other compensation of any kind are hereafter asserted.

**MATERIAL CHANGE OF CONDITION.**  In the event of any material change in the condition of the Property after the date of acceptance of this Counter-Offer, if Buyer demands repair of any resulting actual damage to the Property, Seller may, at Seller's sole option: (i) elect to terminate this Agreement, in which event Buyer's and Seller's obligations to buy or sell shall terminate and the Initial Deposit shall be refunded to Buyer without interest; or (ii) make required repairs at the bankruptcy estate's expense; or (iii) assign any insurance proceeds for the damage to the Property to Buyer as of the close of the Sale; or (iv) credit the cost of such repairs to Buyer through escrow, it being agreed that in the event that Seller elects and complies with subpart (b), (c), or (d) of this paragraph, Buyer's obligation to proceed with the Sale shall be unaffected by any such material change in the condition of the Property. Buyer's

1701850.1  27086

obligation to proceed with the Sale shall be unaffected by any such material change in the condition of the Property. Conditions related to the Covid-19 pandemic shall not constitute a material change in condition under this Counter-Offer.

**REMEDY FOR BUYER'S OR SELLER'S FAILURE TO CLOSE.**  Buyer's sole remedy in the event that the Sale fails to close as a result of Seller's inability or failure to close for any reason, including but not limited to the reason of failure to obtain approval of the Sale by the Bankruptcy Court, shall be the mutual release of Buyer's and Seller's obligations to buy or sell and a full refund of the Initial Deposit (plus any increase thereof by Buyer).  In the event Buyer fails to close the Sale for any reason other than Seller's default, after Buyer's contingencies have been removed as under this Agreement, Buyer's Initial Deposit (plus any increase thereof by Buyer) shall be paid over to Seller and retained by Seller as liquidated damages without further legal action.  This provision shall apply equally to the Initial Deposit (and any increase thereof by Buyer) without interest. If Buyer fails to complete this purchase because of Buyer's default, Seller shall retain, as liquidated damages, the deposit actually paid. Buyer and Seller agree that this amount is a reasonable sum given that it is impractical or extremely difficult to establish the amount of damages that would actually be suffered by Seller in the event Buyer were to breach this Agreement. Release of funds will require mutual, signed release instructions from both Buyer and Seller, judicial decision or arbitration award. AT TIME OF ANY INCREASED DEPOSIT, BUYER AND SELLER SHALL SIGN A SEPARATE LIQUIDATED DAMAGES PROVISION INCORPORATING THE INCREASED DEPOSIT AS LIQUIDATED DAMAGES (C.A.R.FORM RID).

_LH_   _WX_  [Buyer's Initials]

**BANKRUPTCY COURT JURISDICTION.**  The United States Bankruptcy Court for the Central District of California, Los Angeles Division shall have sole and exclusive jurisdiction to interpret and enforce the terms of this Agreement and Buyer hereby consents and submits to such exclusive jurisdiction.  This Agreement shall be interpreted and enforced pursuant to the laws of the State of California, the United States of America, and title 11 of the United States Code.

**"AS-IS," "WHERE-IS" CONDITION; NO WARRANTIES.**  Buyer acknowledges and agrees that, to the maximum extent permitted by law, the sale contemplated by this Agreement is made "as-is," "where-is," and "with all faults," except as specifically provided in this Agreement.  Seller and Seller's Brokers have not made, do not make, and specifically negate and disclaim any representations, warranties, promises, covenants, agreements, or guaranties of any kind or character whatsoever, whether express or implied, oral or written, concerning or respecting (i) the value of the Property; (ii) the income to be derived from the Property; (iii) the suitability of the Property, or lack thereof for any activity or use which Buyer may intend to conduct thereon, including any possibilities or limitations for future development; (iv) the habitability, merchantability, marketability, profitability, or fitness for a particular purpose, of the Property, or lack thereof; (v) the manner, quality, state of repair, or lack of repair of the Property; (vi) the nature, quality, or condition of the Property, or any portion, system, or component

1701850.1  27086

Authentisign ID: FD4FAA2F-588C-ED11-AC20-0050F2765AB1

thereof, including without limitation, water, soil, and geology; (vii) the compliance of the Property or its operation, or lack thereof, with any laws, ordinances, regulations, rules, or orders of any applicable governmental authority or body; (viii) the manner or quality of engineering, design, construction or materials, if any, incorporated into the Property; (ix) the compliance or lack of compliance with any land use, building and safety, or other laws, ordinances, regulations, rules, orders, or other requirements imposed or enforced by any governmental or non-governmental body, including without limitation the Americans with Disabilities Act of 1990; (x) the presence or absence at, on, under, or adjacent to the Property, of materials described as "hazardous substances, hazardous materials, or toxic substances" or by similar terms under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. §§ 9601, et seq.), the Hazardous Materials Transportation Act, as amended (49 U.S.C. §§1801, et seq.), the Resource Conservation and Recovery Act (42 U.S.C. §§ 6901, et seq.), the Toxic Substance Control Act (15 U.S.C. § 2601, et seq.), the Clean Water Act (33 U.S.C. § 1251, et seq.), California Health and Safety Code §§ 25117 or 25316, or other statutes and laws, all as amended and including all regulations issued thereunder; (xi) the content, completeness or accuracy of any due diligence materials or preliminary report regarding title to the Property; (xii) the conformity or lack of conformity of the improvements to any plans or specifications for the Property, including any plans and specifications that may have been or may be provided to Buyer; (xiii) the conformity or lack of conformity of the Property to past, current, or future applicable zoning or building requirements; (xiv) any deficiency of any undershoring, drainage, or other aspects, systems, or components of or affecting the Property; (xv) the fact, if applicable, that all or a portion of the Property may be located on or near any natural hazard zone as determined by any governmental agency or body; (xvi) the existence of vested land use, zoning, or building entitlements affecting the Property or any other property; or (xvii) any other matter.  Without in any manner limiting the foregoing, Buyer hereby acknowledges and agrees that (i) Seller's Brokers have provided (and will hereafter provide) to Buyer various materials and information relating to the Property, including, without limitation, information and materials relating to the condition of the Property, and (ii) all such materials and information so provided to Buyer by Seller's Brokers shall, for all purposes of this Agreement, be deemed to have been disclosed to Buyer by the Seller, as well.

**BROKERS.**   Seller's Brokers herein have not and will not perform any inspections, investigations, or due diligence on behalf of Buyer unless otherwise specified herein. Buyer is informed that Buyer must arrange for any inspections and investigations desired by Buyer utilizing suitable third party professionals selected and compensated by Buyer.   In no event shall Seller have any liability or responsibility for any representation, warranty, statement made, or information furnished by Seller's Brokers, or any other person or entity, concerning the Property, this Agreement, or any other matter, unless expressly set forth in writing and signed personally by Seller.

**OPPORTUNITY TO INSPECT; BUYER'S SOLE RELIANCE.**   Buyer represents, warrants, acknowledges, and agrees that Buyer has been given the opportunity to inspect and investigate the Property and all other facts and circumstances deemed by

1701850.1  27086

Authentisign ID: FD4FAA2F-588C-ED11-AC20-0050F2755AB1

Buyer relevant and significant, and to review information and documentation affecting the Property.  In deciding to proceed with the Sale, Buyer is relying solely on Buyer's own inspections and investigation of the Property (including by any outside professionals whom Buyer has elected to engage for such services) and review of such information and documentation, and not on any information provided or to be provided by Seller.  Buyer further acknowledges and agrees that any information made available to Buyer or provided or to be provided by or on behalf of Seller with respect to the Property was obtained from a variety of sources and that neither Seller nor Seller's Brokers nor any other person has made or makes any representations as to the accuracy or completeness of such information.   Buyer hereby fully and irrevocably releases all such sources and preparers of information and documentation affecting the Property which were retained or engaged by Seller or Seller's Brokers from any and all claims that Buyer may now or hereafter have against such sources and preparers of information, for any costs, expenses, losses, liabilities, damages, demands, actions, or causes of action arising from any such information or documentation.   NEITHER SELLER NOR BROKERS HAVE PROVIDED OR WILL PROVIDE ANY LEGAL OR TAX ADVICE TO BUYER.   Buyer is informed that Buyer must obtain any such advice, if desired by Buyer, from independent professionals selected and engaged by Buyer.

## PHYSICAL, GEOLOGICAL, PEST CONTROL, AND ENVIRONMENTAL INSPECTIONS AND INVESTIGATIONS.

A.    BUYER SHALL CONDUCT THOROUGH PHYSICAL, GEOLOGICAL, PEST CONTROL, ENVIRONMENTAL INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY AS MAY BE DETERMINED BY BUYER, THROUGH QUALIFIED PROFESSIONALS SELECTED BY BUYER.   Seller and Seller's Brokers strongly recommend that Buyer fully exercise and not waive such inspections and investigations.

B.    Buyer shall select and employ, at Buyer's sole expense, a licensed engineer(s), architect(s), contractor(s), geologist(s), pest control licensee(s), environmental consultant(s), or other qualified professional(s), to make inspection(s) and investigations of the Property, including, but not limited to, (i) its general structure, plumbing, heating, air conditioning (if any), electrical system, built-in appliances, cesspool/sewer/septic system, well, roof, soils, foundation, mechanical systems, pool, spa, related equipment and filters, sprinklers, and those other matters affecting the desirability of the Property (all if and only to the extent any such structures, systems, and components are presently a part of the Property); (ii) any actual or potential wood destroying pests or other conditions damaging to the Property or any portion thereof; (iii) environmental hazards, substances, products, or conditions, including without limitation, asbestos, formaldehyde, lead, lead-based paint, contaminated soil or water, fuel, chemical storage tanks, hazardous waste, electromagnetic fields, and radon gas, any of which may constitute a health risk; (iv) the presence or absence of any required governmental permits, inspections, applications, approvals, and certificates of

1701850.1  27086

occupancy, and compliance or lack of compliance with building codes and laws applicable to the Property; (v) plans and specifications for the Property; (vi) all applicable zoning, municipal, county, state, and federal, including those affecting the past, current, or any future use of the Property; (vii) deed restrictions and other matters of public record which may govern, restrict, condition, or prohibit the use, alteration, or development of the Property; and (viii) generally, without limitation, any and all other items and matters of whatsoever nature, character, or description, which Buyer deems material to Buyer's interests, in, on, or affecting the Property, and to approve or disapprove said inspection within the period and in the manner set forth in this Agreement.

**RETROFITTING.**  All required retrofitting including but not limited to the payment of City Report, installation of smoke and carbon monoxide detectors, low flow toilets and compliance with all governmental agencies shall be Buyer's responsibility for cost and completion.

**COMPLETE AGREEMENT; NO OTHER REPRESENTATIONS OR WARRANTIES.** Seller shall not be liable or bound in any manner by any oral or written statements, representations, or information pertaining to the Property, or the operation thereof, furnished by any real estate broker, agent, employee, contractor, or other person. Buyer further acknowledges and agrees Seller has no obligations to make repairs, replacements, or improvements to the Property except as may otherwise be expressly stated herein.  Without limiting any other provision hereof,  Buyer represents, warrants, and covenants to Seller that, except for Seller's express representations and warranties specified in this Agreement, Buyer is relying solely upon Buyer's own investigation of the Property.

**WRITTEN AFFIRMATION OF SELLER REQUIRED.**   Buyer understands that Seller may continue to receive and respond to other offers on the Property and may be making several counter-offers concurrently containing the same or different terms.  This Counter-Offer shall not be binding until accepted by Buyer and executed by Buyer and Seller on the signature page below; and then approved by Seller, in Seller's sole discretion, in the form of the Seller's "Affirmation of Agreement" attached hereto as Exhibit "A" which, if so executed by Seller, will constitute Seller's agreement that Seller will sell the Property to Buyer, subject to Bankruptcy Court approval, the rights of any overbidding parties, and the terms and conditions of this Agreement.  Buyer further acknowledges that it would be imprudent and unrealistic to rely upon the expectation of entering into a binding agreement regarding the subject matter of this Counter-Offer prior to receipt of Seller's Affirmation of Agreement, and further represents to Seller that any efforts to complete due diligence, or to perform any of the obligations provided herein shall not be considered as evidence of binding intent without Seller's Affirmation of Agreement, and understands that BUYER'S ACCEPTANCE HEREOF SHALL HAVE NO FORCE OR EFFECT PRIOR TO BUYER'S RECEIPT OF SUCH AFFIRMATION OF AGREEMENT SIGNED BY SELLER.

1701850.1  27086

Authentisign ID: FD4FA02F-588C-ED11-AC20-0050F2765AB1

**ATTORNEYS' FEES.**  In the event that either party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing party in that action or proceeding shall be entitled to have and recover from the non-prevailing party all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing party may suffer or incur in the pursuit or defense of such action or proceeding.

**EXPIRATION OF COUNTER-OFFER.**  This Counter-Offer shall expire if not accepted by Buyer by delivering a copy hereof, fully signed and initialed by Buyer, to Seller, on or before 5:00 p.m., Pacific time, on January 5, 2023.  Such acceptance shall nevertheless be subject to the receipt of Seller's Affirmation of Agreement.

**AGREED AND ACCEPTED:**

BUYER:

Dated:  01/04/2022

By:  *Lihua He*  01/04/23    *Weijun Xu*  01/04/23
Lihua He and Weijun Xu

SELLER (subject to execution of Seller's Affirmation of Agreement):

Dated:  1/3/2023

1701850.1  27086

Page 9 of 11

By: _____

        Zhaopu Yang, attorney-in-fact for Jianqing Yang, in his capacity as manager of Jinzheng Group(USA), LLC, chapter 11 debtor and debtor in possession

1701850.1   27086

Authentisign ID: FD4FA02F-588C-ED11-AC20-0050F2755AB1

## EXHIBIT "A"

## SELLER'S AFFIRMATION OF AGREEMENT

Seller hereby acknowledges Buyer's acceptance of the foregoing Counter-Offer and affirmatively agrees to sell the Property to Buyer on the terms and conditions of the foregoing Agreement, but subject to Bankruptcy Court approval and any qualified overbidders.  Seller shall revoke any other outstanding Counter-Offers made to other prospective buyers or make the same subject and subordinate to this Agreement.

SELLER

Dated: _____1/3/2023_____

By: _____

*zhaopu yang*

Zhaoupu Yang, attorney-in-fact for Jianqing Yang, in his capacity as manager of Jinzheng Group(USA), LLC, chapter 11 debtor and debtor in possession

EXHIBIT 2

## OFFER TO PURCHASE REAL PROPERTY

The undersigned (collectively "Offerors") hereby offer (the "Offer") to purchase from Jinzheng Group (USA), LLC (the "Debtor"), debtor and debtor-in-possession, the Debtor's right, title and interest to the real property commonly known as 2240 Lorain Road, San Marino, CA 91108, bearing Assessor Parcel Number 5365-019-052 (the "Property"), which is the subject of a certain Purchase and Sale Agreement and amendments thereto (collectively, the "PSA"), dated on or about January 4, 2023. **Offerors hereby acknowledges receipt of a copy of the PSA. [Initials_____; initials _____].** Offerors agree to substitute into the Debtor's currently pending sale upon identical terms and conditions, except as to price and as otherwise set forth herein.

The Offer price, all cash, shall be $_____ [at least $1,825,000].

There are no contingencies to the Offer whatsoever—save and excepting Bankruptcy Court approval after notice and hearing—including, without limitation, inspection, due diligence or financing contingencies. The Offer is subject to acceptance by the Debtor, approval by the Bankruptcy Court, and higher and better bids at a sale motion hearing on April 4, 2023, at 11 a.m. in: Courtroom "1568" of the United States Bankruptcy Court located at 255 East Temple Street, Los Angeles, California 90012. The Offerors understand, acknowledge, and agree that if the Offerors are deemed "qualified bidders," they or a duly authorized representative, shall personally attend the hearing.

Offerors understand that the Debtor has neither inspected the Property nor analyzed its fitness for any particular use. Offerors further understand that the sale is of the Debtor's right, title and interest, if any, in the Property only, and is sold on an "As Is" and "Where Is" basis, with no warranty or recourse whatsoever. Offerors have completed all due diligence which Offerors believe to be required to purchase the Property and have not relied upon any statement or representation from the Debtor, its attorneys, its real estate brokers or other agents. Any necessary testing, remediation, repairs, or other actions, including without limitation, those relating to any environmental laws, shall be the sole responsibility of the Offerors, at Offerors' sole expense.

The initial deposit is $55,000 (the "Deposit"). To be "qualified bidders" for the Property, Offerors must deliver by **March 30, 2023**, to Jinzheng Group (USA), LLC, c/o Zev Shechtman, 1901 Avenue of the Stars, Suite 450, Los Angeles, California 90067-6006: (a) a cashier's check payable to "Jinzheng Group (USA), LLC, Debtor and Debtor-In-Possession" in an amount not less than the Deposit, (b) an executed copy of this Offer, and (c) proof of adequate funding. Parties who do not timely submit the foregoing will be barred from bidding at the sale motion hearing at the Debtor's discretion. The Deposit shall be non-refundable in the event that the Court confirms the sale to the Offerors but Offerors breach their obligations under the Offer, in which event the Debtor shall be free to sell the Property to another party and to retain the entire Deposit without liability to anyone. Offerors' sole remedy in the event that the Debtor is unable to close the sale shall be a return of the Deposit in full. If the Offerors perform in full under the terms of the Offer, but the Court confirms the sale of the Property to another party, Offerors' Deposit shall be refundable in full. If another party is the successful bidder at the sale motion

1710669.1  27086

1

**EXHIBIT 2**

hearing, Offerors may opt to be a back-up bidder in which event the Deposit will be retained by the Debtor until the sale closes.

A commission of 2% of the sale price shall be payable to Offerors' real estate broker, if any, subject to approval of the Bankruptcy Court, but only upon closing of the sale to Offerors.

The Offerors further understand, acknowledge, and agree that at the sale motion hearing, only qualified bidders shall be entitled to bid, and that the Debtor has sole discretion to determine, in the exercise of its sound business judgment, whether the Offerors are "qualified bidders." If the Offerors are not deemed qualified bidders (but have not otherwise defaulted), the Debtor will refund the Deposit.

The Offerors understand, acknowledge, and agree that upon conclusion of the bidding process, the Debtor shall have sole discretion, in the exercise of its sound business judgment, to decide which of the bids is the best bid, subject to approval of the Bankruptcy Court. The overbidder who is accepted by the Debtor and approved by the Bankruptcy Court as the successful bidder must pay all amounts reflected in its bid in cash at the closing of the sale. At the sale hearing, and upon conclusion of the bidding process, the Debtor may also acknowledge a back-up bidder, which shall be the bidder with the next best bid determined in the sole discretion of the Debtor subject to Bankruptcy Court approval. Should the successful bidder fail to timely close on the sale of the Property, the Debtor may sell the Property to the back-up bidder without further court order and retain the Deposit as liquidated damages. The undersigned Offerors hereby agree that the Bankruptcy Court wherein the Bankruptcy Case No. 2:21-bk-16674 is pending, for Jinzheng Group (USA), LLC, debtor and debtor-in-possession, shall have and retain exclusive jurisdiction to interpret and enforce this Offer as well as to resolve any dispute related in any way to this Offer, without a jury, and to enter final judgments thereon.

Dated: _____    _____
                                           (Name of Offeror)


                                           _____
                                           (address of Offeror)


                                           _____
                                           (tel. no. and email address of Offeror)


                                           _____
                                           (name, tel. no. email address of authorized agent
                                           of Offeror, if applicable)


                                           _____

(name, tel. no. email address of real estate agent and
brokerage of Offeror, if applicable)

_____
(signature of Offeror and/or authorized agent
of Offeror, if applicable)

Dated: _____    _____
(Name of Offeror)


_____
(address of Offeror)


_____
(tel. no. and email address of Offeror)


_____
(name, tel. no. email address of authorized agent
of Offeror, if applicable)


_____
(name, tel. no. email address of real estate agent and
brokerage of Offeror, if applicable)


_____
(signature of Offeror and/or authorized agent
of Offeror, if applicable)

1710669.1  27086                    3

EXHIBIT 3

### CARVEOUT AGREEMENT SUBJECT TO COURT APPROVAL
### Between Jinzheng Group (USA) LLC, and Corona Capital Group, LLC
### March 2023

This carveout agreement (the "Agreement") executed on March 10, 2023, is made by and
between Jinzheng Group (USA) LLC, debtor and debtor-in-possession in bankruptcy case no.
2:21-bk-16674 (the "Debtor"), on the one hand, and Corona Capital Group, LLC ("Corona") on
the other hand, (collectively, the "Parties") by and through their respective undersigned counsel.

### FACTUAL BACKGROUND

1.      On August 24, 2021 (the "Petition Date"), the Debtor, filed a voluntary petition
for relief under chapter 11 of the Bankruptcy Code. The Debtor continues in possession of its
property and is operating and managing its business as a debtor in possession pursuant to the
provisions of 11 U.S.C. §§ 1107(a) and 1108.

2.      The assets of the bankruptcy estate include, among other things, a parcel of real
property located at 2240 Lorain Road, San Marino, California 91108 (the "Property"). The
Debtor is currently listing the Property for sale at $1,800,000.

3.      The Debtor is informed that there are three liens on the Property. The holders of
the liens are Royal Business Bank (first position), Corona Capital Group, LLC (second position),
and DNQ LLC (third position) (collectively, the "Lienholders").

4.      Royal Business Bank has asserted that it is owed at least $1,177,301.24 on
account of its first priority lien.

5.      On or about January 17, 2022, Corona filed claim no. 8 asserting a claim against
the Debtor's estate in the amount of $540,000 (the "Corona Proof of Claim"). Corona Capital
Group, LLC has asserted that, as of May 6, 2022, it was owed at least $583,194.21, with unpaid
interest and costs continuing to accrue, on account of its second priority lien (the "Corona
Lien").

6.      DNQ LLC has asserted that it is owed at least $420,000 on account of its third
priority lien.

7.      On or about July 15, 2022, the Debtor filed an application to employ brokers (the
"Brokers") to sell the Property (Docket No. 307). On or about August 8, 2022, the bankruptcy
court entered an order granting the Brokers' employment (Docket No. 330).

8.      The Property has been listed on the real estate market since July 13, 2022. The
Debtor has yet to receive an offer on the Property that would be sufficient to pay all liens,
brokers' commissions and closing costs in full. The Debtor has, however, received and accepted

1710225.1 27086

1 | P a g e

**EXHIBIT 3**

an offer to purchase the Property for $1,800,000 subject to court approval and overbid pursuant to a sale under section 363 of the Bankruptcy Code (the "Sale").

9.      In order to generate sufficient equity in the Property for the Debtor's estate and afford Corona the opportunity for a recovery on account of its secured claim, the Debtor and Corona have entered into this carveout agreement.

## AGREEMENT

Based on the mutual promises contained herein and for other good and valuable consideration, the receipt of which is acknowledged, the parties agree as follows:

1.      Recitals Acknowledged. The above recitals are incorporated herein by reference.

2.      Court Approval Required. This Agreement is subject to the approval of the Bankruptcy Court after notice and a hearing. The Debtor will seek approval of this Agreement in conjunction with approval of the Sale.

3.      Consent to Sale. Subject to Court approval, Corona consents to the Sale free and clear of any lien, right, or claim it may have with respect to the Property, including, but not limited to the Corona Lien. All Net Sale Proceeds, as defined in the next paragraph, less the Carveout, as defined in the next paragraph, secured by the Corona Lien shall be paid to Corona at close of escrow of the Sale.

4.      Sale of the Property. The Debtor will promptly seek approval of the Sale, subject to overbids, on the next available hearing date that will allow for sufficient notice under Section 363 of the Bankruptcy Code, with a good faith determination sought under Section 363(m). If the Debtor completes the Sale, the Debtor shall receive a carveout (the "Carveout") as follows: (1) $25,000 from the net sale proceeds (the "Base Carveout Amount"), to the extent available, after payment of the first lien, any property tax liabilities and any other reasonable and customary escrow or closing costs and brokers' commissions (the "Net Sale Proceeds"), plus (2) one-third (1/3) of the Net Sale Proceeds generated from the sale of the Property in excess of those that would have been generated by the Sale at $1,800,000. (the "Increase in Net Proceeds"). If the Sale does not close, Debtor is not entitled to payment of the Carveout. With the exception of the Carveout provided for herein, Corona shall receive at close of escrow of the Sale, all Net Sale Proceeds secured by the Corona Lien. There shall be no surcharge that arises from or relates to the Sale, under Section 506[c] of the Bankruptcy Code or common law principles of similar effect, from any property securing an allowed secured claim, including, but not limited to the Net Sale Proceeds to which Corona is entitled under this Agreement. The total real estate commissions paid in connection with the Sale shall not exceed 4% of the gross sale price.

5.      No Effect on Corona's Pending Foreclosure. Nothing in this Agreement shall modify or alter the termination of the automatic stay provided for in the Amended Order Approving Stipulation Resolving Motions for Relief from the Automatic Stay, etc. entered on

September 13, 2022 (Docket No. 379). Nothing in this Agreement shall preclude or in any way limit Corona from exercising all of its rights to proceed with and complete its pending non-judicial foreclosure sale of the Property.

6.    <u>Notices.</u> All notices, demands or communications pursuant to this agreement shall be in writing and shall be deemed to have been duly given if delivered via email, as follows:

        a.    To the Debtor:

                c/o Zev Shechtman
                Danning, Gill, Israel & Krasnoff, LLP
                zs@DanningGill.com

        b.    To Corona:

                c/o Eric Alan Mitnick
                MitnickLaw@gmail.com

7.    <u>Interpretation.</u> If there is a dispute over the meaning of any provision, this Agreement shall not be interpreted against any of the Parties, regardless of which one prepared the initial draft hereof or any modifications hereto.

8.    <u>Jurisdiction; Applicable Law.</u> The Bankruptcy Court presiding over the bankruptcy case shall have and retain sole and exclusive jurisdiction to interpret and enforce the terms of this agreement as a core matter, without a right to jury trial or, if required by any applicable law, with a jury before such Bankruptcy Court, and the Parties hereby consent and submit to entry of a final order or final judgment by the Bankruptcy Court. This Agreement shall be interpreted and enforced pursuant to the United States Bankruptcy Code, and where State law is required to be applied, California law shall apply.

9.    <u>Execution.</u> This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Signatures by facsimile or electronic mail shall be deemed as originals.

10.    <u>Entire Agreement.</u> This Agreement constitutes the entire agreement between and among the Parties concerning the subject matter hereof. There are no other understandings, representations, or agreements, oral or otherwise, between and among the Parties concerning the subject matter of this Agreement.

11.    <u>Amendments; Modifications; Waiver.</u> This Agreement may not be modified, superseded, terminated, or amended and no provision hereto may be waived except by: (i) a writing, making specific reference hereto, signed by the Parties and approved by the Bankruptcy Court; or, (ii) an order of the Bankruptcy Court which has become final.

1710225.1  27086
**3 | P a g e**

12.    <u>Further Assurances.</u>  The Parties shall promptly execute and deliver, as appropriate, such other and further documents as may be necessary to effectuate the terms of this agreement.

**AGREED**

**DANNING, GILL, ISRAEL & KRASNOFF, LLP JINZHENG GROUP, LLC,**

_____

ZEV SHECHTMAN, Attorneys for Debtor and Debtor in Possession, JINZHENG GROUP (USA) LLC

**AGREED**

**LAW OFFICE OF ERIC ALAN MITNICK**

_____

ERIC ALAN MITNICK, Attorney for Secured Creditor CORONA CAPITAL GROUP, LLC

~~Title:~~

EXHIBIT 4

Loan Number: 1805020405

Loan Number: 1805020405                                      MIN: 100705300000183061

# FIXED/ADJUSTABLE RATE NOTE

(LIBOR One-Year Index (As Published In *The Wall Street Journal*)–Rate Caps)

**NOTICE TO BORROWER:** THIS DOCUMENT CONTAINS PROVISIONS FOR A VARIABLE INTEREST RATE.

THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MINIMUM AND MAXIMUM RATES I MUST PAY.

June 27, 2018                          SAN MARINO, CALIFORNIA

2240 LORAIN ROAD
SAN MARINO, CA 91108-2847
(Property Address)

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $1,100,000.00 (this amount is called "Principal"), plus interest, to the order of Lender. Lender is **PACIFIC BAY LENDING GROUP**. I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **5.500%**. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3. PAYMENTS**

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the **1st** day of each month beginning on **August 1, 2018**. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **July 1, 2048**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at

PACIFIC BAY LENDING GROUP
1 CENTERPOINTE DRIVE, SUITE 330
LA PALMA, CALIFORNIA  90623
or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. **$6,245.68**. This amount may change.

(C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**

(A) Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on the **1st** day of **July, 2025**, and the adjustable interest rate I will pay may change on that day every **12th** month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

(B) The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index value available as of the date 45 days before each Change Date is called the "Current Index,"

MULTISTATE FIXED/ADJUSTABLE RATE NOTE – WSJ One-Year LIBOR -Single Family Fannie Mae **UNIFORM INSTRUMENT**          Form 3528   6/01 (rev. 6/16)

IDS, Inc.                                    Page 1 of 4                              Borrower(s) Initials ____

THIS IS
THIS IS CERTIFIED TO BE A
TRUE AND CORRECT COPY OF
THE ORIGINAL
TIME ESCROW, INC.

Loan Number: 1805020405

MIN: 100705300000183061

provided that if the Current Index is less than zero, then the Current Index will be deemed to be zero for purposes of calculating my interest rate.

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **TWO AND THREE FOURTHS** percentage points (2.750%) ("the Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **6.500%** or less than **4.500%**. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than **TWO** percentage points from the rate of interest I have been paying for the preceding **TWELVE** months. My interest rate will never be greater than **10.500%** or less than the Margin.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **FIFTEEN** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000%** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

---

MULTISTATE FIXED/ADJUSTABLE RATE NOTE – WSJ One-Year LIBOR -Single Family Fannie Mae UNIFORM INSTRUMENT        Form 3528   6/01 (rev. 6/16)
Page 2 of 4

IDS, Inc.

Borrower(s) Initials _____/_____

THIS IS CERTIFIED TO BE A
TRUE AND CORRECT COPY OF
THE ORIGINAL.
TIME ESCROW, INC.

Loan Number: 1805020405                                                      MIN: 100705300000183061

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

**(A) Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:**

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:**

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

---

THIS IS CERTIFIED TO BE A
TRUE AND CORRECT COPY OF
THE ORIGINAL.
TIME ESCROW, INC.

Loan Number: 1805020405

MIN: 100705300000183061

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)        _____ (Seal)
JIANQING YANG                    -Borrower                                        -Borrower

                                                                *(Sign Original Only)*

Loan originator (Organization): **PACIFIC BAY LENDING GROUP**; NMLS #: 192103
Loan originator (Organization): **BOW TIE LENDING**; NMLS #: 1022983
Loan originator (Individual): **JONG HAN LEE**; NMLS #: 380929

MULTISTATE FIXED/ADJUSTABLE RATE NOTE – WSJ One-Year LIBOR –Single Family Fannie Mae UNIFORM INSTRUMENT        Form 3528   6/01 (rev. 6/16)
Page 4 of 4
IDS, Inc.

THIS IS CERTIFIED TO BE A
TRUE AND CORRECT COPY OF
THE ORIGINAL.
TIME ESCROW, INC,

EXHIBIT 5

 

**This page is part of your document - DO NOT DISCARD**



# 20211001850



**Pages:
0022**

**Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California**

**06/25/21 AT 08:00AM**

| | |
|---|---|
| FEES: | 87.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 75.00 |
| PAID: | 162.00 |



**L E A D S H E E T**



**202106251170014**

**00020735097**



**012371762**

**SEQ:
02**

**SECURE - 8:00AM**



**THIS FORM IS NOT TO BE DUPLICATED**



*E494220*

**EXHIBIT 5**

95004-21-0327

RECORDING REQUESTED BY:
NORTH AMERICAN TITLE CO.
95004-21-03271
Recording Requested By:
CORONA CAPITAL GROUP LLC

And After Recording Return To:
CORONA CAPITAL GROUP LLC
1222 CRENSHAW BLVD #B
TORRANCE, CALIFORNIA 90501
Loan Number: YANG

——————— [Space Above This Line For Recording Data] ———————

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 10, 12, 17, 19 and 20. Certain rules regarding the usage of words used in this document are also provided in Section 15.

**(A)** **"Security Instrument"** means this document, which is dated          JUNE 14, 2021          , together with all Riders to this document.

**(B)** **"Borrower"** is    JINZHENG GROUP (USA), LLC, A CALIFORNIA LIMITED LIABILITY COMPANY

BORROWER'S ADDRESS IS 100 E. HUNTINGTON DR #207, ALHAMBRA, CALIFORNIA 91801.

Borrower is the trustor under this Security Instrument.

**(C)** **"Lender"** is    CORONA CAPITAL GROUP LLC

Lender is a                                                                                 organized
and existing under the laws of                              CALIFORNIA
Lender's address is    1222 CRENSHAW BLVD #B, TORRANCE, CALIFORNIA 90501

Lender is the beneficiary under this Security Instrument.

**(D)** **"Trustee"** is    WESTERN FIDELITY TRUSTEES
1222 CRENSHAW BLVD #B, TORRANCE, CALIFORNIA 90501

**(E)** **"Note"** means the promissory note signed by Borrower and dated          JUNE 14, 2021
The Note states that Borrower owes Lender   FIVE HUNDRED FORTY THOUSAND AND 00/100
                                                  . Dollars (U.S. $540,000.00                    )

CALIFORNIA SUBORDINATE LIEN DEED OF TRUST
© 2008 DOCMAGIC, INC.
CASEC.DOT 10/03/18                                Page 1 of 13                              ☆ DocMagic

**54**

plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than    JULY 1, 2022

**(F)    "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G)    "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H)    "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☒ Balloon Rider | ☐ Planned Unit Development Rider | ☐ Biweekly Payment Rider |
| ☒ 1 - 4 Family Rider | ☐ Home Improvement Rider | ☐ Revocable Trust Rider |
| ☒ Other(s) [Specify]    Prepayment Rider | | |

**(I)    "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)    "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K)    "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L)    Reserved.**

**(M)    "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N)    Reserved.**

**(O)    "Periodic Payment"** means the regularly scheduled amount due for principal and interest under the Note.

**(P)    "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q)    "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

|  COUNTY | of |  LOS ANGELES | : |
|---|---|---|---|
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".
A.P.N.: 5365-019-052

which currently has the address of    2240 LORAIN ROAD

|  | | [Street] | |
|---|---|---|---|
| SAN MARINO | , California | 91108 | ("Property Address"): |
| [City] | | [Zip Code] | |

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:
**1. Payment of Principal, Interest, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 14. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not

obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; and (b) principal due under the Note. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Reserved.**

**4. Charges; Liens.** Borrower shall perform all of Borrower's obligations under any mortgage, deed of trust, or other security instrument that is a lien having priority over this Security Instrument. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any.

Except for a lien Borrower disclosed to Lender in Borrower's application or in any title report Lender obtained, Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which

reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 21 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further

CALIFORNIA SUBORDINATE LIEN DEED OF TRUST
© 2008 DOCMAGIC, INC.
CASEC.DOT  10/03/18                    Page 5 of 13                    ☆ DocMagic

deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**7. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**8. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 8, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 8.

Any amounts disbursed by Lender under this Section 8 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**9. Reserved.**

**10. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender, subject to the terms of any mortgage, deed of trust, or other security instrument with a lien which has priority over this Security Instrument.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or

Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

CALIFORNIA SUBORDINATE LIEN DEED OF TRUST
© 2008 DOCMAGIC, INC.
CASEC.DOT  10/03/18                    Page 7 of 13

☆ DocMagic

Subject to the provisions of Section 17, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 19) and benefit the successors and assigns of Lender.

**13. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**14. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**15. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**16. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**17. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 17, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

CALIFORNIA SUBORDINATE LIEN DEED OF TRUST
© 2008 DOCMAGIC, INC.
CASEC.DOT 10/03/18                                Page 8 of 13                                ☆ DocMagic

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 14 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**18. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, to the extent authorized by Applicable Law; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 17.

**19. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 14) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 21 and the notice of acceleration given to Borrower pursuant to Section 17 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 19.

**20. Hazardous Substances.** As used in this Section 20: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances:

gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**21. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 17 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

---

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: **(a)** to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; **(b)** to all sums secured by this Security Instrument; and **(c)** any excess to the person or persons legally entitled to it.

**22. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**23. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**24. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

## REQUEST FOR NOTICE OF DEFAULT AND FORECLOSURE
## UNDER SUPERIOR MORTGAGES OR DEEDS OF TRUST

Borrower and Lender request the holder of any mortgage, deed of trust or other encumbrance with a lien which has priority over this Deed of Trust to give Notice to Lender, at Lender's address set forth on page one of this Deed of Trust, of any default under the superior encumbrance and of any sale or other foreclosure action. In accordance with Section 2924b, Civil Code, request is hereby made that a copy of any notice of default and a copy of any notice of sale under the deed of trust (or mortgage) recorded                                              , in Book                    ,
Page                    , records of                                                                                          County,
(or filed for record with recorder's serial number                                        ,
County), California, executed by

as trustor (or mortgagor) in which    ROYAL BUSINESS BANK

is named as beneficiary (or mortgagee) and

as trustee be mailed to    CORONA CAPITAL GROUP LLC

at  1222 CRENSHAW BLVD #B, TORRANCE, CALIFORNIA 90501

NOTICE: A copy of any notice of default and of any notice of sale will be sent only to the address contained in this recorded request. If your address changes, a new request must be recorded.

Signature: _____

CALIFORNIA SUBORDINATE LIEN DEED OF TRUST
© 2008 DOCMAGIC, INC.
CASEC.DOT 10/03/18                        Page 11 of 13                                    ☆ DocMagic

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

The undersigned Borrower requests that a copy of any Notice of Default and any Notice of Sale under this Security Instrument be mailed to Borrower at the address set forth above.

JINZHENG GROUP (USA), LLC, A
CALIFORNIA LIMITED LIABILITY
COMPANY


By: _____ (Seal)

BETTY ZHENG, MANAGING    -Borrower
MEMBER


_____    _____
Witness                       Witness

[Space Below This Line For Acknowledgment]

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of ___CALIFORNIA___ )

County of __Los Angeles__ )

On __June 17, 2021__ before me, _S. Ruggiero, notary public_

Date

Here Insert Name and Title of the Notarizing Officer

personally appeared __BETTY ZHENG__

Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

S. RUGGIERO
Notary Public – California
Orange County
Commission # 2227447
My Comm. Expires Jan 31, 2022

Signature of Notary Public

Notary Seal

Loan Originator: ROBERT DAVENPORT, NMLSR ID 262927
Loan Originator Organization: LEXXELFUNDING CORPORATION, NMLSR ID 355287

CALIFORNIA SUBORDINATE LIEN DEED OF TRUST
© 2008 DOCMAGIC, INC.
CASEC.DOT  10/03/18                    Page 13 of 13

☆ DocMagic

# 1-4 FAMILY RIDER
## (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this 14th day of          JUNE, 2021          ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to
secure Borrower's Note to   CORONA CAPITAL GROUP LLC

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

2240 LORAIN ROAD, SAN MARINO, CALIFORNIA 91108
[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition
to the Property described in the Security Instrument, the following items are added to the Property
description, and shall also constitute the Property covered by the Security Instrument: building materials,
appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be
used in connection with the Property, including, but not limited to, those for the purposes of supplying or
distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing
apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks,
ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors,
screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, panelling and attached floor
coverings now or hereafter attached to the Property, all of which, including replacements and additions
thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of
the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the
Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument
as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or
make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to
the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any
governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien
inferior to the Security Instrument to be perfected against the Property without Lender's prior written
permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to
the other hazards for which insurance is required by Uniform Covenant 5.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Uniform Covenant 18 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, the
first sentence in Uniform Covenant 6 concerning Borrower's occupancy of the Property is deleted. All
remaining covenants and agreements set forth in Uniform Covenant 6 shall remain in effect.

---

MULTISTATE 1-4 FAMILY RIDER
SECOND MORTGAGE
US14.RDR 04/26/19                          Page 1 of 3                          ☆ DocMagic

**G. ASSIGNMENT OF LEASES.** Upon Lender's request, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to paragraph 21 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of breach to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Uniform Covenant 8.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not and will not perform any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this 1-4 Family Rider.

JINZHENG GROUP (USA), LLC,
A CALIFORNIA LIMITED
LIABILITY COMPANY

By:_____(Seal)
BETTY ZHENG, MANAGING -Borrower
MEMBER

—————————————————— [Space Above This Line For Recording Data] ——————————————————

Loan Number: YANG

# BALLOON RIDER

THIS BALLOON RIDER is made this  14th  day of    JUNE 2021                     , and
is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security
Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure
Borrower's Note (the "Note") to  CORONA CAPITAL GROUP LLC

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

2240 LORAIN ROAD,  SAN MARINO,  CALIFORNIA 91108
[Property Address]

The interest rate stated on the Note is called the "Note Rate." The date of the Note is called the "Note
Date." I understand the Lender may transfer the Note, Security Instrument and this Rider. The Lender or
anyone who takes the Note, the Security Instrument and this Rider by transfer and who is entitled to receive
payments under the Note is called the "Note Holder."

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements in the Security
Instrument, Borrower and Lender further covenant and agree as follows (despite anything to the contrary
contained in the Security Instrument or the Note):

**THIS LOAN IS PAYABLE IN FULL AT MATURITY.  YOU MUST REPAY THE ENTIRE
PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE.  THE LENDER IS
UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME.  YOU WILL,
THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY
OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE
THIS LOAN WITH, WILLING TO LEND YOU THE MONEY.  IF YOU REFINANCE THIS LOAN
AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS
NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM
THE SAME LENDER.**

MULTISTATE BALLOON RIDER
04/26/04

Page 1 of 2

☆DocMagic

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Balloon
Rider.

JINZHENG GROUP (USA), LLC, A CALIFORNIA LIMITED LIABILITY COMPANY

By: _____  6-17-2021  _____
Borrower BETTY ZHENG, MANAGING    Date    Borrower                    Date
MEMBER

_____    _____
Borrower                  Date    Borrower                    Date

_____    _____
Borrower                  Date    Borrower                    Date

Loan Number: YANG

# PREPAYMENT PENALTY RIDER

THIS PREPAYMENT PENALTY RIDER (the "RIDER") is made this          14th          day of
JUNE, 2021                                 , and is incorporated into and shall be deemed to amend and
supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given
by the undersigned ("Borrower") to secure repayment of the Borrower's promissory note (the "Note") in
favor of    CORONA CAPITAL GROUP LLC
("Lender"). The Security Instrument encumbers the Property more specifically described in the Security
Instrument and located at:

2240 LORAIN ROAD, SAN MARINO, CALIFORNIA 91108

[Property Address]

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

## A. PREPAYMENT PENALTY
The Note provides for the payment of a prepayment penalty as follows:

### 4 . BORROWER'S RIGHT TO PREPAY; PREPAYMENT PENALTY
I have the right to make payments of Principal at any time before they are due. A payment of Principal
only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I
am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments
due under the Note.
The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under the
Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the
Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make
a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note
Holder agrees in writing to those changes.
If within      3      months following the date the loan was consummated I make a full Prepayment
or partial Prepayment, I will pay a Prepayment penalty in an amount equal to: TWO AND 000/1000
                                percent (      2.000  %) of the outstanding loan balance
prepaid if the Prepayment is made within the first twelve-month period immediately following the date the
loan was consummated; N/A                                     percent (     N/A%)
of the outstanding loan balance prepaid if the  Prepayment is made within the second twelve-month period
immediately following the date the loan was consummated; and  N/A
                        percent (           N/A %) of the outstanding loan balance prepaid if the Prepayment
is made within the third twelve-month period immediately following the date the loan was consummated.

---

MULTISTATE PREPAYMENT PENALTY RIDER
12 CFR §1026.43(g)
USPPR.PPF 01/10/14                              Page 1 of 2                              ☆DocMagic

72

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Rider.

JINZHENG GROUP (USA), LLC, A CALIFORNIA LIMITED LIABILITY COMPANY

By: _____ (Seal)          _____ (Seal)
BETTY ZHENG, MANAGING        -Borrower                                   -Borrower
MEMBER

_____ (Seal)          _____ (Seal)
                         -Borrower                                   -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                                   -Borrower

# EXHIBIT A
## LEGAL DESCRIPTION

PARCEL 1:

LOT 149 OF TRACT NO. 8954, IN THE CITY OF SAN MARINO, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 145 PAGES 82 AND 83 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 2:

THAT PORTION OF THE NORTHEAST QUARTER OF SECTION 2, TOWNSHIP 1 SOUTH, RANGE 12 WEST, SAN BERNARDINO MERIDIAN, IN THE CITY OF SAN MARINO, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT OF THE SURVEY OF SAID LAND ON FILE IN THE BUREAU OF LAND MANAGEMENT, INCLUDED WITHIN THAT PORTION OF THE 40 FEET OF STRIP OF LAND MARKED "SOUTHERN PACIFIC RAILWAY MONROVIA BRANCH" ON THE MAP OF SAN MARINO PARK, RECORDED IN BOOK 12, PAGE 74 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, LYING BETWEEN THE SOUTHERLY PROLONGATION OF THE WEST LINE OF LOT 149 OF TRACT NO. 8954, AS PER MAP RECORDED IN BOOK 145 PAGES 82 AND 83 OF MAPS, IN THE OFFICE OF SAID COUNTY RECORDER, AND THE CENTER LINE OF SAN MARINO AVENUE, 80 FEET WIDE SHOWN ON THE MAP OF SAID TRACT NO. 8954.

Exhibit A (Legal Description)                                                                95004-21-03271

EXHIBIT 6



**Mindy Beckham**
Title Officer

Stewart Title of California, Inc.
2801 Townsgate Rd #111
Westlake Village, CA  91361
Phone:  (805) 367-5628
Fax:
teammindy@stewart.com

## PRELIMINARY REPORT

Order No.:              1763669
Your File No.:          105659 AA
Buyer/Borrower Name:   Lihua He and Weijun Xu
Seller Name:            Jinzheng Group Usa Llc

Property Address:  2240 Lorain Road, San Marino, CA  91108

In response to the above referenced application for a Policy of Title Insurance, Stewart Title of California, Inc. hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a Stewart Title Guaranty Company Policy or Policies of Title Insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referenced to as an Exception on Schedule B or not excluded from coverage pursuant to the printed Schedules, Conditions, and Stipulations of said Policy forms.

The printed Exceptions and Exclusions from the coverage and Limitations on covered Risks of said policy or policies are set forth in Exhibit A attached. The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties.  Limitations on Covered Risks applicable to the CLTA and ALTA Homeowner's Policies of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limits of Liability for certain coverages are also set forth in Exhibit A.  Copies of the policy forms should be read. They are available from the office which issued this report.

Please read the exceptions shown or referred to below and the exceptions and exclusions set forth in Exhibit A of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters, which are not covered under the terms of the title insurance policy and should be carefully considered.

It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects, and encumbrances affecting title to the land.

This report, (and any supplements or amendments thereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance a binder or commitment should be requested.

| Dated as of December 22, 2022 at 7:30AM | |
|---|---|
| | **Update No. 2** |

**When replying, please contact:**    Mindy Beckham, Title Officer

Stewart Title of California, Inc.
2801 Townsgate Rd #111
Westlake Village, CA  91361
(805) 367-5628
teammindy@stewart.com

**IF ANY DECLARATION, GOVERNING DOCUMENT (FOR EXAMPLE, COVENANT, CONDITION OR RESTRICTION) OR DEED IDENTIFIED AND/OR LINKED IN THIS TITLE PRODUCT CONTAINS ANY RESTRICTION BASED ON AGE, RACE COLOR, RELIGION, SEX, GENDER, GENDER IDENTITY, GENDER EXPRESSION, SEXUAL ORIENTATION, FAMILIAL STATUS, MARITAL STATUS, DISABILITY, VETERAN OR MILITARY STATUS, GENETIC INFORMATION, NATIONAL ORIGIN, SOURCE OF INCOME AS DEFINED IN SUBDIVISION (p) OF SECTION 12955, OR ANCESTRY, THAT RESTRICTION VIOLATES STATE AND FEDERAL FAIR HOUSING LAWS AND IS VOID, AND MAY BE REMOVED PURSUANT TO SECTION 12956.2 OF THE GOVERNMENT CODE BY SUBMITTING A "RESTRICTIVE COVENANT MODIFICATION" FORM, TOGETHER WITH A COPY OF THE ATTACHED DOCUMENT WITH THE UNLAWFUL PROVISION REDACTED TO THE COUNTY RECORDER'S OFFICE. THE "RESTRICTIVE COVENANT MODIFICATION" FORM CAN BE OBTAINED FROM THE COUNTY RECORDER'S OFFICE AND MAY BE AVAILABLE ON ITS WEBSITE. THE FORM MAY ALSO BE AVAILABLE FROM THE PARTY THAT PROVIDED YOU WITH THIS DOCUMENT. LAWFUL RESTRICTIONS UNDER STATE AND FEDERAL LAW ON THE AGE OF OCCUPANTS IN SENIOR HOUSING OR HOUSING FOR OLDER PERSONS SHALL NOT BE CONSTRUED AS RESTRICTIONS BASED ON FAMILIAL STATUS.**

# PRELIMINARY REPORT

**The form of Policy of Title Insurance contemplated by this report is:**

☐ Standard Coverage Owner's Policy

☐ Extended Coverage Owner's Policy

☒ CLTA/ALTA Homeowners Policy

☐ Standard Coverage Loan Policy

☒ Extended Coverage Loan Policy

☐ Short Form Residential Loan Policy

☐

# SCHEDULE A

**The estate or interest in the land hereinafter described or referred to covered by this report is:**

FEE SIMPLE

**Title to said estate or interest at the date hereof is vested in:**

Jinzheng Group (USA), LLC, a California Limited Liability Company

# LEGAL DESCRIPTION

**The land referred to herein is situated in the State of California, County of Los Angeles, City of San Marino and described as follows:**

Parcel 1:

Lot 149 of Tract No. 8954, in the City of San Marino, County of Los Angeles, State of California, as per Map recorded in Book 145 Pages 82 and 83 of Maps, in the Office of the County Recorder of said County.

Parcel 2:

That portion of the Northeast quarter of Section 2, Township 1 South, Range 12 West, San Bernardino Meridian, in the City of San Marino, County of Los Angeles, State of California, according to the Official Plat of the Survey of said Land on file in the Bureau of Land Management, included within that Portion of the 40 feet of Strip of Land marked "Southern Pacific Railway Monrovia Branch" on the Map of San Marino Park, recorded in Book 12, Page 74 of Maps, in the Office of the County Recorder of said County, lying between the Southerly prolongation of the West line of Lot 149 of Tract No. 8954, as per Map recorded in Book 145 Pages 82 and 83 of Maps, in the Office of said County Recorder, and the center line of San Marino Avenue, 80 feet wide shown on the Map of said Tract No. 8954.

APN:  5365-019-052

(End of Legal Description)

MAP

THE MAP CONNECTED HEREWITH IS BEING PROVIDED AS A COURTESY AND FOR INFORMATIONAL PURPOSES ONLY; THIS MAP SHOULD NOT BE RELIED UPON. FURTHERMORE, THE PARCELS SET OUT ON THIS MAP MAY NOT COMPLY WITH LOCAL SUBDIVISION OR BUILDING ORDINANCES. STEWART ASSUMES NO LIABILITY, RESPONSIBILITY OR INDEMNIFICATION RELATED TO THE MAPS NOR ANY MATTERS CONCERNING THE CONTENTS OF OR ACCURACY OF THE MAP.

# <u>SCHEDULE B</u>

**At the date hereof, exceptions to coverage in addition to the printed exceptions and exclusions contained in said policy or policies would be as follows:**

**Taxes:**

A.  Property taxes, which are a lien not yet due and payable, including any assessments collected with taxes, to be levied for the fiscal year 2023 - 2024.

B.  General and special city and/or county taxes, including any personal property taxes, and any assessments collected with taxes, for the fiscal year 2022 - 2023:
    1st Installment            : $12,122.58
    Status 1st                 : Delinquent
    Delinquent                 : December 12, 2022
    Penalty                    : $1,212.25
    2nd Installment:           : $12,122.58
    Status 2nd                 : Open
    Parcel No.                 : 5365-019-052
    Code Area / Tracer No.: 08541

C.  The lien of supplemental taxes, if any, assessed pursuant to the provisions of Chapter 3.5 (commencing with Section 75) of the revenue and taxation code of the State of California.

D.  Taxes and/or assessments affecting the land, if any, for Community Facility Districts including Mello Roos Districts which may exist by virtue of assessment maps or notices filed by said districts. Said taxes and/or assessments are typically collected with the County taxes; however, some districts may remove these taxes and/or assessment from the County taxes and assess and collect them separately.

E.  Prior to recording, the final amount due for taxes must be confirmed with tax collector.

**Exceptions:**

1.  Water rights, claims or title to water in or under the property, whether or not shown by the public records.

2.  Ownership of, or rights to, minerals or other substances, subsurface and surface, of whatsoever kind, including, but not limited to coal, ores, metals, lignite, oil, gas, geothermal resources, brine, uranium, clay, rock, sand and gravel in, on, under and that may be produced from the Land, together with all rights, privileges, and immunities relating thereto, whether the ownership or rights arise by lease, grant, exception, conveyance, reservation or otherwise, and whether or not appearing in the Public Records or listed in Schedule B. Stewart Title Guaranty Company and its issuing agent make no representation as to the present ownership of any such interests. There may be leases, grants, exceptions, or reservations of interests that are not listed.

3.  Easement and rights incidental thereto for highway to City of San Marino, a municipal corporation of the State of California, as set forth in a document recorded May 15, 1926, in Book 4476 Page 329, of Official Records.

4.  Easement and rights incidental thereto for pole lines to John L. Connolly and Bertha M. Connolly, husband and wife, as joint tenants, as set forth in a document recorded October 21, 1938, in Book 16114 Page 198, of Official Records.

5.  Covenants, conditions and restrictions as set forth in a document recorded October 21, 1938, in Book 16114 Page 198, of Official Records.

    Said covenants, conditions, and restrictions provide that a violation thereof shall not defeat or render invalid the lien of any mortgage or deed of trust made in good faith and for value.

6.  Easement and rights incidental thereto for poles and conduits to Southern California Telephone Company, a corporation, as set forth in a document recorded March 11, 1941, in Book 18230 Page 252, of Official Records.

7.  Easement and rights incidental thereto construct, use, maintain, operate, alter, add to, repair, replace, reconstruct, inspect and remove at any time and from time to time overhead electrical supply systems and communication systems to Southern California Edison Company, a corporation, as set forth in a document recorded November 7, 2018, as Instrument No. 20181128475, of Official Records.

8.  Deed of Trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby:
    Amount          : $1,100,000.00
    Trustor         : Jianqing Yang, a married man as his sole and separate property
    Trustee         : Provident Title Company
    Beneficiary     : Mortgage Electronic Registration Systems, Inc., as nominee for Pacific
    Bay Lending Group
    Recorded        : July 5, 2018, as Instrument No. 20180669029, of Official Records.

    The beneficial interest of Mortgage Electronic Registration Systems, Inc. (MERS) as nominee for Pacific Bay Lending Group Its successors and assigns has been assigned of record to Royal Business Bank by that certain document recorded December 20, 2022 by Instrument No. 20221184135 of Official Records.

    Substitution of trustee naming First American Title Insurance Company as trustee, recorded December 20, 2022 as Instrument No. 20221184136 of Official Records.

    Notice of default recorded December 20, 2022 as Instrument No. 20221186620 of Official Records.

9.  Deed of Trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby:
    Amount          : $420,000.00
    Trustor         : Jinzheng Group (USA), LLC, a California Limited Liability Company
    Trustee         : North American Title Company, Inc., a California Corporation
    Beneficiary     : DNQ LLC, a Nevada Limited Liability Company
    Recorded        : November 14, 2019, as Instrument No. 20191237663, of Official Records.

    To avoid delays in recording, you must submit the following documents for review and approval:
        (a) the original note.
        (b) the original deed of trust.
        (c) the request for reconveyance.
        (d) a final payoff demand executed by the record beneficiary(ies).
            (i) if the beneficiary(ies) is a trust, you must provide a full copy of the trust and any amendments thereto, and all trustees must sign the payoff demand. In certain situations, you may be permitted to provide the STG Certification of Trust.
            (ii) if a servicing agent prepares the demand on behalf of the beneficiary(ies), you must provide a full copy of the servicing agreement and the beneficiary(ies) must still sign and approve the payoff demand.
    Please contact your title officer to discuss the above requirements.

The right is reserved to add requirements or additional items after completion of such review.

The above instrument has been subordinated to the Deed of Trust recorded on June 25, 2021, as Instrument No. 20211001850, of Official Records by that certain Agreement recorded on June 25, 2021, as Instrument No. 20211001452, of Official Records.

10.  Deed of Trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby:

Amount            : $540,000.00
Trustor           : Jinzheng Group (USA), LLC, a California Limited Liability Company
Trustee           : Western Fidelity Trustees
Beneficiary       : Corona Capital Group LLC
Recorded          : June 25, 2021, as Instrument No. 20211001850, of Official Records.

To avoid delays in recording, you must submit the following documents for review and approval:
  (a) the original note.
  (b) the original deed of trust.
  (c) the request for reconveyance.
  (d) a final payoff demand executed by the record beneficiary(ies).
      (i) if the beneficiary(ies) is a trust, you must provide a full copy of the trust and any amendments thereto, and all trustees must sign the payoff demand. In certain situations, you may be permitted to provide the STG Certification of Trust.
      (ii) if a servicing agent prepares the demand on behalf of the beneficiary(ies), you must provide a full copy of the servicing agreement and the beneficiary(ies) must still sign and approve the payoff demand.
Please contact your title officer to discuss the above requirements.
The right is reserved to add requirements or additional items after completion of such review.

Notice of default recorded December 14, 2022 as Instrument No. 20221166840 of Official Records.

11.  In order to insure a conveyance, acquisition or encumbrance by the limited liability company named below, you must provide the following:

12.  Limited liability company: Jinzheng Group (USA), LLC, a California Limited Liability Company (a) A certified copy of the articles of organization (Form LLC-1), and any filed amendment (Form LLC-2) or restatement (Form LLC-10), if applicable.
(b) A copy of the operating agreement and any amendments.
Additional requirements or items may be requested upon review of the required documents set forth above.

13.  US Code Title 31-Sec 5326 authorizes the U.S Department of Treasury to collect information about certain transaction as specified in various geographic targeting orders for the purpose of preventing evasion of the Bank Secrecy Act. As a result of a Geographic Targeting Order ("GTO") issued by the United States Department of Treasury, Financial Crimes Enforcement Network ("FinCEN"), this transaction may be responsive to the requirements of the GTO. If the buyer(s) is an entity purchasing property located in Los Angeles, San Diego, San Francisco, San Mateo and Santa Clara counties without financing through an institutional lender, buyer(s) will be asked to complete and provide information on the ALTA 2018 Information Collection Form. Upon review, additional exceptions and/or requirements may be raised; please contact the title unit for further information.

(End of Exceptions)

Order No.:  1763669
Preliminary Report
Page 7 of  9

# NOTES AND REQUIREMENTS

A.  There are no transfers or conveyances shown in the public records within 24 months of the date of this report. If you have knowledge of any transfers or conveyances, please contact your title officer immediately for further research and review.

B.  There are no items in this preliminary report that will cause Stewart Title Guaranty Company to decline to attach the CLTA Endorsement Form 116.01-06 (or similar ALTA 22-06 equivalent), indicating that there is located a Single Family Residence known as 2240 Lorain Road, San Marino, California.

C.  There are no items in this preliminary report that will cause Stewart Title Guaranty Company to decline to attach the CLTA Endorsement Form 100.2-06 (or a similar ALTA 9 equivalent) to an ALTA Loan Policy, when issued.

D.  A Preliminary Change of Ownership Report must be completed by the transferee (buyer) prior to the transfer of property in accordance with the provisions of Section 480.3 of the Revenue and Taxation Code. The Preliminary Change of Ownership Report should be submitted to the recorder concurrent with the recordation of any document effecting a change of ownership. If a document evidencing a change of ownership (i.e. Deed, Affidavit-Death Joint Tenant) is presented to the recorder for recording without a preliminary change of ownership report, the recorder may charge an additional $20.00.

E.  Additional Requirements for "Short Sale" Transactions in which a lender will accept less than the outstanding balance of its loan as full satisfaction of the obligation: The Company will require, prior to the issuance of a policy of title insurance, evidence that the first-position trust deed holder has received and acknowledged all payments to be made to subordinate-position lien holders, regardless of whether such payments are to be made from proceeds or from contributions by real estate brokers and/or buyers in the subject transaction, or from other third-party sources. Evidence shall include but not be limited to:  (a) a written demand from the first-position trust deed holder acknowledging and approving payments to subordinate-position lien holders from proceeds and otherwise; or (b) a supplemental letter or amended demand from the first-position lien holder acknowledging payments to be made to subordinate lien holders from sources other than proceeds (including broker commissions and additional buyer deposits).

# CALIFORNIA "GOOD FUNDS" LAW

California Insurance Code Section 12413.1 regulates the disbursement of escrow and sub-escrow funds by title companies.  The law requires that funds be deposited in the title company escrow account and available for withdrawal prior to disbursement.  Funds received by Stewart Title of California, Inc. via wire transfer may be disbursed upon receipt.  Funds received via cashier's checks or teller checks drawn on a California Bank may be disbursed on the next business day after the day of deposit.  If funds are received by any other means, recording and/or disbursement may be delayed, and you should contact your title or escrow officer.  All escrow and sub-escrow funds received will be deposited with other escrow funds in one or more non-interest bearing escrow accounts in a financial institution selected by Stewart Title of California, Inc..  Stewart Title of California, Inc. may receive certain direct or indirect benefits from the financial institution by reason of the deposit of such funds or the maintenance of such accounts with the financial institution, and Stewart Title of California, Inc. shall have no obligation to account to the depositing party in any manner for the value of, or to pay to such party, any benefit received by Stewart Title of California, Inc..  Such benefits shall be deemed additional compensation to Stewart Title of California, Inc. for its services in connection with the escrow or sub-escrow.

If any check submitted is dishonored upon presentation for payment, you are authorized to notify all principals and/or their respective agents of such nonpayment.

Order No.:  1763669
Preliminary Report
Page 9 of  9

# EXHIBIT "A"

## LEGAL DESCRIPTION

Order No.:  1763669
Escrow No.:  1763669

The land referred to herein is situated in the State of California, County of Los Angeles, City of San Marino and described as follows:

Parcel 1:

Lot 149 of Tract No. 8954, in the City of San Marino, County of Los Angeles, State of California, as per Map recorded in Book 145 Pages 82 and 83 of Maps, in the Office of the County Recorder of said County.

Parcel 2:

That portion of the Northeast quarter of Section 2, Township 1 South, Range 12 West, San Bernardino Meridian, in the City of San Marino, County of Los Angeles, State of California, according to the Official Plat of the Survey of said Land on file in the Bureau of Land Management, included within that Portion of the 40 feet of Strip of Land marked "Southern Pacific Railway Monrovia Branch" on the Map of San Marino Park, recorded in Book 12, Page 74 of Maps, in the Office of the County Recorder of said County, lying between the Southerly prolongation of the West line of Lot 149 of Tract No. 8954, as per Map recorded in Book 145 Pages 82 and 83 of Maps, in the Office of said County Recorder, and the center line of San Marino Avenue, 80 feet wide shown on the Map of said Tract No. 8954.

APN:  5365-019-052

(End of Legal Description)

## <u>Procedures to Accompany the Restrictive Covenant Modification Form</u>

The law prohibits unlawfully restrictive covenants based upon:

"…age, race, color, religion, sex, gender, gender identity, gender expression, sexual orientation, familial status, marital status, disability, veteran or military status, genetic information, national origin, source of income as defined in subdivision (p) of Section 12955, or ancestry… Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status."

As the individual holding or acquiring an interest in the property, you may have any unlawfully restrictive covenants "removed", which means "redacted."

To have the unlawfully restrictive covenant removed, you may prepare and submit to the county recorder's office, a "Restrictive Covenant Modification" form (RCM) together with a copy of the attached document with the unlawfully restrictive covenant redacted. This request must be submitted to the county recorder's office and must include your return address so the county recorder can notify you of the action taken by the county counsel.

The process at the county recorder's office is as follows:
- The county recorder takes the RCM with the redacted document and the original document attached and submits it to the county counsel for review to determine if, from a legal standpoint, the language was an unlawfully restrictive covenant and thus the redacted version should be indexed and recorded.
- The county counsel shall inform the county recorder of his/her determination within a reasonable amount of time, not to exceed three months from the date of your request.
- If county counsel determined that the redacted language was unlawful then, once recorded, the redacted document is the only one that effects the property and this modified document has the same effective date as the original document.
- If county counsel determined that the redacted language was not unlawful then county counsel will return the RCM package to the county recorder and the county recorder will advise the requestor that same the request has been denied and the redacted document has not been recorded.
- The modification document shall be indexed in the same manner as the original document and shall contain a recording reference to the original document.

**RECORDING REQUESTED BY**


AND WHEN RECORDED MAIL TO

NAME

ADDRESS

CITY
STATE & ZIP

| TITLE ORDER NO. | ESCROW NO. | APN NO. |
|---|---|---|

# RESTRICTIVE COVENANT MODIFICATION
**(Unlawfully Restrictive Covenant Modification Pursuant to Government Code Section 12956.2)**

I(We)_____
have or are acquiring an ownership interest of record in the property located at _____
_____ that is covered by the
document described below.

The following reference document contains a restriction based on age, race, color, religion, sex, gender, gender identity, gender expression, sexual orientation, familial status, marital status, disability, veteran or military status, genetic information, national origin, source of income as defined in Section 12955 of the Government Code, or ancestry, that violates state and federal fair housing laws and is void. Pursuant to Section 12956.2 of the Government Code, this document is being recorded solely for the purpose of eliminating that restrictive covenant as shown on page(s)_____of the document recorded on _____ in book_____and page _____ or instrument number_____of the official records of the County of _____, State of California.

Attached hereto is a true, correct and complete copy of the document referenced above, with the unlawful restrictive covenant redacted.

This modification document shall be indexed in the same manner as the original document pursuant to subdivision (d) of Section 12956 of the Government.

The effective date of the terms and conditions of the modification document shall be the same as the effective date of the original document.


_____
(Signature of Submitting Party)


_____
(Printed Name)


_____
(Signature of Submitting Party)


_____
(Printed Name)

_____ County Counsel, or their designee, pursuant to Government Code Section 12956.2, hereby states that it has been determined that the original document referenced above _____ Does _____ Does Not contain an unlawful restriction and this modification may be recorded.

County Counsel
By:
_____
Date:
_____



Stewart Title of California, Inc.
2801 Townsgate Rd #111
Westlake Village, CA  91361
Phone:  (805) 367-5628
Fax:
teammindy@stewart.com

**Date:**                    July 11, 2022
**Title Officer:**        Mindy Beckham
**Order No.:**           1763669
**Property Address:**  2240 Lorain Road, San Marino, CA  91108

# UNLAWFULLY RESTRICTIVE COVENANTS
# ACKNOWLEDGMENT AND INDEMNIFICATION

**STEWART TITLE OF CALIFORNIA, INC.**
**IS LICENSED BY THE STATE OF CALIFORNIA UNDER THE DEPARTMENT OF INSURANCE LICENSE NO. 388**

The undersigned hereby acknowledge receipt of (1) the statutory required language describing unlawfully restrictive covenants in the title product from Stewart Title of California, Inc. ("Stewart Title"); (2) a copy of the Restrictive Covenant Modification (RCM) form; (3) the procedures describing how to have, when applicable, an unlawfully restrictive covenant of record updated; and (4) when applicable, notice of actual knowledge of a potential unlawfully restrictive covenant.

The undersigned further acknowledge that he/she/they have received, read, understand and accept these documents in connection with the above-described transaction and have received a copy of this acknowledgment as evidenced by the signature below

If the undersigned requested of Stewart Title assistance with preparation of the RCM form, the undersigned attests that Stewart Title is directly involved in the pending transaction and that the request to Stewart Title was made prior to close of escrow. The undersigned agrees and understands that Stewart Title will provide guidance in my/our preparation of the RCM and required attachments and/or may submit such RCM package to the county recorder on my/our behalf. The undersigned agrees that Stewart Title shall have no liability associated with the creation or preparation of and/or recordation of a RCM and its attachments.

The undersigned acknowledge and understand that Stewart Title will rely upon this acknowledgment as evidence that Stewart Title has fulfilled its duties and obligations under the law with respect to unlawfully restrictive covenants. The undersigned jointly and severally agree to hold harmless Stewart Title of California, Inc., its officers, employees, agents, parent, affiliated and subsidiary companies, including Stewart Title Guaranty Company, and successors and assigns from and against any and all damages or liability and agree to reimburse Stewart Title for all losses, costs, charges, attorneys' fees or other expenses which shall or may at any time be suffered, sustained or incurred by reason of, or in consequence of or related to these unlawfully restrictive covenants and the RCM submission and form.

The undersigned acknowledges and understands that Stewart Title will rely upon this acknowledgement as evidence that Stewart Title has fulfilled its duties and obligations under the law with respect to unlawfully restrictive covenants. The undersigned jointly and severally agree to hold harmless Stewart Title of California, Inc., its officers, employees, agents, parent, affiliated and subsidiary companies, including Stewart Title Guaranty Company, and successors and assigns from and against

**87**

any and all damages or liability and agree to reimburse Stewart Title for all losses, costs, charges, attorneys' fees or other expenses which shall or may at any time be suffered, sustained or incurred by reason of, or in consequence of or related to these unlawfully restrictive covenants and the RCM form and submission.

_____    _____
Lihua He                                      Weijun Xu


Jinzheng Group Usa Llc

By:_____

# AFFILIATED BUSINESS ARRANGEMENT DISCLOSURE STATEMENT

Date:  July 11, 2022

File No.:  1763669

Property:  2240 Lorain Road, San Marino, CA  91108

From:  Stewart Title of California, Inc.

This is to give you notice that Stewart Title of California, Inc. ("Stewart Title") has a business relationship with Stewart Solutions, LLC, DBA – Stewart Specialty Insurance Services, LLC ("Stewart  Insurance"). Stewart Information Services Corporation owns 100% of Stewart Insurance and Stewart Title of California, Inc..  Because of this relationship, this referral may provide Stewart Title a financial or other benefit.

Set forth below is the estimated charge or range of charges for the settlement services listed.  You are NOT required to use the listed provider(s) as a condition for purchase, sale, or refinance of the subject Property.  THERE ARE FREQUENTLY OTHER SETTLEMENT SERVICE PROVIDERS AVAILABLE WITH SIMILAR SERVICES.  YOU ARE FREE TO SHOP AROUND TO DETERMINE THAT YOU ARE RECEIVING THE BEST SERVICES AND THE BEST RATE FOR THESE SERVICES.

| *Stewart Insurance Settlement Service* | *Charge or range of charges* |
|---|---|
| Hazard Insurance | $400.00 to $6,500.00 |
| Home Warranty | $255.00 to $  780.00 |
| Natural Hazard Disclosure Report | $  42.50 to $   149.50 |

File No.:  1763669                  Page 1 of 1

89

## ACKNOWLEDGEMENT OF RECEIPT, UNDERSTANDING AND APPROVAL OF STEWART TITLE GUARANTY COMPANY PRIVACY NOTICE FOR STEWART TITLE COMPANIES AND AFFILIATED BUSINESS ARRANGEMENT DISCLOSURE STATEMENT

The undersigned hereby acknowledge receipt of the Stewart Title Guaranty Company Privacy Notice for Stewart Title Companies and the Affiliated Business Arrangement Disclosure Statement that apply to this transaction. The undersigned further acknowledge that he/she/they have received, read, understand and accept these documents in connection with the above described transaction.

The undersigned have received a copy of this acknowledgement as evidenced by the signature below.


Jinzheng Group Usa Llc

By:_____


_____          _____
Lihua He                                                                          Weijun Xu

**CLTA Preliminary Report Form Exhibit A (11-09-18)**

## CALIFORNIA LAND TITLE ASSOCIATION

### STANDARD COVERAGE POLICY – 1990
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1.  (a) Any law, ordinance or governmental regulation (including but not limited to building or zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
    (b)  Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2.  Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3.  Defects, liens, encumbrances, adverse claims or other matters:
    a)  whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant;
    b)  not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
    c)  resulting in no loss or damage to the insured claimant;
    d)  attaching or created subsequent to Date of Policy; or
    e)  resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.

4.  Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.

5.  Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6.  Any claim, which arises out of the transaction vesting in the insured the estate of interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

### EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART I

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1.  Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on  real property or by the public records.

    Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the  records of such agency or by the public records.

2.  Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the  land or which may be asserted by persons in possession thereof.

3.  Easements, liens or encumbrances, or claims thereof, not shown by the public records.

4.  Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose,   and which are not shown by the public records

5.  (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights,   claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

6.  Any lien or right to a lien for services, labor or material unless such lien is shown by the Public Records at Date of Policy.

## CLTA/ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE (12-02-13)
## EXCLUSIONS

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of those portions of any law or government regulation concerning:

   a. building;
   b. zoning;
   c. land use;
   d. improvements on the Land;
   e. land division;
   f. environmental protection.
   This Exclusion does not limit the coverage described in Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23 or 27.

2. The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This Exclusion does not limit the coverage described in Covered Risk 14 or 15.
3. The right to take the Land by condemning it. This Exclusion does not limit the coverage described in Covered Risk 17.

4. Risks:
   a. that are created, allowed, or agreed to by You, whether or not they appear in the Public Records;
   b. that are Known to You at the Policy Date, but not to Us, unless they are recorded in the Public Records at the Policy Date;
   c. that result in no loss to You; or
   d. that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.e., 25, 26, 27 or 28.

5. Failure to pay value for Your Title.

6. Lack of a right:
   a. to any land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
   b. in streets, alleys, or waterways that touch the Land.
   This Exclusion does not limit the coverage described in Covered Risk 11 or 21.

7. The transfer of the Title to You is invalid as a preferential transfer or as a fraudulent transfer or conveyance under federal bankruptcy,   state insolvency, or similar creditors' rights laws.

8. Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.

9. Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

## LIMITATIONS ON COVERED RISKS

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:
*         For Covered Risk 16, 18, 19, and 21 Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.  The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

|  | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 16: | 1% of Policy Amount or $2,500.00 (whichever is less) | $10,000.00 |
| Covered Risk 18: | 1% of Policy Amount or $5,000.00 (whichever is less) | $25,000.00 |
| Covered Risk 19: | 1% of Policy Amount or $5,000.00 (whichever is less) | $25,000.00 |
| Covered Risk 21: | 1% of Policy Amount or $2,500.00 (whichever is less) | $5,000.00 |

## 2006 ALTA LOAN POLICY (06-17-06)
## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.  (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
    (i)   the occupancy, use, or enjoyment of the Land;
    (ii)  the character, dimensions, or location of any improvement erected on the Land;
    (iii) the subdivision of land; or
    (iv)  environmental protection;
    or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
    (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2.  Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3.  Defects, liens, encumbrances, adverse claims, or other matters
    (a) created, suffered, assumed, or agreed to by the Insured Claimant;
    (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
    (c) resulting in no loss or damage to the Insured Claimant;
    (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or
    (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4.  Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.

5.  Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.

6.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
    (a) a fraudulent conveyance or fraudulent transfer, or
    (b) a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.

7.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

## EXCEPTIONS FROM COVERAGE

Except as provided in Schedule B - Part II, this policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses, that arise by reason of:

### PART I

1.  (a) taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
    (b) proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

2.  Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.

3.  Easements, liens or encumbrances, or claims thereof, which are not shown by the Public Records.

4.  Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.

5.  (a) unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

6.  Any lien or right to a lien for services, labor or material unless such lien is shown by the Public Records at Date of Policy.

### PART II

In addition to the matters set forth in Part I of this Schedule, the Title is subject to the following matters, and the Company insures against loss or damage sustained in the event that they are not subordinate to the lien of the Insured Mortgage:

## 2006 ALTA OWNER'S POLICY (06-17-06)
## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.  (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating,  prohibiting, or relating to
    (i)   the occupancy, use, or enjoyment of the Land;
    (ii)  the character, dimensions, or location of any improvement erected on the Land;
    (iii) the subdivision of land; or
    (iv)  environmental protection;
    or the effect of any violation of these laws, ordinances, or governmental regulations.  This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
    (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2.  Rights of eminent domain.  This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3.  Defects, liens, encumbrances, adverse claims, or other matters
    (a) created, suffered, assumed, or agreed to by the Insured Claimant;
    (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
    (c) resulting in no loss or damage to the Insured Claimant;
    (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9  and 10); or
    (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.

4.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting  the Title as shown in Schedule A, is
    (a) a fraudulent conveyance or fraudulent transfer; or
    (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.

5.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of  Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage.  In addition to the above Exclusions from  Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the company will not pay costs, attorneys' fees or expenses) which arise by reason  of:

1.  Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on  real property or by the public records.
    Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the  records of such agency or by the public records.

2.  Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the  land or by making inquiry of persons in possession thereof.

3.  Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.

4.  Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate  and complete land survey of the Land and that are not shown by the Public Records.

5.  (a) unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims  or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

6.  Any lien or right to a lien for services, labor or material unless such lien is shown by the Public Records at Date of Policy..

**ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY – ASSESSMENTS PRIORITY (04-02-15)**
**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys fees or expenses which arise by reason of:

1.  a.  Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to
    (i)    the occupancy, use, or enjoyment of the Land;
    (ii)   the character, dimensions or location of any improvement now or hereafter erected on the Land;
    (iii)  the subdivision of land; or
    (iv)   environmental protection

    or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.
    b.  Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.

2.  Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3.  Defects, liens, encumbrances, adverse claims or other matters:

    (a)  created, suffered, assumed or agreed to by the Insured Claimant;
    (b)  not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
    (c)  resulting In no loss or damage to the Insured Claimant;
    (d)  attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 16, 17, 18, 19, 20, 21, 22, 23, 24, 27 or 28); or
    (e)  resulting in loss or damage which would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4.  Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing- business laws of the state where the Land is situated.

5.  Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury, or any consumer credit protection or truth-in-lending law. This Exclusion does not modify or limit the coverage provided in Covered Risk 26.

6.  Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to Advances or modifications made after the Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11.

7.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching subsequent to Date of Policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11(b) or 25.

8.  The failure of the residential structure, or any portion of it, to have been constructed before, on or after Date of Policy in accordance with applicable building codes. This Exclusion does not modify or limit the coverage provided in Covered Risk 5 or 6.

9.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is

    (a)  a fraudulent conveyance or fraudulent transfer, or
    (b)  a preferential transfer for any reason not stated in Covered Risk 27(b) of this policy.

10  Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.

11.  Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

File No.:  1763669

## AVAILABLE DISCOUNTS DISCLOSURE STATEMENT

This is to give you notice that Stewart Title of California, Inc. ("Stewart Title") is pleased to inform you that upon proper qualification, there are premium discounts available upon the purchase of title insurance covering improved property with a one to four family residential dwelling.

Such discounts apply to and include:

Property located within an area proclaimed a state or federal disaster area;

Property purchased from a foreclosing beneficiary or successful bidder at a foreclosure sale;

Property being refinanced.

Please talk with your escrow or title officer to determine your qualification for any of these discounts.

File No.:  1763669

# STGC TITLE PREMIUM DISCOUNT APPLICATION
# AND CONFIRMATION OF ELIGIBILITY

Order Number: 1763669

Property:  2240 Lorain Road, San Marino, CA  91108

APN: 5365-019-052

In connection with the request of the Undersigned ("Applicant") for the preparation and issuance of title insurance, Applicant provides this completed STGC Title Premium Discount Application and Confirmation of Eligibility ("Request Form") for the benefit of, and reliance by, title insurer Stewart Title Guaranty Company, and its policy issuing agent Stewart Title of California, Inc. (collectively hereafter referred to as "Stewart Title") in connection with pricing the title premium in the above referenced transaction:

1. Applicant understands that Stewart Title has available for qualifying requestors a 10% discount on the title insurance premium charged under certain circumstances; however, all endorsement fees and other charges are not discounted.

2. Applicant understands that Stewart Title is only able to provide such discount if requested through providing this completed Request Form and is received by Stewart Title at least five (5) business days prior to recording of the transaction to which a discount is requested.

3. Applicant understands that Stewart Title prohibits combined discounts; accordingly, Stewart Title will provide this requested discount and disregard other applicable discounts, if any, when eligibility requirements for such discount are satisfied.

4. Applicant requests the following discount and affirms that Applicant meets the criteria and requirements set forth to qualify for such selected discount (SELECT ONLY ONE QUALIFYING DISCOUNT):

☐ <u>Active military personnel and honorably discharged veteran discount</u>* – To qualify for an active military personnel or honorably discharged veteran discount: (1) the property being purchased, mortgaged or refinanced is a fee simple interest in a primary, owner-occupied residence; and (2) at least one of the undersigned purchaser(s), seller(s) or borrower(s), as applicable, is a U.S. citizen, permanent resident or qualified alien and is engaged in full-time, active duty in the military on the date signed below or was a honorably discharged veteran.

☐ <u>Senior citizen discount</u> – To qualify for a senior citizen discount: (1) the property being purchased, mortgaged or refinanced is a fee simple interest in a primary, owner-occupied residence; and (2) at least one of the undersigned purchaser(s), seller(s) or borrower(s), as applicable, is a U.S. citizen, permanent resident or qualified alien and is 55 years of age or older on the date signed below.

*Active military personnel and honorably discharged veterans include those members from the following U.S. military services branches: Air Force, Army, Coast Guard, Marine Corps, Navy and Space Force, and any active Reserve members of these military services branches and any active members of the Air or Army National Guard.

☐ <u>First-time homebuyer discount</u> – To qualify for a first-time homebuyer discount: (1) the property being purchased is a fee simple interest in a primary, owner-occupied residence; and (2) at least one of the undersigned purchaser(s) is a U.S. citizen, permanent resident or qualified alien and has either never owned any property or, has not been an owner in a primary residence for the last three calendar years from the date signed below.

☐ <u>First responder discount</u> – To qualify for a first responder discount: (1) the property being purchased, mortgaged or refinanced is a fee simple interest in a primary, owner-occupied residence; and (2) at least one of the undersigned purchaser(s), seller(s) or borrower(s), as applicable, is a U.S. citizen, permanent resident or qualified alien and is currently employed as a police officer, firefighter, paramedic or emergency medical technician on the date signed below.

This Request Form is completed under penalty of perjury and is made for the purpose of inducing Stewart Title to provide the title premium discount, and the representations contained herein are material to such insurance coverage pricing.  The undersigned hereby indemnifies and holds Stewart Title harmless from any loss or damage, liability, costs, expenses and attorneys' fees which it may sustain to the extent any representation contained herein is incorrect. The undersigned understands that Stewart Title may decide not to provide the requested title insurance despite the information and affirmations contained herein.

**PLEASE READ AND COMPLETE THE STGC TITLE PREMIUM DISCOUNT REQUEST FORM ON THE PREVIOUS PAGE BEFORE SIGNING BELOW. IF YOU DO NOT UNDERSTAND OR HAVE ANY QUESTIONS ABOUT THIS AFFIDAVIT, YOU SHOULD CONTACT YOUR LOCAL STEWART TITLE PROFESSIONAL.**

**THE UNDERSIGNED DECLARES UNDER PENALTY OF PERJURY THAT THE ABOVE INFORMATION IS TRUE AND CORRECT.**

_____    _____
Signature                            Signature


_____    _____
Printed Name                         Printed Name


_____    _____
Date Signed                          Date Signed

## Stewart Title of California, Inc.
## STATEMENT OF INFORMATION

**CONFIDENTIAL**

**THE STREET ADDRESS of the property in this transaction is:**  (IF NONE LEAVE BLANK)

ADDRESS  2240 Lorain Road                                    CITY San Marino, CA 91108

IMPROVEMENTS:  ☐ SINGLE RESIDENCE   ☐ MULTIPLE RESIDENCE   ☐ COMMERCIAL

OCCUPIED BY:   ☐ OWNER   ☐ TENANTS

CONSTRUCTION OR IMPROVEMENTS WITHIN THE LAST 6 MONTHS?   ☐ YES   ☐ NO

IF YES, STATE NATURE WORK DONE _____

| **PARTY 1** | **PARTY 2** |
|---|---|
| FIRST        MIDDLE        LAST | FIRST        MIDDLE        LAST |
| FORMER LAST NAME(S), IF ANY | FORMER LAST NAME(S), IF ANY |
| BIRTHPLACE        BIRTH DATE | BIRTHPLACE        BIRTH DATE |
| Social Security No.        DRIVER'S LICENSE NO. | Social Security No.        DRIVER'S LICENSE NO. |
| Home        Cell | Home        Cell |
| ☐ AM SINGLE   ☐ AM MARRIED   ☐ HAVE A DOMESTIC PARTNER | ☐ AM SINGLE   ☐ AM MARRIED   ☐ HAVE A DOMESTIC PARTNER |
| Date of Marriage or Partnership | Date of Marriage or Partnership |
| NAME OF <u>CURRENT</u> SPOUSE OR DOM. PARTNER (if other than Party 2): | NAME OF <u>CURRENT</u> SPOUSE OR DOM. PARTNER (if other than Party 1): |
| NAME OF <u>FORMER</u> SPOUSE/DOM. PARTNER: (IF NONE, WRITE "NONE"): | NAME OF <u>FORMER</u> SPOUSE/DOM. PARTNER: (IF NONE, WRITE "NONE"): |

| PARTY 1 | | PARTY 2 | |
|---|---|---|---|
| Dissolutions pending | Yes   No   (circle one) | Dissolutions pending | Yes   No   (circle one) |
| Required to make child support payments? | Yes   No   (circle one) | Required to make child support payments? | Yes   No   (circle one) |
| Required to make Family support payments? | Yes   No   (circle one) | Required to make Family support payments? | Yes   No   (circle one) |
| If paying former spouse directly, please provide address: | | If paying former spouse directly, please provide address: | |

### OCCUPATIONS FOR LAST 10 YEARS (attach additional 10 year information, if applicable)

Party 1: _____

| Occupation | Firm Name | Street and City | No. Years |

Party 2: _____

| Occupation | Firm Name | Street and City | No. Years |

### RESIDENCES FOR LAST 10 YEARS (attach additional 10 year information, if applicable)

Party 1: _____

| Street No. | Street Name | City | No. Years |

Party 2: _____

| Street No. | Street Name | City | No. Years |

### Email Address

If you would like us to contact you by email, please provide your email address _____

Home Phone: _____    Business Phone: _____    Cell Phone: _____

**The undersigned declare, under penalty of perjury, that foregoing is true and correct.**

**Signature:** _____  **Date:** _____      **Signature:** _____  **Date:** _____

Order No.:  1763669 - Statement of Information CA
Rev. 4/09

**99**

## Stewart Title Guaranty Company Privacy Notice
## Stewart Title Companies

**WHAT DO THE STEWART TITLE COMPANIES DO WITH YOUR PERSONAL INFORMATION?**

Federal and applicable state law and regulations give consumers the right to limit some but not all sharing. Federal and applicable state law regulations also require us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand how we use your personal information. This privacy notice is distributed on behalf of the Stewart Title Guaranty Company and its title affiliates (the Stewart Title Companies), pursuant to Title V of the Gramm-Leach-Bliley Act (GLBA).

The types of personal information we collect and share depend on the product or service that you have sought through us. This information can include social security numbers and driver's license number.

All financial companies, such as the Stewart Title Companies, need to share customers' personal information to run their everyday business—to process transactions and maintain customer accounts. In the section below, we list the reasons that we can share customers' personal information; the reasons that we choose to share; and whether you can limit this sharing.

| Reasons we can share your personal information. | Do we share | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes**— to process your transactions and maintain your account. This may include running the business and managing customer accounts, such as processing transactions, mailing, and auditing services, and responding to court orders and legal investigations. | Yes | No |
| **For our marketing purposes**— to offer our products and services to you. | Yes | No |
| **For joint marketing with other financial companies** | No | We don't share |
| **For our affiliates' everyday business purposes**— information about your transactions and experiences. Affiliates are companies related by common ownership or control. They can be financial and non-financial companies. *Our affiliates may include companies with a Stewart name; financial companies, such as Stewart Title Company* | Yes | No |
| **For our affiliates' everyday business purposes**— information about your creditworthiness. | No | We don't share |
| **For our affiliates to market to you** — For your convenience, Stewart has developed a means for you to opt out from its affiliates marketing even though such mechanism is not legally required. | Yes | Yes, send your first and last name, the email address used in your transaction, your Stewart file number and the Stewart office location that is handling your transaction by email to optout@stewart.com or fax to 1-800-335-9591. |
| **For non-affiliates to market to you.** Non-affiliates are companies not related by common ownership or control. They can be financial and non-financial companies. | No | We don't share |

We may disclose your personal information to our affiliates or to non-affiliates as permitted by law. If you request a transaction with a non-affiliate, such as a third party insurance company, we will disclose your personal information to that non-affiliate.  [We do not control their subsequent use of information, and suggest you refer to their privacy notices.]

**SHARING PRACTICES**

| | |
|---|---|
| **How often do the Stewart Title Companies notify me about their practices?** | We must notify you about our sharing practices when you request a transaction. |
| **How do the Stewart Title Companies protect my personal information?** | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer, file, and building safeguards. |
| **How do the Stewart Title Companies collect my personal information?** | We collect your personal information, for example, when you request insurance-related services provide such information to us We also collect your personal information from others, such as the real estate agent or lender involved in your transaction, credit reporting agencies, affiliates or other companies. |
| **What sharing can I limit?** | Although federal and state law give you the right to limit sharing (e.g., opt out) in certain instances, we do not share your personal information in those instances. |

***Contact us:   If you have any questions about this privacy notice, please contact us at:*** Stewart Title Guaranty Company, **1360 Post Oak Blvd., Ste. 100,  Privacy Officer, Houston, Texas 77056**

File No.: 1763669                                                                                                        Revised 01-01-2020

Effective Date:  January 1, 2020

# Privacy Notice for California Residents

Pursuant to the California Consumer Privacy Act of 2018 ("CCPA"), Stewart Information Services Corporation and its subsidiary companies (collectively, "Stewart") are providing this **Privacy Notice for California Residents** ("CCPA Notice").  This CCPA Notice supplements the information contained in Stewart's existing privacy notice and applies solely to all visitors, users and others who reside in the State of California or are considered California Residents ("consumers" or "you").  Terms used but not defined shall have the meaning ascribed to them in the CCPA.

<u>Information Stewart Collects</u>

Stewart collects information that identifies, relates to, describes, references, is capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer, household, or device.  Most of the information that Stewart collects in the course of its regular business is already protected pursuant to the Gramm-Leach-Bliley Act (GLBA).  Additionally, much of this information comes from government records or other information already in the public domain.  Personal information under the CCPA does not include:

- Publicly available information from government records.
- Deidentified or aggregated consumer information.
- Certain personal information protected by other sector-specific federal or California laws, including but not limited to the Fair Credit Reporting Act (FCRA), GLBA and California Financial Information Privacy Act (FIPA).

Specifically, Stewart has collected the following categories of personal information from consumers within the last twelve (12) months:

| Category | Examples | Collected? |
|---|---|---|
| A. Identifiers. | A real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, Social Security number, driver's license number, passport number, or other similar identifiers. | YES |
| B. Personal information categories listed in the California Customer Records statute (Cal. Civ. Code § 1798.80(e)). | A name, signature, Social Security number, physical characteristics or description, address, telephone number, passport number, driver's license or state identification card number, insurance policy number, education, employment, employment history, bank account number, credit card number, debit card number, or any other financial information, medical information, or health insurance information. Some personal information included in this category may overlap with other categories. | YES |
| C. Protected classification characteristics under California or federal law. | Age (40 years or older), race, color, ancestry, national origin, citizenship, religion or creed, marital status, medical condition, physical or mental disability, sex (including gender, gender identity, gender expression, pregnancy or childbirth and related medical conditions), sexual orientation, veteran or military status, genetic information (including familial genetic information). | YES |
| D. Commercial information. | Records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies. | YES |
| E. Biometric information. | Genetic, physiological, behavioral, and biological characteristics, or activity patterns used to extract a template or other identifier or identifying information, such as, fingerprints, faceprints, and voiceprints, iris or retina scans, keystroke, gait, or other physical patterns, and sleep, health, or exercise data. | YES |
| F. Internet or other similar network activity. | Browsing history, search history, information on a consumer's interaction with a website, application, or advertisement. | YES |
| G. Geolocation data. | Physical location or movements. | YES |
| H. Sensory data. | Audio, electronic, visual, thermal, olfactory, or similar information. | YES |
| I. Professional or employment-related information. | Current or past job history or performance evaluations. | YES |
| J. Non-public education information (per the Family Educational Rights and Privacy Act (20 U.S.C. Section 1232g, 34 C.F.R. Part 99)). | Education records directly related to a student maintained by an educational institution or party acting on its behalf, such as grades, transcripts, class lists, student schedules, student identification codes, student financial information, or student disciplinary records. | YES |
| K. Inferences drawn from other personal information. | Profile reflecting a person's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes. | YES |

File No.: 1763669

Revised 01-01-2020

Stewart obtains the categories of personal information listed above from the following categories of sources:

- Directly and indirectly from customers, their designees or their agents (For example, realtors, lenders, attorneys, etc.)
- Directly and indirectly from activity on Stewart's website or other applications.
- From third-parties that interact with Stewart in connection with the services we provide.

<u>Use of Personal Information</u>

Stewart may use or disclose the personal information we collect for one or more of the following purposes:

- To fulfill or meet the reason for which the information is provided.
- To provide, support, personalize, and develop our website, products, and services.
- To create, maintain, customize, and secure your account with Stewart.
- To process your requests, purchases, transactions, and payments and prevent transactional fraud.
- To prevent and/or process claims.
- To assist third party vendors/service providers who complete transactions or perform services on Stewart's behalf.
- As necessary or appropriate to protect the rights, property or safety of Stewart, our customers or others.
- To provide you with support and to respond to your inquiries, including to investigate and address your concerns and monitor and improve our responses.
- To personalize your website experience and to deliver content and product and service offerings relevant to your interests, including targeted offers and ads through our website, third-party sites, and via email or text message (with your consent, where required by law).
- To help maintain the safety, security, and integrity of our website, products and services, databases and other technology assets, and business.
- To respond to law enforcement or regulator requests as required by applicable law, court order, or governmental regulations.
- Auditing for compliance with federal and state laws, rules and regulations.
- Performing services including maintaining or servicing accounts, providing customer service, processing or fulfilling orders and transactions, verifying customer information, processing payments, providing advertising or marketing services or other similar services.
- To evaluate or conduct a merger, divestiture, restructuring, reorganization, dissolution, or other sale or transfer of some or all of our assets, whether as a going concern or as part of bankruptcy, liquidation, or similar proceeding, in which personal information held by us is among the assets transferred.

Stewart will not collect additional categories of personal information or use the personal information we collected for materially different, unrelated, or incompatible purposes without providing you notice.

<u>Disclosure of Personal Information to Affiliated Companies and Nonaffiliated Third Parties</u>

Stewart does not sell your personal information to nonaffiliated third parties.  Stewart may share your information with those you have designated as your agent in the course of your transaction (for example, a realtor or a lender).  Stewart may disclose your personal information to a third party for a business purpose.  Typically, when we disclose personal information for a business purpose, we enter a contract that describes the purpose and requires the recipient to both keep that personal information confidential and not use it for any purpose except performing the contract.

We share your personal information with the following categories of third parties:

- Service providers and vendors (For example, search companies, mobile notaries, and companies providing credit/debit card processing, billing, shipping, repair, customer service, auditing, marketing, etc.)
- Affiliated Companies
- Litigation parties and attorneys, as required by law.
- Financial rating organizations, rating bureaus and trade associations.
- Federal and State Regulators, law enforcement and other government entities

In the preceding twelve (12) months, Stewart has disclosed the following categories of personal information for a business purpose:

Category A:  Identifiers
Category B:  California Customer Records personal information categories
Category C:  Protected classification characteristics under California or federal law
Category D:  Commercial Information
Category E:  Biometric Information
Category F:  Internet or other similar network activity
Category G:  Geolocation data
Category H:  Sensory data
Category I:  Professional or employment-related information
Category J:  Non-public education information
Category K:  Inferences

<u>Consumer Rights and Choices</u>

The CCPA provides consumers (California residents) with specific rights regarding their personal information.  This section describes your CCPA rights and explains how to exercise those rights.

**Access to Specific Information and Data Portability Rights**

You have the right to request that Stewart disclose certain information to you about our collection and use of your personal information over the past 12 months.  Once we receive and confirm your verifiable consumer request, Stewart will disclose to you:

- The categories of personal information Stewart collected about you.
- The categories of sources for the personal information Stewart collected about you.
- Stewart's business or commercial purpose for collecting that personal information.
- The categories of third parties with whom Stewart shares that personal information.
- The specific pieces of personal information Stewart collected about you (also called a data portability request).
- If Stewart disclosed your personal data for a business purpose, a listing identifying the personal information categories that each category of recipient obtained.

**Deletion Request Rights**

You have the right to request that Stewart delete any of your personal information we collected from you and retained, subject to certain exceptions. Once we receive and confirm your verifiable consumer request, Stewart will delete (and direct our service providers to delete) your personal information from our records, unless an exception applies.

Stewart may deny your deletion request if retaining the information is necessary for us or our service providers to:

1. Complete the transaction for which we collected the personal information, provide a good or service that you requested, take actions reasonably anticipated within the context of our ongoing business relationship with you, or otherwise perform our contract with you.

2. Detect security incidents, protect against malicious, deceptive, fraudulent, or illegal activity, or prosecute those responsible for such activities.

3. Debug products to identify and repair errors that impair existing intended functionality.

4. Exercise free speech, ensure the right of another consumer to exercise their free speech rights, or exercise another right provided for by law.

5. Comply with the California Electronic Communications Privacy Act (Cal. Penal Code § 1546 *seq.*).

6. Engage in public or peer-reviewed scientific, historical, or statistical research in the public interest that adheres to all other applicable ethics and privacy laws, when the information's deletion may likely render impossible or seriously impair the research's achievement, if you previously provided informed consent.

7. Enable solely internal uses that are reasonably aligned with consumer expectations based on your relationship with us.

8. Comply with a legal obligation.

9. Make other internal and lawful uses of that information that are compatible with the context in which you provided it.

<u>Exercising Access, Data Portability, and Deletion Rights</u>

To exercise the access, data portability, and deletion rights described above, please submit a verifiable consumer request to us either:

- Calling us Toll Free at 1-866-571-9270

- Emailing us at Privacyrequest@stewart.com

- Visiting http://stewart.com/ccpa

Only you, or someone legally authorized to act on your behalf, may make a verifiable consumer request related to your personal information. You may also make a verifiable consumer request on behalf of your minor child.

To designate an authorized agent, please contact Stewart through one of the methods mentioned above.

You may only make a verifiable consumer request for access or data portability twice within a 12-month period. The verifiable consumer request must:

- Provide sufficient information that allows us to reasonably verify you are the person about whom we collected personal information or an authorized representative.

- Describe your request with sufficient detail that allows us to properly understand, evaluate, and respond to it.

Stewart cannot respond to your request or provide you with personal information if we cannot verify your identity or authority to make the request and confirm the personal information relates to you.

Making a verifiable consumer request does not require you to create an account with Stewart.

<u>Response Timing and Format</u>

We endeavor to respond to a verifiable consumer request within forty-five (45) days of its receipt.  If we require more time (up to an additional 45 days), we will inform you of the reason and extension period in writing.

A written response will be delivered by mail or electronically, at your option.

Any disclosures we provide will only cover the 12-month period preceding the verifiable consumer request's receipt.  The response we provide will also explain the reasons we cannot comply with a request, if applicable.  For data portability requests, we will select a format to provide your personal information that is readily useable and should allow you to transmit the information from one entity to another entity without hindrance.

Stewart does not charge a fee to process or respond to your verifiable consumer request unless it is excessive, repetitive, or manifestly unfounded.  If we determine that the request warrants a fee, we will tell you why we made that decision and provide you with a cost estimate before completing your request.

<u>Non-Discrimination</u>

Stewart will not discriminate against you for exercising any of your CCPA rights.  Unless permitted by the CCPA, we will not:

- Deny you goods or services.
- Charge you a different prices or rates for goods or services, including through granting discounts or other benefits, or imposing penalties.
- Provide you a different level or quality of goods or services.
- Suggest that you may receive a different price or rate for goods or services or a different level or quality of goods or services.

<u>Changes to Our Privacy Notice</u>

Stewart reserves the right to amend this privacy notice at our discretion and at any time.  When we make changes to this privacy notice, we will post the updated notice on Stewart's website and update the notice's effective date.  **Your continued use of Stewart's website following the posting of changes constitutes your acceptance of such changes.**

<u>Contact Information</u>

If you have questions or comments about this notice, the ways in which Stewart collects and uses your information described here, your choices and rights regarding such use, or wish to exercise your rights under California law, please do not hesitate to contact us at:

**Phone:**          Toll Free at 1-866-571-9270

**Website:**        **http://stewart.com/ccpa**

**Email:**          Privacyrequest@stewart.com

**Postal Address:**  Stewart Information Services Corporation

              Attn:  Mary Thomas, Deputy Chief Compliance Officer

              1360 Post Oak Blvd., Ste. 100, MC #14-1

              Houston, TX  77056

Documents provided by DataTree LLC via it's proprietary imaging and delivery system. Copyright 2003. All rights reserved.

OFFICE OF THE ASSESSOR
COUNTY OF LOS ANGELES
COPYRIGHT © 2002

SEARCH NO

690807
7002004-309
201410230008001-05

REVISED
1-5-05
690718241

TRA
8541

P. A.
11856-19

19
SHEET

5365

BK
5333

SAN MARINO AVE

BK
5334

WEST HAVEN RD

2015

149
(52)

148
(51)

147
(1)

146
(50)

145
(15)

144
(55)

143
(3)

142
(37)

141
(48)

140
(47)

139
(46)

138
(45)

137
(44)

136
(43)

135
(42)

134
(41)

133
(40)

132
(39)

131

130
(38)

PG
20

PG
21

PG
18

TRACT

LORAIN

M B

105

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 1901 Avenue of the Stars, Suite 450, Los Angeles, CA 90067-6006.

A true and correct copy of the foregoing document entitled (*specify*): DEBTOR'S NOTICE OF MOTION AND MOTION TO:  (1) AUTHORIZE SALE OF REAL PROPERTY LOCATED AT 2240 LORAIN ROAD, SAN MARINO, CA 91108 FREE AND CLEAR OF LIENS; AND (2) APPROVE COMPROMISE WITH CORONA CAPITAL GROUP, LLC; MEMORANDUM OF POINTS AND AUTHORITIES, DECLARATIONS OF ZHAO PU YANG, WEIJUN XU, LIHUA HE, WILLIAM FRIEDMAN, STEPHEN ENG, AND ALPHAMORLAI L. KEBEH, AND REQUEST FOR JUDICIAL NOTICE IN SUPPORT THEREOF will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)  March 14, 2023  I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page.

**2.  <u>SERVED BY UNITED STATES MAIL</u>**:  On <u>March 14, 2023 </u>, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by causing to be placed a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒ Service information continued on attached page.

**3. <u>SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL</u>** (<u>state method for each person or entity served</u>): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| March 14, 2023 | Beverly Lew | */s/ Beverly Lew* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

<u>**ADDITIONAL SERVICE INFORMATION**</u> (if needed):

## 1.  <u>SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")</u>

David M Browne on behalf of Defendant CBW Global Inc.    dmbrownelaw@gmail.com, dmbeaster@aol.com

David M Browne on behalf of Defendant CBW Global, Inc.    dmbrownelaw@gmail.com, dmbeaster@aol.com

David M Browne on behalf of Defendant Betty Zheng    dmbrownelaw@gmail.com, dmbeaster@aol.com

David M Browne on behalf of Defendant Betty Bao Zheng    dmbrownelaw@gmail.com, dmbeaster@aol.com

Donna C Bullock on behalf of Interested Party Donna Bullock Carrera
donnabullockcarrera@yahoo.com, donna.bullock@ymail.com

Steven P Chang on behalf of Interested Party Courtesy NEF
heidi@spclawoffice.com,
schang@spclawoffice.com,assistant1@spclawoffice.com,attorney@spclawoffice.com;g9806@notify.cincompass.com;chang
sr75251@notify.bestcase.com

Michael F Chekian on behalf of Creditor The Phalanx Group
mike@cheklaw.com, chekianmr84018@notify.bestcase.com

Michael F Chekian on behalf of Interested Party Chekian Law Office, Inc.
mike@cheklaw.com, chekianmr84018@notify.bestcase.com

Heidi M Cheng on behalf of Plaintiff JINZHENG GROUP (USA) LLC
heidi@slclawoffice.com, assistant1@spclawoffice.com;schang@spclawoffice.com;chenghr75251@notify.bestcase.com

Susan Titus Collins on behalf of Interested Party INTERESTED PARTY        scollins@counsel.lacounty.gov

Nicholas S Couchot on behalf of Creditor Royal Business Bank
ncouchot@buchalter.com, docket@buchalter.com;marias@buchalter.com

Jeffrey W Dulberg on behalf of Creditor Committee OFFICIAL COMMITTEE OF UNSECURED CREDITORS
jdulberg@pszjlaw.com

Oscar Estrada on behalf of Creditor LOS ANGELES COUNTY TREASURER AND TAX COLLECTOR
oestrada@ttc.lacounty.gov

Danielle R Gabai on behalf of Debtor JINZHENG GROUP (USA) LLC
dgabai@danninggill.com, dgabai@ecf.courtdrive.com

Runmin Gao on behalf of Plaintiff JINZHENG GROUP (USA) LLC
ivy.gao@aalrr.com, alicia.mcmaster@aalrr.com

Runmin Gao on behalf of Plaintiff JINZHENG GROUP (USA) LLC
ivy.gao@aalrr.com, alicia.mcmaster@aalrr.com

Richard Girgado on behalf of Interested Party Courtesy NEF        rgirgado@counsel.lacounty.gov

Brian T Harvey on behalf of Interested Party Courtesy NEF
bharvey@buchalter.com, IFS_filing@buchalter.com;dbodkin@buchalter.com

M. Jonathan Hayes on behalf of Interested Party Courtesy NEF
jhayes@rhmfirm.com,
roksana@rhmfirm.com;matt@rhmfirm.com;rosario@rhmfirm.com;sloan@rhmfirm.com;priscilla@rhmfirm.com;rebeca@rhmfir
m.com;david@rhmfirm.com;susie@rhmfirm.com;max@rhmfirm.com;russ@rhmfirm.com

Teddy M Kapur on behalf of Creditor Committee OFFICIAL COMMITTEE OF UNSECURED CREDITORS

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                      **F 9013-3.1.PROOF.SERVICE**

tkapur@pszjlaw.com, mdj@pszjlaw.com

Alphamorlai Lamine Kebeh on behalf of Debtor JINZHENG GROUP (USA) LLC          akebeh@danninggill.com

Alphamorlai Lamine Kebeh on behalf of Plaintiff JINZHENG GROUP (USA) LLC          akebeh@danninggill.com

Peter A Kim on behalf of Attorney LAW OFFICES OF PETER KIM     peter@pkimlaw.com, peterandrewkim@yahoo.com

Peter A Kim on behalf of Defendant Betula Lenta Inc          peter@pkimlaw.com, peterandrewkim@yahoo.com

Peter A Kim on behalf of Defendant David Park          peter@pkimlaw.com, peterandrewkim@yahoo.com

Peter A Kim on behalf of Defendant Jonathan Pae          peter@pkimlaw.com, peterandrewkim@yahoo.com

Christopher J Langley on behalf of Attorney Shioda Langley and Chang LLP
chris@slclawoffice.com, omar@slclawoffice.com;langleycr75251@notify.bestcase.com;ecf123@casedriver.com

Christopher J Langley on behalf of Plaintiff JINZHENG GROUP (USA) LLC
chris@slclawoffice.com, omar@slclawoffice.com;langleycr75251@notify.bestcase.com;ecf123@casedriver.com

Paul J Leeds on behalf of Creditor Sound Equity, Inc.          Pleeds@fsl.law, ssanchez@fsl.law

Benjamin R Levinson, ESQ on behalf of Creditor Michael E. Dorff and Shari L. Dorff
ben@benlevinsonlaw.com, courtney@benlevinsonlaw.com

Damian J. Martinez on behalf of Attorney ATKINSON ANDELSON LOYA RUUD & ROMO
damian.martinez@aalrr.com, julissa.ruiz@aalrr.com

Damian J. Martinez on behalf of Debtor JINZHENG GROUP (USA) LLC
damian.martinez@aalrr.com, julissa.ruiz@aalrr.com

Damian J. Martinez on behalf of Plaintiff JINZHENG GROUP (USA) LLC
damian.martinez@aalrr.com, julissa.ruiz@aalrr.com

Damian J. Martinez on behalf of Plaintiff JINZHENG GROUP (USA) LLC
damian.martinez@aalrr.com, julissa.ruiz@aalrr.com

Eric A Mitnick on behalf of Creditor Corona Capital Group LLC          MitnickLaw@gmail.com, mitnicklaw@gmail.com

Eric A Mitnick on behalf of Interested Party Courtesy NEF          MitnickLaw@gmail.com, mitnicklaw@gmail.com

Giovanni Orantes on behalf of Other Professional Orantes Law Firm, P.C.
go@gobklaw.com, gorantes@orantes-
law.com,cmh@gobklaw.com,gobklaw@gmail.com,go@ecf.inforuptcy.com;orantesgr89122@notify.bestcase.com

Donald W Reid on behalf of Interested Party INTERESTED PARTY          don@donreidlaw.com, ecf@donreidlaw.com

Matthew D. Resnik on behalf of Attorney Matthew Resnik
Matt@rhmfirm.com,
roksana@rhmfirm.com;rosario@rhmfirm.com;sloan@rhmfirm.com;priscilla@rhmfirm.com;rebeca@rhmfirm.com;david@rhmfirm.com;susie@rhmfirm.com;max@rhmfirm.com;russ@rhmfirm.com

Matthew D. Resnik on behalf of Creditor Royalty Equity Lending, LLC/Bobs LLC
Matt@rhmfirm.com,
roksana@rhmfirm.com;rosario@rhmfirm.com;sloan@rhmfirm.com;priscilla@rhmfirm.com;rebeca@rhmfirm.com;david@rhmfirm.com;susie@rhmfirm.com;max@rhmfirm.com;russ@rhmfirm.com

Matthew D. Resnik on behalf of Interested Party Courtesy NEF

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                   **F 9013-3.1.PROOF.SERVICE**

Matt@rhmfirm.com,
roksana@rhmfirm.com;rosario@rhmfirm.com;sloan@rhmfirm.com;priscilla@rhmfirm.com;rebeca@rhmfirm.com;david@rhmfirm.com;susie@rhmfirm.com;max@rhmfirm.com;russ@rhmfirm.com

Peter J Ryan on behalf of Defendant Testa Capital Group          ryan@floresryan.com, schneider@floresryan.com

Peter J Ryan on behalf of Defendant Thomas L. Testa          ryan@floresryan.com, schneider@floresryan.com

Allan D Sarver on behalf of Creditor Investment Management Company LLC
ADS@asarverlaw.com

Allan D Sarver on behalf of Interested Party Courtesy NEF          ADS@asarverlaw.com

Zev Shechtman on behalf of Attorney DANNING, GILL, ISRAEL & KRASNOFF, LLP
zs@DanningGill.com, danninggill@gmail.com;zshechtman@ecf.inforuptcy.com

Zev Shechtman on behalf of Debtor JINZHENG GROUP (USA) LLC
zs@DanningGill.com, danninggill@gmail.com;zshechtman@ecf.inforuptcy.com

Zev Shechtman on behalf of Interested Party INTERESTED PARTY
zs@DanningGill.com, danninggill@gmail.com;zshechtman@ecf.inforuptcy.com

Zev Shechtman on behalf of Plaintiff JINZHENG GROUP (USA) LLC
zs@DanningGill.com, danninggill@gmail.com;zshechtman@ecf.inforuptcy.com

David Samuel Shevitz on behalf of Interested Party INTERESTED PARTY
david@shevitzlawfirm.com, shevitzlawfirm@ecf.courtdrive.com;r48785@notify.bestcase.com;Jose@shevitzlawfirm.com

John N Tedford, IV on behalf of Interested Party INTERESTED PARTY
jtedford@DanningGill.com, danninggill@gmail.com;jtedford@ecf.courtdrive.com

United States Trustee (LA)          ustpregion16.la.ecf@usdoj.gov

Hatty K Yip on behalf of U.S. Trustee United States Trustee (LA)          hatty.yip@usdoj.gov, hatty.k.yip@usdoj.gov2.

---

**2.  <u>SERVED BY U.S. MAIL</u>**

JINZHENG GROUP (USA) LLC
1414 S Azusa Ave, Suite B-22
West Covina, CA 91791-4084

The Honorable Ernest M. Robles
U.S. Bankruptcy Court
255 E. Temple Street, Suite 1560
Los Angeles, CA 90012

DNQ LLC
Jason D Wang
6145 W Spring Mountain Rd.
#205
Las Vegas NV 89146-8819

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                          **F 9013-3.1.PROOF.SERVICE**