ZEV SHECHTMAN (State Bar No. 266280)
*zs@DanningGill.com*
ALPHAMORLAI L. KEBEH (State Bar No. 336798)
*akebeh@DanningGill.com*
DANNING, GILL, ISRAEL & KRASNOFF, LLP
1901 Avenue of the Stars, Suite 450
Los Angeles, California 90067-6006
Telephone: (310) 277-0077
Facsimile: (310) 277-5735

General Bankruptcy Counsel for Jinzheng Group
(USA) LLC, Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:21-bk-16674-ER |
| JINZHENG GROUP (USA) LLC, | Chapter 11 |
| Debtor. | **DEBTOR'S NOTICE OF MOTION AND MOTION TO CONSOLIDATE ACTIONS; MEMORANDUM OF POINTS AND AUTHORITIES AND REQUEST FOR JUDICIAL NOTICE IN SUPPORT THEREOF** |
| | Date: April 19, 2023 |
| | Time: 11:00 a.m. |
| | Crtrm.: 1568 |
| | 255 East Temple Street |
| | Los Angeles, California 90012 |

**TO THE HONORABLE ERNEST M. ROBLES, UNITED STATES BANKRUPTCY JUDGE, AND INTERESTED PARTIES:**

   **PLEASE TAKE NOTICE THAT** on April 19, 2023, at 11:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 1568 of the United States Bankruptcy Court, 255 E. Temple Street, Los Angeles, California, Jinzheng Group (USA), LLC, Debtor and Debtor in Possession (the "Debtor"), will and hereby does move (the "Motion") the Court under Federal Rules of Bankruptcy Procedure 7042 and 9014, and Local Bankruptcy Rule 9013-1, for an order:

1.      Consolidating (1) the Debtor's pending adversary proceeding against Betula Lenta, Inc. ("Betula"), David Park ("Park"), and Jonathan Pae ("Pae") (collectively, the "Defendants"), Adv. No. 2:22-ap-01090-ER (the "Adversary Proceeding"); and (2) the Debtor's pending *Objection to Proof of Claim No. 18 of Betula Lenta Inc.* (bankr. docket no. 120) (the "Claim Objection");

2.      Vacating all dates and deadlines relating to the Claim Objection and the Court's *Order Continuing Litigation Deadlines Pertaining to Evidentiary Hearing on Claim No. 18 Filed by Betula Lenta, Inc.* (bankr. docket no. 426); and

3.      Deeming the complaint in the Adversary Proceeding to be amended and the Claim Objection and any responses thereto to be treated as parts of the pleadings for purposes of the Adversary Proceeding.

**PLEASE TAKE FURTHER NOTICE** that the Debtor is contemporaneously filing the identical Motion in both the Debtor's main bankruptcy case, Case No. 2:21-bk-16674-ER, and the Adversary Proceeding, Adv. No. 2:22-ap-01090-ER.

**PLEASE TAKE FURTHER NOTICE** that the Motion is based on this Notice of Motion and Motion and accompanying memorandum of points and authorities, request for judicial notice and other evidence presented at or before the hearing on the Motion.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Local Bankruptcy Rule 9013-1(f), each interested party opposing, joining in, or responding to the Motion must, not later than **14 days** before the date of the hearing, file with the Clerk of the Bankruptcy Court and serve upon the Debtor's undersigned general counsel either: (i) a complete written statement of all reasons in opposition thereto or in support or joinder thereof, declarations and copies of all evidence on which the responding party intends to rely, and any responding memorandum of points and authorities; or (ii) a written statement that the Motion will not be opposed.

1    Pursuant to Local Bankruptcy Rule 9013-1(h), failure to timely file and serve papers may

2 be deemed by the Court to be consent to the granting of the Motion.

3

4 DATED:  March 29, 2023                    DANNING, GILL, ISRAEL & KRASNOFF, LLP

5

6                                          By:    _____/s/ Alphamorlai L. Kebeh_____

7                                                 ALPHAMORLAI L. KEBEH
                                                  General Bankruptcy Counsel for Jinzheng Group
8                                                 (USA) LLC, Debtor and Debtor in Possession

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### FACTUAL STATEMENT

**A.      Bankruptcy Background**

On August 24, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor continues in possession of its property and is operating and managing its business as a debtor in possession pursuant to the provisions of 11 U.S.C. §§ 1107(a) and 1108.

**B.      The Claim Objection**

On February 3, 2022, Betula Lenta, Inc. ("Betula Lenta") filed claim no. 18 in the case, alleging an unsecured claim in the amount of $1,643,977.00 (the "Claim").  A copy of the Claim is attached as Exhibit "1" to the RJN.  The Claim is based on three written contracts between the Debtor and Betula Lenta for entitlement and development of 32 acres of raw unentitled land and adjacent or nearby parcels.  On February 19, 2022, the Debtor filed its *Objection to Proof of Claim No. 18 of Betula Lenta Inc.* (bankr. docket no. 120) (the "Claim Objection").  A copy of the Claim Objection is attached as Exhibit "2" to the RJN.  In the Claim Objection, the Debtor argued that the Claim does not contain sufficient documentation and information to support the Claim or the calculation of its amount.  Specifically, the Debtor argued that Betula Lenta failed to provide sufficient evidence of the development services it allegedly provided to the Debtor or an accounting of the amounts owed on account thereof.  Exhibit "2," Claim Objection, p. 7-8.

A hearing on the Claim Objection was initially set for March 22, 2022.  At the hearing, the Court determined that an evidentiary hearing was required to determine the validity of the Claim.  The Court then set the matter for trial during the week of October 24, 2022.  On April 25, 2022, the Court entered a scheduling order confirming the litigation deadlines relating to the Claim Objection (the "Scheduling Order") (bankr. docket no. 189).  Since then, the Debtor has entered into a series

of stipulations with Betula, David Park ("Park"), and Jonathan Pae ("Pae")[1] (collectively, the "Defendants") to continue the litigation deadlines set in the Scheduling Order.  Pursuant to the most recent stipulation and order, the evidentiary hearing on the Claim Objection is set for the week of May 22, 2023 (bankr. docket nos. 424, 426).

**C.    The Adversary Proceeding**

On February 7, 2022, the Debtor commenced an action in the Los Angeles Superior Court, entitled <u>Jinzheng Group (USA) LLC vs. Jonathan Pae, etc., et al.</u>, Case No. 22STCV046231 (the "State Court Action").  A copy of the complaint in the State Court Action is attached to the RJN as Exhibit "3."  In the State Court Action, the Debtor claimed damages under causes of action for Breach of Contract, Intentional Misrepresentation, Negligent Misrepresentation and other claims.

Betula Lenta filed a notice of removal (bankr. docket no. 185) of the State Court Action to the Bankruptcy Case on April 14, 2022, consequently commencing an adversary proceeding in the case, Case No. 2:22-ap-01090-ER (the "Adversary Proceeding").  A copy of the filed notice of removal is attached hereto as Exhibit "4" to RJN.  In Betula Lenta's notice of removal, it notes that the alleged facts and evidence underlying the State Court Action are identical to the alleged grounds for the Claim.  Bankr. docket no. 185, page 3 ("The allowance or disallowance of [Betula Lenta's Claim] involves determination of the identical facts and evidence as required for the State Court Action").

On January 9, 2023, the Debtor filed a request for entry of default as to Betula Lenta, David Park, and Jonathan Pae (Adv. docket nos. 34, 35, and 36, respectively).  On January 17, 2023, the Court filed a notice that the clerk has entered default as against each Defendant (Adv. docket nos. 39, 40, and 41).  Pursuant to a series of stipulations between the Debtor and the Defendants, the Adversary Proceeding is set for a status conference on May 9, 2023.

---

[1] Park and Pae are two of the principals of Betula.

## II.

## LEGAL STANDARD

**A.     The Court has Discretion to Consolidate the Actions**

Federal Rule of Civil Procedure 42 states, in relevant part:

If actions before the court involve a common question of law or fact, the court may:
(1) join for hearing or trial any or all matters at issue in the actions;
(2) consolidate the actions; or
(3) issue any other orders to avoid unnecessary cost or delay.

Fed. R. Civ. Pro. 42.

Federal Rule of Civil Procedure 42 is incorporated by Federal Rules of Bankruptcy

Procedure 7042 and 9014(c), conferring upon the bankruptcy court the discretion to consolidate

claims or actions related to a contested matter.  In re Fagan, 559 B.R. 718, 726 (Bankr. E.D. Cal.

2016) ("The bankruptcy court has the discretion to apply Civil Rule 42 to consolidate a claim made

in a contested matter with a claim made in an adversary proceeding").  See In re de la Salle, 461

B.R. 593, 603 (B.A.P. 9th Cir. 2011).  Indeed, the bankruptcy court's discretion is such that

contested matter issues may, upon consolidation, be alleged as a count in an adversary proceeding.

Fagan, 559 B.R. at 726.

The instant case presents a perfect opportunity for consolidation.  As demonstrated in the

Defendant's notice of removal, the Defendants agree with the Debtor's assertion that the Claim and

the Adversary Proceeding share a factual nexus.  The issues presented in the Adversary Proceeding

are directly related to the issues in the Claim Objection, and are based on the same written

contracts.  For example, the Claim Objection asserts that Betula Lenta has not provided sufficient

evidence that it performed services for which it is owed the amount alleged in the Claim.  If the

Court finds that Betula Lenta indeed failed to provide sufficient evidence that it performed services

allegedly giving rise to the Claim, such a finding is pertinent, if not dispositive, to the Adversary

Proceeding's breach of contract claim.

Consolidation of the Claim Objection and Adversary Proceeding will also serve judicial

economy by sparing the Court from creating duplicative hearing dates and findings of fact or the

possibility of inconsistent rulings.  The above facts compel consolidation from a substantive,

procedural, and efficiency perspective.  Accordingly, the Debtor respectfully requests that the

1  Court preserve the estate's resources, as well as its own, by consolidating the Claim Objection and

2  the Adversary Proceeding.

3

4                                                    III.

5                                    **REQUEST FOR RELIEF**

6          For the foregoing reasons, the Debtor requests that the Court enter an order:

7          1.        Granting the Motion in its entirety.

8          2.        Directing that all claims made in the Claim Objection are hereby considered

9  additional claims for relief in the Adversary Proceeding.

10         3.        Vacating all dates and deadlines relating to the Claim Objection and the Court's

11 *Order Continuing Litigation Deadlines Pertaining to Evidentiary Hearing on Claim No. 18 Filed*

12 *by Betula Lenta, Inc.* (bankr. docket no. 426).

13         4.        Directing that the complaint underlying the Adversary Proceeding is deemed

14 amended to include any and all claims for relief and defenses raised by the parties to the Claim

15 Objection and that any substantive rights belonging to the parties shall be preserved and considered

16 the same in connection with the Adversary Proceeding.

17

18 DATED:  March 29, 2023                    DANNING, GILL, ISRAEL & KRASNOFF, LLP

19

20                                          By:    _____*/s/ Alphamorlai L. Kebeh*_____

21                                                 ALPHAMORLAI L. KEBEH
                                                   General Bankruptcy Counsel for Jinzheng Group
22                                                 (USA) LLC, Debtor and Debtor in Possession

23

24

25

26

27

28

**REQUEST FOR JUDICIAL NOTICE**

Jinzheng Group (USA) LLC, debtor and debtor-in-possession (the "Debtor"), hereby respectfully requests that the Court take judicial notice of the following facts:

1.      On August 24, 2021, the Debtor filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code.  The case was assigned case number 2:21-bk-16674-ER.

2.      On February 3, 2022, Betula Lenta, Inc. ("Betula") filed claim no. 18 in the Debtor's bankruptcy case.  A copy thereof is attached hereto as Exhibit "1."

3.      On February 19, 2022, the Debtor filed its *Objection to Proof of Claim No. 18 of Betula Lenta Inc* (bankr. docket no. 120) (the "Claim Objection").  A copy thereof is attached hereto as Exhibit "2."

4.      On February 7, 2022, the Debtor commenced an action in the Los Angeles Superior Court, entitled Jinzheng Group (USA) LLC vs. Jonathan Pae, etc., et al., Case No. 22STCV046231 (the "State Court Action").  A copy of the complaint is attached hereto as Exhibit "3."

5.      On April 14, 2022, Betula Lenta filed its *Notice of Removal* in Adversary Proceeding case no. 2:22-ap-01090-ER (bankr. docket no. 185).  A copy thereof is attached hereto as Exhibit "4."

6.      On April 25, 2022, the Court entered its *Order Continuing Litigation Deadlines Pertaining to Evidentiary Hearing on Claim No. 18* (the "Scheduling Order") (bankr. docket no. 189).

DATED:  March 29, 2023                    DANNING, GILL, ISRAEL & KRASNOFF, LLP


                                          By:      */s/ Alphamorlai L. Kebeh*
                                                 ALPHAMORLAI L. KEBEH
                                                 General Bankruptcy Counsel for Jinzheng Group
                                                 (USA) LLC, Debtor and Debtor in Possession

EXHIBIT 1

**Fill in this information to identify the case:**

Debtor 1   JINZHENG GROUP (USA) LLC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court   **Central District of California**

Case number:  **21–16674**

FILED

**U.S. Bankruptcy Court
Central District of California**

2/3/2022

**Kathleen J. Campbell, Clerk**

Official Form 410
## Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
| --- | --- |

| 1. **Who is the current creditor?** | Betula Lenta Inc. |
| --- | --- |
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor     David Park. The Code Solution. TCS. TCS Building Solutions |

| 2. **Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes. From whom? |
| --- | --- |

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Betula Lenta Inc.

Name

800 West 6th Street
Suite 1250
Los Angeles, CA 90017

Contact phone        2135370158

Contact email
    david@thecodesolution.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

**Where should payments to the creditor be sent?** (if different)

Name

Contact phone

Contact email

| 4. **Does this claim amend one already filed?** | ☑ No<br>☐ Yes. Claim number on court claims registry (if known) _____   Filed on _____<br>                 MM / DD / YYYY |
| --- | --- |

| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes. Who made the earlier filing? |
| --- | --- |

Official Form 410            Proof of Claim            page 1

**EXHIBIT 1**       009

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

| 6. | **Do you have any number you use to identify the debtor?** | ☑ No <br> ☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ |
|---|---|---|

| 7. | **How much is the claim?** | $ ___ 1643977.00 ___ | **Does this amount include interest or other charges?** <br> ☐ No <br> ☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |
|---|---|---|---|

| 8. | **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). <br><br> Limit disclosing information that is entitled to privacy, such as healthcare information. <br><br> Services performed. Expenses paid to 3rd parties per contract. Consulting |
|---|---|---|

| 9. | **Is all or part of the claim secured?** | ☑ No <br> ☐ Yes. The claim is secured by a lien on property. <br><br> **Nature of property:** <br> ☐ Real estate.   If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410–A) with this *Proof of Claim.* <br> ☐ Motor vehicle <br> ☐ Other. Describe: _____ <br><br> **Basis for perfection:** _____ <br><br> Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.) <br><br> **Value of property:** $ _____ <br> **Amount of the claim that is secured:** $ _____ <br> **Amount of the claim that is unsecured:** $ _____  (The sum of the secured and unsecured amounts should match the amount in line 7.) <br><br> **Amount necessary to cure any default as of the date of the petition:** $ _____ <br><br> **Annual Interest Rate** (when case was filed) ____ % <br><br> ☐ Fixed <br> ☐ Variable |
|---|---|---|

| 10. | **Is this claim based on a lease?** | ☑ No <br> ☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____ |
|---|---|---|

| 11. | **Is this claim subject to a right of setoff?** | ☑ No <br> ☐ Yes. Identify the property: _____ |
|---|---|---|

Official Form 410    Proof of Claim    page 2

010

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No | | |
|---|---|---|---|---|
| | | ☐ Yes. *Check all that apply:* | | Amount entitled to priority |

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).   $ _____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).   $ _____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).   $ _____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).   $ _____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).   $ _____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies   $ _____

\* Amounts are subject to adjustment on 4/1/22 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157 and 3571.**

Check the appropriate box:

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   2/3/2022
                   MM / DD / YYYY

/s/  David Park

Signature

Print the name of the person who is completing and signing this claim:

| Name | David Park | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | President | | |
| Company | Betula Lenta Inc. | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer | | |
| Address | 800 West 6th Street Suite 1250 | | |
| | Number   Street | | |
| | Los Angeles, CA 90017 | | |
| | City  State  ZIP Code | | |
| Contact phone | 2135370158 | Email | david@thecodesolution.com |

011

### PREDEVELOPMENT CONSULTING AGREEMENT

This Predevelopment Consulting Agreement ("Agreement") is made effective as of ~~November~~ *December* __7__, 2017, and entered into by and between **JINZHENG GROUP (USA), LLC, a California limited liability company** ("Principal") and **BETULA LENTA, INC., a California Corporation** ("Consultant"), with regard to the following:

      **WHEREAS,** Principal and Consultant desire to enter into this Agreement for the purpose of Consultant providing and performing certain predevelopment consulting services (the "Predevelopment Services") with respect to the construction and development of certain for-sale residential improvements (the "Project") on that certain real property commonly referred to as 2929 Amethyst Street, Los Angeles, California 90032 (the "Site") as more specifically detailed, outlined and provided for below in this Agreement and as set forth in the "Scope of Services" which is attached hereto as Exhibit "A" and fully incorporated into this Agreement by this reference as though fully set forth herein; and

      **WHEREAS,** Consultant hereby represents and warrants that it possesses the necessary expertise and experience required to provide and perform the Predevelopment Services with respect to the development of the Site and is fully prepared and able to provide and perform the Predevelopment Services in a timely manner; and

      **WHEREAS,** Principal hereby acknowledges and agrees that it or a legal entity owned and controlled by it or one of its principals owns fee title to the Site and is duly authorized to enter into this Agreement for the performance of the Predevelopment Services by Consultant,

      **NOW, THEREFORE,** the Principal and Consultant (collectively referred to herein as the "Parties") do hereby agree to the following and terms and conditions established herein below in this Agreement.

      **1. DESCRIPTION OF PREDEVELOPMENT SERVICES.** Commencing on the date on which this Agreement is fully executed by the Parties, Consultant shall timely provide and perform the Predevelopment Services as provided for in this Agreement and the Scope of Services.

      **2. PERFORMANCE OF PREDEVELOPMENT SERVICES.** The manner in which the Predevelopment Services are to be performed and provided shall be determined exclusively by Consultant and will include, but not limited to, the specific amount of hours to be worked; provided however, Consultant shall commit as many hours as may be reasonably necessary to fulfill Consultant's obligations under this Agreement and the Scope of Services.

      **3. COMPENSATION SCHEDULE.** Compensation payable to Consultant by Principal for the Predevelopment Services shall as set forth in that certain "Compensation Schedule" which is attached to this Agreement as Exhibit "B" and fully incorporated into this Agreement as though fully set forth herein. As provided in the Compensation Schedule, payments shall be

1

made on an installment basis with each installment fully due and payable to Consultant within five (5) business days following the delivery of written notice by Consultant to Principal requesting payment. Failure to provide full payment of the requested amount shall be subject to a ten percent (10 %) late fee.

**4. EXPENSE REIMBURSEMENT.** All expenses not otherwise provided for in this Agreement shall be the sole responsibility of Consultant. Except as otherwise agreed upon by the Parties, the Principal shall not be responsible for the reimbursement of any expenses incurred by Consultant.

**5. OUTSIDE PROJECT APPROVAL.** Principal acknowledges and agrees that Consultant is and/or may become engaged in providing its services on various development projects other the Project. In this regard, Consultant shall provide Principal with a list of all such development projects in which it currently is involved and shall provide written notice to Principal of any and future projects in which it will be involved for approval consideration, pursuant to which, Principal shall not unreasonably withhold, delay, or condition its approval if such work does not materially and adversely affect Consultant's providing and performing the Predevelopment Work on the Project as provided for in this Agreement and the Scope of Development. In the event that Principal reasonably determines that such other project work will have an adverse and material effect on Consultant's performance of the Predevelopment Services, the Parties shall meet and confer to address and resolve the concerns of Principal.

**6. TERM/TERMINATION.** This Agreement shall terminate automatically upon completion of the Predevelopment Services by Consultant as required by this Agreement and the Scope of Services. However, in the event of a default with respect to of any of the obligations set forth in this Agreement by either Principal or Consultant, and such default is not cured within thirty (30) days following written notice to cure from the non-defaulting part, the non-defaulting party may terminate this Agreement and pursue any and all legal rights pertinent to such default including, but not limited to, damages or specific performance of the outstanding obligation(s).

**7. RELATIONSHIP OF PARTIES.** It is understood by the Parties that Consultant is an independent contractor with respect to providing and performing the Predevelopment Services and is not an employee of the Principal, who shall not be required to provide any fringe benefits, including health insurance benefits, paid vacation, or any other employee benefits, for the benefit of Consultant.

**8. DISCLOSURE.** Consultant is required to disclose to Principal any outside activities or interests, including ownership or participation in any developments that conflict or will conflict with the Consultant's providing and performing of the Predevelopment Services and the ultimate development of the Project on the Site.

**9. EMPLOYEES.** Consultant's contractors, consultants and employees, if any, who perform any aspect of the Predevelopment Services for Consultant under this Agreement shall also be bound by the provisions of this Agreement. At the written request of the Principal, Consultant shall provide adequate evidence that such persons are Consultant's agents, contractors, consultants, or employees.

2

**10. INJURIES AND INSURANCE.** Consultant acknowledges that Consultant's obligation to obtain appropriate insurance coverage for the benefit of Consultant (and Consultant's agents, contractors, consultants and employees, if any) to the extent required by applicable California law. Consultant waives any and all rights to recovery against Principal for any injuries that Consultant (and/or Consultant's agents, contractors, consultants and employees, if any) may sustain while providing and/or performing the Predevelopment Services under this Agreement, and that are a result of the negligence of Consultant or Consultant's agents, contractors, consultants, or employees.

**11. INDEMNIFICATION.** Consultant agrees to indemnify and hold Principal harmless from all claims, losses, expenses, fees including attorney fees, costs, and judgments that may be asserted against Principal that result from the acts or omissions of Consultant, Consultant's agents, contractors, consultants, and employees, if any.

Principal agrees to indemnify and hold Consultant, Consultant's agents, contractors, consultants, and employees, harmless from all claims, losses, expenses, fees including attorney fees, costs, and judgments that may be asserted against Consultant for any of the following: (a) any third-party work previously provided and performed on the behalf of Principal with respect to the Project; or (b) any acts or omissions of Principal, Principals agents, contractors, consultants, and/or employees.

**12. INTELLECTUAL PROPERTY.** The following provisions shall apply with respect to copyrightable works, ideas, discoveries, inventions, applications for patents, and patents (collectively, "Intellectual Property"):

*Consultant's Intellectual Property.* Consultant does not presently hold any interest in any Intellectual Property with respect to the development of the Project on the Site.

*Development of Intellectual Property.* To the extent that any Intellectual Property rights are established with respect to providing or performing the Predevelopment Services, or development of the Project on the Site, unless otherwise provided, all such Intellectual Property shall be the property of Principal and Consultant shall take all such reasonable efforts to cause all such rights to be assigned to Principal.

**13. OWNERSHIP OF SOCIAL MEDIA CONTACTS.** Any social media contacts, including "followers" or "friends," that are acquired through accounts (including, but not limited to email addresses, blogs, Twitter, Facebook, You-tube, or other social media networks) used or created in conjunction with providing and performing the Predevelopment Services shall be the property of Consultant.

**14. CONFIDENTIALITY.**  Principal recognizes that Consultant has and will have the following information:

-   prices
-   costs

3

014

- discounts
- future plans
- process information
- technical information
- copyrights
- proprietary information

as well as any other proprietary information (collectively, "Information") which are valuable, special and unique assets of Principal that require protection from improper disclosure. In consideration for access and disclosure of the Information to Consultant, Consultant agrees that it will not at any time or in any manner, either directly or indirectly, use any Information for Consultant's own benefit, or divulge, disclose, or communicate in any manner any Information to any third party without the prior written consent of Principal. Consultant will protect the Information and treat it as strictly confidential. A violation of this paragraph shall be a material violation of this Agreement.

**15. UNAUTHORIZED DISCLOSURE OF INFORMATION.** If it appears that Consultant has disclosed (or has threatened to disclose) Information in violation of this Agreement, Principal shall be entitled to an injunction to restrain Consultant from disclosing, in whole or in part, such Information, or from providing any services to any party to whom such Information has been disclosed or may be disclosed.  Principal shall not be prohibited by this provision from pursuing any other remedies, including a claim for losses and damages.

**16. CONFIDENTIALITY AFTER TERMINATION.** The confidentiality provisions of this Agreement shall remain in full force and effect after the termination of this Agreement.

**17. SERVICES TO THIRD PARTIES.**  Except as otherwise approved by Principal as set forth hereinabove in this Agreement, Consultant shall not provide any consulting services to any third party during the term of this Agreement.

**18. RETURN OF RECORDS.** Upon termination of this Agreement, Consultant, at the written request of Principal, shall deliver all records, notes, data, memoranda, models, and equipment of any nature that are in Consultant's possession or under Consultant's control that are Principal's property or directly relate to Principal's business.

**19. NOTICES.** All notices required or permitted under this Agreement shall be in writing and shall be deemed delivered when delivered in person or deposited in the United States mail, postage prepaid, addressed as follows:

4

015

If to Principal:

**JINZHENG GROUP (USA), LLC,**
**a California limited liability company**
100 E. Huntington Drive,
Alhambra, CA 91801
Phone: (626) 703-4116
Attn: Jianging Yang, President


If to Consultant:

**BETULA LENTA, INC.**
**a California limited liability company**
1125 West 6th Street.
Suite 205
Los Angeles, CA 90017
Phone: (310) 295-8764
Attn: David Park, CEO

Such address may be changed from time to time by either party by providing written notice to the other in the manner set forth above.

**20. ENTIRE AGREEMENT.** This Agreement along with the two attached exhibits constitutes the entire agreement of the parties and there are no other promises or conditions in any other agreement whether oral or written. This Agreement supersedes any prior written or oral agreements between the parties.

**21. AMENDMENT.** This Agreement may be modified or amended if the amendment is made in writing and is signed by the Parties.

**22. SEVERABILITY.** If any provision of this Agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

**23. WAIVER OF CONTRACTUAL RIGHT.** The failure of either party to enforce any provision of this Agreement shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Agreement.

**24. APPLICABLE LAW.** This Agreement shall be governed by the laws of the State of California.

**25. INTERRUPTION OF SERVICE.** Either party shall be excused from any delay or failure in performance required hereunder if caused by reason of any occurrence or contingency

5

beyond its reasonable control, including, but not limited to, acts of God, acts of war, fire, insurrection, laws proclamations, edits, ordinances or regulations, strikes, lock-outs or other serious labor disputes, riots, earthquakes, floods, explosions or other acts of nature. The obligations and rights of the party so excused shall be extended on a day-to-day basis for the time period equal to the period of such excusable interruption. When such events have abated, the parties' respective obligations hereunder shall resume. In the event the interruption of the excused party's obligations continues for a period in excess of thirty (30) days, either party shall have the right to terminate this Agreement upon ten (10) days' prior written notice to the other party.

**26. ASSIGNMENT.** Consultant agrees that it will not assign, sell, transfer, delegate or otherwise dispose of any rights or obligations under this Agreement without the prior written consent of Principal.  Any purported assignment, transfer, or delegation shall be null and void. Nothing in this Agreement shall prevent the consolidation of Principal with, or its merger into, any other legally recognized entity by the State of California, or the sale by Principal of all or substantially all of its properties or assets, or the assignment by Principal of this Agreement and the performance of its obligations hereunder to any successor in interest or any affiliated company, owned or controlled by Principal.  Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, legal representatives, successors, and permitted assigns, and shall not benefit any person or entity other than those enumerated above.

**27. SIGNATORIES.** This Agreement shall be signed on behalf of Principal by Jianging Yang, and on behalf of Consultant by David Park and effective as of the date first above written.

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement as of the date first written above.

PRINCIPAL:

**JINZHENG GROUP (USA), LLC,**
**a California limited liability company**

By: _____
Its: President


CONSULTANT:

**BETULA LENTA, INC.,**
**a California corporation**

By: _____
Its: Chief Executive Officer

6

EXHIBIT "A"

## SCOPE OF SERVICES
### (Pre-Development Services)

1. Perform pre-development feasibility and pre-concept design strategy with emphasis on developing up to three hundred (300) for-sale detached single-family residential units as a master planned community.

2. Consultation with City representatives regarding development concept for master planned community.

3. Neighborhood outreach services as identified by City representatives including targeted neighborhood groups and organizations for project input and comments.

4. Coordination of project-related applications and submittals.

5. City Entitlement Coordination and Process:

    (A) <u>California Environmental Quality Act Requirements (CEQA)</u>: Determine or cause to be determined environmental clearances necessary for the project. Prepare or cause to be prepared initial study for project impacts in order to determine if significant impact(s) are likely. Determine if impacts can be mitigated below a threshold of significance and cause to be prepared a Mitigated Negative Declaration (MND). If the project is determined to cause significant impacts that cannot be mitigated then the consultant shall cause an Environmental Impact Report (EIR) to be prepared for peer review by the Los Angeles Department of City Planning (LADCP) as lead agency. Submit all such documents as part of project review and facilitate/monitor LADCP processing.

    (B) <u>General Plan Amendment, Zone Change and Tentative Tract Map Processing</u>: Determine optimal processing for multiple entitlement and discretionary approvals in order to facilitate highest and best use for the property with a goal of establishing a Master Planned Community with up to 300 detached residential units. Prepare or cause to be prepared Master Land Use application, obtain Authorization to File from LADCP Management Team. Prepare or cause to be prepared justification and findings/specialized requirements in order to expedite the processing of such General Plan Amendment, Zone Change and Tentative Tract Map entitlements through both the LADCP and LA Bureau of Engineering (LABE). Coordinate with Los Angeles Parks and Recreation Department (LAPRD) as needed. Facilitate review in compliance with Subdivision Map Act as part of discretionary project review.

    (C) <u>Traffic Study:</u>  Determine or cause to be determined traffic clearances necessary for the project. Prepare or cause to be prepared reports for project impacts in order to determine if significant impact(s) are likely. Determine if impacts can be mitigated below a threshold of significance and cause to be prepared a Memorandum of Understanding (MOU) or Technical Letter. If the project is determined to cause significant impacts that cannot be mitigated then the consultant shall cause a full

7



Traffic Study to be prepared for peer review by the Los Angeles Department of Transportation (LADOT) as lead agency. Submit all such documents as part of project review and facilitate/monitor LADCP processing

(D) <u>City Planning Commission/ Planning and Land Use Meeting/ City Council Meetings</u>: Represent project and or coordinate representation at all required public hearing meetings and coordinate all responses to queries or conditions of approval.

6. Pre-Construction Activity:

7. Prepare or cause to be prepared schematic architectural design.

8. Prepare or cause to be prepared mass grading plan for site preparation work.

9. Prepare or cause to be prepared 3rd-party engineering reports and analysis.

10. Coordination, response, and access analysis through LADCP with various agencies including, but not limited to Bureau of Engineering (BOE), Los Angeles Fire Department (LAFD), Los Angeles Department of Water and Power (LADWP), sanitation, and other utilities

8



ADDENDUM TO DECEMBER 7, 2017 CONTRACT BETWEEN JINZHENG GROUP (USA) LLC AND BETULA LENTA, INC. for Consultant Services for 2929 Amethyst

Consultant Betula Lenta, Inc. agrees and is engaged to complete the scope of services listed in the Agreement with TL Pacific, Inc. , a copy of which is attached as Exhibit "A" hereto.



EXHIBIT B
COMPENSATION SCHEDULE

## 2929 Amethyst Milestones and Budget

| | | |
|---|---|---|
| Original contract Amount | $ | 2,594,500.00 |
| Amount previously disbursed | $ | 1,581,975.00 |
| Budget Remaining (to be disbursed below) | $ | 1,012,525.00 |

| Months | Task | Milestone Amounts | |
|---|---|---|---|
| 1 | **Contract Execution** | $ | 390,000.00 |
| | Continue City Meetings | | |
| | Traffic Study Proposal | | |
| | Neighborhood Targeted Support Groups Initiatives | | |
| | Phase I Report | | |
| | Slope Band Analysis | | |
| | Geotech/Soils Report | | |
| | Seismic Study | | |
| | Complete Conceptual Plans | | |
| | Hillside Analysis/Findings | | |
| | LADOT MOU Submission | | |
| | **Massings/sections/elevations/floorplates** | | |
| | Initial Study Proposal/EIR (MND is less) | | |
| | Additional Traffic Data Reports as needed | | |
| | Traffic Study Submission | | |
| | Traffic Mitigation/DOT Tasks/DOT-PDM Meetings | | |
| | **Shade and Shadow Study (if needed)** | | |
| | Biological Study (if needed) | | |
| | **Begin Schematic Plans** | | |
| | LADCP Final Case Management | | |
| | LADCP Pre-Development Meeting | | |
| | Community/Agency Referral Approvals | | |
| | Specific IS Report Data Requirements | | |
| | Continue Specific Plans Progress | | |
| | Continue Master Planning Concept | | |
| | Begin Expedite Referral Process (if possible) | | |
| 3 to 4 | **Completion of Initial Study** | $ | 218,000.00 |
| | Land-Use Attorney/Neighborhood Consultant | | |
| | Reminder of Proposals, after retainers | | |
| | General Plan Amendment Initiation Plan (as needed) | | |
| | Initial Zoning Administrater meetings | | |
| | ZA Findings | | |
| | 2nd. LADCP Pre-Development Meeting | | |
| | Completion of IS/MND/EIR | | |
| | Mailing Labels | | |
| | Radius Map | | |
| 5 to 8 | **EAF/MND/EIR Submission** | $ | 123,000.00 |
| | City Filing Fee | | |
| | Master Land Use Application/Filing/Equivalent | | |
| | ZA Coordination | | |
| | Planning Commission Coordination | | |
| | Continue Council Meetings | | |
| | Continue Neighborhood Targeted Support | | |
| | Traffic Mitigation | | |
| | Completion of IS/MND/EIR | | |
| | LADOT Tech Letter Sign off (equivalent) | | |
| | Traffic Report Approval | | |
| | **Begin Civil and Architectural Infrastructure Coordination** | | |
| | Final Findings | | |
| | Ready Public Hearing Package | | |
| 6 to 10 | **Initial Public Hearing** | $ | 138,000.00 |
| | Follow up from any comments | | |
| | Neighborhood Outreach regarding specific comments | | |
| | Continue Council Meetings | | |
| | Continue Neighborhood Targeted Support | | |
| 9 to 12 | **Planning Commission Public Hearing/NOD/Equivalent** | $ | 58,000.00 |
| | City Council Resolution Coordination | | |
| | City Council Calendaring | | |
| | Continue Council Meetings | | |
| | Continue Neighborhood Targeted Support | | |
| 11 to 14 | **City Council Hearing/Discretionary Approval** | $ | 85,525.00 |
| | Follow up from City Council Resolution and Approval | | |
| | CLA Coordination | | |
| | Any recordations | | |
| | | $ | 1,012,525.00 |



## TL Pacific, Inc. August 31, 2016

**Subject:** Pre-Development Scope for 2929 Amethyst Street Los Angeles CA 90032

Proposed Development Strategy:

### Up to 300 Unit Master Planned Community

Dear Mr. Yang:

TL Pacific, Inc. specializes in the ability to take the known aspects of a property and increase the use and development potential. We are pleased to submit this proposal for Professional Entitlement & Land-Use Consulting Services, and Project Management Services. Based upon our meetings and subsequent conversations, it is my understanding that we are charged to consult for the future development of the 30 +- acre site located at the address above, and this proposal and initial work scope shall consist of the following:

**1. Scope of Work, as applicable: (Other work scope and consulting shall be addressed in a subsequent Development Services Agreement)**

- Development feasibility/strategy
- Concept Design consultation
- Initial Land-use consultation
- City Agency Liaison
- Neighborhood Outreach
- Case Management Coordination
- Case Management meetings
- Affordable Housing Referral/DB submission coordination (if applicable)
- Affordable Housing Referral/DB Submission compliance (LAMC section 12.22, if applicable)
- Ancillary AB 2222 Research and planning input outside of mandatory legal representation, if applicable
- Zoning Administration Coordination
- Planning Commission (CPC) Coordination/Hearings
- Planning and Land Use Management (PLUM) Coordination/Hearings
- Work with District Councilman's office to assist in approval of desired Master Plan
- City Council Calendar and Resolution Coordination as required
- Peer Review Coordination, including representation at review hearings as needed
- Urban Planning Design Department Coordination, if applicable
- CEQA/Traffic integration from 3rd-party input as needed
- Public Hearing Coordination
- Non-profit outreach if required
- Pre-Construction Analysis/Coordination with 3rd party
- Initial Findings, Initial Research, and Summary Input Coordination

*Exhibit "A" to Addendum to 12/7/17 Agreement between Jinzheng Group (OSA) LLC & Belula Leola, Inc.*

022

12

- CEQA (State/local municipality level) Initial Study/Findings Coordination
- General Plan Amendment Coordination as needed, in-house and 3rd party
- Zone Change Coordination as needed, in-house and 3rd party
- Entitlement/Planning pre-package
- Master Land Use application consultation
- EAF/MND application consultation (outside of 3rd-party reports) if applicable
- MLU/EAF/MND Exhibits consultation (outside of 3rd-party reports, maps, findings, etc.) if applicable
- Preparation of relevant Findings
- Preparation of relevant Summaries
- Preparation of relevant Codes
- Environmental documentation coordination
- Environmental Impact Report
- Project coordination with relevant vendors
- Conceptual Design: to include initiation of consultants and engineers
- Master Plan Concept Design
- City Agency Liaison, as needed
- Neighborhood Outreach
- Peer Review Coordination (including representation at peer review hearings as needed)
- Urban Planning Design Department Coordination
- CEQA/Traffic integration from 3rd-party input, as needed
- Civil Engineering integration from 3rd-party input, as needed
- Bureau of Engineering integration from 3rd-party input, as needed
- Parks & Recreation Dept. integration from 3rd-party input, as needed
- Public Hearing Coordination & Documentation, as needed
- Pre-Construction Cost Coordination
- Master Plan Community Safety and Finish design Coordination with 3rd party
- Master Plan Community/Other Specification Coordination with 3rd party
- Project coordination with relevant vendors
- Prepare architectural conceptual design set to submit to City of Los Angeles
- Documentation preparation for CPC/City Council/PLUM,  as needed
- Documentation preparation for Case Management/Pre-Development Meetings
- Documentation preparation  for Land Use Submissions
- Implementing, delegating, and/or coordinating necessary General Plan and Zone Change processing duties (not including 3rd-party duties and deliverables)
- Services related to clearances associated with project
- Design of entrances with access either from North Broadway or Lincoln Avenue, or both
- Design integration either including or not including six existing houses at southern property line

*(Please note that the scope of work and work product are based upon assumptions and investigation into the development, but in no way guarantees the timing and outcome of the development, due to forces outside the scope of the consultants)*

13



023

## 2. Additional Compensation:

- Any unforeseen or extra work not included in above "Scope of Work" will be discussed and mutually agreed upon between Mr. Yang and TL Pacific, Inc., prior to additional work being performed.

## 3. Exclusions:

- Subsequent variations of items detailed in "Scope of Work."
- Other exclusions shall be addressed in full Development Services Agreement.

## 4. Authorization & Retainer:

Total itemized estimated cost for above Scope of Work: $2,594,500. To signify your authorization to proceed, please sign proposal and remit a retainer in the amount of $673,625.00.

Subsequent Payments as follows:

1) $134,725.00 at Master Plan Concept.
2) $134,725.00 at Kick off meeting with Engineers to integrate Master Plan.
3) $269,450.00 at 50% Architectural Conceptual Plan.
4) $269,450.00 at Case management Submission.
5) $269,450.00 at 100% Master Plan Conceptual Design.
6) $269,450.00 at Peer review Coordination/Land Use Submission.
7) $269,450.00 at 100% Architectural Concept Design.
8) $269,400.00 at Planning Case Public Hearing.
9) $ 34,725.00 at Final Planning Approval of Master Plan.

Respectfully submitted,

Rich Lamphere, TL Pacific Inc.

Acceptance of Proposal by: Jinzheng Group (USA) LLC

Signature: _____ Date: 2016. 9. 3.

TL Pacific Inc.

Signature: _____ Pres TL Pacific Inc. _____ Date: Sept 3, 2016

14

024

## CONSTRUCTION MANAGEMENT AGREEMENT

This Construction Management Agreement ("Agreement") is made effective as of June __22__, 2018, and entered into by and between **JINZHENG GROUP (USA), LLC, a California limited liability company** ("Principal") and **BETULA LENTA, INC., a California Corporation** ("Construction Manager"), with regard to the following:

**WHEREAS,** Principal and Construction Manager desire to enter into this Agreement for the purpose of Construction Manager providing and performing certain construction management services (the "Construction Management Services") with respect to the construction and development of the infrastructure preparation for 2929 North Amethyst Street, Los Angeles, CA 90032 (the "Project") as more specifically detailed, outlined and provided for below in this Agreement and as set forth in the "GMAX Estimate" (herein attached Exhibit "B") and fully incorporated into this Agreement by this reference as though fully set forth herein; and

**WHEREAS,** Construction Manager hereby represents and warrants that it possesses the necessary expertise, licenses, and experience required to provide and perform the Construction Management Services with respect to the development of the Property and is fully prepared and able to provide and perform the Construction Management Services in a timely manner; and will pull all applicable permits.

**WHEREAS,** Principal hereby acknowledges and agrees that it or a legal entity owned and controlled by it or one of its principals owns fee title to the Property and is duly authorized to enter into this Agreement for the performance of the Construction Management Services by Construction Manager,

**NOW, THEREFORE,** the Principal and Construction Manager (collectively referred to herein as the "Parties") do hereby agree to the following and terms and conditions established herein below in this Agreement.

1. **DESCRIPTION OF CONSTRUCTION MANAGEMENT SERVICES.** Both Parties wish to perform the duties and engage the professionals necessary to cause either one of the following duties to occur:   a). Grading or equivalent permit for Property AND b). Infrastructure Construction Start, OR c). Cut and Fill Earthwork to Start. Once the duties have commenced, the Construction Manager has fulfilled his obligations to the Agreement.

2. **PERFORMANCE OF CONSTRUCTION MANAGEMENT SERVICES.**
The manner in which the Construction Management Services are to be performed and provided shall be determined exclusively by Construction Manager.

3. **COMPENSATION SCHEDULE.** Compensation payable to Construction Manager by Principal for the Construction Management Services shall as set forth in that certain "Compensation Schedule" (Herein attached Exhibit A) and fully incorporated into this Agreement as though fully set forth herein.  As provided in the Compensation Schedule, payments shall be made on an installment basis with each installment fully due and payable to Construction Manager within five (5) business days following the delivery of written notice

Page | 1                                                    JY **JY**  DP **X**



by Construction Manager to Principal requesting payment. ~~Failure to provide full payment of the requested amount shall be subject to a ten percent (10 %) late fee.~~

4. **EXPENSE REIMBURSEMENT. All Permit, Plan Check, and other City Fees.** All other expenses not otherwise provided for in this Agreement shall be the sole responsibility of Construction Manager. Except as otherwise agreed upon by the Parties, the Principal shall not be responsible for the reimbursement of any expenses incurred by Construction Manager.

5. **GUARANTEED MAXIMUM PRICE.** Both Parties agree that Construction Documents may be incomplete and unavailable at the time of the execution of this contract. However, both Parties agree that a Guaranteed Maximum Price (hereinafter "GMAX") amount of $4,517,913 detailed in Exhibit B will be the basis of the GMAX for the services detailed herein, to complete the Construction Management Services described herein under Paragraph 1 a), and b), or c). Further to the aforementioned;

> • The estimated costs detailed in Exhibit B include the estimated expenses for the actual cost of the services, the staffing, overhead, contingency, general conditions, and insurance.

> • Any initial savings from a given line item shall be kept in reserve for any overages in any other line items.

> • At the end of the services detailed herein, there is a savings from the GMAX amount of $4,517,913, then the balance of savings shall be disbursed 75% to Principal and 25% to Construction Manager.

> • An Estimated Timeline (herein attached "Exhibit C"), shall constitute the estimated timeline for the start of Infrastructure Construction, depending on the date of the signing of this Agreement.

> • Last, although the GMAX estimate is $4,517,913, Principal is also required to hold in reserve an additional $2 million in the Principal's bank account, during the entire time the work scope of this Agreement is being done, and the entire $2 million shall be held in reserve until after Construction Funding has occurred AND Lender has approved of release of reserve.

6. **OPEN BOOK POLICY.** Both Parties agree that all data, agreements, and accounting related to the GMAX and all information related to the source of funds for the GMAX shall be viewed openly by Principal and Construction Manager in an effort to ensure costs are minimized where possible.

7. **TERM/TERMINATION.** This Agreement shall terminate automatically upon completion of the Construction Management Services by Construction Manager as required by this Agreement and the Construction Estimate. However, in the event of a default with respect to of any of the obligations set forth in this Agreement by either Principal or Construction Manager, and such default is not cured within thirty (30) days following written notice to

JY JY DP JP

cure from the non-defaulting part, the non-defaulting party may terminate this Agreement and pursue any and all legal rights pertinent to such default including, but not limited to, damages or specific performance of the outstanding obligation(s).

8. **RELATIONSHIP OF PARTIES.** It is understood by the Parties that Construction Manager is an independent Construction Manager with respect to providing and performing the Construction Management Services and is not an employee of the Principal, who shall not be required to provide any fringe benefits, including health insurance benefits, paid vacation, or any other employee benefits, for the benefit of Construction Manager.

9. **DISCLOSURE.** Construction Manager is required to disclose to Principal any outside activities or interests, including ownership or participation in any developments that conflict or will conflict with the Construction Manager's providing and performing of the Construction Management Services and the ultimate development of the Project on the Property.

10. **EMPLOYEES.** Construction Manager's Construction Managers, Construction Managers and employees, if any, who perform any aspect of the Construction Management Services for Construction Manager under this Agreement shall also be bound by the provisions of this Agreement. At the written request of the Principal, Construction Manager shall provide adequate evidence that such persons are Construction Manager's agents, Construction Managers, Construction Managers, or employees.

11. **INJURIES AND INSURANCE.** Construction Manager acknowledges that Construction Manager's obligation to obtain appropriate insurance coverage for the benefit of Construction Manager (and Construction Manager's agents, Construction Managers, Construction Managers and employees, if any) to the extent required by applicable California law. Construction Manager waives any and all rights to recovery against Principal for any injuries that Construction Manager (and/or Construction Manager's agents, Construction Managers, Construction Managers and employees, if any) may sustain while providing and/or performing the Construction Management Services under this Agreement, and that are a result of the negligence of Construction Manager or Construction Manager's agents, Construction Managers, Construction Managers, or employees.

12. **INDEMNIFICATION.** Construction Manager agrees to indemnify and hold Principal harmless from all claims, losses, expenses, fees including attorney fees, costs, and judgments that may be asserted against Principal that result from the acts or omissions of Construction Manager, Construction Manager's agents, Construction Managers, Construction Managers, and employees, if any.

Principal agrees to indemnify and hold Construction Manager, Construction Manager's agents, Construction Managers, Construction Managers, and employees, harmless from all claims, losses, expenses, fees including attorney fees, costs, and judgments that may be asserted against Construction Manager for any of the following: (a) any third-party work previously provided and performed on the behalf of Principal with respect to the Project; or (b) any acts or omissions of Principal, Principals agents, Construction Managers, Construction Managers, and/or employees.

Page | 3

JY JY   DP

**13. INTELLECTUAL PROPERTY.** The following provisions shall apply with respect to copyrightable works, ideas, discoveries, inventions, applications for patents, and patents (collectively, "Intellectual Property"):

*Construction Manager's Intellectual Property.* Construction Manager does not presently hold any interest in any Intellectual Property with respect to the development of the Project on the Property.

*Development of Intellectual Property.* To the extent that any Intellectual Property rights are established with respect to providing or performing the Construction Management Services, or development of the Project on the Property, unless otherwise provided, all such Intellectual Property shall be the property of Principal and Construction Manager shall take all such reasonable efforts to cause all such rights to be assigned to Principal.

**14. OWNERSHIP OF SOCIAL MEDIA CONTACTS.** Any social media contacts, including "followers" or "friends," that are acquired through accounts (including, but not limited to email addresses, blogs, Twitter, Facebook, You-tube, or other social media networks) used or created in conjunction with providing and performing the Construction Management Services shall be the property of Construction Manager.

**15. CONFIDENTIALITY.** Principal recognizes that Construction Manager has and will have the following information:

- costs
- discounts
- future plans
- process information
- technical information
- copyrights
- proprietary information

as well as any other proprietary information (collectively, "Information") which are valuable, special and unique assets of Principal that require protection from improper disclosure. In consideration for access and disclosure of the Information to Construction Manager, Construction Manager agrees that it will not at any time or in any manner, either directly or indirectly, use any Information for Construction Manager's own benefit, or divulge, disclose, or communicate in any manner any Information to any third party without the prior written consent of Principal. Construction Manager will protect the Information and treat it as strictly confidential. A violation of this paragraph shall be a material violation of this Agreement.

**16. UNAUTHORIZED DISCLOSURE OF INFORMATION.** If it appears that Construction Manager has disclosed (or has threatened to disclose) Information in violation of this Agreement, Principal shall be entitled to an injunction to restrain Construction Manager from disclosing, in whole or in part, such Information, or from providing any services to any party to whom such Information has been disclosed or may be disclosed. Principal shall not be prohibited by this provision from pursuing any other remedies, including a claim for losses and damages.

Page | 4

JY ___ DP ___

17. **CONFIDENTIALITY AFTER TERMINATION.** The confidentiality provisions of this Agreement shall remain in full force and effect after the termination of this Agreement.

18. **SERVICES TO THIRD PARTIES.** Except as otherwise approved by Principal as set forth hereinabove in this Agreement, Construction Manager shall not provide any consulting services to any third party during the term of this Agreement.

19. **RETURN OF RECORDS.** Upon termination of this Agreement, Construction Manager, at the written request of Principal, shall deliver all records, notes, data, memoranda, models, and equipment of any nature that are in Construction Manager's possession or under Construction Manager's control that are Principal's property or directly relate to Principal's business.

20. **NOTICES.** All notices required or permitted under this Agreement shall be in writing and shall be deemed delivered when delivered in person or deposited in US Mail in the U.S Mail, postage prepaid, addressed as follows:

**If to Principal:**

**JINZHENG GROUP (USA), LLC,**
**a California limited liability company**
100 E. Huntington Drive,
Alhambra, CA 91801
Phone: (626) 703-4116
Attn: Jianging Yang, President

**If to Construction Manager:**

**BETULA LENTA, INC.**
**a California corporation**
1125 West 6th Street.
Suite 205
Los Angeles, CA 90017
Phone: (310) 295-8764
Attn: David Park, CEO

Such address may be changed from time to time by either party by providing written notice to the other in the manner set forth above.

21. **ENTIRE AGREEMENT.** This Agreement along with the two attached exhibits constitutes the entire agreement of the parties and there are no other promises or conditions in any other agreement whether oral or written. This Agreement supersedes any prior written or oral agreements between the parties.

22. **AMENDMENT.** This Agreement may be modified or amended if the amendment is made in writing and is signed by the Parties.

Page | 5

JY DP

**23. SEVERABILITY.** If any provision of this Agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

**24. WAIVER OF CONTRACTUAL RIGHT.** The failure of either party to enforce any provision of this Agreement shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Agreement.

**25. APPLICABLE LAW.** This Agreement shall be governed by the laws of the State of California.

**26. INTERRUPTION OF SERVICE.** Either party shall be excused from any delay or failure in performance required hereunder if caused by reason of any occurrence or contingency beyond its reasonable control, including, but not limited to, acts of God, acts of war, fire, insurrection, laws proclamations, edits, ordinances or regulations, strikes, lock-outs or other serious labor disputes, riots, earthquakes, floods, explosions or other acts of nature. The obligations and rights of the party so excused shall be extended on a day-to-day basis for the time period equal to the period of such excusable interruption. When such events have abated, the parties' respective obligations hereunder shall resume. In the event the interruption of the excused party's obligations continues for a period in excess of thirty (30) days, either party shall have the right to terminate this Agreement upon ten (10) days' prior written notice to the other party.

**27. ASSIGNMENT.** Construction Manager agrees that it will not assign, sell, transfer, delegate or otherwise dispose of any rights or obligations under this Agreement without the prior written consent of Principal. Any purported assignment, transfer, or delegation shall be null and void. Nothing in this Agreement shall prevent the consolidation of Principal with, or its merger into, any other legally recognized entity by the State of California, or the sale by Principal of all or substantially all of its properties or assets, or the assignment by Principal of this Agreement and the performance of its obligations hereunder to any successor in interest or any affiliated company, owned or controlled by Principal. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, legal representatives, successors, and permitted assigns, and shall not benefit any person or entity other than those enumerated above.

**28. SIGNATORIES.** This Agreement shall be signed on behalf of Principal by Jianging Yang, and on behalf of Construction Manager by David Park and effective as of the date first above written.

*(SIGNATURES FOLLOW):*

Page | 6

JY JY  DP

030

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement as of the date first written above.

**PRINCIPAL:**

**JINZHENG GROUP (USA), LLC,**
**a California limited liability company**

By: _____  6-22-18_____
Its: President


**CONSTRUCTION MANAGER:**

**BETULA LENTA, INC.,**
**a California corporation**

By: _____  6-22-18_____
Its: President

JY  DP

031

## COMPENSATION SCHEDULE
## EXHIBIT A

1.  Payment One - Retainer (30% of total contracted amount) - $1,355,373.90

2.  Payment Two – At 30% Completion of Construction Management Services - $1,807,165.20

3.  Payment Three – At 70% Completion of Construction Management Services - $ 908,582.60

4.  Payment Four – At 80% Completion of Construction Management Services - $ 451,791.30

JY _JY_ DP _ _

032

### EXHIBIT B

## 2929 Amethyst Estimatd Costs

| | | Phase 2 Funding Needed: | $ | 4,817,913.00 |
|---|---|---|---|---|

| Infrastructure/Property Capacity for Planning Approvals | Payment One | Payment Two | Payment Three | Payment Four |
|---|---|---|---|---|
| | $ 1,355,373.90 | $ 1,807,165.20 | $ 908,584.60 | $ 451,791.30 |

| Task or Professional Engaged (May. 2018-Jan. 2019) | Estimated Fee | Description |
|---|---|---|
| Project Manager | $ 450,000 | David Park/Craig Fry - Pre-Construction Management/Developer Fee |
| 1 Architect (Schematic Design) | $ 295,000 | Schematic Layout of Homes and Site Plan for 310 Lots |
| 2 Architect (Master Planning) | $ 270,000 | Master Community Plan & Infrastructure Design, Schematic through Design Development |
| | $ 1,015,000 | |
| 3 Civil Engineer | $ 595,000 | Entire Infrastructure from Concept through Construction Plans ("CDs")/Plan check |
| 4 Geotech/Soils Engineer | $ 42,500 | Geotechnical Approvals & Engineering input through CDs/Plan check |
| 5 Hydrologist | $ 35,000 | Water Flow Analysis of entire site, irrigation, storm water flow, etc. to CDs/Plan check |
| 6 Structural Engineer | $ 165,452 | Structural Plans of 5 model homes to CDs/plan check |
| 7 Site Structural Engineer | $ 395,000 | Structural Plans of 310 lots, infrastructure to CDs/plan check |
| 8 Seismic Engineer (Trench Consultant) | $ 85,000 | Seismic Study, Report, Approvals, and Plan submissions, as needed |
| 9 Shoring Engineer | $ 225,000 | All Supplemental Shoring (to structure) Plans of 310 lots, roads, infrastructure to CDs/plan check |
| 10 Traffic Improvements & Mitigation Consultant | $ 72,500 | After Traffic Approval engineer to work with LADOT on all future mitigation & improvements |
| 11 Landscape Architect | $ 125,000 | Master Site Plan - Consept and Schematic through Design Development (landscape only) |
| 12 Landscape/Hardscape Engineer | $ 125,000 | Master Site Plan - Consept and Schematic through Design Development (hardscape only) |
| 13 Fire Access & Hydrants Engineer | $ 75,000 | Engineering, FD mitigation, and City Lobby |
| 14 Grading Engineer | $ 225,000 | All Grading Plans of 310 lots, roads, infrastructure to CDs/plan check |
| | $ 2,165,452 | |
| 15 Pre-Construction Consultant | $ 243,461 | Potential General Contractor to vet, research, bid, RFP all Infrastructure Costs |
| 16 Sub-contractor bid coordinator | $ 15,000 | CM watching over GC candidate for Item #16 |
| | $ 258,461 | |
| 17 Storm Water Consultant | $ 25,000 | Engineering and Design of rain water capture to CDs/Plan check |
| 18 Water Control Board Consultant | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of Utility Agency |
| 19 LADWP (Water and Power) Capacity Consultant | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of LADWP Utility |
| 20 Gas Consultant | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of Gas Utility |
| 21 Sewer Consultant | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of Sewer |
| 22 Street Lighting Consultant | $ 50,000 | Specifications written, Design, and City Approval of all exterior lighting on and off-site |
| 23 Earthwork Consultant | $ 50,000 | Potential future Earthwork Subcontractor who will run all cut and fill analysis, scheduling, and costs |
| 24 Parks and Recreation Consultant | $ 97,500 | Mitigation, Agreements, Analysis, & City Approval of Quimby, P & R, Tree replacement |
| 25 Public Works Consultant | $ 100,000 | Lobby, Mitigation, Agreements, Analysis, & City Approval of Dept. of Public Works & BOE |
| 26 Bureau of Engineering Consultant | $ 100,000 | Lobby, Mitigation, Agreements, Analysis, & City Approval of Dept. of BOE |
| 27 Sanitation Consultant | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of Dept. Of Sanitation |
| | $ 435,000 | |
| 28 LADBS Expeditor | $ 20,000 | Lobby & Plan Check Coordination between architect, engineers, consultants, & City |
| 29 LA Fire Life & Safety Consultant and Expeditor | $ 20,000 | Lobby, Mitigation, Agreements, Analysis, & City Approval of LAFD and LAPD |
| 30 HVAC & Mechanical Engineer | $ 20,000 | All HVAC & Mech system Site Plans to CDs/plan check |
| 31 Plumbing Engineer | $ 20,000 | All HVAC & Mech system Site Plans to CDs/plan check |
| 32 Electric Engineer | $ 20,000 | All HVAC & Mech system Site Plans to CDs/plan check |
| 33 Cable and Soft Utilities Consultant | $ 2,500 | Agreements, Design, and Engineering for Internet and Cable |
| 34 Solar SubConsultant | $ 2,500 | Engineering, Analysis, and City Approvals for Solar System |
| 35 Filtration and Grey Water Consultant | $ 2,500 | Engineering and Analysis of reusable water system |
| 36 LID Consultant | $ 2,500 | Design, CDs/Plan check of 'Low Impact Design" Rules |
| 37 LEED Consultant | $ 5,000 | Lobby, Mitigation, Design, & City Approval |
| | $ 115,000 | |
| | $ 3,988,913 | |

| | TOTAL: | $ 3,988,913 | |
|---|---|---|---|

Loan Proceeds for start of Infrastructure Construction to fund below and construction

**Homes Construction Phase of Contracts**

Initial Phase of Homes Permits

| Task or Professional Engaged (March, 2018-Jan. 2019) | Budget Estimated Fee | Description |
|---|---|---|
| 1 Architect | $ 150,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes |
| 2 Civil Engineer | $ 95,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes |
| 3 Structural Engineer | | Already above for first 5 homes |
| 4 HVAC & Mechanical Engineer | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes |
| 5 Plumbing Engineer | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes |
| 6 Electric Engineer | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes |
| 7 Landscape Architecture | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes |
| 8 Grading Engineer | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes |
| 9 Utilities Consultant | $ 7,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & Coordination of Infrastructure into individual homes |
| 10 LADBS Expeditor | $ 7,500 | Lobby & Plan Check Coordination between architect, engineers, consultants, & City for homes |
| 11 LA Fire Life & Safely Consultant and Expeditor | $ 12,500 | Lobby, Mitigation, Agreements, Analysis, & City Approval of LAFD and LAPD for homes |
| 12 Alarm, Sprinkler, and Emergency Consultant | $ 2,500 | Integration of systems into individual homes |
| 13 Cable and Soft Utilities Consultant | $ 1,000 | Engineering, Analysis, and City Approvals for Solar System for homes |
| 14 Solar Sub/Consultant | $ 1,000 | Engineering and Analysis of reusable water system for homes |
| 15 LID Consultant | $ 1,000 | Design, CDs/Plan check of 'Low Impact Design" Rules for homes |
| 16 LEED Consultant | $ 1,000 | Lobby, Mitigation, Design, & City Approval for homes |
| | TOTAL: $ | 529,000 | |

 

Jinzheng/Betula Lenta/DPark

Amethyst Development Schedule

| ID | Task Name | Duration | Start | Finish | Predec | Resource Names |
|----|-----------|----------|-------|--------|--------|----------------|
| 39 | Begin Construction Plans | 100 days | Mon 12/3/18 | Fri 4/19/19 | 38 | TCS |
| 40 | Submit All Construction Plans for Plan Check (for Homes Building Permit) | 120 days | Mon 4/22/19 | Fri 10/4/19 | 39 | TCS |
| 41 | Submit All Construction Plans for Plan Check (if DELAY) | 120 days | Mon 11/11/19 | Fri 4/24/20 | 32 | TCS |
| 42 | Ready Team for Grading Permit | 30 days | Mon 4/23/18 | Fri 6/1/18 | 22 | Park |
| 43 | Soils Report Approval | 60 days | Mon 6/4/18 | Fri 8/24/18 | 22 | PGI/TCS |
| 44 | Finish All Earthwork Calculations | 25 days | Mon 4/23/18 | Fri 5/25/18 | 7 | LDC/Build |
| 45 | Finish all Storm Calculations | 20 days | Mon 5/21/18 | Fri 6/15/18 | 13 | LDC/Build |
| 46 | Finish all Sewer Calculations | 20 days | Mon 5/21/18 | Fri 6/15/18 | 13 | LDC/Build |
| 47 | Initial Earthwork RFPs | 60 days | Mon 4/23/18 | Fri 7/13/18 | 20 | Build GC |
| 48 | Complete all Cut and Fill Calculations | 30 days | Mon 5/21/18 | Fri 6/29/18 | 5 | LDC |
| 49 | Complete all Infrastructure Calculations | 30 days | Mon 5/21/18 | Fri 6/29/18 | 5 | LDC/Build |
| 50 | Shoring Engineering Plans | 90 days | Mon 4/23/18 | Fri 8/24/18 | 20 | TBD |
| 51 | Grading Engineer Plans | 90 days | Mon 4/23/18 | Fri 8/24/18 | 20 | TBD |
| 52 | Complete All Pre-Construction Bids for Infrastructure Construction Loan | 120 days | Mon 7/16/18 | Fri 12/28/18 | 24 | Park/Build |
| 53 | Coordination between Model Homes and Infrastructure Build | 45 days | Mon 9/10/18 | Fri 11/9/18 | 47,33 | Park/TCS/Build |
| 54 | Final Grading Submission preparation | 30 days | Mon 7/16/18 | Fri 8/24/18 | 47 | Park/TCS/Build |
| 55 | Final Grading Permit Submission | 60 days | Mon 8/27/18 | Fri 11/16/18 | 54 | Park/TCS/Build |
| 56 | Construction Loan Due Diligence and Underwriting | 90 days | Mon 9/10/18 | Fri 1/11/19 | 33,48 | Park |
| 57 | Construction Loan for Infrastructure | 30 days | Mon 12/31/18 | Fri 2/8/19 | 47,52 | Park |
| 58 | Begin Grading/Infrastructure Construction | 300 days | Mon 2/11/19 | Fri 4/3/20 | 57,52 | GC/TCS/Park |
| 59 | Begin Construction of Model Homes | 240 days | Mon 4/6/20 | Fri 3/5/21 | 58 | Park/TCS/Build |
| 60 | Begin Construction of Homes (Phase 1) | 300 days | Mon 10/7/19 | Fri 11/27/20 | 40 | Park/TCS/Build |
| 61 | Begin Construction of Homes (Phase 1) (ONLY if DELAY) | 300 days | Mon 4/27/20 | Fri 6/18/21 | 41 | Park/TCS/Build |
| 62 | Complete all Infrastructure | 180 days | Mon 11/30/20 | Fri 8/6/21 | 60 | Park/TCS/Build |
| 63 | | 30 days | Mon 8/9/21 | Fri 9/17/21 | 62 | Park/TCS/Build |
| 64 | | 30 days | Mon 9/20/21 | Fri 10/29/21 | 63 | Park/TCS/Build |
| 65 | | 30 days | Mon 11/1/21 | Fri 12/10/21 | 64 | Park/TCS/Build |
| 66 | | 30 days | Mon 12/13/21 | Fri 1/21/22 | 65 | Park/TCS/Build |
| 67 | | 30 days | Mon 1/24/22 | Fri 3/4/22 | 66 | Park/TCS/Build |
| 68 | | 30 days | Mon 3/7/22 | Fri 4/15/22 | 67 | Park/TCS/Build |
| 69 | | 30 days | Mon 4/18/22 | Fri 5/27/22 | 68 | Park/TCS/Build |

Legend:
| Phase One Task | | Summary | | Split | | Inactive Task | | Duration-only | | Progress | |
| Phase Two task | | Rolled Up Milestone ◇ | | Project Summary | | Inactive Milestone ◇ | | Start-only | | Deadline ⇩ | |
| Milestone ◆ | | Rolled Up Progress | | Group By Summary | | Inactive Summary | | Finish-only | | | |

2929 North Amethyst ST.
Los ANgeles, CA  90032

JY 034

Amethyst Development Schedule

Jinzheng/Betula Lenta/DPark



| | | | Phase One Task | | Summary | | Split | | Inactive Task | | Duration-only | | Progress | |
| 2929 North Amethyst ST. | | | Phase Two task | | Rolled Up Milestone ◇ | | Project Summary | | Inactive Milestone ◇ | | Start-only | ⊏ | Deadline | ⇩ |
| Los ANgeles, CA  90032 | | | Milestone | ◆ | Rolled Up Progress | | Group By Summary | | Inactive Summary | | Finish-only | ⊐ | | |

Page 4

## EXHIBIT B

## 2929 Amethyst Estimated Costs

**Infrastructure/Property Capacity for Planning Approvals**

| | Payment One | Payment Two | Payment Three | Payment Four | Phase 2 Funding Needed |
|---|---|---|---|---|---|
| | $ 1,355,373.90 | $ 1,807,165.20 | $ 908,584.60 | $ 451,791.30 | $ 4,517,913.00 |

| | Task or Professional Engaged (May, 2018–Jan. 2019) | Estimated Fee | Description |
|---|---|---|---|
| | Project Manager | $ 450,000 | David Park/Craig Fry - Pre-Construction Management/Developer Fee |
| 1 | Architect (Schematic Design) | $ 285,000 | Schematic Layout of Homes and Site Plan for 310 Lots |
| 2 | Architect (Master Planning) | $ 270,000 | Master Community Plan & Infrastructure Design, Schematic through Design Development |
| | | $ 1,015,000 | |
| 3 | Civil Engineer | $ 555,000 | Entire Infrastructure from Concept through Construction Plans ("CDs")/Plan check |
| 4 | Geotech/Soils Engineer | $ 42,500 | Geotechnical Approvals & Engineering Input through CDs/Plan check |
| 5 | Hydrologist | $ 35,000 | Water Flow Analysis of entire site, irrigation, storm water flow, etc. to CDs/Plan check |
| 6 | Structural Engineer | $ 165,452 | Structural Plans of 5 model homes to CDs/plan check |
| 7 | Site Structural Engineer | $ 395,000 | Structural Plans of 310 lots, roads, infrastructure to CDs/plan check |
| 8 | Seismic Engineer (Trench Consultant) | $ 85,000 | Seismic Study, Report, Approvals, and Plan submissions, as needed |
| 9 | Shoring Engineer | $ 225,000 | All Supplemental Shoring by structural Plans of 310 lots, roads, infrastructure to CDs/plan check |
| 10 | Traffic improvements & Mitigation Consultant | $ 72,500 | After Traffic Approval engineer to work with LADOT on all future mitigation & improvements |
| 11 | Landscape Architect | $ 125,000 | Master Site Plan - Consent and Schematic through Design Development (landscape only) |
| 12 | Landscape/Hardscape Engineer | $ 125,000 | Master Site Plan - Consent and Schematic through Design Development (hardscape only) |
| 13 | Fire Access & Hydrants Engineer | $ 75,000 | Engineering, FD mitigation, and City Lobby |
| 14 | Grading Engineer | $ 225,000 | All Grading Plans of 310 lots, roads, infrastructure to CDs/plan check |
| | | $ 2,165,452 | |
| 15 | Pre-Construction Consultant | $ 243,461 | Potential General Contractor to vet, research, bid, RFP all Infrastructure Costs |
| 16 | Sub-contractor bid coordinator | $ 15,000 | CM switching over GC candidate for item #16 |
| | | $ 258,461 | |
| 17 | Storm Water Consultant | $ 25,000 | Engineering and Design of rain water capture to CDs/Plan check |
| 18 | Water Control Board Consultant | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of Utility Agency |
| 19 | LADWP (Water and Power) Capacity Consultant | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of LADWP Utility |
| 20 | Gas Consultant | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of Gas Utility |
| 21 | Sewer Consultant | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of Sewer |
| 22 | Street Lighting Consultant | $ 50,000 | Specifications written, Design, and City Approval of all exterior lighting on and off-site |
| 23 | Earthwork Consultant | $ 50,000 | Potential future Earthwork Subcontractor who will run all cut and fill analysis, scheduling, and costs |
| 24 | Parks and Recreation Consultant | $ 97,500 | Mitigation, Agreements, Analysis, & City Approval of Quimby, P.A.R, Tree replacement |
| 25 | Public Works Consultant | $ 100,000 | Lobby, Mitigation, Agreements, Analysis, & City Approval of Dept. of Public Works & BOE |
| 26 | Bureau of Engineering Consultant | $ 100,000 | Lobby, Mitigation, Agreements, Analysis, & City Approval of Dept. of BOE |
| 27 | Sanitation Consultant | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of Dept. Of Sanitation |
| | | $ 435,000 | |
| 28 | LADBS Expeditor | $ 20,000 | Lobby & Plan Check Coordination between architect, engineers, consultants, & City |
| 29 | LA Fire Life & Safety Consultant and Expeditor | $ 20,000 | Lobby, Mitigation, Agreements, Analysis, & City Approval of LAFD and LAPD |
| 30 | HVAC & Mechanical Engineer | $ 20,000 | All HVAC & Mech system Site Plans to CDs/plan check |
| 31 | Plumbing Engineer | $ 20,000 | All HVAC & Mech system Site Plans to CDs/plan check |
| 32 | Electric Engineer | $ 20,000 | All HVAC & Mech system Site Plans to CDs/plan check |
| 33 | Cable and Soft Utilities Consultant | $ 2,500 | Agreements, Design, and Engineering for Internet and Cable |
| 34 | Solar Sub/Consultant | $ 2,500 | Agreements, Design, and City Approvals for Solar System |
| 35 | Filtration and Grey Water Consultant | $ 2,500 | Engineering, Analysis, and City approvals for reusable water system |
| 36 | LID Consultant | $ 2,500 | Design, CDs/Plan check of "Low Impact Design" Rules |
| 37 | LEED Consultant | $ 5,000 | Lobby, Mitigation, Design, & City Approval |
| | | $ 115,000 | |

**TOTAL:** $ 3,988,913

Loan Proceeds for start of Infrastructure Construction to fund below and construction

**Homes Construction Phase of Contracts**

Initial Phase of Homes Permits

| | Task or Professional Engaged (March, 2018–Jan. 2019) | Estimated Fee | Description |
|---|---|---|---|
| 1 | Architect | $ 150,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes |
| 2 | Civil Engineer | $ 95,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes |
| 3 | Structural Engineer | | Already above for first 5 homes |
| 4 | HVAC & Mechanical Engineer | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes |
| 5 | Plumbing Engineer | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes |
| 6 | Electric Engineer | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes |
| 7 | Landscape Architecture | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes |
| 8 | Grading Engineer | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes |
| 9 | Utilities Consultant | $ 7,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & Coordination of Infrastructure into individual home |
| 10 | LADBS Expeditor | $ 7,500 | Lobby & Plan Check Coordination between architect, engineers, consultants, & City for homes |
| 11 | LA Fire Life & Safety Consultant and Expeditor | $ 12,500 | Lobby, Mitigation, Agreements, Analysis, & City Approval of LAFD and LAPD for homes |
| 12 | Alarm, Sprinkler, and Emergency Consultant | $ 2,500 | Integration of systems into individual homes |
| 13 | Cable and Soft Utilities Consultant | $ 1,000 | Engineering, Analysis, and City Approvals for Solar System for homes |
| 14 | Solar Sub/Consultant | $ 1,000 | Engineering and Analysis of reusable water system for homes |
| 15 | LID Consultant | $ 1,000 | Design, CDs/Plan check of "Low Impact Design" Rules for homes |
| 16 | LEED Consultant | $ 1,000 | Lobby, Mitigation, Design, & City Approval for homes |

**TOTAL:** $ 529,000



# CFD BONDS PROCUREMENT - CM - DEVELOPMENT AGREEMENT

This CFD Bonds Procurement - CM - Development Agreement ("Agreement") is made effective as of March ____13____, 2019, and entered into by and between **JINZHENG GROUP (USA), LLC, a California limited liability company** ("Principal") and **BETULA LENTA, INC., a California Corporation** ("Developer/Underwriter"), with regard to the following:

**WHEREAS,** Principal and Developer/Underwriter desire to enter into this Agreement for the purpose of Developer/Underwriter providing and performing certain CFD Bonds Procurement - CM - Development services (the "CFD Bonds Procurement - CM - Development Services") with respect to the construction and development of the infrastructure preparation for 2929 North Amethyst Street, Los Angeles, CA 90032 (the "Project") as more specifically detailed, outlined and provided for below in this Agreement and as set forth in the "GMAX Estimate" herein and fully incorporated into this Agreement by this reference as though fully set forth herein; and

**WHEREAS,** Developer/Underwriter hereby represents and warrants that it possesses the necessary expertise, licenses, and experience required to provide and perform the CFD Bonds Procurement - CM - Development Services with respect to the development of the Property and is fully prepared and able to provide and perform the CFD Bonds Procurement - CM - Development Services in a timely manner; and will pull all applicable permits.

**WHEREAS,** Principal hereby acknowledges and agrees that it or a legal entity owned and controlled by it or one of its principals owns fee title to the Property and is duly authorized to enter into this Agreement for the performance of the CFD Bonds Procurement - CM - Development Services by Developer/Underwriter,

**NOW, THEREFORE,** the Principal and Developer/Underwriter (collectively referred to herein as the "Parties") do hereby agree to the following and terms and conditions established herein below in this Agreement.

1. **DESCRIPTION OF CFD BONDS PROCUREMENT - CM - DEVELOPMENT SERVICES.** Both Parties wish to perform the duties and engage the professionals necessary to cause either one of the following duties to occur: CFD Bond Procurement or any like Financing Vehicle. Once the Financing has commenced, the Developer/Underwriter has fulfilled his obligations to the Agreement.

2. **PERFORMANCE OF CFD BONDS PROCUREMENT - CM - DEVELOPMENT SERVICES.**
The manner in which the CFD Bonds Procurement - CM - Development Services are to be performed and provided shall be determined exclusively by Developer/Underwriter.

3. **COMPENSATION SCHEDULE.** Compensation payable to Developer/Underwriter by Principal for the CFD Bonds Procurement - CM - Development Services shall be requisitioned on a monthly basis as deemed necessary for the Project by the Developer/Underwriter and shall be paid by Principal or directly by the funding sources secured by the Project within 5 days of the requisition of funds requested.

037

4. **EXPENSE REIMBURSEMENT. All Permit, Plan Check, and other City Fees.** All other expenses not otherwise provided for in this Agreement shall be the sole responsibility of Developer/Underwriter. Except as otherwise agreed upon by the Parties, the Principal shall not be responsible for the reimbursement of any expenses incurred by Developer/Underwriter.

5. **GUARANTEED MAXIMUM PRICE.** Both Parties agree that Construction Documents may be incomplete and unavailable at the time of the execution of this contract. However, both Parties agree that a Guaranteed Maximum Price (hereinafter "GMAX") amount of $6,224,490 detailed (herein attached "Exhibit A") will be the basis of the GMAX for the services detailed herein, to complete the CFD Bonds Procurement - CM - Development Services described herein as follows;

> • The estimated costs detailed in Exhibit A include the estimated expenses for the actual cost of the services, the staffing, overhead, 3rd-party fees, expenses, and insurance.

> • Any initial savings from a given line item shall be kept in reserve for any overages in any other line items.

> • If at the end of the services detailed herein for Phase I, there is a savings from the GMAX amount of $6,224,490, then the balance of savings shall be disbursed 75% to Principal and 25% to Developer/Underwriter.

> • Although the GMAX amount of $6,224,490 shall be deemed as the estimated expenses for Phase 1 & 2 of the services detailed herein, Developer/Underwriter shall earn such fees as detailed in the Total Budget (herein attached "Exhibit B"),

> • Last, although the GMAX estimate is $6,224,490, Principal is also required to hold in reserve an additional $10 million in the Principal's bank account which was set up directly for the Project, and shall be held in reserve until after Construction Funding has occurred AND Lender has approved of release of reserve.

6. **OPEN BOOK POLICY.** Both Parties agree that all data, agreements, and accounting related to the GMAX and all information related to the source of funds for the GMAX shall be viewed openly by Principal and Developer/Underwriter in an effort to ensure costs are minimized where possible.

7. **TERM/TERMINATION.** This Agreement shall terminate automatically upon completion of the CFD Bonds Procurement - CM - Development Services by Developer/Underwriter as required by this Agreement and the Construction Estimate. However, in the event of a default with respect to of any of the obligations set forth in this Agreement by either Principal or Developer/Underwriter, and such default is not cured within thirty (30) days following written notice to cure from the non-defaulting part, the non-defaulting party may terminate this Agreement and pursue any and all legal rights pertinent to such default including, but not limited to, damages or specific performance of the outstanding obligation(s).

8. **RELATIONSHIP OF PARTIES.** It is understood by the Parties that Developer/Underwriter is an independent Developer/Underwriter with respect to providing



038



and performing the CFD Bonds Procurement - CM - Development Services and is not an employee of the Principal, who shall not be required to provide any fringe benefits, including health insurance benefits, paid vacation, or any other employee benefits, for the benefit of Developer/Underwriter.

9. **DISCLOSURE.** Developer/Underwriter is required to disclose to Principal any outside activities or interests, including ownership or participation in any developments that conflict or will conflict with the Developer/Underwriter's providing and performing of the CFD Bonds Procurement - CM - Development Services and the ultimate development of the Project on the Property.

10. **EMPLOYEES.** Developer/Underwriter's Developer/Underwriters, Developer/Underwriters and employees, if any, who perform any aspect of the CFD Bonds Procurement - CM - Development Services for Developer/Underwriter under this Agreement shall also be bound by the provisions of this Agreement. At the written request of the Principal, Developer/Underwriter shall provide adequate evidence that such persons are Developer/Underwriter's agents, Developer/Underwriters, Developer/Underwriters, or employees.

11. **INJURIES AND INSURANCE.** Developer/Underwriter acknowledges that Developer/Underwriter's obligation to obtain appropriate insurance coverage for the benefit of Developer/Underwriter (and Developer/Underwriter's agents, Developer/Underwriters, Developer/Underwriters and employees, if any) to the extent required by applicable California law. Developer/Underwriter waives any and all rights to recovery against Principal for any injuries that Developer/Underwriter (and/or Developer/Underwriter's agents, Developer/Underwriters, Developer/Underwriters and employees, if any) may sustain while providing and/or performing the CFD Bonds Procurement - CM - Development Services under this Agreement, and that are a result of the negligence of Developer/Underwriter or Developer/Underwriter's agents, Developer/Underwriters, Developer/Underwriters, or employees.

12. **INDEMNIFICATION.** Developer/Underwriter agrees to indemnify and hold Principal harmless from all claims, losses, expenses, fees including attorney fees, costs, and judgments that may be asserted against Principal that result from the acts or omissions of Developer/Underwriter, Developer/Underwriter's agents, Developer/Underwriters, Developer/Underwriters, and employees, if any.

   Principal agrees to indemnify and hold Developer/Underwriter, Developer/Underwriter's agents, Developer/Underwriters, Developer/Underwriters, and employees, harmless from all claims, losses, expenses, fees including attorney fees, costs, and judgments that may be asserted against Developer/Underwriter for any of the following: (a) any third-party work previously provided and performed on the behalf of Principal with respect to the Project; or (b) any acts or omissions of Principal, Principals agents, Developer/Underwriters, Developer/Underwriters, and/or employees.

13. **INTELLECTUAL PROPERTY.** The following provisions shall apply with respect to copyrightable works, ideas, discoveries, inventions, applications for patents, and patents




(collectively, "Intellectual Property"):

*Developer/Underwriter's Intellectual Property.* Developer/Underwriter does not presently hold any interest in any Intellectual Property with respect to the development of the Project on the Property.

*Development of Intellectual Property.* To the extent that any Intellectual Property rights are established with respect to providing or performing the CFD Bonds Procurement - CM - Development Services, or development of the Project on the Property, unless otherwise provided, all such Intellectual Property shall be the property of Principal and Developer/Underwriter shall take all such reasonable efforts to cause all such rights to be assigned to Principal.

**14. CONFIDENTIALITY.** Principal recognizes that Developer/Underwriter has and will have the following information:

- costs
- discounts
- future plans
- process information
- technical information
- copyrights
- proprietary information

as well as any other proprietary information (collectively, "Information") which are valuable, special and unique assets of Principal that require protection from improper disclosure. In consideration for access and disclosure of the Information to Developer/Underwriter, Developer/Underwriter agrees that it will not at any time or in any manner, either directly or indirectly, use any Information for Developer/Underwriter's own benefit, or divulge, disclose, or communicate in any manner any Information to any third party without the prior written consent of Principal. Developer/Underwriter will protect the Information and treat it as strictly confidential. A violation of this paragraph shall be a material violation of this Agreement.

**15. UNAUTHORIZED DISCLOSURE OF INFORMATION.** If it appears that Developer/Underwriter has disclosed (or has threatened to disclose) Information in violation of this Agreement, Principal shall be entitled to an injunction to restrain Developer/Underwriter from disclosing, in whole or in part, such Information, or from providing any services to any party to whom such Information has been disclosed or may be disclosed. Principal shall not be prohibited
by this provision from pursuing any other remedies, including a claim for losses and damages.

**16. CONFIDENTIALITY AFTER TERMINATION.** The confidentiality provisions of this Agreement shall remain in full force and effect after the termination of this Agreement.

**17. SERVICES TO THIRD PARTIES.** Except as otherwise approved by Principal as set forth hereinabove in this Agreement, Developer/Underwriter shall not provide any consulting services to any third party during the term of this Agreement.



**18. RETURN OF RECORDS.** Upon termination of this Agreement, Developer/Underwriter, at the written request of Principal, shall deliver all records, notes, data, memoranda, models, and equipment of any nature that are in Developer/Underwriter's possession or under Developer/Underwriter's control that are Principal's property or directly relate to Principal's business.

**19. NOTICES.** All notices required or permitted under this Agreement shall be in  writing and shall be deemed delivered when delivered in person or deposited in US Mail in the U.S Mail, postage prepaid, addressed as follows:

**If to Principal:**

**JINZHENG GROUP (USA), LLC,**
**a California limited liability company**
100 E. Huntington Drive,
Alhambra, CA 91801
Phone: (626) 703-4116
Attn: Jianging Yang, President

**If to Developer/Underwriter:**

**BETULA LENTA, INC.**
**a California corporation**
800 West 6th Street.
Suite 1250
Los Angeles, CA 90017
Phone: (310) 295-8764
Attn: David Park, President

Such address may be changed from time to time by either party by providing written notice to the other in the manner set forth above.

**20. ENTIRE AGREEMENT.** This Agreement along with the two attached exhibits constitutes the entire agreement of the parties and there are no other promises or conditions in any other agreement whether oral or written. This Agreement supersedes any prior written or oral agreements between the parties.

**21. AMENDMENT.** This Agreement may be modified or amended if the amendment is made in writing and is signed by the Parties.

**22. SEVERABILITY.** If any provision of this Agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

041

**23. WAIVER OF CONTRACTUAL RIGHT.** The failure of either party to enforce any provision of this Agreement shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Agreement.

**24. APPLICABLE LAW.** This Agreement shall be governed by the laws of the State of California.

**25. INTERRUPTION OF SERVICE.** Either party shall be excused from any delay or failure in performance required hereunder if caused by reason of any occurrence or contingency beyond its reasonable control, including, but not limited to, acts of God, acts of war, fire, insurrection, laws proclamations, edits, ordinances or regulations, strikes, lock-outs or other serious labor disputes, riots, earthquakes, floods, explosions or other acts of nature. The obligations and rights of the party so excused shall be extended on a day-to-day basis for the time period equal to the period of such excusable interruption. When such events have abated, the parties' respective obligations hereunder shall resume. In the event the interruption of the excused party's obligations continues for a period in excess of thirty (30) days, either party shall have the right to terminate this Agreement upon ten (10) days' prior written notice to the other party.

**26. ASSIGNMENT.** Developer/Underwriter agrees that it will not assign, sell, transfer, delegate or otherwise dispose of any rights or obligations under this Agreement without the prior written consent of Principal. Any purported assignment, transfer, or delegation shall be null and void. Nothing in this Agreement shall prevent the consolidation of Principal with, or its merger into, any other legally recognized entity by the State of California, or the sale by Principal of all or substantially all of its properties or assets, or the assignment by Principal of this Agreement and the performance of its obligations hereunder to any successor in interest or any affiliated company, owned or controlled by Principal. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, legal representatives, successors, and permitted assigns, and shall not benefit any person or entity other than those enumerated above.

**27. SIGNATORIES.** This Agreement shall be signed on behalf of Principal by Jianging Yang, and on behalf of Developer/Underwriter by David Park and effective as of the date first above written.

*(SIGNATURES FOLLOW):*

042

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement as of the date first written above.

**PRINCIPAL**:

**JINZHENG GROUP (USA), LLC,**
**a California limited liability company**

By: _____

Its: President

**DEVELOPER/UNDERWRITER:**

**BETULA LENTA, INC.,**
**a California corporation**

By: _____

Its: President

# EXHIBIT A

## 2929 Amethyst Estimated Costs

Phase 3 Funding Needed (for CFD Bonds):

| | Consultants and Engaged Contracts | Estimated Total Fees (Through Construction) | CFD Bond Expenses (Phase I) | CFD Bond Expenses (Phase 2) | Balance to be paid by CFD Bonds |
|---|---|---|---|---|---|
| 1 | Developer Fee (ALL City Fees & Below) | $ 3,500,000 | $ 225,000 | $ 225,000 | $ 3,050,000 |
| 2 | Brokerage - (Included in Development Fee) | | | | $ - |
| 3 | Architect (All Homes) - TCS | $ 4,310,389 | $ 432,000 | $ 432,000 | $ 3,446,389 |
| 4 | Architect (Master Planning & Landscape Architecture) - TCS | $ 2,600,000 | $ 216,000 | $ 216,000 | $ 2,168,000 |
| 5 | Conceptual Design - Nvision | PAID IN FULL | | | |
| 6 | Civil Engineer - Land Design Consultants/Other | $ 3,455,194 | $ 266,245 | $ 266,245 | $ 2,922,704 |
| 7 | Geotech/Soils Engineer - Pacific Geotech (included in Civil) | | | | |
| 8 | Entitlements & Code Compliance - Craig Fry/Other | $ 2,344,525 | $ 273,500 | $ 273,500 | $ 1,797,525 |
| 9 | Structural Engineer - TBD | $ 4,146,233 | $ 184,000 | $ 184,000 | $ 3,778,233 |
| 10 | Site Structural Engineer (Included in Strutural) | | | | $ - |
| 11 | Seismic Engineer (Trench Consultant) (Included in Strutural) | | | | $ - |
| 12 | Shoring Engineer (Included in Strutural) | | | | $ - |
| 13 | Traffic Improvements & Mitigation Consultant - Overland Traffic | $ 250,000 | $ 17,500 | $ 17,500 | $ 215,000 |
| 14 | Landscape Architect - Harmony Gardens/Bardez/Other | $ 1,382,078 | $ 97,500 | $ 97,500 | $ 1,187,078 |
| 15 | Landscape/Hardscape Engineer (Included in Landscape) | | | | $ - |
| 16 | Grading Engineer (Included in Strutural) | | | | $ - |
| 17 | Project Management | $ 3,000,000 | $ 180,000 | $ 180,000 | $ 2,640,000 |
| 18 | CEQA Reports (Included in Entitlements) | | | | $ - |
| 19 | Pre-Construction Consultant | $ 2,923,190 | $ 149,000 | $ 149,000 | $ 2,625,190 |
| 20 | Sub-contractor bid coordinator (Included in Construction Management) | | | | $ - |
| 21 | MEP Engineers | $ 2,764,156 | $ 97,500 | $ 97,500 | $ 2,569,156 |
| 22 | Construction Management/GC Fees | $ 5,169,235 | $ 231,500 | $ 231,500 | $ 4,706,235 |
| 23 | Bond Counsel | $ 2,700,000 | $ 450,000 | $ 450,000 | $ 1,800,000 |
| 24 | Bonds Reservation/State Sponsor/App Fees | $ 900,000 | $ 97,500 | $ 97,500 | $ 705,000 |
| 25 | Bonds Consultant/Commission | $ 1,800,000 | $ 97,500 | $ 97,500 | $ 1,605,000 |
| 26 | Bonds Placement Investment Banker | $ 1,800,000 | $ 97,500 | $ 97,500 | $ 1,605,000 |
| | Proceeds Needed: | $ 43,045,000 | $ 3,112,245 | $ 3,112,245 | $ 36,820,510 |

Included in Developer Fee:

| | | |
|---|---|---|
| 1 | Developer Overhead and Expenses | $ 500,000 |
| 2 | Staff | $ 318,090 |
| 3 | Liability Insurance | $ 165,000 |
| 4 | Construction Bond Fees | $ 325,000 |
| 5 | City Fees - LADCP/LADBS | $ 765,325 |
| 6 | City Fees - LADOT & Other Agencies | $ 226,585 |
| 7 | Community Outreach | $ 350,000 |
| 8 | Inspection Fees | $ 250,000 |
| 9 | Non-Profit Donations | $ 150,000 |
| 10 | Legal | $ 450,000 |
| | | $ 3,500,000 |

## EXHIBIT B

|  |  |  |  | Per SF/Yd. |  | Total |
|---|---|---|---|---|---|---|
|  |  | 24 (months) | General Conditions: | $ 164,130.00 | $ | 3,939,120.00 |
| Cut & Fill Site: | 1,532,930 |  | Site Work: | $ 28.99 | $ | 44,439,641 |
|  |  |  | Concrete: | $ 0.23 | $ | 352,574 |
|  |  |  | Masonry: | $ 0.20 | $ | 306,586 |
|  |  |  | Metals: | $ 0.06 | $ | 91,976 |
|  |  |  | Wood Structures: | $ 0.41 | $ | 628,501 |
|  |  |  | Water Proofing: | $ 0.38 | $ | 582,513 |
|  |  |  | Specialties: | $ 0.05 | $ | 76,647 |
|  |  |  | Special Construction: | $ 0.23 | $ | 352,574 |
|  |  |  | Electrical: | $ 1.02 | $ | 1,563,589 |
|  |  |  | Misc. Expenses: | $ 0.67 | $ | 1,027,063 |
|  |  |  | Job equipment: | $ 0.42 | $ | 643,831 |
|  |  | Design and Construction Contingency: | | 10.000% | $ | 5,400,461 |
|  |  | Off-Site GL & SDI: | | 2.722% | $ | 1,617,006 |
|  |  | Fee: | | 4.500% | $ | 2,745,994 |
| Streets: | 372,714 |  |  |  |  |  |
| Lots & Streets: | 372,714 |  | Infrastructure SUB Total: | | $ | 63,768,075 |
| 1 Acre: | 43,560 sf |  | CFD Bond Fees: | | $ | 6,421,445 |

| Homes: | | | | | | | |
|---|---|---|---|---|---|---|---|
| Model | SF (incl. garage) | | | | | | |
| Yellow | 1,604.1 | 24 | 38,498 | $ | 200.00 | $ | 7,699,680 |
| Magenta | 2,111.4 | 50 | 105,570 | $ | 225.00 | $ | 23,753,250 |
| Red | 1,905.5 | 36 | 68,598 | $ | 250.00 | $ | 17,149,500 |
| Beige | 2,572.3 | 38 | 97,747 | $ | 265.00 | $ | 25,903,061 |
| Orange | 3,885.6 | 23 | 89,369 | $ | 265.00 | $ | 23,682,732 |
| Green (Canteliver) | 2,785.4 | 106 | 295,252 | $ | 295.00 | $ | 87,099,458 |
| Custom (Purple) | 4,960.0 | 7 | 34,720 | $ | 350.00 | $ | 12,152,000 |
|  |  | 284 | 729,755 | | Subtotal Homes: | $ | 197,439,681 |

| | Slope Analysis: | R1 | | | |
|---|---|---|---|---|---|
| 3.84 | 167,270.40 | 83,635.20 | Architecture: | 24,332 | $ | 6,910,389 |
| 8.08 | 351,964.80 | 158,384.16 | Landscape Architecture: | 4,866.47 | $ | 1,382,078 |
| 6.21 | 270,507.60 | 108,203.04 | MEP Engineering: | 9,733 | $ | 2,764,156 |
| 7.21 | 314,067.60 | 109,923.66 | Structural Engineering: | 14,599 | $ | 4,146,233 |
| 5.58 | 243,064.80 | 72,919.44 | Civil Engineering: | 12,166 | $ | 3,455,194 |
|  | 1,346,875.20 | 533,065.50 | Entitlements: | | $ | 2,594,525 |
|  |  |  | City Fees (During Entitlements): | | $ | 350,000 |
|  |  |  | Permits: | | $ | 5,923,190 |
|  |  |  | City Fees (Construction): | | $ | 7,403,988 |
|  | Project Management (Phase II & III) & 3rd-party Construction Services: | | | | $ | 5,923,190 |
|  |  |  | Developer Fee: | | $ | 5,000,000 |
|  |  |  | Construction Management: | | $ | 5,169,235 |

|  |  |  |
|---|---|---|
| Total (including CFD Bonds): | $ | 318,651,380 |
| Mello Roos (CFD Bond Portion): | $ | 90,104,281 |
| NET Total: | $ | 228,547,099 |



EXHIBIT 2

Gene H. Shioda – SBN 186780
ghs@slclawoffice.com
Christopher J. Langley – SBN 258851
chris@slclawoffce.com
Steven P. Chang – SBN 221783
schang@slclawoffice.com
**SHIODA, LANGLEY & CHANG LLP**
1063 E. Las Tunas Dr.
San Gabriel, CA 91776
Tel: (626)281-1232
Fax: (626)281-2919

Counsel for Jinzheng Group (USA) LLC
Debtor and Debtor-in-Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:21-bk-16674-ER |
| | Chapter 11 |
| JINZHENG GROUP (USA) LLC | **OBJECTION TO PROOF OF CLAIM NO. 18 OF BETULA LENTA INC.; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF CHRISTOPHER J. LANGLEY IN SUPPORT THEREOF** |
| Debtor and Debtor in Possession. | |
| | **HEARING DATE:** |
| | Date:    March 22, 2022 |
| | Time:    10:00am |
| | Location:  Ctrm 1568 |
| | 255 E. Temple St. |
| | Los Angeles, CA 90012 |

TO THE HONORABLE ERNEST M. ROBLES, U.S. BANKRUPTCY JUDGE,

OFFICE OF THE UNITED STATES TRUSTEE, AND ALL INTERESTED PARTIES:

1

JINZHENG GROUP (USA) LLC ("Debtor"), the chapter 11 debtor and debtor-in -possession respectfully submits the motion ("Motion") objection to the Claim of Betula Lenta, Inc. filed as official Claim 18.

The Motion is based on this Notice, the Motion and its accompanying Memorandum of Points and Authorities, the Declaration of Christopher J. Langley, the pleadings and files in the Debtor's bankruptcy cases, and upon such further oral and documentary evidence as may be presented to the Court. The Motion will be heard on March 22, 2022, at 10:00 a.m., in the United States Bankruptcy Court for the Central District of California, Los Angeles Division, located at 255 E. Temple St. Los Angeles, CA 90012 in Courtroom 1568.

**NOTICE TO CLAIMANT IS HEREBY GIVEN**: the Debtor has filed an objection to the Betula Lenta Inc.'s ("Betula") Proof of Claim ("Claim") identified as follows:

| Claim No. | Date Filed | Claimant | Alleged Claim Amount | Disputed Amount | Claim To Be Allowed |
|-----------|-----------|----------|---------------------|-----------------|--------------------|
| 18 | 2/03/2022 | Betula Lenta, Inc. | $1,643,977. | $1,643,977. | $0.00 |

The Motion seeks to alter Betula's rights by reducing Betula's Proof of Claim based on the grounds set forth in the Motion detailed below.

PLEASE TAKE FURTHER NOTICE that any response to the objections must be in the form as required by Rule 9013-1(f) of the Local Bankruptcy Rules ("LBR") and filed with the Clerk of the above-entitled Court no later than fourteen (14) days prior to the hearing date set forth above, and a copy served on Christopher J. Langley at the address indicated above. A copy of any response must also be served on the Office of the United States Trustee, 915 Wilshire Blvd. Ste 1850, Los Angeles, CA 90017. Failure to timely respond may be deemed as acceptance of the proposed objections and the Court may grant the relief requested in the Objection Motion without further notice or hearing. *See* LBR 3007-1(b) and 9013-1(h).

Dated: 2/20/2022          SHIODA, LANGLEY & CHANG LLP

          /s/Christopher J. Langley

          By: Christopher J. Langley
          Attorneys for Debtor and Debtor in Possession

## 1.    Summary of Argument

The basis for the objection to the Claim is that Claimant has provide insufficient documentation and information to support Betula's claim for $1,643,977.00. There is no support for the said Claim because either no or limited information has been provided to ascertain how Claimant determined its claim amount.

Therefore, and for the reasons stated below, this Court must sustain this Objection and disallow the claims in their entirety, or in the alternative continue the said hearing.

## 2.    Statement of Facts

### A.    Factual Background

Debtor is a single member LLC that is wholly owned by Mr. Jiaqing Yang. Between August 2016 and July 2017, the Debtor acquired approximately 32 contiguous acres in Los Angeles that it intended to develop (the "Los Angeles Properties"). The Debtor contracted with Betula Lenta, Inc. ("Betula"), a real estate consultancy company, in December 2017 to assist Debtor with the development and entitlement of the Los Angeles Properties.  To fund the development of the Los Angeles Properties, Debtor borrowed $7,000,000 on September of 2018 which was cross collateralized by a first priority deed of trust held by Royal Equity Lending. When Debtor was unable to refinance the loan because Betula was unable to obtain the necessary entitlements (which Betula claims it did 65% of the work), Royal Equity Lending initiated foreclosure on its note, which necessitated this bankruptcy filing.[1]

---

[1] Presumptively, if Betula did 65% of the work as it claims, then Debtor should have been able to refinance the loan with Royal Equity Lending.  However, Royal Equity, Inc. did not refinance the loan and started foreclosure proceedings.

## B.    Debtor's Chapter 11 Bankruptcy

On August 24, 2021 ("Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Central District of California.

On December 9, 2021, Debtor filed a Notice of Bar Date for Filing Proofs of Claim. The deadline for filing claims in this case was February 4, 2022. To date, the 21 proofs of claims have been filed against the Debtor's bankruptcy estate:

| Claim | Creditor | Secured | Priority | Unsecured | Total |
|---|---|---|---|---|---|
| 1 | LA County Tax Collector | $163,520.10 | -- | -- | $163,520.10 |
| 2 | Royalty Equity Lending LLC | $9,353,009.29 | -- | -- | $9,353,009.29 |
| 3 | IRS | | $28,700.70 | -- | $28,700.70 |
| 4 | Michael and Shari Dorff | $50,000.00 | -- | -- | $50,000.00 |
| 5 | Investment Management Company | $350,000.00 | -- | -- | $350,000.00 |
| 6 | Testa Capital Group | -- | $13,650.00 | $672,900.00 | $686,550.00 |
| 7 | Home Loans Unlimited Inc. | -- | $13,650.00 | $672,900.00 | $686,550.00 |
| 8 | Corona Capital Group, LLC | $540,000.00 | -- | -- | $540,000.00 |
| 9 | Michael Carlin | -- | $15,650.00 | -- | $15,650.00 |
| 10 | Michael Carlin | -- | $15,650.00 | -- | $15,650.00 |
| 11 | UltraSystems Environmental | -- | -- | $37,106.50 | $37,106.50 |
| 12 | Land Design Consultants, Inc. | -- | -- | $48,145.00 | $48,145.00 |
| 13 | Craig Fry & Associates, LLC | -- | -- | $240,700.47 | $240,700.47 |
| 14 | Breezeblock Capital LLC | $124,653.99 | -- | -- | $124,653.99 |
| 15 | Betty Zheng | -- | -- | $95,000.00 | $95,000.00 |
| 16 | Shawn Charles Sourgose | -- | 13,650.00 | $672,900.00 | $686,550.00 |
| 17 | The Phalanx Group | -- | -- | $158,845.00 | $158,845.00 |
| 18 | Betula Lenta Inc. | -- | -- | $1,643,977.00 | $1,643,977.00 |
| 19 | Donna Bullock | $45,000 | -- | $97,803.00 | $142,803.00 |
| 20 | Pennington Construction Advisors | -- | -- | $75,000.00 | $75,000.00 |
| 21 | DNQ LLC | $420,000.00 | -- | -- | $420,000.00 |
| | | $11,046,183.38 | $110,950.70 | $4,415,276.97 | $15,562,411.05 |

On January 18, 2022, the Court approved the employment of Debtor's Counsel with the effective date of November 21, 2021.

On January 18, 2022, the Court extended the exclusivity period for Debtor to file a plan to April 21, 2020, as well as extending the exclusivity deadline to solicit acceptances of its Plan to May 20, 2022.

4

On January 25, 2022, The United States Trustee filed a notice of appointment of Creditors'

Committee naming Betula Lenta Inc, Pennington Construction Advisors, Inc and The Phalanx

Group Inc. as committee members.

Debtor is currently in the process of drafting the disclosure statement and proposed plan of

reorganization.  Debtor's current counsel substituted in the said matter on December 6, 2021.

### C.    Proof of Claim

On February 3, 2022, Betula Lenta Inc. ("Claimant or Betula") filed Official Proof of

Claim 18 for $1,643,977.00 based on "Services performed. Expenses paid to 3rd parties per

Contract. Consulting." A true and correct copy of the Claim is attached to the Declaration of

Christopher J. Langley ("Langley Declaration") as **Exhibit A.**

As evidence of his Claim, Claimant attached three separate contracts: 1) Predevelopment

Consulting Agreement dated December 7, 2017 (Claim Attachment "CA" p. 1), 2) Construction

Management Agreement dated June 22, 2018 (CA p. 14), and 3) CFD Bonds Procurement – CM -

Development Agreement (CA p. 18). The respective amount due under the contracts are

$2,594,500; $4,517,913; $4,517,913. The contracts anticipate that the payments are due upon

certain levels of completion of the project.

Despite multiple requests for a full accounting and progress report, the only breakdown or

accounting that Debtor has received is an email from Claimant's counsel, Mr. Peter Kim. A true

and correct copy of the email is attached to the Langley Declaration as Exhibit B.

### 2929 Amethyst

| | |
|---|---|
| Original Contract Amount | 11,754,928 |
| Change Order Amount | 1,500,000 |
| Total Amount | 13,254,928 |
| Amount Received from Jinzheng | 6,971,726 |

5

group
(As of 2/3/2022)

| | |
|---|---|
| % work done | 65% |
| The Calculated amount by work done | 8,615,703.20 |
| Outstanding amount | 1,643,977 |

Claimant acknowledges receipt of $6,971,726 and is calculating the Claim amount based on what percentage of the project Betula believes to be completed. Betula fails to provide the Court any facts or evidence that Betula completed 65% of the work it was contracted to do. Claimant has been unable or unwilling to provide a report of the alleged progress of the project. Claimant has failed to appear to the Court Ordered 2004 exam.

There are no entitlements on the Los Angeles Properties, and the project is still at its very early stages of development. See attached declaration of Max Yang.

The documentation attached to the Claim is completely insufficient as it lacks any information to verify whether Claimant is owed anything by the Debtor. There is no report or information on how Claimant completed 65% of the work which is the basis of the Claimant's claim.

Debtor has been diligent in investigating its liabilities including receiving Court orders for the 2004 examinations of David Park and Jonathan Pae, two of the principals of Claimant. Despite the examinations being set for January 18, 2022, for David Park and January 21, 2022 for Jonathan Pea, neither has yet to appear for examination. The exams were continued multiple times at Park and Pae's request. The exams are currently scheduled for February 24 and March 2, respectively. Debtor is hopeful that both will appear without need for further Court intervention.

On January 25, 2022, The United States Trustee appointed Betula Lenta Inc to Creditors' Committee. Betula Lenta Inc then retained Pachulski Stang Ziehl & Jones LLP as committee

1    counsel. Interestingly, these acts occurred after David Park and Jonathan Pea failed to appear for

2    their respective 2004 exam.

3         On February 7, 2022, Debtor filed a lawsuit against Betula Lenta Inc, Jonathan Pae, David

4    Park for Breach of Contract, Intentional and Negligent Misrepresentation and other related causes

5    of action.

6         Based on the above, Claimant has failed to demonstrate that it is a viable creditor of the

7    Debtor with a right to payment or that it has a right to an "equitable remedy" against Debtor, or

8    that Debtor is liable to Claimant. As such, the objection to the Claim should be sustained as this

9    Court has no information, facts or evidence to substantiate the claim that 65% of the purported

10   work by Betula was actually done.

11

12   **3.    Memorandum of Points and Authorities**

13        **a.    Claim No. 18 must be disallowed because Claimant is not a creditor**

14             **of the Debtor.**

15        Under the Bankruptcy Code, to assert a "claim" and be treated as a creditor, a claimant

16   must have a "right to payment" or a right to an "equitable remedy." 11 U.S.C. §101(5)(A)(B).

17   Further, under Section 502(b)(1) of the Bankruptcy Code, a claim may not be allowed if "such

18   claim is unenforceable against the debtor and property of the debtor, under any agreement or

     applicable law." 11 U.S.C. 502(b)(1).

19        Here, Claimant asserts a $1,643,977 claim based on Services performed and amount paid

20   to 3rd parties per contract but fails to provide even the most minimal of evidentiary support. The

21   evidence it does produce does not actually support its claim since the Claimant has failed to

22   perform under the same and Claimant does not produce any supporting evidence it has performed

23   any work under any of the three agreements.  In fact, the assertion that this claim is based on 65%

24   of the completed work came from Betula Lenta's attorney but that is not even provided in the

25   Claim.  Indeed, all the claimant provided are the contracts with the Debtor and not a single

1  reference to the total amount of work completed.  Ultimately, there are NO facts to show what

2  work was done, what entitlements were procured, how the said entitlements were procured, and

3  when they were procured.

4         When pressed for supporting documentation to demonstrate that 65% of the work was

5  completed, Betula fails to provide it.  The referenced court orders for the 2004 exam of Park and

6  Pae also orders Betula, Park and Pae to provide documentation one week before the 2004 exam.

7  Rather than provide documents supporting Betula's claim, Park and Pae simply provide the

8  contracts and limited documents about the contracts nothing again to substantiate 65% of the work

9  being completed or for that matter any work were ever started or completed.  What is missing, as

10  evidenced by Betula's claim filing, are the facts, evidence or support on when, how, what Betula

11  actually did to conclude it completed 65% of the work.

12         Based on the Claims as filed and exhibits attached thereto, because Claimant neither

13  asserts nor provides any evidence that shows that Claimant is owed anything by the Debtor, or that

14  the Debtor is otherwise liable to it, thus Claimant is not a creditor of the Debtor. *See e.g., In re*

15  *Jeter,* 2014 Bankr. LEXIS 969, at *38 (Bankr. E.D. Tenn. Mar. 13, 2014 ) (stating party was

16  creditor of debtor where it held contingent right to payment under the agreement at issue); *In re*

17  *B-Bar Tavern Inc.,* 506 B.R. 879, 914 (Bankr. D. Mont. 2013) (finding, notwithstanding the broad

18  definitions under 11 U.S.C. 101, that party was not creditor of debtor with a right to payment of

19  debt alleged in its proof of claim where no written evidence existed in the record of a note or other

20  promise by debtor to repay for the alleged loans); *In re Player Wire Wheels, Ltd.*, 428 B.R. 767,

21  769-770 (Bankr. N.D. Ohio 2010) (finding ex-wife of deceased debtor's principal was not a

22  creditor of debtor where debtor did not owe her any money). Claimant fails to provide any

23  documents on its purported claim against the Debtor, or any other evidence that would support his

24  assertion that it is a creditor of the Debtor, or that it has a right to an equitable remedy against

25  Debtor.

Based on the above, Claimant has failed to provide evidence that he is a creditor of Debtor. As such, the Court should sustain this Objection and disallow the Claim in its entirely.

### b.    Claimant has not met his burden of proof.

A proof of claim executed and filed in accordance with Federal Rule of Bankruptcy Procedure 3001 constitutes *prima facie* evidence of the validity and amount of the claim. FRBP 3001(f). The proof of claim is deemed allowed "unless a party in interest" objects. 11 U.S.C. §502(a). "[I]f such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount[.]" 11 U.S.C. §502(b).

It is an objecting party's burden to submit sufficient evidence to overcome the presumption of the validity of the proof of claim executed and filed in accordance with FRBP 3001. *See* LBR 3007-1(c)(1); *In re Lundell*, 223 F.3d 1035, 1039 (9th Cir. 2000). The objecting party is not required to disprove the claim. *In re Kahn*, 114 B.R. 40 (Bankr. S.D.N.Y. 1990). The objecting party only has the initial burden of producing facts sufficient to demonstrate that an actual dispute regarding the validity or amount of the claim exists. *In re Hydorn*, 94 B.R. 608 (Bankr. W.D. Mo. 1988). If the objecting party provides sufficient evidence to negate one or more of the sworn facts in the proof of claim, then the burden reverts back to the claimant to prove the validity by a preponderance of the evidence. *In re Lundell*, 233 F.3d at 1039. The ultimate burden of persuasion remains at all times with the claimant. *Id.*; *In re Holms*, 931 F.2d 620 (9th Cir. 1991).

In the present case, the entire Claim as filed fails to provide any statement itemizing its interest, fees, or charges as to allow any understanding of the basis for the $1,643,977.00 it is asserting.  Plus there are no documents for the Court to evaluate that 65% of the work was actually performed by Betula, and again this assertion the claim is based on 65% completion of all work from the 3 contracts is not evident in the claim but rather only supplied to Debtor in an email through Claimant's counsel.

Furthermore, this Claim is not "executed" as required under 3001(f), Claimant instead of providing a holographic signature merely used /s/ David Park, which, in light of its lack of

9

willingness to provide any evidentiary support despite demands since December and Court order should be construed against Claimant and the validity of its claim.

Moreover, Debtor has raised issues sufficient to demonstrate an actual dispute regarding the validity of the claim. As stated above, Claimant has failed to meet its burden of proof that it is a creditor of the Debtor, that Debtor owes Claimant any money, or that Debtor is otherwise liable to Claimant.   Just because a claim is asserted does not mean the Claim is valid.  Certainly supporting documentation showing or illustrating that 65% of the work is completed is a pre-requisite for the Court to determine the validity of the claim.

Because Claimant does not have a "right to payment" or an "equitable remedy," it cannot assert a claim under the Bankruptcy Code. Claimant therefore must establish by a preponderance of the evidence that the Claim should be allowed, and based upon the substance of this Objection, the burden of persuasion squarely rests with it.

Based on the foregoing, the Objection to the Claim should be sustained and the claim disallowed in its entirety as set forth herein.

**c.      The Objection should be sustained absent a response.**

Rule 3007-1(b)(6) of this Court's Local Bankruptcy Rules provides that in the event of an objection to claim, "If the claimant does not timely file and serve a response, the court may sustain the objection without a hearing. (A) The objector must file a declaration attesting that no response was timely filed and served upon the objector. The declaration must identify the docket number and filing date of the objection to claim, notice, and proof of service of the notice and objection to claim and be served on the claimant. (B) The objector must also lodge a proposed order prepared and served in accordance with LBR 9021-1 and the Court Manual. (C) The objecting party must serve the entered order on the claimant and counsel, if any."

Absent a response by Claimant, this Objection should be sustained without hearing and the Claim should be disallowed in its entirety.

**4.      Conclusion**

1        Based on the foregoing, the Objection to the Claim must be sustained, disallowing the

2  claim in its entirety without the right to amend and for such other and further relief as the Court

3  may deem just and proper.

4

5                                     Respectfully Submitted,

6  Dated:  2/20/2022

7                            /s/Christopher J. Langley

8                            By: Christopher J. Langley
                               Shioda, Langley & Chang LLP

9                            Attorneys for Debtor and Debtor in Possession

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# DECLARATION OF CHRISTOPHER J. LANGLEY

I, Christopher J. Langley, am the attorney duly authorized and admitted to practice law in this jurisdiction. I represent the Debtor and Debtor-in-possession Jinzhang Group (USA) LLC. I have personal knowledge of the matters set forth in this declaration and, if called upon to testify, I could and would competently testify thereto. I make this declaration in support of OBJECTION TO PROOF OF CLAIM NO. 18 OF BETULA LENTA INC.; which this declaration is attached to.

1.     A true and correct copy of Official Claim #18 filed by Betula Lenta, Inc. is attached as **Exhibit A.** They were served on me through the Court's electronic noticing system and are true and correct copies of the claims on file with the Court

2.     On at least 5 separate occasions I have requested a full accounting and progress report, the only breakdown or accounting that Debtor has received is an email that was forwarded to me on February 3, 2022 from Claimant's counsel, Mr. Peter Kim. A true and correct copy of the email is attached hereto as Exhibit B.

3.     The Court granted my request for 2004 examinations of David Park and Jonathan Pae, two of the principals of Claimant. Despite the examinations being set for January 18, 2022, for David Park and January 21, 2022 for Jonathan Pea, neither has yet to appear for examination. The exams were continued multiple times at Park and Pea's request and once at mine since they had failed to produce the documents requested. The exams are currently scheduled for February 24 and March 2, respectively.

4.     On January 25, 2022, the United States Trustee appointed Betula Lenta Inc. to Creditors' Committee. After discussing the matter with both the United States Trustee and Pachulski Stang Ziehl & Jones LLP, I ascertained that Betula Lenta Inc was the party that hired Pachulski on behalf of the committee. It is my understanding that Betula is the taking the lead for the three committee members.

5.     On February 7, 2022, Debtor filed a lawsuit against Betula Lenta Inc, Jonathan Pae, David Park for Breach of Contract, Intentional and Negligent Misrepresentation and other related causes of action.

DEBTOR-IN-POSSESSION'S OBJECTION TO CLAIM 18

1

 I declare under penalty of perjury under the laws of the United States of America that the

2

foregoing is true and correct to the best of my knowledge.

3

4

Dated: February 17, 2022                    By: /s/Christopher J. Langley
                                                Christopher Langley

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## <u>DECLARATION OF MAX YANG</u>

I, Max Yang, am the attorney-in-fact for Jiaqing Yang ("J. Yang"), the managing member of Jinzheng Group (USA), LLC ("Debtor"), the debtor in possession in the above captioned bankruptcy case. I have personal knowledge of the matters set forth in this declaration and, if called upon to testify, I could and would competently testify thereto. I make this declaration in support of OBJECTION TO PROOF OF CLAIM NO. 18 OF BETULA LENTA INC.; which this declaration is attached to.

1.     The Debtor commenced this bankruptcy case by filing a voluntary chapter 11 bankruptcy petition on August 24, 2021 (the "Petition Date"). The Debtor continues to manage its financial affairs as a debtor in possession pursuant to 11 U.S.C. §§ 1107, 1108.

2.     Debtor is a single member LLC that is wholly owned by Mr. Jiaqing Yang. Between August 2016 and July 2017, the Debtor acquired approximately 32 contiguous acres in Los Angeles that it intended to develop (the "Los Angeles Properties"). The Debtor contracted with Betula Lenta, Inc. ("Betula"), a real estate consultancy company, in December 2017 to assist it with the development and entitlement of the Los Angeles Properties. To fund the development of the Los Angeles Properties, Debtor borrowed $7,000,000 in September of 2018 which was cross collateralized by a first priority deed of trust held by Royal Equity Lending. The Debtor was unable to refinance the short-term loan in large part because Betula was unable to obtain the necessary entitlements and the project was not progressing as planned. Debtor filed for bankruptcy protection on the eve of Royal Equity Lending foreclosing on the Los Angeles Properties.

3.     I have reviewed the Official Claim #18 of Betula Lenta Inc as well as the rudimentary accounting produced by Betula through its attorney in which it claims that the Los Angeles Properties are 65% complete.

4.     Based on my personal knowledge and review of the County records, the Los Angeles Properties do not have any entitlements. The entitlement project is still at a very early stages. The project is not anywhere near 65% complete based on the defined scope of the 3 contracts with Betula that are attached to its proof of claim.

1        I declare under penalty of perjury that the foregoing is true and correct to the best of my

2    knowledge.

3    Dated: _____

4                                        Shao Xing Max Yang

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

13

DEBTOR-IN-POSSESSION'S OBJECTION TO CLAIM 18

# EXHIBIT A

| Fill in this information to identify the case: | |
|---|---|

Debtor 1 _JINZHENG GROUP (USA) LLC_

Debtor 2
_(Spouse, if filing)_

United States Bankruptcy Court _Central District of California_

Case number: _21-16674_

FILED

U.S. Bankruptcy Court
Central District of California

2/3/2022

Kathleen J. Campbell, Clerk

## Official Form 410
## Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

### Part 1: Identify the Claim

| 1. Who is the current creditor? | Betula Lenta Inc. | |
|---|---|---|
| | Name of the current creditor (the person or entity to be paid for this claim) | |
| | Other names the creditor used with the debtor | David Park, The Code Solution, TCS, TCS Building Solutions |
| 2. Has this claim been acquired from someone else? | ☑ No<br>☐ Yes. From whom? | |
| 3. Where should notices and payments to the creditor be sent?<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Where should notices to the creditor be sent?<br><br>Betula Lenta Inc.<br><br>Name<br><br>800 West 6th Street<br>Suite 1250<br>Los Angeles, CA 90017 | Where should payments to the creditor be sent? (if different)<br><br>Name |
| | Contact phone _____ 2135370158 | Contact phone _____ |
| | Contact email<br>_david@thecodesolution.com_ | Contact email _____ |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one): | |
| 4. Does this claim amend one already filed? | ☑ No<br>☐ Yes. Claim number on court claims registry (if known) | Filed on _____<br><br>MM / DD / YYYY |
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No<br>☐ Yes. Who made the earlier filing? | |

Official Form 410                              Proof of Claim                              page 1

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

---

**6.Do you have any number you use to identify the debtor:**

☑ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____

---

**7.How much is the claim?**

$     1643977.00     **Does this amount include interest or other charges?**
☐ No
☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

---

**8.What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as healthcare information.

Services performed. Expenses paid to 3rd parties per contract. Consulting

---

**9. Is all or part of the claim secured?**

☑ No
☐ Yes. The claim is secured by a lien on property.

    **Nature of property:**
    ☐ Real estate.    If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*
    ☐ Motor vehicle
    ☐ Other. Describe: _____

    **Basis for perfection:** _____

    Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

    **Value of property:**    $ _____

    **Amount of the claim that is secured:**    $ _____

    **Amount of the claim that is unsecured:**    $ _____    (The sum of the secured and unsecured amounts should match the amount in line 7.)

    **Amount necessary to cure any default as of the date of the petition:**    $ _____

    **Annual Interest Rate (when case was filed)**    _____ %
    ☐ Fixed
    ☐ Variable

---

**10.Is this claim based on a lease?**

☑ No
☐ Yes. Amount necessary to cure any default as of the date of the petition.$ _____

---

**11.Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: _____

---

Official Form 410             Proof of Claim             page 2

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☒ **No** | |
|---|---|---|
| | ☐ **Yes.** *Check all that apply:* | **Amount entitled to priority** |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(_) that applies | $ _____ |
| | * Amounts are subject to adjustment on 4/1/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3: Sign Below

| The person completing this proof of claim must sign and date it. FRBP 9011(b).<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.<br>18 U.S.C. §§ 152, 157 and 3571. | Check the appropriate box:<br><br>☒ I am the creditor.<br>☐ I am the creditor's attorney or authorized agent.<br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct. |
|---|---|

Executed on date  2/3/2022
                 MM / DD / YYYY

/s/ David Park

Signature

Print the name of the person who is completing and signing this claim:

| Name | David Park |
|---|---|
| | First name    Middle name    Last name |
| Title | President |
| Company | Betula Lenta Inc. |
| | Identify the corporate servicer as the company if the authorized agent is a servicer |
| Address | 800 West 6th Street Suite 1250 |
| | Number  Street |
| | Los Angeles, CA 90017 |
| | City  State  ZIP Code |
| Contact phone | 2135370158     Email  david@thecodesolution.com |

064

*PREDEVELOPMENT CONSULTING AGREEMENT*

This Predevelopment Consulting Agreement ("Agreement") is made effective as of November *December* **7**, 2017, and entered into by and between **JINZHENG GROUP (USA), LLC, a California limited liability company** ("Principal") and **BETULA LENTA, INC., a California Corporation** ("Consultant"), with regard to the following:

 **WHEREAS,** Principal and Consultant desire to enter into this Agreement for the purpose of Consultant providing and performing certain predevelopment consulting services (the "Predevelopment Services") with respect to the construction and development of certain for-sale residential improvements (the "Project") on that certain real property commonly referred to as 2929 Amethyst Street, Los Angeles, California 90032 (the "Site") as more specifically detailed, outlined and provided for below in this Agreement and as set forth in the "Scope of Services" which is attached hereto as Exhibit "A" and fully incorporated into this Agreement by this reference as though fully set forth herein; and

 **WHEREAS,** Consultant hereby represents and warrants that it possesses the necessary expertise and experience required to provide and perform the Predevelopment Services with respect to the development of the Site and is fully prepared and able to provide and perform the Predevelopment Services in a timely manner; and

 **WHEREAS,** Principal hereby acknowledges and agrees that it or a legal entity owned and controlled by it or one of its principals owns fee title to the Site and is duly authorized to enter into this Agreement for the performance of the Predevelopment Services by Consultant,

 **NOW, THEREFORE,** the Principal and Consultant (collectively referred to herein as the "Parties") do hereby agree to the following and terms and conditions established herein below in this Agreement.

 **1. DESCRIPTION OF PREDEVELOPMENT SERVICES.** Commencing on the date on which this Agreement is fully executed by the Parties, Consultant shall timely provide and perform the Predevelopment Services as provided for in this Agreement and the Scope of Services.

 **2. PERFORMANCE OF PREDEVELOPMENT SERVICES.** The manner in which the Predevelopment Services are to be performed and provided shall be determined exclusively by Consultant and will include, but not limited to, the specific amount of hours to be worked; provided however, Consultant shall commit as many hours as may be reasonably necessary to fulfill Consultant's obligations under this Agreement and the Scope of Services.

 **3. COMPENSATION SCHEDULE.** Compensation payable to Consultant by Principal for the Predevelopment Services shall as set forth in that certain "Compensation Schedule" which is attached to this Agreement as Exhibit "B" and fully incorporated into this Agreement as though fully set forth herein. As provided in the Compensation Schedule, payments shall be

I

065

made on an installment basis with each installment fully due and payable to Consultant within five (5) business days following the delivery of written notice by Consultant to Principal requesting payment. Failure to provide full payment of the requested amount shall be subject to a ten percent (10 %) late fee.

**4. EXPENSE REIMBURSEMENT.** All expenses not otherwise provided for in this Agreement shall be the sole responsibility of Consultant. Except as otherwise agreed upon by the Parties, the Principal shall not be responsible for the reimbursement of any expenses incurred by Consultant.

**5. OUTSIDE PROJECT APPROVAL.** Principal acknowledges and agrees that Consultant is and/or may become engaged in providing its services on various development projects other the Project. In this regard, Consultant shall provide Principal with a list of all such development projects in which it currently is involved and shall provide written notice to Principal of any and future projects in which it will be involved for approval consideration, pursuant to which, Principal shall not unreasonably withhold, delay, or condition its approval if such work does not materially and adversely affect Consultant's providing and performing the Predevelopment Work on the Project as provided for in this Agreement and the Scope of Development. In the event that Principal reasonably determines that such other project work will have an adverse and material effect on Consultant's performance of the Predevelopment Services, the Parties shall meet and confer to address and resolve the concerns of Principal.

**6. TERM/TERMINATION.** This Agreement shall terminate automatically upon completion of the Predevelopment Services by Consultant as required by this Agreement and the Scope of Services. However, in the event of a default with respect to of any of the obligations set forth in this Agreement by either Principal or Consultant, and such default is not cured within thirty (30) days following written notice to cure from the non-defaulting part, the non-defaulting party may terminate this Agreement and pursue any and all legal rights pertinent to such default including, but not limited to, damages or specific performance of the outstanding obligation(s).

**7. RELATIONSHIP OF PARTIES.** It is understood by the Parties that Consultant is an independent contractor with respect to providing and performing the Predevelopment Services and is not an employee of the Principal, who shall not be required to provide any fringe benefits, including health insurance benefits, paid vacation, or any other employee benefits, for the benefit of Consultant.

**8. DISCLOSURE.** Consultant is required to disclose to Principal any outside activities or interests, including ownership or participation in any developments that conflict or will conflict with the Consultant's providing and performing of the Predevelopment Services and the ultimate development of the Project on the Site.

**9. EMPLOYEES.** Consultant's contractors, consultants and employees, if any, who perform any aspect of the Predevelopment Services for Consultant under this Agreement shall also be bound by the provisions of this Agreement. At the written request of the Principal, Consultant shall provide adequate evidence that such persons are Consultant's agents, contractors, consultants, or employees.

**10. INJURIES AND INSURANCE.** Consultant acknowledges that Consultant's obligation to obtain appropriate insurance coverage for the benefit of Consultant (and Consultant's agents, contractors, consultants and employees, if any) to the extent required by applicable California law. Consultant waives any and all rights to recovery against Principal for any injuries that Consultant (and/or Consultant's agents, contractors, consultants and employees, if any) may sustain while providing and/or performing the Predevelopment Services under this Agreement, and that are a result of the negligence of Consultant or Consultant's agents, contractors, consultants, or employees.

**11. INDEMNIFICATION.** Consultant agrees to indemnify and hold Principal harmless from all claims, losses, expenses, fees including attorney fees, costs, and judgments that may be asserted against Principal that result from the acts or omissions of Consultant, Consultant's agents, contractors, consultants, and employees, if any.

Principal agrees to indemnify and hold Consultant, Consultant's agents, contractors, consultants, and employees, harmless from all claims, losses, expenses, fees including attorney fees, costs, and judgments that may be asserted against Consultant for any of the following: (a) any third-party work previously provided and performed on the behalf of Principal with respect to the Project; or (b) any acts or omissions of Principal, Principals agents, contractors, consultants, and/or employees.

**12. INTELLECTUAL PROPERTY.** The following provisions shall apply with respect to copyrightable works, ideas, discoveries, inventions, applications for patents, and patents (collectively, "Intellectual Property"):

*Consultant's Intellectual Property.* Consultant does not presently hold any interest in any Intellectual Property with respect to the development of the Project on the Site.

*Development of Intellectual Property.* To the extent that any Intellectual Property rights are established with respect to providing or performing the Predevelopment Services, or development of the Project on the Site, unless otherwise provided, all such Intellectual Property shall be the property of Principal and Consultant shall take all such reasonable efforts to cause all such rights to be assigned to Principal.

**13. OWNERSHIP OF SOCIAL MEDIA CONTACTS.** Any social media contacts, including "followers" or "friends," that are acquired through accounts (including, but not limited to email addresses, blogs, Twitter, Facebook, You-tube, or other social media networks) used or created in conjunction with providing and performing the Predevelopment Services shall be the property of Consultant.

**14. CONFIDENTIALITY.** Principal recognizes that Consultant has and will have the following information:

- prices
- costs

3

- discounts
- future plans
- process information
- technical information
- copyrights
- proprietary information

as well as any other proprietary information (collectively, "Information") which are valuable, special and unique assets of Principal that require protection from improper disclosure. In consideration for access and disclosure of the Information to Consultant, Consultant agrees that it will not at any time or in any manner, either directly or indirectly, use any Information for Consultant's own benefit, or divulge, disclose, or communicate in any manner any Information to any third party without the prior written consent of Principal. Consultant will protect the Information and treat it as strictly confidential. A violation of this paragraph shall be a material violation of this Agreement.

**15. UNAUTHORIZED DISCLOSURE OF INFORMATION.** If it appears that Consultant has disclosed (or has threatened to disclose) Information in violation of this Agreement, Principal shall be entitled to an injunction to restrain Consultant from disclosing, in whole or in part, such Information, or from providing any services to any party to whom such Information has been disclosed or may be disclosed. Principal shall not be prohibited by this provision from pursuing any other remedies, including a claim for losses and damages.

**16. CONFIDENTIALITY AFTER TERMINATION.** The confidentiality provisions of this Agreement shall remain in full force and effect after the termination of this Agreement.

**17. SERVICES TO THIRD PARTIES.** Except as otherwise approved by Principal as set forth hereinabove in this Agreement, Consultant shall not provide any consulting services to any third party during the term of this Agreement.

**18. RETURN OF RECORDS.** Upon termination of this Agreement, Consultant, at the written request of Principal, shall deliver all records, notes, data, memoranda, models, and equipment of any nature that are in Consultant's possession or under Consultant's control that are Principal's property or directly relate to Principal's business.

**19. NOTICES.** All notices required or permitted under this Agreement shall be in writing and shall be deemed delivered when delivered in person or deposited in the United States mail, postage prepaid, addressed as follows:

4

If to Principal:

**JINZHENG GROUP (USA), LLC,**
**a California limited liability company**
100 E. Huntington Drive,
Alhambra, CA 91801
Phone: (626) 703-4116
Attn: Jianging Yang, President


If to Consultant:

**BETULA LENTA, INC.**
**a California limited liability company**
1125 West 6th Street.
Suite 205
Los Angeles, CA 90017
Phone: (310) 295-8764
Attn: David Park, CEO

Such address may be changed from time to time by either party by providing written notice to the other in the manner set forth above.

**20. ENTIRE AGREEMENT.** This Agreement along with the two attached exhibits constitutes the entire agreement of the parties and there are no other promises or conditions in any other agreement whether oral or written. This Agreement supersedes any prior written or oral agreements between the parties.

**21. AMENDMENT.** This Agreement may be modified or amended if the amendment is made in writing and is signed by the Parties.

**22. SEVERABILITY.** If any provision of this Agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

**23. WAIVER OF CONTRACTUAL RIGHT.** The failure of either party to enforce any provision of this Agreement shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Agreement.

**24. APPLICABLE LAW.** This Agreement shall be governed by the laws of the State of California.

**25. INTERRUPTION OF SERVICE.** Either party shall be excused from any delay or failure in performance required hereunder if caused by reason of any occurrence or contingency

5

069

beyond its reasonable control, including, but not limited to, acts of God, acts of war, fire, insurrection, laws proclamations, edits, ordinances or regulations, strikes, lock-outs or other serious labor disputes, riots, earthquakes, floods, explosions or other acts of nature. The obligations and rights of the party so excused shall be extended on a day-to-day basis for the time period equal to the period of such excusable interruption. When such events have abated, the parties' respective obligations hereunder shall resume. In the event the interruption of the excused party's obligations continues for a period in excess of thirty (30) days, either party shall have the right to terminate this Agreement upon ten (10) days' prior written notice to the other party.

26. **ASSIGNMENT.** Consultant agrees that it will not assign, sell, transfer, delegate or otherwise dispose of any rights or obligations under this Agreement without the prior written consent of Principal. Any purported assignment, transfer, or delegation shall be null and void. Nothing in this Agreement shall prevent the consolidation of Principal with, or its merger into, any other legally recognized entity by the State of California, or the sale by Principal of all or substantially all of its properties or assets, or the assignment by Principal of this Agreement and the performance of its obligations hereunder to any successor in interest or any affiliated company, owned or controlled by Principal. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, legal representatives, successors, and permitted assigns, and shall not benefit any person or entity other than those enumerated above.

27. **SIGNATORIES.** This Agreement shall be signed on behalf of Principal by Jianqing Yang, and on behalf of Consultant by David Park and effective as of the date first above written.

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement as of the date first written above.

PRINCIPAL:

JINZHENG GROUP (USA), LLC,
a California limited liability company

By: _____
Its: President

CONSULTANT:

BETULA LENTA, INC.,
a California corporation

By: _____
Its: Chief Executive Officer

6

070

EXHIBIT "A"

## SCOPE OF SERVICES
### (Pre-Development Services)

1. Perform pre-development feasibility and pre-concept design strategy with emphasis on developing up to three hundred (300) for-sale detached single-family residential units as a master planned community.

2. Consultation with City representatives regarding development concept for master planned community.

3. Neighborhood outreach services as identified by City representatives including targeted neighborhood groups and organizations for project input and comments.

4. Coordination of project-related applications and submittals.

5. City Entitlement Coordination and Process:

    (A) California Environmental Quality Act Requirements (CEQA): Determine or cause to be determined environmental clearances necessary for the project. Prepare or cause to be prepared initial study for project impacts in order to determine if significant impact(s) are likely. Determine if impacts can be mitigated below a threshold of significance and cause to be prepared a Mitigated Negative Declaration (MND). If the project is determined to cause significant impacts that cannot be mitigated then the consultant shall cause an Environmental Impact Report (EIR) to be prepared for peer review by the Los Angeles Department of City Planning (LADCP) as lead agency. Submit all such documents as part of project review and facilitate/monitor LADCP processing.

    (B) General Plan Amendment, Zone Change and Tentative Tract Map Processing: Determine optimal processing for multiple entitlement and discretionary approvals in order to facilitate highest and best use for the property with a goal of establishing a Master Planned Community with up to 300 detached residential units. Prepare or cause to be prepared Master Land Use application, obtain Authorization to File from LADCP Management Team. Prepare or cause to be prepared justification and findings/specialized requirements in order to expedite the processing of such General Plan Amendment, Zone Change and Tentative Tract Map entitlements through both the LADCP and LA Bureau of Engineering (LABE). Coordinate with Los Angeles Parks and Recreation Department (LAPRD) as needed. Facilitate review in compliance with Subdivision Map Act as part of discretionary project review.

    (C) Traffic Study:  Determine or cause to be determined traffic clearances necessary for the project. Prepare or cause to be prepared reports for project impacts in order to determine if significant impact(s) are likely. Determine if impacts can be mitigated below a threshold of significance and cause to be prepared a Memorandum of Understanding (MOU) or Technical Letter. If the project is determined to cause significant impacts that cannot be mitigated then the consultant shall cause a full

7

Traffic Study to be prepared for peer review by the Los Angeles Department of Transportation (LADOT) as lead agency. Submit all such documents as part of project review and facilitate/monitor LADCP processing

(D) City Planning Commission/ Planning and Land Use Meeting/ City Council Meetings: Represent project and or coordinate representation at all required public hearing meetings and coordinate all responses to queries or conditions of approval.

6. Pre-Construction Activity:

7. Prepare or cause to be prepared schematic architectural design.

8. Prepare or cause to be prepared mass grading plan for site preparation work.

9. Prepare or cause to be prepared 3rd-party engineering reports and analysis.

10. Coordination, response, and access analysis through LADCP with various agencies including, but not limited to Bureau of Engineering (BOE), Los Angeles Fire Department (LAFD), Los Angeles Department of Water and Power (LADWP), sanitation, and other utilities

8

ADDENDUM TO DECEMBER 7, 2017 CONTRACT BETWEEN JINZHENG GROUP (USA) LLC AND BETULA LENTA, INC. for Consultant Services for 2929 Amethyst

Consultant Betula Lenta, Inc. agrees and is engaged to complete the scope of services listed in the Agreement with TL Pacific, Inc. , a copy of which is attached as Exhibit "A" hereto.

9

07

**EXHIBIT B**
**COMPENSATION SCHEDULE**

## 2929 Amethyst Milestones and Budget

| Original contract Amount | $ | 2,594,500.00 |
|---|---|---|
| Amount previously disbursed | $ | 1,581,975.00 |
| Budget Remaining (to be disbursed below) | $ | 1,012,525.00 |

| Months | Task | | Milestone Amounts |
|---|---|---|---|
| 1 | Contract Execution | $ | 390,000.00 |
| | Continue City Meetings | | |
| | Traffic Study Proposal | | |
| | Neighborhood Targeted Support Groups Initiatives | | |
| | Phase I Report | | |
| | Slope Band Analysis | | |
| | Geotech/Soils Report | | |
| | Seismic Study | | |
| | Complete Conceptual Plans | | |
| | Hillside Analysis/Findings | | |
| | LADOT MOU Submission | | |
| | Massings/sections/elevations/floorplates | | |
| | Initial Study Proposal/EIR (MND is less) | | |
| | Additional Traffic Data Reports as needed | | |
| | Traffic Study Submission | | |
| | Traffic Mitigation/DOT Tasks/DOT-PDM Meetings | | |
| | Shade and Shadow Study (if needed) | | |
| | Biological Study (if needed) | | |
| | Begin Schematic Plans | | |
| | LADCP Final Case Management | | |
| | LADCP Pre-Development Meeting | | |
| | Community/Agency Referral Approvals | | |
| | Specific IS Report Data Requirements | | |
| | Continue Specific Plans Progress | | |
| | Continue Master Planning Concept | | |
| | Begin Expedite Referral Process (if possible) | | |
| 3 to 4 | Completion of Initial Study | $ | 218,000.00 |
| | Land-Use Attorney/Neighborhood Consultant | | |
| | Reminder of Proposals, after retainers | | |
| | General Plan Amendment Initiation Plan (as needed) | | |
| | Initial Zoning Administrator meetings | | |
| | ZA Findings | | |
| | 2nd. LADCP Pre-Development Meeting | | |
| | Completion of IS/MND/EIR | | |
| | Mailing Labels | | |
| | Radius Map | | |
| 5 to 8 | EAF/MND/EIR Submission | $ | 123,000.00 |
| | City Filing Fee | | |
| | Master Land Use Application/Filing/Equivalent | | |
| | ZA Coordination | | |
| | Planning Commission Coordination | | |
| | Continue Council Meetings | | |
| | Continue Neighborhood Targeted Support | | |
| | Traffic Mitigation | | |
| | Completion of IS/MND/EIR | | |
| | LADOT Tech Letter Sign off (equivalent) | | |
| | Traffic Report Approval | | |
| | Begin Civil and Architectural Infrastructure Coordination | | |
| | Final Findings | | |
| | Ready Public Hearing Package | | |
| 8 to 10 | Initial Public Hearing | $ | 138,000.00 |
| | Follow up from any comments | | |
| | Neighborhood Outreach regarding specific comments | | |
| | Continue Council Meetings | | |
| | Continue Neighborhood Targeted Support | | |
| 9 to 12 | Planning Commission Public Hearing/NOC/Equivalent | $ | 58,000.00 |
| | City Council Resolution Coordination | | |
| | City Council Calendaring | | |
| | Continue Council Meetings | | |
| | Continue Neighborhood Targeted Support | | |
| 11 to 14 | City Council Hearing/Discretionary Approval | $ | 85,525.00 |
| | Follow up from City Council Resolution and Approval | | |
| | CLA Coordination | | |
| | Any recordations | | |
| | | $ | 1,012,525.00 |

074

## TL Pacific, Inc.August 31, 2016

**Subject:**Pre-Development Scope for 2929 Amethyst Street Los Angeles CA 90032

Proposed Development Strategy:

### Up to 300 Unit Master Planned Community

Dear Mr. Yang:

TL Pacific, Inc. specializes in the ability to take the known aspects of a property and increase the use and development potential.   We are pleased to submit this proposal for Professional Entitlement & Land-Use Consulting Services, and Project Management Services. Based upon our meetings and subsequent conversations, it is my understanding that we are charged to consult for the future development of the 30 +- acre site located at the address above, and this proposal and initial work scope shall consist of the following:

**1. Scope of Work, as applicable: (Other work scope and consulting shall be addressed in a subsequent Development Services Agreement)**

* Development feasibility/strategy
* Concept Design consultation
* Initial Land-use consultation
* City Agency Liaison
* Neighborhood Outreach
* Case Management Coordination
* Case Management meetings
* Affordable Housing Referral/DB submission coordination (if applicable)
* Affordable Housing Referral/DB Submission compliance (LAMC section 12.22, if applicable)
* Ancillary AB 2222 Research and planning input outside of mandatory legal representation, if applicable
* Zoning Administration Coordination
* Planning Commission (CPC) Coordination/Hearings
* Planning and Land Use Management (PLUM) Coordination/Hearings
* Work with District Councilman's office to assist in approval of desired Master Plan
* City Council Calendar and Resolution Coordination as required
* Peer Review Coordination, including representation at review hearings as needed
* Urban Planning Design Department Coordination, if applicable
* CEQA/Traffic integration from 3rd-party input as needed
* Public Hearing Coordination
* Non-profit outreach if required
* Pre-Construction Analysis/Coordination with 3rd party
* Initial Findings, Initial Research, and Summary Input Coordination

Exhibit "A" to Addendum to
12/7/17 Agreement between
Dinghao Group COSA LLC & Sedula LeADG, Inc.

12

- CEQA (State/local municipality level) Initial Study/Findings Coordination
- General Plan Amendment Coordination as needed, in-house and 3rd party
- Zone Change Coordination as needed, in-house and 3rd party
- Entitlement/Planning pre-package
- Master Land Use application consultation
- EAF/MND application consultation (outside of 3rd-party reports) if applicable
- MLU/EAF/MND Exhibits consultation (outside of 3rd-party reports, maps, findings, etc.) if applicable
- Preparation of relevant Findings
- Preparation of relevant Summaries
- Preparation of relevant Codes
- Environmental documentation coordination
- Environmental Impact Report
- Project coordination with relevant vendors
- Conceptual Design: to include initiation of consultants and engineers
- Master Plan Concept Design
- City Agency Liaison, as needed
- Neighborhood Outreach
- Peer Review Coordination (including representation at peer review hearings as needed)
- Urban Planning Design Department Coordination
- CEQA/Traffic integration from 3rd-party input, as needed
- Civil Engineering integration from 3rd-party input, as needed
- Bureau of Engineering integration from 3rd-party input, as needed
- Parks & Recreation Dept. integration from 3rd-party input, as needed
- Public Hearing Coordination & Documentation, as needed
- Pre-Construction Cost Coordination
- Master Plan Community Safety and Finish design Coordination with 3rd party
- Master Plan Community/Other Specification Coordination with 3rd party
- Project coordination with relevant vendors
- Prepare architectural conceptual design set to submit to City of Los Angeles
- Documentation preparation for CPC/City Council/PLUM, as needed
- Documentation preparation for Case Management/Pre-Development Meetings
- Documentation preparation for Land Use Submissions
- Implementing, delegating, and/or coordinating necessary General Plan and Zone Change processing duties (not including 3rd-party duties and deliverables)
- Services related to clearances associated with project
- Design of entrances with access either from North Broadway or Lincoln Avenue, or both
- Design integration either including or not including six existing houses at southern property line

*(Please note that the scope of work and work product are based upon assumptions and investigation into the development, but in no way guarantees the timing and outcome of the development, due to forces outside the scope of the consultants)*

13

076

**2. Additional Compensation:**
- Any unforeseen or extra work not included in above "Scope of Work" will be discussed and mutually agreed upon between Mr. Yang and TL Pacific, Inc.,prior to additional work being performed.

**3. Exclusions:**
- Subsequent variations of items detailed in "Scope of Work."
- Other exclusions shall be addressed in full Development Services Agreement.

**4. Authorization & Retainer:**

Total itemized estimated cost for above Scope of Work: $2,594,500. To signify your authorization to proceed, please sign proposal and remit a retainer in the amount of $673,625.00.

Subsequent Payments as follows:

1) $134,725.00 at Master Plan Concept.
2) $134,725.00 at Kick off meeting with Engineers to integrate Master Plan.
3) $269,450.00 at 50% Architectural Conceptual Plan.
4) $269,450.00 at Case management Submission.
5) $269,450.00 at 100% Master Plan Conceptual Design.
6) $269,450.00 at Peer review Coordination/Land Use Submission.
7) $269,450.00 at 100% Architectural Concept Design.
8) $269,400.00 at Planning Case Public Hearing.
9) $ 34,725.00 at Final Planning Approval of Master Plan.

Respectfully submitted,

Rich Lamphere, TL Pacific Inc.

Acceptance of Proposal by: Jinzheng Group (USA) LLC

Signature: _____    Date: 2016. 9. 3.

TL Pacific Inc.

Signature: _____ Pres TL Pacific Inc.    Date: Sept 3, 2016

## CONSTRUCTION MANAGEMENT AGREEMENT

This Construction Management Agreement ("Agreement") is made effective as of June __22__, 2018, and entered into by and between **JINZHENG GROUP (USA), LLC, a California limited liability company** ("Principal") and **BETULA LENTA, INC., a California Corporation** ("Construction Manager"), with regard to the following:

       **WHEREAS,** Principal and Construction Manager desire to enter into this Agreement for the purpose of Construction Manager providing and performing certain construction management services (the "Construction Management Services") with respect to the construction and development of the infrastructure preparation for 2929 North Amethyst Street, Los Angeles, CA 90032 (the "Project") as more specifically detailed, outlined and provided for below in this Agreement and as set forth in the "GMAX Estimate" (herein attached Exhibit "B") and fully incorporated into this Agreement by this reference as though fully set forth herein; and

       **WHEREAS,** Construction Manager hereby represents and warrants that it possesses the necessary expertise, licenses, and experience required to provide and perform the Construction Management Services with respect to the development of the Property and is fully prepared and able to provide and perform the Construction Management Services in a timely manner; and will pull all applicable permits.

       **WHEREAS,** Principal hereby acknowledges and agrees that it or a legal entity owned and controlled by it or one of its principals owns fee title to the Property and is duly authorized to enter into this Agreement for the performance of the Construction Management Services by Construction Manager,

       **NOW, THEREFORE,** the Principal and Construction Manager (collectively referred to herein as the "Parties") do hereby agree to the following and terms and conditions established herein below in this Agreement.

1. **DESCRIPTION OF CONSTRUCTION MANAGEMENT SERVICES.** Both Parties wish to perform the duties and engage the professionals necessary to cause either one of the following duties to occur:  a). Grading or equivalent permit for Property AND b). Infrastructure Construction Start, OR c). Cut and Fill Earthwork to Start. Once the duties have commenced, the Construction Manager has fulfilled his obligations to the Agreement.

2. **PERFORMANCE OF CONSTRUCTION MANAGEMENT SERVICES.**
The manner in which the Construction Management Services are to be performed and provided shall be determined exclusively by Construction Manager.

3. **COMPENSATION SCHEDULE.** Compensation payable to Construction Manager by Principal for the Construction Management Services shall as set forth in that certain "Compensation Schedule" (Herein attached Exhibit A) and fully incorporated into this Agreement as though fully set forth herein. As provided in the Compensation Schedule, payments shall be made on an installment basis with each installment fully due and payable to Construction Manager within five (5) business days following the delivery of written notice

Page | 1

JY _JY_  DP _(initials)_

078



by Construction Manager to Principal requesting payment. ~~Failure to provide full payment of the requested amount shall be subject to a ten percent (10%) late fee.~~

4. **EXPENSE REIMBURSEMENT. All Permit, Plan Check, and other City Fees.** All other expenses not otherwise provided for in this Agreement shall be the sole responsibility of Construction Manager. Except as otherwise agreed upon by the Parties, the Principal shall not be responsible for the reimbursement of any expenses incurred by Construction Manager.

5. **GUARANTEED MAXIMUM PRICE.** Both Parties agree that Construction Documents may be incomplete and unavailable at the time of the execution of this contract. However, both Parties agree that a Guaranteed Maximum Price (hereinafter "GMAX") amount of $4,517,913 detailed in Exhibit B will be the basis of the GMAX for the services detailed herein, to complete the Construction Management Services described herein under Paragraph 1 a), and b), or c). Further to the aforementioned;

> • The estimated costs detailed in Exhibit B include the estimated expenses for the actual cost of the services, the staffing, overhead, contingency, general conditions, and insurance.

> • Any initial savings from a given line item shall be kept in reserve for any overages in any other line items.

> • At the end of the services detailed herein, there is a savings from the GMAX amount of $4,517,913, then the balance of savings shall be disbursed 75% to Principal and 25% to Construction Manager.

> • An Estimated Timeline (herein attached "Exhibit C"), shall constitute the estimated timeline for the start of Infrastructure Construction, depending on the date of the signing of this Agreement.

> • Last, although the GMAX estimate is $4,517,913, Principal is also required to hold in reserve an additional $2 million in the Principal's bank account, during the entire time the work scope of this Agreement is being done, and the entire $2 million shall be held in reserve until after Construction Funding has occurred AND Lender has approved of release of reserve.

6. **OPEN BOOK POLICY.** Both Parties agree that all data, agreements, and accounting related to the GMAX and all information related to the source of funds for the GMAX shall be viewed openly by Principal and Construction Manager in an effort to ensure costs are minimized where possible.

7. **TERM/TERMINATION.** This Agreement shall terminate automatically upon completion of the Construction Management Services by Construction Manager as required by this Agreement and the Construction Estimate. However, in the event of a default with respect to of any of the obligations set forth in this Agreement by either Principal or Construction Manager, and such default is not cured within thirty (30) days following written notice to

JY JY DP 

cure from the non-defaulting part, the non-defaulting party may terminate this Agreement and pursue any and all legal rights pertinent to such default including, but not limited to, damages or specific performance of the outstanding obligation(s).

8. **RELATIONSHIP OF PARTIES.** It is understood by the Parties that Construction Manager is an independent Construction Manager with respect to providing and performing the Construction Management Services and is not an employee of the Principal, who shall not be required to provide any fringe benefits, including health insurance benefits, paid vacation, or any other employee benefits, for the benefit of Construction Manager.

9. **DISCLOSURE.** Construction Manager is required to disclose to Principal any outside activities or interests, including ownership or participation in any developments that conflict or will conflict with the Construction Manager's providing and performing of the Construction Management Services and the ultimate development of the Project on the Property.

10. **EMPLOYEES.** Construction Manager's Construction Managers, Construction Managers and employees, if any, who perform any aspect of the Construction Management Services for Construction Manager under this Agreement shall also be bound by the provisions of this Agreement. At the written request of the Principal, Construction Manager shall provide adequate evidence that such persons are Construction Manager's agents, Construction Managers, Construction Managers, or employees.

11. **INJURIES AND INSURANCE.** Construction Manager acknowledges that Construction Manager's obligation to obtain appropriate insurance coverage for the benefit of Construction Manager (and Construction Manager's agents, Construction Managers, Construction Managers and employees, if any) to the extent required by applicable California law. Construction Manager waives any and all rights to recovery against Principal for any injuries that Construction Manager (and/or Construction Manager's agents, Construction Managers, Construction Managers and employees, if any) may sustain while providing and/or performing the Construction Management Services under this Agreement, and that are a result of the negligence of Construction Manager or Construction Manager's agents, Construction Managers, Construction Managers, or employees.

12. **INDEMNIFICATION.** Construction Manager agrees to indemnify and hold Principal harmless from all claims, losses, expenses, fees including attorney fees, costs, and judgments that may be asserted against Principal that result from the acts or omissions of Construction Manager, Construction Manager's agents, Construction Managers, Construction Managers, and employees, if any.

Principal agrees to indemnify and hold Construction Manager, Construction Manager's agents, Construction Managers, Construction Managers, and employees, harmless from all claims, losses, expenses, fees including attorney fees, costs, and judgments that may be asserted against Construction Manager for any of the following: (a) any third-party work previously provided and performed on the behalf of Principal with respect to the Project; or (b) any acts or omissions of Principal, Principals agents, Construction Managers, Construction Managers, and/or employees.

Page | 3                                         JY JY    DP ⱽⱽ

080

13. **INTELLECTUAL PROPERTY.** The following provisions shall apply with respect to copyrightable works, ideas, discoveries, inventions, applications for patents, and patents (collectively, "Intellectual Property"):

*Construction Manager's Intellectual Property.* Construction Manager does not presently hold any interest in any Intellectual Property with respect to the development of the Project on the Property.

*Development of Intellectual Property.* To the extent that any Intellectual Property rights are established with respect to providing or performing the Construction Management Services, or development of the Project on the Property, unless otherwise provided, all such Intellectual Property shall be the property of Principal and Construction Manager shall take all such reasonable efforts to cause all such rights to be assigned to Principal.

14. **OWNERSHIP OF SOCIAL MEDIA CONTACTS.** Any social media contacts, including "followers" or "friends," that are acquired through accounts (including, but not limited to email addresses, blogs, Twitter, Facebook, You-tube, or other social media networks) used or created in conjunction with providing and performing the Construction Management Services shall be the property of Construction Manager.

15. **CONFIDENTIALITY.** Principal recognizes that Construction Manager has and will have the following information:

- costs
- discounts
- future plans
- process information
- technical information
- copyrights
- proprietary information

as well as any other proprietary information (collectively, "Information") which are valuable, special and unique assets of Principal that require protection from improper disclosure. In consideration for access and disclosure of the Information to Construction Manager, Construction Manager agrees that it will not at any time or in any manner, either directly or indirectly, use any Information for Construction Manager's own benefit, or divulge, disclose, or communicate in any manner any Information to any third party without the prior written consent of Principal. Construction Manager will protect the Information and treat it as strictly confidential. A violation of this paragraph shall be a material violation of this Agreement.

16. **UNAUTHORIZED DISCLOSURE OF INFORMATION.** If it appears that Construction Manager has disclosed (or has threatened to disclose) Information in violation of this Agreement, Principal shall be entitled to an injunction to restrain Construction Manager from disclosing, in whole or in part, such Information, or from providing any services to any party to whom such Information has been disclosed or may be disclosed. Principal shall not be prohibited by this provision from pursuing any other remedies, including a claim for losses and damages.

Page | 4

JY JY   DP

081

17. **CONFIDENTIALITY AFTER TERMINATION.** The confidentiality provisions of this Agreement shall remain in full force and effect after the termination of this Agreement.

18. **SERVICES TO THIRD PARTIES.** Except as otherwise approved by Principal as set forth hereinabove in this Agreement, Construction Manager shall not provide any consulting services to any third party during the term of this Agreement.

19. **RETURN OF RECORDS.** Upon termination of this Agreement, Construction Manager, at the written request of Principal, shall deliver all records, notes, data, memoranda, models, and equipment of any nature that are in Construction Manager's possession or under Construction Manager's control that are Principal's property or directly relate to Principal's business.

20. **NOTICES.** All notices required or permitted under this Agreement shall be in writing and shall be deemed delivered when delivered in person or deposited in US Mail in the U.S Mail, postage prepaid, addressed as follows:

**If to Principal:**

**JINZHENG GROUP (USA), LLC,**
**a California limited liability company**
100 E. Huntington Drive,
Alhambra, CA 91801
Phone: (626) 703-4116
Attn: Jianging Yang, President

**If to Construction Manager:**

**BETULA LENTA, INC.**
**a California corporation**
1125 West 6th Street.
Suite 205
Los Angeles, CA 90017
Phone: (310) 295-8764
Attn: David Park, CEO

Such address may be changed from time to time by either party by providing written notice to the other in the manner set forth above.

21. **ENTIRE AGREEMENT.** This Agreement along with the two attached exhibits constitutes the entire agreement of the parties and there are no other promises or conditions in any other agreement whether oral or written. This Agreement supersedes any prior written or oral agreements between the parties.

22. **AMENDMENT.** This Agreement may be modified or amended if the amendment is made in writing and is signed by the Parties.

JY JY    DP

23. **SEVERABILITY.** If any provision of this Agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

24. **WAIVER OF CONTRACTUAL RIGHT.** The failure of either party to enforce any provision of this Agreement shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Agreement.

25. **APPLICABLE LAW.** This Agreement shall be governed by the laws of the State of California.

26. **INTERRUPTION OF SERVICE.** Either party shall be excused from any delay or failure in performance required hereunder if caused by reason of any occurrence or contingency beyond its reasonable control, including, but not limited to, acts of God, acts of war, fire, insurrection, laws proclamations, edits, ordinances or regulations, strikes, lock-outs or other serious labor disputes, riots, earthquakes, floods, explosions or other acts of nature. The obligations and rights of the party so excused shall be extended on a day-to-day basis for the time period equal to the period of such excusable interruption. When such events have abated, the parties' respective obligations hereunder shall resume. In the event the interruption of the excused party's obligations continues for a period in excess of thirty (30) days, either party shall have the right to terminate this Agreement upon ten (10) days' prior written notice to the other party.

27. **ASSIGNMENT.** Construction Manager agrees that it will not assign, sell, transfer, delegate or otherwise dispose of any rights or obligations under this Agreement without the prior written consent of Principal. Any purported assignment, transfer, or delegation shall be null and void. Nothing in this Agreement shall prevent the consolidation of Principal with, or its merger into, any other legally recognized entity by the State of California, or the sale by Principal of all or substantially all of its properties or assets, or the assignment by Principal of this Agreement and the performance of its obligations hereunder to any successor in interest or any affiliated company, owned or controlled by Principal. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, legal representatives, successors, and permitted assigns, and shall not benefit any person or entity other than those enumerated above.

28. **SIGNATORIES.** This Agreement shall be signed on behalf of Principal by Jianging Yang, and on behalf of Construction Manager by David Park and effective as of the date first above written.

*(SIGNATURES FOLLOW):*

Page | 6                                                                JY _JY_  DP _Ṽ_

083

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement as of the date first written above.

**PRINCIPAL:**

**JINZHENG GROUP (USA), LLC,**
**a California limited liability company**

By: _____  6-22-18
Its: President


**CONSTRUCTION MANAGER:**

**BETULA LENTA, INC.,**
**a California corporation**

By: _____  6-22-18
Its: President

JY JY   DP JP

084

## COMPENSATION SCHEDULE
## EXHIBIT A

1.  Payment One - Retainer (30% of total contracted amount) - $1,355,373.90

2.  Payment Two – At 30% Completion of Construction Management Services - $1,807,165.20

3.  Payment Three – At 70% Completion of Construction Management Services - $ 908,582.60

4.  Payment Four – At 80% Completion of Construction Management Services - $ 451,791.30

Page | 8

JY JY   DP

**EXHIBIT B**

**2929 Amethyst Estimatd Costs**

| Infrastructure/Property Capacity for Planning Approvals | | | Phase 2 Funding Needed) $ | 4,817,913.00 |
|---|---|---|---|---|
| | | | Payment One $ 1,355,373.90 | Payment Two $ 1,607,165.20 | Payment Three $ 903,584.60 | Payment Four $ 451,791.30 | |
| Task or Professional Engaged (Mar. 2018–Jun. 2019) | Estimated Fee | Description | | |
| Project Manager | $ 450,000 | David Park/Craig Fry - Pre-Construction Management/Developer Fee | | |
| 1 Architect (Schematic Design) | $ 295,000 | Schematic Layout of Homes and Site Plan for 310 Lots | | |
| 2 Architect (Master Planning) | $ 270,000 | Master Community Plan & Infrastructure Design, Schematic through Design Development | | |
| | $ 1,015,000 | | | |
| 3 Civil Engineer | $ 595,000 | Entire Infrastructure from Concept through Construction Plans "CDs"/Plan check | | |
| 4 Geotech/Soils Engineer | $ 42,500 | Geotechnical Approvals & Engineering input through CDs/Plan check | | |
| 5 Hydrologist | $ 35,000 | Water Flow Analysis of entire site, irrigation, storm water flow, etc. to CDs/Plan check | | |
| 6 Structural Engineer | $ 165,452 | Structural Plans of 5 model homes to CDs/plan check | | |
| 7 Site Structural Engineer | $ 395,000 | Structural Plans of 310 lots, roads, infrastructure to CDs/plan check | | |
| 8 Seismic Engineer (Trench Consultant) | $ 85,000 | Seismic Study, Report, Approvals, and Plan submissions, as needed | | |
| 9 Shoring Engineer | $ 225,000 | All Supplemental Shoring (to structure) Plans of 310 lots, roads, infrastructure to CDs/plan check | | |
| 10 Traffic Improvements & Mitigation Consultant | $ 72,500 | After Traffic Approval engineer to work with LADOT on all future mitigation & improvements | | |
| 11 Landscape Architect | $ 125,000 | Master Site Plan - Concept and Schematic through Design Development (landscape only) | | |
| 12 Landscape/Hardscape Engineer | $ 125,000 | Master Site Plan - Concept and Schematic through Design Development (landscape only) | | |
| 13 Fire Access & Hydrants Engineer | $ 75,000 | Engineering, FD mitigation, and City Lobby | | |
| 14 Grading Engineer | $ 225,000 | All Grading Plans of 310 lots, roads, infrastructure to CDs/plan check | | |
| | $ 2,165,452 | | | |
| 15 Pre-Construction Consultant | $ 243,461 | Potential General Contractor to vet, research, bid, RFP all infrastructure Costs | | |
| 16 Sub-contractor bid coordinator | $ 15,000 | CM watching over GC candidate for Item #18 | | |
| | $ 258,461 | | | |
| 17 Storm Water Consultant | $ 25,000 | Engineering and Design of rain water capture to CDs/Plan check | | |
| 18 Water Control Board Consultant | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of Utility Agency | | |
| 19 LADWP (Water and Power) Capacity Consultant | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of LADWP Utility | | |
| 20 Gas Consultant | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of Gas Utility | | |
| 21 Sewer Consultant | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of Sewer | | |
| 22 Street Lighting Consultant | $ 50,000 | Specifications written, Design, and City Approval of all exterior lighting on and off-site | | |
| 23 Earthwork Consultant | $ 50,000 | Potential future Earthwork Subcontractor who will run all cut and fill analysis, scheduling, and costs | | |
| 24 Parks and Recreation Consultant | $ 97,500 | Mitigation, Agreements, Analysis, & City Approval of Quimby, P & R, Tree replacement | | |
| 25 Public Works Consultant | $ 100,000 | Lobby, Mitigation, Agreements, Analysis, & City Approval of Public Works & BOE | | |
| 26 Bureau of Engineering Consultant | $ 100,000 | Lobby, Mitigation, Agreements, Analysis, & City Approval of Dept. of BOE | | |
| 27 Sanitation Consultant | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of Dept. Of Sanitation | | |
| | $ 435,000 | | | |
| 28 LADBS Expeditor | $ 20,000 | Lobby & Plan Check Coordination between architect, engineers, consultants, & City | | |
| 29 LA Fire Life & Safety Consultant and Expeditor | $ 20,000 | Lobby, Mitigation, Agreements, Analysis, & City Approval of LAFD and LAPD | | |
| 30 HVAC & Mechanical Engineer | $ 20,000 | All HVAC & Mech system Site Plans to CDs/plan check | | |
| 31 Plumbing Engineer | $ 20,000 | All HVAC & Mech system Site Plans to CDs/plan check | | |
| 32 Electric Engineer | $ 20,000 | All HVAC & Mech system Site Plans to CDs/plan check | | |
| 33 Cable and So5 Utilities Consultant | $ 2,500 | Agreements, Design, and Engineering for Internet and Cable | | |
| 34 Solar Sub/Consultant | $ 2,500 | Engineering, Analysis, and City Approvals for Solar System | | |
| 35 Filtration and Grey Water Consultant | $ 2,500 | Engineering and Analysis of reusable water system | | |
| 36 LID Consultant | $ 2,500 | Design, CDs/Plan check of "Low Impact Design" Rules | | |
| 37 LEED Consultant | $ 5,000 | Lobby, Mitigation, Design, & City Approval | | |
| | $ 115,000 | | | |
| | $ 3,988,913 | | | |

| | TOTAL: $ | 3,988,913 | |
|---|---|---|---|
| | | Loan Proceeds for start of Infrastructure Construction to fund below and construction | |

| Homes Construction Phase of Contracts | | |
|---|---|---|
| Initial Phase of Homes Permits | Budget | |
| Task or Professional Engaged (March, 2018–Jun. 2019) | Estimated Fee | Description |
| 1 Architect | $ 150,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes |
| 2 Civil Engineer | $ 95,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes |
| 3 Structural Engineer | | Already above for first 5 homes |
| 4 HVAC & Mechanical Engineer | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes |
| 5 Plumbing Engineer | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes |
| 6 Electric Engineer | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes |
| 7 Landscape Architecture | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes |
| 8 Grading Engineer | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes |
| 9 Utilities Consultant | $ 7,500 | Lobby & Plan Check Coordination between architect, engineers, consultants, & Coordination of Infrastructure into individual homes |
| 10 LADBS Expeditor | $ 7,500 | Lobby & Plan Check Coordination between architect, engineers, consultants, & City for homes |
| 11 LA Fire Life & Safety Consultant and Expeditor | $ 12,500 | Lobby, Mitigation, Agreements, Analysis, & City Approval of LAFD and LAPD for homes |
| 12 Alarm, Sprinkler, and Emergency Consultant | $ 2,500 | Integration of systems into individual homes |
| 13 Cable and So5 Utilities Consultant | $ 1,000 | Engineering, Analysis, and City Approvals for Solar System for homes |
| 14 Solar Sub/Consultant | $ 1,000 | Engineering and Analysis of reusable water system for homes |
| 15 LID Consultant | $ 1,000 | Design, CDs/Plan check of "Low Impact Design" Rules for homes |
| 16 LEED Consultant | $ 1,000 | Lobby, Mitigation, Design, & City Approval for homes |
| | TOTAL: $ | 529,000 | |

Amethyst Development Schedule

Jinzheng/Betula Lenta/DPark

| ID | Task Name | Duration | Start | Finish | Predec | Resource Names |
|----|-----------|----------|-------|--------|--------|----------------|
| 39 | Begin Construction Plans | 100 days | Mon 12/3/18 | Fri 4/19/19 | 38 | TCS |
| 40 | Submit All Construction Plans for Plan Check (for Homes Building Permit) | 120 days | Mon 4/22/19 | Fri 10/4/19 | 39 | TCS |
| 41 | Submit All Construction Plans for Plan Check (if DELAY) | 120 days | Mon 11/11/19 | Fri 4/24/20 | 32 | TCS |
| 42 | Ready Team for Grading Permit | 30 days | Mon 4/23/18 | Fri 6/1/18 | 20 | Park |
| 43 | Soils Report Approval | 60 days | Mon 6/4/18 | Fri 8/24/18 | 22 | PGI/TCS |
| 44 | Finish All Earthwork Calculations | 25 days | Mon 4/23/18 | Fri 5/25/18 | 7 | LDC/Build |
| 45 | Finish all Storm Calculations | 20 days | Mon 5/21/18 | Fri 6/15/18 | 13 | LDC/Build |
| 46 | Finish all Sewer Calculations | 20 days | Mon 5/21/18 | Fri 6/15/18 | 13 | LDC/Build |
| 47 | Initial Earthwork RFPs | 60 days | Mon 4/23/18 | Fri 7/13/18 | 20 | Build GC |
| 48 | Complete all Cut and Fill Calculations | 30 days | Mon 5/21/18 | Fri 6/29/18 | 5 | LDC |
| 49 | Complete all Infrastructure Calculations | 30 days | Mon 5/21/18 | Fri 6/29/18 | 5 | LDC/Build |
| 50 | Shoring Engineering Plans | 90 days | Mon 4/23/18 | Fri 8/24/18 | 20 | TBD |
| 51 | Grading Engineer Plans | 90 days | Mon 4/23/18 | Fri 8/24/18 | 20 | TBD |
| 52 | Complete All Pre-Construction Bids for Infrastructure Construction Loan | 120 days | Mon 7/16/18 | Fri 12/28/18 | 24 | Park/Build |
| 53 | Coordination between Model Homes and Infrastructure Build | 45 days | Mon 9/10/18 | Fri 11/9/18 | 47,33 | Park/TCS/Build |
| 54 | Final Grading Submission preparation | 30 days | Mon 7/16/18 | Fri 8/24/18 | 47 | Park/TCS/Build |
| 55 | Final Grading Permit Submission | 60 days | Mon 8/27/18 | Fri 11/16/18 | 54 | Park/TCS/Build |
| 56 | Construction Loan Due Diligence and Underwriting | 90 days | Mon 9/10/18 | Fri 1/11/19 | 33,48 | Park |
| 57 | Construction Loan for Infrastructure | 30 days | Mon 12/31/18 | Fri 2/8/19 | 47,52 | Park |
| 58 | Begin Grading/Infrastructure Construction | 300 days | Mon 2/11/19 | Fri 4/3/20 | 57,52 | GC/TCS/Park |
| 59 | Begin Construction of Model Homes | 240 days | Mon 4/6/20 | Fri 3/5/21 | 58 | Park/TCS/Build |
| 60 | Begin Construction of Homes (Phase 1) | 300 days | Mon 10/7/19 | Fri 11/27/20 | 40 | Park/TCS/Build |
| 61 | Begin Construction of Homes (Phase 1) (ONLY if DELAY) | 300 days | Mon 4/27/20 | Fri 6/18/21 | 41 | Park/TCS/Build |
| 62 | Complete all Infrastructure | 180 days | Mon 11/30/20 | Fri 8/6/21 | 60 | Park/TCS/Build |
| 63 |  | 30 days | Mon 8/9/21 | Fri 9/17/21 | 62 | Park/TCS/Build |
| 64 |  | 30 days | Mon 9/20/21 | Fri 10/29/21 | 63 | Park/TCS/Build |
| 65 |  | 30 days | Mon 11/1/21 | Fri 12/10/21 | 64 | Park/TCS/Build |
| 66 |  | 30 days | Mon 12/13/21 | Fri 1/21/22 | 65 | Park/TCS/Build |
| 67 |  | 30 days | Mon 1/24/22 | Fri 3/4/22 | 66 | Park/TCS/Build |
| 68 |  | 30 days | Mon 3/7/22 | Fri 4/15/22 | 67 | Park/TCS/Build |
| 69 |  | 30 days | Mon 4/18/22 | Fri 5/27/22 | 68 | Park/TCS/Build |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2929 North Amethyst ST. Los ANgeles, CA  90032 | Phase One Task | | Summary | | Split | | Inactive Task | | Duration-only | | Progress |
| | Phase Two task | | Rolled Up Milestone ◇ | | Project Summary | | Inactive Milestone ◇ | | Start-only | | Deadline ⇩ |
| | Milestone ◆ | | Rolled Up Progress | | Group By Summary | | Inactive Summary | | Finish-only | | |

Page 2

087

JY   VP



**EXHIBIT B**

## 2929 Amethyst Estimatd Costs

| | | | | | Phase 2 Funding Needed: $ | 4,817,913.00 |
|---|---|---|---|---|---|---|
| Infrastructure/Property Capacity for Planning Approvals | | | Payment One | Payment Two | Payment Three | Payment Four |
| | | | $ 1,355,373.30 | $ 1,607,165.20 | $ 903,584.60 | $ 451,791.30 |
| | Task or Professional Engaged (May, 2018-Jan, 2019) | Estimated Fee | Description | | | |
| | Project Manager | $ 450,000 | David Park/Craig Fry - Pre-Construction Management/Developer Fee | | | |
| 1 | Architect (Schematic Design) | $ 295,000 | Schematic Layout of Homes and Site Plan for 310 Lots | | | |
| 2 | Architect (Master Planning) | $ 270,000 | Master Community Plan & Infrastructure Design, Schematic through Design Development | | | |
| | | $ 1,015,000 | | | | |
| 3 | Civil Engineer | $ 595,000 | Entire infrastructure from Concept through Construction Plans "CDs")/Plan check | | | |
| 4 | Geotech/Soils Engineer | $ 42,500 | Geotechnical Approvals & Engineering Input through CDs/Plan check | | | |
| 5 | Hydrologist | $ 35,000 | Water Flow Analysis of entire site, irrigation, storm water flow, etc. to CDs/Plan check | | | |
| 6 | Structural Engineer | $ 165,452 | Structural Plans of 5 model homes to CDs/plan check | | | |
| 7 | Site Structural Engineer | $ 395,000 | Structural Plans of 310 lots, roads, infrastructure to CDs/plan check | | | |
| 8 | Seismic Engineer (Trench Consultant) | $ 85,000 | Seismic Study, Report, Approvals, and Plan submissions, as needed | | | |
| 9 | Shoring Engineer | $ 225,000 | All Supplemental Shoring (to structure) Plans of 310 lots, roads, infrastructure to CDs/plan check | | | |
| 10 | Traffic Improvements & Mitigation Consultant | $ 72,500 | After Traffic Approval engineer to work with LADOT on all future mitigation & improvements | | | |
| 11 | Landscape Architect | $ 125,000 | Master Site Plan - Consept and Schematic through Design Development (landscape only) | | | |
| 12 | Landscape/Hardscape Engineer | $ 125,000 | Master Site Plan - Consept and Schematic through Design Development (hardscape only) | | | |
| 13 | Fire Access & Hydrants Engineer | $ 75,000 | Engineering, FD mitigation, and City Lobby | | | |
| 14 | Grading Engineer | $ 225,000 | All Grading Plans of 310 lots, roads, infrastructure to CDs/plan check | | | |
| | | $ 2,165,452 | | | | |
| 15 | Pre-Construction Consultant | $ 243,461 | Potential General Contractor to vet, research, bid, RFP all Infrastructure Costs | | | |
| 16 | Sub-contractor bid coordinator | $ 15,000 | CM watching over GC candidate for item #16 | | | |
| | | $ 258,461 | | | | |
| 17 | Storm Water Consultant | $ 25,000 | Engineering and Design of rain water capture to CDs/Plan check | | | |
| 18 | Water Control Board Consultant | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of Utility Agency | | | |
| 19 | LADWP (Water and Power) Capacity Consultant | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of LADWP Utility | | | |
| 20 | Gas Consultant | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of Gas Utility | | | |
| 21 | Sewer Consultant | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of Sewer | | | |
| 22 | Street Lighting Consultant | $ 50,000 | Specifications written, Design, and City Approval of all exterior lighting on and off-site | | | |
| 23 | Earthwork Consultant | $ 50,000 | Potential future Earthwork Subcontractor who will run all cut and fill analysis, scheduling, and costs | | | |
| 24 | Parks and Recreation Consultant | $ 97,500 | Lobby, Mitigation, Agreements, Analysis, & City Approval of Quimby, P & R, Tree replacement | | | |
| 25 | Public Works Consultant | $ 100,000 | Lobby, Mitigation, Agreements, Analysis, & City Approval of Dept. of Public Works & BOE | | | |
| 26 | Bureau of Engineering Consultant | $ 100,000 | Lobby, Mitigation, Agreements, Analysis, & City Approval of Dept. of BOE | | | |
| 27 | Sanitation Consultant | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of Dept. Of Sanitation | | | |
| | | $ 435,000 | | | | |
| 28 | LADBS Consultant | $ 20,000 | Lobby & Plan Check Coordination between architect, engineers, consultants, & City | | | |
| 29 | LA Fire Life & Safety Consultant and Expeditor | $ 20,000 | Lobby, Mitigation, Agreements, Analysis, & City Approval of LAFD and LAPD | | | |
| 30 | HVAC & Mechanical Engineer | $ 20,000 | All HVAC & Mech system Site Plans to CDs/plan check | | | |
| 31 | Plumbing Engineer | $ 20,000 | All HVAC & Mech system Site Plans to CDs/plan check | | | |
| 32 | Electric Engineer | $ 20,000 | All HVAC & Mech system Site Plans to CDs/plan check | | | |
| 33 | Cable and Soft Utilities Consultant | $ 2,500 | Agreements, Design, and Engineering for Internet and Cable | | | |
| 34 | Solar Sub/Consultant | $ 2,500 | Engineering, Analysis, and City Approvals for Solar System | | | |
| 35 | Filtration and Grey Water Consultant | $ 2,500 | Engineering and Analysis of reusable water system | | | |
| 36 | LID Consultant | $ 2,500 | Design, CDs/Plan check of "Low Impact Design" Rules | | | |
| 37 | LEED Consultant | $ 5,000 | Lobby, Mitigation, Design, & City Approval | | | |
| | | $ 115,000 | | | | |
| | | $ 3,988,913 | | | | |
| | TOTAL: | $ 3,988,913 | | | | |
| | | | Loan Proceeds for start of infrastructure Construction to fund below and construction | | | |
| **Homes Construction Phase of Contracts** | | | | | | |
| Initial Phase of Homes Permits | | Budget | | | | |
| | Task or Professional Engaged (March, 2018-Jan, 2019) | Estimated Fee | Description | | | |
| 1 | Architect | $ 150,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes | | | |
| 2 | Civil Engineer | $ 95,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes | | | |
| 3 | Structural Engineer | | Already above for first 5 homes | | | |
| 4 | HVAC & Mechanical Engineer | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes | | | |
| 5 | Plumbing Engineer | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes | | | |
| 6 | Electric Engineer | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes | | | |
| 7 | Landscape Architecture | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes | | | |
| 8 | Grading Engineer | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes | | | |
| 9 | Utilities Consultant | $ 7,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & Coordination of Infrastructure into individual home | | | |
| 10 | LADBS Expeditor | $ 7,500 | Lobby & Plan Check Coordination between architect, engineers, consultants, & City for homes | | | |
| 11 | LA Fire Life & Safety Consultant and Expeditor | $ 12,500 | Lobby, Mitigation, Agreements, Analysis, & City Approval of LAFD and LAPD for homes | | | |
| 12 | Alarm, Sprinkler, and Emergency Consultant | $ 2,500 | Integration of systems into individual homes | | | |
| 13 | Cable and Soft Utilities Consultant | $ 1,000 | Engineering, Analysis, and City Approvals for Solar System for homes | | | |
| 14 | Solar Sub/Consultant | $ 1,000 | Engineering and Analysis of reusable water system for homes | | | |
| 15 | LID Consultant | $ 1,000 | Design, CDs/Plan check of "Low Impact Design" Rules for homes | | | |
| 16 | LEED Consultant | $ 1,000 | Lobby, Mitigation, Design, & City Approval for homes | | | |
| | TOTAL: | $ 529,000 | | | | |

JY

## CFD BONDS PROCUREMENT - CM - DEVELOPMENT AGREEMENT

This CFD Bonds Procurement - CM - Development Agreement ("Agreement") is made effective as of March ___13___, 2019, and entered into by and between **JINZHENG GROUP (USA), LLC, a California limited liability company ("Principal")** and **BETULA LENTA, INC., a California Corporation ("Developer/Underwriter")**, with regard to the following:

**WHEREAS,** Principal and Developer/Underwriter desire to enter into this Agreement for the purpose of Developer/Underwriter providing and performing certain CFD Bonds Procurement - CM - Development services (the "CFD Bonds Procurement - CM - Development Services") with respect to the construction and development of the infrastructure preparation for 2929 North Amethyst Street, Los Angeles, CA 90032 (the "Project") as more specifically detailed, outlined and provided for below in this Agreement and as set forth in the "GMAX Estimate" herein and fully incorporated into this Agreement by this reference as though fully set forth herein; and

**WHEREAS,** Developer/Underwriter hereby represents and warrants that it possesses the necessary expertise, licenses, and experience required to provide and perform the CFD Bonds Procurement - CM - Development Services with respect to the development of the Property and is fully prepared and able to provide and perform the CFD Bonds Procurement - CM - Development Services in a timely manner; and will pull all applicable permits.

**WHEREAS,** Principal hereby acknowledges and agrees that it or a legal entity owned and controlled by it or one of its principals owns fee title to the Property and is duly authorized to enter into this Agreement for the performance of the CFD Bonds Procurement - CM - Development Services by Developer/Underwriter,

**NOW, THEREFORE,** the Principal and Developer/Underwriter (collectively referred to herein as the "Parties") do hereby agree to the following and terms and conditions established herein below in this Agreement.

1. **DESCRIPTION OF CFD BONDS PROCUREMENT - CM - DEVELOPMENT SERVICES.** Both Parties wish to perform the duties and engage the professionals necessary to cause either one of the following duties to occur: CFD Bond Procurement or any like Financing Vehicle. Once the Financing has commenced, the Developer/Underwriter has fulfilled his obligations to the Agreement.

2. **PERFORMANCE OF CFD BONDS PROCUREMENT - CM - DEVELOPMENT SERVICES.**
   The manner in which the CFD Bonds Procurement - CM - Development Services are to be performed and provided shall be determined exclusively by Developer/Underwriter.

3. **COMPENSATION SCHEDULE.** Compensation payable to Developer/Underwriter by Principal for the CFD Bonds Procurement - CM - Development Services shall be requisitioned on a monthly basis as deemed necessary for the Project by the Developer/Underwriter and shall be paid by Principal or directly by the funding sources secured by the Project within 5 days of the requisition of funds requested.



090

4. **EXPENSE REIMBURSEMENT. All Permit, Plan Check, and other City Fees.** All other expenses not otherwise provided for in this Agreement shall be the sole responsibility of Developer/Underwriter. Except as otherwise agreed upon by the Parties, the Principal shall not be responsible for the reimbursement of any expenses incurred by Developer/Underwriter.

5. **GUARANTEED MAXIMUM PRICE.** Both Parties agree that Construction Documents may be incomplete and unavailable at the time of the execution of this contract. However, both Parties agree that a Guaranteed Maximum Price (hereinafter "GMAX") amount of $6,224,490 detailed (herein attached "Exhibit A") will be the basis of the GMAX for the services detailed herein, to complete the CFD Bonds Procurement - CM - Development Services described herein as follows;

- The estimated costs detailed in Exhibit A include the estimated expenses for the actual cost of the services, the staffing, overhead, 3rd-party fees, expenses, and insurance.

- Any initial savings from a given line item shall be kept in reserve for any overages in any other line items.

- If at the end of the services detailed herein for Phase I, there is a savings from the GMAX amount of $6,224,490, then the balance of savings shall be disbursed 75% to Principal and 25% to Developer/Underwriter.

- Although the GMAX amount of $6,224,490 shall be deemed as the estimated expenses for Phase I & 2 of the services detailed herein, Developer/Underwriter shall earn such fees as detailed in the Total Budget (herein attached "Exhibit B"),

- Last, although the GMAX estimate is $6,224,490, Principal is also required to hold in reserve an additional $10 million in the Principal's bank account which was set up directly for the Project, and shall be held in reserve until after Construction Funding has occurred AND Lender has approved of release of reserve.

6. **OPEN BOOK POLICY.** Both Parties agree that all data, agreements, and accounting related to the GMAX and all information related to the source of funds for the GMAX shall be viewed openly by Principal and Developer/Underwriter in an effort to ensure costs are minimized where possible.

7. **TERM/TERMINATION.** This Agreement shall terminate automatically upon completion of the CFD Bonds Procurement - CM - Development Services by Developer/Underwriter as required by this Agreement and the Construction Estimate. However, in the event of a default with respect to of any of the obligations set forth in this Agreement by either Principal or Developer/Underwriter, and such default is not cured within thirty (30) days following written notice to cure from the non-defaulting part, the non-defaulting party may terminate this Agreement and pursue any and all legal rights pertinent to such default including, but not limited to, damages or specific performance of the outstanding obligation(s).

8. **RELATIONSHIP OF PARTIES.** It is understood by the Parties that Developer/Underwriter is an independent Developer/Underwriter with respect to providing



091

and performing the CFD Bonds Procurement - CM - Development Services and is not an employee of the Principal, who shall not be required to provide any fringe benefits, including health insurance benefits, paid vacation, or any other employee benefits, for the benefit of Developer/Underwriter.

9. **DISCLOSURE.** Developer/Underwriter is required to disclose to Principal any outside activities or interests, including ownership or participation in any developments that conflict or will conflict with the Developer/Underwriter's providing and performing of the CFD Bonds Procurement - CM - Development Services and the ultimate development of the Project on the Property.

10. **EMPLOYEES.** Developer/Underwriter's Developer/Underwriters, Developer/Underwriters and employees, if any, who perform any aspect of the CFD Bonds Procurement - CM - Development Services for Developer/Underwriter under this Agreement shall also be bound by the provisions of this Agreement. At the written request of the Principal, Developer/Underwriter shall provide adequate evidence that such persons are Developer/Underwriter's agents, Developer/Underwriters, Developer/Underwriters, or employees.

11. **INJURIES AND INSURANCE.** Developer/Underwriter acknowledges that Developer/Underwriter's obligation to obtain appropriate insurance coverage for the benefit of Developer/Underwriter (and Developer/Underwriter's agents, Developer/Underwriters, Developer/Underwriters and employees, if any) to the extent required by applicable California law. Developer/Underwriter waives any and all rights to recovery against Principal for any injuries that Developer/Underwriter (and/or Developer/Underwriter's agents, Developer/Underwriters, Developer/Underwriters and employees, if any) may sustain while providing and/or performing the CFD Bonds Procurement - CM - Development Services under this Agreement, and that are a result of the negligence of Developer/Underwriter or Developer/Underwriter's agents, Developer/Underwriters, Developer/Underwriters, or employees.

12. **INDEMNIFICATION.** Developer/Underwriter agrees to indemnify and hold Principal harmless from all claims, losses, expenses, fees including attorney fees, costs, and judgments that may be asserted against Principal that result from the acts or omissions of Developer/Underwriter, Developer/Underwriter's agents, Developer/Underwriters, Developer/Underwriters, and employees, if any.

Principal agrees to indemnify and hold Developer/Underwriter, Developer/Underwriter's agents, Developer/Underwriters, Developer/Underwriters, and employees, harmless from all claims, losses, expenses, fees including attorney fees, costs, and judgments that may be asserted against Developer/Underwriter for any of the following: (a) any third-party work previously provided and performed on the behalf of Principal with respect to the Project; or (b) any acts or omissions of Principal, Principals agents, Developer/Underwriters, Developer/Underwriters, and/or employees.

13. **INTELLECTUAL PROPERTY.** The following provisions shall apply with respect to copyrightable works, ideas, discoveries, inventions, applications for patents, and patents

092

(collectively, "Intellectual Property"):

*Developer/Underwriter's Intellectual Property.* Developer/Underwriter does not presently hold any interest in any Intellectual Property with respect to the development of the Project on the Property.

*Development of Intellectual Property.* To the extent that any Intellectual Property rights are established with respect to providing or performing the CFD Bonds Procurement - CM - Development Services, or development of the Project on the Property, unless otherwise provided, all such Intellectual Property shall be the property of Principal and Developer/Underwriter shall take all such reasonable efforts to cause all such rights to be assigned to Principal.

14. **CONFIDENTIALITY.** Principal recognizes that Developer/Underwriter has and will have the following information:

- costs
- discounts
- future plans
- process information
- technical information
- copyrights
- proprietary information

as well as any other proprietary information (collectively, "Information") which are valuable, special and unique assets of Principal that require protection from improper disclosure. In consideration for access and disclosure of the Information to Developer/Underwriter, Developer/Underwriter agrees that it will not at any time or in any manner, either directly or indirectly, use any Information for Developer/Underwriter's own benefit, or divulge, disclose, or communicate in any manner any Information to any third party without the prior written consent of Principal. Developer/Underwriter will protect the Information and treat it as strictly confidential. A violation of this paragraph shall be a material violation of this Agreement.

15. **UNAUTHORIZED DISCLOSURE OF INFORMATION.** If it appears that Developer/Underwriter has disclosed (or has threatened to disclose) Information in violation of this Agreement, Principal shall be entitled to an injunction to restrain Developer/Underwriter from disclosing, in whole or in part, such Information, or from providing any services to any party to whom such Information has been disclosed or may be disclosed. Principal shall not be prohibited
by this provision from pursuing any other remedies, including a claim for losses and damages.

16. **CONFIDENTIALITY AFTER TERMINATION.** The confidentiality provisions of this Agreement shall remain in full force and effect after the termination of this Agreement.

17. **SERVICES TO THIRD PARTIES.** Except as otherwise approved by Principal as set forth hereinabove in this Agreement, Developer/Underwriter shall not provide any consulting services to any third party during the term of this Agreement.



093

18. **RETURN OF RECORDS.** Upon termination of this Agreement, Developer/Underwriter, at the written request of Principal, shall deliver all records, notes, data, memoranda, models, and equipment of any nature that are in Developer/Underwriter's possession or under Developer/Underwriter's control that are Principal's property or directly relate to Principal's business.

19. **NOTICES.** All notices required or permitted under this Agreement shall be in writing and shall be deemed delivered when delivered in person or deposited in US Mail in the U.S Mail, postage prepaid, addressed as follows:

**If to Principal:**

**JINZHENG GROUP (USA), LLC,**
**a California limited liability company**
100 E. Huntington Drive,
Alhambra, CA 91801
Phone: (626) 703-4116
Attn: Jianping Yang, President

**If to Developer/Underwriter:**

**BETULA LENTA, INC.**
**a California corporation**
800 West 6th Street.
Suite 1250
Los Angeles, CA 90017
Phone: (310) 295-8764
Attn: David Park, President

Such address may be changed from time to time by either party by providing written notice to the other in the manner set forth above.

20. **ENTIRE AGREEMENT.** This Agreement along with the two attached exhibits constitutes the entire agreement of the parties and there are no other promises or conditions in any other agreement whether oral or written. This Agreement supersedes any prior written or oral agreements between the parties.

21. **AMENDMENT.** This Agreement may be modified or amended if the amendment is made in writing and is signed by the Parties.

22. **SEVERABILITY.** If any provision of this Agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.



094

23. **WAIVER OF CONTRACTUAL RIGHT.** The failure of either party to enforce any provision of this Agreement shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Agreement.

24. **APPLICABLE LAW.** This Agreement shall be governed by the laws of the State of California.

25. **INTERRUPTION OF SERVICE.** Either party shall be excused from any delay or failure in performance required hereunder if caused by reason of any occurrence or contingency beyond its reasonable control, including, but not limited to, acts of God, acts of war, fire, insurrection, laws proclamations, edits, ordinances or regulations, strikes, lock-outs or other serious labor disputes, riots, earthquakes, floods, explosions or other acts of nature. The obligations and rights of the party so excused shall be extended on a day-to-day basis for the time period equal to the period of such excusable interruption. When such events have abated, the parties' respective obligations hereunder shall resume. In the event the interruption of the excused party's obligations continues for a period in excess of thirty (30) days, either party shall have the right to terminate this Agreement upon ten (10) days' prior written notice to the other party.

26. **ASSIGNMENT.** Developer/Underwriter agrees that it will not assign, sell, transfer, delegate or otherwise dispose of any rights or obligations under this Agreement without the prior written consent of Principal. Any purported assignment, transfer, or delegation shall be null and void. Nothing in this Agreement shall prevent the consolidation of Principal with, or its merger into, any other legally recognized entity by the State of California, or the sale by Principal of all or substantially all of its properties or assets, or the assignment by Principal of this Agreement and the performance of its obligations hereunder to any successor in interest or any affiliated company, owned or controlled by Principal. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, legal representatives, successors, and permitted assigns, and shall not benefit any person or entity other than those enumerated above.

27. **SIGNATORIES.** This Agreement shall be signed on behalf of Principal by Jianging Yang, and on behalf of Developer/Underwriter by David Park and effective as of the date first above written.

*(SIGNATURES FOLLOW):*

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement as of the date first written above.

**PRINCIPAL:**

**JINZHENG GROUP (USA), LLC,**
a California limited liability company

By: _____

Its: President

**DEVELOPER/UNDERWRITER:**

**BETULA LENTA, INC.,**
a California corporation

By: _____

Its: President

096

## EXHIBIT A

### 2929 Amethyst Estimated Costs

**Phase 3 Funding Needed (for CFD Bonds):**

| Consultants and Engaged Contracts | Estimated Total Fees (Through Construction) | CFD Bond Expenses (Phase I) | CFD Bond Expenses (Phase 2) | Balance to be paid by CFD Bonds |
|---|---|---|---|---|
| 1 Developer Fee (ALL City Fees & Below) | $ 3,500,000 | $ 225,000 | $ 225,000 | $ 3,050,000 |
| 2 Brokerage - (Included in Development Fee) | | | | $ - |
| 3 Architect (All Homes) - TCS | $ 4,310,389 | $ 432,000 | $ 432,000 | $ 3,446,389 |
| 4 Architect (Master Planning & Landscape Architecture) - TCS | $ 2,600,000 | $ 216,000 | $ 216,000 | $ 2,168,000 |
| 5 Conceptual Design - Nvision | PAID IN FULL | | | |
| 6 Civil Engineer - Land Design Consultants/Other | $ 3,455,194 | $ 266,245 | $ 266,245 | $ 2,922,704 |
| 7 Geotech/Soils Engineer - Pacific Geotech (Included in Civil) | | | | |
| 8 Entitlements & Code Compliance - Craig Fry/Other | $ 2,344,525 | $ 273,500 | $ 273,500 | $ 1,797,525 |
| 9 Structural Engineer - TBD | $ 4,146,233 | $ 184,000 | $ 184,000 | $ 3,778,233 |
| 10 Site Structural Engineer (Included in Strutural) | | | | $ - |
| 11 Seismic Engineer (Trench Consultant) (Included in Strutural) | | | | $ - |
| 12 Shoring Engineer (Included in Strutural) | | | | $ - |
| 13 Traffic Improvements & Mitigation Consultant - Overland Traffic | $ 250,000 | $ 17,500 | $ 17,500 | $ 215,000 |
| 14 Landscape Architect - Harmony Gardens/Bardez/Other | $ 1,382,078 | $ 97,500 | $ 97,500 | $ 1,187,078 |
| 15 Landscape/Hardscape Engineer (Included in Landscape) | | | | $ - |
| 16 Grading Engineer (Included in Strutural) | | | | $ - |
| 17 Project Management | $ 3,000,000 | $ 180,000 | $ 180,000 | $ 2,640,000 |
| 18 CEQA Reports (Included in Entitlements) | | | | $ - |
| 19 Pre-Construction Consultant | $ 2,923,190 | $ 149,000 | $ 149,000 | $ 2,625,190 |
| 20 Sub-contractor bid coordinator (Included in Construction Management) | | | | $ - |
| 21 MEP Engineers | $ 2,764,156 | $ 97,500 | $ 97,500 | $ 2,569,156 |
| 22 Construction Management/GC Fees | $ 5,169,235 | $ 231,500 | $ 231,500 | $ 4,706,235 |
| 23 Bond Counsel | $ 2,700,000 | $ 450,000 | $ 450,000 | $ 1,800,000 |
| 24 Bonds Reservation/State Sponsor/App Fees | $ 900,000 | $ 97,500 | $ 97,500 | $ 705,000 |
| 25 Bonds Consultant/Commission | $ 1,800,000 | $ 97,500 | $ 97,500 | $ 1,605,000 |
| 26 Bonds Placement Investment Banker | $ 1,800,000 | $ 97,500 | $ 97,500 | $ 1,605,000 |
| **Proceeds Needed:** | $ 43,045,000 | $ 3,112,245 | $ 3,112,245 | $ 36,820,510 |

**Included in Developer Fee:**

| | | |
|---|---|---|
| 1 Developer Overhead and Expenses | $ | 500,000 |
| 2 Staff | $ | 318,090 |
| 3 Liability Insurance | $ | 165,000 |
| 4 Construction Bond Fees | $ | 325,000 |
| 5 City Fees - LADCP/LADBS | $ | 765,325 |
| 6 City Fees - LADOT & Other Agencies | $ | 226,585 |
| 7 Community Outreach | $ | 350,000 |
| 8 Inspection Fees | $ | 250,000 |
| 9 Non-Profit Donations | $ | 150,000 |
| 10 Legal | $ | 450,000 |
| | $ | 3,500,000 |




097

## EXHIBIT B

|  |  | 24 (months) |  | Per SF/Yd. |  | Total |
|---|---|---|---|---|---|---|
| Cut & Fill Site: |  | 1,532,930 | General Conditions: | $ 164,130.00 | $ | 3,939,120.00 |
|  |  |  | Site Work: | $ 28.99 | $ | 44,439,841 |
|  |  |  | Concrete: | $ 0.23 | $ | 352,574 |
|  |  |  | Masonry: | $ 0.20 | $ | 306,586 |
|  |  |  | Metals: | $ 0.06 | $ | 91,976 |
|  |  |  | Wood Structures: | $ 0.41 | $ | 628,501 |
|  |  |  | Water Proofing: | $ 0.38 | $ | 582,513 |
|  |  |  | Specialties: | $ 0.05 | $ | 76,647 |
|  |  |  | Special Construction: | $ 0.23 | $ | 352,574 |
|  |  |  | Electrical: | $ 1.02 | $ | 1,563,589 |
|  |  |  | Misc. Expenses: | $ 0.67 | $ | 1,027,063 |
|  |  |  | Job equipment: | $ 0.42 | $ | 643,831 |
|  |  | Design and Construction Contingency: |  | 10.000% | $ | 5,400,461 |
|  |  |  | Off-Site GL & SDI: | 2.722% | $ | 1,617,006 |
|  |  |  | Fee: | 4.500% | $ | 2,745,994 |
| Streets: | 372,714 |  |  |  |  |  |
| Lots & Streets: | 372,714 |  | Infrastructure SUB Total: |  | $ | 63,768,075 |
| 1 Acre: | 43,560 | sf |  | CFD Bond Fees: | $ | 6,421,445 |

| Homes: |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
| Model | SF (incl. garage) |  |  |  |  |  |  |
| Yellow | 1,604.1 | 24 | 38,498 | $ 200.00 | $ | 7,699,680 |
| Magenta | 2,111.4 | 50 | 105,570 | $ 225.00 | $ | 23,753,250 |
| Red | 1,905.5 | 36 | 68,598 | $ 250.00 | $ | 17,149,500 |
| Beige | 2,572.3 | 38 | 97,747 | $ 265.00 | $ | 25,903,061 |
| Orange | 3,885.6 | 23 | 89,369 | $ 265.00 | $ | 23,682,732 |
| Green (Canteliver) | 2,785.4 | 106 | 295,252 | $ 295.00 | $ | 87,099,458 |
| Custom (Purple) | 4,960.0 | 7 | 34,720 | $ 350.00 | $ | 12,152,000 |
|  |  | 284 | 729,755 | Subtotal Homes: | $ | 197,439,681 |

| Slope Analysis: | R1 |  |  |  |  |  |
|---|---|---|---|---|---|---|
| 3.84 | 167,270.40 | 83,635.20 | Architecture: | 24,332 | $ | 6,910,389 |
| 8.08 | 351,964.80 | 158,384.16 | Landscape Architecture: | 4,866.47 | $ | 1,382,078 |
| 6.21 | 270,507.60 | 108,203.04 | MEP Engineering: | 9,733 | $ | 2,764,156 |
| 7.21 | 314,067.60 | 109,923.66 | Structural Engineering: | 14,599 | $ | 4,146,233 |
| 5.58 | 243,064.80 | 72,919.44 | Civil Engineering: | 12,166 | $ | 3,455,194 |
|  | 1,346,875.20 | 533,065.50 | Entitlements: |  | $ | 2,594,525 |
|  |  |  | City Fees (During Entitlements): |  | $ | 350,000 |
|  |  |  | Permits: |  | $ | 5,923,190 |
|  |  |  | City Fees (Construction): |  | $ | 7,403,988 |
|  |  | Project Management (Phase II & III) & 3rd-party Construction Services: |  |  | $ | 5,923,190 |
|  |  |  | Developer Fee: |  | $ | 5,000,000 |
|  |  |  | Construction Management: |  | $ | 5,169,235 |

|  |  |  |
|---|---|---|
| Total (including CFD Bonds): | $ | 318,651,380 |
| Mello Roos (CFD Bond Portion): | $ | 90,104,281 |
| NET Total: | $ | 228,547,099 |

098

# EXHIBIT B

| From: | David Park |
| To: | Peter A. Kim |
| Cc: | Jonathan Pae; Jamie Cho |
| Subject: | Fwd: 2929 Amethyst Total Accounting |
| Date: | Thursday, February 3, 2022 6:40:25 PM |

HI Peter,

Here is the basic accounting breakdown.

Best,
David

## David Park | Partner

800 W. 6th Street, Suite 1250, Los Angeles, CA 90017
Phone:  213-537-0158, extension 103
www.thecodesolution.com
E-Mail: david@thecodesolution.com

## Check out our new real estate platform: Introducing Terrakan

---------- Forwarded message ---------
From: **Jamie Cho** <jamie@thecodesolution.com>
Date: Thu, Feb 3, 2022 at 4:37 PM
Subject: Re: 2929 Amethyst Total Accounting
To: David Park <david@thecodesolution.com>
Cc: Jonathan Pae <jonathan@thecodesolution.com>

### 2929 Amethyst

| | |
|---|---:|
| Original Contract Amount | 11,754,928 |
| Change Order Amount | 1,500,000 |
| Total Amount | 13,254,928 |
| | |
| Amount Received from Jinzheng group (As of 2/3/2022) | 6,971,726 |
| % work done | 65% |
| The Calculated amount by work done | 8,615,703.20 |
| Outstanding amount | 1,643,977 |

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: **4158 14th Street, Riverside, CA 92501**

A true and correct copy of the foregoing document entitled (*specify*): **OBJECTION TO PROOFS OF CLAIM NO. 9 & 10 OF MICHAEL CARLIN; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF CHRISTOPHER J. LANGLEY IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):** Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 2/20/2022, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Donna C Bullock     donnabullockcarrera@yahoo.com, donna.bullock@ymail.com
Michael F Chekian     mike@cheklaw.com, chekianmr84018@notify.bestcase.com
Susan Titus Collins     scollins@counsel.lacounty.gov
Jeffrey W Dulberg     jdulberg@pszjlaw.com
Richard Girgado     rgirgado@counsel.lacounty.gov
M. Jonathan Hayes     jhayes@rhmfirm.com,
roksana@rhmfirm.com;matt@rhmfirm.com;rosario@rhmfirm.com;pardis@rhmfirm.com;russ@rhmf
irm.com;david@rhmfirm.com;sloan@rhmfirm.com;boshra@rhmfirm.com;rosario@rhmfirm.com
Christopher J Langley     chris@slclawoffice.com,
omar@slclawoffice.com;langleycr75251@notify.bestcase.com
Benjamin R Levinson     ben@benlevinsonlaw.com, courtney@benlevinsonlaw.com
Eric A Mitnick     MitnickLaw@aol.com, mitnicklaw@gmail.com
Giovanni Orantes     go@gobklaw.com, gorantes@orantes-
law.com,cmh@gobklaw.com,gobklaw@gmail.com,go@ecf.inforuptcy.com;orantesgr89122@notify.
bestcase.com
Matthew D. Resnik     matt@rhmfirm.com,
roksana@rhmfirm.com;rosario@rhmfirm.com;susie@rhmfirm.com;max@rhmfirm.com;priscilla@rh
mfirm.com;pardis@rhmfirm.com;russ@rhmfirm.com;rebeca@rhmfirm.com;david@rhmfirm.com;sl
oan@rhmfirm.com
Allan D Sarver     ADS@asarverlaw.com
David Samuel Shevitz     david@shevitzlawfirm.com,
shevitzlawfirm@ecf.courtdrive.com;r48785@notify.bestcase.com;Jose@shevitzlawfirm.com
United States Trustee (LA)     ustpregion16.la.ecf@usdoj.gov
Hatty K Yip     hatty.yip@usdoj.gov, hatty.k.yip@usdoj.gov
☐     Service information continued on attached page

**2.   SERVED BY UNITED STATES MAIL**:
On (*date*) 2/20/2022, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows: Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Honorable Ernest M. Robles
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1560 / Courtroom 1568
Los Angeles, CA 90012

Michael Carlin
PO Box 67132
Century City, CA 90067
(Address per proof of claim)

1          ☐    Service information continued on attached page

2 **3.** **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**:
(state the method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on
3 (*date*) 2/20/2022, I served the following persons and/or entities by personal delivery, overnight mail service,
or (for those who consented in writing to such service method), by facsimile transmission and/or email as
follows:  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the
4 judge <u>will be completed</u> no later than 24 hours after the document is filed.

5          ☐    Service information continued on attached page

6 I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

7
| 2/20/2022 | John Martinez | /s/John Martinez |
|-----------|---------------|------------------|
| *Date* | *Printed Name* | *Signature* |

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

17

DEBTOR-IN-POSSESSION'S OBJECTION TO CLAIM 18

EXHIBIT 3

Electronically FILED by Superior Court of California, County of Los Angeles on 02/07/2022 11:58 AM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Clifton, Deputy Clerk
Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Daniel Crowley

Gene H. Shioda, SBN: 186780
Steven P. Chang, SBN: 221783
Heidi M. Cheng, SBN: 289419
**SHIODA LANGLEY & CHANG, LLP**
1063 E. Las Tunas Dr.
San Gabriel, CA 91776
Email: heidi@slclawoffice.com
Tel: (626) 281-1232 / Fax: (626) 281-2919

Attorneys for Plaintiff
JINZHENG GROUP (USA) LLC,
a California limited liability company

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES- STANLEY MOSK COURTHOUSE

| | |
|---|---|
| JINZHENG GROUP (USA), LLC, a California limited liability company; <br><br> Plaintiff, <br><br> vs. <br><br> JONATHAN PAE, an individual; DAVID PARK, an individual; BETULA LENTA, INC., a California corporation; BETTY BAO ZHENG, an individual; CBW GLOBAL, INC., a California corporation; and DOES 1 through 50, inclusive, <br><br> Defendants. | Case No.: 22STCV04623 <br><br> **COMPLAINT FOR:** <br><br> 1. **BREACH OF CONTRACT;** <br> 2. **BREACH OF CONTRACT;** <br> 3. **BREACH OF CONTRACT;** <br> 4. **INTENTIONAL MISREPRESENTATION;** <br> 5. **NEGLIGENT MISREPRESENTATION;** <br> 6. **NEGLIGENCE;** <br> 7. **NEGLIGENCE;** <br> 8. **BREACH OF FIDUCIARY DUTY;** <br> 9. **AIDING AND ABETTING;** <br> 10. **VIOLATION OF BUSINESS AND PROFESSIONS CODE §17200 ET SEQ.** <br><br> [COMPLAINT EXCESS OF $25,000.00] |

Plaintiff, for counts and causes of action against Defendants and each of them, alleges as follows:

1.    Plaintiff JINZHENG GROUP (USA), LLC ("Plaintiff") is, and at all relevant times herein was, a California limited liability company organized and existing under the laws of the State of California with its principal place of business located in the County of Los Angeles.

1

COMPLAINT

**EXHIBIT 3**                103

2.      Upon information and belief, Defendant JONATHAN PAE ("PAE") is, and at all relevant times herein was, an individual residing and / or employed in the State of California, County of Los Angeles.

3.      Upon information and belief, Defendant DAVID PARK ("PARK") is, and at all relevant times herein was, an individual residing and / or employed in the State of California, County of Los Angeles.

4.      Upon information and belief, Defendant BETULA LENTA ("BETULA") is, and at all relevant times herein was, a California limited liability company organized and existing under the laws of the State of California with its principal place of business located in the County of Los Angeles.

5.      Upon information and belief, Defendant BETTY BAO ZHENG ("ZHENG") is, and at all relevant times herein was, an individual residing and / or employed in the State of California, County of Los Angeles.

6.      Upon information and belief, Defendant CBW GLOBAL, INC. ("CBW") is, and at all relevant times herein was, a California corporation organized and existing under the laws of the State of California with its principal place of business located in the County of Los Angeles. Upon information and belief, ZHENG is the Chief Executive Officer, Chief Financial Officer, Secretary, and only director of CBW.

7.      PAE is currently listed as the Chief Executive Officer, Chief Financial Officer, Secretary, and one of two directors of BETULA.  PARK is currently listed as the other director of BETULA, as well as its agent for service of process.

8.      The true names and capacities of Defendants DOES 1 through 50, inclusive, whether individual, corporate, associate, or otherwise, are unknown to Plaintiff, who therefore sues these Defendants by such fictitious names.  Plaintiff will seek leave of court to amend its complaint to show their true names and capacities when the same have been ascertained.

9.      Plaintiff is informed and believes, and based thereon alleges, that in doing the acts alleged herein, each of the Defendants was acting for himself, herself or itself and was acting as the agent, employee, and/or representative of each of the other Defendants within the course and

1    scope of such agency, employment and/or representation.  Plaintiff is further informed and

2    believes, and based thereon alleges, that the acts and conduct of each of the Defendants as

3    alleged herein were known to, authorized and ratified by each of the other Defendants.

4        10.    Plaintiff is informed and believes, and based thereon alleges, that there exists, and

5    at all times herein mentioned, there existed a unity of interest and ownership between the

6    individual defendants PAE AND PARK and BETULA such that any individuality and

7    separateness between Defendants have ceased to exist, and Defendant BETULA is the alter ego

8    of the individual defendants PAE and PARK in that PAE and PARK completely controlled,

9    dominated, managed, and operated Defendant BETULA and intermingled their assets to suit the

10    convenience of Defendants PAE and PARK.

11        11.    Plaintiff is informed and believes, and based thereon alleges, that there exists, and

12    at all times herein mentioned, there existed a unity of interest and ownership between the

13    individual defendant ZHENG and CBW such that any individuality and separateness between

14    Defendants have ceased to exist, and Defendant CBW is the alter ego of the individual defendant

15    ZHENG in that ZHENG completely controlled, dominated, managed, and operated Defendant

16    CBW and intermingled their assets to suit the convenience of Defendant ZHENG.

17        12.    Plaintiff is informed and believes, and on that basis alleges, that the acts and

18    conduct of each of the Defendants as alleged herein were known to, agreed by, authorized, and

19    ratified by each of the other Defendants such that Defendants are considered co-conspirators of

20    the wrongful conduct alleged herein.

21                         **<u>GENERAL ALLEGATIONS</u>**

22        13.    Plaintiff is a real estate development company which purchases various properties

23    in California, then develops and sells them for profit.

24        14.    In or about August 2016, Plaintiff purchased a 31-acre land commonly known as

25    2929 Amethyst Street, Los Angeles, California 90032 ("2929 Amethyst Property") for

26    $18,500,000.00, free and clear.

27        15.    In or about August 2016, Plaintiff purchased four parcels of adjacent land/houses

28    to 2929 Amethyst Street for approximately $4 million dollars.

3

COMPLAINT

16. In or about September 2016, Plaintiff purchased a house located at 2240 Lorain Rd, San Marino, CA 91108-2847 ("San Marino House") for approximately $2 million dollars, free and clear.

17. In or about June 2017, Plaintiff purchased a house located at 150 E La Sierra Dr, Arcadia, CA 91006-4163 ("Arcadia House") for approximately $2 million dollars, free and clear.

18. The broker for each of the transactions identified in paragraphs 14, 15, 16, and 17 above was Defendant BETTY BAO ZHENG ("ZHENG") and her related company CBW Global, Inc., a California Corporation.

19. In or about December 2017, Plaintiff's sole managing member Jiaqing Yang was introduced by ZHENG to PAE and PARK. PAE and PARK, on behalf of themselves and BETULA.

20. ZHENG was fully aware that Plaintiff and its sole managing member Jiaqing Yang would need assistance in the developing these said properties and that Plaintiff and Yang had an incredible amount of money to spend.  As a result, ZHENG introduced Plaintiff and Yang to PAE, PARK, and BETULA.

21. Based on information and belief, Plaintiff and Yang were not aware that ZHENG and Defendants had a scheme to defraud Plaintiff of its money.   ZHENG would convince Plaintiff that she was looking out for their best interests and that Defendants could assist Plaintiff in developing their properties when in fact they did not and were not capable to do so.

22. Plaintiff, relying on ZHENG's apparent loyalty, even elected ZHENG as a member of Plaintiff.

23. Based on information and belief, unbeknownst to Plaintiff, ZHENG and Defendants PAE, PARK, and BETULA had no intention of performing and wanted to bilk Plaintiff over $12 Million dollars in false service fees.

24. As a result on or about December 7, 2017, Plaintiff and Defendants PAE, PARK and BETULA entered into a pre-development consulting agreement ("Contract 1") to develop the 2929 Amethyst Property.  The terms of the contract are outlined in **Exhibit 1** and incorporated herein.

4
COMPLAINT

25.     Plaintiff paid $1,012,525.00 for the services outlined in Contract 1.

26.     To date, Defendants have not fully performed under the terms of Contract 1.

27.     On or about June 22, 2018, Plaintiff and Defendants PAE, PARK and BETULA entered into a Construction Management Agreement ("Contract 2") to construct and manage the construction at 2929 Amethyst Property.  The terms of the contract are outlined in **Exhibit 2** and incorporated herein.

28.     Plaintiff paid a substantial amount of $4,517,913.00 as outlined in Contract 2.

29.     Pursuant to Defendants' false representations, since Contract 2 cannot commence until Contract 1 is completed, Defendants have not performed any of its obligations under Contract 2.

30.     On or about March 2019, Plaintiff entered into a CDF Bond Procurement - CM - Development Agreement ("Contract 3") with Defendants as it relates to the construction at 2929 Amethyst Property.  The terms of the contract are outlined in **Exhibit 3** and incorporated herein.

31.     Under Contract 3, Defendants were to procure bonds for the Amethyst Property project.

32.     Plaintiff paid a substantial portion of the $6,224,490.00 outlined in Contract 3.

33.     To date, Defendants have failed to procure any of the bonds.

34.     Due to Defendants' delays, Plaintiff had to borrow money from certain lenders.

35.     In fact, Plaintiff, through its agents, complained to Defendants that their services were slow and delayed and that they had breached the various agreements stated in this lawsuit.

36.     Despite Plaintiff's repeated demands for performance, Defendants have refused to do so as agreed.

37.     As a result of these payments, Plaintiff has suffered great economic loss.

38.     Based on information and belief, Plaintiff and Yang allege that Defendants were providing improper payments to ZHENG for the services she performed for BETULA by advocating for BETULA and convincing Plaintiff and Yang to continue to use BETULA for its services.

39.     When Plaintiff sought additional information from ZHENG pertaining financial

5

COMPLAINT

1 | records, or information related to BETULA needed for the bankruptcy or the lawsuit, ZHENG
2 | stopped communicating with Plaintiff and Yang.

### FIRST CAUSE OF ACTION

### BREACH OF CONTRACT- CONTRACT 1

### (Against Defendants PAE, PARK, and BETULA)

40.　Plaintiff repeats and re-alleges paragraphs 1 through 39 and incorporates them by reference as though fully set forth herein.

41.　On or about December 7, 2017, Plaintiff and Defendants PAE, PARK and BETULA entered into a pre-development consulting agreement ("Contract 1") to develop the 2929 Amethyst Property.  The terms of the contract are outlined in **Exhibit 1** and incorporated herein.

42.　Plaintiff paid Defendants $1,012,525.00 for the services outlined in Contract 1.

43.　To date, Defendants have not fully performed under the terms of Contract 1, thereby breaching Contract 1.

44.　Due to Defendants' failure to perform pursuant to the terms of Contract 1, Plaintiff has been harmed in an amount to be proven at trial, but at least $5,000,000.00.

45.　Defendants' conduct was a substantial factor in causing Plaintiff's harm.

### SECOND CAUSE OF ACTION

### BREACH OF CONTRACT- CONTRACT 2

### (Against Defendants PAE, PARK, and BETULA)

46.　Plaintiff repeats and re-alleges paragraphs 1 through 45 and incorporates them by reference as though fully set forth herein.

47.　On or about June 22, 2018, Plaintiff and Defendants PAE, PARK and BETULA entered into a Construction Management Agreement ("Contract 2") to construct and manage the construction at 2929 Amethyst Property.  The terms of the contract are outlined in **Exhibit 2** and incorporated herein.

48.　Plaintiff paid a substantial amount of $4,517,913.00 to Defendants as outlined in Contract 2.

49.     Since Contract 2 cannot commence until Contract 1 is completed, Defendants have not performed any of its obligations under Contract 2.

50.     Due to Defendants' failure to perform pursuant to the terms of Contract 2, Plaintiff has been harmed in an amount to be proven at trial, but at least $5,000,000.00.

51.     Defendants' conduct was a substantial factor in causing Plaintiff's harm.

### THIRD CAUSE OF ACTION

### BREACH OF CONTRACT- CONTRACT 3

### (Against Defendants PAE, PARK, and BETULA)

52.     Plaintiff repeats and re-alleges paragraphs 1 through 51 and incorporates them by reference as though fully set forth herein.

53.     On or about March 2019, Plaintiff entered into a CDF Bond Procurement - CM - Development Agreement ("Contract 3") with Defendants as it relates to the construction at 2929 Amethyst Property.  The terms of the contract are outlined in **Exhibit 3** and incorporated herein.

54.     Under Contract 3, Defendants were to procure bonds for the Amethyst Property project.

55.     Plaintiff paid a substantial portion of the $6,224,490.00 to Defendants outlined in Contract 3.

56.     To date, Defendants have failed to procure any of the bonds.

57.     Due to Defendants' delays, Plaintiff had to borrow money from certain lenders. Additionally, Plaintiff has been harmed in an amount to be proven at trial, but at least $5,000,000.00.

58.     Defendants' conduct was a substantial factor in causing Plaintiff's harm.

### FOURTH CAUSE OF ACTION

### INTENTIONAL MISREPRESENTATION

### (Against All Defendants)

59.     Plaintiff repeats and re-alleges paragraphs 1 through 58 and incorporates them by reference as though fully set forth herein.

60.     In or around December 2017, Plaintiff was introduced to Defendants PAE,

7

COMPLAINT

1   PARK, and BETULA by ZHENG. Defendants PAE and PARK, on behalf of themselves and / or

2   BETULA, orally represented to Plaintiff that they were qualified and could assist Plaintiff with

3   his various real estate development projects until they came to fruition.

4       61.     ZHENG was fully aware that Plaintiff and its sole managing member Jiaqing

5   Yang would need assistance in the developing these said properties and that Plaintiff and Yang

6   had an incredible amount of money to spend as ZHENG was the broker who helped Plaintiff

7   purchase various multi-million dollar properties.  As a result, ZHENG introduced Plaintiff and

8   Yang to PAE, PARK, and BETULA.

9       62.     Based on information and belief, Plaintiff and Yang were not aware that ZHENG

10  and Defendants had a scheme to defraud Plaintiff of its money.   ZHENG would convince

11  Plaintiff that she was looking out for their best interests and that Defendants could assist Plaintiff

12  in developing their properties.

13      63.     Plaintiff, relying on ZHENG's apparent loyalty, even elected ZHENG as a

14  member of Plaintiff.

15      64.     Based on information and belief, unbeknownst to Plaintiff, ZHENG and

16  Defendants PAE, PARK, and BETULA had no intention of performing and wanted to bilk

17  Plaintiff over $12 Million dollars in false service fees.

18      65.     As a result of Defendants' representations that they would and could help Plaintiff

19  with his real estate development projects, Plaintiff signed three written contracts with Defendants

20  PAE, PARK, and BETULA, as more fully described herein and agreed to pay Defendants over

21  $12 million dollars in service fees for their work.

22      66.     Plaintiff became aware of this scheme in December 2021 when ZHENG refused

23  to cooperate and provide financial information when requested by Plaintiff.

24      67.     Defendant PAE, PARK, and BETULA's representations were false as they were

25  not able to or never intended to perform pursuant to the terms of Contracts 1, 2, and 3.

26      68.     Defendants knew that the representations were false when they made it, or the

27  representation was made recklessly and without regarding for its truth.

28      69.     Defendants intended that Plaintiff rely upon the representation, and Plaintiff did in

8

COMPLAINT

1    fact reasonably rely on the representation because it entered into three separate agreements with

2    Defendants and paid to Defendants over $5 million dollars for services that were never

3    performed.

4            70.    Plaintiff was harmed by Defendants' misrepresentation, and Plaintiff's reliance

5    was a substantial factor in causing Plaintiff's harm because but for the misrepresentations,

6    Plaintiff would not have agreed to sign the contracts and would not have paid Defendants such

7    exorbitant sums of money.

8            71.    Plaintiff is informed and believes, and on that basis alleges, that the acts and

9    conduct of each of the Defendants as alleged herein were known to, agreed by, authorized, and

10   ratified by each of the other Defendants such that Defendants are considered co-conspirators of

11   the wrongful conduct alleged herein.

12           72.    Defendants, and each of them, acted with fraud, malice and oppression and with a

13   conscious disregard of Plaintiffs' rights, making them liable for punitive damages under

14   California Civil Code §§3294 and 3295.

15                          **FIFTH CAUSE OF ACTION**

16                        **NEGLIGENT MISREPRESENTATION**

17                           **(Against All Defendants)**

18           73.    Plaintiff repeats and re-alleges paragraphs 1 through 72 and incorporates them by

19   reference as though fully set forth herein.

20           74.    In or around December 2017, Plaintiff was introduced to Defendants PAE,

21   PARK, and BETULA by ZHENG. Defendants PAE and PARK, on behalf of themselves and / or

22   BETULA, orally represented to Plaintiff that they were qualified and could assist Plaintiff with

23   his various real estate development projects until they came to fruition.

24           75.    ZHENG was fully aware that Plaintiff and its sole managing member Jiaqing

25   Yang would need assistance in the developing these said properties and that Plaintiff and Yang

26   had an incredible amount of money to spend as ZHENG was the broker who helped Plaintiff

27   purchase various multi-million dollar properties.  As a result, ZHENG introduced Plaintiff and

28   Yang to PAE, PARK, and BETULA.

76.     Based on information and belief, Plaintiff and Yang were not aware that ZHENG and Defendants had a scheme to defraud Plaintiff of its money.   ZHENG would convince Plaintiff that she was looking out for their best interests and that Defendants could assist Plaintiff in developing their properties.

77.     Plaintiff, relying on ZHENG's apparent loyalty, even elected ZHENG as a member of Plaintiff.

78.     Based on information and belief, unbeknownst to Plaintiff, ZHENG and Defendants PAE, PARK, and BETULA had no intention of performing and wanted to bilk Plaintiff over $12 Million dollars in false service fees.

79.     As a result of Defendants' representations that they would and could help Plaintiff with his real estate development projects, Plaintiff signed three written contracts with Defendants PAE, PARK, and BETULA, as more fully described herein and agreed to pay Defendants over $12 million dollars in service fees for their work.

80.     Plaintiff became aware of this scheme in December 2021 when ZHENG refused to cooperate and provide financial information when requested by Plaintiff.

81.     Defendant PAE, PARK, and BETULA's representations were false as they were not able to or never intended to perform pursuant to the terms of Contracts 1, 2, and 3.

82.     Although Defendants may have honestly believed that the representations were true, they had no reasonable grounds for believing the representation was true when they made it.

83.     Defendants intended that Plaintiff rely upon the representation, and Plaintiff did in fact reasonably rely on the representation because it entered into three separate agreements with Defendants and paid to Defendants over $5 million dollars for services that were never performed.

84.     Plaintiff was harmed by Defendants' misrepresentation, and Plaintiff's reliance was a substantial factor in causing Plaintiff's harm because but for the misrepresentations, Plaintiff would not have agreed to sign the contracts and would not have paid Defendants such exorbitant sums of money. Plaintiff is informed and believes, and on that basis alleges, that the acts and conduct of each of the Defendants as alleged herein were known to, agreed by,

10

COMPLAINT

1 │ authorized, and ratified by each of the other Defendants such that Defendants are considered co-

2 │ conspirators of the wrongful conduct alleged herein.

3 │ **<u>SIXTH CAUSE OF ACTION</u>**

4 │ **NEGLIGENCE**

5 │ **(Against Defendants ZHENG and CBW)**

6 │ 85. Plaintiff repeats and re-alleges paragraphs 1 through 84 and incorporates them by

7 │ reference as though fully set forth herein.

8 │ 86. ZHENG, as a member of Plaintiff, owed Plaintiff a duty to act as a reasonably

9 │ prudent person would under the circumstances.

10 │ 87. ZHENG breached that duty by conspiring with the remaining defendants to bilk

11 │ over $5,000,000.00 from Plaintiff in fees for services that were never performed as more fully

12 │ alleged herein.

13 │ 88. As a result of ZHENG's negligence, Plaintiff has been harmed, and ZHENG's

14 │ negligence was a proximate cause of Plaintiff's harm.

15 │ **<u>SEVENTH CAUSE OF ACTION</u>**

16 │ **NEGLIGENCE**

17 │ **(Against Defendants PAE, PARK, and BETULA)**

18 │ 89. Plaintiff repeats and re-alleges paragraphs 1 through 88 and incorporates them by

19 │ reference as though fully set forth herein.

20 │ 90. Defendants PAE, PARK, and BETULA, as agents of Plaintiff, owed Plaintiff a

21 │ duty to act as a reasonably prudent person would under the circumstances.

22 │ 91. Defendants breached that duty by conspiring with the ZHENG to bilk over

23 │ $5,000,000.00 from Plaintiff in fees for services that were never performed as more fully alleged

24 │ herein.

25 │ 92. As a result of Defendants' negligence, Plaintiff has been harmed, and Defendants'

26 │ negligence was a proximate cause of Plaintiff's harm.

27 │ ///

28 │ ///

**EIGHTH CAUSE OF ACTION**

**BREACH OF FIDUCIARY DUTY**

**(Against Defendant ZHENG and CBW)**

93.     Plaintiff hereby repeats and re-alleges paragraphs 1 through 92 and incorporates them by reference as though fully set forth herein.

94.     ZHENG, as a member of Plaintiff, owed Plaintiff a fiduciary duty of utmost care and loyalty.

95.     ZHENG breached that duty by conspiring with the remaining defendants to bilk over $5,000,000.00 from Plaintiff in fees for services that were never performed as more fully alleged herein.

96.     Based on information and belief, Plaintiff and Yang allege that Defendants were providing payments to ZHENG for the services she performed for BETULA by advocating for BETULA and convincing Plaintiff and Yang to continue to use BETULA for its services. ZHENG's actions were to the detriment of Plaintiff and for her own self-interests and was thereby a breach of her fiduciary duties owed to Plaintiff.

97.     When Plaintiff sought additional information from ZHENG pertaining financial records, or information related to BETULA needed for the bankruptcy or the lawsuit, ZHENG stopped communicating with Plaintiff and Yang.

98.     As a result of ZHENG's breach of her fiduciary duties, Plaintiff has been harmed in an amount to be proven at trial.

**NINTH CAUSE OF ACTION**

**AIDING AND ABETTING**

**(Against All Defendants)**

99.     Plaintiff repeats and re-alleges paragraphs 1 through 98 and incorporates them by reference as though fully set forth herein.

100.     Defendants, and each of them, knew and were aware of each other's unlawful conduct as more fully alleged herein, all in an attempt to defraud Plaintiff out of over $12 million dollars.

12

COMPLAINT

1    101.    Defendants gave substantial assistance and encouragement to each other to

2    commit the foregoing wrongful actions.

3    102.    Defendants' conduct was a substantial factor in causing harm to Plaintiff.

4    **TENTH CAUSE OF ACTION**

5    **UNFAIR BUSINESS PRACTICES PURSUANT TO CALIFORNIA BUSINESS &**

6    **PROFESSIONS CODE §17200 ET. SEQ.**

7    **(Against All Defendants)**

8    103.    Plaintiff repeats and re-alleges paragraphs 1 through 102 and incorporate them by

9    reference as though fully set forth herein.

10    104.    Under California Business & Professions Code §17200 et. seq. and related

11    statutory provisions, Defendants, and each of them, are obligated to refrain from any unlawful,

12    unfair, or fraudulent business act or practice.

13    105.    Defendants, and each of them, have engaged in unlawful and unfair business

14    practices by the acts described herein. Specifically, based on information and belief, Plaintiff and

15    Yang were not aware that ZHENG and Defendants had a scheme to defraud Plaintiff of its

16    money.   ZHENG, using her position as Plaintiff's member, would convince Plaintiff that she

17    was looking out for their best interests and that Defendants could assist Plaintiff in developing

18    their properties.

19    106.    Based on information and belief, unbeknownst to Plaintiff, ZHENG and

20    Defendants PAE, PARK, and BETULA had no intention of performing and wanted to bilk

21    Plaintiff over $12 Million dollars in false service fees.

22    107.    When Plaintiff sought additional information from ZHENG pertaining financial

23    records, or information related to BETULA needed for the bankruptcy or the lawsuit, ZHENG

24    stopped communicating with Plaintiff and Yang.

25    108.    Defendants, and each of them, through such unlawful, unfair, deceptive, and

26    fraudulent practices, have enriched themselves with unfair benefits and illegal profits at the

27    expense of Plaintiff and members of the public.

28    109.    Defendants, and each of them, should therefore be disgorged of any and all

profits, direct or indirect, and any other ill-gotten gains, which Defendants acquired by their

unlawful practices.

110.    Defendants, and each of them, should be ordered to restore to Plaintiff all moneys

made by them as result of their unfair business practices in an amount which is at least

$5,000,000.00, plus interest at the maximum applicable legal rate thereon.

## **PRAYER**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as

follows:

1.    General Damages, in an amount to be proven at trial but at least $5,000,000.00;

2.    Consequential and Special Damages, according to proof;

3.    Punitive Damages, according to proof;

4.    For reasonable attorney's fees and costs;

5.    For prejudgment and post judgment interest;

6.    For such other and further relief as the court may deem appropriate.


SHIODA LANGLEY & CHANG, LLP

Dated: December 1, 2021              By:      _/s/ Heidi Cheng_____
                                             Gene H. Shioda
                                             Steven P. Chang
                                             Heidi M. Cheng
                                             Attorneys for Plaintiff

# EXHIBIT 1

## *PREDEVELOPMENT CONSULTING AGREEMENT*

December

This Predevelopment Consulting Agreement ("Agreement") is made effective as of ~~November~~ __7__, 2017, and entered into by and between **JINZHENG GROUP (USA), LLC, a California limited liability company** ("Principal") and **BETULA LENTA, INC., a California Corporation** ("Consultant"), with regard to the following:

**WHEREAS**, Principal and Consultant desire to enter into this Agreement for the purpose of Consultant providing and performing certain predevelopment consulting services (the "Predevelopment Services") with respect to the construction and development of certain for-sale residential improvements (the "Project") on that certain real property commonly referred to as 2929 Amethyst Street, Los Angeles, California 90032 (the "Site") as more specifically detailed, outlined and provided for below in this Agreement and as set forth in the "Scope of Services" which is attached hereto as Exhibit "A" and fully incorporated into this Agreement by this reference as though fully set forth herein; and

**WHEREAS,** Consultant hereby represents and warrants that it possesses the necessary expertise and experience required to provide and perform the Predevelopment Services with respect to the development of the Site and is fully prepared and able to provide and perform the Predevelopment Services in a timely manner; and

**WHEREAS,** Principal hereby acknowledges and agrees that it or a legal entity owned and controlled by it or one of its principals owns fee title to the Site and is duly authorized to enter into this Agreement for the performance of the Predevelopment Services by Consultant,

**NOW, THEREFORE,** the Principal and Consultant (collectively referred to herein as the "Parties") do hereby agree to the following and terms and conditions established herein below in this Agreement.

**1. DESCRIPTION OF PREDEVELOPMENT SERVICES.** Commencing on the date on which this Agreement is fully executed by the Parties, Consultant shall timely provide and perform the Predevelopment Services as provided for in this Agreement and the Scope of Services.

**2. PERFORMANCE OF PREDEVELOPMENT SERVICES.** The manner in which the Predevelopment Services are to be performed and provided shall be determined exclusively by Consultant and will include, but not limited to, the specific amount of hours to be worked; provided however, Consultant shall commit as many hours as may be reasonably necessary to fulfill Consultant's obligations under this Agreement and the Scope of Services.

**3. COMPENSATION SCHEDULE.** Compensation payable to Consultant by Principal for the Predevelopment Services shall as set forth in that certain "Compensation Schedule" which is attached to this Agreement as Exhibit "B" and fully incorporated into this Agreement as though fully set forth herein. As provided in the Compensation Schedule, payments shall be

1

118

made on an installment basis with each installment fully due and payable to Consultant within five (5) business days following the delivery of written notice by Consultant to Principal requesting payment. Failure to provide full payment of the requested amount shall be subject to a ten percent (10 %) late fee.

**4. EXPENSE REIMBURSEMENT.** All expenses not otherwise provided for in this Agreement shall be the sole responsibility of Consultant. Except as otherwise agreed upon by the Parties, the Principal shall not be responsible for the reimbursement of any expenses incurred by Consultant.

**5. OUTSIDE PROJECT APPROVAL.** Principal acknowledges and agrees that Consultant is and/or may become engaged in providing its services on various development projects other the Project. In this regard, Consultant shall provide Principal with a list of all such development projects in which it currently is involved and shall provide written notice to Principal of any and future projects in which it will be involved for approval consideration, pursuant to which, Principal shall not unreasonably withhold, delay, or condition its approval if such work does not materially and adversely affect Consultant's providing and performing the Predevelopment Work on the Project as provided for in this Agreement and the Scope of Development. In the event that Principal reasonably determines that such other project work will have an adverse and material effect on Consultant's performance of the Predevelopment Services, the Parties shall meet and confer to address and resolve the concerns of Principal.

**6. TERM/TERMINATION.** This Agreement shall terminate automatically upon completion of the Predevelopment Services by Consultant as required by this Agreement and the Scope of Services. However, in the event of a default with respect to of any of the obligations set forth in this Agreement by either Principal or Consultant, and such default is not cured within thirty (30) days following written notice to cure from the non-defaulting part, the non-defaulting party may terminate this Agreement and pursue any and all legal rights pertinent to such default including, but not limited to, damages or specific performance of the outstanding obligation(s).

**7. RELATIONSHIP OF PARTIES.** It is understood by the Parties that Consultant is an independent contractor with respect to providing and performing the Predevelopment Services and is not an employee of the Principal, who shall not be required to provide any fringe benefits, including health insurance benefits, paid vacation, or any other employee benefits, for the benefit of Consultant.

**8. DISCLOSURE.** Consultant is required to disclose to Principal any outside activities or interests, including ownership or participation in any developments that conflict or will conflict with the Consultant's providing and performing of the Predevelopment Services and the ultimate development of the Project on the Site.

**9. EMPLOYEES.** Consultant's contractors, consultants and employees, if any, who perform any aspect of the Predevelopment Services for Consultant under this Agreement shall also be bound by the provisions of this Agreement. At the written request of the Principal, Consultant shall provide adequate evidence that such persons are Consultant's agents, contractors, consultants, or employees.

2

119

**10. INJURIES AND INSURANCE.** Consultant acknowledges that Consultant's obligation to obtain appropriate insurance coverage for the benefit of Consultant (and Consultant's agents, contractors, consultants and employees, if any) to the extent required by applicable California law. Consultant waives any and all rights to recovery against Principal for any injuries that Consultant (and/or Consultant's agents, contractors, consultants and employees, if any) may sustain while providing and/or performing the Predevelopment Services under this Agreement, and that are a result of the negligence of Consultant or Consultant's agents, contractors, consultants, or employees.

**11. INDEMNIFICATION.** Consultant agrees to indemnify and hold Principal harmless from all claims, losses, expenses, fees including attorney fees, costs, and judgments that may be asserted against Principal that result from the acts or omissions of Consultant, Consultant's agents, contractors, consultants, and employees, if any.

Principal agrees to indemnify and hold Consultant, Consultant's agents, contractors, consultants, and employees, harmless from all claims, losses, expenses, fees including attorney fees, costs, and judgments that may be asserted against Consultant for any of the following: (a) any third-party work previously provided and performed on the behalf of Principal with respect to the Project; or (b) any acts or omissions of Principal, Principals agents, contractors, consultants, and/or employees.

**12. INTELLECTUAL PROPERTY.** The following provisions shall apply with respect to copyrightable works, ideas, discoveries, inventions, applications for patents, and patents (collectively, "Intellectual Property"):

*Consultant's Intellectual Property.* Consultant does not presently hold any interest in any Intellectual Property with respect to the development of the Project on the Site.

*Development of Intellectual Property.* To the extent that any Intellectual Property rights are established with respect to providing or performing the Predevelopment Services, or development of the Project on the Site, unless otherwise provided, all such Intellectual Property shall be the property of Principal and Consultant shall take all such reasonable efforts to cause all such rights to be assigned to Principal.

**13. OWNERSHIP OF SOCIAL MEDIA CONTACTS.** Any social media contacts, including "followers" or "friends," that are acquired through accounts (including, but not limited to email addresses, blogs, Twitter, Facebook, You-tube, or other social media networks) used or created in conjunction with providing and performing the Predevelopment Services shall be the property of Consultant.

**14. CONFIDENTIALITY.** Principal recognizes that Consultant has and will have the following information:

- prices
- costs

3

120

- discounts
- future plans
- process information
- technical information
- copyrights
- proprietary information

as well as any other proprietary information (collectively, "Information") which are valuable, special and unique assets of Principal that require protection from improper disclosure. In consideration for access and disclosure of the Information to Consultant, Consultant agrees that it will not at any time or in any manner, either directly or indirectly, use any Information for Consultant's own benefit, or divulge, disclose, or communicate in any manner any Information to any third party without the prior written consent of Principal. Consultant will protect the Information and treat it as strictly confidential. A violation of this paragraph shall be a material violation of this Agreement.

**15. UNAUTHORIZED DISCLOSURE OF INFORMATION.** If it appears that Consultant has disclosed (or has threatened to disclose) Information in violation of this Agreement, Principal shall be entitled to an injunction to restrain Consultant from disclosing, in whole or in part, such Information, or from providing any services to any party to whom such Information has been disclosed or may be disclosed. Principal shall not be prohibited by this provision from pursuing any other remedies, including a claim for losses and damages.

**16. CONFIDENTIALITY AFTER TERMINATION.** The confidentiality provisions of this Agreement shall remain in full force and effect after the termination of this Agreement.

**17. SERVICES TO THIRD PARTIES.** Except as otherwise approved by Principal as set forth hereinabove in this Agreement, Consultant shall not provide any consulting services to any third party during the term of this Agreement.

**18. RETURN OF RECORDS.** Upon termination of this Agreement, Consultant, at the written request of Principal, shall deliver all records, notes, data, memoranda, models, and equipment of any nature that are in Consultant's possession or under Consultant's control that are Principal's property or directly relate to Principal's business.

**19. NOTICES.** All notices required or permitted under this Agreement shall be in writing and shall be deemed delivered when delivered in person or deposited in the United States mail, postage prepaid, addressed as follows:

4

121

If to Principal:

**JINZHENG GROUP (USA), LLC,**
**a California limited liability company**
100 E. Huntington Drive,
Alhambra, CA 91801
Phone: (626) 703-4116
Attn: Jianging Yang, President

If to Consultant:

**BETULA LENTA, INC.**
**a California limited liability company**
1125 West 6th Street.
Suite 205
Los Angeles, CA 90017
Phone: (310) 295-8764
Attn: David Park, CEO

Such address may be changed from time to time by either party by providing written notice to the other in the manner set forth above.

**20. ENTIRE AGREEMENT.** This Agreement along with the two attached exhibits constitutes the entire agreement of the parties and there are no other promises or conditions in any other agreement whether oral or written. This Agreement supersedes any prior written or oral agreements between the parties.

**21. AMENDMENT.** This Agreement may be modified or amended if the amendment is made in writing and is signed by the Parties.

**22. SEVERABILITY.** If any provision of this Agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

**23. WAIVER OF CONTRACTUAL RIGHT.** The failure of either party to enforce any provision of this Agreement shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Agreement.

**24. APPLICABLE LAW.** This Agreement shall be governed by the laws of the State of California.

**25. INTERRUPTION OF SERVICE.** Either party shall be excused from any delay or failure in performance required hereunder if caused by reason of any occurrence or contingency

5

122

beyond its reasonable control, including, but not limited to, acts of God, acts of war, fire, insurrection, laws proclamations, edits, ordinances or regulations, strikes, lock-outs or other serious labor disputes, riots, earthquakes, floods, explosions or other acts of nature. The obligations and rights of the party so excused shall be extended on a day-to-day basis for the time period equal to the period of such excusable interruption. When such events have abated, the parties' respective obligations hereunder shall resume. In the event the interruption of the excused party's obligations continues for a period in excess of thirty (30) days, either party shall have the right to terminate this Agreement upon ten (10) days' prior written notice to the other party.

**26. ASSIGNMENT.** Consultant agrees that it will not assign, sell, transfer, delegate or otherwise dispose of any rights or obligations under this Agreement without the prior written consent of Principal.  Any purported assignment, transfer, or delegation shall be null and void. Nothing in this Agreement shall prevent the consolidation of Principal with, or its merger into, any other legally recognized entity by the State of California, or the sale by Principal of all or substantially all of its properties or assets, or the assignment by Principal of this Agreement and the performance of its obligations hereunder to any successor in interest or any affiliated company, owned or controlled by Principal. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, legal representatives, successors, and permitted assigns, and shall not benefit any person or entity other than those enumerated above.

**27. SIGNATORIES.** This Agreement shall be signed on behalf of Principal by Jianging Yang, and on behalf of Consultant by David Park and effective as of the date first above written.

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement as of the date first written above.

PRINCIPAL:

**JINZHENG GROUP (USA), LLC,**
**a California limited liability company**

By: _____
Its: President

CONSULTANT:

**BETULA LENTA, INC.,**
**a California corporation**

By: _____
Its: Chief Executive Officer

6

## EXHIBIT "A"

### SCOPE OF SERVICES
### (Pre-Development Services)

1. Perform pre-development feasibility and pre-concept design strategy with emphasis on developing up to three hundred (300) for-sale detached single-family residential units as a master planned community.

2. Consultation with City representatives regarding development concept for master planned community.

3. Neighborhood outreach services as identified by City representatives including targeted neighborhood groups and organizations for project input and comments.

4. Coordination of project-related applications and submittals.

5. City Entitlement Coordination and Process:

   (A) California Environmental Quality Act Requirements (CEQA): Determine or cause to be determined environmental clearances necessary for the project. Prepare or cause to be prepared initial study for project impacts in order to determine if significant impact(s) are likely. Determine if impacts can be mitigated below a threshold of significance and cause to be prepared a Mitigated Negative Declaration (MND). If the project is determined to cause significant impacts that cannot be mitigated then the consultant shall cause an Environmental Impact Report (EIR) to be prepared for peer review by the Los Angeles Department of City Planning (LADCP) as lead agency. Submit all such documents as part of project review and facilitate/monitor LADCP processing.

   (B) General Plan Amendment, Zone Change and Tentative Tract Map Processing: Determine optimal processing for multiple entitlement and discretionary approvals in order to facilitate highest and best use for the property with a goal of establishing a Master Planned Community with up to 300 detached residential units. Prepare or cause to be prepared Master Land Use application, obtain Authorization to File from LADCP Management Team. Prepare or cause to be prepared justification and findings/specialized requirements in order to expedite the processing of such General Plan Amendment, Zone Change and Tentative Tract Map entitlements through both the LADCP and LA Bureau of Engineering (LABE). Coordinate with Los Angeles Parks and Recreation Department (LAPRD) as needed. Facilitate review in compliance with Subdivision Map Act as part of discretionary project review.

   (C) Traffic Study: Determine or cause to be determined traffic clearances necessary for the project. Prepare or cause to be prepared reports for project impacts in order to determine if significant impact(s) are likely. Determine if impacts can be mitigated below a threshold of significance and cause to be prepared a Memorandum of Understanding (MOU) or Technical Letter. If the project is determined to cause significant impacts that cannot be mitigated then the consultant shall cause a full

7



124

Traffic Study to be prepared for peer review by the Los Angeles Department of Transportation (LADOT) as lead agency. Submit all such documents as part of project review and facilitate/monitor LADCP processing

(D) <u>City Planning Commission/ Planning and Land Use Meeting/ City Council Meetings</u>: Represent project and or coordinate representation at all required public hearing meetings and coordinate all responses to queries or conditions of approval.

6. Pre-Construction Activity:

7. Prepare or cause to be prepared schematic architectural design.

8. Prepare or cause to be prepared mass grading plan for site preparation work.

9. Prepare or cause to be prepared 3rd-party engineering reports and analysis.

10. Coordination, response, and access analysis through LADCP with various agencies including, but not limited to Bureau of Engineering (BOE), Los Angeles Fire Department (LAFD), Los Angeles Department of Water and Power (LADWP), sanitation, and other utilities

125



ADDENDUM TO DECEMBER 7, 2017 CONTRACT BETWEEN JINZHENG GROUP (USA) LLC AND BETULA
LENTA, INC. for Consultant Services for 2929 Amethyst


Consultant Betula Lenta, Inc. agrees and is engaged to complete the scope of services listed in the
Agreement with TL Pacific, Inc. , a copy of which is attached as Exhibit "A" hereto.

**EXHIBIT B**
**COMPENSATION SCHEDULE**

## 2929 Amethyst Milestones and Budget

| Original contract Amount | $ | 2,594,500.00 |
|---|---|---|
| Amount previously disbursed | $ | 1,581,975.00 |
| Budget Remaining (to be disbursed below) | $ | 1,012,525.00 |

| Months | Task | | Milestone Amounts |
|---|---|---|---|
| 1 | **Contract Execution** | $ | 390,000.00 |
| | Continue City Meetings | | |
| | Traffic Study Proposal | | |
| | Neighborhood Targeted Support Groups Initiatives | | |
| | Phase I Report | | |
| | Slope Band Analysis | | |
| | Geotech/Soils Report | | |
| | Seismic Study | | |
| | Complete Conceptual Plans | | |
| | Hillside Analysis/Findings | | |
| | LADOT MOU Submission | | |
| | Massings/sections/elevations/floorplates | | |
| | Initial Study Proposal/EIR (MND is less) | | |
| | Additional Traffic Data Reports as needed | | |
| | Traffic Study Submission | | |
| | Traffic Mitigation/DOT Tasks/DOT-PDM Meetings | | |
| | Shade and Shadow Study (if needed) | | |
| | Biological Study (if needed) | | |
| | Begin Schematic Plans | | |
| | LADCP Final Case Management | | |
| | LADCP Pre-Development Meeting | | |
| | Community/Agency Referral Approvals | | |
| | Specific IS Report Data Requirements | | |
| | Continue Specific Plans Progress | | |
| | Continue Master Planning Concept | | |
| | Begin Expedite Referral Process (if possible) | | |
| 3 to 4 | **Completion of Initial Study** | $ | 218,000.00 |
| | Land-Use Attorney/Neighborhood Consultant | | |
| | Reaminder of Proposals, after retainers | | |
| | General Plan Amendment Initiation Plan (as needed) | | |
| | Initial Zoning Administrator meetings | | |
| | ZA Findings | | |
| | 2nd. LADCP Pre-Development Meeting | | |
| | Completion of IS/MND/EIR | | |
| | Mailing Labels | | |
| | Radius Map | | |
| 5 to 8 | **EAF/MND/EIR Submission** | $ | 123,000.00 |
| | City Filing Fee | | |
| | Master Land Use Application/Filing/Equivalent | | |
| | ZA Coordination | | |
| | Planning Commission Coordination | | |
| | Continue Council Meetings | | |
| | Continue Neighborhood Targeted Support | | |
| | Traffic Mitigation | | |
| | Completion of IS/MND/EIR | | |
| | LADOT Tech Letter Sign off (equivalent) | | |
| | Traffic Report Approval | | |
| | Begin Civil and Architectural Infrastructure Coordination | | |
| | Final Findings | | |
| | Ready Public Hearing Package | | |
| 6 to 10 | **Initial Public Hearing** | $ | 138,000.00 |
| | Follow up from any comments | | |
| | Neighborhood Outreach regarding specific comments | | |
| | Continue Council Meetings | | |
| | Continue Neighborhood Targeted Support | | |
| 9 to 12 | **Planning Commission Public Hearing/NOD/Equivalent** | $ | 58,000.00 |
| | City Council Resolution Coordination | | |
| | City Council Calendaring | | |
| | Continue Council Meetings | | |
| | Continue Neighborhood Targeted Support | | |
| 11 to 14 | **City Council Hearing/Discretionary Approval** | $ | 85,525.00 |
| | Follow up from City Council Resolution and Approval | | |
| | CLA Coordination | | |
| | Any recordations | | |
| | | $ | 1,012,525.00 |

# TL Pacific, Inc. August 31, 2016

**Subject:** Pre-Development Scope for 2929 Amethyst Street Los Angeles CA 90032

Proposed Development Strategy:

## Up to 300 Unit Master Planned Community

Dear Mr. Yang:

TL Pacific, Inc. specializes in the ability to take the known aspects of a property and increase the use and development potential. We are pleased to submit this proposal for Professional Entitlement & Land-Use Consulting Services, and Project Management Services. Based upon our meetings and subsequent conversations, it is my understanding that we are charged to consult for the future development of the 30 +- acre site located at the address above, and this proposal and initial work scope shall consist of the following:

## 1. Scope of Work, as applicable: (Other work scope and consulting shall be addressed in a subsequent Development Services Agreement)

- Development feasibility/strategy
- Concept Design consultation
- Initial Land-use consultation
- City Agency Liaison
- Neighborhood Outreach
- Case Management Coordination
- Case Management meetings
- Affordable Housing Referral/DB submission coordination (if applicable)
- Affordable Housing Referral/DB Submission compliance (LAMC section 12.22, if applicable)
- Ancillary AB 2222 Research and planning input outside of mandatory legal representation, if applicable
- Zoning Administration Coordination
- Planning Commission (CPC) Coordination/Hearings
- Planning and Land Use Management (PLUM) Coordination/Hearings
- Work with District Councilman's office to assist in approval of desired Master Plan
- City Council Calendar and Resolution Coordination as required
- Peer Review Coordination, including representation at review hearings as needed
- Urban Planning Design Department Coordination, if applicable
- CEQA/Traffic integration from 3rd-party input as needed
- Public Hearing Coordination
- Non-profit outreach if required
- Pre-Construction Analysis/Coordination with 3rd party
- Initial Findings, Initial Research, and Summary Input Coordination

PDL

Exhibit "A" to Addendum to
12/7/17 Agreement between
Sinzheim Group (OSA LLC & Betula Leala, Inc.

128

12

- CEQA (State/local municipality level) Initial Study/Findings Coordination
- General Plan Amendment Coordination as needed, in-house and 3rd party
- Zone Change Coordination as needed, in-house and 3rd party
- Entitlement/Planning pre-package
- Master Land Use application consultation
- EAF/MND application consultation (outside of 3rd-party reports) if applicable
- MLU/EAF/MND Exhibits consultation (outside of 3rd-party reports, maps, findings, etc.) if applicable
- Preparation of relevant Findings
- Preparation of relevant Summaries
- Preparation of relevant Codes
- Environmental documentation coordination
- Environmental Impact Report
- Project coordination with relevant vendors
- Conceptual Design: to include initiation of consultants and engineers
- Master Plan Concept Design
- City Agency Liaison, as needed
- Neighborhood Outreach
- Peer Review Coordination (including representation at peer review hearings as needed)
- Urban Planning Design Department Coordination
- CEQA/Traffic integration from 3rd-party input, as needed
- Civil Engineering integration from 3rd-party input, as needed
- Bureau of Engineering integration from 3rd-party input, as needed
- Parks & Recreation Dept. integration from 3rd-party input, as needed
- Public Hearing Coordination & Documentation, as needed
- Pre-Construction Cost Coordination
- Master Plan Community Safety and Finish design Coordination with 3rd party
- Master Plan Community/Other Specification Coordination with 3rd party
- Project coordination with relevant vendors
- Prepare architectural conceptual design set to submit to City of Los Angeles
- Documentation preparation for CPC/City Council/PLUM, as needed
- Documentation preparation for Case Management/Pre-Development Meetings
- Documentation preparation for Land Use Submissions
- Implementing, delegating, and/or coordinating necessary General Plan and Zone Change processing duties (not including 3rd-party duties and deliverables)
- Services related to clearances associated with project
- Design of entrances with access either from North Broadway or Lincoln Avenue, or both
- Design integration either including or not including six existing houses at southern property line

*(Please note that the scope of work and work product are based upon assumptions and investigation into the development, but in no way guarantees the timing and outcome of the development, due to forces outside the scope of the consultants)*

## 2. Additional Compensation:

- Any unforeseen or extra work not included in above "Scope of Work" will be discussed and mutually agreed upon between Mr. Yang and TL Pacific, Inc., prior to additional work being performed.

## 3. Exclusions:

- Subsequent variations of Items detailed in "Scope of Work."
- Other exclusions shall be addressed In full Development Services Agreement.

## 4. Authorization & Retainer:

Total itemized estimated cost for above Scope of Work: $2,594,500. To signify your authorization to proceed, please sign proposal and remit a retainer in the amount of $673,625.00.

Subsequent Payments as follows:

1) $134,725.00 at Master Plan Concept.
2) $134,725.00 at Kick off meeting with Engineers to integrate Master Plan.
3) $269,450.00 at 50% Architectural Conceptual Plan.
4) $269,450.00 at Case management Submission.
5) $269,450.00 at 100% Master Plan Conceptual Design.
6) $269,450.00 at Peer review Coordination/Land Use Submission.
7) $269,450.00 at 100% Architectural Concept Design.
8) $269,400.00 at Planning Case Public Hearing.
9) $ 34,725.00 at Final Planning Approval of Master Plan.


Respectfully submitted,

Rich Lamphere, TL Pacific Inc.


Acceptance of Proposal by: Jinzheng Group (USA) LLC

Signature: _____    Date: 2016.9.3.


TL Pacific Inc.

Signature: _____ Pres TL Pacific Inc.    Date: Sept 3, 2016

# EXHIBIT 2

131

## CONSTRUCTION MANAGEMENT AGREEMENT

This Construction Management Agreement ("Agreement") is made effective as of June **22**, 2018, and entered into by and between **JINZHENG GROUP (USA), LLC, a California limited liability company** ("Principal") and **BETULA LENTA, INC., a California Corporation** ("Construction Manager"), with regard to the following:

   **WHEREAS**, Principal and Construction Manager desire to enter into this Agreement for the purpose of Construction Manager providing and performing certain construction management services (the "Construction Management Services") with respect to the construction and development of the infrastructure preparation for 2929 North Amethyst Street, Los Angeles, CA 90032 (the "Project") as more specifically detailed, outlined and provided for below in this Agreement and as set forth in the "GMAX Estimate" (herein attached Exhibit "B") and fully incorporated into this Agreement by this reference as though fully set forth herein; and

   **WHEREAS,** Construction Manager hereby represents and warrants that it possesses the necessary expertise, licenses, and experience required to provide and perform the Construction Management Services with respect to the development of the Property and is fully prepared and able to provide and perform the Construction Management Services in a timely manner; and will pull all applicable permits.

   **WHEREAS,** Principal hereby acknowledges and agrees that it or a legal entity owned and controlled by it or one of its principals owns fee title to the Property and is duly authorized to enter into this Agreement for the performance of the Construction Management Services by Construction Manager,

   **NOW, THEREFORE,** the Principal and Construction Manager (collectively referred to herein as the "Parties") do hereby agree to the following and terms and conditions established herein below in this Agreement.

1. **DESCRIPTION OF CONSTRUCTION MANAGEMENT SERVICES.** Both Parties wish to perform the duties and engage the professionals necessary to cause either one of the following duties to occur:   a). Grading or equivalent permit for Property AND b). Infrastructure Construction Start, OR c). Cut and Fill Earthwork to Start. Once the duties have commenced, the Construction Manager has fulfilled his obligations to the Agreement.

2. **PERFORMANCE OF CONSTRUCTION MANAGEMENT SERVICES.**
   The manner in which the Construction Management Services are to be performed and provided shall be determined exclusively by Construction Manager.

3. **COMPENSATION SCHEDULE.** Compensation payable to Construction Manager by Principal for the Construction Management Services shall as set forth in that certain "Compensation Schedule" (Herein attached Exhibit A) and fully incorporated into this Agreement as though fully set forth herein.  As provided in the Compensation Schedule, payments shall be made on an installment basis with each installment fully due and payable to Construction Manager within five (5) business days following the delivery of written notice

Page | 1                                                                          JY **JY**   DP **ᗺ**

132



by Construction Manager to Principal requesting payment. ~~Failure to provide full payment of the requested amount shall be subject to a ten percent (10%) late fee.~~

4. **EXPENSE REIMBURSEMENT. All Permit, Plan Check, and other City Fees.** All other expenses not otherwise provided for in this Agreement shall be the sole responsibility of Construction Manager. Except as otherwise agreed upon by the Parties, the Principal shall not be responsible for the reimbursement of any expenses incurred by Construction Manager.

5. **GUARANTEED MAXIMUM PRICE.** Both Parties agree that Construction Documents may be incomplete and unavailable at the time of the execution of this contract. However, both Parties agree that a Guaranteed Maximum Price (hereinafter "GMAX") amount of $4,517,913 detailed in Exhibit B will be the basis of the GMAX for the services detailed herein, to complete the Construction Management Services described herein under Paragraph 1 a), and b), or c). Further to the aforementioned;

    • The estimated costs detailed in Exhibit B include the estimated expenses for the actual cost of the services, the staffing, overhead, contingency, general conditions, and insurance.

    • Any initial savings from a given line item shall be kept in reserve for any overages in any other line items.

    • At the end of the services detailed herein, there is a savings from the GMAX amount of $4,517,913, then the balance of savings shall be disbursed 75% to Principal and 25% to Construction Manager.

    • An Estimated Timeline (herein attached "Exhibit C"), shall constitute the estimated timeline for the start of Infrastructure Construction, depending on the date of the signing of this Agreement.

    • Last, although the GMAX estimate is $4,517,913, Principal is also required to hold in reserve an additional $2 million in the Principal's bank account, during the entire time the work scope of this Agreement is being done, and the entire $2 million shall be held in reserve until after Construction Funding has occurred AND Lender has approved of release of reserve.

6. **OPEN BOOK POLICY.** Both Parties agree that all data, agreements, and accounting related to the GMAX and all information related to the source of funds for the GMAX shall be viewed openly by Principal and Construction Manager in an effort to ensure costs are minimized where possible.

7. **TERM/TERMINATION.** This Agreement shall terminate automatically upon completion of the Construction Management Services by Construction Manager as required by this Agreement and the Construction Estimate. However, in the event of a default with respect to of any of the obligations set forth in this Agreement by either Principal or Construction Manager, and such default is not cured within thirty (30) days following written notice to

Page | 2

JY **JY** DP **P**

cure from the non-defaulting part, the non-defaulting party may terminate this Agreement and pursue any and all legal rights pertinent to such default including, but not limited to, damages or specific performance of the outstanding obligation(s).

8. **RELATIONSHIP OF PARTIES.** It is understood by the Parties that Construction Manager is an independent Construction Manager with respect to providing and performing the Construction Management Services and is not an employee of the Principal, who shall not be required to provide any fringe benefits, including health insurance benefits, paid vacation, or any other employee benefits, for the benefit of Construction Manager.

9. **DISCLOSURE.** Construction Manager is required to disclose to Principal any outside activities or interests, including ownership or participation in any developments that conflict or will conflict with the Construction Manager's providing and performing of the Construction Management Services and the ultimate development of the Project on the Property.

10. **EMPLOYEES.** Construction Manager's Construction Managers, Construction Managers and employees, if any, who perform any aspect of the Construction Management Services for Construction Manager under this Agreement shall also be bound by the provisions of this Agreement. At the written request of the Principal, Construction Manager shall provide adequate evidence that such persons are Construction Manager's agents, Construction Managers, Construction Managers, or employees.

11. **INJURIES AND INSURANCE.** Construction Manager acknowledges that Construction Manager's obligation to obtain appropriate insurance coverage for the benefit of Construction Manager (and Construction Manager's agents, Construction Managers, Construction Managers and employees, if any) to the extent required by applicable California law. Construction Manager waives any and all rights to recovery against Principal for any injuries that Construction Manager (and/or Construction Manager's agents, Construction Managers, Construction Managers and employees, if any) may sustain while providing and/or performing the Construction Management Services under this Agreement, and that are a result of the negligence of Construction Manager or Construction Manager's agents, Construction Managers, Construction Managers, or employees.

12. **INDEMNIFICATION.** Construction Manager agrees to indemnify and hold Principal harmless from all claims, losses, expenses, fees including attorney fees, costs, and judgments that may be asserted against Principal that result from the acts or omissions of Construction Manager, Construction Manager's agents, Construction Managers, Construction Managers, and employees, if any.

Principal agrees to indemnify and hold Construction Manager, Construction Manager's agents, Construction Managers, Construction Managers, and employees, harmless from all claims, losses, expenses, fees including attorney fees, costs, and judgments that may be asserted against Construction Manager for any of the following: (a) any third-party work previously provided and performed on the behalf of Principal with respect to the Project; or (b) any acts or omissions of Principal, Principals agents, Construction Managers, Construction Managers, and/or employees.

Page | 3                                                         JY JY  DP

13. **INTELLECTUAL PROPERTY.** The following provisions shall apply with respect to copyrightable works, ideas, discoveries, inventions, applications for patents, and patents (collectively, "Intellectual Property"):

*Construction Manager's Intellectual Property.* Construction Manager does not presently hold any interest in any Intellectual Property with respect to the development of the Project on the Property.

*Development of Intellectual Property.* To the extent that any Intellectual Property rights are established with respect to providing or performing the Construction Management Services, or development of the Project on the Property, unless otherwise provided, all such Intellectual Property shall be the property of Principal and Construction Manager shall take all such reasonable efforts to cause all such rights to be assigned to Principal.

14. **OWNERSHIP OF SOCIAL MEDIA CONTACTS.** Any social media contacts, including "followers" or "friends," that are acquired through accounts (including, but not limited to email addresses, blogs, Twitter, Facebook, You-tube, or other social media networks) used or created in conjunction with providing and performing the Construction Management Services shall be the property of Construction Manager.

15. **CONFIDENTIALITY.** Principal recognizes that Construction Manager has and will have the following information:

- costs
- discounts
- future plans
- process information
- technical information
- copyrights
- proprietary information

as well as any other proprietary information (collectively, "Information") which are valuable, special and unique assets of Principal that require protection from improper disclosure. In consideration for access and disclosure of the Information to Construction Manager, Construction Manager agrees that it will not at any time or in any manner, either directly or indirectly, use any Information for Construction Manager's own benefit, or divulge, disclose, or communicate in any manner any Information to any third party without the prior written consent of Principal. Construction Manager will protect the Information and treat it as strictly confidential. A violation of this paragraph shall be a material violation of this Agreement.

16. **UNAUTHORIZED DISCLOSURE OF INFORMATION.** If it appears that Construction Manager has disclosed (or has threatened to disclose) Information in violation of this Agreement, Principal shall be entitled to an injunction to restrain Construction Manager from disclosing, in whole or in part, such Information, or from providing any services to any party to whom such Information has been disclosed or may be disclosed. Principal shall not be prohibited by this provision from pursuing any other remedies, including a claim for losses and damages.

Page | 4

JY JY  DP

135

17. **CONFIDENTIALITY AFTER TERMINATION.** The confidentiality provisions of this Agreement shall remain in full force and effect after the termination of this Agreement.

18. **SERVICES TO THIRD PARTIES.** Except as otherwise approved by Principal as set forth hereinabove in this Agreement, Construction Manager shall not provide any consulting services to any third party during the term of this Agreement.

19. **RETURN OF RECORDS.** Upon termination of this Agreement, Construction Manager, at the written request of Principal, shall deliver all records, notes, data, memoranda, models, and equipment of any nature that are in Construction Manager's possession or under Construction Manager's control that are Principal's property or directly relate to Principal's business.

20. **NOTICES.** All notices required or permitted under this Agreement shall be in writing and shall be deemed delivered when delivered in person or deposited in US Mail in the U.S Mail, postage prepaid, addressed as follows:

**If to Principal:**

**JINZHENG GROUP (USA), LLC,**
**a California limited liability company**
100 E. Huntington Drive,
Alhambra, CA 91801
Phone: (626) 703-4116
Attn: Jianging Yang, President

**If to Construction Manager:**

**BETULA LENTA, INC.**
**a California corporation**
1125 West 6th Street.
Suite 205
Los Angeles, CA 90017
Phone: (310) 295-8764
Attn: David Park, CEO

Such address may be changed from time to time by either party by providing written notice to the other in the manner set forth above.

21. **ENTIRE AGREEMENT.** This Agreement along with the two attached exhibits constitutes the entire agreement of the parties and there are no other promises or conditions in any other agreement whether oral or written. This Agreement supersedes any prior written or oral agreements between the parties.

22. **AMENDMENT.** This Agreement may be modified or amended if the amendment is made in writing and is signed by the Parties.

Page | 5

JY JY  DP

**23. SEVERABILITY.** If any provision of this Agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

**24. WAIVER OF CONTRACTUAL RIGHT.** The failure of either party to enforce any provision of this Agreement shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Agreement.

**25. APPLICABLE LAW.** This Agreement shall be governed by the laws of the State of California.

**26. INTERRUPTION OF SERVICE.** Either party shall be excused from any delay or failure in performance required hereunder if caused by reason of any occurrence or contingency beyond its reasonable control, including, but not limited to, acts of God, acts of war, fire, insurrection, laws proclamations, edits, ordinances or regulations, strikes, lock-outs or other serious labor disputes, riots, earthquakes, floods, explosions or other acts of nature. The obligations and rights of the party so excused shall be extended on a day-to-day basis for the time period equal to the period of such excusable interruption. When such events have abated, the parties' respective obligations hereunder shall resume. In the event the interruption of the excused party's obligations continues for a period in excess of thirty (30) days, either party shall have the right to terminate this Agreement upon ten (10) days' prior written notice to the other party.

**27. ASSIGNMENT.** Construction Manager agrees that it will not assign, sell, transfer, delegate or otherwise dispose of any rights or obligations under this Agreement without the prior written consent of Principal. Any purported assignment, transfer, or delegation shall be null and void. Nothing in this Agreement shall prevent the consolidation of Principal with, or its merger into, any other legally recognized entity by the State of California, or the sale by Principal of all or substantially all of its properties or assets, or the assignment by Principal of this Agreement and the performance of its obligations hereunder to any successor in interest or any affiliated company, owned or controlled by Principal. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, legal representatives, successors, and permitted assigns, and shall not benefit any person or entity other than those enumerated above.

**28. SIGNATORIES.** This Agreement shall be signed on behalf of Principal by Jianging Yang, and on behalf of Construction Manager by David Park and effective as of the date first above written.

*(SIGNATURES FOLLOW):*

Page | 6

JY JY  DP

137

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement as of the date first written above.

**PRINCIPAL**:

**JINZHENG GROUP (USA), LLC,**
**a California limited liability company**

By: _____ $6-22-18$
Its: President

**CONSTRUCTION MANAGER:**

**BETULA LENTA, INC.,**
**a California corporation**

By: _____ $6-22-18$
Its: President

JY JY  DP

138

## COMPENSATION SCHEDULE
## EXHIBIT A

1. Payment One - Retainer (30% of total contracted amount) - $1,355,373.90

2. Payment Two – At 30% Completion of Construction Management Services - $1,807,165.20

3. Payment Three – At 70% Completion of Construction Management Services - $ 908,582.60

4. Payment Four – At 80% Completion of Construction Management Services - $ 451,791.30

JY _JY_ DP _____

## 2929 Amethyst Estimatd Costs

| Infrastructure/Property Capacity for Planning Approvals | | Payment One | Payment Two | Payment Three | Payment Four | Phase 2 Funding Needed: $ 4,517,913.00 |
|---|---|---|---|---|---|---|
| | | $ 1,355,373.90 | $ 1,807,165.20 | $ 908,584.60 | $ 451,791.30 | |
| Task or Professional Engaged (May, 2018-Jan. 2019) | | Estimated Fee | Description | | | |
| | Project Manager | $ 450,000 | David Park/Craig Fry - Pre-Construction Management/Developer Fee | | | |
| 1 | Architect (Scematic Design) | $ 295,000 | Schematic Layout of Homes and Site Plan for 310 Lots | | | |
| 2 | Architect (Master Planning) | $ 270,000 | Master Community Plan & Infrastructure Design, Schematic through Design Development | | | |
| | | $ 1,015,000 | | | | |
| 3 | Civil Engineer | $ 595,000 | Entire Infrastructure from Concept through Construction Plans ("COs")/Plan check | | | |
| 4 | Geotech/Soils Engineer | $ 42,500 | Geotechnical Approvals & Engineering input through CDs/Plan check | | | |
| 5 | Hydrologist | $ 35,000 | Water Flow Analysis of entire site, Irrigation, storm water flow, etc. to CDs/Plan check | | | |
| 6 | Structural Engineer | $ 165,452 | Stuctural Plans of 5 model homes to CDs/plan check | | | |
| 7 | Site Structural Engineer | $ 395,000 | Structural Plans of 310 lots, roads, infrastructure to COs/plan check | | | |
| 8 | Seismic Engineer (Trench Consultant) | $ 85,000 | Seismic Study, Report, Approvals, and Plan submissions, as needed | | | |
| 9 | Shoring Engineer | $ 225,000 | All Supplemental Shoring (to structure) Plans of 310 lots, roads, infrastructure to CDs/plan check | | | |
| 10 | Traffic Improvements & Mitigation Consultant | $ 72,500 | After Traffic Approval engineer to work with LADOT on all future mitigation & improvements | | | |
| 11 | Landscape Architect | $ 125,000 | Master Site Plan - Concept and Schematic through Design Development (landscape only) | | | |
| 12 | Landscape/Hardscape Engineer | $ 125,000 | Master Site Plan - Concept and Schematic through Design Development (hardscape only) | | | |
| 13 | Fire Access & Hydrants Engineer | $ 75,000 | Engineering, FD mitigation, and City Lobby | | | |
| 14 | Grading Engineer | $ 225,000 | All Grading Plans of 310 lots, roads, infrastructure to CDs/plan check | | | |
| | | $ 2,165,452 | | | | |
| 15 | Pre-Construction Consultant | $ 243,461 | Potential General Contractor to vet, research, bid, RFP all Infrastructure Costs | | | |
| 16 | Sub-contractor bid coordinator | $ 15,000 | CM watching over GC candidate for Item #16 | | | |
| | | $ 258,461 | | | | |
| 17 | Storm Water Consultant | $ 25,000 | Engineering and Design of rain water capture to CDs/Plan check | | | |
| 18 | Water Control Board Consultant | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of Utility Agency | | | |
| 19 | LADWP (Water and Power) Capacity Consultant | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of LADWP Utility | | | |
| 20 | Gas Consultant | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of Gas Utility | | | |
| 21 | Sewer Consultant | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of Sewer | | | |
| 22 | Street Lighting Consultant | $ 50,000 | Specifications written, Design, and City Approval of all exterior lighting on and off-site | | | |
| 23 | Earthwork Consultant | $ 50,000 | Potential future Earthwork Subcontractor who will run all out and fill analysis, scheduling, and costs | | | |
| 24 | Parks and Recreation Consultant | $ 97,500 | Mitigation, Agreements, Analysis, & City Approval of Quimby, P & R, True replacement | | | |
| 25 | Public Works Consultant | $ 100,000 | Lobby, Mitigation, Agreements, Analysis, & City Approval of Dept. of Public Works & BOE | | | |
| 26 | Bureau of Engineering Consultant | $ 100,000 | Lobby, Mitigation, Agreements, Analysis, & City Approval of Dept. of BOE | | | |
| 27 | Sanitation Consultant | $ 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of Dept. Of Sanitation | | | |
| | | $ 435,000 | | | | |
| 28 | LADBS Expeditor | $ 20,000 | Lobby & Plan Check Coordination between architect, engineers, consultants, & City | | | |
| 29 | LA Fire Life & Safety Consultant and Expeditor | $ 20,000 | Lobby, Mitigation, Agreements, Analysis, & City Approval of LAFD and LAPD | | | |
| 30 | HVAC & Mechanical Engineer | $ 20,000 | All HVAC & Mech system Site Plans to CDs/plan check | | | |
| 31 | Plumbing Engineer | $ 20,000 | All HVAC & Mech system Site Plans to CDs/plan check | | | |
| 32 | Electric Engineer | $ 20,000 | All HVAC & Mech system Site Plans to CDs/plan check | | | |
| 33 | Cable and Soft Utilities Consultant | $ 2,500 | Agreements, Design, and Engineering for Internet and Cable | | | |
| 34 | Solar Sub/Consultant | $ 2,500 | Engineering, Analysis, and City Approvals for Solar System | | | |
| 35 | Filtration and Grey Water Consultant | $ 2,500 | Engineering and Analysis of reusable water system | | | |
| 36 | LID Consultant | $ 2,500 | Design, CDs/Plan check of "Low Impact Design" Rules | | | |
| 37 | LEED Consultant | $ 5,000 | Lobby, Mitigation, Design, & City Approval | | | |
| | | $ 115,000 | | | | |
| | | $ 3,988,913 | | | | |

| | | TOTAL: | $ 3,988,913 | |
|---|---|---|---|---|

Loan Proceeds for start of Infrastructure Construction to fund below and construction

### Homes Construction Phase of Contracts

| Initial Phase of Homes Permits | | Budget | |
|---|---|---|---|
| Task or Professional Engaged (March, 2018-Jan. 2019) | | Estimated Fee | Description |
| 1 | Architect | $ 150,000 | Schematic Design Development, to CDs/Plan Check for 5 "model" homes |
| 2 | Civil Engineer | $ 95,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes |
| 3 | Structural Engineer | | Already above for first 5 homes |
| 4 | HVAC & Mechanical Engineer | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes |
| 5 | Plumbing Engineer | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes |
| 6 | Electric Engineer | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes |
| 7 | Landscape Architecture | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes |
| 8 | Grading Engineer | $ 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes |
| 9 | Utilities Consultant | $ 7,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & Coordination of Infrastructure into individual homes |
| 10 | LADBS Expeditor | $ 7,500 | Lobby & Plan Check Coordination between architect, engineers, consultants, & City for homes |
| 11 | LA Fire Life & Safety Consultant and Expeditor | $ 12,500 | Lobby, Mitigation, Agreements, Analysis, & City Approval of LAFD and LAPD for homes |
| 12 | Alarm, Sprinkler, and Emergency Consultant | $ 2,500 | Integration of systems into individual homes |
| 13 | Cable and Soft Utilities Consultant | $ 1,000 | Engineering, Analysis, and City Approvals for Solar System for homes |
| 14 | Solar Sub/Consultant | $ 1,000 | Engineering and Analysis of reusable water system for homes |
| 15 | LID Consultant | $ 1,000 | Design, CDs/Plan check of "Low Impact Design" Rules for homes |
| 16 | LEED Consultant | $ 1,000 | Lobby, Mitigation, Design, & City Approval for homes |
| | | TOTAL: | $ 529,000 |



**EXHIBIT C**

Amethyst Development Schedule



| ID | Task Name | Duration | Start | Finish | Pred | Resource Names |
|----|-----------|----------|-------|--------|------|----------------|
| 39 | Begin Construction Plans | 100 days | Mon 12/5/18 | Fri 4/19/18 | 38 | TCS |
| 40 | Submit All Construction Plans for Plan Check (for Homes Building Permit) | 120 days | Mon 4/22/19 | Fri 10/4/19 | 39 | TCS |
| 41 | Submit All Construction Plans for Plan Check (if DELAY) | 120 days | Mon 11/11/19 | Fri 4/24/20 | 32 | TCS |
| 42 | Ready Team for Grading Permit | 30 days | Mon 4/23/18 | Fri 6/1/18 | 20 | Park |
| 43 | Soils Report Approval | 60 days | Mon 6/4/18 | Fri 8/24/18 | 22 | PG/TCS |
| 44 | Finish All Earthwork Calculations | 25 days | Mon 4/23/18 | Fri 5/25/18 | 7 | LDC/Build |
| 45 | Finish all Storm Calculations | 20 days | Mon 5/2/18 | Fri 6/15/18 | 13 | LDC/Build |
| 46 | Finish all Sewer Calculations | 20 days | Mon 5/21/18 | Fri 6/15/18 | 13 | LDC/Build |
| 47 | Initial Earthwork RFPs | 60 days | Mon 4/23/18 | Fri 7/13/18 | 20 | Build GC |
| 48 | Complete all Cut and Fill Calculations | 30 days | Mon 5/21/18 | Fri 6/29/18 | 5 | LDC |
| 49 | Complete all Infrastructure Calculations | 30 days | Mon 5/21/18 | Fri 6/29/18 | 5 | LDC/Build |
| 50 | Shoring Engineering Plans | 90 days | Mon 4/23/18 | Fri 8/24/18 | 20 | TBD |
| 51 | Grading Engineer Plans | 90 days | Mon 4/23/18 | Fri 8/24/18 | 20 | TBD |
| 52 | Complete All Pre-Construction Bids for Infrastructure Construction Loan | 120 days | Mon 7/16/18 | Fri 12/28/18 | 24 | Park/Build |
| 53 | Coordination between Model Homes and Infrastructure Build | 45 days | Mon 9/10/18 | Fri 11/9/18 | 47,33 | Park/TCS/Build |
| 54 | Final Grading Submission preparation | 30 days | Mon 7/16/18 | Fri 8/24/18 | 47 | Park/TCS/Build |
| 55 | Final Grading Permit Submission | 60 days | Mon 8/27/18 | Fri 11/16/18 | 54 | Park/TCS/Build |
| 56 | Construction Loan Due Diligence and Underwriting | 90 days | Mon 9/10/18 | Fri 1/11/19 | 33,48 | Park |
| 57 | Construction Loan for Infrastructure | 30 days | Mon 12/31/18 | Fri 2/8/19 | 47,52 | Park |
| 58 | Begin Grading/Infrastructure Construction | 300 days | Mon 2/11/19 | Fri 4/3/20 | 57,52 | GC/TCS/Park |
| 59 | Begin Construction of Model Homes | 240 days | Mon 4/6/20 | Fri 3/5/21 | 58 | Park/TCS/Build |
| 60 | Begin Construction of Homes (Phase 1) | 300 days | Mon 10/7/19 | Fri 11/27/20 | 40 | Park/TCS/Build |
| 61 | Begin Construction of Homes (Phase 1) (ONLY if DELAY) | 300 days | Mon 4/27/20 | Fri 6/18/21 | 41 | Park/TCS/Build |
| 62 | Complete all Infrastructure | 180 days | Mon 11/30/20 | Fri 8/6/21 | 60 | Park/TCS/Build |
| 63 | | 30 days | Mon 8/9/21 | Fri 9/17/21 | 62 | Park/TCS/Build |
| 64 | | 30 days | Mon 3/20/21 | Fri 10/29/21 | 63 | Park/TCS/Build |
| 65 | | 30 days | Mon 11/1/21 | Fri 12/10/21 | 64 | Park/TCS/Build |
| 66 | | 30 days | Mon 12/13/21 | Fri 1/21/22 | 85 | Park/TCS/Build |
| 67 | | 30 days | Mon 1/24/22 | Fri 3/4/22 | 66 | Park/TCS/Build |
| 68 | | 30 days | Mon 3/7/22 | Fri 4/15/22 | 67 | Park/TCS/Build |
| 69 | | 30 days | Mon 4/18/22 | Fri 5/27/22 | 68 | Park/TCS/Build |

2929 North Amethyst ST.
Los Angeles, CA 90032

Page 2



## 2929 Amethyst Estimatd Costs

| | | | | Phase 2 Funding Needed: | $ | 4,517,912.00 |
| Infrastructure/Property Capacity for Planning Approvals | | Payment One | Payment Two | Payment Three | Payment Four | |
| | | $ 1,355,373.90 | $ 1,807,165.20 | $ 908,584.60 | $ 451,791.30 | |

| Task or Professional Engaged (May, 2018-Jan. 2019) | | Estimated Fee | Description |
|---|---|---|---|
| Project Manager | $ | 450,000 | David Park/Craig Fry - Pre-Construction Management/Developer Fee |
| 1 Architect (Schematic Design) | $ | 295,000 | Schematic Layout of Homes and Site Plan for 310 Lots |
| 2 Architect (Master Planning) | $ | 270,000 | Master Community Plan & Infrastructure Design, Schematic through Design Development |
| | $ | 1,015,000 | |
| 3 Civil Engineer | $ | 595,000 | Entire Infrastructure from Concept through Construction Plans ("CDs")/Plan check |
| 4 Geotech/Soils Engineer | $ | 42,500 | Geotechnical Approvals & Engineering Input through CDs/Plan check |
| 5 Hydrologist | $ | 35,000 | Water Flow Analysis of entire site, irrigation, storm water flow, etc. to CDs/Plan check |
| 8 Structural Engineer | $ | 165,452 | Structural Plans of 5 model homes to CDs/plan check |
| 7 Site Structural Engineer | $ | 385,000 | Structural Plans of 310 lots, roads, infrastructure to CDs/plan check |
| 8 Seismic Engineer (Trench Consultant) | $ | 85,000 | Seismic Study, Report, Approvals, and Plan submissions, as needed |
| 9 Shoring Engineer | $ | 225,000 | All Supplemental Shoring (to structure) Plans of 310 lots, roads, infrastructure to CDs/plan check |
| 10 Traffic Improvements & Mitigation Consultant | $ | 72,500 | After Traffic Approval engineer to work with LADOT on all future mitigation & improvements |
| 11 Landscape Architect | $ | 125,000 | Master Site Plan - Consept and Schematic through Design Development (landscape only) |
| 12 Landscape/Hardscape Engineer | $ | 125,000 | Master Site Plan - Consept and Schematic through Design Development (hardscape only) |
| 13 Fire Access & Hydrants Engineer | $ | 75,000 | Engineering, FD mitigation and City Lobby |
| 14 Grading Engineer | $ | 225,000 | All Grading Plans of 310 lots, roads, infrastructure to CDs/plan check |
| | $ | 2,155,452 | |
| 15 Pre-Construction Consultant | $ | 243,481 | Potential General Contractor to vet, research, bid, RFP all Infrastructure Costs |
| 16 Sub-contractor bid coordinator | $ | 15,000 | GW watching over GC candidate for term #15 |
| | $ | 258,481 | |
| 17 Storm Water Consultant | $ | 25,000 | Engineering and Design of rain water capture to CDs/Plan check |
| 18 Water Control Board Consultant | $ | 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of Utility Agency |
| 19 LADWP (Water and Power) Capacity Consultant | $ | 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of LADWP Utility |
| 20 Gas Consultant | $ | 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements Analysis, & City Approval of Gas Utility |
| 21 Sewer Consultant | $ | 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of Sewer |
| 22 Street Lighting Consultant | $ | 50,000 | Specifications written, Design, and City Approval of all exterior lighting on and off-site |
| 23 Earthwork Consultant | $ | 50,000 | Potential future Earthwork Subcontractor who will run all cut and fill analysis, scheduling, and costs |
| 24 Parks and Recreation Consultant | $ | 97,500 | Mitigation Agreements, Analysis, & City Approval of Quimby, P & R Tree replacement |
| 25 Public Works Consultant | $ | 100,000 | Lobby, Mitigation, Agreements, Analysis, & City Approval of Dept of Public Works & BOE |
| 26 Bureau of Engineering Consultant | $ | 100,000 | Lobby, Mitigation, Agreements, Analysis, & City Approval of Dept. of BOE |
| 27 Sanitation Consultant | $ | 2,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & City Approval of Dept. Of Sanitation |
| | $ | 435,000 | |
| 28 LADBS Expeditor | $ | 20,000 | Lobby & Plan Check Coordination between architect, engineers, consultants, & City |
| 29 LA Fire Life & Safety Consultant and Expeditor | $ | 20,000 | Lobby, Mitigation, Agreements, Analysis, & City Approval of LAFD and LAPD |
| 30 HVAC & Mechanical Engineer | $ | 20,000 | All HVAC & Mech system Site Plans to CDs/plan check |
| 31 Plumbing Engineer | $ | 20,000 | All HVAC & Mech system Site Plans to CDs/plan check |
| 32 Electric Engineer | $ | 20,000 | All HVAC & Mech system Site Plans to CDs/plan check |
| 33 Cable and Soft Utilities Consultant | $ | 2,500 | Agreements, Design, and Engineering for Internet and Cable |
| 34 Solar Sub/Consultant | $ | 2,500 | Engineering, Analysis, and City Approvals for Solar System |
| 35 Filtration and Grey Water Consultant | $ | 2,500 | Engineering and Analysis of reusable water system |
| 36 LID Consultant | $ | 2,500 | Design, CDs/Plan check of "Low Impact Design" Rules |
| 37 LEED Consultant | $ | 5,000 | Lobby, Mitigation, Design, & City Approval |
| | $ | 115,000 | |
| | $ | 3,988,913 | |

| TOTAL: | $ | 3,988,913 |

Loan Proceeds for start of Infrastructure Construction to fund below and construction

### Homes Construction Phase of Contracts

| Initial Phase of Homes Permits | | Budget | |
|---|---|---|---|
| Task or Professional Engaged (March, 2018-Jan. 2019) | | Estimated Fee | Description |
| 1 Architect | $ | 150,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes |
| 2 Civil Engineer | $ | 95,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes |
| 3 Structural Engineer | | | Already above for first 5 homes |
| 4 HVAC & Mechanical Engineer | $ | 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes |
| 5 Plumbing Engineer | $ | 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes |
| 6 Electric Engineer | $ | 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes |
| 7 Landscape Architecture | $ | 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes |
| 8 Gridding Engineer | $ | 50,000 | Schematic, Design Development, to CDs/Plan Check for 5 "model" homes |
| 9 Utilities Consultant | $ | 7,500 | Capacity, Will Serve, Approval, Mitigation, Agreements, Analysis, & Coordination of Infrastructure into individual homes |
| 10 LADBS Expeditor | $ | 7,500 | Lobby & Plan Check Coordination between architect, engineers, consultants, & City for homes |
| 11 LA Fire Life & Safety Consultant and Expeditor | $ | 12,500 | Lobby, Mitigation, Agreements, Analysis, & City Approval of LAFD and LAPD for homes |
| 12 Alarm, Sprinkler, and Emergency Consultant | $ | 2,500 | Integration of systems into individual homes |
| 13 Cable and Soft Utilities Consultant | $ | 1,000 | Engineering, Analysis, and City Approvals for Soar System for homes |
| 14 Solar Sub/Consultant | $ | 1,000 | Engineering and Analysis of reusable water system for homes |
| 15 LID Consultant | $ | 1,000 | Design, CDs/Plan check of "Low Impact Design" Rules for homes |
| 16 LEED Consultant | $ | 1,000 | Lobby, Mitigation, Design, & City Approval for homes |
| TOTAL: | $ | 529,000 | |

# EXHIBIT 3

## CFD BONDS PROCUREMENT - CM - DEVELOPMENT AGREEMENT

This CFD Bonds Procurement - CM - Development Agreement ("Agreement") is made effective as of March ___13___, 2019, and entered into by and between **JINZHENG GROUP (USA), LLC, a California limited liability company** ("Principal") and **BETULA LENTA, INC., a California Corporation** ("Developer/Underwriter"), with regard to the following:

  **WHEREAS**, Principal and Developer/Underwriter desire to enter into this Agreement for the purpose of Developer/Underwriter providing and performing certain CFD Bonds Procurement - CM - Development services (the "CFD Bonds Procurement - CM - Development Services") with respect to the construction and development of the infrastructure preparation for 2929 North Amethyst Street, Los Angeles, CA 90032 (the "Project") as more specifically detailed, outlined and provided for below in this Agreement and as set forth in the "GMAX Estimate" herein and fully incorporated into this Agreement by this reference as though fully set forth herein; and

  **WHEREAS,** Developer/Underwriter hereby represents and warrants that it possesses the necessary expertise, licenses, and experience required to provide and perform the CFD Bonds Procurement - CM - Development Services with respect to the development of the Property and is fully prepared and able to provide and perform the CFD Bonds Procurement - CM - Development Services in a timely manner; and will pull all applicable permits.

  **WHEREAS,** Principal hereby acknowledges and agrees that it or a legal entity owned and controlled by it or one of its principals owns fee title to the Property and is duly authorized to enter into this Agreement for the performance of the CFD Bonds Procurement - CM - Development Services by Developer/Underwriter,

  **NOW, THEREFORE,** the Principal and Developer/Underwriter (collectively referred to herein as the "Parties") do hereby agree to the following and terms and conditions established herein below in this Agreement.

1. **DESCRIPTION OF CFD BONDS PROCUREMENT - CM - DEVELOPMENT SERVICES.** Both Parties wish to perform the duties and engage the professionals necessary to cause either one of the following duties to occur: CFD Bond Procurement or any like Financing Vehicle. Once the Financing has commenced, the Developer/Underwriter has fulfilled his obligations to the Agreement.

2. **PERFORMANCE OF CFD BONDS PROCUREMENT - CM - DEVELOPMENT SERVICES.**
The manner in which the CFD Bonds Procurement - CM - Development Services are to be performed and provided shall be determined exclusively by Developer/Underwriter.

3. **COMPENSATION SCHEDULE.** Compensation payable to Developer/Underwriter by Principal for the CFD Bonds Procurement - CM - Development Services shall be requisitioned on a monthly basis as deemed necessary for the Project by the Developer/Underwriter and shall be paid by Principal or directly by the funding sources secured by the Project within 5 days of the requisition of funds requested.

4. **EXPENSE REIMBURSEMENT. All Permit, Plan Check, and other City Fees.** All other expenses not otherwise provided for in this Agreement shall be the sole responsibility of Developer/Underwriter. Except as otherwise agreed upon by the Parties, the Principal shall not be responsible for the reimbursement of any expenses incurred by Developer/Underwriter.

5. **GUARANTEED MAXIMUM PRICE.** Both Parties agree that Construction Documents may be incomplete and unavailable at the time of the execution of this contract. However, both Parties agree that a Guaranteed Maximum Price (hereinafter "GMAX") amount of $6,224,490 detailed (herein attached "Exhibit A") will be the basis of the GMAX for the services detailed herein, to complete the CFD Bonds Procurement - CM - Development Services described herein as follows;

   • The estimated costs detailed in Exhibit A include the estimated expenses for the actual cost of the services, the staffing, overhead, 3rd-party fees, expenses, and insurance.

   • Any initial savings from a given line item shall be kept in reserve for any overages in any other line items.

   • If at the end of the services detailed herein for Phase I, there is a savings from the GMAX amount of $6,224,490, then the balance of savings shall be disbursed 75% to Principal and 25% to Developer/Underwriter.

   • Although the GMAX amount of $6,224,490 shall be deemed as the estimated expenses for Phase I & 2 of the services detailed herein, Developer/Underwriter shall earn such fees as detailed in the Total Budget (herein attached "Exhibit B"),

   • Last, although the GMAX estimate is $6,224,490, Principal is also required to hold in reserve an additional $10 million in the Principal's bank account which was set up directly for the Project, and shall be held in reserve until after Construction Funding has occurred AND Lender has approved of release of reserve.

6. **OPEN BOOK POLICY.** Both Parties agree that all data, agreements, and accounting related to the GMAX and all information related to the source of funds for the GMAX shall be viewed openly by Principal and Developer/Underwriter in an effort to ensure costs are minimized where possible.

7. **TERM/TERMINATION.** This Agreement shall terminate automatically upon completion of the CFD Bonds Procurement - CM - Development Services by Developer/Underwriter as required by this Agreement and the Construction Estimate. However, in the event of a default with respect to of any of the obligations set forth in this Agreement by either Principal or Developer/Underwriter, and such default is not cured within thirty (30) days following written notice to cure from the non-defaulting part, the non-defaulting party may terminate this Agreement and pursue any and all legal rights pertinent to such default including, but not limited to, damages or specific performance of the outstanding obligation(s).

8. **RELATIONSHIP OF PARTIES.** It is understood by the Parties that Developer/Underwriter is an independent Developer/Underwriter with respect to providing

146

and performing the CFD Bonds Procurement - CM - Development Services and is not an employee of the Principal, who shall not be required to provide any fringe benefits, including health insurance benefits, paid vacation, or any other employee benefits, for the benefit of Developer/Underwriter.

9. **DISCLOSURE**. Developer/Underwriter is required to disclose to Principal any outside activities or interests, including ownership or participation in any developments that conflict or will conflict with the Developer/Underwriter's providing and performing of the CFD Bonds Procurement - CM - Development Services and the ultimate development of the Project on the Property.

10. **EMPLOYEES.** Developer/Underwriter's Developer/Underwriters, Developer/Underwriters and employees, if any, who perform any aspect of the CFD Bonds Procurement - CM - Development Services for Developer/Underwriter under this Agreement shall also be bound by the provisions of this Agreement. At the written request of the Principal, Developer/Underwriter shall provide adequate evidence that such persons are Developer/Underwriter's agents, Developer/Underwriters, Developer/Underwriters, or employees.

11. **INJURIES AND INSURANCE.** Developer/Underwriter acknowledges that Developer/Underwriter's obligation to obtain appropriate insurance coverage for the benefit of Developer/Underwriter (and Developer/Underwriter's agents, Developer/Underwriters, Developer/Underwriters and employees, if any) to the extent required by applicable California law. Developer/Underwriter waives any and all rights to recovery against Principal for any injuries that Developer/Underwriter (and/or Developer/Underwriter's agents, Developer/Underwriters, Developer/Underwriters and employees, if any) may sustain while providing and/or performing the CFD Bonds Procurement - CM - Development Services under this Agreement, and that are a result of the negligence of Developer/Underwriter or Developer/Underwriter's agents, Developer/Underwriters, Developer/Underwriters, or employees.

12. **INDEMNIFICATION.** Developer/Underwriter agrees to indemnify and hold Principal harmless from all claims, losses, expenses, fees including attorney fees, costs, and judgments that may be asserted against Principal that result from the acts or omissions of Developer/Underwriter, Developer/Underwriter's agents, Developer/Underwriters, Developer/Underwriters, and employees, if any.

Principal agrees to indemnify and hold Developer/Underwriter, Developer/Underwriter's agents, Developer/Underwriters, Developer/Underwriters, and employees, harmless from all claims, losses, expenses, fees including attorney fees, costs, and judgments that may be asserted against Developer/Underwriter for any of the following: (a) any third-party work previously provided and performed on the behalf of Principal with respect to the Project; or (b) any acts or omissions of Principal, Principals agents, Developer/Underwriters, Developer/Underwriters, and/or employees.

13. **INTELLECTUAL PROPERTY.** The following provisions shall apply with respect to copyrightable works, ideas, discoveries, inventions, applications for patents, and patents



147

(collectively, "Intellectual Property"):

*Developer/Underwriter's Intellectual Property.* Developer/Underwriter does not presently hold any interest in any Intellectual Property with respect to the development of the Project on the Property.

*Development of Intellectual Property.* To the extent that any Intellectual Property rights are established with respect to providing or performing the CFD Bonds Procurement - CM - Development Services, or development of the Project on the Property, unless otherwise provided, all such Intellectual Property shall be the property of Principal and Developer/Underwriter shall take all such reasonable efforts to cause all such rights to be assigned to Principal.

14. **CONFIDENTIALITY.** Principal recognizes that Developer/Underwriter has and will have the following information:

- costs
- discounts
- future plans
- process information
- technical information
- copyrights
- proprietary information

as well as any other proprietary information (collectively, "Information") which are valuable, special and unique assets of Principal that require protection from improper disclosure. In consideration for access and disclosure of the Information to Developer/Underwriter, Developer/Underwriter agrees that it will not at any time or in any manner, either directly or indirectly, use any Information for Developer/Underwriter's own benefit, or divulge, disclose, or communicate in any manner any Information to any third party without the prior written consent of Principal. Developer/Underwriter will protect the Information and treat it as strictly confidential. A violation of this paragraph shall be a material violation of this Agreement.

15. **UNAUTHORIZED DISCLOSURE OF INFORMATION.** If it appears that Developer/Underwriter has disclosed (or has threatened to disclose) Information in violation of this Agreement, Principal shall be entitled to an injunction to restrain Developer/Underwriter from disclosing, in whole or in part, such Information, or from providing any services to any party to whom such Information has been disclosed or may be disclosed.  Principal shall not be prohibited
by this provision from pursuing any other remedies, including a claim for losses and damages.

16. **CONFIDENTIALITY AFTER TERMINATION.** The confidentiality provisions of this Agreement shall remain in full force and effect after the termination of this Agreement.

17. **SERVICES TO THIRD PARTIES.** Except as otherwise approved by Principal as set forth hereinabove in this Agreement, Developer/Underwriter shall not provide any consulting services to any third party during the term of this Agreement.

148

**18. RETURN OF RECORDS.** Upon termination of this Agreement, Developer/Underwriter, at the written request of Principal, shall deliver all records, notes, data, memoranda, models, and equipment of any nature that are in Developer/Underwriter's possession or under Developer/Underwriter's control that are Principal's property or directly relate to Principal's business.

**19. NOTICES.** All notices required or permitted under this Agreement shall be in writing and shall be deemed delivered when delivered in person or deposited in US Mail in the U.S Mail, postage prepaid, addressed as follows:

**If to Principal:**

**JINZHENG GROUP (USA), LLC,**
**a California limited liability company**
100 E. Huntington Drive,
Alhambra, CA 91801
Phone: (626) 703-4116
Attn: Jianging Yang, President

**If to Developer/Underwriter:**

**BETULA LENTA, INC.**
**a California corporation**
800 West 6th Street.
Suite 1250
Los Angeles, CA 90017
Phone: (310) 295-8764
Attn: David Park, President

Such address may be changed from time to time by either party by providing written notice to the other in the manner set forth above.

**20. ENTIRE AGREEMENT.** This Agreement along with the two attached exhibits constitutes the entire agreement of the parties and there are no other promises or conditions in any other agreement whether oral or written. This Agreement supersedes any prior written or oral agreements between the parties.

**21. AMENDMENT.** This Agreement may be modified or amended if the amendment is made in writing and is signed by the Parties.

**22. SEVERABILITY.** If any provision of this Agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

149

**23. WAIVER OF CONTRACTUAL RIGHT.** The failure of either party to enforce any provision of this Agreement shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Agreement.

**24. APPLICABLE LAW.** This Agreement shall be governed by the laws of the State of California.

**25. INTERRUPTION OF SERVICE.** Either party shall be excused from any delay or failure in performance required hereunder if caused by reason of any occurrence or contingency beyond its reasonable control, including, but not limited to, acts of God, acts of war, fire, insurrection, laws proclamations, edits, ordinances or regulations, strikes, lock-outs or other serious labor disputes, riots, earthquakes, floods, explosions or other acts of nature. The obligations and rights of the party so excused shall be extended on a day-to-day basis for the time period equal to the period of such excusable interruption. When such events have abated, the parties' respective obligations hereunder shall resume. In the event the interruption of the excused party's obligations continues for a period in excess of thirty (30) days, either party shall have the right to terminate this Agreement upon ten (10) days' prior written notice to the other party.

**26. ASSIGNMENT.** Developer/Underwriter agrees that it will not assign, sell, transfer, delegate or otherwise dispose of any rights or obligations under this Agreement without the prior written consent of Principal. Any purported assignment, transfer, or delegation shall be null and void. Nothing in this Agreement shall prevent the consolidation of Principal with, or its merger into, any other legally recognized entity by the State of California, or the sale by Principal of all or substantially all of its properties or assets, or the assignment by Principal of this Agreement and the performance of its obligations hereunder to any successor in interest or any affiliated company, owned or controlled by Principal. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, legal representatives, successors, and permitted assigns, and shall not benefit any person or entity other than those enumerated above.

**27. SIGNATORIES.** This Agreement shall be signed on behalf of Principal by Jianging Yang, and on behalf of Developer/Underwriter by David Park and effective as of the date first above written.

*(SIGNATURES FOLLOW):*

150

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement as of the date first written above.

**PRINCIPAL**:

**JINZHENG GROUP (USA), LLC,**
**a California limited liability company**

**By:** _____

Its: President

**DEVELOPER/UNDERWRITER:**

**BETULA LENTA, INC.,**
**a California corporation**

By: _____

Its: President

151

# EXHIBIT A

## 2929 Amethyst Estimated Costs

Phase 3 Funding Needed (for CFD Bonds):

| | Consultants and Engaged Contracts | Estimated Total Fees (Through Construction) | CFD Bond Expenses (Phase I) | CFD Bond Expenses (Phase 2) | Balance to be paid by CFD Bonds |
|---|---|---|---|---|---|
| 1 | Developer Fee (ALL City Fees & Below) | $ 3,500,000 | $ 225,000 | $ 225,000 | $ 3,050,000 |
| 2 | Brokerage - (Included in Development Fee) | | | | $ - |
| 3 | Architect (All Homes) - TCS | $ 4,310,389 | $ 432,000 | $ 432,000 | $ 3,446,389 |
| 4 | Architect (Master Planning & Landscape Architecture) - TCS | $ 2,600,000 | $ 216,000 | $ 216,000 | $ 2,168,000 |
| 5 | Conceptual Design - Nvision | PAID IN FULL | | | |
| 6 | Civil Engineer - Land Design Consultants/Other | $ 3,455,194 | $ 266,245 | $ 266,245 | $ 2,922,704 |
| 7 | Geotech/Soils Engineer - Pacific Geotech (included in Civil) | | | | |
| 8 | Entitlements & Code Compliance - Craig Fry/Other | $ 2,344,525 | $ 273,500 | $ 273,500 | $ 1,797,525 |
| 9 | Structural Engineer - TBD | $ 4,146,233 | $ 184,000 | $ 184,000 | $ 3,778,233 |
| 10 | Site Structural Engineer (Included in Strutural) | | | | $ - |
| 11 | Seismic Engineer (Trench Consultant) (Included in Strutural) | | | | $ - |
| 12 | Shoring Engineer (Included in Strutural) | | | | $ - |
| 13 | Traffic Improvements & Mitigation Consultant - Overland Traffic | $ 250,000 | $ 17,500 | $ 17,500 | $ 215,000 |
| 14 | Landscape Architect - Harmony Gardens/Bardez/Other | $ 1,382,078 | $ 97,500 | $ 97,500 | $ 1,187,078 |
| 15 | Landscape/Hardscape Engineer (Included in Landscape) | | | | $ - |
| 16 | Grading Engineer (Included in Strutural) | | | | $ - |
| 17 | Project Management | $ 3,000,000 | $ 180,000 | $ 180,000 | $ 2,640,000 |
| 18 | CEQA Reports (included in Entitlements) | | | | $ - |
| 19 | Pre-Construction Consultant | $ 2,923,190 | $ 149,000 | $ 149,000 | $ 2,625,190 |
| 20 | Sub-contractor bid coordinator (Included in Construction Management) | | | | $ - |
| 21 | MEP Engineers | $ 2,764,156 | $ 97,500 | $ 97,500 | $ 2,569,156 |
| 22 | Construction Management/GC Fees | $ 5,169,235 | $ 231,500 | $ 231,500 | $ 4,706,235 |
| 23 | Bond Counsel | $ 2,700,000 | $ 450,000 | $ 450,000 | $ 1,800,000 |
| 24 | Bonds Reservation/State Sponsor/App Fees | $ 900,000 | $ 97,500 | $ 97,500 | $ 705,000 |
| 25 | Bonds Consultant/Commission | $ 1,800,000 | $ 97,500 | $ 97,500 | $ 1,605,000 |
| 26 | Bonds Placement Investment Banker | $ 1,800,000 | $ 97,500 | $ 97,500 | $ 1,605,000 |
| | Proceeds Needed: | $ 43,045,000 | $ 3,112,245 | $ 3,112,245 | $ 36,820,510 |

Included in Developer Fee:

| | | |
|---|---|---|
| 1 | Developer Overhead and Expenses | $ 500,000 |
| 2 | Staff | $ 318,090 |
| 3 | Liability Insurance | $ 165,000 |
| 4 | Construction Bond Fees | $ 325,000 |
| 5 | City Fees - LADCP/LADBS | $ 765,325 |
| 6 | City Fees - LADOT & Other Agencies | $ 226,585 |
| 7 | Community Outreach | $ 350,000 |
| 8 | Inspection Fees | $ 250,000 |
| 9 | Non-Profit Donations | $ 150,000 |
| 10 | Legal | $ 450,000 |
| | | $ 3,500,000 |

152

## EXHIBIT B

|  |  |  |  |  |  | Per SF/Yd. |  | Total |
|---|---|---|---|---|---|---|---|---|
|  |  | 24 (months) | General Conditions: | $ | 164,130.00 | $ | 3,939,120.00 |
| Cut & Fill Site: | 1,532,930 |  | Site Work: | $ | 28.99 | $ | 44,439,641 |
|  |  |  | Concrete: | $ | 0.23 | $ | 352,574 |
|  |  |  | Masonry: | $ | 0.20 | $ | 306,586 |
|  |  |  | Metals: | $ | 0.06 | $ | 91,976 |
|  |  |  | Wood Structures: | $ | 0.41 | $ | 628,501 |
|  |  |  | Water Proofing: | $ | 0.38 | $ | 582,513 |
|  |  |  | Specialties: | $ | 0.05 | $ | 76,647 |
|  |  |  | Special Construction: | $ | 0.23 | $ | 352,574 |
|  |  |  | Electrical: | $ | 1.02 | $ | 1,563,589 |
|  |  |  | Misc. Expenses: | $ | 0.67 | $ | 1,027,063 |
|  |  |  | Job equipment: | $ | 0.42 | $ | 643,831 |
|  | Design and Construction Contingency: |  |  |  | 10.000% | $ | 5,400,461 |
|  |  |  | Off-Site GL & SDI: |  | 2.722% | $ | 1,617,006 |
|  |  |  | Fee: |  | 4.500% | $ | 2,745,994 |
| Streets: | 372,714 |  |  |  |  |  |  |
| Lots & Streets: | 372,714 |  | Infrastructure SUB Total: |  |  | $ | 63,768,075 |
| 1 Acre: | 43,560 | sf | CFD Bond Fees: |  |  | $ | 6,421,445 |

Homes:

| Model | SF (incl. garage) |  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|
| Yellow | 1,604.1 | 24 | 38,498 | $ | 200.00 | $ | 7,699,680 |
| Magenta | 2,111.4 | 50 | 105,570 | $ | 225.00 | $ | 23,753,250 |
| Red | 1,905.5 | 36 | 68,598 | $ | 250.00 | $ | 17,149,500 |
| Beige | 2,572.3 | 38 | 97,747 | $ | 265.00 | $ | 25,903,061 |
| Orange | 3,885.6 | 23 | 89,369 | $ | 265.00 | $ | 23,682,732 |
| Green (Canteliver) | 2,785.4 | 106 | 295,252 | $ | 295.00 | $ | 87,099,458 |
| Custom (Purple) | 4,960.0 | 7 | 34,720 | $ | 350.00 | $ | 12,152,000 |
|  |  | 284 | 729,755 | Subtotal Homes: | | $ | 197,439,681 |

| Slope Analysis: | R1 |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
| 3.84 | 167,270.40 | 83,635.20 | Architecture: | 24,332 | $ | 6,910,389 |
| 8.08 | 351,964.80 | 158,384.16 | Landscape Architecture: | 4,866.47 | $ | 1,382,078 |
| 6.21 | 270,507.60 | 108,203.04 | MEP Engineering: | 9,733 | $ | 2,764,156 |
| 7.21 | 314,067.60 | 109,923.66 | Structural Engineering: | 14,599 | $ | 4,146,233 |
| 5.58 | 243,064.80 | 72,919.44 | Civil Engineering: | 12,166 | $ | 3,455,194 |
|  | 1,346,875.20 | 533,065.50 | Entitlements: |  | $ | 2,594,525 |
|  |  |  | City Fees (During Entitlements): |  | $ | 350,000 |
|  |  |  | Permits: |  | $ | 5,923,190 |
|  |  |  | City Fees (Construction): |  | $ | 7,403,988 |
|  | Project Management (Phase II & III) & 3rd-party Construction Services: |  |  |  | $ | 5,923,190 |
|  |  |  | Developer Fee: |  | $ | 5,000,000 |
|  |  |  | Construction Management: |  | $ | 5,169,235 |

|  |  |  |
|---|---|---|
| Total (including CFD Bonds): | $ | 318,651,380 |
| Mello Roos (CFD Bond Portion): | $ | 90,104,281 |
| NET Total: | $ | 228,547,099 |

153

EXHIBIT 4

1

Peter A. Kim, Esq.
(SBN 250470)
2  3450 Wilshire Blvd Ste 1200,
Los Angeles, CA 90010-2214
3  Phone: 213-387-0800 | Fax: 213-387-0880
Email: peter@pkimlaw.com

4

5

Attorneys for Defendants BETULA LENTA, INC., DAVID PARK and
6  JONATHAN PAE

7

8              UNITED STATES BANKRUPTCY COURT

9          FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11  JINZHENG GROUP (USA) LLC,          )  Los Angeles Superior Court
                                       )  Case No.: 22STCV04623
12          Plaintiff,                 )
                                       )  Bankruptcy Case No. 2:21-bk-16674-ER
13  Vs.                                )
                                       )  Chapter 11
14                                     )
    BETULA LENTA, INC., etc., et al.,  )  **Corrected**
15                                     )  NOTICE OF REMOVAL OF STATE
                                       )  COURT ACTION
16          Defendants.                )
                                       )
17                                     )  [FRBP 9027; LBR 9027-1]
                                       )
18                                     )
                                       )
19                                     )
                                       )
20                                     )
    _____)

21

22  TO THE UNITED STATES BANKRUPTCY COURT, TO THE UNITED STATES TRUSTEE

23  AND TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

24          Please take notice that Defendants BETULA LENTA, INC., DAVID PARK and

25  JONATHAN PAE hereby file a Correction of the Case Number for the removed action pending

26  in the Los Angeles Superior Court as Los Angeles Superior Court Case No. 22STCV04623,

27  correcting the Notice of Removal filed on April 12, 2022 with the Clerk of this Court at the

28  United States Bankruptcy Courthouse, located at 255 E. Temple St., Los Angeles, CA 90012,

    this Notice of Removal of State Court Action (the "Notice"). The Notice is filed to accomplish

                                    - 1 -

**EXHIBIT 4**                                    154

the removal of the action pending in the Superior Court of the State of California in and for the County of Los Angeles, entitled <u>Jinzheng Group (USA) LLC vs. Jonathan Pae, etc., et al.</u>, Los Angeles Superior Court Case No. 22STCV04623[1] commenced on February 7, 2022 (the "State Court Action"), to the United States Bankruptcy Court for the Central District of California in Plaintiff's Chapter 11 Bankruptcy Case No. 2:21-bk-16674-ER filed on August 24, 2021 (the "Chapter 11").

Pursuant to FRBP Rule 9027, 28 USC §1452, 28 USC §1334(e)(1) and 28 USC §157, this Notice of Removal of State Court Action is hereby filed with the assigned Bankruptcy Court for the Chapter 11 case.  A copy of the Notice has been filed with the Clerk of the Los Angeles Superior Court, after which the parties shall proceed no further in that court and this matter shall be placed upon the docket of the assigned Bankruptcy Court for further proceedings.

On February 7, 2022, Debtor filed the State Court Action against named Creditor BETULA LENTA, INC. ("BLI") and two of its principals JONATHAN PAE and DAVID PARK,.  The State Court Action also named Creditor BETTY BAO ZHENG and related business entity CBW GLOBAL, Inc..  This State Court Action was filed after Debtor filed the Chapter 11 case on August 24, 2021, and without first seeking leave of the Bankruptcy Court in the Chapter 11 case or informing the Bankruptcy Court of the State Court Action at the time of filing.  In the State Court Action, Debtor claims damages under causes of action for Breach of Contract, Intentional Misrepresentation, Negligent Misrepresentation and other claims based upon the same three (3) written contracts between Plaintiff and Debtor JINZHENG GROUP (USA) LLC with Defendant and Creditor BLI, for performance by BLI of professional services for entitlement of the primary asset of Debtor in this Chapter 11 case:  the 32 acres of raw unentitled land and adjacent entry parcels commonly known as 2929 Amethyst St., Los Angeles, CA, and development of a housing project, for which reorganization of Debtor ultimately depends.  Those same 3 written contracts between Debtor and Creditor BLI for the same housing development on the real property owned by Debtor upon which Debtor's reorganization depends, are the exact same 3 contracts and services related to the same housing project upon which Creditor BLI based its Proof of Claim filed in this Chapter 11 on February 3, 2022 (Claim No. 18 of Creditor BLI), (the "Proof of Claim").

---

[1]  The April 12, 2022 Notice of Removal inadvertently included an incorrect case number for the State Court Action as 22STCV02643, hereby correct to 22STCV04623.

On February 19, 2022, Debtor filed a Motion to Disallow Creditor BLI's Proof of Claim, which was heard in the Bankruptcy Court on March 30, 2022.  On March 30, 2022, the Bankruptcy Court issued an Order (Docket No. 174) in the Debtor's Chapter 11 case setting a trial date of October 24, 2022 in the Bankruptcy Court.  That trial will receive evidence and shall enter a judgment on all issues relating to Creditor BLI's Proof of Claim and the value of BLI's services under the contracts and for the housing project, which are identical facts and evidence which are the alleged grounds and basis of Debtor-Plaintiff's State Court Action against Creditor BLI and its individual principals.  The State Court Action and the October 24, 2022 Bankruptcy Court trial in the Chapter 11 case, will adjudicate and determine Creditor BLI's performance and right to payment for services performed under those written contracts for Debtor, the value of Creditor BLI's Proof of Claim for unpaid pre-petition services and the directly related damage claims under the State Court Action, all of which are based upon the same three (3) written contracts for the same real property asset of Debtor, the same evidence, the same witnesses and clearly upon the same allegations of fact.  The State Court Action is the same action as the trial set in the Chapter 11 case on Creditor BLI's Proof of Claim.  Debtor must not fragment the litigation between the Los Angeles Superior Court and the Bankruptcy Court, or attempt to seek different, inconsistent or more favorable results on the same facts as pending in the trial on Creditor BLI's Proof of Claim, or to use the State Court Action to delay the expedited proceedings in the Chapter 11 case or the due dates for Debtor's plan of reorganization or any alternative liquidation of assets.

The Bankruptcy Court has jurisdiction over the claims in the State Court Action, under 28 USC §157 as a core proceeding in the Chapter 11 case, which is already scheduled for trial on October 24, 2022 in the Bankruptcy Court.  The allowance or disallowance of Creditor BLI's Proof of Claim involves determination of the identical facts and evidence as required for the State Court Action.  Any judgment in the State Court Action would impact the claim and affect liquidation of the assets of the estate or adjustment of the Debtor/Creditor relationship between Debtor and Creditor BLI.  Resolution of the State Court Action will significantly affect the administration of the estate, which is evident as it is relied upon as grounds under the Second Motion of Debtor for Order Extending Debtor's Exclusivity Period to file Chapter 11 Plan and Solicit Acceptances Thereto (Docket No. 181) filed on April 7, 2022 and set for hearing on May 4, 2022 (Docket No. 183).  Debtor must not be permitted to seek to delay confirmation of a plan

of reorganization by demanding for the Bankruptcy Court to wait until the State Court Action is adjudicated in the Los Angeles Superior Court, based upon the same set of facts, same evidence and the same three (3) written contracts which form the basis of Creditor BLI's Proof of Claim, pending in the adversary proceedings which are set for evidentiary trial in the Chapter 11 case before the Bankruptcy Court on October 24, 2022.

The State Court Action will involve attempts by Debtor to obtain property of the estate. All such proceedings are core proceedings, under 28 USC §157(b)(2)(A), (E) and (O), among others. Should "any claim or cause of action" asserted in the Civil Action be determined to be non-core, Creditor BLI consents to the entry of final orders or judgment by the Bankruptcy Judge. The individual principals of Creditor BLI sued without adequate allegations of individual liability, named as DAVID PARK and JONATHAN PAE, consents to the jurisdiction of this Court, and to the entry of final orders or judgment by the Bankruptcy Judge. Creditor BLI is informed and believes that the remaining Defendants in the State Court Action also consent to removal to the Bankruptcy Court in the Chapter 11 case.

Each and every cause of action in the State Court Action is directly related to this Chapter 11 case, for which all evidence and findings are directly and inextricably related. The State Court Action will require determination of the same issues, evidence and findings required in the October 24, 2022 trial set for Creditor BLI's Proof of Claim (Docket No. 174). Removal of each claim and cause of action of the State Court Action to the Chapter 11 case pending in the Bankruptcy Court is authorized by 28 USC §§1452, 1334 and 157, and the General Order of the District Court of California referring bankruptcy matters to the United States Bankruptcy Court. Removal is in accordance with Rule 9027 of the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rule 9027-1. No responsive pleading is due or has been filed in the State Court Action. Within 30 days of the filing of this Notice, a copy of all process and pleadings in the State Court Action shall be filed with the Bankruptcy Court in accordance with Rule 9027(a)(1 of the Federal Rules of Bankruptcy Procedure, and Local Bankruptcy Rule 9027-1. The term "pleadings" is defined by Rule 7 of the Federal Rules of Civil Procedure, which is incorporated by Rule 7007 of the Federal Rules of Bankruptcy Procedure. Copies of the pleadings will be timely filed, and if additional documents are required Creditor BLI will submit these documents.

NOW THEREFORE, ALL PARTIES TO THE STATE COURT ACTION PENDING IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF LOS ANGELES, STANLEY MOSK COURTHOUSE CASE NO. 22STCV04623 ARE HEREBY NOTIFIED, Pursuant to Rule 9027(e) of the Federal Rules of Bankruptcy Procedure, as follows:

Removal of the State Court Action and all claims and causes of action therein is effectuated upon the filing of a copy of this notice with the Clerk of the Superior Court of the County of Los Angeles pursuant to Rule 9027(c) of the Federal Rules of Bankruptcy Procedure. The State Court Action, is removed from the Superior Court to the Bankruptcy Court presiding over the Chapter 11 case.  The parties to the State Court Action shall proceed no further in the Superior Court unless and until the action is remanded by the Bankruptcy Court.

Respectfully Submitted,

Dated:  April 14, 2022          _/s/ Peter A. Kim_____
                                Peter A. Kim, Attorney for Defendants
                                BETULA LENTA, INC., DAVID PARK and
                                JONATHAN  PAE

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:  3450 WILSHIRE BLVD., STE. 1200, LOS ANGELES, CA 90010

A true and correct copy of the foregoing document entitled (*specify*): Corrected NOTICE OF REMOVAL OF STATE COURT ACTION;  NOTICE OF STATUS CONFERENCE RE: REMOVAL OF ACTION
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 4/14/2022, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Michael F Chekian       mike@cheklaw.com, chekianmr84018@notify.bestcase.com
Susan Titus Collins      scollins@counsel.lacounty.gov
Jeffrey W Dulberg      jdulberg@pszjlaw.com
Richard Girgado      rgirgado@counsel.lacounty.gov
M. Jonathan Hayes      jhayes@rhmfirm.com,
roksana@rhmfirm.com;matt@rhmfirm.com;rosario@rhmfirm.com;pardis@rhmfirm.com;russ@rhmf
irm.com;david@rhmfirm.com;sloan@rhmfirm.com;boshra@rhmfirm.com;rosario@rhmfirm.com Christopher J
Christopher Langley      chris@slclawoffice.com, omar@slclawoffice.com
Benjamin R Levinson      ben@benlevinsonlaw.com, courtney@benlevinsonlaw.com
Eric A Mitnick   MitnickLaw@aol.com, mitnicklaw@gmail.com
Giovanni Orantes      go@gobklaw.com, gorantes@orantes-
law.com,cmh@gobklaw.com,gobklaw@gmail.com
Matthew D. Resnik      matt@rhmfirm.com,
Allan D Sarver      ADS@asarverlaw.com
David Samuel Shevitz      david@shevitzlawfirm.com,
shevitzlawfirm@ecf.courtdrive.com;r48785@notify.bestcase.com;Jose@shevitzlawfirm.com United States
Trustee (LA)      ustpregion16.la.ecf@usdoj.gov
Hatty K Yip      hatty.yip@usdoj.gov, hatty.k.yip@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) 4/12/2022, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Honorable Ernest M. Robles
Edward R. Roybal Federal Building & Courtho4/use
255 E. Temple St, Suite 1560/Courtroom 1568
Los Angeles, CA 90012

☐ Service information continued on attached page

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                              **F 9013-3.1.PROOF.SERVICE**

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 4/14/2022 | Peter Kim | /s/ Peter Kim |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

**160**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 1901 Avenue of the Stars, Suite 450, Los Angeles, CA 90067-6006.

A true and correct copy of the foregoing document entitled (*specify*):  **DEBTOR'S NOTICE OF MOTION AND MOTION TO CONSOLIDATE ACTIONS; MEMORANDUM OF POINTS AND AUTHORITIES AND REQUEST FOR JUDICIAL NOTICE IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On  March 29, 2023  I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

&#8862; Service information continued on attached page.

**2.  SERVED BY UNITED STATES MAIL**:  On  March 29, 2023, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by causing to be placed a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

&#8862; Service information continued on attached page.

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| March 29, 2023 | Beverly Lew | */s/ Beverly Lew* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

ADDITIONAL SERVICE INFORMATION (if needed):

## 1.  SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")

David M Browne on behalf of Defendant CBW Global Inc.
dmbrownelaw@gmail.com, dmbeaster@aol.com

David M Browne on behalf of Defendant CBW Global, Inc.
dmbrownelaw@gmail.com, dmbeaster@aol.com

David M Browne on behalf of Defendant Betty Zheng
dmbrownelaw@gmail.com, dmbeaster@aol.com

David M Browne on behalf of Defendant Betty Bao Zheng
dmbrownelaw@gmail.com, dmbeaster@aol.com

Donna C Bullock on behalf of Interested Party Donna Bullock Carrera
donnabullockcarrera@yahoo.com, donna.bullock@ymail.com

Steven P Chang on behalf of Interested Party Courtesy NEF
heidi@spclawoffice.com,
schang@spclawoffice.com,assistant1@spclawoffice.com,attorney@spclawoffice.com;g9806@notify.cincompass.com;chang
sr75251@notify.bestcase.com

Michael F Chekian on behalf of Creditor The Phalanx Group
mike@cheklaw.com, chekianmr84018@notify.bestcase.com

Michael F Chekian on behalf of Interested Party Chekian Law Office, Inc.
mike@cheklaw.com, chekianmr84018@notify.bestcase.com

Heidi M Cheng on behalf of Plaintiff JINZHENG GROUP (USA) LLC
heidi@slclawoffice.com, assistant1@spclawoffice.com;schang@spclawoffice.com;chenghr75251@notify.bestcase.com

Susan Titus Collins on behalf of Interested Party INTERESTED PARTY
scollins@counsel.lacounty.gov

Nicholas S Couchot on behalf of Creditor Royal Business Bank
ncouchot@buchalter.com, docket@buchalter.com;marias@buchalter.com

Jeffrey W Dulberg on behalf of Creditor Committee OFFICIAL COMMITTEE OF UNSECURED CREDITORS
jdulberg@pszjlaw.com

Oscar Estrada on behalf of Creditor LOS ANGELES COUNTY TREASURER AND TAX COLLECTOR
oestrada@ttc.lacounty.gov

Danielle R Gabai on behalf of Debtor JINZHENG GROUP (USA) LLC
dgabai@danninggill.com, dgabai@ecf.courtdrive.com

Runmin Gao on behalf of Plaintiff JINZHENG GROUP (USA) LLC
ivy.gao@aalrr.com, alicia.mcmaster@aalrr.com

Runmin Gao on behalf of Plaintiff JINZHENG GROUP (USA) LLC
ivy.gao@aalrr.com, alicia.mcmaster@aalrr.com

Richard Girgado on behalf of Interested Party Courtesy NEF
rgirgado@counsel.lacounty.gov

Brian T Harvey on behalf of Interested Party Courtesy NEF
bharvey@buchalter.com, IFS_filing@buchalter.com;dbodkin@buchalter.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

_June 2012_                                                              **F 9013-3.1.PROOF.SERVICE**

M. Jonathan Hayes on behalf of Interested Party Courtesy NEF
jhayes@rhmfirm.com,
roksana@rhmfirm.com;matt@rhmfirm.com;rosario@rhmfirm.com;sloan@rhmfirm.com;priscilla@rhmfirm.com;rebeca@rhmfir
m.com;david@rhmfirm.com;susie@rhmfirm.com;max@rhmfirm.com;russ@rhmfirm.com

Teddy M Kapur on behalf of Creditor Committee OFFICIAL COMMITTEE OF UNSECURED CREDITORS
tkapur@pszjlaw.com, mdj@pszjlaw.com

Alphamorlai Lamine Kebeh on behalf of Debtor JINZHENG GROUP (USA) LLC
akebeh@danninggill.com

Alphamorlai Lamine Kebeh on behalf of Plaintiff JINZHENG GROUP (USA) LLC
akebeh@danninggill.com

Peter A Kim on behalf of Attorney LAW OFFICES OF PETER KIM
peter@pkimlaw.com, peterandrewkim@yahoo.com

Peter A Kim on behalf of Defendant Betula Lenta Inc
peter@pkimlaw.com, peterandrewkim@yahoo.com

Peter A Kim on behalf of Defendant David Park
peter@pkimlaw.com, peterandrewkim@yahoo.com

Peter A Kim on behalf of Defendant Jonathan Pae
peter@pkimlaw.com, peterandrewkim@yahoo.com

Christopher J Langley on behalf of Attorney Shioda Langley and Chang LLP
chris@slclawoffice.com, omar@slclawoffice.com;langleycr75251@notify.bestcase.com;ecf123@casedriver.com

Christopher J Langley on behalf of Plaintiff JINZHENG GROUP (USA) LLC
chris@slclawoffice.com, omar@slclawoffice.com;langleycr75251@notify.bestcase.com;ecf123@casedriver.com

Paul J Leeds on behalf of Creditor Sound Equity, Inc.
Pleeds@fsl.law, ssanchez@fsl.law

Benjamin R Levinson, ESQ on behalf of Creditor Michael E. Dorff and Shari L. Dorff
ben@benlevinsonlaw.com, courtney@benlevinsonlaw.com

Damian J. Martinez on behalf of Attorney ATKINSON ANDELSON LOYA RUUD & ROMO
damian.martinez@aalrr.com, julissa.ruiz@aalrr.com

Damian J. Martinez on behalf of Debtor JINZHENG GROUP (USA) LLC
damian.martinez@aalrr.com, julissa.ruiz@aalrr.com

Damian J. Martinez on behalf of Plaintiff JINZHENG GROUP (USA) LLC
damian.martinez@aalrr.com, julissa.ruiz@aalrr.com

Damian J. Martinez on behalf of Plaintiff JINZHENG GROUP (USA) LLC
damian.martinez@aalrr.com, julissa.ruiz@aalrr.com

Eric A Mitnick on behalf of Creditor Corona Capital Group LLC
MitnickLaw@gmail.com, mitnicklaw@gmail.com

Eric A Mitnick on behalf of Interested Party Courtesy NEF
MitnickLaw@gmail.com, mitnicklaw@gmail.com

Giovanni Orantes on behalf of Other Professional Orantes Law Firm, P.C.
go@gobklaw.com, gorantes@orantes-
law.com,cmh@gobklaw.com,gobklaw@gmail.com,go@ecf.inforuptcy.com;orantesgr89122@notify.bestcase.com

Donald W Reid on behalf of Interested Party INTERESTED PARTY
don@donreidlaw.com, ecf@donreidlaw.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

_June 2012_                                                                **F 9013-3.1.PROOF.SERVICE**

Matthew D. Resnik on behalf of Attorney Matthew Resnik
Matt@rhmfirm.com,
roksana@rhmfirm.com;rosario@rhmfirm.com;sloan@rhmfirm.com;priscilla@rhmfirm.com;rebeca@rhmfirm.com;david@rhmfirm.com;susie@rhmfirm.com;max@rhmfirm.com;russ@rhmfirm.com

Matthew D. Resnik on behalf of Creditor Royalty Equity Lending, LLC/Bobs LLC
Matt@rhmfirm.com,
roksana@rhmfirm.com;rosario@rhmfirm.com;sloan@rhmfirm.com;priscilla@rhmfirm.com;rebeca@rhmfirm.com;david@rhmfirm.com;susie@rhmfirm.com;max@rhmfirm.com;russ@rhmfirm.com

Matthew D. Resnik on behalf of Interested Party Courtesy NEF
Matt@rhmfirm.com,
roksana@rhmfirm.com;rosario@rhmfirm.com;sloan@rhmfirm.com;priscilla@rhmfirm.com;rebeca@rhmfirm.com;david@rhmfirm.com;susie@rhmfirm.com;max@rhmfirm.com;russ@rhmfirm.com

Peter J Ryan on behalf of Defendant Testa Capital Group    ryan@floresryan.com, schneider@floresryan.com

Peter J Ryan on behalf of Defendant Thomas L. Testa    ryan@floresryan.com, schneider@floresryan.com

Allan D Sarver on behalf of Creditor Investment Management Company LLC    ADS@asarverlaw.com

Allan D Sarver on behalf of Interested Party Courtesy NEF    ADS@asarverlaw.com

Zev Shechtman on behalf of Attorney DANNING, GILL, ISRAEL & KRASNOFF, LLP
zs@DanningGill.com, danninggill@gmail.com;zshechtman@ecf.inforuptcy.com

Zev Shechtman on behalf of Debtor JINZHENG GROUP (USA) LLC
zs@DanningGill.com, danninggill@gmail.com;zshechtman@ecf.inforuptcy.com

Zev Shechtman on behalf of Interested Party INTERESTED PARTY
zs@DanningGill.com, danninggill@gmail.com;zshechtman@ecf.inforuptcy.com

Zev Shechtman on behalf of Plaintiff JINZHENG GROUP (USA) LLC
zs@DanningGill.com, danninggill@gmail.com;zshechtman@ecf.inforuptcy.com

David Samuel Shevitz on behalf of Interested Party INTERESTED PARTY
david@shevitzlawfirm.com, shevitzlawfirm@ecf.courtdrive.com;r48785@notify.bestcase.com;Jose@shevitzlawfirm.com

John N Tedford, IV on behalf of Interested Party INTERESTED PARTY
jtedford@DanningGill.com, danninggill@gmail.com;jtedford@ecf.courtdrive.com

United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov

Hatty K Yip on behalf of U.S. Trustee United States Trustee (LA)    hatty.yip@usdoj.gov, hatty.k.yip@usdoj.gov

## 2. **SERVED BY U.S. MAIL**

JINZHENG GROUP (USA) LLC
1414 S Azusa Ave, Suite B-22
West Covina, CA 91791

Hon. Ernest M. Robles
U. S. Bankruptcy Court
255 E. Temple Street, Suite 1560
Los Angeles, CA  90012

Betula Lenta, Inc.
800 W. Sixth Street, Suite 1250
Los Angeles, CA  90017

David Park
800 W. Sixth Street, Suite 1250
Los Angeles, CA  90017

Jonathan Pae
800 W. Sixth Street, Suite 1250
Los Angeles, CA  90017

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*    **F 9013-3.1.PROOF.SERVICE**